UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

NINA BOLOGNA, individually and as the parent of minor children,

Plaintiff,

v.

1:26-CV-0703 (ECC/ML)

DETECTIVE NEHILL DANBURY, individually and in his official capacity; and WATERVLIET POLICE DEP'T,

Defendants.

---

APPEARANCES: OF COUNSEL:

NINA BOLOGNA
Plaintiff, *Pro Se*
2410 Third Avenue
Watervliet, New York 12189

MIROSLAV LOVRIC, United States Magistrate Judge

# **ORDER and REPORT-RECOMMENDATION**

Plaintiff Nina Bologna ("Plaintiff") commenced this *pro se* civil rights action against Defendants Detective Nehill Danbury and Watervliet Police Department (collectively "Defendants") by filing a complaint together with an application to proceed *in forma pauperis* ("IFP"). (Dkt. Nos. 1, 2.) In addition, Plaintiff filed a supplemental complaint. (Dkt. No. 5.) For the reasons set forth below, I grant Plaintiff's IFP application and recommend that the Complaint and supplemental complaint be accepted in part for filing and dismissed in part.

## I. BACKGROUND

Construed as liberally[1] as possible, the Complaint alleges violations of Plaintiff's rights by Defendants. (*See generally* Dkt. No. 1.)

More specifically, the Complaint alleges that on June 23, 2024, Defendant Danbury "and members of the Watervliet Police Department arrived at Plaintiff's residence regarding allegations of sexual abuse." (Dkt. No. 1 at ¶ 7.) Plaintiff alleges that she was detained by police, transported to the police station for questioning, and was not free to leave. (*Id*. at ¶ 9.) The Complaint alleges that while Plaintiff was detained, she repeatedly requested to contact an attorney but was denied the opportunity to do so. (*Id*. at ¶ 10.)

Plaintiff alleges that her phone was seized and officers informed her that they did not have a warrant but would keep the phone until they obtained one. (*Id*. at ¶ 11.) Plaintiff alleges that she asked but was not informed of the allegations against her and was prevented from contacting or checking on her minor child. (*Id*. at ¶¶ 13-14.)

Plaintiff alleges that she requested that her child be taken for a medical examination related to the allegations, but Defendants refused to do so and the allegations against Plaintiff were ultimately unfounded. (Dkt. No. 1 at ¶¶ 17-18.)

Based on these factual allegations, the Complaint asserts the following causes of action: (1) a claim of unlawful seizure related to Plaintiff's cell phone pursuant to the Fourth Amendment and 42 U.S.C. § 1983; (2) a claim of false arrest pursuant to the Fourth Amendment and 42 U.S.C. § 1983; (3) a claim that Plaintiff's right to counsel was violated pursuant to the Fifth and Sixth Amendments and 42 U.S.C. § 1983; (4) a claim that Plaintiff's right to family

---

[1] The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

integrity was violated pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983; and (5) a *Monell* claim against Defendant Watervliet Police Department. (Dkt. No. 1 at 2-3.) As relief, Plaintiff seeks compensatory and punitive damages. (Dkt. No. 1 at 3.)

In her supplemental complaint,[2] Plaintiff alleges that she was denied the right to speak with legal counsel, Defendants failed to administer warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), Defendants searched Plaintiff's residence without a valid search warrant, and Defendants seized Plaintiff's cell phone without a valid warrant at the time of the seizure. (Dkt. No. 5 at 1-2.) Plaintiff alleges that Defendants initiated actions against her based on unverified, inconsistent, and unreliable statements, which violated her due process rights. (*Id*. at 2.) Plaintiff alleges that she was separated from her child without sufficient legal justification or due process. (*Id*.) Plaintiff alleges that the constitutional violations were carried out pursuant to policies, customs, or practices of municipal Defendants including the failure to train, failure to ensure proper warrant procedures, failure to safeguard the right to counsel and against self-incrimination, and a pattern of relying on unverified reports without an adequate investigation. (Dkt. No. 5 at 2.) Plaintiff alleges that Defendants were deliberately indifferent to serious medical needs because she is prescribed seizure medication and "Wendell is insulin-dependent"[3]

---

[2] Fed. R. Civ. P. 15(d) provides that the court may permit a party to supplement his/her pleading "[o]n motion and reasonable notice," which sets "out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Plaintiff was not granted leave to supplement her complaint and the transactions, occurrences, and events set forth in her supplemental complaint pre-date the filing of her original Complaint. (*Compare* Dkt. No. 1, *with* Dkt. No. 5.) Notwithstanding, in light of the liberality afforded to *pro se* litigants, the undersigned considered the allegations contained in the Complaint and the supplemental complaint.

[3] Plaintiff does not specify who "Wendell" is, but the undersigned presumes Wendell is Plaintiff's fiancé. The Complaint alleges that Plaintiff "and her fiancé were detained by police and transported to the police station for questioning." (Dkt. No. 1 at ¶ 9.) The Supplemental Complaint alleges that "Defendants failed and refused to permit access to such critical care [access to seizure medication and insulin] while they were in police custody." (Dkt. No. 5 at 3.)

but while in custody, Defendants "refused to permit access to" those medications, which exposed them to foreseeable risks of harm. (*Id*. at 2-3.) Plaintiff alleges that she submitted a New York Freedom of Information Law ("FOIL") request seeking records relevant to this case but her request was improperly denied without invocation of a lawful exemption, which violated Plaintiff's rights to due process and access to the courts. (Dkt. No. 5 at 3.) Further, Plaintiff alleges that Defendants failed to take reasonable and necessary investigative steps because they did not obtain a forensic medical examination and instead relied on unverified, inconsistent, and uncorroborated statements. (*Id*. at 3-4.) Plaintiff alleges that Defendants affirmatively created and enhanced a dangerous condition that deprived her minor child of substantive due process rights pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983 by conducting a search of Plaintiff's residence while knowing that the minor child would return home, which left him alone, unsupervised, frightened, and emotionally distressed. (*Id*. at 4.) Finally, Plaintiff alleges that "Municipal Defendant maintained unconstitutional policies, customs, and practices" that caused the constitutional violations. (*Id*. at 5-6.)

Plaintiff seeks leave to proceed IFP. (Dkt. No. 2.)

## II. PLAINTIFF'S APPLICATION TO PROCEED *IN FORMA PAUPERIS*

When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $405, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized,

---

To the extent that Plaintiff attempts to assert any claims on behalf of Wendell or any other individual, the law is clear that a person who is not an attorney may only represent herself in a *pro se* action. 28 U.S.C. § 1654 ("In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein."); *see United States ex rel. v. Mergent Servs. v. Flaherty,* 540 F.3d 89, 92 (2d Cir. 2008) ("Because [§1654] permits parties only to 'plead and conduct their *own* cases personally,' we have held that 'an individual who is not licensed as an attorney may not appear on another person's behalf in the other's cause.' That is, in order to proceed pro se, '[a] person must be litigating an interest personal to him.'").

however, to permit a litigant to proceed IFP status if a party "is unable to pay" the standard fee for commencing an action. 28 U.S.C. § 1915(a)(1).[4] After reviewing Plaintiff's IFP application (Dkt. No. 2), the Court finds that Plaintiff meets this standard.[5] Therefore, Plaintiff's application to proceed IFP is granted.[6]

## III. LEGAL STANDARD FOR REVIEW OF THE COMPLAINT

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2).

In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 [2007]). "Determining whether a

---

[4] The language of that section is ambiguous because it suggests an intent to limit availability of IFP status to prison inmates. *See* 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses"). The courts have construed that section, however, as making IFP status available to any litigant who can meet the governing financial criteria. *Hayes v. United States*, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

[5] Plaintiff is reminded that proceeding IFP is always a privilege, not an unqualified right. Misuse of the IFP process by a litigant, such as repetitive filing of frivolous lawsuits, may result in the denial of a request to proceed IFP.

[6] Plaintiff is reminded that, although her IFP application has been granted, she is still required to pay fees that she may incur in this action, including copying and/or witness fees.

complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

"In reviewing a complaint . . . the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Courts are "obligated to construe a pro se complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009); *see also Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam) (reading the plaintiff's *pro se* complaint "broadly, as we must" and holding that the complaint sufficiently raised a cognizable claim). "[E]xtreme caution should be exercised in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and [the] parties . . . have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).

## IV. ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe her pleadings liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Having reviewed Plaintiff's Complaint and supplement with this principle in mind, I recommend that it be accepted in part for filing and dismissed in part.

### A. Claims Against Defendant Watervliet Police Department

"Although a municipality is subject to suit pursuant to section 1983, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), a municipal . . . department does not have the capacity to be sued as an entity separate from the municipality in which it is located." *White v. Syracuse Police Dep't*, 18-CV-1471, 2019 WL 981850 at *3 (N.D.N.Y. Jan. 7, 2019) (Peebles, M.J.) (citing *Krug v. Cnty. of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008); *Turczyn ex rel. McGregor v. City of Utica*, 13-CV-1357, 2014 WL 6685476, at *2 (N.D.N.Y. Nov. 26, 2014) (Sharpe, C.J.); *Hoisington v. Cnty. of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999) ("Under New York law, a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence. Therefore, municipal departments like the Department of Social Services are not amenable to suit and no claims lie directly against the Department.")), *rep't and rec. adopted*, 2019 WL 974824 (N.D.N.Y. Feb. 28, 2019) (Suddaby, C.J.). Hence, Defendant Watervliet Police Department is not proper party amenable to suit. As a result, I recommend that Plaintiff's claims against Defendant Watervliet Police Department be dismissed.

Moreover, even construing the Complaint and supplemental complaint as liberally asserting claims against the City of Watervliet, I recommend that they be dismissed for failure to state a claim upon which relief may be granted.

It is well settled that "a municipality cannot be made liable [under § 1983] by application of the doctrine of respondeat superior." *Lucente v. Cty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (quotations omitted). Rather, "[i]n order to hold the [municipality] liable under § 1983, plaintiff must put forth sufficient evidence to show that individual defendants' unconstitutional actions were taken pursuant to an official municipal policy, custom, or practice." *Thornton v. Cty. of Albany*, 14-CV-0679, 2016 WL 5793714, *7 (N.D.N.Y. Oct. 4, 2016) (Hurd, J.) (citing *Monell v. Dept. of Soc. Servs. Of City of New York*, 436 U.S. 658, 690-91 (1978)).

The existence of a municipal policy or custom may be pled in any of four ways: "(1) a policy formally adopted and endorsed by the municipality; (2) actions taken by policymaking officials that caused the particular deprivation alleged; (3) practices by subordinate officials that are not expressly authorized but are so widespread and consistent that policymakers must have been aware of them; or (4) a failure by policymakers to train or supervise that amounts to deliberate indifference to the rights of those who come into contact with the inadequately trained or supervised municipal employees." *Crawley v. City of Syracuse*, 496 F. Supp. 3d 718, 729 (N.D.N.Y. 2020) (Hurd, J.) (internal quotation marks omitted) (citing *Deferio v. City of Syracuse*, 770 F. App'x 587, 589 (2d Cir. 2019) (summary order)). "Once a plaintiff has demonstrated the existence of a municipal policy, a plaintiff must then establish a causal connection, or an 'affirmative link,' between the policy and the deprivation of his constitutional rights." *Deferio*, 770 F. App'x at 590 (2d Cir. 2019) (citing *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985)). "Boilerplate statements" that municipal employees were acting in accord with a municipal policy, with no facts to support those statements, are not sufficient to support a *Monell* claim. *See Brown v. Oneida Cnty.*, 15-CV-0849, 2016 WL 4275727, at *4 (N.D.N.Y. Aug. 12, 2016) (Kahn, J.).

Plaintiff's allegations, even liberally construed, do not plausibly allege a *Monell* claim under any of the available theories of liability. The closest that Plaintiff appears to come to alleging a *Monell* claim relates to her allegation that on four occasions she was "subjected to similar [sexual assault] allegations, all of which were ultimately determined to be unfounded." (Dkt. No. 1 at ¶ 8.) Notwithstanding, nowhere in the Complaint or supplemental complaint does Plaintiff allege a formal policy or custom related to her claims. (*See generally* Dkt. Nos. 1, 5.) Moreover, the Complaint and supplemental complaint do not allege that Defendant Danbury was a policy-making official. (*Id.*)

The Complaint and supplemental complaint also fail to plead *Monell* liability based on informal policies. "To show a policy or custom through a 'widespread practice,' a plaintiff must attribute a subordinate's conduct to the actions or omissions of higher-ranking officials with policymaking authority." *Miller v. Cnty. of Monroe*, 23-CV-6649, 2024 WL 2804435, at *4 (W.D.N.Y. May 31, 2024) (citing *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004)). To do so, a plaintiff may show that (i) a "policymaker ordered or ratified the subordinate['s] actions, or (ii) "the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Amnesty America*, 361 F.3d at 126. A plaintiff may also plead the existence of de facto customs or policies "by citing [ ] complaints in other cases that contain similar allegations." *Gaston v. Ruiz*, 17-CV-1252, 2018 WL 3336448, at *6 (E.D.N.Y. July 6, 2018). "Such complaints should involve factually similar misconduct, be contemporaneous to the misconduct at issue in the plaintiff's case, and result in an adjudication of liability." *Miller*, 2024 WL 2804435, at *4 (citing *Isaac v. City of New York*, 16-CV-4729, 2018 WL 5020173, at *17 (E.D.N.Y. Aug. 6, 2018) (finding that other court cases could not establish a de facto policy or custom because they

involved dissimilar misconduct, were resolved by settlement, or the city prevailed); *Calderon v. City of New York*, 138 F. Supp. 3d 593, 613 (S.D.N.Y. 2015) ("None of the [16] lawsuits cited resulted in an adjudication or admission of liability and the number of suits does not suggest a pervasive illegal practice."); and *Buari v. City of New York*, 530 F. Supp. 3d 356, 404 (S.D.N.Y. 2021)).

Here, even under the most liberal pleading standards Plaintiff has not alleged conduct by any policymaker that can be attributed to the alleged violation of her constitutional rights. Likewise, Plaintiff does not point to any similar instances of constitutional violations experienced by others. *See Kiss v. Torres*, 21-CV-10391, 2024 WL 1210941, at *23 (S.D.N.Y. Mar. 19, 2024) (dismissing a *Monell* claim where "[p]laintiff only points to the alleged constitutional deprivations that he suffered . . . , and he entirely fails to identify any other incidents that would indicate a pattern or practice"); *Aragon v. New York*, 14-CV-9797, 2017 WL 2703562, at *6 (S.D.N.Y. June 22, 2017) (dismissing claims where "[the] [p]laintiff seems to allege the existence of a practice adopted by the [County] solely based on [the] [p]laintiff's alleged experience"); *Gordon v. City of New York*, 10-CV-5148, 2012 WL 1068023, at *4 (E.D.N.Y. Mar. 29, 2012) (dismissing *Monell* claim where the plaintiff's "allegation [was] unsupported by anything other than the facts of what occurred in his particular case" (citations omitted)). Indeed, even looking at Plaintiff's own alleged circumstances in a vacuum, she only tethers her experience here to the fact that she was previously "subjected to similar allegations" but does not allege any constitutional violations related to those prior allegations.

Further, Plaintiff has failed to allege a *Monell* claim premised on a failure to train or supervise. A failure to train constitutes a policy or custom that is actionable under § 1983 where "in light of the duties assigned to specific officers or employees[,] the need for more or different

training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989). The Second Circuit has held that a finding of deliberate indifference requires: (1) "that a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "that the wrong choice by the . . . employee will frequently cause the deprivation of a citizen's constitutional rights." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (alteration in original) (quoting *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992)). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

Similarly, "[t]o establish *Monell* liability premised on a failure to supervise, a plaintiff must plead that (1) there was a pattern of allegations of or complaints about, or a pattern of actual, similar unconstitutional activity, and (2) the municipality consistently failed to investigate those allegations." *Lopes v. Westchester County*, 18-CV-8205, 2020 WL 1445729, at *5 (S.D.N.Y. Mar. 25, 2020). Alternatively, "a plaintiff may plead (1) that there was a pattern of actual similar constitutional violations and (2) the municipality consistently failed to discipline those involved." *Tieman v. City of Newburgh*, 13-CV-4178, 2015 WL 1379652, at *21 (S.D.N.Y. Mar. 26, 2015) (emphasis omitted). To establish deliberate indifference for a failure to supervise and/or discipline claim, the plaintiff must show that "the need for more or better supervision to protect against constitutional violations was obvious," which may be established "through proof of repeated complaints of civil rights violations . . . if the complaints are followed

by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Buari*, 530 F. Supp. 3d at 400 (quoting *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)).

Here, Plaintiff has not alleged, or even implied, a specific training deficiency contributing to the underlying alleged constitutional violations. *See Taranto v. Putnam County*, 21-CV-2455, 2023 WL 6318280, at *19 (S.D.N.Y. Sept. 28, 2023) (dismissing the plaintiff's *Monell* claim because, insofar as it sounded in a failure-to-train theory, "they ha[d] not alleged a specific training deficiency"); *see also Tieman*, 2015 WL 1379652, at *22 ("[A] plaintiff must plausibly allege a specific deficiency in the municipality's training." (emphasis added)). With respect to failure to supervise, Plaintiff has not alleged that there was a "pattern of allegations of or complaints about, or a pattern of actual, similar unconstitutional activity." *Lopes*, 2020 WL 1445729, at *5; *see also Tieman*, 2015 WL 1379652, at *21 (same).

As a result, I recommend that to the extent the Complaint and supplemental complaint are construed as asserting claims against the City of Watervliet, they be dismissed for failure to state a claim upon which relief may be granted.

In addition, to the extent that the Complaint and supplemental complaint assert claims against Defendant Danbury in his official capacity, I recommend that those claims be dismissed for failure to state a claim upon which relief may be granted. *See Malay v. City of Syracuse*, 638 F. Supp. 2d 303, 311 (N.D.N.Y. 2009) (McCurn, J.) (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991)) (holding that "claims against a government employee in his official capacity are treated as a claim against the municipality.").

### B. Fourth Amendment Claims

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. By virtue of its incorporation through the Fourteenth Amendment's Due Process Clause, the Fourth Amendment is binding on state and municipal officers such as Defendant Danbury. *See Tsinberg v. City of New York*, 20-CV-0749, 2021 WL 1146942, at *10 (S.D.N.Y. Mar. 25, 2021) (citing *City of Ontario v. Quon*, 560 U.S. 746, 750 (2010)).

#### 1. Unlawful Seizure of Cell Phone

Personal property is seized "when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). "Interference can occur even when the government does not ultimately come to possess the property." *Bonner v. Town of Brookhaven*, 22-CV-4690, 2023 WL 6812276, at *4 (E.D.N.Y. Oct. 16, 2023). It is an unconstitutional seizure of personal property when a government actor meaningfully interferes with an individual's possessory interest in the property not authorized by a warrant or an exception to the warrant requirement. *Bonner*, 2023 WL 6812276, at *4 (citing *Jacobsen*, 466 U.S. at 109.

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's Fourth Amendment unlawful seizure claim against Defendant Danbury in his individual capacity for the taking of Plaintiff's cell phone.

**2. Unlawful Search and Seizure of Residence**

"[T]he Fourth Amendment requires that a state actor obtain a warrant, based on probable cause, before entering a residence and conducting a search." *Stumpf v. Maywalt*, 605 F. Supp. 3d 511, 519 (W.D.N.Y. 2022). "Warrantless searches inside a home are presumptively unreasonable. However, police officers may enter a dwelling without a warrant to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of that assistance." *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998) (citations, quotations, and alteration omitted).

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's Fourth Amendment unlawful search and seizure claim against Defendant Danbury in his individual capacity regarding the search of Plaintiff's residence.

**3. False Arrest**

A claim for false arrest "rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citing *Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995)); *see also*, *e.g.*, *Kirby v. Abraham*, 24-CV-0522, 2024 WL 4906112, at *4 (N.D.N.Y. Oct. 25, 2024) (Dancks, M.J.), *report and recommendation adopted*, 2024 WL 4905131 (N.D.N.Y. Nov. 27, 2024) (Sannes, C.J.). "A section 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law." *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (citing *Weyant*, 101 F.3d at 852). Accordingly, to state a claim for false arrest, "a plaintiff must

show that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003) (citing *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)). "An arrest is privileged if it is based on probable cause." *Kirby*, 2024 WL 4906112, at *5 (citing *Jenkins*, 478 F.3d at 84).

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's Fourth Amendment false arrest claim against Defendant Danbury in his individual capacity.

**C. Fifth Amendment Claim**

The Fifth Amendment due process clause applies only to the federal government, and not to state or municipal governments. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without due process of law."). That is, "[t]he Fifth Amendment regulates due process violations by federal, not state or municipal, actors." *Pollok v. Chen*, 806 F. App'x 40, 44 (2d Cir. 2020) (internal quotation marks omitted). "Therefore, the [Complaint]'s 'citation to the Fifth amendment is inapposite' because Defendants are 'not federal[] actors.'" *Adeleke v. Suffolk Cnty. Police Dep't*, 21-CV-3681, 2023 WL 11844273, at *8 (E.D.N.Y. Feb. 8, 2023) (quoting *Bussey v. Phillips*, 419 F. Supp. 2d 569, 586 (S.D.N.Y. 2006)).

Here, the Complaint and supplemental complaint do not allege that any federal official violated Plaintiff's Fifth Amendment due process rights. As a result, I recommend that to the

extent Plaintiff asserts a Fifth Amendment due process claim, it be dismissed with prejudice. *See, e.g., Robinson v. Wright,* 21-CV-1098, 2022 WL 2663369, at *3 (N.D.N.Y. Jul. 11, 2022) (Lovric, M.J.) (dismissing the plaintiff's Fifth Amendment claims because there were no allegations made against any federal official), *report and recommendation adopted by*, 2022 WL 4356214 (N.D.N.Y. Sept. 19, 2022) (McAvoy, J.).

A claim under the Fifth Amendment self-incrimination clause may exist if "coercion was applied to obtain . . . inculpatory statements" that "were used against the plaintiff in a criminal proceeding." *Ortiz v. Stambach*, 137 F.4th 48, 67 (2d Cir. 2025) (quoting *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998) ("While a defendant has a constitutional right not to have a coerced statement used against him, a defendant does not have a constitutional right to receive *Miranda* warnings.")).

To the extent that the Complaint and supplemental complaint are construed as alleging a Fifth Amendment self-incrimination claim, they fail to allege facts plausibly suggesting that coercion was applied to obtain inculpatory statements from Plaintiff and that those statements were used against her in a criminal proceeding. As a result, I recommend that any Fifth Amendment self-incrimination clause claim be dismissed for failure to state a claim upon which relief may be granted.

**D. Sixth Amendment Claim**

In general, "a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him." *Kirby v. Illinois*, 406 U.S. 682, 688 (1972); *see also Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 349 (2d Cir. 1998) (quoting *Kirby*, 406 U.S. 688). When "the underlying charges against [a plaintiff] were state charges, the Court looks to state law to determine when the adversarial

proceedings were initiated." *Nimkoff v. Dollhausen*, 751 F. Supp. 2d 455, 465 (E.D.N.Y. 2010) (citing *Deshawn E.*, 156 F.3d at 349). "[U]nder New York law, the filing of an accusatory instrument at an arraignment commences a criminal action." *Podlach v. Vill. of Southampton*, 14-CV-6954, 2017 WL 4350433, at *8 (E.D.N.Y. May, 11, 2017) (citing *Douglas v. People of the State of N.Y.*, 12-CV-3839, 2015 WL 9901710, at *8 (E.D.N.Y. Nov. 3, 2015), *report and recommendation adopted*, 2016 WL 270079 (E.D.N.Y. Jan. 21, 2016)). "In addition, the right to counsel attaches 'if substantial rights of the accused may be affected by a particular proceeding . . . .'" *Nimkoff*, 751 F. Supp. 2d at 465 (quoting *Meadows v. Kuhlmann*, 812 F.2d 72, 76 (2d Cir. 1987)).

The Complaint and supplemental complaint do not allege facts plausibly suggesting that an accusatory instrument had been filed before Plaintiff's interrogation on June 23, 2024, or that Plaintiff's rights were affected by a particular proceeding at that point in time. As a result, I recommend that Plaintiff's Sixth Amendment right to counsel claim against Defendant Danbury in his individual capacity be dismissed for failure to state a claim upon which relief may be granted.

Moreover, to the extent that Plaintiff attempts to assert a claim that her constitutional rights were violated by the failure to administer warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), I recommend that it be dismissed. *Vega v. Tekoh*, 597 U.S. 134, 141 (2022) (holding that a failure to administer *Miranda* warnings alone cannot serve as the basis for a § 1983 claim).

**E. Fourteenth Amendment Claims**

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." The Due Process

"clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989) (cleaned up).

**1. Inadequate Investigation**

Plaintiff appears to assert several claims that her constitutional rights were violated by an inadequate investigation.[7] (Dkt. No. 5 at 2-4.)

However, "there is no constitutional right to an adequate investigation, and therefore a claim for failure to investigate is not independently cognizable under Section 1983." *Buari v. City of New York*, 530 F. Supp. 3d 356, 391 (S.D.N.Y. 2021); *see also Harrington v. County of Suffolk*, 607 F.3d 31, 35 (2d Cir. 2010) (rejecting a due process claim alleging an inadequate investigation into a car accident because the plaintiffs did not have "'a legitimate claim of entitlement' to a police investigation, much less an investigation conforming with certain minimal standards"); *Stokes v. City of New York*, 05-CV-0007, 2007 WL 1300983, at *6 (E.D.N.Y. May 3, 2007) ("it is well-settled that there is no independent claim for a police officer's purported failure to investigate") (collecting cases).

---

[7] To the extent that Plaintiff attempts to assert claims on behalf of minor child or children, I recommend that those claims be dismissed. It is well established that a non-attorney parent cannot represent a minor child *pro se*. *See Iannaccone v. Law*, 142 F.3d 553, 558 (2d Cir. 1998) ("Because pro se means to appear for one's self, a person may not appear on another person's behalf in the other's cause."); *Wenger v. Canastota Central Sch. Dist.*, 146 F.3d 123, 125 (2d Cir. 1998) (per curiam) (minor children, "are entitled to trained legal assistance so their rights may be fully protected"); *Cheung v. Youth Orchestra Found.*, 906 F.2d 59, 61-62 (2d Cir. 1990) ("A non-attorney parent must be represented by counsel bringing an action on behalf of his or her child."); *Fauconier v. Committee on Special Education*, 02-CV-1050, 2003 WL 21345549, at *1 (S.D.N.Y. June 10, 2003) (a "court has an affirmative duty to enforce the rule that a non-attorney parent must be represented by counsel when bringing an action on behalf of his or her child") (citing *Cheung*, 906 F.2d at 61).

As a result, I recommend that any claim alleging an inadequate investigation be dismissed for failure to state a claim upon which relief may be granted.

**2. Deprivation of Familial Association**

It is well settled in the Second Circuit "that a parent's interest in the custody of a child is a constitutionally protected liberty interest subject to due process protection." *Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 103 (2d Cir. 1999) (quoting *Cecere v. City of New York*, 967 F.2d 826, 829 (2d Cir. 1992) (alteration omitted)). Parents' rights in this context are both substantive and procedural. *See Hagans v. Nassau Cnty. Dep't of Soc. Servs.*, 18-CV-1917, 2020 WL 1550577, at *5 (E.D.N.Y. Mar. 31, 2020); *see also Albright v. Oliver*, 510 U.S. 266, 272 (1994) (the Due Process Clause "confers both substantive and procedural rights").

Essentially, "a procedural due process claim challenges the procedure by which a removal is effected, [while] a substantive due process claim challenges the 'fact of [the] removal' itself." *Southerland v. City of New York*, 680 F.3d 127, 142 (2d Cir. 2012) (alteration in original) (quoting *Bruker v. City of New York*, 92 F. Supp. 2d 257, 266-67 (S.D.N.Y. 2000)). "As a general rule . . . before parents may be deprived of the care, custody or management of their children without their consent, due process—ordinarily a court proceeding resulting in an order permitting removal—must be accorded to them." *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999).

Substantive due process protects parents' right "to remain together [with their children] without the coercive interference of the awesome power of the state.'" *Southerland*, 680 F.3d at 142 (quoting *Tenenbaum*, 193 F.3d at 600). "But as sweeping as such language might sound, it is far from absolute." *Pynn v. Pynn*, 24-CV-0508, 2026 WL 2130622, at *12 (W.D.N.Y. July 24, 2026) (citing *Wilkinson*, 182 F.3d at 104 ("Although parents enjoy a constitutionally protected

interest in their family integrity, this interest is counterbalanced by the compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves.") (internal citation omitted)). Indeed, to constitute a substantive due process violation, "[t]he interference with the" parents' custody of the child "must be 'so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection.'" *Southerland*, 680 F.3d at 152 (quoting *Anthony v. City of New York*, 339 F.3d 129, 142-43 (2d Cir. 2003)). Stated another way, to state a viable substantive due process claim, "[i]t is not enough that the government act be incorrect or ill-advised; it must be conscience-shocking." *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 275 (2d Cir. 2011) (citation and internal quotation marks omitted). Indeed, "[o]nly the most egregious official conduct can be said to be arbitrary in th[is] constitutional sense and therefore unconstitutional." *Cox*, 654 F.3d at 275 (citation and internal quotation marks omitted).

Furthermore, "a claim under the Due Process Clause for infringement of the right to familial associations requires the allegation that state action was specifically intended to interfere with the family relationship." *Gorman v. Rensselaer County*, 910 F.3d 40, 48 (2d Cir. 2018). "Common negligence is categorically insufficient to shock the conscience, so [a] parent[ ] must raise an inference that [the defendants] acted maliciously before [an allegation] can even begin to support a violation of substantive due process." *Cox*, 654 F.3d at 276. Courts impose liability only for "'obvious extremes,' such as manufacturing evidence or ignoring exculpatory information." *E.D. ex rel. V.D. v. Tuffarelli*, 692 F. Supp. 2d 347, 359 (S.D.N.Y. 2010) (quoting *Wilkinson*, 182 F.3d at 104).

Plaintiff does not allege any specific process that she was denied. Hence, Plaintiff fails to state a procedural due process claim, and the undersigned construes her claim as a substantive due process claim. Plaintiff states that she was separated from her children without sufficient legal justification or due process. (Dkt. No. 5 at 2; *see* Dkt. No. 1 at 3 [alleging that "Defendants interfered with Plaintiff's fundamental right to the care, custody, and control of her children"].)

The Complaint and supplemental complaint fail to allege facts plausibly suggesting any action by Defendant Danbury that shocks the conscience. (*See generally* Dkt. Nos. 1, 5.) Instead, the pleadings appear to allege that Plaintiff's minor child was scheduled to arrive home from school during the time that she was in custody and a search of her residence was conducted. (Dkt. No. 5 at 4-5.) Plaintiff alleges that the minor child was frightened and emotionally distressed to find officers at the residence upon his arrival home. (*Id.*) At most, these allegations amount to negligence, but they do not approach the "obvious extremes" necessary to support a claim of substantive due process. As a result, I recommend that Plaintiff's substantive due process claim, asserting that she was deprived of the right to familial association, be dismissed for failure to state a claim upon which relief may be granted.

**3. Deliberate Indifference to Serious Medical Needs**

A plaintiff's deliberate indifference to serious medical needs claim arising from an arrest is evaluated under the Due Process Clause of the Fourteenth Amendment. *Durr v. Slator*, 558 F. Supp. 3d 1, 22 (N.D.N.Y. 2021) (D'Agostino, J.)

"To state a claim for deliberate indifference, a plaintiff must satisfy a two-pronged test." *Oteri v. Palmatier*, 23-CV-0986, 2024 WL 808774, at *5 (N.D.N.Y. Feb. 27, 2024) (Nardacci, J.). "First, the alleged deprivation of adequate medical care must be sufficiently serious." *Oteri*, 2024 WL 808774, at *5 (quoting *Lloyd v. City of New York*, 246 F. Supp. 3d 704, 717 (S.D.N.Y.

2017)) (cleaned up). "Second, the defendant must act with a 'sufficiently culpable state of mind.'" *Id*. (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)).

"The objective prong requires 'that the alleged deprivation of medical treatment is, in objective terms, sufficiently serious—that is, the prisoner must prove that his medical need was a condition of urgency, one that may produce death, degeneration, or extreme pain.'" *Durr*, 558 F. Supp. 3d at 22 (quoting *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (internal quotations omitted)).

To satisfy the second prong, a plaintiff must establish that the defendant either: "acted intentionally to impose the alleged condition[ ] or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee." *Darnell*, 849 F.3d at 35; *see also Charles v. Orange County*, 925 F.3d 73, 87 (2d Cir. 2019) (quoting *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996)) ("A plaintiff must show 'something more than mere negligence' to establish deliberate indifference in the Fourteenth Amendment context.").

The Complaint and supplemental complaint fail to allege facts plausibly suggesting that Plaintiff was deprived medical care. Plaintiff alleges that she is prescribed seizure medication and appears to suggest that she did not have access to her medication while detained and thus, Defendants were deliberately indifferent to her medical needs. (Dkt. No. 5 at 2-3.) The pleadings fail to allege facts plausibly suggesting that Defendants knew or should have known of Plaintiffs condition, that she missed any of her prescribed doses of medication, or that her detainment exposed her to any risk. (*See generally* Dkt. Nos. 1, 5.)

As a result, I recommend that Plaintiff's deliberate indifference to serious medical needs claim be dismissed for failure to state a claim upon which relief may be granted.

4. **State Created Danger**

"As a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). There are, however, "two narrow exceptions to this rule: the 'special relationship' exception and the 'state-created danger' exception." *Baker v. Peters*, 25-CV-2609, 2026 WL 74267, at *3 (S.D.N.Y. Jan. 9, 2026) (citing *Tufaro v. City of New York*, 12-CV-7505, 2014 WL 4290631, at *2-3 (S.D.N.Y. Aug. 28, 2014)).

The state-created danger exception applies where (1) a "governmental official takes an affirmative act that creates an opportunity for a third party to harm a victim (or increases the risk of such harm)," and (2) "the government action shocks the contemporary conscience." *Corr. Offs.' Benevolent Ass'n, Inc. v. City of New York*, 415 F. Supp. 3d 464, 469 (S.D.N.Y. 2019). It is "not enough to allege that a government actor failed to protect an individual from a known danger of bodily harm or failed to warn the individual of that danger." *Corr. Offs.' Benevolent Ass'n, Inc.*, 415 F. Supp. 3d at 469 (citing *Lombardi v. Whitman*, 485 F.3d 73, 79 (2d Cir. 2007)). Rather, the complaint must allege "affirmative, risk-creating acts that actually contributed to the vulnerability of the plaintiff." *Id.*

If the complaint shows an affirmative act, the Court must then evaluate whether "the defendant's conduct was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience to sustain a substantive due process claim." *Baker*, 2026 WL 74267, at *3. "Conscience-shocking conduct may be found where government actors engage in conduct posing serious danger that is arbitrary and unjustified by legitimate concerns, but the concept is very narrow and courts defer to local officials' balancing of competing public policy goals." *Corr. Offs.' Benevolent Ass'n, Inc.*, 415 F. Supp. 3d at 469.

The Complaint and supplemental complaint fail to allege facts plausibly suggesting that Defendants (1) took an affirmative act that created an opportunity for a third-party harm to a victim, or (2) the government action shocks the contemporary conscious. (*See generally* Dkt. Nos. 1, 5.) As a result, I recommend that Plaintiff's state-created danger claim be dismissed for failure to state a claim upon which relief may be granted.

**F. State Law Claims**

Plaintiff raises a "FOIL violation" claim pursuant to N.Y. Pub. Off. Law § 84 et seq. (Dkt. No. 5 at 3.) To the extent that Plaintiff attempts to assert this claim pursuant to 42 U.S.C. § 1983, I recommend that it be dismissed because "it is well settled that such a claim, standing alone, is insufficient to support a Section 1983 claim." *Jackson v. Wilcox*, 23-CV-0130, 2023 WL 2756489, at *3 (N.D.N.Y. Apr. 3, 2023) (Hummel, M.J.), *report and recommendation adopted*, 2023 WL 4230351 (N.D.N.Y. June 28, 2023) (D'Agostino, J.).

Further, this Court lacks jurisdiction to review the merits of a complaint that is based on the alleged denial of a FOIL request. *Jackson*, 2023 WL 2756489, at *4. Rather, "[t]he appropriate vehicle for challenging denials of access guaranteed by the New York Freedom of Information Law is a state court proceeding pursuant to N.Y. C.P.L.R. Article 78 upon exhaustion of administrative remedies." *Ramos v. Culick*, 16-CV-1312, 2017 WL 835406, at *4 (N.D.N.Y. Feb. 9, 2017) (Dancks, M.J.) (quoting *Schuloff v. Fields*, 950 F. Supp. 66, 67-68 (E.D.N.Y. 1997)), *report and recommendation adopted*, 2017 WL 823580 (N.D.N.Y. Mar. 2, 2017) (Scullin, J.); *see also Posr v. City of New York*, 10-CV-2551, 2013 WL 2419142, at *14 (S.D.N.Y. June 4, 2013) (finding that the court was "without jurisdiction to consider [p]laintiff's FOIL-related claims" because the proper remedy would be through "an administrative appeal or seek remedies in state court"), *aff'd sub nom., Posr v. Ueberbacher*, 569 F. App'x 32 (2d Cir.

2014) (summary order); *Abreu v. Bascue*, 18-CV-0186, 2018 WL 11466956, at *25 (N.D.N.Y. May 1, 2018) (D'Agostino, J.) ("[A] violation of New York State FOIL does not give rise to a federal claim under 42 U.S.C. § 1983. Rather, plaintiff's remedy for an alleged violation of FOIL is to follow procedures set forth in state laws or regulations.").

## V. OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[8]

---

[8] *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

Although this Court has serious doubts about whether Plaintiff can amend the pleadings to assert claims (1) against the City of Watervliet; and (2) asserting (a) a claim that her Fifth Amendment right against self-incrimination was violated, (b) a claim that her Sixth Amendment right to counsel was violated, (c) a claim that she was deprived of her Fourteenth Amendment right to familial association, (d) a claim that Defendants were deliberately indifferent to her serious medical condition in violation of the Fourteenth Amendment, and (e) a claim that her Due Process rights were violated by a state-created danger pursuant to the Fourteenth Amendment, given Plaintiff's *pro se* status, out of an abundance of caution, I recommend that Plaintiff be granted leave to amend her pleading with respect to these claims.

However, I reach a different conclusion with respect to Plaintiff's claims (1) against Defendant Watervliet Police Department, and (2) asserting (a) a Fifth Amendment due process claim, (b) that her rights were violated by the failure to administer *Miranda* warnings, (c) that her Fourteenth Amendment Due Process rights were violated by an inadequate investigation, and (d) that Defendants violated FOIL, because a better pleading could not cure the deficiencies identified with these claims.

If Plaintiff chooses to file an amended complaint, she should note that in any amended complaint, Plaintiff must clearly set forth facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Finally, Plaintiff is informed that any such amended complaint will replace the existing Complaint and supplemental complaint, and must be a wholly

integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").

PLAINTIFF IS ADVISED THAT SHE SHOULD NOT SEEK TO FILE A MOTION TO AMEND HER COMPLAINT UNTIL UNITED STATES DISTRICT JUDGE COOMBE RULES ON THIS COURT'S RECOMMENDATIONS WITH RESPECT TO PLAINTIFF'S COMPLAINT AND SUPPLEMENTAL COMPLAINT. ANY AMENDED COMPLAINT OR MOTION TO AMEND BEFORE JUDGE COOMBE'S DECISION WITH RESPECT TO THIS COURT'S RECOMMENDATIONS WILL BE STRICKEN AS PREMATURE AND WILL NOT BE CONSIDERED BY THE COURT. As noted below, however, Plaintiff may file objections to this Court's recommendations.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's application to proceed *in forma pauperis* (Dkt. No. 2), is **GRANTED**; and it is further respectfully

**RECOMMENDED** that Plaintiff's Complaint (Dkt. No. 1) and supplemental complaint (Dkt. No. 5) be **ACCEPTED** for filing to the extent that they assert (1) a claim of unlawful seizure related to Plaintiff's cell phone pursuant to the Fourth Amendment and 42 U.S.C. § 1983 against Defendant Danbury in his individual capacity, (2) a claim of unlawful search and seizure related to Plaintiff's residence pursuant to the Fourth Amendment and 42 U.S.C. § 1983 against Defendant Danbury in his individual capacity, and (3) a claim of false arrest pursuant to the Fourth Amendment and 42 U.S.C. § 1983 against Defendant Danbury in his individual capacity; **DISMISSED** with leave to amend to the extent that they assert (1) a claim that Plaintiff was

coerced into making incriminating statements pursuant to the Fifth Amendment and 42 U.S.C. § 1983, (2) a claim that Plaintiff's right to counsel was violated pursuant to the Sixth Amendment and 42 U.S.C. § 1983, (3) a claim that Plaintiff's right to familial association was violated pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983, (4) a claim of deliberate indifference to serious medical needs pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983, and (5) a claim of state-created danger pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983; and **DISMISSED** without leave to amend to the extent that they assert (1) claims against Defendant Watervliet Police Department, and (2) claims asserting (a) a Fifth Amendment due process claim, (b) claim regarding the failure to administer *Miranda* warnings, (c) an inadequate investigation claim pursuant to the Fourteenth Amendment, and (d) a FOIL violation;[9] and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this Order and Report-Recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[10]

---

[9] To the extent that the Complaint and supplemental complaint assert any claims on behalf of individuals other than Plaintiff, I recommend that those claims be dismissed as set forth *supra*, in notes 3, 7.

[10] The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[11] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

Dated: September 22, 2026
Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge

[11] If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

2018 WL 11466956
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Carlos ABREU, Plaintiff,
v.
C. BASCUE, et al., Defendants.

9:18-CV-0186 (MAD/ATB)
|
Filed May 1, 2018

**Attorneys and Law Firms**

CARLOS ABREU, 99-A-3027, Marcy Correctional Facility, P.O. Box 3600, Marcy, NY 13403.

**DECISION AND ORDER**

Mae A. D'Agostino, United States District Judge

**I. BACKGROUND**

***1** Pro se plaintiff Carlos Abreu commenced this action in the United States District Court for the Western District of New York ("Western District") on October 20, 2014, by filing a complaint and application to proceed in forma pauperis. Dkt. No. 1 ("Compl."); Dkt. No. 3 ("IFP Application"). On July 11, 2016, an amended complaint was filed in the Western District, Dkt. No. 50 ("Am. Compl."), and plaintiff paid the requisite filing fee. *See* Docket Sheet.

By Decision and Order filed January 22, 2018, United States District Judge Elizabeth A. Wolford of the Western District severed and transferred the portion of plaintiff's claims regarding events that occurred at Sullivan Correctional Facility to the Southern District of New York, and the portion of plaintiff's claims regarding events that occurred at Great Meadow Correctional Facility ("Great Meadow C.F."), as detailed in paragraphs 71 through 151 of the amended complaint, to the Northern District of New York. *See* Dkt. No. 56 ("Transfer Order"). This action was transferred to this District on February 13, 2018. Dkt. No. 57.

**II. DISCUSSION**

**A. Legal Standard for Review of the Amended Complaint**

Section 1915(e) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed in forma pauperis, "(2) ... the court shall dismiss the case at any time if the court determines that – ... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).

Likewise, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A; *see also* *Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam) (Section 1915A applies to all actions brought by prisoners against government officials even when plaintiff paid the filing fee).

Therefore, the Court must determine whether plaintiff may properly maintain his complaint before permitting him to proceed. Although a court has the duty to show liberality towards pro se litigants, *see* *Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990), and should exercise "extreme caution ... in ordering *sua sponte* dismissal of a *pro se* complaint *before* the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond," *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted), a court also has the responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed with an action in forma pauperis. "Dismissal of frivolous actions pursuant to 28 U.S.C. § 1915(e) is appropriate to prevent abuses of the process of the court," *Nelson v. Spitzer*, No. 9:07-CV-1241 (TJM/RFT), 2008 WL 268215, at *1 n.3 (N.D.N.Y. Jan. 29, 2008) (citation omitted), as well as "to discourage the filing of, and waste of judicial and private resources upon, baseless lawsuits that paying litigants generally do not initiate because of the costs of bringing suit and because of the threat of sanctions for bringing vexatious suits under Federal Rule of Civil Procedure 11." *Neitzke v. Williams*, 490 U.S. 319, 327 (1989). To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact." *Id.* at 325.

***2** When reviewing a complaint, the court may also look to the Federal Rules of Civil Procedure. Rule 8 provides that a


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

pleading that sets forth a claim for relief shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.*

**B. Sufficiency of Plaintiff's Amended Complaint**

In his amended complaint, which is extremely lengthy, plaintiff asserts claims arising out of his confinement at Great Meadow C.F. between October 2015 and July 2016. *See generally* Am. Compl. The following facts are set forth as alleged by plaintiff in his amended complaint.

On October 15, 2015, plaintiff was transferred to Great Meadow C.F. Am. Compl. at 31. Upon his arrival at Great Meadow C.F., plaintiff was placed in a special housing unit ("SHU") cell, with a door shielded by plexiglass, which was dirty and "contaminated with insects," and his medication prescribed for pain, high cholesterol, allergies, and tuberculosis was discontinued. *Id*. at 31-32. At various points during his incarceration at Great Meadow C.F., plaintiff was harassed, and was denied cleaning supplies for his cell, legal materials, postage for his mail, religious meals, a clean body suit, medications, and treatment for his medical, dental, and psychiatric needs. *Id*. at 33-71.

In addition, plaintiff was "physical[ly] and sexually" assaulted on October 28, 2015, by defendants Bascue, Gonyea, Lyons, and other unidentified corrections officers, which was covered up by several nurses and staff members. Am. Compl. at 41-44, 54, 63. Plaintiff was also placed on a restrictive diet from November 2015 through July 2016, which caused him pain and suffering. *Id*. at 45. On July 5, 2016, plaintiff suffered injuries during defendant Weston's use of force in removing handcuffs around plaintiff's wrists. *Id*. at 70.

Plaintiff filed multiple grievances regarding his mistreatment, which grievances were discarded or ignored, and resulted in further retaliatory treatment. Am. Compl. at 46, 54-56, 65. Plaintiff also sought to obtain photographs, documentation, and video recordings of the injuries he experienced, which he was denied. *Id*. at 54, 64-65. The mistreatment that plaintiff experienced from Great Meadow C.F. staff members and "DOCCS Albany authorities" was part of an ongoing conspiracy to violate plaintiff's constitutional rights and to retaliate against him. *Id*. at 31, 34, 38-39, 47.

Liberally construed, plaintiff's amended complaint asserts the following claims: (1) defendants Karandy, Paolano, Lipka, Havens, Rogue, Lafresch, Brunelle, Watkins, Boice, Van Order, and Ives denied plaintiff medication and medical treatment at various points throughout his incarceration at Great Meadow C.F., in deliberate indifference to his serious medical and mental health needs, in violation of the Eighth Amendment (*see*, *e.g.*, Am. Compl. 31, 34, 36, 44, 49-52); (2) defendants Ives, Jackson, Pal, Pink, and Leclaire denied plaintiff psychiatric medication and mental health treatment in April and June 2016, in deliberate indifference to his serious mental health needs, in violation of the Eighth Amendment (*id*. at 61-64); (3) defendants Ives, Pink, Pal, Miller, Eastman, Havens, Horris, Karandy, Jackson, Pal, Boall, and Paolano denied plaintiff adequate medical treatment following an alleged assault that occurred on October 28, 2015, in deliberate indifference to his serious medical needs, in violation of the Eighth Amendment (*id*. at 41-44, 63); (4) defendants Karandy, Paolano, Miller, Thoms, Peacock, and Koenigsmann ignored the medical recommendations of plaintiff's treating physician, in deliberate indifference to his serious medical needs, in violation of the Eighth Amendment (*id*. at 53); (5) defendants Karandy, Koenigsmann, Yuna, and D'Silva denied plaintiff adequate dental treatment, in deliberate indifference to his serious medical needs, in violation of the Eighth Amendment (*id*. at 38, 67); (6) defendants McCarthy, Winney, Peacock, and Collins refused plaintiff mental health services, in deliberate indifference to his serious medical needs, in violation of the Eighth Amendment (*id*. at 64); (7) defendants Miller, Eastman, Annucci, Melecio, Koenigsmann, Thoms, McKoy, Heywood, Hollmen, Karandy, Bellnier, Venettozzi, Chief of OSI, Hale, Bellamy, Horris, Ives, Pal, Jackson, Paolano, Telesco, Bruen, Depalo, Gonyea, Weston, Beebe, Cleveland, Collins, Williams, Birrell, Boice, Lafresch, Pink, Lowry, Byers, Lipka, Rogue, Leclaire, Van Order, Peacock, Sullivan, Watkins, Leonard, Bascue, Scanlon, Vladyka, Brunelle, Kellman, Nabozny, Hilton, McCulloch, "OMH DOCCS," Adams, Menning, Grant, and Yaiser failed to remedy plaintiff's inadequate medical care after they became aware of the deprivations of his rights

(*id*. at 36-37, 47, 55, 58, 63); (8) defendants Bascue and Lowry subjected plaintiff to inadequate conditions of confinement by denying him cleaning supplies for his cell, which was dirty and flooded, in violation of the Eighth Amendment (*id*. at 33, 39); (9) defendants Miller, Eastman, Annucci, Melecio, Koenigsmann, Thoms, McKoy, Heywood, Hollmen, Karandy, Bellnier, Venettozzi, Chief of OSI, Hale, Bellamy, Horris, Ives, Pal, Jackson, Paolano, Telesco, Bruen, Depalo, Gonyea, Weston, Beebe, Cleveland, Collins, Williams, Birrell, Boice, Lafresch, Pink, Lowry, Byers, Lipka, Rogue, Leclaire, Van Order, Peacock, Sullivan, Watkins, Leonard, Bascue, Scanlon, Vladyka, Brunelle, Kellman, Nabozny, and Hilton failed to remedy plaintiff's inadequate cell conditions after they became aware of these conditions (*id*. at 33-34, 39, 47, 55, 58); (10) defendants Heyward, Bruen, Sullivan, Melecio, Annucci, Eastman, Miller, and Bellnier denied plaintiff access to the courts in violation of the First Amendment, and as a result of their actions, "several" of plaintiff's pending cases "were dismissed" (*id*. at 34-35, 56-57); (11) defendants Beebe, Kuinlan, Bellamy, Hale, Miller, Melecio, Thoms, Eastman, Annucci, Hilton, Heywood, and McKoy interfered with plaintiff's mail by throwing away his grievances, in violation of the First Amendment (*id*. at 54-57); (12) defendants Bascue, Gonyea, Lyons, and other unidentified corrections officers subjected plaintiff to excessive force and/or failed to intervene to protect him against an excessive use of force, in violation of the Eighth Amendment (*id*. at 40); (13) defendants Karandy and Paolano retaliated against plaintiff for filing lawsuits against employees of the New York State Department of Corrections and Community Supervision ("DOCCS") by denying him proper medical care following the alleged assault on October 28, 2015 (*id*. at 44); (14) defendants Ives and Thoms retaliated against plaintiff for filing one or more prior lawsuits in which they were named as defendants by harassing plaintiff, covering up the misconduct of others, and denying him access to adequate medical care (*id*. at 34, 44); (15) defendant Lipka retaliated against plaintiff for filing grievances against her by depriving him of certain over-the-counter medications, directing other nurses at Great Meadow C.F. to stop providing him over-the-counter medication, drafting a false misbehavior report, threatening him with further retaliatory conduct, and ignoring his sick call requests (*id*. at 49-52); (16) defendants Havens, Rogue, Lafresch, Brunelle, Watkins, Boice, and Van Order retaliated against plaintiff for filing grievances against defendant Lipka by denying him medication in and after March 2016, and ignoring his sick call requests (*id*. at 50-52); (17) defendants Ives, Pal, Jackson, Pink, and Leclaire retaliated against plaintiff for filing grievances against them by denying him psychiatric medication, and taking actions to cover up the denials (*id*. at 61-63); (18) defendant Weston, after learning that plaintiff was drafting the amended complaint on July 4, 2016, retaliated against him by threatening plaintiff with harm, searching his cell, disturbing his personal property, and drafting a false misbehavior report against him, in violation of the First Amendment (*id*. at 69-70); (19) defendants Boice, Van Order, Havens, Rogue, and Watkins covered up the alleged assault that occurred on October 28, 2015 by refusing to report plaintiff's complaints, and photograph and document his injuries (*id*. at 54); (20) defendants Ives, Miller, Jackson, Pal, Eastman, Karandy, Bascue, Nabozny, Cleveland, Depalo, Annucci, Bellnier, and Venettozzi denied plaintiff due process by imposing a disciplinary diet, in violation of the Fourteenth Amendment (*id*.); (21) defendants Annucci, Bellnier, Heywood, Bellamy, Venettozzi, Bruen, McKoy, Hollman, Hilton, Koenigsmann, Effman, Miller, Thoms, Eastman, Melecio, Peacock, Horris, Karandy, Depalo, Nabozny, Collins, and Cleveland failed to address plaintiff's complaints and grievances regarding his restrictive diet despite knowing that the diet was nutritionally inadequate, in violation of the Eighth Amendment (*id*. at 46); (22) defendants Bascue, Lowry, Cleveland, Williams, Nabozny, Depalo, Peacock, Thoms, Eastman, Miller, Horris, Karandy, Collins, Koenigsmann, Annucci, Melecio, Bellnier, Bellamy, Beebe, and Birrell "covered up" the misconduct of defendant Lipka, and "found [plaintiff] guilty" on the charges she brought against him (*id*. at 49); (23) defendants Beebe, Kuinlan, Bellamy, Hale, Miller, Melecio, Thoms, Eastman, Annucci, Heywood, McKoy, Effmon, Collins, Koenigsmann, Peacock, Hollman, Morris, Chief of OSI, Hilton, Montes, Bruen, Jackson, and "DOCCS/OMH/NYS" conspired with each other to violate plaintiff's rights by failing to address misconduct to which plaintiff was subjected (*id*. at 54-55); (24) defendant Paolano harassed plaintiff by using "dirties [sic] words and discriminatory words against [him]" (*id*. at 52); (25) defendants Miller, Eastman, Annucci, Bellnier, McKoy, Williams, Thoms, Peacock, Leonard, Telesco, Cleveland, Birrell, Nabozny, Bascue, Melecio, Lowry, Byers, Kellmon, Depalo, Collins, Hilton, Bellamy, Beebe, Bruen, Heywood, Hale, Lyons, Scanlon, Vladyka, and Venettozzi interfered with plaintiff's right to practice his religion by denying him religious meals in violation of the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc (*id*. at 39, 59-60); (26) defendants McCarthy, Winney, Peacock, and Collins ignored plaintiff and his requests for mental health treatment, and in doing so treated him differently than other

similarly situated inmates at Great Meadow C.F. confined to SHU, in violation of the Equal Protection Clause of the Fourteenth Amendment and the Americans With Disabilities Act ("ADA") (*id*. at 64); (27) defendant White denied plaintiff's Freedom of Information Law ("FOIL") requests for video and audio recordings (*id*. at 64-65); (28) defendants Bruen, Beebe, Kuinlan, Bellamy, Hale, Miller, Melecio, Thoms, Eastman, Annucci, Hilton, Heywood, and McKoy interfered with or ignored plaintiff's grievances (*id*. at 54-57, 65); (29) defendant Weston harassed plaintiff, issued him false misbehavior reports, mishandled his legal materials, conducted unauthorized searches of his cell, and denied him meals, showers and recreation at various points between October 2015 and July 2016 (*id*. at 68); and (30) defendant Weston used excessive force in removing handcuffs from plaintiff's wrists, and denied plaintiff medical care for his injuries, in violation of the Eighth Amendment (*id*. at 70).

***3** Plaintiff seeks monetary damages, as well as declaratory and injunctive relief. Am. Compl. at 72-79. For a more complete statement of plaintiff's claims, refer to the amended complaint.

### 1. Eleventh Amendment Immunity

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10-21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984). Eleventh Amendment immunity is lost only if Congress unequivocally abrogates states' immunity or a state expressly consents to suit. *Gollomp v. Spitzer*, 568 F.3d 355, 365-66 (2d Cir. 2009). It is well-settled that Congress did not abrogate states' immunity through 42 U.S.C. § 1983, *see Quern v. Jordan*, 440 U.S. 332, 343-45 (1979), and that New York State has not waived its immunity from suit on the Section 1983 claims asserted in plaintiff's amended complaint. *See generally Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 38-40 (2d Cir. 1977); *Dawkins v. State of New York*, No. 5:93-CV-1298 (RSP/GJD), 1996 WL 156764 at *2 (N.D.N.Y. 1996). It is now equally well-settled that Congress did not abrogate states' immunity through RLUIPA, and that New York State has not waived its immunity from a suit for money damages under RLUIPA. *Sossamon v. Texas*, 131 S.Ct. 1651, 1663 (2011) ("States, in accepting federal funding, do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA because no statute expressly and unequivocally includes such a waiver."); *Washington v. Gonyea*, 731 F.3d 143, 145 (2d Cir. 2013). Thus, plaintiff's claims against New York State fail.

Furthermore, state immunity extends not only to the states, but also to state agencies. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf,* 506 U.S. 139, 142-47 (1993); *McGinty v. New York,* 251 F.3d 84, 95 (2d Cir. 2001) ("The Eleventh Amendment extends immunity not only to a state, but also to entities considered 'arms of the state.' "); *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 414 (2d Cir. 1999) ("An official arm of the state enjoys the same Eleventh Amendment immunity from suit in federal court as is enjoyed by the state itself."). Thus, plaintiff's claims against the New York State Department of Corrections and Community Supervision and the New York State Office of Mental Health fail because these agencies are arms of New York State. *See Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002) (affirming dismissal of Section 1983 claims against DOCCS on Eleventh Amendment grounds); *Jones v. New York State Div. of Military and Naval Affairs*, 166 F.3d 45, 49 (2d Cir. 1999) (the Eleventh Amendment bars Section 1983 suits against state agencies); *Linwongse v. NYS Office of Mental Health*, 249 Fed. Appx. 862-63 (2d Cir. 2007) (finding that the New York State Office of Mental Health is a state agency and thus, protected by Eleventh Amendment immunity from the plaintiff's suit for monetary damages); *Vasquez v. New York State Office of Mental Health*, No. 9:16-CV-0320 (GLS), 2016 WL 1312567, at *4 (N.D.N.Y. Apr. 4, 2016) (dismissing claims against New York State Office of Mental Health as barred by the Eleventh Amendment).

***4** In addition, the Eleventh Amendment bars suits for damages against state officials acting in their official capacities. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985) (a claim for damages against state officials in their official capacity is considered to be a claim against the State and is therefore barred by the Eleventh Amendment); *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993) ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v.*

*Negron*, 996 F.2d 1439, 1441 (2d Cir. 1993) ("[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities.").

Accordingly, New York State, the Department of Corrections and Community Supervision, and the Office of Mental Health, and all claims against them, are dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) as barred by the Eleventh Amendment. To the extent that plaintiff seeks monetary damages against any defendant in his or her official capacity, those claims are dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) as barred by the Eleventh Amendment. [1]

### 2. Medical Indifference Claims

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 102, 104 (1976). The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain" and is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.*; *see also Whitley v. Albers*, 475 U.S. 312, 319 (1986) (citing, inter alia, *Estelle*). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citing *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).

"In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Estelle*, 429 U.S. at 104). "First, the alleged deprivation must be, in objective terms, sufficiently serious." *Chance*, 143 F.3d at 702 (internal quotation marks and citations omitted). Addressing the objective element, to prevail a plaintiff must demonstrate a violation sufficiently serious by objective terms, "in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). "Second, the defendant must act with a sufficiently culpable state of mind," *Chance*, 143 F.3d at 702 (internal quotation marks and citations omitted); that is, the plaintiff must demonstrate that the defendant "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837; *see also Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999) (With respect to the subjective element, a plaintiff must also demonstrate that defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' ").

***5** The protections afforded by the Eighth Amendment do not extend to remedy harms which may be inflicted as a result of conduct amounting to negligence or medical malpractice but not encompassing conscious disregard of an inmate's health. An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle*, 429 U.S. at 105-06.

Additionally, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim." *Chance*, 143 F.3d at 703. "So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Id.*; *Graham v. Gibson*, No. 04-CV-6088, 2007 WL 3541613, at *5 (W.D.N.Y. Nov. 14, 2007) ("Courts have repeatedly held that disagreements over treatment do not rise to the level of a Constitutional violation."); *Jones v. Westchester County Dept. of Corrs.* Med. Dept., 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008) (The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' ").

#### a. Medical Indifference Claims Based on Denial of Medication and Treatment Previously Provided

Plaintiff alleges that defendants Karandy, Paolano, Lipka, Havens, Rogue, Lafresch, Brunelle, Watkins, Boice, Van Order, and Ives denied him medication and medical treatment at various points throughout his incarceration at Great Meadow C.F., *see*, *e.g.*, Am. Compl. 31, 34, 36, 44, 49-52, and defendants Ives, Jackson, Pal, Pink, and Leclaire denied plaintiff psychiatric medication and mental health treatment in April and June 2016, *id*. at 61-64.

Mindful of the Second Circuit's instruction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that a response to these medical indifference claims is required from defendants Karandy, Paolano, Lipka, Havens, Rogue, Lafresch, Brunelle, Watkins, Boice, Van Order, Ives,

Jackson, Pal, Pink, and Leclaire. In so ruling, the Court expresses no opinion as to whether these medical indifference claims can withstand a properly filed motion to dismiss or for summary judgment.

### b. Medical Indifference Claim Based on Treatment Following Alleged Assault

Plaintiff alleges that defendants Ives, Pink, Pal, Miller, Eastman, Havens, Horris, Karandy, Jackson, Boall, Karandy, and Paolano failed to provide him with adequate medical treatment following the assault that occurred on October 28, 2015. Am. Compl. at 41-44, 63. Plaintiff further alleges that, as a result of the assault, he suffered "lacerations, swollen faces [sic] one closed eye/bloodshot eye[,] cuts over all his body and face, a lot of bruises over all his body and face" and a bloody stool. *Id*. at 41. The amended complaint does not provide any information regarding the size of the cuts or bruises, or the location of the bruising other than on plaintiff's face. In addition, while the amended complaint contains a general allegation that plaintiff experienced "chronic pain" in his "body" as a result of the assault, *id*. at 42, plaintiff also alleges that he received two Tylenol for his pain, and was seen by doctors at the facility infirmary some unstated number of days after the assault, by which time his injuries had "disappear[ed] or healed." *Id*. at 42, 44.

***6** Because plaintiff has failed to allege when in relation to the alleged assault he received Tylenol and was seen by physicians at the infirmary, the Court is unable to evaluate the length of any delay in treatment. In any event, the amended complaint does not allege that a delay in plaintiff's treatment caused his condition to worsen in any respect, or put him at an "unreasonable risk of future harm." *Smith v. Carpenter*, 316 F.3d 178, 188 (2d Cir. 2003) (noting that in cases of delayed or inadequate care, "it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant").

Moreover, even when considered in the abstract, the injuries as alleged by plaintiff are not, objectively speaking, sufficiently serious to satisfy the objective component of the deliberate indifference inquiry. *See Watson v. Doe*, No. 1:15-CV-1356 (BKS/DEP), 2016 WL 347339, at *3 (N.D.N.Y. Jan. 28, 2016) (finding that plaintiff failed to allege a serious medical need where allegations about pain were generic); *Watts v. N.Y.C. Police Dep't*, 100 F. Supp. 3d 314, 328 (S.D.N.Y. 2015) ("Courts in this district have held that terrible and extreme headaches and swelling do not satisfy the objective component of the deliberate indifference inquiry." (alterations and internal quotation marks omitted)); *Garcia v. Furnia*, No. 12-CV-924, 2014 WL 4685104, at *4 (N.D.N.Y. Sept. 19, 2014) (finding no sufficiently serious medical need where the plaintiff suffered from "(1) body soreness; (2) a black eye; (3) scrapes and minor contusions; (4) a headache; (5) a loose tooth; (6) a 'wobbly' knee; and (7) blurriness in one eye"); *Munlyn v. Pietrie*, No. 13-CV-6170, 2014 WL 3695488, at *6 (W.D.N.Y. July 24, 2014) (finding that the complaint failed to allege a serious medical condition where only allegation was that the plaintiff "was 'in pain,' " and there were no allegations regarding, among other things, "the level or extent of the pain ... any resulting inability to engage in normal activities, or any harm consequently experienced or likely to occur"); *Latouche v. Tompkins*, No. 09-CV-308 (NAM/RFT), 2011 WL 1103022, at *14 (N.D.N.Y. Mar. 4, 2011) (finding that a 4-5 centimeter bruise, a 2-3 centimeter cut, and a scratch on plaintiff's face and pain from a bump on the right and left sides of his face are not objectively sufficiently serious to support a claim of medical indifference), report and recommendation adopted by 2011 WL 1103045 (N.D.N.Y. Mar. 23, 2011); *Finley v. Perry*, No. 06-CV-1524 (FJS/ATB), 2010 WL 6427496, at *2, 11 (N.D.N.Y. July 13, 2010), report and recommendation adopted by 2011 WL 1302248 (N.D.N.Y. Mar. 31, 2011) ("busted" and bleeding lip, swollen face, and bruised back did not constitute serious medical condition); *Brown v. Outhouse*, No. 07-CV-1169 (GLS/GHL), 2010 WL 3862082, at *10 (N.D.N.Y. July 9, 2010), report and recommendation adopted by 2010 WL 3862080 (N.D.N.Y. Sept. 27, 2010) ("busted" lip, cuts and scratches, and minimal swelling did not constitute serious medical condition); *Dallio v. Hebert*, 678 F. Supp. 2d 35, 44-45 (N.D.N.Y. 2009) (holding that two black eyes, bruising in kidney area, kick marks and open lacerations on knees, bruising and red spots on thigh, lacerations on arms and wrists, a headache, and numbness in hands and fingers are not "conditions of urgency that may produce death, degeneration, or extreme pain") (collecting cases); *Jones v. Furman*, No. 02-CV-939, 2007 WL 894218, at *10 (W.D.N.Y. Mar. 21, 2007) (explaining that soreness, pain in and a lump behind ear, lump on back of head, abrasions on nose and knuckle, and bruising to back, ribs and legs do not constitute a serious medical condition).

***7** Thus, plaintiff has failed to allege facts which plausibly suggest that, following the assault, he suffered from a serious medical need due to a deprivation in care. *See Ramirez v.*

*City of New York*, No. 13-CV-3268, 2014 WL 3747178, at *4 (S.D.N.Y. July 28, 2014) ("There are, for example, no allegations that his conditions were life-threatening and fast-degenerating, or that they worsened because of the delay, or that the delay was punitive.... Consequently, the Court concludes that any alleged delay was not serious enough to violate Feliciano's constitutional rights."), report and recommendation adopted by 2014 WL 12769456 (S.D.N.Y. Aug. 20, 2014); *Ferguson v. Cai*, No. 11-CV-6181, 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012) ("The Second Circuit has held that a short interruption of care, even if the underlying medical condition is serious, does not constitute a serious medical need where 'the alleged lapses in treatment are minor.' ") (quoting *Smith*, 316 F.3d at 186); *Gantt v. Horn*, No. 09-CV-7310, 2013 WL 865844, at *9 (S.D.N.Y. Mar. 8, 2013) ("[Plaintiff] has not alleged that any delays in his treatment caused any symptoms of his underlying illnesses to worsen.... Furthermore, [plaintiff] has not alleged, beyond making conclusory claims, that any delay in treatment, or any inadequacy of such treatment, has put him at an 'unreasonable risk of future harm.' ... The facts at hand fall far short of those in cases in which courts have found an objectively serious injury." (quoting *Smith*, 316 F.3d at 188)); *Thomas v. Nassau Cnty. Corr. Ctr.*, 288 F. Supp. 2d 333, 339 (E.D.N.Y. 2003) ("[E]ven assuming that the plaintiff's treatment and/or his seeing a hand specialist was delayed, the plaintiff has not alleged that his hand injury became worse, or that his general condition deteriorated as a result of this delay.").

For these reasons, plaintiff's medical indifference claim against defendants Ives, Pink, Pal, Miller, Eastman, Havens, Horris, Karandy, Jackson, Boall, Karandy, and Paolano based on their alleged failure to provide him with adequate medical treatment following the alleged assault that occurred on October 28, 2015, is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### c. Medical Indifference Claim Based on Ignored Treatment Recommendation

Plaintiff alleges that in "March or April 2016," he was transported to Sullivan Correctional Facility to be seen by Doctor Arliss, the physician who performed surgery on his hand in July 2015. Am. Compl. at 53. Plaintiff further alleges that Doctor Arliss recommended that plaintiff receive pain medication, a hand brace, and physical therapy, and defendants Karandy, Paolano, Miller, Thoms, Peacock, and Koenigsmann "refused to follow" these recommendations. *Id*. Instead, defendant Paolano allegedly calleged Doctor Arliss and "maked [sic] sure that he changed the prescriptions and recommendations[.]" *Id*.

Mindful of the Second Circuit's instruction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that a response is warranted from defendant Paolano regarding plaintiff's medical indifference claim based on inadequate treatment of his hand. In so ruling, the Court expresses no opinion as to whether this medical indifference claim can withstand a properly filed motion to dismiss or for summary judgment.

The Court, however, reaches a different conclusion with respect to defendants Karandy, Miller, Thoms, Peacock, and Koenigsmann because, even assuming that the post-surgery condition of plaintiff's hand was sufficiently serious for purposes of satisfying the objective standard of his deliberate indifference claim, the amended complaint fails to allege facts which plausibly suggest that any of these defendants acted with deliberate indifference to plaintiff's medical needs. Indeed, the amended complaint does not contain any allegations which plausibly suggest that, after plaintiff met with Doctor Arliss, he requested medical treatment from any of these defendants. Nor does the amended complaint contain any allegations that any of these defendants were aware of either a deterioration in the condition of plaintiff's hand following his visit with Doctor Arliss, or the recommendations of Doctor Arliss. Moreover, the amended complaint plausibly suggests that Doctor Arliss changed his recommendation in response to a call from defendant Paolano. Accordingly, plaintiff's medical indifference claim against defendants Karandy, Miller, Thoms, Peacock, and Koenigsmann based on inadequate treatment of plaintiff's hand is subject to dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### d. Medical Indifference Claim Based on Delayed Dental Treatment

***8** Plaintiff alleges that he was "diagnosed" with a "gum disease" at Green Haven Correctional Facility in "2013-2014" and at Sullivan Correctional Facility in 2015 "where dentists alleged and ordered that Abreu need dental cleanings every 3 months ... to control the disease and infections." Am. Compl. at 38. Plaintiff further alleges that he

filed daily sick call requests for dental treatment while housed at Great Meadow C.F., but was not seen by a dentist until "April-May 2016." *Id*.

The amended complaint is devoid of any allegations regarding the condition of plaintiff's gums when he arrived at Great Meadow C.F., and how that conditioned worsened, if at all, during the six or seven month delay between when plaintiff requested dental treatment and when he received it. Because there are no allegations that the condition with plaintiff's gums was life-threatening and fast-degenerating, that it worsened because of the delay, or that the delay was punitive, plaintiff has failed to allege facts which plausibly suggest that his "gum disease" constituted a serious medical need.

Accordingly, plaintiff's medical indifference claim against defendants Karandy, Koenigsmann, Yuna, and D'Silva based on their alleged failure to provide him with adequate dental treatment is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### e. Medical Indifference Claim Based on Refusal of Mental Health Services

Plaintiff alleges that defendants McCarthy, Winney, and Collins refused him "all classes of mental health services" at the direction of the OMH Clinician, defendant Ives, the Deputy Superintendent of Administration, defendant Peacock, and members of mental health staff at Great Meadow C.F. Am. Compl. at 64.

As an initial matter, plaintiff has failed to allege facts which plausibly suggest that, during his confinement at Great Meadow C.F., he suffered from a serious medical condition that necessitated mental health treatment. Indeed, the amended complaint does not contain any allegations regarding the nature of plaintiff's condition for which he sought mental health services.

In addition, the amended complaint is devoid of any allegations regarding the type(s) of mental health services sought by plaintiff, the number of times he requested mental health services from defendants McCarthy, Winney, Peacock, and Collins, or the number of days plaintiff went without mental health services. *See generally id.*

Conclusory allegations that defendants were aware of a plaintiff's medical needs and failed to provide adequate care are generally insufficient to state an Eighth Amendment claim of inadequate medical care. *See, e.g., Olivo v. New York State Dep't of Corr. & Cmty. Supervision*, No. 9:17-CV-0357 (BKS/DJS), 2017 WL 2656199, at *6 (N.D.N.Y. June 20, 2017) ("plaintiff's formulaic and conclusory allegations that defendants Annucci and Graham 'were indifferent to and failed to provide plaintiff with medical care for his injuries' without some facts to explain the basis for those conclusions or how each of the named defendants participated in alleged wrongdoing, are insufficient to state a claim against them"); *Adekoya v. Holder*, 751 F. Supp. 2d 688, 691 (S.D.N.Y. Nov. 12, 2010) (finding conclusory allegations that medical staff defendants were aware of plaintiff's medical needs and failed to provide adequate care insufficient to defeat a motion to dismiss a claim of inadequate medical care); *Williams v. Bailey*, No. 9:09-CV-0643, 2010 WL 3881024 (DNH/DEP), at *8 (N.D.N.Y. Sept. 3, 2010) (recommending dismissal of medical indifference claim where, "[a]side from the factually conclusory statement that Dr. Paolano failed to provide him with treatment for a diagnosed condition, plaintiff offer[ed] no specifics regarding his deliberate indifference claim against Dr. Paolano[,]" and the complaint did not provide "any indication of treatment requested, complaints made regarding [plaintiff's] condition, and Dr. Paolano's involvement in plaintiff's care and treatment"), report and recommendation adopted by 2010 WL 3843723 (N.D.N.Y. Sept. 28, 2010); *see also Iqbal*, 556 U.S. at 678 (A pleading that only "tenders naked assertions devoid of further factual enhancement" will not survive sua sponte review.) (internal quotations and alterations omitted).

***9** For these reasons, plaintiff's medical indifference claim based on the alleged refusal by defendants McCarthy, Winney, and Collins to provide plaintiff with "all classes of mental health services" is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### f. Medical Indifference Claims Based on Failure-to-Remedy

Plaintiff alleges that he filed letters and grievances regarding his inadequate medical treatment, and lists the following defendants as having failed to remedy plaintiff's inadequate medical care after they became aware of the deprivations of plaintiff's rights: defendants Miller, Eastman,

Annucci, Melecio, Koenigsmann, Thoms, McKoy, Heywood, Hollmen, Bellnier, Venettozzi, Chief of OSI, Hale, Bellamy, Horris, Telesco, Bruen, Depalo, Gonyea, Weston, Beebe, Cleveland, Collins, Williams, Birrell, Lowry, Byers, Peacock, Sullivan, Leonard, Bascue, Scanlon, Vladyka, Kellman, Nabozny, Hilton, Yaiser, McCulloch, "OMH DOCCS," Adams, Menning, and Grant. *See* Am. Compl. at 36-37, 47, 55, 58, 63.[2]

In this circuit, it is well settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). Thus, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas*, No. 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)) (other citation omitted).

"Pleadings that do not differentiate which defendant was involved in the unlawful conduct are insufficient to state a claim." *Ying Li v. City of New York*, No. 15-CV-1599, 2017 WL 1208422, at *6 (E.D.N.Y. Mar. 31, 2017); *see also Wright v. Orleans Cnty.*, No. 14-CV-0622, 2015 WL 5316410, at *13 (W.D.N.Y. Sept. 10, 2015) (noting in a Section 1983 case that "[g]roup pleading is insufficient for purposes of Rule 8(a)(2) [of the FRCP] which requires a short and plain statement of the claim showing that the pleader is entitled to relief" (citation and quotation marks omitted)); *Holmes v. Allstate Corp.*, No. 11-CV-1543, 2012 WL 627238, at *7, *22 (S.D.N.Y. Jan. 27, 2012) ("[FRCP] 8(a) is violated where a plaintiff, by engaging in 'group pleading,' fails to give each defendant fair notice of the claims against it.").

In this case, plaintiff fails to provide any information regarding the grievances and letters he filed relative to his medical care, such as the dates when these grievances and letters were filed, the subject matter of each grievance or letter, and the individuals to whom he sent each grievance or letter. *See generally* Am. Compl. In addition, plaintiff fails to otherwise allege facts which plausibly suggest how each individual identified by plaintiff was personally involved in the deprivation of his Eighth Amendment right to adequate medical care. The Court is therefore unable to evaluate which of the officials listed by plaintiff, if any, might have been personally involved in a constitutional deprivation of plaintiff's Eighth Amendment rights.

***10** Accordingly, plaintiff's Eighth Amendment medical indifference claims against defendants Miller, Eastman, Annucci, Melecio, Koenigsmann, Thoms, McKoy, Heywood, Hollmen, Bellnier, Venettozzi, Chief of OSI, Hale, Bellamy, Horris, Telesco, Bruen, Depalo, Gonyea, Weston, Beebe, Cleveland, Collins, Williams, Birrell, Lowry, Byers, Peacock, Sullivan, Leonard, Bascue, Scanlon, Vladyka, Kellman, Nabozny, Hilton, Yaiser, McCulloch, "OMH DOCCS," Adams, Menning, and Grant based on their alleged failure to remedy plaintiff's inadequate medical care are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 3. Conditions-of-Confinement Claims

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. The Second Circuit, in addressing the needs protected by the Eighth Amendment, has stated that sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." *Wolfish v. Levi*, 573 F.2d 118, 125 (2d Cir. 1978), *rev'd on other grounds sub nom. Bell v. Wolfish*, 441 U.S. 520 (1979); *Lareau v. Manson*, 651 F.2d 96, 106 (2d Cir. 1981). To demonstrate that the conditions of confinement constitute cruel and unusual punishment in violation of the Eighth Amendment, a plaintiff must satisfy both an objective and subjective element. *See Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996). A plaintiff must demonstrate that (1) the conditions of confinement resulted in "unquestioned and serious deprivations of basic human needs," *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985); *see also Jolly*, 76 F.3d at 480, and (2) the defendants acted with "deliberate indifference." *Wilson v. Seiter*, 501 U.S. 294, 303-04 (1991).

Here, plaintiff has asserted a conditions-of-confinement claim against defendants Bascue and Lowry based on them allegedly denying him cleaning supplies and otherwise failing to address insects and sugar "over all the floor," a dirty sink, dirty sheets and linens, a broken toilet that caused the cell to flood with urine and feces on four occasions, and a lack of hot water. Am. Compl. at 32-33, 39. In addition, plaintiff has asserted a conditions-of-confinement claim against the following defendants based on them having been aware of his cell conditions by virtue of him filing grievances or letters, or by virtue of them personally examining the conditions: Miller, Eastman, Annucci, Melecio, Koenigsmann, Thoms,

McKoy, Heywood, Hollmen, Karandy, Bellnier, Venettozzi, Chief of OSI, Hale, Bellamy, Horris, Ives, Pal, Jackson, Paolano, Telesco, Bruen, Depalo, Gonyea, Weston, Beebe, Cleveland, Collins, Williams, Birrell, Boice, Lafresch, Pink, Byers, Lipka, Rogue, Leclaire, Van Order, Peacock, Sullivan, Watkins, Leonard, Scanlon, Vladyka, Brunelle, Kellman, Nabozny, and Hilton. *Id*. at 32-34, 37, 39, 58.

Mindful of the Second Circuit's instruction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that a response is required from defendants Bascue and Lowry. In so ruling, the Court expresses no opinion as to whether plaintiff's conditions-of-confinement claim against them can withstand a properly filed motion to dismiss or for summary judgment.

The Court, however, reaches a different conclusion with respect to the remaining defendants for several reasons. First, none of these defendants are alleged to have been responsible for placing plaintiff in a SHU cell behind plexiglass, requiring that he wear a "special control suit," or refusing to wash the suit. Moreover, the existence of a plexiglass shield covering plaintiff's cell door window, by itself, does not constitute an unquestioned and serious deprivation of basic human needs. *See Telesford v. Annucci*, No. 9:16-CV-0793 (BKS/DEP), 2017 WL 3600941, at *4 (N.D.N.Y. July 26, 2017), report and recommendation adopted by 2017 WL 3588640 (N.D.N.Y. Aug. 18, 2017). Thus, the fact that an individual may have known about the plexiglass shield covering plaintiff's cell door window does not mean that, in not taking steps to remove the shield, that individual was personally involved in a violation of plaintiff's Eighth Amendment rights.

***11** In addition, with the exception of a grievance plaintiff submitted to defendant Ives, the amended complaint fails to provide any information regarding the grievances and letters plaintiff filed relative to the conditions of his confinement, such as the dates when these grievances and letters were filed, the subject matter of each grievance or letter, and the individual(s) to whom he sent each grievance or letter. *See generally* Am. Compl. The Court is therefore unable to evaluate what any official identified by plaintiff, other than defendant Ives, knew about the conditions of his confinement. *See Williams v. Carbello*, 666 F. Supp. 2d 373, 378 (S.D.N.Y. 2009) (deliberate indifference to inmate health or safety requires proof that defendants were "aware of facts from which the inference could be drawn that a substantial risk of harm exists" (internal quotation marks and citations omitted)).

With regard to defendant Ives, plaintiff alleges that he complained to defendant Ives about the conditions of his confinement one day after he arrived at Great Meadow C.F., and defendant Ives disregarded his complaints. Am. Compl. at 34. The amended complaint plausibly suggests that, as of October 16, 2015, the conditions of plaintiff's cell included a dirty sink, dirty sheets and linens, no hot water, and poor ventilation. *Id*. at 32-34. Plaintiff does not allege that, as of October 16, 2015, his toilet was broken and his cell was flooded with urine and feces.

Objectively speaking, enduring conditions such as those described by plaintiff for one day does not constitute an unquestioned and serious deprivation of basic human needs. *See, e.g., McNatt v. Unit Manager Parker*, No. 99-CV-1397, 2000 WL 307000, at *4 (D. Conn. January 18, 2000) (holding that the totality of conditions in restrictive housing unit, including stained, smelly mattresses; unclean cell; no bedding for six days; no cleaning supplies for six days; no toilet paper for one day; no toiletries or clothing for six days; no shower shoes; dirty showers; cold water that did not function properly; and smaller food portions, while not pleasant, did not rise to level of Eighth Amendment violation)). Moreover, the Court is unable to discern from the allegations in the amended complaint whether, after October 16, 2015, defendant Ives became aware of worsening cell conditions.

For these reasons, plaintiff's Eighth Amendment conditions-of-confinement claim against defendants Miller, Eastman, Annucci, Melecio, Koenigsmann, Thoms, McKoy, Heywood, Hollmen, Karandy, Bellnier, Venettozzi, Chief of OSI, Hale, Bellamy, Horris, Ives, Pal, Jackson, Paolano, Telesco, Bruen, Depalo, Gonyea, Weston, Beebe, Cleveland, Collins, Williams, Birrell, Boice, Lafresch, Pink, Byers, Lipka, Rogue, Leclaire, Van Order, Peacock, Sullivan, Watkins, Leonard, Scanlon, Vladyka, Brunelle, Kellman, Nabozny, and Hilton is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

**4. Access-to-Courts Claim**

It is well settled that inmates have a First Amendment right to "petition the Government for a redress of grievances." *See* U.S. Const. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the

free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."). This right, which is more informally referred to as a "right of access to the courts," requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights." *Bounds v. Smith*, 430 U.S. 817, 828 (1977), *modified on other grounds, Lewis v. Casey*, 518 U.S. 343, 350 (1996); *see also Bourdon v. Loughren*, 386 F.2d 88, 92 (2d Cir. 2004). [3] "However, this right is not 'an abstract, freestanding right ....' and cannot ground a Section 1983 claim without a showing of 'actual injury.' " *Collins v. Goord*, 438 F. Supp. 2d 399, 415 (S.D.N.Y. 2006) (quoting *Lewis*, 518 U.S. at 351).

***12** "A hypothetical injury is not sufficient to state a claim for violation of the right of access to the courts." *Amaker v. Haponik,* No. 98-CV-2663, 1999 WL 76798, at *3 (S.D.N.Y. Feb. 17, 1999). Instead, a plaintiff must demonstrate "actual injury" by establishing that the denial "hindered his efforts" to pursue a non-frivolous legal claim. *Lewis*, 518 U.S. at 349, 351-53. "Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.' " *Davis*, 320 F.3d at 352 (citing *Jermosen v. Coughlin*, 877 F. Supp. 864, 871 (S.D.N.Y. 1995)).

The Supreme Court has stated that in order to allege a denial of access to the courts claim, "the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint ...." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). The Supreme Court instructed that the underlying claim "must be described well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope." *Id*. at 415-16. "[T]he complaint should state the underlying claim in accordance with Federal Rule of Civil Procedure 8(a), just as if it were being independently pursued, and a like plain statement should describe any remedy available under the access claim and presently unique to it." *Id*. at 417-18 (footnote omitted).

Here, plaintiff has alleged in only conclusory fashion that "several" of his pending cases "were dismissed" as a result of him not having access to "legal postages [sic] and legal copies" and limitations being placed on his "writing papers" and access to law library materials. Am. Compl. at 34-35. Plaintiff has failed to identify any specific action that was dismissed as a result of the alleged restrictions that he identifies, or otherwise explain how the alleged restrictions hindered his efforts to pursue a legal claim in some respect.

As a result, plaintiff's claim that he was denied access to the courts is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

**5. Mail Interference Claim**

The First Amendment protects an inmate's right to send and receive both legal and nonlegal mail, although prison officials may regulate that right if the restrictions they employ are " 'reasonably related to legitimate penological interests.' " *Thornburgh v. Abbott*, 490 U.S. 401, 409 (1989) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)); *see also Johnson v. Goord*, 445 F.3d 532, 534 (2d Cir. 2006) (holding that prisoners do have a right – albeit a limited one – to send and receive mail (citation omitted)). Legal mail is entitled to greater protection from interference than nonlegal mail. *See Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (citations omitted). A single instance of mail tampering that does not result in the plaintiff suffering any damage is generally insufficient to support a constitutional challenge. *See Morgan v. Montanye*, 516 F.2d 1367, 1371 (2d Cir. 1975).

The Court liberally construes the amended complaint to assert a claim of interference with outgoing mail based on plaintiff's allegations that grievances mailed to officials outside Great Meadow C.F. were not received because they were thrown away. Am. Compl. at 54. As an initial matter, while plaintiff lists several defendants who allegedly conspired to deprive him of access to the grievance process by throwing away his grievances, he does not identify how each individual was personally involved in the alleged deprivation. As stated, "[p]leadings that do not differentiate which defendant was involved in the unlawful conduct are insufficient to state a claim." *Ying Li*, 2017 WL 1208422, at *6.

***13** Moreover, plaintiff does not identify the number of grievances that were allegedly thrown away, or provide the dates when he attempted to mail these grievances. The Court is therefore unable to evaluate the number of occasions, if any, on which plaintiff's mail was interfered with.

In any event, "complaints that prison officials tampered with, failed to investigate, or improperly processed grievances, without more, do not give rise to liability under § 1983."

*Celestin v. Premo*, No. 9:12-CV-301 (GLS/RFT), 2014 WL 272443, at *3 (N.D.N.Y. Dec. 9, 2013), report and recommendation adopted by 2014 WL 272443, at *1 (N.D.N.Y. Jan. 24, 2014); *Irvis v. Seally*, No. 9:09-CV-543 (GLS/ATB), 2011 WL 454792, at *2 (N.D.N.Y. Feb.4, 2011) ("Thus, regardless of whether and to what extent defendants followed their grievance procedures in investigating or failing to investigate Irvis's complaints, his claims must fail as a matter of law as they are not actionable under § 1983.").

Accordingly, plaintiff's First Amendment mail interference claim is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

**6. Excessive Force Claims Based on October 28, 2015 Incident**

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991); *Estelle*, 429 U.S. at 104. This includes punishments that "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). The Eighth Amendment's prohibition against cruel and unusual punishment encompasses the use of excessive force against an inmate, who must prove two components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated "contemporary standards of decency." *Blyden v. Mancusi*, 186 F.3d 252, 262-63 (2d Cir. 1999) (internal quotations omitted) (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). [4]

"The Eighth Amendment [also] requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dept. of Corrs.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer*, 511 U.S. at 832). Law enforcement officials, including prison officials, can be held liable under § 1983 for failing to intervene in a situation where another official is violating an inmate's constitutional rights, including the use of excessive force, in their presence. *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001); *see also Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (prison official's Eighth Amendment duty to take reasonable measures to guarantee the safety of inmates in their custody includes a duty to protect inmates from harm threatened by other officers).

***14** Here, the amended complaint alleges that on October 28, 2015, defendants Bascue, Gonyea, Lyons, and other unidentified corrections officers physically and sexually assaulted plaintiff, and/or failed to intervene to protect plaintiff against these assaults. Am. Compl. at 40.

Mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's Eighth Amendment claims against defendants Bascue, Gonyea, and Lyons based on the alleged assault survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

**7. Retaliation Claims [5]**

Courts must approach claims of retaliation " 'with skepticism and particular care' because 'virtually any adverse action taken against a prisoner by a prison official–even those otherwise not rising to the level of a constitutional violation–can be characterized as a constitutionally proscribed retaliatory act.' " *Davis*, 320 F.3d at 352 (*quoting Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)). To state a plausible claim, a plaintiff asserting a First Amendment retaliation claim must advance "non-conclusory" allegations establishing "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action." *Davis*, 320 F.3d at 352 (*quoting Dawes*, 239 F.3d at 492). "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983). Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003).

The filing of a prison grievance is a constitutionally protected activity for the purpose of meeting the first prong of the retaliation test. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir. 1996); *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir. 1988) (same).

**a. Retaliation Claims Based on Prior Lawsuits**

Plaintiff alleges that defendants Karandy and Paolano retaliated against him for filing lawsuits against unidentified DOCCS employees by denying him proper medical care following the alleged assault on October 28, 2015. Am. Compl. at 44. Plaintiff also alleges that defendants Ives and Thoms retaliated against him for filing one or more prior lawsuits against them by harassing him, covering up the misconduct of others, and denying him access to adequate medical care. *Id*. at 44.

**(i) Defendants Karandy and Paolano**

***15** According to plaintiff, defendants Karandy and Paolano were told by "the Department/DOCCS" that plaintiff has pending lawsuits about "incidents" that happened at Five Points Correctional Facility, and, because of that, defendants Karandy and Paolano were directed not to treat plaintiff. *Id*.

The amended complaint does not identify the lawsuit(s) that plaintiff filed about which defendants Karandy and Paolano were made aware, when the lawsuit(s) were filed, or the individual(s) who allegedly made these defendants aware of plaintiff's lawsuit(s). Instead, plaintiff's allegation that defendants Karandy and Paolano were aware of his prior lawsuits is entirely conclusory.

In addition, plaintiff's allegation that he was denied "pain meds and medical treatment" is entirely conclusory. Plaintiff does not allege the treatment he sought from defendants Karandy and Paolano that was refused, or the basis for requesting such treatment. Thus, plaintiff has also failed to properly allege that he suffered any adverse action when he was seen by defendants Karandy and Paolano in November 2015.

Furthermore, the amended complaint fails to allege facts which plausibly suggest a casual connection between lawsuits plaintiff filed and the alleged denial of treatment by defendants Karandy and Paolano. It also appears based on plaintiff's own allegations that he was not treated by defendants Karandy and Paolano because his injuries had "disappear[ed] or healed" by the time he was seen by them. Am. Compl. at 44.

For these reasons, plaintiff's retaliation claims against defendants Karandy and Paolano are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

**(ii) Defendants Ives and Thoms**

Plaintiff alleges that defendants Ives and Thoms were both named in one or more prior lawsuits that he filed. Am. Compl. at 34, 44. According to plaintiff, he met with defendant Ives on October 16, 2015, the day after he arrived at Great Meadow C.F., during which time he complained about the conditions of his cell, "legal papers[,] and medical staff misconduct[,]" and defendant Ives responded that he did not care. *Id*. at 34.

The amended complaint does not identify the prior lawsuit(s) that plaintiff filed in which defendant Ives was a defendant, or provide any information about the nature or disposition of the claim(s) asserted against defendant Ives. Even assuming that the alleged failure by defendant Ives to address plaintiff's complaints constitutes adverse action, the Court is unable to evaluate whether such adverse action was casually connected to one or more prior lawsuits filed by plaintiff in which defendant Ives was a defendant. *See* *Spavone v. Fischer*, No. 10-CV-9427, 2012 WL 360289, at *5 (S.D.N.Y. Feb. 3, 2012) (concluding that fifteen-month period between alleged retaliatory act by certain defendants and filing of lawsuit against same defendants failed to give rise to inference of retaliatory intent).

Moreover, with respect to defendant Thoms, plaintiff alleges that he has "cover[ed] up staff misconducts [sic]" and "denied [plaintiff] all classes of medical care." Am. Compl. at. 44. Such conclusory allegations are insufficient to demonstrate adverse action. *See* *Corley v. City of New York*, No. 1:14-CV-3202, 2017 WL 4357662, at *19 (S.D.N.Y. Sept. 28, 2017) ("Similarly, Plaintiff's allegations that he was 'repeatedly harassed' about kosher meals and that unit officers observed the food he ate, without more, are too vague to amount to an adverse action, however rude or upsetting they might have been."); *Bumpus v. Canfield*, 495 F. Supp. 2d 316, 326 (W.D.N.Y. 2007) ("[V]ague intimations of some unspecified harm generally will not rise to the level of adverse action for the purpose of a First Amendment retaliation claim."). In addition, as with defendant Ives, the amended complaint does not identify the prior lawsuit(s) that plaintiff filed in which defendant Thoms was a defendant, or provide any information about the nature or disposition of the

claim(s) asserted against defendant Thoms. Thus, the Court is unable to evaluate whether the alleged adverse action taken by defendant Thoms was casually connected to one or more prior lawsuits filed by plaintiff in which defendant Thoms was a defendant.

***16** Accordingly, plaintiff's retaliation claims against defendants Ives and Thoms are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### b. Retaliation Claims Based on Denial of Medical Treatment

Liberally construed, the amended complaint asserts retaliation claims against defendants Lipka, Havens, Rogue, Lafresch, Brunelle, Watkins, Boice, Van Order, Ives, Pal, Jackson, Pink, and Leclaire, based on the denial of medical treatment, which plaintiff alleges occurred as a result of grievances that he filed regarding his medical treatment. *See* Am. Compl. at 49-52, 61-63.

Although plaintiff does not allege the date when any of his grievances were filed, he does allege as follows: (1) after defendant Lipka denied plaintiff sick call services and over-the-counter medications in January 2016, he "wrote multipl[e] grievance complaints against [defendant] Lipka[,]" Am. Compl. at 49; and (2) after defendants Pal, Ives, and Jackson discontinued plaintiff's psychiatric medication in April 2016, he filed grievances against these defendants regarding the discontinuation, *id*. at 61. Plaintiff further alleges that, after he engaged in this protected activity, he experienced adverse action.

More specifically, plaintiff alleges that after he wrote grievances against defendant Lipka, she drafted false misbehavior reports against him and, along with defendants Havens, Rogue, Lafresch, Brunelle, Watkins, Boice, and Van Order, denied him medication and treatment. *Id*. at 36, 49-53. In addition, he alleges that defendants Ives, Jackson, and Pal denied him medications based on a letter he wrote to defendant Leclaire, and that after he wrote grievances about their denial of medications, they caused defendant Pink to falsely report that he was refusing to take his medication, which false report was used as a basis for defendants Ives, Jackson, Pal, Pink and Leclaire to deny plaintiff future access to psychiatric medication and mental health treatment. *Id*. at 61-64.

Mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that these First Amendment retaliation claims against defendants Lipka, Havens, Rogue, Lafresch, Brunelle, Watkins, Boice, Van Order, Ives, Pal, Jackson, Pink, and Leclaire survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

### c. Retaliation Claim Against Defendant Weston

Plaintiff also asserts a retaliation claim against defendant Weston based on alleged adverse action taken within a day or less of him learning that he was a named defendant in plaintiff's amended complaint. Am. Compl. at 69-70. More specifically, plaintiff alleges that defendant Weston, after learning that plaintiff was drafting the amended complaint on July 4, 2016, threatened him with harm, searched his cell, disturbed personal property belonging to plaintiff, and drafted a false misbehavior report against him. *Id*. at 69-70.

Mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that this retaliation claim survives sua sponte review and requires a response. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed motion to dismiss or for summary judgment.

### 8. Cover-Up Claim Based on Failure to Report and Document Injuries

***17** Plaintiff alleges that defendants Boice, Van Order, Havens, Rogue, and Watkins covered up the alleged assault that occurred on October 28, 2015, by refusing to report plaintiff's complaints, and photograph and document his injuries. Am. Compl. at 54.

Ordinarily, "[a] claim that a prison employee has taken steps to conceal evidence of a past constitutional violation which is not ongoing does not alone state a cognizable constitutional claim under 42 U.S.C. § 1983." *De Ponceau v. Bruner*, No. 9:09-CV-0605 (GTS/DEP), 2012 WL 1030415, at *7 (N.D.N.Y. Feb. 21, 2012) (collecting cases), report and recommendation adopted by 2012 WL 1014821 (N.D.N.Y. Mar. 23, 2012); *Evans v. Murphy*, No. 12-CV-365, 2013 WL

2250709, at *3 (W.D.N.Y. May 22, 2013) (dismissing claim that defendant "failed to document [plaintiff's] injuries to cover-up the incident[,]" noting that "[s]uch a claim does not state a constitutional claim"); *Barnes v. Fedele*, 760 F. Supp. 2d 296, 304-05 (W.D.N.Y. 2011) (the plaintiff's conclusory allegations of a "cover up" due to a "less than thorough investigation" fail to state a claim) (citing *Twombly*, 550 U.S. at 544).

An exception to this general rule may exist when an alleged cover-up "has made it impossible for the plaintiff to litigate an underlying claim, because material evidence was destroyed, for instance, or because the statute of limitations expired before the plaintiff discovered the cover-up." *Tavares v. New York City Health & Hosps. Corp.*, No. 13-CV-3148, 2015 WL 158863, at *7 (S.D.N.Y. Jan. 13, 2015) (citing *Christopher v. Harbury*, 536 U.S. 403, 413-14 & n. 11 (2002) (describing these claims as "backward-looking access claims")). "The Second Circuit has emphasized, however, that '[t]he viability of [such] claims is far from clear,' pointing out that the *Harbury* decision was careful not to endorse their validity." *Tavares*, 2015 WL 158863, at *7 (quoting *Sousa v. Marquez*, 702 F.3d 124, 128 (2d Cir. 2012)).

In any event, even assuming backward-looking access claims are actionable, "such claims are available only if a judicial remedy was 'completely foreclosed' by the alleged cover-up." *Sousa*, 702 F.3d at 128 (quoting *Broudy v. Mather*, 460 F.3d 106, 120 (D.C. Cir. 2006)). Here, plaintiff has failed to allege facts which plausibly suggest that a judicial remedy for the alleged violation of his Eighth Amendment rights has been foreclosed by a destruction of evidence. Plaintiff does not have a constitutional right to have his injuries documented, and the alleged refusal to document his injuries does not demonstrate personal involvement in the violation of a constitutional right that has already occurred. *See Simpson v. Overbaugh*, No. 9:15-CV-180 (DNH/CFH), 2015 WL 7444369, at *8 (N.D.N.Y. Sept. 28, 2015) ("It appears that plaintiff is suggesting that Klein substituted later-taken pictures for pictures taken shortly after plaintiff received his injuries in order to make his injuries appear less severe. This conclusory claim, without more, fails to demonstrate that Klein was personally involved in any deprivation rising to the level of a section 1983 violation."), report and recommendation adopted by 2015 WL 7444617 (N.D.N.Y. Nov. 23, 2015); *Sowell v. Chappius*, 695 F. Supp. 2d 16 (W.D.N.Y. 2010) (dismissing claim that correctional officer wrote a false misbehavior report to cover up for other officers who had allegedly assaulted the plaintiff on the ground that a "prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report" and "courts have dismissed claims alleging the issuance of false misbehavior reports as part of a 'coverup' attempt"); *see also Evans*, 2013 WL 2250709, at *3; *Barnes*, 760 F. Supp. 2d at 304-05.

***18** Accordingly, plaintiff's claims against defendants Boice, Van Order, Havens, Rogue, and Watkins based on an alleged cover up of an assault are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 9. Due Process Claim Based on Restrictive Diet

Plaintiff alleges that defendants Ives, Miller, Jackson, Pal, Eastman, Karandy, Bascue, Nabozny, Cleveland, Depalo, Annucci, Bellnier, and Venettozzi conspired with each other and "sentenced" him to a restrictive "loaf" diet for several months, in violation of his due process rights. Am. Compl. at 45-47.

To successfully state a claim under Section 1983 for denial of due process, a plaintiff must establish both the existence of a protected liberty or property interest, and that he or she was deprived of that interest without being afforded sufficient process. *Shakur v. Selsky*, 391 F.3d 106, 118 (2d Cir. 2004) (citing *Kentucky Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989)). Due process generally requires that the state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003). An inmate's protected liberty interest is implicated where the punishment at issue imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor*, 515 U.S. 472, 484 (1995).

Here, plaintiff has failed to allege any facts regarding the disciplinary hearing(s) that resulted in his "sentences" to a restrictive loaf diet, including the charges that formed the basis for the hearing(s), the identity of the hearing officer(s), and the defenses he raised to the charge(s), if any. Plaintiff has also failed to allege how, if at all, he was denied due process during the hearing(s), let alone how any of the defendants he has named were personally involved in denying him due process. Thus, even assuming that his placement on the restrictive diet imposed an "atypical and significant hardship" on plaintiff, he has failed to allege facts which plausibly

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

suggest that he was deprived of sufficient process before being deprived of a liberty interest by any of the defendants he has named.

Accordingly, plaintiff's due process claim against defendants Ives, Miller, Jackson, Pal, Eastman, Karandy, Bascue, Nabozny, Cleveland, Depalo, Annucci, Bellnier, and Venettozzi arising out of his placement on a restrictive diet is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

**10. Eighth Amendment Claim Based on Restrictive Diet**

Plaintiff alleges that the restrictive diet he received was not nutritionally adequate, and caused him to suffer personal injuries, in violation of his Eighth Amendment rights. Am. Compl. at 45. Plaintiff further alleges that he filed complaints and grievances regarding his diet with defendants Annucci, Bellnier, Heywood, Bellamy, Venettozzi, Bruen, McKoy, Hollman, Hilton, Koenigsmann, Effman, Miller, Thoms, Eastman, Melecio, Peacock, Horris, Karandy, Depalo, Nabozny, Collins, and Cleveland, and all failed to remedy the situation. *Id*. at 46.

The Eighth Amendment's protection of prisoners from "cruel and unusual punishment" includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer*, 511 U.S. at 837. "Conditions imposed by a prison official violate the Eighth Amendment only when a plaintiff establishes that (1) he was confined under conditions that exposed him to a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety." *Adams v. Rock*, No. 9:12-CV-1400 (GLS/ATB), 2015 WL 1312738, at *5 (N.D.N.Y. Mar. 24, 2015) (citing *Farmer*, 511 U.S. at 834).

***19** With respect to the first prong, "under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." *Robles v. Coughlin*, 725 F.2d 12, 15-16 (2d Cir. 1983) (citations omitted). For instance, " 'the Eighth Amendment prohibition against cruel and unusual punishment does require that prisoners be served nutritionally adequate food ... [that does not] present an immediate danger to health and well being of the inmates who consume it.' " *Id.* at 15 (citation omitted). "With respect to the second prong, deliberate indifference to inmate health or safety may be shown where a prison official knew a diet was inadequate and likely to cause pain. *Adams*, 2015 WL 1312738, at *5 (citing *Phelps v. Kapnolas*, 308 F.3d 180, 186 (2d Cir. 2002)).

Here, plaintiff alleges in conclusory terms that he was placed on a restrictive diet for six or seven months based on multiple "sentences" that he received, and that his placement on the "loaf" "provoked stomach pains, constipation[ ], heartburn, bleeding, vomits [sic] and nausea[.]" Am. Compl. at 45. The amended complaint does not allege any facts regarding the duration of each sentence, or the number of "sentences" plaintiff received. The Court is therefore unable to determine the total number of days that plaintiff was on a restrictive diet. In addition, plaintiff does not allege any facts regarding the frequency or severity of the conditions he identifies, or state when they first arose. It also appears from the allegations in the amended complaint that the plaintiff's condition was monitored by medical staff.[6] *See* Am. Compl. at 45, 48.[7] Plaintiff has therefore failed to allege facts which plausibly suggest that his placement on the "loaf" was a sufficiently serious deprivation for purposes of the objective prong of the Eighth Amendment claim. *See, e.g., McEachin v. McGuinnis*, 357 F.3d 197, 199-200 (2d Cir. 2004) (affirming district court's dismissal of Eighth Amendment claim alleging, inter alia, that inmate was placed on a restricted "loaf" diet for seven days during which time he experienced severe stomach pains and weight loss); *Alexander v. Fischer*, No. 9:14-CV-548 (GLS/ATB), 2015 WL 10568892, at *9 (N.D.N.Y. Dec. 21, 2015) ("While plaintiff objects to his placement on a restricted diet in September 2013 as a violation of due process and DOCCS policy, that penalty does not raise an Eighth Amendment issue under the circumstances, where the diet was approved by medical staff."), report and recommendation adopted by 2016 WL 1261124 (N.D.N.Y. Mar. 30, 2016); *Mortimer Excell v. Fischer*, No. 9:08-CV-945 (DNH/RFT), 2009 WL 3111711, at *4 (N.D.N.Y. Sept. 24, 2009) (holding plaintiff's claims that he suffered from heart and chest pains for a period of five days and that he was denied refills for medication used to treat stomach pain to be conclusory allegations).

In addition, even assuming that the allegations in the amended complaint satisfied the objective test, the amended complaint is devoid of any allegations which plausibly suggest that any individual defendant was aware of plaintiff's alleged medical condition resulting from the restrictive diet, let alone that he or she was aware of a substantial risk of serious harm to plaintiff. Indeed, aside from plaintiff's conclusory allegation that several defendants and "medical staff" were

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

aware that plaintiff was on this diet, Am. Compl. at 45, the amended complaint alleges only that plaintiff spoke with defendants Ives, Pal, and Jackson regarding his belief that he was improperly placed on the restrictive diet. *Id.* at 46. There are no allegations that plaintiff discussed any of his symptoms with these defendants, and plaintiff does not otherwise identify any date(s) when he filed grievances or complaints regarding the restrictive diet, the subject matter of any such grievances or complaints, or the individual(s) to whom he wrote about the restrictive diet. Thus, plaintiff has failed to allege facts sufficient to demonstrate that any of the defendants acted with a sufficiently culpable state of mind. *See* *Toliver v. Dep't of Corrs.*, No. 10-CV-6298, 2012 WL 4510635, at *9 (S.D.N.Y. Apr. 10, 2012) (dismissing deliberate indifference claim for failure to plead facts identifying a responsible official who acted with a sufficiently culpable state of mind).

***20** Accordingly, plaintiff's Eighth Amendment claim based on his placement on a restrictive diet is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 11. Conspiracy Claims

A conspiracy claim under 42 U.S.C. § 1983 must allege that: (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on plaintiff and (2) an overt act was committed in furtherance of that goal. *Ciambriello v. County of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002). Vague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed. *Ciambriello*, 292 F.3d at 325; *see also* *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983) ("A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss."); *Brown v. City of Oneonta,* 106 F.3d 1125, 1133 (2d Cir. 1997) (complaints containing only conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief). "[A]lthough a plaintiff does not need to provide detailed factual allegations, the allegations in the complaint must be 'enough to raise a right to relief above the speculative level.' " *Flores v. Levy*, No. 07-CV-3753, 2008 WL 4394681, at *9 (E.D.N.Y. Sep. 23, 2008) (quoting *Twombly*, 550 U.S. at 554).

Here, plaintiff alleges that defendants Bascue, Lowry, Cleveland, Williams, Nabozny, Depalo, Peacock, Thoms, Eastman, Miller, Horris, Karandy, Collins, Koenigsmann, Annucci, Melecio, Bellnier, Bellamy, Beebe, and Birrell "covered up" the misconduct of defendant Lipka, and "found [plaintiff] guilty" on the charges she brought against him. Am. Compl. at 49. Plaintiff also alleges that defendants Beebe, Kuinlan, Bellamy, Hale, Miller, Melecio, Thoms, Eastman, Annucci, Hilton, Heywood, McKoy, Effmon, Collins, Koenigsmann, Peacock, Hollman, Morris, Chief of OSI, Montes, Bruen, Jackson, and "DOCCS/OMH/NYS" conspired with each other to violate plaintiff's rights by refusing to process his grievances, and failing to address the misconduct to which plaintiff was subjected after becoming aware of such misconduct. *Id.* at 54-55.

These allegations are wholly conclusory, and fail to plausibly suggest how, when, or why these defendants colluded and formed these alleged schemes. While specifics are unnecessary, plaintiff fails to provide any information which would plausibly suggest a claim of an explicit or implicit agreement between any or all of these defendants to violate his constitutional rights. *See* *Iqbal*, 556 U.S. at 680-81 (allegations that the defendants "willfully and maliciously agreed to subject" the plaintiff to harsh conditions of confinement "solely on account of his religion, race, and/or national origin" found conclusory); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (finding allegations of conspiracy "baseless" where the plaintiff "offer[ed] not a single fact to corroborate her allegation of a 'meeting of the minds' among the conspirators"); *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights" is proper).

***21** Accordingly, plaintiff's conspiracy claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 12. Harassment Claim

Verbal harassment and name calling, absent physical injury, are not constitutional violations cognizable under Section 1983. *See* *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) (per curiam); *Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 474 (S.D.N.Y. 1998) ("verbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

right and therefore is not actionable under 42 U.S.C. § 1983") (quotation omitted); *see also* *Rivera v. Goord*, 119 F. Supp. 2d 327, 342 (S.D.N.Y. 2000) (collecting cases); *Baskerville v. Goord*, No. 97-CV-6413, 2000 WL 897153, at *3 (S.D.N.Y. July 6, 2000) ("Mere verbal abuse or the use of ... slurs or epithets reflecting ... prejudice, although reprehensible, does not form the basis of a claim pursuant to § 1983."). This principle holds true even when the harassment concerns threats. *See, e.g.,* *Thomas v. Pingotti*, No. 9:17-CV-0300 (GTS/DEP), 2017 WL 3913018, at *4 (N.D.N.Y. Sept. 6, 2017) (dismissing First Amendment retaliation claim based on threat made by corrections officer); *Pledger v. Hudson,* No. 99-CV-2167, 2005 WL 736228, at *5 (S.D.N.Y. Mar. 31, 2005) ("[T]hreats made to an inmate, without more, do not rise to the level of a constitutional violation."); *Kemp v. LeClaire*, No. 03-CV-0844, 2007 WL 776416, at *15 (W.D.N.Y. Mar. 12, 2007) (threats such as "your day is coming," "you'll be sent to your mother in a black box," and "you'll get your black ass kicked" are indistinguishable from those that have been found insufficient to establish a constitutional violation).

Here, plaintiff alleges that defendant Paolano harassed him by using "dirties [sic] words and discriminatory words" while treating him. Am. Compl. at 52. Plaintiff does not allege that he sustained any physical injury as a result of the alleged harassment.

Accordingly, plaintiff's claim against defendant Paolano based on verbal harassment is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 13. Religious Meals Claims

Plaintiff alleges that defendants Miller, Eastman, Annucci, Bellnier, McKoy, Williams, Thoms, Peacock, Leonard, Telesco, Cleveland, Birrell, Nabozny, Bascue, Melecio, Lowry, Byers, Kellmon, Depalo, Collins, Hilton, Bellamy, Beebe, Bruen, Heywood, Hale, Lyons, Scanlon, Vladyka, and Venettozzi interfered with his right to practice his religion by denying him religious meals in violation of the First Amendment and RLUIPA. Am. Compl. at 39, 59-60.

The First Amendment to the United States Constitution guarantees the right to free exercise of religion. *See* U.S. Const. amend. I; *Cutter v. Wilkinson*, 544 U.S. 709, 719, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). As is true with regard to the First Amendment generally, the free exercise clause applies to prison inmates, subject to appropriate limiting factors. *See* *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (holding that "[p]risoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause" (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).

***22** RLUIPA also affords prison inmates certain protections relative to exercising their religious beliefs, and provides, in pertinent part, that

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of a burden on that person-
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.
>
> 42 U.S.C. § 2000cc–1(a).

"The right of prison inmates to exercise their religious beliefs, however, is not absolute or unbridled, but instead is subject to valid penological concerns, including those relating to institutional security." *Walker v. Fischer*, No. 9:10-CV-01431 (MAD/DEP), 2012 WL 1029614, at *6 (N.D.N.Y. Mar. 26, 2012) (citing, *inter alia, O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)). "Ordinarily, the Eighth Amendment establishes as a constitutional minimum the requirement that inmates be provided with nutritionally adequate meals; provided this threshold is met, prison officials otherwise retain considerable discretion in determining dietary constituents." *Walker*, 2012 WL 1029614, at *6 (citing *Word v. Croce*, 169 F. Supp. 2d 219, 226 (S.D.N.Y. 2001)). This requirement, however, is on occasion narrowed by the First Amendment's free exercise clause, which is broad enough to include an inmate's "clearly established" right "to a diet consistent with his or her religious scruples." *Ford*, 352 F.3d at 597; *see also* *Bass v. Coughlin*, 976 F.2d 98, 99 (2d Cir. 1992).

"To state a claim under the First Amendment or RLUIPA, an inmate 'must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.' " *Simmons v. Robinson*, No. 07-CV-7383, 2011 WL 31066, at


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

*5 (S.D.N.Y. Jan. 4, 2011) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006)). However, " '[a]ll that is required for a prison diet not to burden an inmate's free exercise of religion is the provision of a diet sufficient to sustain the prisoner's good health without violating [his religion's] dietary laws.' " *Simmons v. Robinson*, No. 07-CV-7383, 2010 WL 5538412, at *12 (S.D.N.Y. Jan. 28, 2010) (quoting *Abdul–Malik v. Goord*, No. 07-CV-4584, 1997 WL 83402, at *6 (S.D.N.Y. Feb. 27, 1997)), report and recommendation adopted by 2011 WL 31066, at *5 (S.D.N.Y. Jan. 4, 2011).

Here, plaintiff alleges that because he was placed on a restrictive diet, he was denied the opportunity to participate in "the Jewish pass over" in May 2016. Am. Compl. at 59. However, plaintiff fails to identify his religion, which makes it impossible for the Court to determine if the denial of one or more kosher meals placed a substantial burden on his religious beliefs. Plaintiff also alleges no facts which plausibly suggest which individuals were personally involved in sentencing him to a restrictive diet during Passover, which individuals he contacted to request kosher meals, and when he contacted those individuals. Thus, the amended complaint is devoid of any allegations which plausibly suggest that defendants Miller, Eastman, Annucci, Bellnier, McKoy, Williams, Thoms, Peacock, Leonard, Telesco, Cleveland, Birrell, Nabozny, Bascue, Melecio, Lowry, Byers, Kellmon, Depalo, Collins, Hilton, Bellamy, Beebe, Bruen, Heywood, Hale, Lyons, Scanlon, Vladyka, and/or Venettozzi interfered with a tenet or belief that is central to any religious doctrine.

***23** Accordingly, plaintiff's RLUIPA and First Amendment free exercise claims against defendants Miller, Eastman, Annucci, Bellnier, McKoy, Williams, Thoms, Peacock, Leonard, Telesco, Cleveland, Birrell, Nabozny, Bascue, Melecio, Lowry, Byers, Kellmon, Depalo, Collins, Hilton, Bellamy, Beebe, Bruen, Heywood, Hale, Lyons, Scanlon, Vladyka, and Venettozzi are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 14. Discrimination Claims

Plaintiff alleges that defendants McCarthy, Winney, Peacock, and Collins ignored him and his requests for mental health treatment, and in doing so, treated him differently than other similarly situated inmates at Great Meadow C.F. confined to SHU, in violation of the Equal Protection Clause of the Fourteenth Amendment and the ADA. Am. Compl. at 64.

#### a. Fourteenth Amendment Equal Protection Claim

The Equal Protection Clause requires that the government treat all similarly situated people alike. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Specifically, the Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)). To state a viable claim for denial of equal protection, a plaintiff generally must allege "purposeful discrimination ... directed at an identifiable or suspect class." *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995). In the alternative, under a "class of one" theory, plaintiff must allege that he has been intentionally treated differently from others similarly situated, with no rational basis for the difference in treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *DeMuria v. Hawkes*, 328 F.3d 704, 706 (2d Cir. 2003).

Assuming that plaintiff has intended to assert an equal protection claim under a "class of one" theory, the amended complaint is devoid of any allegations that plaintiff was intentionally treated differently from others similarly situated, with no rational basis for the difference in treatment. *See Village of Willowbrook*, 528 U.S. at 564. In fact, the amended complaint fails to identify any individuals treated differently than plaintiff under a similar situation. Instead, plaintiff's allegation that defendants McCarthy, Winney, Peacock, and Collins denied him equal protection is entirely conclusory, which is not enough to survive sua sponte review. *See Iqbal*, 556 U.S. at 678 (concluding that a pleading that only "tenders naked assertions devoid of further factual enhancement" will not survive sua sponte review) (internal quotations and alterations omitted); *Twombly*, 550 U.S. at 555 ("[A] plaintiff's obligation ... requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."); *Thomas*, 2017 WL 3913018, at *7 ("Conclusory allegations of disparate treatment or a plaintiff's personal belief of discriminatory intent are patently

insufficient to plead a valid claim under the Equal Protection clause.").

Accordingly, plaintiff's equal protection claims against defendants McCarthy, Winney, Peacock, and Collins are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### b. ADA Claim

***24** Title II of the ADA "proscribes discrimination against the disabled in access to public services." *Harris v. Mills*, 572 F.3d 66, 73 (2d Cir. 2009) (citation omitted). The statute provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id*. (citing 42 U.S.C. § 12132).[8] "To assure those requirements are met, 'reasonable accommodation' may have to be provided to the qualified individual." *Harris*, 572 F.3d at 73 (citation omitted).

"Individuals in their personal capacities are not proper defendants on claims brought under the ADA ..., although individuals can be sued in their official capacities under [the ADA]." *Keitt v. New York City*, 882 F. Supp. 2d 412, 456-57 (S.D.N.Y. 2011); *Wenger v. New York State Dep't of Health*, No. 5:14-CV-885 (DNH/TWD), 2015 WL 3397958, at *5 (N.D.N.Y. May 26, 2015) ("Title II of the ADA does not provide for individual capacity suits against public officials[.]"). However, "claims for money damages against state officials in their official capacities under Title II of the ADA are barred by the Eleventh Amendment, absent a showing that a violation was motivated by discriminatory animus or ill will due to the disability." *Wenger*, 2015 WL 3397958, at *5.

To the extent that, liberally construed, plaintiff's amended complaint can be read to encompass a claim against the named defendants in their official capacities, plaintiff's ADA claim is deficient because he fails to identify a disability for which he needed mental health treatment. Moreover, plaintiff fails to allege facts which plausibly suggest that he was treated differently than other inmates in SHU because of his disability. *See* *Roberts v. City of New York*, No. 14-CV-5198, 2016 WL 4146135, at *9 (S.D.N.Y. Aug. 2, 2016) (dismissing ADA claim where "[t]he complaint fail[ed] to allege that Plaintiff was excluded from participation in any program or activity, or otherwise treated differently, because of the disability"); *Rosado v. Herard*, No. 12-CV-8943, 2014 WL 1303513 at *5 (S.D.N.Y. Mar. 25, 2014) ("[C]ourts routinely dismiss ADA suits by disabled inmates that allege inadequate medical treatment, but do not allege that the inmate was treated differently because of his or her disability." (citations & quotations omitted)); *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514 at *19 (S.D.N.Y. Aug. 2, 2013) ("[T]he Court need not engage in an extensive analysis of the ADA requirements because Plaintiff makes absolutely no allegation that he was discriminated against, or that Defendants failed to provide him with a reasonable accommodation—i.e., railings on the walkway or an alternative to traveling through the walkway—because of his disability.... Thus, Plaintiff's ADA claim is DISMISSED."); *see also, e.g.,* *Daniels v. Arnone*, No. 13-CV-1371, 2013 WL 5671047 at *3 (D. Conn. Oct. 11, 2013) (dismissing ADA claim where plaintiff failed to identify his disability or "any program or service from which he has been excluded or denied benefits as a result of his disabilities").

Accordingly, plaintiff's ADA claim is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 15. FOIL Claim

***25** Plaintiff alleges that defendant White denied his FOIL requests for video and audio recordings. *See* Am. Compl. at 64-65. Construing plaintiff's claim as one alleging that he was denied property, namely material requested pursuant to New York state FOIL, without due process in violation of the Fourteenth Amendment to the United States Constitution, plaintiff has failed to state a claim pursuant to Section 1983. Multiple district courts in this circuit have held that a plaintiff has no constitutionally protected interest in obtaining FOIL documents. *See* *Dudley v. Harris*, No. 9:08-CV-0271 (DNH/RFT), 2008 WL 5056612 at *2 (N.D.N.Y. Oct. 17, 2008) (finding no property interest in documents requested through FOIL), adopted by 2008 WL 5056612, at *1 (N.D.N.Y. Nov. 24, 2008); *Lawrence v. Antonucci*, No. 04-CV-0356, 2005 WL 643457, at *3 (W.D.N.Y. Mar. 16, 2005) (finding that plaintiff failed to establish a protected property interest in documents subject to a FOIL request); *O'Bradovich v. Vill. of Tuckahoe*, No. 04-CV-0049, 2004 WL 1616588, at *15-16 (S.D.N.Y. July 19, 2004) ("Plaintiffs could not, as a matter of law, have a property interest in the mere

expectation of receiving FOIL documents."). Accordingly, access to documents pursuant to FOIL constitutes a mere expectation, not an entitlement that would establish a property interest under the Due Process Clause. Moreover, a violation of New York State FOIL does not give rise to a federal claim under 42 U.S.C. § 1983. *See Pollnow v. Glennon*, 757 F.2d 496, 501 (2d Cir. 1985) ("Clearly, a violation of state law is not cognizable under § 1983."). Rather, plaintiff's remedy for an alleged violation of FOIL is to follow procedures set forth in state laws or regulations.

Accordingly, plaintiff's FOIL claim against defendant White is dismissed pursuant to pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

**16. Interference with Grievance Claims**

There is no constitutional right of access to the established inmate grievance program. *Davis v. Buffardi*, No. 9:01-CV-0285 (PAM/GJD), 2005 WL 1174088, at *3 (N.D.N.Y. May 4, 2005) ("[p]articipation in an inmate grievance process is not a constitutionally protected right"); *Shell v. Brzezniak*, 365 F. Supp. 2d 362, 369-70 (W.D.N.Y. 2005) ("[i]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim"); *Cancel v. Goord*, No. 00-CV-2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) ("inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983"). "If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim." *Shell*, 365 F. Supp. 2d at 369-70 (W.D.N.Y. 2005). "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Id.* (internal quotation marks and citation omitted); *Celestin*, 2014 WL 272443, at *1, *3 ("[C]omplaints that prison officials tampered with, failed to investigate, or improperly processed grievances, without more, do not give rise to liability under § 1983."); *Irvis*, 2011 WL 454792, at *2 ("Thus, regardless of whether and to what extent defendants followed their grievance procedures in investigating or failing to investigate Irvis's complaints, his claims must fail as a matter of law as they are not actionable under § 1983.").

Thus, insofar as plaintiff alleges that defendants Beebe, Kuinlan, Bruen, Annucci, Hilton, Bellamy, Hale, Miller, Melecio, Thoms, Eastman, McKoy, and Heywood interfered with, or failed to address, his grievances, *see* Am. Compl. at 54-57, 65, or violated plaintiff's First Amendment right to freedom of speech by obstructing his grievances, he fails to state a claim upon which relief may be granted.

Accordingly, plaintiff's interference with grievance claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

**17. Remaining Claims Against Defendant Weston**

***26** Plaintiff alleges that at on four occasions between June 28, 2016 and July 5, 2016, as well as other unidentified occasions between October 2015 and July 2016, defendant Weston harassed him, conducted unauthorized searches of his cell, and "mishandled" his legal materials. Am. Compl. at 68. Plaintiff also alleges that on unidentified dates between October 2015 and July 2016, defendant Weston issued him false misbehavior reports, and denied him meals, showers and recreation. *Id.* In addition, plaintiff alleges that on July 5, 2016, defendant Weston used excessive force against him in removing handcuffs from his wrists, and denied plaintiff medical care for his injuries, in violation of the Eighth Amendment. *Id.* at 70.

As set forth above, verbal harassment and name calling, absent physical injury, are not constitutional violations cognizable under Section 1983. *See, e.g., Purcell*, 790 F.2d at 265. Similarly, the searches of plaintiff's cell do not amount to a constitutional violation. *See Leitzsey v. Coombe*, 998 F. Supp. 282, 289 (W.D.N.Y. 1998) ("The Supreme Court has held that searches of prison cells do not implicate protected constitutional rights; prisoners have no reasonable expectation of privacy within the confines of their cell.") (citing *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)); *DeMaio v. Mann*, 877 F. Supp. 89, 95 (N.D.N.Y. 1995) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights."); *Rodriguez v. McClenning*, 399 F. Supp. 2d 228, 239 (S.D.N.Y. 2005) (concluding that an inmate has "no constitutional right to be free from cell searches of any kind, including retaliatory cell searches"). Plaintiff also does not have a constitutional right to be free from being falsely accused of misconduct. *See Boddie*, 105 F.3d at 862 ("[A] prison inmate has no general

right to be free from being falsely accused in a misbehavior report.”).

With regard to the alleged “mishandl[ing]” of his legal papers, plaintiff has failed to allege facts which plausibly suggest that any of his legal claims were prejudiced as a result of defendant Weston's actions. As a result, this allegation also does not give rise to a constitutional claim.

In addition, plaintiff has failed to identify the date(s) and number of times when defendant Weston denied him meals, showers, and recreation. The Court is therefore unable to evaluate whether these denials, together or individually, give rise to a constitutional claim. *See* *Jabot v. MHU Counselor Roszel*, No. 14-CV-3951, 2016 WL 6996173, at *5 (S.D.N.Y. Nov. 29, 2016) (“The denial of a shower on an unspecified number of occasions fails to state a plausible claim of inhumane conditions of confinement because it is too vague and cursory to withstand a motion to dismiss.”); *Ford v. Phillips*, No. 05-CV-6646, 2007 WL 946703, at *9 (S.D.N.Y. Mar. 27, 2007) (temporary deprivations of property, showers, and recreation do not violate the Eighth Amendment); *Cruz v. Jackson*, No. 94-CV-2600, 1997 WL 45348, at *7 (S.D.N.Y. Feb. 5, 1997) (two weeks without showers and unspecified incidents of receiving rusty drinking water does not satisfy the objective component of an Eighth Amendment claim); *Reeder v. Artus*, No. 9:09-CV-575 (DNH/DRH), 2010 WL 3636138, at *11 (N.D.N.Y. July 27, 2010) (recommending dismissal of Eighth Amendment claim against two corrections officers based on an allegation that they “denied him food meals” because the complaint “fail[ed] to allege with specificity any dates or times of such meal denials”), report and recommendation adopted by 2010 WL 3636132 (N.D.N.Y. Sept. 9, 2010); *Konovalchuk v. Cerminaro*, No. 9:11-CV-01344 (MAD/CFH), 2014 WL 272428, at *1-*3, *21 (N.D.N.Y. Jan. 24, 2014) (adopting recommendation dismissing Eighth Amendment claim based on denial of two consecutive meals); *Gill v. Hoadley*, 261 F. Supp. 2d 113, 129 (N.D.N.Y. 2003) (finding that complaint failed to state Eighth Amendment claim where prisoner alleged he was denied one meal).

***27** Lastly, with regard to plaintiff's allegation that defendant Weston used force in removing handcuffs from his wrists and thereafter denied him medical treatment, the amended complaint fails to allege facts which plausibly suggest that defendant Weston maliciously used force in removing the handcuffs for the purpose of causing harm to plaintiff. *See, e.g.,* *Chavis v. Chappius*, No. 06-CV-543, 2015 WL 1472117, at *6 (W.D.N.Y. Mar. 31, 2015) (dismissing claim based on application of handcuffs where complaint failed to allege that corrections officer “placed the handcuffs on plaintiff's wrists with a sufficient level of wantonness to state a violation of the Eighth Amendment”). In addition, because plaintiff alleges only that the removal of the handcuffs “injured” his “hands and wrists[,]” the Court is unable to evaluate the seriousness of plaintiff's injuries, and whether denying plaintiff access to medical treatment, as alleged, states a claim for medical indifference under the Eighth Amendment.

For all of these reasons, plaintiff's claims against defendant Weston, other than his retaliation claim discussed in Part II.B.7.c, are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

## III. CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED** that the amended complaint, as modified, is accepted for filing and is the operative pleading; and it is further

**ORDERED** that the following claims are **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b): (1) plaintiff's claims against New York State, the New York State Department of Corrections and Community Supervision, and the New York State Office of Mental Health; (2) plaintiff's FOIL claim against defendant White; and (3) plaintiff's claim that defendants Beebe, Kuinlan, Bruen, Annucci, Hilton, Bellamy, Hale, Miller, Melecio, Thoms, Eastman, McKoy, and Heywood violated his constitutional rights by interfering with, or failing to address, his grievances; [9] and it is further

**ORDERED** that the following claims **SURVIVE** sua sponte review and require a response: (1) plaintiff's medical indifference claims against defendants Karandy, Paolano, Lipka, Havens, Rogue, Lafresch, Brunelle, Watkins, Boice, Van Order, Ives, Jackson, Pal, Pink, Leclaire, and Paolano; (2) plaintiff's conditions-of-confinement claim against defendants Bascue and Lowry; (3) plaintiff's excessive force and failure-to-intervene claims against defendants Bascue, Gonyea, and Lyons; and (4) plaintiff's retaliation claims against defendants Lipka, Havens, Rogue,

Lafresch, Brunelle, Watkins, Boice, Van Order, Ives, Pal, Jackson, Pink, Leclaire, and Weston; and it is further

**ORDERED** that the remaining claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted; [10] and it is further

***28** **ORDERED** that all defendants, other than defendants Karandy, Paolano, Lipka, Havens, Rogue, Lafresch, Brunelle, Watkins, Boice, Van Order, Ives, Jackson, Pal, Pink, Leclaire, Paolano, Bascue, Lowry, Gonyea, Lyons, and Weston, are **DISMISSED without prejudice** as defendants to this action; and it is further

**ORDERED** that the Clerk shall issue summonses and forward them, along with a copy of the amended complaint, to the United States Marshal for service upon defendants Karandy, Paolano, Lipka, Havens, Rogue, Lafresch, Brunelle, Watkins, Boice, Van Order, Ives, Jackson, Pal, Pink, Leclaire, Paolano, Bascue, Lowry, Gonyea, Lyons, and Weston. The Clerk shall also forward a copy of the summons and amended complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that defendants Karandy, Paolano, Lipka, Havens, Rogue, Lafresch, Brunelle, Watkins, Boice, Van Order, Ives, Jackson, Pal, Pink, Leclaire, Paolano, Bascue, Lowry, Gonyea, Lyons, and Weston, or their counsel, respond to the amended complaint as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court. **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in plaintiff's address; his failure to do so may result in the dismissal of this action**; and it is further

**ORDERED** that the Clerk shall serve a copy of this Decision and Order on plaintiff.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 11466956

## Footnotes

1 In *Ex Parte Young*, 209 U.S. 123 (1908), the Supreme Court established an exception to state sovereign immunity in federal actions where an individual brings an action seeking injunctive relief against a state official for an ongoing violation of law or the Constitution. Under the doctrine, a suit may proceed against a state official in his or her official capacity, notwithstanding the Eleventh Amendment, when a plaintiff, "(a) alleges an ongoing violation of federal law, and (b) seeks relief properly characterized as prospective." *See In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) (quotations and citations omitted); *see also Santiago v. New York State Dep't of Corr. Serv.*, 945 F.2d 25, 32 (2d Cir. 1991) (holding that such claims, however, cannot be brought directly against the state, or a state agency, but only against state officials in their official capacities). In this case, plaintiff has not alleged facts which plausibly suggest the existence of an ongoing violation of law or the Constitution. *See generally*, Am. Compl.

2 Plaintiff also lists defendants Ives, Pal, Jackson, Pink, Leclaire, Van Order, Watkins, Lipka, Paolano, Karandy, Rogue, Boice, Lafresch, and Brunelle as having been aware of plaintiff's complaints regarding his medical care, but this is presumably based on their alleged direct involvement in denying plaintiff medical treatment, discussed above. Plaintiff does not otherwise allege facts which plausibly suggest that any of

these defendants were personally involved in a separate violation of plaintiff's Eighth Amendment right to adequate medical care.

3 "[A] person's right of access to the courts has been found to arise not only under the First Amendment but under other parts of the Constitution, including the Due Process Clause of the Fourteenth Amendment." *Lasher v. Dagostino*, No. 9:16-CV-0198 (BKS), 2016 WL 1717205, at *4 (N.D.N.Y. Apr. 28, 2016) (collecting cases).

4 In this regard, while "a *de minimis* use of force will rarely suffice to state a constitutional claim," *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993), the malicious use of force to cause harm constitutes an Eighth Amendment violation per se because in such an instance "contemporary standards of decency are always violated." *Blyden*, 186 F.3d at 263 (citing *Hudson*, 503 U.S. at 9). The key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7 (citing *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986)); *see also* *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973).

5 Liberally construed, plaintiff's amended complaint asserts several retaliation claims based on adverse action that plaintiff claims he experienced as a result of his grievances and/or complaints. While the amended complaint generically alleges that plaintiff filed grievances and/or complaints, it is not clear when any grievances or complaints were filed, nor, with limited exception, is it clear who the grievances or complaints were filed against.

6 7 N.Y.C.R.R. § 304.2(f) also requires such monitoring.

7 Plaintiff alleges that "medical nurses" "refused" to take plaintiff's blood pressure and weight, and falsified records regarding his condition. Am. Compl. at 45. Because plaintiff has not identified any individuals by name, or explained how any individual nurse was personally involved in this alleged misconduct, these allegations do not properly state a medical indifference claim.

8 A state prison is a "public entity" for purposes of the ADA. *See* *Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998); *Allah v. Goord*, 405 F. Supp. 2d 265, 279 (S.D.N.Y. 2005).

9 Generally, when a district court dismisses a pro se action sua sponte, the plaintiff will be allowed to amend his action. *See* *Gomez v. USAA Fed. Savings Bank*, 171 F.3d 794, 796 (2d Cir. 1999). However, an opportunity to amend is not required where the defects in the plaintiff's claims are substantive rather than merely formal, such that any amendment would be futile. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also* *Pucci v. Brown*, 423 Fed. App'x 77, 78 (2d Cir. 2011). Because these claims are either barred by the Eleventh Amendment or not cognizable, leave to amend would be futile.

10 Should plaintiff seek to pursue one or more of the claims dismissed without prejudice by the Court herein, he must amend his complaint in accordance with Rule 15 of the Federal Rules of Civil Procedure. Any amended complaint, which shall supersede and replace the operative pleading in its entirety, must allege claims of misconduct or wrongdoing against each named defendant which plaintiff has a legal right to pursue, and over which this Court may properly exercise jurisdiction. Any amended complaint filed by plaintiff must also comply with the pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 11844273
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Abiodun ADELEKE, Plaintiff,
v.
SUFFOLK COUNTY POLICE DEPARTMENT; and Daniann Stapleton as legal successor to James Stapleton, Defendants.

21-CV-03681 (GRB) (LGD)
|
Signed February 8, 2023

**Attorneys and Law Firms**

Abiodun Adeleke, Ossining, NY, Pro Se.

Stacy A. Skorupa, Suffolk County Department of Law, Hauppauge, NY, for Defendant Daniann Stapleton.

**REPORT AND RECOMMENDATION**

LEE G. DUNST, Magistrate Judge:

***1** *Pro se* plaintiff Abiodun Adeleke ("Plaintiff") commenced this action on June 9, 2021 under 42 U.S.C. Section 1983 ("Section 1983") alleging defendants Suffolk County Police Department ("SCPD") and SCPD Detective James Stapleton violated Plaintiff's Fourth and Fourteenth Amendment rights in connection with Plaintiff's arrest on June 19, 2018. *See* Electronic Case File Number ("ECF No.") 1 ("Complaint" or "Compl."). On August 29, 2022, Plaintiff filed a First Amended Complaint adding (1) Section 1983 claims asserting Fifth and Sixth Amendment violations in connection with the June 19, 2018 arrest, and (2) factual allegations regarding an earlier May 29, 2018 arrest. *See* ECF No. 41 ("FAC"). On August 30, 2022, the Court construed the FAC as a motion for leave to file the FAC (the "Motion"). *See* August 30, 2022 Electronic Schedule Order. For the reasons set forth herein, the undersigned respectfully recommends that the Court (1) deny Plaintiff's Motion with prejudice pursuant to Federal Rule of Civil Procedure ("Rule") 15 and (2) dismiss Plaintiff's existing claims against the SCPD *sua sponte* with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1).

## I. BACKGROUND

### A. Relevant Alleged Facts.

On May 29, 2018, unspecified SCPD officers followed and stopped a 2018 Nissan Frontier with Plaintiff inside the vehicle in Suffolk County, New York. FAC ¶ 5. The officers arrested Plaintiff and seized his cellular phones "without a warrant" (the "First Arrest"). *Id.* Plaintiff was released the same day but was "denied the return of his cellular phones" even though, according to Plaintiff, he was not charged in connection with that arrest. *Id.*

A similar event allegedly occurred the following month. On June 19, 2018, defendant SCPD Detective James Stapleton ("Detective Stapleton") stopped the same Nissan Frontier in Suffolk County, New York while Plaintiff was in its front passenger seat. Compl. ¶ 4. After reportedly finding heroin in the vehicle, Detective Stapleton arrested Plaintiff (as well as the driver, Christina Delciello) and seized Plaintiff's blue Alcatel cellphone (the "Second Arrest").[1] *Id.*; *id.* at 11-13. Plaintiff was transported to the SCPD's Fourth Precinct and charged with criminal possession of a controlled substance in the seventh degree pursuant to New York Penal Law Section 220.03. *Id.* ¶ 4. "Plaintiff was released the same day" without the phone, even though Plaintiff asked Detective Stapleton to return it, and the "charge was subsequently dismissed in Suffolk County Court." FAC ¶ 3; Compl. ¶¶ 4, 11, 16.

### B. Relevant Procedural History

On June 9, 2021, Plaintiff, who is now incarcerated at the Attica Correctional Facility, commenced this action by placing the Complaint for mailing to this Court.[2] ECF No. 1-2. On June 29, 2021, the Court received the Complaint. *See* Compl. at 1. The Complaint asserted that Detective Stapleton and the SCPD ("Defendants") violated Plaintiff's Fourth and Fourteenth Amendment rights during the Second Arrest when Detective Stapleton reportedly "seized plaintiff['s] cell phones against his will without a warrant or oath or affirmation to do so" and "falsely arrested plaintiff and [falsely] stated in his report that the plaintiff 'was found to be in possession of a quantity of heroin.' " Compl. ¶¶ 7-8. Plaintiff seeks $40,000,000 in damages in connection with this incident. Compl. ¶¶ 21-23.

***2** On July 19, 2021, Plaintiff moved for leave to proceed *in forma pauperis.* ECF No. 5. On August 17, 2021, District Judge Gary R. Brown granted that motion. ECF No. 7.

On September 13, 2021, Detective Stapleton answered the Complaint. ECF No. 12. On December 23, 2021, Detective Stapleton's counsel filed a Suggestion Of Death On The Record indicating pursuant to Rule 25(a)(1) and (2) that Detective Stapleton died during the pendency of this action. ECF No. 21. On February 22, 2022, Plaintiff moved to continue the action against Detective Stapleton. ECF No. 23. On April 8, 2022, defense counsel reported that Detective Stapleton's wife, Daniann Stapleton, "is the appropriate party to be substituted as legal successor to James Stapleton for the purposes of th[is] matter and she has advised ... that she consents to being substituted as the Defendant in that capacity only." ECF No. 24. On April 13, 2022, Judge Brown granted Plaintiff's motion to continue and substituted Daniann Stapleton as the legal successor to Detective Stapleton in this action under Rule 25. *See* April 13, 2022 Order.

On August 11, 2022, the undersigned set a schedule providing (among other things) that any motion or stipulation to amend the Complaint must be filed by September 15, 2022. ECF No. 37. That schedule also reminded Plaintiff that any motion to amend must comply with the undersigned's Individual Practice Rule VI regarding motion practice. *Id.*

On August 23, 2022, Plaintiff mailed the FAC to the undersigned, the Clerk of the Court, and Defendants' counsel. *See* FAC at 4. On August 29, 2022, the Clerk of the Court received and filed the FAC, which seeks to add (1) factual allegations regarding the First Arrest, and (2) claims under Section 1983 asserting the Second Arrest violated Plaintiff's rights under the Fifth and Sixth Amendments. *Compare* FAC *with* Compl. In response, the Court issued an order noting several deficiencies in Plaintiff's filing of the FAC:

> Pro se Plaintiff filed [the FAC] in violation of (1) Fed. R. Civ. P. 15 (requiring Plaintiff to seek leave of the Court or Defendants' consent prior to filing an amended complaint), (2) the undersigned's Individual Practice Rule VI (requiring that Plaintiff file a letter motion to amend the complaint and certify therein that he complied with his meet and confer efforts before filing the letter motion), and (3) the Court's 8/11/22 Order at [ECF No.] 37 ("Plaintiff is reminded that any motion to amend the complaint must comply with the undersigned's Individual Practice Rule VI").

August 30, 2022 Electronic Scheduling Order. Nonetheless, the Court extended *pro se* Plaintiff the courtesy of interpreting the FAC as a motion for leave to amend the Complaint under Rule 15. *Id.* Defendants filed their opposition to the FAC on September 21, 2022. ECF No. 42 ("Opp."). Plaintiff filed a reply in support of the FAC on October 3, 2022. ECF No. 43 ("Reply").

## II. LEGAL STANDARDS

### A. Amending The Complaint

Plaintiff's August 23, 2022 mailing of the FAC, which the Court construed as a motion to amend, precedes the Court-ordered September 15, 2022 deadline after which proposed amendments must show "good cause" to be permitted. *See* ECF No. 37 (setting schedule for, among other things, amendment of pleadings); FAC at 4 (asserting Plaintiff mailed the FAC on August 23, 2022)); August 30, 2022 Electronic Scheduling Order (construing FAC as a motion to amend). The FAC is thus subject to analysis under Rule 15(a)(2), which governs amendments after the period to amend as of right has expired but before the date set in an order after which amendments will be denied absent a showing of good cause. *See Sacerdote v. New York Univ.*, 9 F.4th 95, 115 (2d Cir. 2021).

***3** Rule 15 provides that a party may amend its pleading with leave of the Court, and the Court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." *Pasternack v. Shrader*, 863 F.3d 162, 174 (2d Cir. 2017). Leave to amend also may be denied based on the futility of the proposed amendment. *See, e.g.*, *Chunn v. Amtrak*, 916 F.3d 204, 208 (2d Cir. 2019); *Berlin v. JetBlue Airways Corp.*, 436 F. Supp. 3d 550, 571 (E.D.N.Y. 2019). "The opposing party likewise bears the burden of establishing that an amendment would be futile." *Seemann v. Coastal Env't Grp., Inc.*, 219 F. Supp. 3d 362, 366 (E.D.N.Y. 2016). Absent one of these showings, "the leave sought should, as the rules require, be freely given." *Chan v. City of New York*, No. 19-CV-7239, 2021 WL 6502292, at *3 (E.D.N.Y. Dec. 29, 2021) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

The undersigned may issue a report and recommendation on a dispositive issue where, as here, the parties have not consented to the magistrate judge's jurisdiction. *See* 28 U.S.C. § 636(b)(1). While granting a motion to amend is considered non-dipositive, denying same "may be construed as dispositive." *Simmons v. Casella*, No. 14-CV-4491, 2020 WL 1026798, at *2 (E.D.N.Y. Mar. 3, 2020) (Brown, J.); *see Romero v. Bestcare, Inc.*, No. 15-CV-7397, 2018 WL 1702001, at *1 (E.D.N.Y. Feb. 28, 2018) (Brown, M.J.) (holding that determining amendment would

be futile "is substantively claim dispositive"), *report and recommendation adopted*, 2018 WL 1701948 (E.D.N.Y. Mar. 31, 2018). Accordingly, this Report and Recommendation complies with Section 636(b)(1).

**B. Plaintiff's Section 1983 Claims**

Section 1983 provides that

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

42 U.S.C. § 1983. "It is well-settled that § 1983 does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." *Morris-Hayes v. Bd. of Educ.*, 423 F.3d 153, 159 (2d Cir. 2005); *see Moroughan v. Cnty. of Suffolk*, 514 F. Supp. 3d 479, 511 (E.D.N.Y. 2021) ("Section 1983 does not itself create substantive rights; it offers a method for vindicating federal rights elsewhere conferred" (internal quotations omitted)).

**C. Plaintiff's *Pro Se* Status**

*Pro se* Plaintiff is entitled to "special solicitude" when the court reviews the instant motion to amend. *Ceara v. Deacon*, 916 F.3d 208, 213 (2d Cir. 2019) (quoting *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016)); *see Dluhos v. Floating & Abandoned Vessel*, 162 F.3d 63, 69 (2d Cir. 1998) (holding that under Rule 15 "a pro se litigant in particular should be afforded every reasonable opportunity to demonstrate that he has a valid claim" (internal quotations omitted)); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers" (internal quotations omitted)). To that end, the Court must "liberally construe" Plaintiff's filings and "read[ ] such submissions to raise the strongest arguments they suggest." *McLeod v. Jewish Guild For The Blind*, 864 F.3d 154, 156 (2d Cir. 2017) (quoting *Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007)). This policy is "driven by the understanding that implicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training." *McLeod*, 864 F.3d at 156 (quoting *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007)). Nonetheless, "pro se status 'does not exempt a party from compliance with relevant rules of procedural and substantive law.' " *Peavey v. A. Rosenblum, Inc.*, 793 F. Supp. 2d 590, 594 (E.D.N.Y. 2011) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)); *see Faretta v. California*, 422 U.S. 806, 834 n.46 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."). Accordingly, the duty to liberally construe *pro se* filings "is not the equivalent of a duty to re-write [them]." *Williams v. Richardson*, 425 F. Supp. 3d 190, 201 (S.D.N.Y. 2019) (internal quotations omitted). Ultimately, Plaintiff's motion —liberally construed—must still comply with Rule 15. *See e.g.*, *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 737 (S.D.N.Y. 2011) (denying *pro se* plaintiff's motion to amend for noncompliance with Rule 15).

**III. DISCUSSION**

***4** Defendants contend that the amendments in the FAC are futile because (1) the new allegations regarding the First Arrest are untimely and barred by "the doctrines of collateral estoppel and/or res judicata," and (2) the new claims regarding the Second Arrest are likewise untimely. Opp. at 1-2.

An amendment is futile if it "could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." *Pettaway v. Nat'l Recovery Sols., LLC*, 955 F.3d 299, 304 (2d Cir. 2020) (internal quotations omitted). Under Rule 12(b)(6), a court determines whether a pleading contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To that end, the Court accepts as true the well-pled factual allegations set forth in the FAC and draws all reasonable inferences in Plaintiff's favor. *See Green v. Dep't of Educ. of N.Y.*, 16 F.4th 1070, 1076 (2d Cir. 2021). But the Court need not accept conclusory assertions, legal conclusions, or formulaic recitation of a claim's elements. *See In re Facebook, Inc., IPO Derivative Litig.*, 797 F.3d 148, 159 (2d Cir. 2015). To be sure, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 664. The FAC must contain "more than an unadorned, the defendant-

unlawfully-harmed-me accusation." *Id.* at 678. Determining whether the new content propounded in the FAC state a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 664. At bottom, "[l]eave to amend may be denied on grounds of futility if the proposed amendment fails to state a legally cognizable claim ...." *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 726 (2d Cir. 2010); *see Terry v. Inc. Vill. of Patchogue*, 826 F.3d 631, 633 (2d Cir. 2016) (affirming denial of *pro se* plaintiff's motion to amend as futile).

**A. Timeliness Of The Amendments**

"Courts may deny a motion to amend where the proposed claims would be time-barred and therefore futile." *Charlot v. Ecolab, Inc.*, 97 F. Supp. 3d 40, 68 (E.D.N.Y. 2014); *see 421-A Tenants Ass'n v. 125 Court St. LLC*, 760 F. App'x 44, 51 (2d Cir. 2019) (affirming denial of motion to amend where proposed amendments sought to assert time barred claims); *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 238 (2d Cir. 2007) (affirming denial of cross-motion to amend as to time barred claims). Claims are futile as untimely when "the dates in a complaint show that an action is barred by a statute of limitations." *Cangemi v. United States*, 13 F.4th 115, 134 (2d Cir. 2021) (quoting *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989)); *see Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 319 (2d Cir. 2021) (recognizing that a court "may dismiss a claim on statute-of-limitations grounds at the pleadings stage if the complaint clearly shows the claim is out of time" (internal quotations and alterations omitted)). Generally, "the date of the filing of the motion to amend is the date the action was commenced for statute of limitations purposes since the defendant is on notice of the new claims as of the filing of the motion." *Charlot*, 97 F. Supp. 3d at 69 (internal quotations and alterations omitted).

***5** State law governs the limitations period for Section 1983 claims, which means Plaintiffs' claims are subject to New York's three-year limitations period for personal injury actions. *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013); *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009). At the same time, "[f]ederal law determines when a section 1983 cause of action accrues." *Hogan*, 738 F.3d at 518 (quoting *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002)). Generally, a Section 1983 false arrest claim "accrues at the time that the alleged false arrest ends." *Ying Li v. City of N.Y.*, 246 F. Supp. 3d 578, 601 (E.D.N.Y. 2017); *see Wallace v. Kato*, 549 U.S. 384, 389 (2007) (holding that a false arrest claim accrued when the "false imprisonment came to an end" (internal quotations omitted)). "[W]here the arrest is followed by criminal proceedings," which applies here to only the Second Arrest, a false arrest claim accrues when "the claimant becomes detained pursuant to legal process" at arraignment. *Wallace*, 549 U.S. at 389-90, 397. As noted above, Plaintiff "was released the same day" for both the First Arrest and Second Arrest. FAC ¶ 5. Accordingly, "Plaintiff's false arrest claim[s] accrued on [each] date he was arrested." [3] *Lont v. Roberts*, No. 12-CV-4960, 2013 WL 1810759, at *2 (E.D.N.Y. Apr. 26, 2013); *see Johnson v. Dep't of Hous. Pres. & Dev.*, 218 F. App'x 5, 6-7 (2d Cir. 2007) (finding false arrest claim time-barred based on the date of arrest); *Crichlow v. Butchen*, No. 09-CV-4398, 2009 WL 4266711, at *3-4 (E.D.N.Y. Nov. 20, 2009) (finding that the accrual of a Section 1983 false arrest claim depended on the date of arrest). Plaintiff's claims concerning the seizure of his cellphones likewise accrued on each date he was arrested. [4] *See Tripathy v. City of New York*, No. 1:20-CV-1646, 2020 WL 1699997, at *2 (S.D.N.Y. Apr. 6, 2020) (holding that unreasonable seizure claims accrued on the date of the seizure); *Smith v. Doe*, No. 15-CV-0245, 2016 WL 7046803, at *2 (E.D.N.Y. Oct. 31, 2016) (same), *report and recommendation adopted*, 2016 WL 7048700 (E.D.N.Y. Dec. 2, 2016).

Based on the foregoing, Plaintiff's Section 1983 claims (1) concerning the First Arrest accrued on May 29, 2018 and expired no later than May 29, 2021; and (2) concerning the Second Arrest accrued on June 19, 2018 and expired no later than June 19, 2021. Plaintiff's mailing of the FAC on August 23, 2022 for filing postdated each of those expiration dates by over one year. *See* FAC at 4. "While Plaintiff is *pro se*, 'the special solicitude extended to *pro se* parties does not serve to expand statutory limitations periods.' " *Johnson v. Wendy's Corp.*, No. 19-CV-8157, 2021 WL 243055, at *4 (S.D.N.Y. Jan. 25, 2021) (quoting *Konteye v. New York City Dep't of Educ.*, No. 17-CV-2876, 2019 WL 4418647, at *12 (S.D.N.Y. Apr. 10, 2019), *report and recommendation adopted*, 2019 WL 3229068 (S.D.N.Y. July 18, 2019)). The undersigned finds, for the reasons explained below, that the FAC's First Arrest allegations are time-barred while its new Second Arrest claims are timely.

1. The First Arrest

Plaintiff contends that the allegations regarding the First Arrest are "not a claim but facts necessary to enable plaintiff to prove plaintiff's cause [of action] against Suffolk County Police Department." Reply at 1. That argument fails. Plaintiff


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

cannot circumvent the limitations period for a Section 1983 claim regarding the First Arrest by tethering those allegations to an existing claim regarding a separate occurrence (the Second Arrest). *See* *Morales v. Valley Stream Union Free Sch. Dist. 24*, 527 F. Supp. 3d 470, 473 (E.D.N.Y. 2021) (Brown, J.) (dismissing, among other things, "time-barred allegations" levied in an amended pleading in support of an existing claim); *United States ex rel. Raffington v. Bon Secours Health Sys.*, 567 F. Supp. 3d 429, 446 (S.D.N.Y. 2021) (declining to allow amendment to the extent that supporting facts occurred outside the limitations period); *Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 246 (E.D.N.Y. 2015) (dismissing claims to the extent they relied on time-barred allegations).

***6** Relation back cannot remedy the untimeliness of the FAC's First Arrest allegations. [5] Rule 15(c)(1)(B) allows a new claim against existing defendants to relate back if it "arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Thus, "even where an amended complaint tracks the legal theory of the first complaint, claims that are based on an entirely distinct set of factual allegations will not relate back." *Lehman XS Tr., Series 2006-GP2 by U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*, 916 F.3d 116, 128 (2d Cir. 2019) (quoting *Slayton v. Am. Exp. Co.*, 460 F.3d 215, 228 (2d Cir. 2006)). This principle prevents the time-barred First Arrest allegations from relating back to the timely Second Arrest claims. [6] *See* *Tang v. Visnauskas*, 847 F. App'x 24, 27 (2d Cir. 2021) (finding new Section 1983 claim did not relate back to the original Section 1983 claim because "the original complaint contained no factual allegations whatsoever regarding the [new] claim"), *cert. denied*, 142 S. Ct. 349 (2021); *Rochester v. Sixth Precinct Police Station*, 370 F. App'x 244, 246 (2d Cir. 2010) ("Although Appellant's claims are similar to those raised in his original complaint—namely, police misconduct and harassment—the claims are nevertheless unrelated because they did not arise out of the same conduct set forth in his original complaint ...."); *Diallo v. Williams*, No. 04-CV-4556, 2006 WL 156158, at *3 (S.D.N.Y. Jan. 20, 2006) (finding new allegations about one arrest did not relate back to allegations about a different arrest). Accordingly, the FAC's allegations concerning the First Arrest are time barred. [7]

2. <u>The Second Arrest</u>

Plaintiff argues that he should be permitted to assert that the Second Arrest violated his Fifth and Sixth Amendment rights even though the limitations period expired because he "was ignorant of" the Fifth and Sixth Amendments until an unspecified time after he filed the Complaint. Opp. at 1. This argument necessitates analysis under the doctrine of equitable tolling. *See* *Watson v. United States*, 865 F.3d 123, 132 (analyzing argument that plaintiff was "unaware[ ] that he could bring an FTCA claim until being advised by appointed counsel" under the equitable tolling doctrine); *Castang v. Geimano*, No. 19-CV-7178, 2020 WL 5531553, at *2 (E.D.N.Y. Sept. 15, 2020) (analyzing plaintiff's argument that he "lacked legal knowledge due to his *pro se* status" under the equitable tolling doctrine).

***7** Equitable tolling allows otherwise time-barred claims to proceed in "cases where the plaintiff is ignorant of his cause of action because of the defendant's fraudulent concealment." *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 802 (2d Cir. 2014) (internal quotations omitted). "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Watson*, 865 F.3d at 132 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). The Second Circuit has explicitly held that the latter element cannot be premised on a plaintiff's "lack of education, pro se status, or ignorance of the right to bring a claim." *Id.* at 133 (dismissing Section 1983 claims); *see also* *Ormiston v. Nelson*, 117 F.3d 69, 72 n.5 (2d Cir. 1997) ("Mere ignorance of the law is, of course, insufficient to delay the accrual of the statute of limitations."). By the same token, "[c]ourts within the Second Circuit consistently have held that the lack of legal knowledge or legal assistance is *not* an extraordinary circumstance warranting equitable tolling." *Bowens v. Cook*, No. 3:20-CV-355, 2020 WL 4043048, at *4 (D. Conn. July 17, 2020) (emphasis added) (collecting cases); *see* *Rush v. Lempke*, No. 09-CV-3464, 2011 WL 477807, at *7 (E.D.N.Y. Feb. 2, 2011) (Bianco, J.) (collecting cases showing that "the lack of familiarity with the law or *pro se* status alone does not warrant equitable tolling"), *aff'd*, 500 F. App'x 12 (2d Cir. 2012). Accordingly, Plaintiff's stated "ignoran[ce]" does not warrant equitable tolling for the FAC's claims asserting the Second Arrest violated his Fifth and Sixth Amendment rights. *See* *Watson*, 865 F.3d at 133 (reversing application of equitable tolling as improperly based on plaintiff's ignorance of the law and *pro se* status); *Castang*, 2020 WL 5531553, at *3 (dismissing claims as time barred because "neither lack of familiarity with the law nor a prisoner's inability to hire


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

a lawyer is sufficient to warrant equitable tolling"); *Perez v. Royce*, No. 20-CV-601, 2020 WL 1975244, at *3 (E.D.N.Y. Apr. 24, 2020) (rejecting argument that *pro se* plaintiff's lack of education and unfamiliarity with the law were sufficient to invoke equitable tolling).

But the Court reaches a different result when considering relation back regarding the newly-asserted Second Arrest claims in the FAC. "For a newly-added claim to relate back under Rule 15(c)(1)(B), 'the basic claim must have arisen out of the conduct set forth in the original pleading.' " *Asarco LLC v. Goodwin*, 756 F.3d 191, 202 (2d Cir. 2014) (quoting *Slayton*, 460 F.3d at 228). Under that principle, "[t]he central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading." *Id.* (quoting *Slayton*, 460 F.3d at 228). The FAC's Section 1983 claims asserting the Second Arrest violated Plaintiff's Fifth and Sixth Amendment rights are based on the same conduct alleged in the Complaint—namely, the Second Arrest and simultaneous seizure of Plaintiff's cellphone—and thus relate back to the Complaint. *See Strada v. City of New York*, No. 11-CV-5735, 2014 WL 3490306, at *7 (E.D.N.Y. July 11, 2014) ("[T]here is no question that the new claims, excessive force and false arrest, arise from the same conduct set forth in the original Complaint."); *Mendoza v. Cnty. of Nassau*, No. 11-CV-02487, 2012 WL 4490539, at *12 (E.D.N.Y. Sept. 27, 2012) (finding new claims related back where they arose out of "plaintiff's arrest"); *Berry v. Vill. of Millbrook*, No. 09-CV-4234, 2010 WL 3932289, at *4 (S.D.N.Y. Sept. 29, 2010) (finding Section 1983 claim related back partly because it "arises out of the same conduct alleged in the original and timely filed Complaint—the investigation and arrest of Plaintiff"). Nonetheless, the undersigned finds the FAC's Fifth and Sixth Amendment claims are futile.

**B. Futility Of The FAC's Proposed Fifth And Sixth Amendment Claims**

The Court may *sua sponte* decline to permit amendment as futile for reasons independent of those provided by Defendants. *See Peterec-Tolino v. New York*, 364 F. App'x 708, 711 (2d Cir. 2010) (affirming *sua sponte* dismissal of claim in *pro se* complaint); *Shoemaker v. State of Cal.*, 101 F.3d 108 (2d Cir. 1996) (affirming district court's denial of motion to amend based on its *sua sponte* finding that the amendment would be futile; confirming that "amendment of the complaint was certain to be unproductive"). Consistent with that principle, the undersigned finds *sua sponte* that the Fifth Amendment and Sixth Amendment claims in the FAC are substantively futile.

***8** "The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without due process of law." *Dusenbery v. United States*, 534 U.S. 161, 167 (2002) (internal quotations omitted). That is, "[t]he Fifth Amendment regulates due process violations by federal, not state or municipal, actors." *Pollok v. Chen*, 806 F. App'x 40, 44 (2d Cir. 2020) (internal quotations omitted); *Brown v. City of New York*, No. 11-CV-1068, 2013 WL 491926, at *4 (S.D.N.Y. Feb. 8, 2013). Therefore, the FAC's "citation to the Fifth Amendment is inapposite" because Defendants are "not federal[ ] actors ...." *Bussey v. Phillips*, 419 F. Supp. 2d 569, 586 (S.D.N.Y. 2006) (citing *Dusenbery*, 534 U.S. at 167) (dismissing Section 1983 claim); *see Pollok,* 806 F. App'x at 44 (affirming dismissal of Fifth Amendment claims because state and local police are not federal actors); *Brown*, 2013 WL 491926, at *4 (dismissing Fifth Amendment claim against police officers because said officers are "municipal actors" subject to "the Fourteenth Amendment, rather than the Fifth Amendment").

The FAC similarly misplaces its reliance on the Sixth Amendment in support of its claim that the Second Arrest was "unlawful[ ]" and "lead [sic] to the unlawful seizure of Plaintiff's Blue Alcatel cellular phone." FAC ¶ 7. The Sixth Amendment "provides certain procedural safeguards to individuals who have been charged with crimes."[8] *United States v. Rosemond*, 958 F.3d 111, 119 (2d Cir. 2020). It does not protect against the activity Plaintiff challenges here—the alleged false arrest and unreasonable seizure of property. *See Campbell v. City of Clarksdale, Miss.*, No. 08-CV-225, 2011 WL 2604739, at *1 (N.D. Miss. June 30, 2011) (holding the Sixth Amendment "affords no protection from illegal arrest and detention"). Instead, a "§ 1983 claim for false arrest[ ] rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures." *Kee v. City of N.Y.*, 12 F.4th 150, 158 (2d Cir. 2021) (internal quotations omitted); *see Dufort v. City of N.Y.*, 874 F.3d 338, 355 n.7 (2d Cir. 2017) ("The forcible detention of plaintiff without probable cause is conceptualized as a false arrest claim under the Fourth Amendment for § 1983 purposes" (citing *Wallace*, 549 U.S. at 388-89)). A Section 1983 claim asserting that property was unreasonably seized is likewise governed by the Fourth Amendment. *See Carroll v. Cty. of Monroe*, 712 F.3d 649, 651-53 (2d Cir. 2013) (holding that unreasonable seizure

claims require "the nature and quality of the intrusion on the individual's Fourth Amendment interests" to exceed the government's interest under the totality of the circumstances (internal quotations omitted)); *Phelan v. Sullivan*, 541 F. App'x 21, 24 (2d Cir. 2013) (reviewing unreasonable seizure claim under Fourth Amendment framework); *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 185-87 (2d Cir. 2004) (same); *see also United States v. Cosme*, 796 F.3d 226, 236 (2d Cir. 2015) ("We conclude that the continued seizure of Cosme's accounts violated the Fourth Amendment.").

In brief, Plaintiff "does not allege any denial of access to the courts or right to counsel in a criminal proceeding or any other right that would implicate the Sixth Amendment." *Bussey*, 419 F. Supp. 2d at 586. Accordingly, Plaintiff's Sixth Amendment claims are futile. [9] *See Pittman v. Edwards*, No. 20-CV-319, 2020 WL 4194479, at *9 (N.D.N.Y. June 22, 2020) (recommending dismissal of Sixth Amendment claim because the allegations failed to "specify how [plaintiff's] Sixth Amendment rights were violated"), *report and recommendation adopted*, 2020 WL 4192547 (N.D.N.Y. July 21, 2020); *Scull v. Hennegan*, No. 15-CV-00309, 2016 WL 3365328, at *4 (W.D.N.Y. Apr. 26, 2016) (recommending dismissal of Sixth Amendment claim because plaintiff's allegations did not "implicate the Sixth Amendment"), *report and recommendation adopted*, 2016 WL 3349327 (W.D.N.Y. June 16, 2016); *Campbell*, 2011 WL 2604739, at *1 (dismissing Sixth Amendment claim because it was premised on conduct protected by the Fourth Amendment). [10]

**C. Dismissal Of Claims Against The SCPD**

***9** Given that Plaintiff is proceeding *in forma pauperis*, the Court is required to "dismiss the case" to the extent the Court determines the action "fails to state a claim on which relief may be granted." [11] 28 U.S.C. § 1915(e)(2)(B)(ii). Because Plaintiff is incarcerated and seeks redress against a governmental entity (SCPD) and its deceased employee (Detective Stapleton), the Court is similarly required to dismiss "any portion" of the action that is "frivolous, malicious, or fails to state a claim upon which relief may be granted." 28 U.S.C. § 1915A(b)(1). Consistent with those obligations, the undersigned recommends the Court *sua sponte* dismiss Plaintiffs' claims against the SCPD because the SCPD cannot be sued.

"Under New York law, a municipal police department has no separate legal identity apart from the municipality that created it, and is thus a non-suable entity." *Parra v. City of White Plains*, 48 F. Supp. 3d 542, 547 n.1 (S.D.N.Y. 2014) (dismissing claims against White Plains Police Department); *see Henry v. Cnty. of Nassau*, 6 F.4th 324, 336 (2d Cir. 2021) (affirming dismissal of claims against Nassau County Police Department because it is a non-suable entity). Accordingly, the SCPD is "merely an administrative arm of a municipality —Suffolk County—and ... therefore, cannot sue or be sued." *Young v. Suffolk Cnty.*, 922 F. Supp. 2d 368, 394 n.11 (E.D.N.Y. 2013) (internal quotations and alterations omitted). The SCPD should therefore be dismissed under 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1). *See Paulette v. Suffolk Cnty. 5th Precinct Police Dep't*, No. 22-CV-2913, 2022 WL 2803360, at *3 (E.D.N.Y. July 18, 2022) (*sua sponte* dismissing Section 1983 claims against the SCPD on these grounds); *Brooks v. Suffolk Cnty. First Precinct*, No. 21-CV-4546, 2021 WL 5139075, at *2 (E.D.N.Y. Nov. 4, 2021) (same); *Sturgis v. Suffolk Cnty. Jail*, No. 12-CV-5263, 2013 WL 245052, at *2, *6 (E.D.N.Y. Jan. 22, 2013) (same).

**D. Claim Against Suffolk County**

Courts dismissing a *pro se* plaintiff's claims against the SCPD often evaluate whether the plaintiff pled a viable claim for municipal liability against Suffolk County (provided Suffolk County is not already a defendant). *See Paulette*, 2022 WL 2803360, at *3; *Brooks*, 2021 WL 5139075, at *3; *Sturgis*, 2013 WL 245052, at *3-4. The undersigned follows that approach and concludes Plaintiff has not stated a viable claim for municipal liability.

A claim for municipal liability under Section 1983 must comply with *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) and its progeny. "*Monell* expressly prohibits *respondeat superior* liability for municipalities ... meaning that a plaintiff must demonstrate that 'through its deliberate conduct, the municipality was the "moving force" behind the injury alleged.' " *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 97-98 (2d Cir. 2020) (quoting *Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)). This requires Plaintiff to "show that he suffered the denial of a constitutional right that was caused by an official municipal policy or custom." *Frost v. New York City Police Dep't*, 980 F.3d 231, 257 (2d Cir. 2020) (internal quotations omitted). A policy or custom may be established by any of the following:

> ***10** (1) a formal policy officially endorsed by the municipality; (2)

> actions taken by government officials responsible for establishing the municipal policies that caused the particular constitutional deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Alwan v. City of New York*, 311 F. Supp. 3d 570, 578 (E.D.N.Y. 2018) (internal quotations omitted); *see Ying Li v. City of New York*, 246 F. Supp. 3d 578, 636 (E.D.N.Y. 2017) (similar).

"[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *Guillette v. Burlington Police Dep't*, No. 21-1676, 2022 WL 2208122, at *1 (2d Cir. June 21, 2022) (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)); *Paulette*, 2022 WL 2803360, at *3 (quoting *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998)). Consistent with that principle, the Second Arrest represents at most "a single incident of a constitutional violation" that, given the dearth of allegations about an underlying municipal policy or custom, cannot support a *Monell* claim. [12] *Mitchell v. City of N.Y.*, 841 F.3d 72, 80 (2d Cir. 2016) (internal quotations omitted) (affirming dismissal of *Monell* claim premised on plaintiffs' arrest); *see Miller v. Terrillion*, 391 F. Supp. 3d 217, 227 (E.D.N.Y. 2019) (dismissing *Monell* claim because a single arrest by an officer not alleged to be a policy maker cannot confer municipal liability); *Williams v. City of New York*, No. 14-CV-5123, 2015 WL 4461716, at *7 (S.D.N.Y. July 21, 2015) (dismissing *Monell* claim because "[a]t bottom, the Complaint alleges that, at one particular place and time, NYPD officers used excessive force in falsely arresting one criminal suspect"). In short, Plaintiff has not pled a *Monell* claim because "even affording the *pro se* complaint a liberal construction, there are no factual allegations from which the Court may reasonably infer that the conduct or inaction of which Plaintiff complains was caused by a policy or custom of Suffolk County." *Paulette*, 2022 WL 2803360, at *3; *see Brooks*, 2021 WL 5139075, at *3 ("When liberally construing the Complaint, there are no factual allegations that a municipal policy or custom existed which caused the alleged constitutional deprivations Plaintiff complains of."); *Sturgis*, 2013 WL 245052, at *4 ("Since the complaint is devoid of any factual allegations tending to support an inference that a municipal policy or custom existed that caused the alleged constitutional deprivations of which plaintiff complains, it fails to state a Section 1983 claim against [Suffolk] County.").

## IV. CONCLUSION

***11** For the reasons set forth above, the Court recommends, consistent with 28 U.S.C. Section 636(b)(1), that the Motion be DENIED WITH PREJUDICE and that the claims against the SCPD be DISMISSED WITH PREJUDICE.

## V. OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. *See also* Fed. R. Civ. P. 6(a) & (d) (addressing computation of days). **Defendants shall serve a copy of this Report and Recommendation on Plaintiff and file proof of service by February 14, 2023**. Any requests for an extension of time for filing objections must be directed to District Judge Gary R. Brown. FAILURE TO FILE TIMELY OBJECTIONS SHALL CONSTITUTE A WAIVER OF THOSE OBJECTIONS BOTH IN THE DISTRICT COURT AND ON LATER APPEAL TO THE UNITED STATES COURT OF APPEALS. *See Thomas v. Arn*, 474 U.S. 140, 154-55 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018); *McConnell v. ABC-Amega, Inc.*, 338 F. App'x 24, 26 (2d Cir. 2009); *F.D.I.C. v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir. 1995).

## All Citations

Not Reported in Fed. Supp., 2023 WL 11844273

## Footnotes

1 Citations to the Complaint's exhibits refer to the ECF page numbering stamped at the top of each page therein. *See* *Parker v. Fantasia*, 425 F. Supp. 3d 171, 179 n.6 (S.D.N.Y. 2019) (using this method).

2 "Under the prison mailbox rule, a *pro se* prisoner's complaint is deemed filed upon its delivery to prison authorities for transmittal to the district court." *Sides v. Paolano*, 782 F. App'x 49, 50 (2d Cir. 2019) (citing *Dory v. Ryan*, 999 F.2d 679, 682 (2d Cir. 1993)).

3 The Court infers that Plaintiff was arraigned in connection with the Second Arrest before he was released. *See* *Ying Li*, 246 F. Supp. 3d at 601 & n.14 (finding that Plaintiff was "clearly" arraigned prior to release notwithstanding the absence of allegations concerning arraignment); *Smith v. City of New York*, No. 12-CV-4891, 2013 WL 5942224, at *3 (S.D.N.Y. Nov. 6, 2013) (finding plaintiff's false arrest claim accrued the same day he was arrested and charged given the lack of any allegation that Plaintiff "was not arraigned promptly thereafter").

4 The distinct cause of action for deprivation of property without due process of law, which is not alleged here, accrues when the plaintiff knew or had reason to know of the property deprivation. *Sterngass v. Palisades Interstate Park Comm'n*, 260 F. App'x 395 (2d Cir. 2008); *Tripathy*, 2020 WL 1699997, at *2. Even if Plaintiff alleged that cause of action, the undersigned would find such claims accrued on the dates Plaintiff was arrested.

5 The Court considers relation back consistent with its obligation to "liberally construe" Plaintiff's filings and "read[ ] such submissions to raise the strongest arguments they suggest." *McLeod*, 864 F.3d at 156.

6 Rule 15(c)(1)(A) requires the Court to "determine if New York State law provides a more forgiving principle of relation back" than the federal relation back doctrine under Rule 15(c)(1)(B). *Hogan*, 738 F.3d at 518. New York's relation back statute is N.Y. C.P.L.R. Section 203 (when, as here, relation back does not concern replacing John Doe defendants), but that "New York rule need not be analyzed separately given its similarity to Rule 15(c)(1)(B)" *Morency v. NYU Langone Med. Ctr. Hosp.*, No. 15-CV-9142, 2017 WL 1536057, at *2 n.2 (S.D.N.Y. Apr. 17, 2017), *aff'd sub nom.* *Morency v. NYU Hosps. Ctr.*, 728 F. App'x 75 (2d Cir. 2018); *see* *Best v. Bell*, No. 13-C-0163, 2014 WL 1316773, at *10 (S.D.N.Y. Mar. 28, 2014) (finding the New York and federal rules are "nearly identical" and noting that "[t]he driving principle behind both of these rules is that a defendant should not be able to invoke the statute of limitations if he was already on notice of the events giving rise to the plaintiff's claim during the limitations period"); *Scantek Med., Inc. v. Sabella*, 583 F. Supp. 2d 477, 489 (S.D.N.Y. 2008) (holding that the New York and federal rule yield the same result).

7 Given that the First Arrest allegations are time barred, the undersigned need not consider Defendants' additional argument that the First Arrest allegations are barred by equitable estoppel and *res judicata. See* *Harris v. Viau*, No. 17-CV-9746, 2019 WL 1978596, at *7 n.3 (S.D.N.Y. May 3, 2019) ("Because Plaintiff's § 1983 claims are time-barred, the Court need not consider Defendants' remaining arguments.").

8 The Sixth Amendment provides that

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S. Const. amend. VI.

9 The Complaint alleges Detective Stapleton falsely "stated in his report that the plaintiff 'was found to be in possession of a quantity of heroin.' " Compl. ¶ 8 (quoting *id.* at 11-12). If credited, that allegation could support a Sixth Amendment claim. *See* *Miller v. Terrillion*, 391 F. Supp. 3d 217, 222 (E.D.N.Y. 2018) ("Allegations that a criminal charge arose out of a police officer's false statements support a fair trial claim, independent of any false arrest claim, even where the case did not ultimately proceed to trial" (collecting cases)). But Plaintiff's allegation quotes two arrest reports for Christina Delciello, which are attached to the Complaint, that do not even mention Plaintiff. *See* Compl. at 11-12. The Court rejects Plaintiff's mischaracterization of the arrest reports. *See, e.g.,* *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011) (per curiam) (rejecting complaint's allegations as undermined by its attachments); *Kardovich v. Pfizer, Inc.*, 97 F. Supp. 3d 131, 141 (E.D.N.Y. 2015) (same).

10 *See also* *Dufort*, 874 F.3d at 355 n.7 (limiting Section 1983 claim asserting arrest lacked probable cause to relying on the Fourth Amendment); *Hicks v. Anne Arundel Cnty.*, No. 20-CV-0022, 2020 WL 7624773, at *12 (D. Md. Dec. 22, 2020) (dismissing Sixth Amendment claim because allegations did not "fit within the scope of the Sixth Amendment").

11 In cases without a plaintiff proceeding *in forma pauperis*, the court has the discretion to dismiss such claims. *See* *Muka v. Murphy*, 358 F. App'x 239, 241 (2d Cir. 2009) ("A district court's ability *sua sponte* to dismiss a complaint that lacks a basis in law or fact is well-established."); *Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 364 (2d Cir. 2000) (holding that "district courts may dismiss a frivolous complaint *sua sponte*" and affirming such a dismissal); *SPA 79 D L.P. v. Nat'l Credit Union Admin.*, No. 20-CV-301, 2022 WL 4126049, at *2 n.1 (E.D.N.Y. Sept. 9, 2022) (Brown, J.) ("[T]he Court hereby, *sua sponte*, dismisses the ninth cause of action as without basis in law.").

12 The Complaint's allegations of wrongdoing dating back to 1979 by Rochester Police and New York State have no bearing on the existence of a Suffolk County policy or custom. *See* Complaint ¶¶ 12-14. In addition, the untimely First Arrest allegations, even if considered together with the Second Arrest allegations, fall short of adequately alleging that Suffolk County had the requisite policy of effectuating false arrests and/or unreasonably seizing property. *See, e.g.*, *Giaccio v. City of New York*, 308 F. App'x 470, 472 (2d Cir. 2009) (affirming dismissal of *Monell* claim where plaintiff "identifie[d], at most, only four examples" of constitutional violations because "[t]his evidence falls far short of establishing a practice that is so 'persistent or widespread' as to justify the imposition of municipal liability" (citation and internal quotations omitted)).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 2703562
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Rodolfo ARAGON, Plaintiff,
v.
State of NEW YORK, City of New York,
Department of Correctional Services, Defendants.

14-CV-9797 (ER)
|
Signed 06/22/2017

**Attorneys and Law Firms**

Rodolfo Aragon, Fishkill, NY, pro se.

Agnetha Elizabeth Jacob, New York City Law Department, New York, NY, for Defendants.

**OPINION AND ORDER**

Edgardo Ramos, U.S.D.J.

***1** Rodolfo Aragon ("Plaintiff"), acting *pro se* and *in forma pauperis*, brings this action against the State of New York ("New York"), the City of New York ("City"), and the Department of Corrections and Correctional Supervision ("DOCCS", and collectively, "Defendants") pursuant to 42 U.S.C. § 1983 ("Section 1983"). Plaintiff alleges that the conditions of his confinement at the Otis Bantum Correctional Center ("Bantum") amount to cruel and unusual punishment in violation of the Eighth Amendment. Plaintiff further claims false imprisonment as a result of an unlawful conviction in state court. The City brings the instant motion to dismiss Plaintiff's Amended Complaint ("Am. Compl.") and Second Amended Complaint ("Sec. Am. Compl.") pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the City's motion to dismiss is hereby GRANTED.

## I. FACTUAL BACKGROUND [1]

Liberally construed, Plaintiff alleges that he was subject to unconstitutional conditions of confinement at Bantum on Rikers Island starting on October 22, 2014. Compl., at 2. Specifically, Plaintiff claims that he was "forced to live in inhumane conditions" due to "insects, ants, roaches, lead poisoning, asbestos, etc." and a "lack of vitamins and food, [and] non-privacy." Am. Compl., at 1. As a result, Plaintiff states he suffers from "external and internal f[u]ngus and [rashes] to body," infections to his lungs and throat as well as mental anguish. Am. Compl., at 1–2.

On October 22, 2014, Plaintiff requested to be moved from Bantum due to these conditions, but was ignored by two prison officials. Compl., Doc. 1-1, at 2. Plaintiff alleges to have requested medical attention on October 22, 2014 due to his exposure to the "inhumane conditions," and claims to have submitted medical grievances on October 23, 2014. Compl., Doc. 1-2, at 1.

In addition, Plaintiff seeks damages based on a false imprisonment claim resulting from an unlawful conviction in state court. Sec. Am. Compl., at 2. Plaintiff claims that he was falsely imprisoned based on "Defendant's guidelines, practices, patterns and procedures," without any further explanation. *Id.*

## II. PROCEDURAL BACKGROUND

Plaintiff filed the instant action on December 8, 2014 against Jane Doe 1, Jane Doe 2, Bantum, and Rikers Island. Compl. On March 20, 2015, the Court dismissed Plaintiff's claims against Bantum because it is not an entity that can be sued. Doc. 13. The Court instructed the Clerk of the Court to replace Bantum with the City of New York pursuant to Federal Rule of Civil Procedure 21. *Id.*

***2** On August 17, 2015, the Court granted the City's request for an order to show cause on why this action should not be dismissed for want of prosecution pursuant to Federal Rule of Civil Procedure 41(b) based on Plaintiff's failure to keep the Court apprised of his current residence. Doc. 22. After Plaintiff failed to respond to this and two subsequent orders to show cause dated September 4 and October 20, 2015, respectively, Docs. 22–24, the action was dismissed by the Court without prejudice on December 2, 2015. Doc. 25.

Having received a letter from Plaintiff on December 4, 2015 explaining that he had not responded because he had been incarcerated, Doc. 27, the Court vacated the dismissal, requested the Clerk of the Court to reopen the case, and directed Plaintiff to file an Amended Complaint. Doc. 28. On February 22, 2016, Plaintiff filed his Amended Complaint. Doc. 34. On that same day, the Court terminated Plaintiff's claims against Rikers Island, Jane Doe 1, and Jane Doe 2 pursuant to Rule 21.

On March 10, 2016, the Court held an initial conference, during which Plaintiff was granted leave to file a second amended complaint to cure the factual deficiencies in his prior complaints. Doc. 37. The Court provided specific instructions to Plaintiff on the details to be included in the amended pleading.[2] After receiving several extensions of time, *see* Docs. 41–42, Plaintiff filed his Second Amended Complaint on November 15, 2016. On that same day, the Court terminated Plaintiff's claims against the Department of Correctional Services.

On December 1, 2016, the City filed a motion to dismiss Plaintiff's Amended Complaint and Second Amended Complaint pursuant to Rule 12(b)(6). Docs. 44–45. On January 20, 2017, Plaintiff filed an opposition to Defendant's motion. Opp. Mem. To date, the City has not replied to Plaintiff's opposition memorandum.

## III. LEGAL STANDARD

### A. Rule 12(b)(6) Motion to Dismiss Standard

On a motion to dismiss pursuant to Rule 12(b)(6), the Court is required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). However, the Court is not required to credit legal conclusions, bare assertions or conclusory allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must contain enough factual matter to state a claim to relief that is plausible on its face. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Accordingly, a plaintiff is required to support its claims with sufficient factual allegations to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Iqbal*, 556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 570).

### B. *Pro Se* Plaintiff

***3** The same standard applies to motions to dismiss for *pro se* plaintiffs. *See Zapolski v. Fed. Republic of Germany*, 425 Fed.Appx. 5, 6 (2d Cir. 2011). The Court remains obligated to construe a *pro se* complaint liberally, and to interpret a *pro se* plaintiff's claims as raising the strongest arguments that they suggest. *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d. Cir. 2006). The obligation to be lenient while reading a *pro se* plaintiff's pleadings "applies with particular force when the plaintiff's civil rights are at issue." *Jackson v. N.Y.S. Dep't of Labor*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) (citing *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004)). Nevertheless, "*pro se* status 'does not exempt a party from compliance with relevant rules of procedural and substantive law.' " *Triestman*, 470 F.3d at 477 (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). To survive a motion to dismiss pursuant to Rule 12(b)(6), a *pro se* plaintiff's pleadings still must contain "more than an unadorned, the defendant-unlawfully-harmed me accusation." *Iqbal*, 566 U.S. at 678. A *pro se* complaint that "tenders naked assertion[s] devoid of further enhancement" will not suffice. *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

### C. 42 U.S.C. § 1983

To state a claim under Section 1983, a plaintiff must allege that: (1) defendants were state actors or were acting under color of state law at the time of the alleged wrongful action; and (2) the action deprived plaintiff of a right secured by the Constitution or federal law. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999). Section 1983 does not create any rights, but merely provides "a procedure for redress for the deprivation of rights [already] established." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted). Accordingly, a civil rights action brought under Section 1983 will stand only insofar as the plaintiff can prove an actual violation of his rights under the Constitution or federal law. *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970)).

## IV. DISCUSSION

Liberally construing his pleadings, Plaintiff brings a conditions-of-confinement claim under the Eighth Amendment and a false imprisonment claim against the Defendants. Compl.; Am. Compl.; Sec. Am. Compl.[3] Plaintiff also seeks to impose liability on the City pursuant to Section 1983. Sec. Am. Compl., at 2–3. Plaintiff raises a number of new claims in his opposition to Defendant's motion, including the violation of his constitutional rights under the First, Second, Fifth, Ninth, Fifteenth, Twenty-Fourth and Twenty-Sixth Amendments.

Opp. Mem. However, even granting Plaintiff the liberal construction afforded to the submissions of a *pro se* plaintiff, he does not offer any plausible support for such claims. As such, the Court confines its analysis to the conditions-of-confinement claim under the Eighth Amendment, false imprisonment, and the municipal liability.

**A. Eighth Amendment Claim**

***4** Plaintiff alleges that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment due to the "inhumane conditions" of his confinement at Bantum. Am. Compl., at 1; Opp. Mem., at 17. Although the Constitution does not mandate comfortable prison settings, prisoners are entitled to "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989)). Accordingly, prison officials are required to take "reasonable measure[s] to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't of Corrections*, 84 F.3d 614, 620 (2d Cir. 1996). To establish an Eighth Amendment claim based on conditions of confinement, a plaintiff must allege two elements: (1) objectively, that the deprivation the plaintiff suffered was "sufficiently serious" to deny "the minimal civilized measure of life's necessities," and (2) subjectively, that the defendant acted with a "sufficiently culpable state of mind" associated with the "deliberate indifference" to plaintiff's health or safety. *Trammel v. Keane*, 338 F.3d 155, 161 (2d Cir. 2003) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

**i. Objective Element**

To establish the objective element of an Eighth Amendment violation, a plaintiff "must prove that the conditions of his confinement violate contemporary standards of decency." *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (citing *Helling*, 509 U.S. at 35–6). More specifically, a plaintiff must show that the conditions of confinement "pose an unreasonable risk of serious damage" to plaintiff's health or safety. *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citing *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). Generally, the "[n]ormal conditions of ... confinement do not constitute an Eighth Amendment violation," but "[s]uch confinement is not abnormal unless it is 'without penological justification, grossly disproportionate, or involving the unnecessary and wanton infliction of pain.' " *Branch v. Goord*, No. 05 Civ. 6495 (WHP), 2006 WL 2807168, at *5 (S.D.N.Y. Sept. 28, 2006) (quoting *Smith v. Coughlin*, 784 F.2d 783, 787 (2d Cir. 1984)).

In support of its motion to dismiss, the City argues that Plaintiff has failed to provide sufficient details to determine whether the conditions he was subject to constitute a constitutional deprivation. Doc. 45, at 5. Despite the specific instructions provided by this Court to the Plaintiff on the necessity to include details in his amended pleadings, *see* Doc. 37, Plaintiff submits only scant factual matter to support his claim. Plaintiff solely alleges that he suffered from "inhumane conditions" as a result of "insects, ants, roaches, lead poisoning, [and] asbestos." Am. Compl., at 1. However, courts have recognized that contemporary standards of decency currently allow for some amount of exposure to vermin and asbestos in prison settings. *See Pack v. Artuz*, 348 F. Supp. 2d 63, 32 (S.D.N.Y. 2004) (plaintiff alleging a conditions-of-confinement claim under Section 1983 may be exposed to "low levels of asbestos exposure" "as reflected in the New York State Industrial Code and OSHA regulations"); *Solomon v. Nassau County*, 759 F. Supp. 2d 251, 258 (E.D.N.Y. 2011) ("conditions that are temporary or occasional have been found not to constitute a sufficiently serious deprivation to sustain a Section 1983 deliberate indifference claim"); *Wang v. Vahldieck*, No. 09 Civ. 3783 (ARR), 2012 WL 119591 at *9 (E.D.N.Y. Jan 9, 2012) (temporary exposure to cockroaches in a dirty cell "does not rise to the sort of conduct held repugnant to the conscience of mankind") (internal quotations omitted). Without offering any details to substantiate the extent of the alleged exposure, Plaintiff's bare allegations do not sufficiently demonstrate that the conditions he was exposed to constitute a substantial risk of serious harm necessary to satisfy the objective element of an Eighth Amendment violation. *Pack*, 348 F. Supp. 2d at 84; *see also Farmer*, 511 U.S. at 837. Therefore, Plaintiff's Eighth Amendment claim must be dismissed.

***5** Determining that a plaintiff failed to satisfy the objective component of an Eighth Amendment claim, courts may dismiss the claim without passing judgment on the subjective component. *See Martinez v. Schriro*, No. 14 Civ. 3965 (KMW), 2017 WL 87049, at *5 (S.D.N.Y. Jan. 9, 2017) (dismissing plaintiff's Eighth Amendment claim solely based on plaintiff's failure to plead the objective element in his pleadings without analyzing the subjective element).

**B. False Imprisonment Claim**

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

In analyzing false imprisonment claims under Section 1983, the Second Circuit has generally looked to the law of the state in which the arrest occurred. *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006) (citing *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004)). Accordingly, to establish a claim for false imprisonment in New York, a plaintiff must allege: (1) that the defendant intentionally confined plaintiff; (2) that plaintiff was conscious of the confinement and did not consent to it, and (3) that the confinement was not otherwise privileged. *See Jocks v. Tavernier*, 316 F.3d 128, 134–35 (2d Cir. 2003) (quoting *Broughton v. State*, 37 N.Y.2d 451, 373 N.Y.S.2d 87, 335 N.E.2d 310, 314 (N.Y. 1975)).

The Court finds that Plaintiff has failed to satisfy any of the requisite elements to establish a cognizable claim for false imprisonment. Nowhere in his pleadings does Plaintiff substantiate his claim with any factual allegations; he simply states that he was falsely imprisoned. Sec. Am. Compl., at 2. Such a threadbare assertion does not state a plausible claim to relief. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557); *see also Navarra v. Marlborough Gallery, Inc.*, 820 F. Supp. 2d 477, 485 (S.D.N.Y. 2011) (stating that allegations pled upon belief must be accompanied by facts upon which the belief relies).

Furthermore, Plaintiff's false imprisonment claim is barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). Doc. 45, at 6. In *Heck*, the Supreme Court held that a complaint must be dismissed if "judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence ... unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." 512 U.S. at 477, 486–7. Thus, to recover damages for a false imprisonment claim under Section 1983, a prisoner must demonstrate that his conviction "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id.* at 486–7.

Here, Plaintiff alleges that he was falsely imprisoned and requests relief in the form of his "immediate release/liberty" as well as monetary damages amounting to $9.8 million dollars. Am. Compl., at 1; Sec. Am. Compl., at 2–3. Pursuant to *Heck*, however, he must first demonstrate that said conviction was already invalidated. 512 U.S. at 487. This he fails to do. Therefore, Plaintiff is barred by *Heck* from seeking monetary relief under Section 1983 based on his alleged false imprisonment.

**C. Monell Liability**

Plaintiff's constitutional claims against the City are brought pursuant to Section 1983. Sec. Am. Compl., at 3. Although a municipality cannot be held liable under Section 1983 solely on a theory of *respondeat superior*, a Section 1983 claim may be brought against a municipality if the alleged unconstitutional action was the result of an official policy, practice or custom. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–692 (1978). The Second Circuit has established a two prong test for Section 1983 claims brought against a municipality. First, the plaintiff must prove " 'the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving [official].' " *Johnson v. City of New York*, No. 06 Civ 09426 (GBD), 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (quoting *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985)). Second, the plaintiff must establish a causal connection between the policy or custom and the alleged deprivation of his constitutional rights. *Id.*

***6** To satisfy the first prong of the municipal liability test, a plaintiff must allege the existence of at least one of the following elements: (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation; (3) a practice so consistent and widespread that constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees. *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–7 (S.D.N.Y. 2010) (citations omitted).

The Court finds that Plaintiff has failed to meet any of the requisite elements to satisfy the first prong of a municipal liability claim. Plaintiff submits no allegations to indicate the existence of either a formally recognized policy or a consistent and widespread practice adopted by the City. Further, Plaintiff neither alleges that the Bantum prison officials have policymaking authority nor claims that the City failed to train and supervise its employees. Liberally construing the pleadings, Plaintiff seems to allege the existence of a practice adopted by the City solely based on Plaintiff's alleged experience. However, a "single incident alleged in a complaint, especially if it involved only actors

below the policy-making level, does not suffice to show a municipal policy." *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998) (quoting *Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)). Without offering any factual support for his conclusory allegations, this Court cannot "infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 557). Therefore, Plaintiff's claims against the City must be dismissed on this basis as well.

### D. Leave to Amend

In its motion to dismiss, the City requests that the Court deny Plaintiff any further leave to amend his pleading due to his repeated failure to cure the factual deficiencies. Doc. 45, at 8. Denying leave to amend is proper where the amendment would be futile or would result in undue prejudice to the opposing party. *Holmes v. Grubman*, 568 F.3d 329, 334–35 (2d Cir. 2009). An amendment is considered futile where the plaintiff is unable to demonstrate that he would be able to cure the defects in a manner that would survive a motion to dismiss. *Hayden v. Cnty. Of Nassau*, 180 F.3d 42, 53–54 (2d Cir. 1999).

Here, Plaintiff has been afforded two opportunities to amend his complaint pursuant to orders from this Court that contained specific instructions as to what he was required to plead for his claims to survive. Plaintiff failed to follow the directions contained in those orders. Given that Plaintiff's amended pleadings suffer from the same defects as his initial complaint, leave to file a third amended complaint would be futile. Therefore, the Amended and Second Amended Complaints will be dismissed with prejudice.

## V. CONCLUSION

For the reasons set forth above, the City's motion to dismiss Plaintiffs Amended Complaint and Second Amended Complaint is GRANTED. The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444-45 (1962).

The Clerk of the Court is respectfully directed to terminate the motion, Doc. 44, to mail a copy of this Opinion and Order to Plaintiff, and to close the case.

It is SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2017 WL 2703562

## Footnotes

1 The following facts, accepted as true for purposes of the instant motion, are based on Plaintiff's allegations in his Complaint ("Compl.") (Doc. 1), Am. Compl. (Doc. 34), Sec. Am. Compl. (Doc. 43), and Plaintiff's Opposition Memorandum to Defendant's Motion to Dismiss ("Opp. Mem.") (Doc. 48). *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012); *Walker v. Schult*, 717 F.3d 119, 122 n. 1 (2d. Cir. 2013) ("[a] district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion.").

2 Specifically, the Court advised: "If you were placed in a cell that was subject to infestation, you should indicate precisely what facility you were in; to the extent that you can describe the cell or state which cell you were in, indicate where you were housed; indicate the dates that this happened; indicate who, if anyone, you complained to; indicate what their response was, if any. [...] If there are particular individuals who you say you complained to and who ignored your complaints, you need to indicate who they are because if you only sue the City, then you have a slightly tougher case to make because then you would have to establish that the conditions under which you were housed were part of a practice or policy or custom of the city to keep you and perhaps others in those unsafe conditions." Doc. 37, at 6:16–8:3.

3 Plaintiff has failed to plead the same claims or factual allegations in his amended pleadings as in his earlier complaints. The City acknowledges that Plaintiff appears to treat his amended pleadings as supplements to, not replacements of, his earlier complaints. Doc. 45, at 3. "[I]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983). Accordingly, the Court liberally construes Plaintiff's pleadings by addressing the claims and factual allegations contained in all three of his complaints, regardless of their inconsistency.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue-Striped Flag
Appeal Filed by Baker v. Peters, 2nd Cir., February 5, 2026

2026 WL 74267
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Russell J. BAKER, et al. Plaintiffs,
v.
Joseph PETERS, et al., Defendants.

7:25 CV 2609 (NSR)
|
Signed January 09, 2026

**Attorneys and Law Firms**

Michael Howard Sussman, Sussman & Watkins, Goshen, NY, for Plaintiffs.

Joseph Peters, Parksville, NY, Pro Se.

Joseph Peters Jr., Parksville, NY, Pro Se.

Khalid Bashjawish, Jennifer Patricia Nigro, Sullivan County Attorneys Office, Monticello, NY, for Defendants Blake Starner, Michael Schiff, Victor Zayas, Michael Barrett, Rachel Bitjeman, Onyxx Clarke, Sullivan County Sheriff's Office.

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge:

***1** Individuals Russell J. Baker and Wade St. Germain (together, "Individual Plaintiffs") and business entities Beaverkill Studio, Inc., R.J. Baker Corp., Exit 98 Corp., d/b/a/ Cabernet Frank's (together, "Entity Plaintiffs"; together with the Individual Plaintiffs, "Plaintiffs") bring this action against Defendants Blake Starner, Michael Schiff, Victor Zayas, Michael Barrett, Rachel Bitjeman, Onyxx Clarke, and the Sullivan County Sheriff's Office (collectively, "County Defendants") and against Joseph Peters and Joseph Peters Jr. (together, "Peters Defendants" [1] ), pursuant to 42 U.S.C. § 1983, asserting violations of their due process rights under the Fourth and Fourteenth Amendments by County Defendants and violations of section 3604(a) of the Fair Housing Act ("FHA") by the Peters Defendants. The Complaint alleges that their neighbors, the Peters Defendants, repeatedly harassed Plaintiffs on the basis of their sexual orientation and that County Defendants deprived Plaintiffs of their constitutional rights under the Fourteenth and Fourth Amendments by (a) withholding proper and expected protections from the Peters Defendants, based on their sexual orientation and (b) false arrest and excessive force. (*See generally* Complaint, ECF No. 1.)

The County Defendants and the Peters Defendants moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). The County Defendants further moved to dismiss the Entity Plaintiffs' due process claim pursuant to Federal Rule of Civil Procedure Rule 12(b)(1) ("Rule 12(b)(1)") for lack of standing. For the following reasons, the County Defendants' and the Peters Defendants' motions to dismiss are GRANTED.

**FACTUAL BACKGROUND**

The following facts are taken from the Complaint and are assumed to be true for purposes of resolving the motions filed by the County Defendants and the Peters Defendants.

The Individual Plaintiffs are a married same-sex couple. (Compl. ¶ 1.) Plaintiffs and the Peters Defendants own neighboring properties in Parksville, Sullivan County, New York. Plaintiffs use their properties as both a residence and place of business, including a production studio, Beaverkill Studio, and a restaurant, Cabernet Frank's (Exit 98 Corp.). (*Id.* ¶¶ 17–19.) The Peters Defendants' property benefits from a ten-foot right-of-way across one of Plaintiffs' properties, the scope and limitations of which were adjudicated by the Sullivan County Supreme Court. (*Id.* ¶¶ 22–23.) Plaintiffs allege that the Peters Defendants have misused the right-of-way as a staging area for anti-gay slurs and threats. (*Id.*)

According to the Complaint, beginning in 2017, the Peters Defendants engaged in repeated verbal and physical threats and harassment of the Individual Plaintiffs based on their sexual orientation. The Complaint details numerous incidents and exchanges between the parties that occurred intermittently over several years and continued through 2024, when Plaintiffs were allegedly forced to abandon their home and businesses due to the ongoing harassment. (*Id.* ¶¶ 20–150.) During this period, police were summoned on numerous occasions, orders of protection ("OOPs") were issued, and Defendant Joseph Peters was charged and, in some instances

convicted, of multiple criminal offenses, including criminal contempt, harassment, disorderly conduct, and stalking. (*Id.*)

***2** Plaintiffs further allege that between 2017 and 2024, the County Defendants repeatedly failed to enforce active OOPs, instead issuing verbal warnings to the Peters Defendants, crediting the Peters Defendants' accounts over Plaintiffs' in response to reported OOP violations, and otherwise responding inadequately to Plaintiffs' complaints of harassment. (*Id.* ¶¶ 47–50, 61–67, 80–88, 90–92, 96–108, 110–118, 128–131, 135–144, 148–150, 156–157.)

On October 14, 2024, the Peters Defendants filed a complaint alleging that Plaintiff Baker violated an OOP by throwing a bucket of water on Defendant Joseph Peters. (*Id.* ¶ 158.) Plaintiffs allege that this incident never occurred, and that the complaint was false. Nevertheless, Deputy Sheriffs Clarke and Bitjeman arrested Plaintiff Baker. (*Id.* ¶ 159.) Plaintiffs allege that Clarke forced Baker face-down onto the ground with a knee pressed against his back, while Bitjeman used her baton against Baker's back. (*Id.* ¶¶ 163–165.)

Based on these allegations, Plaintiffs assert that the County Defendants violated their rights under the Fourth and Fourteenth Amendments and that the Peters Defendants violated their rights under the FHA.

## PROCEDURAL HISTORY

Plaintiffs commenced this action on March 31, 2025 with the filing of the Complaint. (ECF No. 1.) The Peters Defendants moved to dismiss the FHA claims pursuant to Rule 12(b)(6) and each filed a memorandum of law ("Peters MoL", ECF No. 39; "Peters Jr. MoL", ECF No. 40). County Defendants also moved to dismiss Plaintiffs' due process claims pursuant to Rules 12(b)(6) and 12(b)(1) and filed a memorandum of law. ("County MoL", ECF No. 51.) Plaintiffs filed an opposition to Defendants' motions to dismiss ("Pl. Opp.", ECF No. 53) and County Defendants filed a reply ("County Reply", ECF No. 52).

## LEGAL STANDARDS

### A. Rule 12(b)(1)

In reviewing a motion to dismiss under Rule 12(b)(1), a court "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation and internal quotation marks omitted). Rather, "[t]he plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005). Courts "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but [they] may not rely on conclusory or hearsay statements contained in the affidavits." *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004).

### B. Rule 12(b)(6)

Under Rule 12(b)(6), dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When there are well-pleaded factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. While the Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555). The Second Circuit "deem[s] a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference ... and documents that plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rotham v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (internal citations omitted). The critical inquiry is whether the Plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. A motion to dismiss will be denied where the allegations "allow[ ] the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### C. 42 U.S.C. § 1983 Claims

***3** Plaintiffs bring this claim pursuant to 42 U.S.C. § 1983. Section 1983 provides, in relevant part, that: "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the

deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). To state a claim under § 1983, a plaintiff must allege two essential elements: "(1) that the defendants deprived him of a right 'secured by the Constitution or laws of the United States'; and (2) that they did so 'under color of state law.' " *Giordano v. City of New York*, 274 F.3d 740, 750 (2d Cir. 2001) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999)).

## DISCUSSION

Plaintiffs assert claims for violations of their due process rights under the Fourth and Fourteenth Amendments and for violations of the FHA. The Court addresses the County Defendants' and the Peters Defendants' motions to dismiss in turn.

### A. County Defendants' Motion to Dismiss

Plaintiffs seek damages from the County Defendants for alleged violations of their Fourteenth Amendment due process rights. The County Defendants argue that Plaintiffs fail to state a claim under § 1983; that Plaintiffs' Fourteenth Amendment claims are time-barred and barred by qualified immunity; that Plaintiffs fail to allege facts establishing the personal involvement of Sheriff Michael Schiff or the Sullivan County Sheriff's Office in the alleged violations; and that the Entity Plaintiffs lack standing. [2] The Court agrees.

#### 1. Fourteenth Amendment Due Process Claim Under State-Created Danger

The Supreme Court has repeatedly held that "as a general matter, a State's failure to protect an individual against private violence does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). The Second Circuit recognizes two narrow exceptions to this rule: the "special relationship" exception and the "state-created danger" exception. *Tufaro v. City of New York*, No. 12-CV-7505 (AJN), 2014 WL 4290631, at *2–3 (S.D.N.Y. Aug. 28, 2014). "If a plaintiff's claim satisfies one or both of these theories, the plaintiff must also show that the defendant's conduct was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience' to sustain a substantive due process claim." *Spiezio v. Martinez*, 653 F. Supp. 3d 8, 29 (N.D.N.Y. 2023) (quoting *Golian v. N.Y. City Admin. for Children Servs.*, 282 F. Supp. 3d 718, 728 (S.D.N.Y. 2017)). "In order to shock the conscience and trigger a violation of substantive due process, official conduct must be outrageous and egregious under the circumstances; it must be truly 'brutal and offensive to human dignity.' " *Lombardi v. Whitman*, 485 F.3d 73, 81 (2d Cir. 2007) (quoting *Smith v. Half Hollow Hills Cent. School Dist.*, 298 F.3d 168, 173 (2d Cir. 2002)).

Plaintiffs assert their Fourteenth Amendment claims only under the state-created danger exception. That exception "requires...affirmative, rather than passive, conduct on the part of a government actor that 'communicates, explicitly or implicitly, official sanction of private violence.' " *Tufaro v. City of New York*, No. 12-CV-7505 AJN, 2014 WL 4290631, at *3 (S.D.N.Y. Aug. 28, 2014) (citing *Okin v. Vill. of Cornwall–on–Hudson Police Dep't*, 577 F.3d 415, 429 (2d Cir. 2009)).

***4** Several Second Circuit cases illustrate the type of conduct sufficient to support application of the state-created danger exception. In *Okin*, the complaint alleged that police officers repeatedly ignored a woman's complaints of domestic abuse by her partner, who was personally friendly with the officers. 577 F.3d at 429–30. The abuser admitted to police that he had physically assaulted his partner, yet officers failed to arrest him or prepare domestic incident reports. *Id.* In upholding plaintiff's due process claim under the state-created danger exception, the Second Circuit emphasized the well-known and acute risks inherent in domestic violence situations and concluded that the officers' "deliberate indifference"—combined with their repeated inaction in the face of explicit admissions of abuse—amounted to conscience-shocking conduct that implicitly sanctioned the abuse. *Id.* at 431–32.

Similarly, in *Pearce v. Estate of Longo*, the court upheld the plaintiff's substantive due process claims under the state-created danger exception, finding that a police officer's supervisors were "well-aware of the ongoing abuse and threatening behavior" he exhibited before ultimately stabbing his wife to death and committing suicide. 766 F. Supp. 2d 367, 373, 375 (N.D.N.Y. 2011), aff'd in part, rev'd in part sub nom. *Pearce v. Labella*, 473 F. App'x 16 (2d Cir.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

2012). In *Pearce*, the complaint alleged that the victim had made multiple formal reports and repeatedly contacted the police department to express her concerns, yet her husband's supervisors discouraged her from filing reports or seeking an OOP and failed to discipline or suspend him, confiscate his firearms, or evaluate his mental condition. *Id.* The Court noted that "[t]he dangers of domestic violence are well-established and should be known by the law enforcement defendants," who had ample time to respond to the victim's repeated complaints appropriately. *Id.* The court further concluded that the defendants' conduct was conscience-shocking and, as in *Okin*, "had implicitly encouraged the offender's behavior and, thereby, increased the risk of danger to the victim in violation of the Due Process Clause." *Id.*

In *Dwares v. City of New York*, the complaint alleged, among other things, that one of the defendant officers confirmed to a reporter that police officers had told a group of racist private actors known as "skinheads" that "unless they got completely out of control the police would neither interfere with their assaults nor arrest them." 985 F.2d 94, 97 (2d Cir. 1993). These prior assurances were borne out when plaintiff was violently assaulted by members of the skinheads during a protest in the presence of police officers who failed to intervene, resulting in injury. *Id.* In reversing the lower court, the Second Circuit held that, unlike *DeShaney*, the factual allegations in *Dwares* "went well beyond the allegations that the defendant officers merely stood by and did nothing." *Id.* at 99. Rather, the complaint alleged that the officers "conspired with the skinheads" and provided "prior assurances" of noninterference, thereby increasing the likelihood that the skinheads would assault protestors. *Id.* As the court explained, "[s]uch a prearranged official sanction of privately inflicted injury would surely have violated the victim's rights under the Due Process Clause." *Id.*

While these cases are not exhaustive, they illustrate the type of affirmative, conscience-shocking conduct required to state a claim under the state-created danger exception. The inquiry is inherently fact-specific and turns on whether state actors affirmatively increased a plaintiff's risk of harm. In opposing dismissal, Plaintiffs cited to several cases—*Pena v. DePrisco, Okin*, *Lombardi, Coleman v. County of Suffolk*, and *Eubanks v. Hansell*—without meaningfully comparing the allegations in those cases to the allegations here. Of those cases, only *Okin* and *Pena* sustained claims under the state-created danger exception. *Okin* is distinguishable for the reasons discussed above, and *Pena* is likewise inapposite. *Pena* involved a police officer with a known history of alcohol abuse who struck and killed three pedestrians after a 12-hour drinking binge with fellow officers and supervisors. The complaint alleged that throughout his tenure, the officer was "never questioned, disciplined, or counseled regarding his alcohol use," and, instead, routinely drank alcohol with other officers at or near the police precinct house, openly and with supervisors' knowledge. *Pena v. DePrisco*, 432 F. 3d 98, 103 (2d Cir. 2005). The complaint further alleged that fellow officers "hindered the investigation" of the incident by failing to administer sobriety tests at the scene, delaying testing of the officer's blood alcohol level for several hours, sending his blood to an unauthorized laboratory rather than the medical examiner, failing to develop photographs taken at the scene, losing or destroying inculpatory evidence, intimidating witnesses, and suppressing the results of an alcohol sensor test. *Pena*, 432 F. 3d at 103–104. Distinguishing between "conduct that is 'passive' as in *DeShaney* and that which is 'affirmative' as in *Dwares*," the Second Circuit rejected plaintiffs' state-created danger theory based on allegations that certain officers "stood by and did nothing" to prevent the intoxicated officer's conduct, but upheld it on the basis that other officers encouraged the intoxicated officer "to drink to excess and drive in that condition." *Id.* at 110–111.

***5** Here, the Complaint does not allege comparable affirmative conduct by the County Defendants. Plaintiffs do not allege that the County Defendants collaborated with the Peters Defendants, sanctioned their harassment, provided assurances of noninterference, obstructed investigations, ignored harassment while witnessing it, or otherwise took actions that increased Plaintiffs' risk of harm. Nor do the allegations support conduct that is "outrageous and egregious" enough to shock the conscience. *Lombardi*, 485 F.3d at 81. To the contrary, the Complaint alleges that County Defendants responded to multiple complaints, made arrests, and obtained several OOPs. (Compl. ¶¶ 29–36, 42–46, 47–48, 54–56, 61–64, 71, 82, 84–85, 90–92, 114–15.)

Plaintiffs' contention that the County Defendants should have taken additional measures does not, without more, create liability under the state-created danger doctrine. It is well settled that allegations that officials "stood by and did nothing," or should have done more, are insufficient absent conscience-shocking affirmative conduct. *Pena*, 432 F.3d at 110.

Accordingly, County Defendants' conduct does not rise to the level required to shock the conscience and Plaintiffs fail to

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

state a substantive due process claim under the state-created danger exception.

### 2. Statute of Limitations

The County Defendants further argue that, even if the state-created danger exception applied, Plaintiffs' Fourteenth Amendment due process claim is barred by the applicable statute of limitations. The Court agrees.

This action was commenced on March 31, 2025. The vast majority of the incidents alleged in the Complaint occurred between 2017 and 2020. See Compl. ¶¶ 20–127. In New York, § 1983 claims are subject to a three-year statute of limitations pursuant to CPLR 214(5). Accordingly, any claims accruing prior to March 31, 2022 are time-barred.

Plaintiffs contend that the continuing violation doctrine renders their § 1983 claims timely. That doctrine permits otherwise untimely claims to proceed where they arise from a discriminatory policy or practice and are continuous in time with at least one timely act. *Plumey v. New York State*, 389 F. Supp. 2d 491, 498 (S.D.N.Y. 2005). Courts in this Circuit, however, disfavor application of the continuing violation doctrine and reserve it for "compelling circumstances." *Id.*

Here, the allegations in the Complaint do not warrant application of the continuing violation doctrine. First, Plaintiffs do not plausibly allege that the County Defendants acted pursuant to a specific discriminatory policy or practice. "A simple declaration that defendant's conduct violated the ultimate legal standard (e.g., it was 'because of sex' or 'severe and pervasive') does not suffice." *Id.* (internal quotations omitted). Second, even assuming Plaintiffs had adequately alleged a policy or practice, the untimely incidents—those accruing prior to March 31, 2022—are not sufficiently continuous in time with any timely conduct. Plaintiffs argue that from 2017 through 2024, the County Defendants engaged in a "sustained pattern of inaction" in response to complaints regarding the Peters Defendants' harassment. Pl. Opp. at 17. The Complaint, however, alleges multiple instances during this period in which County Defendants responded to Plaintiffs' complaints, issued OOPs, and made arrests. *See* Compl. ¶¶ 29–36, 42–46, 47–48, 54–56, 61–64, 71, 82, 84–85, 90–92, 114–15. Such allegations undermine any claim of the type of uninterrupted, ongoing conduct required to invoke the continuing violation doctrine. *Cf. Fitzgerald v. Henderson*, 251 F.3d 345, 363 (2d Cir. 2001) (finding a continuing violation where there was a "constant stream" of "day-to-day" abuse with "no interruption"). Finally, Plaintiffs do not allege any basis for equitable tolling of the statute of limitations.

***6** Accordingly, Plaintiffs' substantive due process claims pursuant to § 1983 is time-barred.

### 3. Qualified Immunity

The County Defendants further argue that they are entitled to qualified immunity. Qualified immunity shields government officials from civil liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In *Saucier v. Katz*, the Supreme Court articulated a two-step framework for resolving qualified immunity claims: courts were first required to determine whether the facts alleged establish a violation of a constitutional right and, if so, then determine whether that right was clearly established at the time of the challenged conduct. 533 U.S. 194, 201 (2001). In *Pearson*, however, the Court made clear that this sequence was no longer mandatory and that courts may exercise discretion in deciding which prong of the analysis to address first. 555 U.S. at 236 ("On reconsidering the procedure required in *Saucier,* we conclude that...it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

Here, given the multi-year timeframe of the alleged conduct, the Court exercised its discretion to first determine whether Plaintiffs plausibly alleged a substantive due process violation under the state-created danger doctrine. Having concluded that they did not, the Court further finds that the Complaint points to no "clearly established" law or constitutional right of which County Defendants ran afoul based on the alleged conduct.

Plaintiffs argue that County Defendants are not entitled to qualified immunity by attempting to draw comparisons to *Okin*, but as discussed *supra, Okin* —which involved allegations that police officers implicitly sanctioned domestic abuse by repeatedly ignoring a victim's complaints while

maintaining a friendly relationship with the abuser—is fundamentally distinguishable from the allegations here. Pl. Opp. at 22-24. Without more, Plaintiffs therefore fail to show that County Defendants' conduct violated clearly established law.

Accordingly, County Defendants are entitled to qualified immunity.

**4. Personal Involvement of Defendants Sheriff Michael Schiff and the Sullivan County Sheriff's Office**

The County Defendants argue that the Complaint fails to allege facts establishing the personal involvement of Sheriff Michael Schiff or the Sullivan County Sheriff's Office in the alleged constitutional violations. The Court agrees.

As clarified by the Supreme Court in *Ashcroft v. Iqbal*, "vicarious liability is inapplicable to § 1983 suits." 556 U.S. 662, 676 (2009). Accordingly, "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*" and "a plaintiff must plead that each Government-official Defendant, through the official's own individual actions, has violated the Constitution." *Id.* (citing *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 691 (1978). Further, under *Monell*, "[i]n order to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citing *Monell*, 436 U.S. at 690-91).

***7** With respect to Defendant Sheriff Michael Schiff, the Complaint fails to allege facts demonstrating his direct and personal involvement in the alleged constitutional deprivations. Defendant Schiff is mentioned only once in connection with a specific action: paragraph 56 alleges that, on September 5, 2017, he called Sergeant Baker to inform him that the Sheriff's Office was appointing Sergeant Starner as a liaison in Plaintiffs' ongoing matter with the Peters Defendants. Compl. ¶ 56. As a general matter, such action clearly does not violate Plaintiffs' rights, but even if it did, the allegation predates March 31, 2022, and is therefore barred by the statute of limitations. Plaintiffs' remaining references to Defendant Schiff merely allege that he took "no action" with regards to Plaintiffs' complaints of the Peters Defendants' harassment. As discussed *supra*, such inaction, without conscience-shocking conduct, fails to establish liability for a § 1983 claim under the state-created danger doctrine. Compl. ¶¶ 67, 103, 108, 149, 151.

Similarly, the Complaint fails to allege facts demonstrating the Sullivan County Sheriff's Office's direct and personal involvement in any constitutional deprivation. Plaintiffs do not assert a *Monell* claim for municipal liability; even if they had, they would fail under the applicable standard because they do not allege that the County Defendants acted pursuant to any official policy. *See White v. Westchester Cnty.*, No. 18-CV-730 (KMK), 2018 WL 6726555, at *10 (S.D.N.Y. Dec. 21, 2018) ("A plaintiff may satisfy the policy, custom[,] or practice requirement by alleging one of the following: (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.").

Accordingly, because Plaintiffs fail to allege any personal involvement by Defendant Schiff or to assert a *Monell* claim, the claims against Michael Schiff and the Sullivan County Sheriff's Office are dismissed.

**5. Standing of Entity Plaintiffs**

The County Defendants also argue that Plaintiffs lack standing to pursue § 1983 substantive due process claims under the state-created danger doctrine. The Court agrees.

Although corporations are "persons" within the meaning of the Fourteenth Amendment and have Article III standing, every circuit to recognize the state-created danger doctrine has limited its application to situations involving risks of physical or emotional harm to individuals.[3] As the County Defendants correctly observe, the cases relied upon by both parties uniformly involve allegations that the state failed to protect individual persons—not business entities—from private violence. *See, e.g., County of Sacramento v. Lewis*,

523 U.S. 833 (1998); *Okin v. Village of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415 (2d Cir. 2009); *Matican v. City of New York*, 524 F.3d 151 (2d Cir. 2008); *Pena v. DePrisco*, 432 F.3d 98 (2d Cir. 2005); *Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993); *Eubanks v. Hansell*, No. 23-CV-1234, 2024 WL 1308672 (E.D.N.Y. Mar. 26, 2024); *Tufaro v. City of New York*, No. 12-CV-7505, 2014 WL 4290631 (S.D.N.Y. Aug. 28, 2014).

Because a corporate entity cannot suffer the type of physical or emotional injury that *DeShaney* and its progeny seek to remedy through the state-created danger doctrine, the Entity Plaintiffs lack standing to assert such a claim. Accordingly, the Entity Plaintiffs' substantive due process claims under the state-created danger exception are dismissed with prejudice.

**B. Peters Defendants' Motions to Dismiss**

***8** Plaintiffs seek damages from the Peters Defendants for alleged violations of § 3604(a) of the FHA. Each of the Peters Defendants moved to dismiss the FHA claim pursuant to Rule 12(b)(6), arguing that the claim is time-barred, that Plaintiffs fail to plausibly allege harassment based on sexual orientation, that the allegations are false or inaccurate, and that the conflict amounts to a "bitter neighbor dispute" rather than actionable harassment based on sex discrimination. *See generally* Peters MoL; Peters Jr. MoL. The Court agrees with respect to the statute of limitations.

**1. FHA Statute of Limitations**

Claims brought under the FHA are subject to a two-year statute of limitations. *See* 42 U.S.C. § 3613(a)(1)(A). The statute provides that an aggrieved person must commence a civil action "not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice." *Id.* The limitations period may be equitably tolled where a plaintiff demonstrates that the defendant concealed the existence of the cause of action and that the plaintiff remained unaware of it until a point within the statutory period. *Grimes v. Fremont Gen. Corp.*, 785 F.Supp.2d 269, 291 (S.D.N.Y. 2011) (citing *Cardiello v. Money Store, Inc.*, No. 00-CV-7332, 2001 WL 604007, at *4 (S.D.N.Y. June 1, 2001)). Tolling of the statute of limitations period may be delayed "until the last discriminatory act in furtherance of it." *Shomo v. City of New N.Y.*, 579 F.3d. 176, 181 (2d Cir. 2009) (citations and punctuation omitted). As with Plaintiffs' Fourteenth Amendment claims, FHA claims may also be extended under the continuing violation doctrine. *Tejada v. LittleCity Realty LLC*, 308 F.Supp.3d 724, 733 (E.D.N.Y. 2018) (citing *Havens v. Coleman*, 455 U.S. 363, 380 (1982).

Plaintiffs commenced this action on March 31, 2025, asserting FHA claims against the Peters Defendants based on conduct dating back to 2017. As a general matter, the majority of the alleged incidents occurred between 2017 and 2020. *See* Compl. ¶¶ 20–127. The sole allegation from 2021 is that Plaintiffs, through counsel, advised the Peters Defendants to cease trespassing on Plaintiffs' easement. *Id.* ¶ 128. The 2022 allegations include claims that Defendant Peters followed Plaintiff St. Germain in May 2022; that the Peters Defendants filed a baseless noise complaint against Cabernet Frank's on August 13, 2022; and that beginning on October 5, 2022, the Peters Defendants violated a state-court settlement agreement by trespassing, playing loud music, making homophobic remarks, taunting Plaintiffs, and spreading defamatory statements. *Id.* ¶¶ 129, 131, 135–37.

The remaining allegations that potentially fall within the limitations period concern conduct in 2023 and 2024, including alleged violations of an order of protection through repeated entries onto Plaintiffs' property, harassment from the easement, blasting music, leaving debris and cat litter on Plaintiffs' property, throwing a board against Beaverkill Studio, and urinating on Plaintiffs' property. *Id.* ¶¶ 138–139, 141–143, 156, 172.

Any FHA claims accruing prior to March 31, 2023 are time-barred. Plaintiffs have not alleged that the Peters Defendants concealed the existence of the cause of action or identified any other basis for equitable tolling. Nor does the continuing violation doctrine apply to the allegations as asserted. That doctrine permits otherwise untimely FHA claims to proceed only where they are part of a single, ongoing pattern of discrimination and at least one discriminatory act occurred within the limitations period. Section 3604(a) makes it unlawful to "refuse to sell or rent ... or otherwise make unavailable or deny[ ] a dwelling to any person *because of* [*protected characteristics*]." 42 U.S.C. § 3604(a) (emphasis added). Here, Plaintiffs fail to plausibly allege that the foregoing incidents occurring in 2023 and 2024—i.e., the only conduct within the limitations period—were motivated by discrimination based on sexual orientation. Because the timely allegations do not support a viable FHA claim, they cannot serve as a basis for applying the continuing violation doctrine to revive earlier, time-barred conduct.

***9** Accordingly, even assuming the truth of Plaintiffs' allegations that the Peters Defendants engaged in harassment and other misconduct, the Court must dismiss the FHA claim against the Peters Defendants as time-barred.

## CONCLUSION

For the foregoing reasons, the County Defendants' motion to dismiss is GRANTED, and Plaintiffs' Fourteenth Amendment claims against the County Defendants are dismissed without prejudice, except for those claims asserted on behalf of the Entity Plaintiffs which are dismissed with prejudice. The Peters Defendants' motion to dismiss is GRANTED and Plaintiffs' FHA claims against the Peters Defendants are dismissed without prejudice.

Plaintiffs are granted leave to file an Amended Complaint consistent with this opinion, including to substitute Sullivan County for the Sullivan County Sheriff's Office as requested, on or before February 13, 2026. Should Plaintiff not file an Amended Complaint by this date, Plaintiffs' claims will be dismissed with prejudice. In the event Plaintiffs file an Amended Complaint by February 13, 2026, Defendants are directed to answer, or otherwise respond to, the Amended Complaint within twenty-one (21) days following Plaintiffs' filing of the Amended Complaint.

The Clerk of Court is directed to terminate the motions at ECF Nos. 39, 40, and 51.

### All Citations

Slip Copy, 2026 WL 74267

## Footnotes

1 The Peters Defendants appear *pro se* in this action.

2 As the County Defendants challenged only Plaintiffs' Fourteenth Amendment claims in their memorandum of law, the Court does not address Plaintiffs' Fourth Amendment claims in this Opinion.

3 Since *DeShaney*, all circuit courts of appeals, except for the Fifth Circuit, have adopted the state-created danger doctrine.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 6812276
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Lisa BONNER and Robert Metel, Plaintiffs,
v.
TOWN OF BROOKHAVEN
and Theresa Trejo, Defendants.

CV 22-4690 (GRB)(ARL)
|
Signed October 16, 2023

**Attorneys and Law Firms**

Aaron C. DePass, Brooklyn, NY, for Plaintiffs.

Alexander Sendrowitz, Quatela Chimeri, PLLC, Hauppauge, NY, for Defendants.

**MEMORANDUM & ORDER**

GARY R. BROWN, United States District Judge:

***1** Presently before the Court is defendants' motion to dismiss this case under Fed. R. Civ. P. 12(b)(6). For the reasons stated below, that motion is **DENIED**.

**BACKGROUND**

Plaintiffs Robert Metel and Lisa Bonner ("plaintiffs") bring this action based on alleged constitutional violations committed by defendants Town of Brookhaven ("the Town") and its employee Theresa Trejo ("defendants") regarding the Town's condemnation of plaintiffs' residence in 2019. *See generally* Compl., Docket Entry ("DE") 1. Metel resided at 356 Cypress Drive in Mastic Beach, NY for over twenty years, and he lived there together with Bonner for at least several years. *Id.* at ¶¶ 2, 14. During an unsolicited visit and without plaintiffs present, Trejo allegedly entered plaintiffs' home, declared it "unfit for human habitation," and condemned the house. *Id.* at ¶¶ 14-18. Plaintiffs continued to live there until Town employees boarded it up four days later, rendering both the house and plaintiffs' personal property inaccessible. *Id.* at ¶¶ 21-24.

Plaintiffs claim there was no legitimate basis for the condemnation, which was actually effected to force plaintiffs from their home. *Id.* at ¶¶ 27-28. They further allege that the Town has a policy of performing similar condemnations amounting to illegal evictions and that the Town failed to properly train, supervise, or control its employees, including Trejo. *Id.* at ¶¶ 30-42. Plaintiffs commenced the instant suit on August 9, 2022, bringing claims against defendants under 42 U.S.C. § 1983 for allegedly violating their Fourth Amendment rights by (1) illegally entering and searching the house, leading to the condemnation and (2) illegally seizing plaintiffs' property, including both their house and all the personal property contained within. *Id.* at ¶¶ 63-72. Plaintiffs also bring a *Monell* claim against the Town based on its alleged failure to train or supervise town employees. *Id.* at ¶¶ 83-86.

On March 1, 2023, the Court held a telephonic pre-motion conference and the parties argued defendants' anticipated motion to dismiss. DE 11. The Court made rulings that were placed on the record, and the parties were directed to brief the remaining issues. *Id.* At this conference, defendants alerted the Court that they had conducted a title search revealing that plaintiffs' home was foreclosed on in 2017, *id.*, two years prior to the condemnation, and that the house has ever since been owned by U.S. Bank, DE 14-4. However, there is no indication that U.S. Bank initiated eviction proceedings against plaintiffs prior to the condemnation. On April 27, 2023, defendants filed the instant motion, DE 14, and plaintiffs subsequently filed their memorandum in opposition, DE 15.

**DISCUSSION**

*Standard of Review*

Motions to dismiss are decided under the well-established standard of review for such matters, as discussed in *Burris v. Nassau County District Attorney*, No. 14-5540 (JFB)(GRB), 2017 WL 9485714, at *3-4 (E.D.N.Y. Jan. 12, 2017), *adopted by* 2017 WL 1187709 (E.D.N.Y. Mar. 29, 2017), and incorporated by reference herein. The gravamen of that standard, of course, is the question of whether, assuming the allegations of the complaint to be true solely for the purposes of the motion, the complaint sets forth factual material to render the claims plausible. *See id.*

*Judicial Notice*

***2** In deciding a motion to dismiss for failure to state a claim, the Court must consider only the allegations in the complaint, those documents attached to the complaint or incorporated by reference, and facts subject to judicial notice. *Kramer v.*

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

*Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991). The Court may take judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Judicial notice is regularly taken of publicly available documents and government records, *Kramer*, 937 F.2d at 774, including foreclosure records, *Pennicott v. JPMorgan Chase Bank, N.A.*, No. 21 Civ. 4575 (LGS), 2022 WL 4226025, at *1 (S.D.N.Y. Sept. 13, 2022).

Attached to defendants' motion to dismiss is a Suffolk County foreclosure deed indicating that ownership of the property that is the subject of this case passed to U.S. Bank in 2017. DE 14-4. Because this document comes from a reliable and publicly accessible government source, the Court takes judicial notice of its contents. Though provided with the opportunity, plaintiffs have not attacked the authenticity of the document or controverted its contents. As such, the fact that plaintiffs were not the legal owners of the residence at the time it was condemned will be considered in deciding defendants' motion to dismiss.

*Fourth Amendment Claims as to Plaintiffs' Residence*

The viability of both plaintiffs' first cause of action and second cause of action as it pertains to the house depends on what, if any, property rights plaintiffs held in the house at the time of condemnation. These two claims are considered together.

Whether a plaintiff has standing to assert a Fourth Amendment claim turns on if he or she has a "legitimate expectation of privacy" in the place searched or seized. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). Protection extends to those with a lawful possessory interest, but not those whose presence on the property is "wrongful." *Id.* at 143, n.12. The Supreme Court provided examples of "wrongful presence," such as a "burglar plying his trade in a summer cabin during the off season," *id.*, or a thief in possession of a stolen car, *id.* at 141, n.9. The Second Circuit has applied this rule in criminal cases involving traffic stops where the defendant was neither the owner of the automobile nor had the authorization of the owner. *See United States v. Sanchez*, 635 F.2d 47, 64 (2d Cir. 1980) (finding that a defendant who "demonstrated neither ownership of [the car], nor license from the owner to possess [it]" had no Fourth Amendment rights in the vehicle); *United States v. Roy*, 734 F.2d 108, 111–12 (2d Cir. 1984) (holding that an escaped prisoner did not have a legitimate expectation of privacy in a vehicle he intended to use in the commission of further crimes). Of course, expectations of privacy in a vehicle are generally judged by different standards than those applicable to a residence. United States v. Paulino, 850 F.2d 93, 96 (2d Cir. 1988). Several district courts in this circuit have extended the "wrongful presence" standard to cases involving illegally occupied dwellings, but only if the party attempting to assert Fourth Amendment rights, like the burglar posited in *Rakas*, was never entitled to reside at the property. *See Wilson v. Sessoms-Newton*, No. 14-CV-00106 (PKC), 2017 WL 3575240, at *4 (E.D.N.Y. Aug. 17, 2017) (determining that squatters that never had a lease agreement with property owner had no legitimate expectation of privacy); *Smith v. Cnty. of Nassau*, No. 10-CV-4874 (MKB), 2015 WL 1507767, at *8 (E.D.N.Y. Mar. 31, 2015) (finding that a plaintiff had no Fourth Amendment rights in an apartment based on fraudulent lease unknown to the property owner).

***3** By contrast, courts have generally found that a person whose initial presence is lawful maintains Fourth Amendment rights in his or her residence until an eviction proceeding occurs, even if such a proceeding is legally justified. *See United States v. Washington*, 573 F.3d 279, 284 (6th Cir. 2009) (declaring that even though landlord had the right to evict a tenant for nonpayment of rent and violation of the terms of the lease, "mere authority to evict a person cannot of itself deprive that person of an objectively reasonable expectation of privacy"); *United States v. Young*, 573 F.3d 711, 720 (9th Cir. 2009); *Ryan v. Mary Immaculate Queen Center*, 188 F.3d 857, 859 (7th Cir. 1999) (finding that police officers violated a resident's Fourth Amendment rights by searching a home without a warrant while delivering summons to eviction proceedings). Although the Second Circuit has not spoken on the issue, other circuits have held that until a resident has "notice that his continued occupancy had been adjudged to be unlawful," he maintains a legitimate expectation of privacy in the dwelling. *See United States v. Curlin*, 638 F.3d 562, 566 (7th Cir. 2011).

Here, plaintiffs may assert Fourth Amendment rights in their home because their initial presence was lawful and there had been no effort to evict them. It is undisputed that, prior to U.S. Bank's foreclosure, plaintiff Metel was the lawful owner and occupant of the house and was entitled to Fourth Amendment protections at that time. DE 14-6 at 2; DE 15-1 at 2. Despite nearly two years elapsing between the foreclosure and the condemnation, there is no indication that the bank ever commenced eviction proceedings or otherwise attempted to remove plaintiffs from the premises. This places the case squarely in the ambit of *Washington*, where the Sixth Circuit

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

held that an apartment resident had Fourth Amendment protections even though his landlord could legally evict him. 573 F.3d at 284–85. Here, U.S. Bank could have ousted plaintiffs from their home through a legal proceeding, but since it failed to do so, plaintiffs maintain their pre-existing expectation of privacy in the house. Plaintiffs' argument is more compelling than the interests recognized in *Ryan*, where the Seventh Circuit found that police officers could not search an apartment after delivering summons for an eviction proceeding to the owner. 188 F.3d at 859. In *Ryan*, the police were at least aware of an ongoing eviction effort and arguably trying to vindicate the rights of the property owner attempting to regain possession. *Id.* at 859–60. By contrast, plaintiffs in this case assert that defendants were unaware of the foreclosure at the time they condemned plaintiffs' home, no eviction proceedings had been initiated, and there is no suggestion that defendants were acting at U.S. Bank's behest in appearing at plaintiffs' home. DE 15-1 at 2. Therefore, the Court adopts the reasoning embraced by the Sixth, Seventh, and Ninth Circuits and holds the plaintiffs had a legitimate expectation of privacy in their home at the time of alleged search and seizure.

A contrary outcome in this case would be a dramatic extension of the Second Circuit's vehicular decisions in *Sanchez* and *Roy*. *See Sanchez*, 635 F.2d at 64 (2d Cir. 1980); *Roy*, 734 F.2d at 111. This result is also consistent with the decisions in *Smith* and *Wilson*, which denied Fourth Amendment protections to individuals that were never legal occupants of their residences and therefore never established a legitimate expectation of privacy. *See Smith*, 2015 WL 1507767, at *8; *Wilson*, 2017 WL 3575240, at *4. Finally, plaintiffs' continued residence at their long-term home is simply not analogous to previously established examples of "wrongful presence." *See Roy*, 734 F.2d at 111 n.3 ("Roy's presence at the scene of the search was wrongful since he was supposed to be incarcerated and would have been but for his illegal escape"); *Gallegos v. Haggerty*, 689 F. Supp. 93, 98 (N.D.N.Y. 1988) (finding that plaintiffs involved in a dispute as to their right to occupy two rooms in a house were not " 'wrongfully' present in the sense that a burglar is wrongfully in someone else's house or a person is wrongfully in a stolen automobile"). Accordingly, defendants' motion to dismiss is denied as to plaintiffs' first cause of action and denied as to their second cause of action as it pertains to plaintiffs' residence. [1]

*Fourth Amendment Claims as to Plaintiffs' Personal Property*

***4** Plaintiffs also allege an illegal seizure of their personal property in violation of the Fourth Amendment. An unconstitutional seizure of personal property occurs "when there is some meaningful interference with an individual's possessory interests" in the individual's property by a government actor not authorized by a warrant or an exception to the warrant requirement. *See U.S. v. Jacobsen*, 466 U.S. 109, 113 (1984). Interference can occur even when the government does not ultimately come to possess the property. *See U.S. v. Ramirez*, 523 U.S. 65, 71 (1998) (finding that unnecessary destruction of property may constitute a seizure); *see also Spangler v. Wenniger*, 388 Fed. App'x 507, 511 (6th Cir. 2010) (piling dirt on personal property during a search of a garage is a seizure).

In this case, the Town's conduct may rise to the level of a seizure. Several days after condemning plaintiffs' residence, the town boarded up the building and prevented plaintiffs from accessing their personal property. DE 1 ¶¶ 22-23. This total deprivation of use and access to property is the type of "meaningful interference with possessory interests" the Supreme Court forbade in *Jacobsen.* 466 U.S. at 113. This result holds even though plaintiffs were no longer the legal owners of the house. *See Cochran v. Gilliam*, 656 F.3d 300, 309 (6th Cir. 2011) (finding a Fourth Amendment violation when police assisted a landlord's unauthorized seizure and sale of a tenant's furniture, even though police were assisting the landlord's eviction proceedings against the tenant).

In their memorandum, defendants appear to suggest that no Fourth Amendment violation occurred because the house was not boarded up until four days after the condemnation, providing "ample time [for plaintiffs] to retrieve their personal property." DE 14-6 at 7. But no authority, including the case defendants reference, *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 218 F. Supp. 2d 266 (N.D.N.Y. 2002), supports this position. In *Shaul*, a fired schoolteacher sued for alleged Fourth Amendment violations after the school district cleaned out personal items he left behind in his classroom. *Id.* at 268. The District Court held that the teacher had no possessory interests in the items because he made no effort to retrieve them in the ten days following his termination. *Id.* at 272. The Second Circuit, however, explicitly rejected this conclusion on appeal, noting that the teacher protested being forced to leave without his property and stating, "we cannot agree that, as a matter of law, he lost all possessory interest in any personal effects removed

by defendants the following day." *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 185 (2d. Cir. 2004). The facts of this case are even clearer than those in *Shaul*, as plaintiffs remained in the house until physically barred from entry. DE 1 ¶¶ 21-22. Nothing in plaintiffs' conduct indicates an intent to abandon their property interests or their Fourth Amendment rights therein.

Finally, defendants argue the claim should be dismissed because plaintiffs "fail[ed] to list a single item of personal property" allegedly seized due to the condemnation. While defendants are correct that more than conclusory statements are required to survive a motion to dismiss, the Court must consider allegations in the complaint in their factual context to determine whether they meet the "plausibility" threshold. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Here, the context surrounding plaintiffs' allegations makes clear what kinds of items were seized: put simply, all the normal household items a couple would keep in their sole residence of many years. Therefore, plaintiffs' assertion that they "lost all of their personal property and belongings that were inside the house," although general, is sufficiently pleaded to survive a motion to dismiss. DE 1 ¶ 24. Accordingly, defendants' motion is denied as to the second cause of action as it pertains to plaintiffs' personal property.

*Plaintiffs' Monell Claim*

***5** Plaintiffs' final cause of action is for supervisory liability against the Town of Brookhaven for allegedly failing to properly train or supervise its employees. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 692 (1978). As acknowledged by both parties, a claim for supervisory liability under 42 U.S.C. § 1983 requires an allegation of an underlying constitutional violation. *Blyden v. Mancusi*, 186 F.3d 252, 265 (2d Cir. 1999). Since the Court has determined that both of plaintiffs' Fourth Amendment claims are viable, their *Monell* claim proceeds as well.

**CONCLUSION**

For the foregoing reasons, defendants' motion to dismiss is **DENIED**.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2023 WL 6812276

## Footnotes

1 Given the strength and applicability of cases from other circuits and the absence of Second Circuit authority, the Court does not find it necessary to consider whether plaintiffs had implicit permission from U.S. Bank to continue residing at the house. *See Walls v. Giuliani*, 916 F. Supp. 214, 221 (E.D.N.Y. 1996) (finding that by encouraging squatters to occupy city-owned housing, New York City had created a tenancy relationship with squatters granting them Fourth Amendment rights).

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 4275727
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

James E. BROWN, Plaintiff,
v.
ONEIDA COUNTY, et al., Defendants.

6:15-CV-0849 (LEK/ATB)
|
Signed 08/12/2016

**Attorneys and Law Firms**

Karen H. Charrington, The Charrington Firm, PC, Rosedale, NY, for Plaintiff.

David H. Walsh, IV, Barth, Sullivan Law Firm, Syracuse, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Lawrence L. Kahn, U.S. District Judge

## I. INTRODUCTION

***1** On July 10, 2015, Plaintiff James E. Brown commenced this action against Defendants Oneida County, the Oneida County District Attorney's Office, the Oneida County Police Department, the Oneida County Sheriff's Department, Oneida County Correctional Facility, the Town of Marcy, the Town of Marcy Police Department, Assistant District Attorney Robert A. Bauer, Investigator Nicholas Loconte, Correctional Officers Chapman and John Does 1–6, Sergeant John Doe, and Police Officer John Doe. Dkt. No. 1 ("Complaint"). Plaintiff alleges the following claims against Defendants pursuant to 42 U.S.C. § 1983 or New York state law: (1) malicious prosecution; (2) false arrest and false imprisonment; (3) malicious abuse of process; (4) liability of town and county for constitutional violations; (5) failure to train and supervise; (6) intentional infliction of emotional distress; (7) negligent infliction of emotional distress; (8) unlawful strip search; (9) negligence; (10) negligence in hiring, screening, retention, supervision, and training; (11) respondeat superior liability; (12) supervisory liability; (13) trespass; and (14) attorney fees. Compl. ¶¶ 71–144. Plaintiff seeks two million dollars in compensatory damages and three million dollars in punitive damages for each individual claim. Id. ¶¶ 80, 83, 89, 101, 109, 113, 116, 119, 122, 127, 130, 133, 139, 142.

Currently before the Court is a Motion to Dismiss, brought by all remaining Defendants [1] pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 10 ("Motion to Dismiss"); Dkt. No. 10-1 ("Memorandum"). Plaintiff has requested;leave to amend his Complaint, Dkt. Nos. 19 ("Motion to Amend"); 19-1 ("Proposed Amended Complaint"), and also opposes the Motion to Dismiss, Dkt. No. 20 ("Response"). Defendants filed a Reply. Dkt. No. 22 ("Reply"). For the following reasons, Plaintiff's Motion to Amend is granted, and Defendants' Motion to Dismiss is granted in part and denied in part.

## II. BACKGROUND

### A. Plaintiff's Original Complaint [2]

On April 7, 2013, Plaintiff was pulled over under suspicion of speeding and was issued a ticket for disobeying a traffic device. Compl. ¶ 34. When Plaintiff appeared in Marcy Town Court on May 2, 2013, he met with Bauer to discuss a resolution of the ticket, as is customary in town court. Id. ¶ 38. Plaintiff informed Bauer that he was not speeding and that there were no traffic devices in the area that he could have disobeyed. Id. ¶ 39. Then Plaintiff made a statement to the effect of "there's a lot of fraud going on," believing that the officers had fabricated the ticket. Id. ¶ 40. Plaintiff thought Bauer was infuriated by his statement. Id. ¶ 41. Over Plaintiff's objections, Bauer put Plaintiff's case on for trial. Id. ¶¶ 42–43. On May 9, 2013, Plaintiff returned to Marcy Town Court without an appointment intending to resolve the ticket and avoid a trial. Id. ¶¶ 45–46. After he was told by a court officer that Bauer did not want to speak with him, Plaintiff was advised that he could sit in the courtroom. Id. ¶ 47. The presiding judge gave Plaintiff a card with Bauer's contact information and instructions that Plaintiff could call Bauer but that he would be unable to speak with Bauer that day. Id. ¶ 48.

***2** A conversation then occurred between Plaintiff and Bauer in the parking lot, which was initiated by Bauer when he pulled his car next to Plaintiff's vehicle. Id. ¶ 50. Bauer asked Plaintiff if he still wished to resolve the ticket, and when Plaintiff responded affirmatively, Bauer gave him a new court date for May 14, 2013. Id. ¶ 50–51. On or about May 9, 2013, Plaintiff was called to appear at the State University of New York Police Department, where he was

given new tickets. Id. ¶ 53. Plaintiff was informed that his original tickets for disobeying a traffic device were increased to speeding tickets and that Bauer wanted Plaintiff to have the new tickets. Id. ¶¶ 53–54. The next day, Plaintiff was arrested at work and escorted to the Oneida County Jail on charges of stalking in the third degree, harassment in the first degree, menacing in the second degree, and obstructing governmental administration in the second degree. Id. ¶¶ 55, 57, 72. All of these charges were apparently related to Plaintiff's interactions with Bauer.

On arrival at Oneida County Jail, Correctional Officers Chapman and John Does 1–6 pointed an object at Plaintiff and instructed Plaintiff to remove his clothing. Id. ¶ 58. During the strip search, Plaintiff was laughed at and mocked. Id. ¶ 60. Once he was naked, Plaintiff was strapped to a "wheeled chair" and covered with a clear gown. Id. ¶ 61. He was then wheeled to the lowest floor of the jail and left to sit there, where he began to suffer an anxiety attack and was given no treatment. Id. ¶¶ 61–62. Plaintiff claims that he was given no food for approximately twenty-four hours. Id. ¶ 63.

Plaintiff's Complaint stated that the tickets were dismissed and terminated in his favor on September 17, 2015. Id. ¶ 74. [3]

**B. Plaintiff's Amended Complaint**

Plaintiff's Proposed Amended Complaint is largely similar to his original Complaint. Plaintiff omits the Town of Marcy and its police department from the list of defendants and removes all of the state law tort claims that were originally brought against Defendants. In addition, Plaintiff adds two new claims of excessive force and failure to intervene under § 1983. Plaintiff also alleges that either Loconte or police officer John Doe effectuated his arrest and that Bauer ordered police officers to follow Plaintiff in his car. Proposed Am. Compl. ¶¶ 52–53.

## III. LEGAL STANDARD

**A. Motion to Dismiss**

For pleadings, the Federal Rules require "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In order to survive a motion to dismiss, a plaintiff must offer more than conclusions or a formulaic recitation of the elements of the claim. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The plaintiff does not need to set out "detailed factual allegations," but must assert more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 555). A complaint is insufficient if it "tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557) (alteration in original). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " Iqbal, 556 U.S. at 679 (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

**B. Motion to Amend**

Generally, a party may amend his or her pleading once as a matter of course. Fed. R. Civ. P. 15(a)(1). When the time to amend as a matter of course has elapsed, the plaintiff may amend his complaint with the written consent of the opposing party or the court's leave. Fed. R. Civ. P. 15(a)(2). Where there exists no apparent reason for a court to deny a plaintiff's motion to amend, leave to amend should be "freely given." Price v. Gizzi, No. 11-CV-976, 2012 WL 2120028, at *3 (N.D.N.Y. June 11, 2012) (Kahn, J.) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)). Potential reasons to deny a motion to amend include undue delay, bad faith, failure to cure deficiencies by previously granted amendments, undue prejudice to opposing party, or futility of amendment. Id. "Where 'futility is an appropriate basis for denying leave to amend, such denial should be contemplated within the standards necessary to withstand a motion to dismiss pursuant to [Rule 12(b)(6)].' " Id. at *4 (alteration in original) (quoting Gorham-DiMaggio v. Countrywide Home Loans, Inc., No. 08-CV-19, 2009 WL 1748743, at *3 (N.D.N.Y. June 19, 2009)).

## IV. DISCUSSION

**A. Plaintiff's § 1983 Claims**

***3** 42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983. There are no substantive


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

rights created by § 1983; rather, it provides the means for "vindicating federal rights elsewhere conferred." Dzwonczyk v. Syracuse City Police Dep't, 710 F. Supp. 2d 248, 261 (N.D.N.Y. 2008) (quoting Patterson v. County of Oneida, 375 F.3d 206, 255 (2d Cir. 2004)). A claim pursuant to § 1983 requires an allegation "(1) that some person has deprived [the plaintiff] of a federal right, and (2) that the person who has deprived him of that right acted under color of state ... law." Id. (quoting Velez v. Levy, 401 F.3d 75, 84 (2d Cir. 2005)).

*1. Claims Against County Agencies*

Defendants contend that Plaintiff has named incorrect parties as Defendants in his Complaint. Mem. at 2. Specifically, Defendants state that since Oneida County has already been named as a defendant, claims against its departments are redundant. Id. "[U]nder New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and therefore, cannot sue or be sued." Macaluso v. Nassau Cty. Corr. Ctr., No. 13-CV-6206, 2014 WL 1401429, at *4 (E.D.N.Y. Apr. 8, 2014) (alteration in original) (quoting Davis v. Lynbrook Police Dep't, 224 F. Supp. 2d 463, 477 (E.D.N.Y. 2002)); accord Moffet v. Town of Poughkeepsie, No. 11-CV-6243, 2012 WL 3740724, at *1 n.1 (S.D.N.Y. Aug. 29, 2012). The district attorney's office, police departments, sheriff's department, and correctional facility are all administrative arms of Oneida County. As such, Oneida County is the proper defendant in this case. Therefore, all claims against the Oneida County District Attorney's Office, Oneida County Police Department, Oneida County Sheriff's Department, and Oneida County Correctional Facility are dismissed.

*2. Monell Claims Against Oneida County*

"Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). The Supreme Court has stated that "governments should be held responsible [in § 1983 claims] when, and only when, their official policies cause their employees to violate another person's constitutional rights." City of St. Louis v. Praprotnik, 485 U.S. 112, 122 (1988). Therefore, in order for a municipality to be liable under § 1983 for acts of a public official, the plaintiff must plausibly allege that an official policy of the municipality caused the constitutional injury. Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008) (citing Monell, 436 U.S. at 690–91). To plead the existence of a municipal policy, Plaintiff must allege one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

Brandon v. City of New York, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010). In addition to pleading the plausible existence of a municipal policy, a plaintiff must allege an "affirmative link" between the municipal policy and the constitutional violation at issue. Oklahoma City v. Tuttle, 471 U.S. 808, 824 n.8 (1985).

***4** Plaintiff brings the following claims against Oneida County pursuant to § 1983: malicious prosecution, false arrest, malicious abuse of process, liability of the county for constitutional violations, failure to train and supervise, unlawful strip search, intentional infliction of emotional distress, and supervisory liability. Defendants have moved to dismiss Plaintiff's Monell claims due to Plaintiff's failure to plead facts regarding the existence of a municipal custom that would make Oneida County liable under a Monell claim. Mem. at 10.

Plaintiff's Complaint contains many conclusory statements regarding municipal policies. Plaintiff states that Defendants "had in effect de facto policies, practices, customs, and usages that were a direct and proximate cause of the unconstitutional conduct of the Defendant police officers, investigators, prosecutors, their agents, servants and employees." Compl. ¶

Case 1:26-cv-00703-ECC-ML Document 6 Filed 09/22/26 Page 85 of 391

91. The policies that Plaintiff refers to are "arresting persons without probable cause, providing false information to prosecutors, falsifying police reports and affidavits, working and conspiring with others under a wall of silence, unlawfully utilizing law enforcement and testifying and/or swearing falsely under oath." Id. ¶ 92. Plaintiff fails to substantiate these conclusory allegations with facts that would meet the required plausibility standard. Plaintiff's claims amount to "boilerplate statements" that Oneida County employees were acting according to a municipal policy with no facts that support those statements. Rifenburg v. Hughes, No. 15-CV-978, 2016 WL 866344, at *3 (N.D.N.Y. Mar. 3, 2016); accord Duncan v. City of New York, No. 11-CV-3826, 2012 WL 1672929, at *2–3 (E.D.N.Y. May 14, 2012). "[T]o survive a motion to dismiss, Plaintiff cannot, through conclusory allegations, merely assert the existence of a municipal policy or custom, but 'must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists.' " Tieman v. City of Newburgh, No. 13-CV-4178, 2015 WL 1379652, at *13 (S.D.N.Y. Mar. 26, 2015) (quoting Santos v. City of New York, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012)). Plaintiff's Complaint at most alleges unconstitutional actions taken by employees of a municipality, which is insufficient to establish municipal liability. Monell, 436 U.S. at 691. Plaintiff has failed to meet the plausibility requirements to survive a motion to dismiss.

Plaintiff attempts to bolster his Monell claims in his Proposed Amended Complaint by adding more conclusory statements. Plaintiff adds that the Oneida County District Attorney's office has a policy and custom "of allowing the prosecutors whom cover town court jurisdictions to hold an unreasonable amount of power [and the] ability to [single handedly] file charges against individual[s] without having to obtain authorization from a supervisor or seek authorization from a hierarchical chain of command." Proposed Am. Compl. ¶ 85. Additionally, Plaintiff alleges a policy within the Oneida County Correctional Facility that "authorizes corrections officers to strip search inmates without a reasonable basis or for a purpose related solely to the safety of the facility and allows misdemeanor inmates to be strip searched in front of other corrections officers then strap him down to a wheelchair while depriving him of food and medical treatment." Id. ¶ 88. The only facts that are in accord with these pleaded policies are those that are specific to Plaintiff's case. "[A] custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [government]." Newton v. City of New York, 566 F. Supp. 2d 256, 271 (S.D.N.Y. 2008). Plaintiff states no facts at all that would support the inference that others besides Plaintiff have been affected by these alleged "policies." In order for municipal liability to attach to a single decision, that decision must have been made by a final policymaker that had sufficient power to act on behalf of the municipality. Pembaur v. Cincinnati, 475 U.S. 469, 479–80 (1986). Plaintiff does not allege actions on behalf of any final policymaker in his original or proposed amended complaints.

***5** In consideration of the lack of plausible allegations concerning a municipal policy, all claims against Oneida County are dismissed. As a result, Plaintiff's claims of "Liability of Town and County for Constitutional Violations" and "Failure to Train and Supervise" are dismissed entirely, as they were alleged solely against the municipality and its departments.

### *3. Section 1983 Claims Against Individual Defendants*

#### a. False Arrest

The elements for a claim of false arrest under § 1983 are substantially the same as those under New York law. Jenkins v. City of New York, 478 F.3d 76, 84 (2d Cir. 2007). The elements are "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003) (quoting Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)). If the arrest was conducted without "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime," the plaintiff has a claim for false arrest. Jenkins, 478 F.3d at 84 (quoting Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)).

Plaintiff has plausibly pleaded the first three Savino factors. Plaintiff's arrest itself satisfies intent to confine, and Plaintiff was aware that he was being arrested and confined. Compl. ¶ 55. Additionally, Plaintiff did not consent to the confinement. Id. ¶ 82. Lack of privilege, however, requires a deeper inquiry into probable cause.

The burden of proving that probable cause existed at the time of Plaintiff's arrest lies with Defendants. See Caidor v. M &

T Bank, No. 05-CV-297, 2006 WL 839547, at *5 (N.D.N.Y. Mar. 27, 2006) (denying a motion to dismiss since it was not discernible from the plaintiff's complaint whether probable cause existed); see also Hernandez v. City of Rochester, 260 F. Supp. 2d 599, 606 n.6 (W.D.N.Y. 2003) (collecting cases); Mason v. Town of New Paltz Police Dep't, 103 F. Supp. 2d 562, 565 (N.D.N.Y. 2000) (observing that federal and New York cases state that where "an arrest or imprisonment is extrajudicial, that is, without legal process, the burden is on the defendant to prove justification"). Plaintiff states in his Complaint that the actions in dispute were initiated "without reasonable or probable cause or any legal justification." Compl. ¶ 72. Plaintiff also stated that Bauer had initiated contact with him in the courthouse parking lot. Id. ¶ 50. Taken as a whole, Plaintiff's Complaint describes subsequent encounters with Bauer after May 2, 2013, as being lawful. Plaintiff has demonstrated that he had done no acts that would warrant the charges he was given. "[A]n arrest is justified and a claim for false arrest must be dismissed pursuant to Rule 12(b)(6), if the undisputed facts in plaintiff's complaint demonstrate that the arresting officers had probable cause to believe that the suspect had committed a crime." Brewster v. Nassau County, 349 F. Supp. 2d 540, 551 (E.D.N.Y. 2004). It is unclear from Plaintiff's Complaint whether Defendants had probable cause for the arrest. Therefore, since the Complaint does not allow the Court to determine whether or not probable cause existed at the time of arrest, and since it is the Defendants' burden to prove probable cause, Plaintiff's claim of false arrest against Police Officer John Doe is allowed to proceed.

***6** Defendants state that based upon Plaintiff's Complaint, it is reasonable to assume that it was the Town of Marcy that arrested Plaintiff. Mem. at 8. In their Motion to Dismiss, Defendants reason that since Plaintiff did not specifically allege which law enforcement department arrested him, the logical conclusion is that it was the Town of Marcy Police Department based on the fact that he appeared in Marcy Town Court. Id. Defendants then go on to state that while Plaintiff may have a claim against the Town of Marcy for false arrest, any claim against Oneida County and its officers must be dismissed. Id. The Town of Marcy has been dismissed as a defendant on the grounds that they do not have a police department. Dkt. No. 24. Therefore, it clearly was not the Town of Marcy who arrested Plaintiff and Defendants' argument must fail. The Court will allow the action of false arrest to proceed against Bauer and Police Officer John Doe so that Plaintiff has the opportunity to ascertain the identity of the arresting officers through discovery.

Plaintiff had also brought his false arrest claim against Loconte. In his original Complaint, Plaintiff failed to state any facts indicating that Loconte had any involvement at all in the arrest. However, in his Proposed Amended Complaint, Plaintiff asserts that it was either Loconte or Police Officer John Doe who arrested him. Proposed Am. Compl. ¶ 53. In light of Plaintiff's amended pleadings, the Court will allow Plaintiff's false arrest claim to continue against Loconte as well as Police Officer John Doe.

Bauer was also listed as a Defendant for Plaintiff's false arrest claim in both his original and Proposed Amended Complaint. Compl. ¶ 82; Proposed Am. Compl. ¶ 82. Since Plaintiff makes no mention in his amended pleadings of Bauer aiding in or effectuating the arrest, the false arrest claim against Bauer is dismissed.

b. Malicious Prosecution Under Color of State Law

In order to state a claim for malicious prosecution, the plaintiff must allege: (1) the commencement or continuation of a proceeding against him (2) with malice and without probable cause (3) that was terminated in his favor. Fulton v. Robinson, 289 F.3d 188, 195 (2d Cir. 2002). Probable cause has been defined as "knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." Betts v. Shearman, 751 F.3d 78, 82 (2d Cir. 2014) (quoting Williams v. Town of Greenburgh, 535 F.3d 71, 79 (2d Cir. 2008)).

In support of their Motion to Dismiss, Defendants state three deficiencies with Plaintiff's pleading of malicious prosecution. First, Defendants argue that Plaintiff has failed to allege a particular individual who has commenced a criminal proceeding against him. Mem. at 6–7. Second, Defendants state that Plaintiff has failed to plead facts demonstrating that the arrest was conducted without probable cause. Id. at 6. Finally, Defendants claim that no facts have been pleaded that would support a finding of malice. Id.

Plaintiff's Complaint, taken in light most favorable to Plaintiff, states that he was served with tickets for stalking, harassment, menacing, and obstructing governmental administration that required his appearance in court in the County of Oneida. Compl. ¶ 72. Plaintiff pleads that the

proceeding was instituted by Oneida County "officers"—although only Police Officer John Doe is listed as a defendant police officer—as well as Bauer, and Loconte. Compl. ¶ 76. Plaintiff has sufficiently pleaded the commencement of an action against him by Police Officer John Doe, Loconte, and Bauer.

Defendants state that Plaintiff has not pleaded a lack of probable cause. Mem. at 6. In order to establish probable cause in a malicious prosecution action, it must be shown that probable cause existed "to charge [the suspect] with *each* of the crimes." Cannistraci v. Kirsopp, No. 10-CV-980, 2012 WL 1801733, at *10 (N.D.N.Y. May 16, 2012) (alteration in original) (quoting Kavazanjian v. Rice, No. 03-CV-1923, 2005 WL 1377946, at *4 (E.D.N.Y. June 7, 2005)). "Malicious prosecution asks whether the facts objectively support a reasonable belief that a criminal prosecution should be initiated or continued because that prosecution could succeed." McClellan v. Smith, No. 02-CV-1141, 2009 WL 3587431, at *6 (N.D.N.Y. Oct. 26, 2009). Where, as it seems to be in this case, the arrest was not pursuant to a warrant, the Court must evaluate whether there was "probable cause to file the complaints that commenced the criminal proceeding against Plaintiff." Lenhard v. Dinallo, No. 08-CV-165, 2011 WL 4592804, at *7 (N.D.N.Y. Sept. 30, 2011). "The probable cause to prosecute inquiry focuses solely on those facts available to the officer leading up to, and at the time of, the arraignment." Simons v. New York, 472 F. Supp. 2d 253, 264 (N.D.N.Y. 2007). If an officer has "knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of," then probable cause for the prosecution exists. Rounseville v. Zahl, 13 F.3d 625, 629 (2d Cir. 1994) (quoting Pandolfo v. U.A. Cable Sys. of Watertown, 568 N.Y.S.2d 981, 982 (App. Div. 1991)). "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." Lenhard, 2011 WL 4592804, at *7 (quoting Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)).

***7** In his Complaint, Plaintiff states that Bauer and Loconte caused the criminal charges to be instituted against him. Compl. ¶ 76. After his arrest, Plaintiff was taken to court and was seen by the presiding judge without an attorney present. Id. ¶ 56. The presiding judge told Plaintiff "you're going to jail," denied bail, and ordered a mental examination to be performed. Id. The criminal charges brought against Plaintiff were stalking, harassment, menacing, and obstructing governmental administration. Id. ¶ 72. As described previously, these charges were instituted on the basis of interactions with Bauer that appear to be lawful and benign. Plaintiff's Complaint pleads a lack of probable cause for his arrest, and it does not seem that any facts came to light between the time of Plaintiff's arrest and arraignment that would give the prosecutor probable cause for the charges brought against him.

Additionally, Plaintiff satisfactorily pleaded a favorable termination. Plaintiff stated that the charges against him "were dismissed and withdrawn with prejudice upon decision or motion (Order) before Honorable Justice William M. Virkler." Compl. ¶ 32.

As to malice, Rule 8 requires that where state of mind is an element of a claim, that state of mind must be "plausibly pleaded and supported by factual allegations." Biro v. Conde Nast, 807 F.3d 541, 544 (2d Cir. 2015). However, "a lack of probable cause generally creates an inference of malice." Pizarro v. City of New York, No. 14-CV-507, 2015 WL 5719678, at *4 (E.D.N.Y. Sept. 29, 2015) (quoting Boyd v. City of New York, 336 F.3d 72, 78 (2d Cir. 2003)). As stated previously, Plaintiff has pleaded a lack of probable cause. In addition, "[a]lthough actual malice is subjective, a court typically will infer actual malice from objective facts." Connolly v. Wood-Smith, No. 11-CV-8801, 2012 WL 7809099, at *9 (S.D.N.Y. May 14, 2012) (quoting Celle v. Filipino Reporter Enters. Inc., 209 F.3d 163, 183 (2d Cir. 2000)), adopted as modified, 2013 WL 1285168 (S.D.N.Y. Mar. 28, 2013); see also Rentas v. Ruffin, 816 F.3d 214, 221–22 (2d Cir. 2016) (finding actual malice inferred based on objective facts and lack of probable cause). Plaintiff stated that he believed Bauer to be "infuriated" by a statement made by Plaintiff during their first encounter. Compl. ¶ 41. Plaintiff's Complaint describes that all subsequent interactions with Bauer were cordial. After Plaintiff was told he could not see Bauer on May 9, 2013, since Plaintiff was not on the docket, Bauer approached Plaintiff in his vehicle in the parking lot. Compl. ¶ 50. During that conversation, Bauer inquired as to whether Plaintiff wanted to have his traffic ticket reduced, and Plaintiff responded affirmatively. Id. Bauer gave Plaintiff a new court date for resolving the ticket, and then Plaintiff left the parking lot and proceeded home. Id. ¶ 52. Plaintiff was then subsequently accused of stalking, harassment, menacing, and obstruction of governmental administration. Id. ¶ 72. The fact that Plaintiff was charged with these crimes, without probable cause, after supposedly benign interactions

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

with Bauer is sufficient to suggest that the charges were maliciously commenced.

Accordingly, Plaintiff's claim of malicious prosecution survives Defendants' Motion to Dismiss.

c. Unlawful Strip Search

The Supreme Court has held that strip searches conducted on detainees who would be admitted to the general population of a jail could be constitutional. Florence v. Bd. of Chosen Freeholders, 132 S. Ct. 1510, 1522–23 (2012). The Court articulated that "a regulation impinging on an inmate's constitutional rights must be upheld 'if it is reasonably related to legitimate penological interests.' " Id. at 1515 (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)). Florence "was not a license for prison staff to conduct strip searches anytime, anywhere, or in any manner." George v. City of New York, No. 12-CV-6365, 2013 WL 5943206, at *7 (S.D.N.Y. Nov. 6, 2013). The decision in Florence was limited in its scope and refrained from discussing the constitutionality of strip searches involving "intentional humiliation and other abusive practices." Florence, 132 S. Ct. at 1523.

***8** Defendants claim that the Supreme Court's decision in Florence is a barrier to Plaintiff's claim of unlawful strip search and that Plaintiff has failed to plead facts that suggest that the strip search was unreasonable or unrelated to legitimate penological interests. Mem. at 15–16. The Court disagrees. Plaintiff's Complaint alleged that he was forced to strip while corrections officers laughed and pointed an object at Plaintiff. Compl. ¶¶ 58–59. Additionally, the facts indicate that Plaintiff was strapped to a chair wearing a clear gown and wheeled "to the lowest floor of the jail, and he was left to sit in the chair, causing Plaintiff to begin to suffer from an anxiety attack and trouble breathing." Id. ¶ 61. On its face, the method of strip searching described by Plaintiff appears to be wholly unrelated to legitimate penological goals. See Jean-Laurent v. Wilkinson, 438 F. Supp. 2d 318, 323 (S.D.N.Y. 2006) (holding that a strip search violates the Fourth Amendment "if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish"); see also George, 2013 WL 5943206, at *8 (denying defendants' motion to dismiss where the complaint plausibly alleged that the purpose of the strip search was to make a spectacle and publicly humiliate prisoner plaintiffs). Therefore, Plaintiff has pleaded facts sufficient to indicate that the manner and circumstances of the strip search were unreasonable. The Court denies Defendants' Motion to Dismiss Plaintiff's claim of unlawful strip search against the individual correctional officers.

d. Supervisory Liability

42 U.S.C. § 1983 does not allow for supervisory liability based upon a respondeat superior theory. The plaintiff must show that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." Iqbal, 556 U.S. at 676. "Each government official is only liable for his or her own misconduct." Id. at 677. Personal involvement may be shown by alleging

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).[4]

***9** Plaintiff's Complaint fails to state exactly which supervisors violated his constitutional rights and the nature of their involvement.[5] Plaintiff makes statements such as "supervisory Defendants were personally involved in failing to take preventative and remedial measures to guard against such constitutional deprivations, such that Plaintiff would not have been injured." Compl. ¶ 137. Additionally, the Complaint states without further elaboration that the "supervisory Defendants were personally involved in additional deprivation of Plaintiff's rights." Id. ¶ 138. " 'Conclusory statements and formulaic recitations of the

Colon factors [that are] wholly unsupported by facts,' present no factual support for a supervisory liability claim." Gray-Davis v. New York, No. 14-CV-1490, 2015 WL 2120518, at *8 (N.D.N.Y. May 5, 2015) (alteration in original) (quoting Eldridge v. Kenney, No. 11-CV-6459, 2014 WL 2717982, at *3 (W.D.N.Y. June 16, 2014)). Because Plaintiff has failed to plead facts that meet the plausibility standard, his claim for supervisory liability is dismissed.

e. Malicious Abuse of Process

To state a claim for malicious abuse of process, a plaintiff must allege that a defendant "(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse [or] justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." Hoffman v. Town of Southampton, 523 Fed.Appx. 770, 771 (2d Cir. 2013) (summary order) (alterations in original) (quoting Savino v. City of New York, 331 F.3d 63, 76 (2d Cir. 2003)).

"The crux of a malicious abuse of process claim is the collateral objective element." McHenry v. Bell, No. 13-CV-657, 2015 WL 2354438, at *9 (N.D.N.Y. May 15, 2015). The Court agrees with Defendants' statement that Plaintiff has failed to adequately plead the element of a collateral objective. Mem. at 9. In pleading malicious abuse of process, Plaintiff recites the elements and states that Defendants "arrested Plaintiff and/or caused the arrest, of Plaintiff in order to obtain a collateral objective outside the legitimate ends of legal process." Compl. ¶ 86. A generous reading of the Complaint suggests that Plaintiff believes the charges were brought in retaliation for Plaintiff's insinuation to Bauer that there was a lot of fraud in the county.

"[I]t is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution. Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." Savino, 331 F.3d at 77. "The gist of the action for abuse of process lies in the improper use of process after it is issued." Sullivan v. Laplante, No. 03-CV-359, 2005 WL 1972555, at *8 (N.D.N.Y. Aug. 16, 2005) (quoting Dean v. Kochendorfer, 143 N.E. 229, 231 (N.Y. 1924)). The most that can be inferred from Plaintiff's Complaint is that Bauer had improper motives in initiating legal process. There are no pleaded facts indicating improper use of process after it was issued. There are no facts indicating a collateral objective. Plaintiff properly pleaded a claim for malicious prosecution, but is unable to do the same for malicious abuse of process. However, while Plaintiff's malicious abuse of process claim was pleaded insufficiently, Plaintiff omits the claim in his Proposed Amendment Complaint. Therefore, Defendants' Motion to Dismiss the claim of malicious abuse of process is denied as moot.

f. Attorney Fees

Plaintiff asserts a cause of action for attorney's fees. Compl. ¶ 143–44. As Defendants correctly observe, attorney fees are a remedy, not a cause of action. See Carvel v. Franchise Stores Realty Corp., 08-CV-8938, 2009 WL 4333652, at *9 (S.D.N.Y. Dec. 1, 2009) ("Section 1988 only grants attorneys' fees to a prevailing party under §§ 1981–83, it does not create an independent cause of action."). Therefore, without addressing the possibility of attorney's fees as a remedy, Plaintiff's standalone cause of action for attorney's fees is dismissed.

g. Prosecutorial Immunity for Defendant Bauer

***10** A prosecutor enjoys absolute immunity for the "initiation and pursuit of a criminal prosecution, including presentation of the state's case at trial." Buckley v. Fitzsimmons, 509 U.S. 259, 269 (1993). "The doctrine of absolute prosecutorial immunity creates a formidable obstacle for a plaintiff seeking to maintain a civil rights action against a district attorney, as it provides that 'prosecutors are absolutely immune from liability under § 1983 for their conduct in "initiating a prosecution and in presenting the State's case," insofar as that conduct is "intimately associated with the judicial phase of the criminal process." ' " Pinaud v. County of Suffolk, 52 F.3d 1139, 1147 (2d Cir. 1995) (quoting Burns v. Reed, 500 U.S. 478, 486 (1991)). So long as the actions of a district attorney are clearly within the "judicial phase of the criminal process," he is absolutely immune to civil suits to damages. Day v. Morgenthau, 909 F.2d 75, 77 (2d Cir. 1990) (quoting Imbler v. Pachtman, 424 U.S. 409, 430 (1976)). However, absolute immunity does not cover all conduct by a prosecutor. "When a prosecutor is engaged in administrative or investigative activities, he is entitled only to qualified immunity, which requires a showing that his acts were objectively reasonable." Day, 909 F.2d at 77. "A prosecutor is functioning in an investigatory capacity in a criminal case up and until he or she has gathered sufficient

evidence to demonstrate probable cause and effect an arrest." Tellier v. Petrillo, No. 95-CV-211, 1996 WL 734885, at *2 (S.D.N.Y. Dec. 23, 1996). "When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.' " Buckley, 509 U.S. at 273 (quoting Hampton v. Chicago, 484 F.2d 602, 608 (7th Cir. 1973)).

At this stage in litigation, the Court is unable to determine whether Bauer is entitled to prosecutorial immunity. While Plaintiff's Complaint and subsequent materials do not specify in detail the precise actions taken by Bauer, Plaintiff does accuse Bauer of actions that are outside of the judicial process. Plaintiff asserts that Bauer ordered the state police or Oneida County police to follow Plaintiff in a car. Proposed Am. Compl. ¶ 52. No arrest was effectuated at that time, which suggests that this event was prior to any potential probable cause that may have arisen later. If Bauer ordered officers to follow Plaintiff before probable cause existed for an arrest, Bauer was acting as an investigator and not as an advocate. "[W]hen a prosecutor manufactures evidence for the purpose of obtaining probable cause to arrest a suspect," the actions are deemed to be investigatory in nature and cannot be "transformed into advocacy simply by being characterized as work in preparation for trial." Hill v. City of New York, 45 F.3d 653, 662–63 (2d Cir. 1995). "[A] prosecutor is not entitled to absolute immunity in situations such as those where he 'supervises, conducts, or assists in the investigation of a crime, or gives advice as to the existence of probable cause to make a warrantless arrest ....' " Morris v. Martin, No. 16-CV-601, 2016 WL 4059209, at *6 (N.D.N.Y. June 21, 2016) (quoting Richards v. City of New York, No. 97-CV-7990, 1998 WL 567842, at *2 (S.D.N.Y. Sept. 3, 1998)), adopted, 2016 U.S. Dist. LEXIS 98404 (N.D.N.Y. July 28, 2016). The Court therefore finds that Bauer is not currently entitled to absolute prosecutorial immunity. [6]

**B. New York State Tort Claims**

Plaintiff alleged the following state claims against Defendants: (1) false imprisonment; (2) intentional infliction of emotional distress; (3) negligent infliction of emotional distress; (4) negligence; (5) negligence in hiring, screening, retention, supervision, and training; (6) respondeat superior liability; and (7) trespass under color of state law.

***11** Defendants observe that Plaintiff has failed to comply with General Municipal Law section 50-e, which requires that notice of a claim be given within ninety days after the claim arises. N.Y. Gen.Mun. Law § 50-e; Mem. at 5. "As a 'condition precedent' to commencing a tort action against New York municipalities, or any of their officers, agents, or employees, New York General Municipal Law § 50-e requires plaintiffs to file a notice of claim within ninety days after the claim arises." Olsen v. County of Nassau, No. 05-CV-3623, 2008 WL 4838705, at *1 (E.D.N.Y. Nov. 5, 2008) (citing Chesney v. Valley Stream Union Free Sch. Dist., No. 05-CV-5106, 2006 WL 2713934, at *8 (E.D.N.Y. Sept. 22, 2006)). "Notice of claim requirements are generally strictly construed, and failure to comply with the requirements typically results in dismissal due to failure to state a cause of action." Chesney, 2006 WL 27139345, at *9 (citing Hardy v. N.Y.C. Health & Hosps. Corp., 164 F.3d 789, 793–94 (2d Cir. 1999)); see also Dzwonczyk, 710 F. Supp. 2d at 271–72 (dismissing state law tort claims due to failure to comply with section 50-e). Plaintiff has withdrawn his state tort claims in his Proposed Amended Complaint. As a result, Defendants' Motion to dismiss the state claims is denied as moot.

**C. Plaintiff's Motion to Amend**

Plaintiff's Proposed Amended Complaint specifies that it was either Loconte or Police Officer John Doe who arrested Plaintiff. Proposed Am. Compl. ¶ 53. Specifically, Plaintiff adds facts alleging the personal involvement of Bauer that would vitiate Bauer's entitlement to prosecutorial immunity. Proposed Am. Compl. ¶ 52. Plaintiff's Proposed Amended Complaint is still sparse, and barely passes the threshold of plausibility in regard to the claims that do manage to survive Defendants' Motion to Dismiss. However, based upon the standard for amendments stated in Foman, Plaintiff is entitled to amend his Complaint. Discovery may result in Plaintiff being able to add to the narrative of the circumstances surrounding his claim. Plaintiff is also permitted to amend his Complaint by adding his claims of excessive force and failure to intervene for the following reasons.

*1. Claim of Excessive Force*

There appears to be some general confusion between the parties as to what constitutional amendment applies to Plaintiff's claim of excessive force. Plaintiff has pleaded that excessive force during his strip search was in violation of his Fourth Amendment right to be free from unreasonable searches, seizures, and excessive force by officers. Proposed Am. Compl. ¶ 110. Defendants address the constitutionality

of the strip search under the Eighth Amendment as well as the Fourth, implying that his alleged strip search might be a violation of the Eighth Amendment. Reply at 6.

The correct authority for Plaintiff's excessive force claim is the Due Process Clause of the Fourteenth Amendment. The Eighth Amendment would not apply in this matter, as "the State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." Ingraham v. Wright, 430 U.S. 651, 671 n.40 (1977). According to the Complaint, Plaintiff at no point was adjudged guilty, and certainly not at the point at which the strip search allegedly occurred. Instead, courts have evaluated excessive force claims by pretrial detainees under the Due Process Clause of the Fourteenth Amendment. Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983). However, the standards for a claim of excessive force under the Fourteenth Amendment are substantively the same as those brought under the Eighth Amendment. Bellatto v. County of Orange, 248 Fed.Appx. 232, 235 (2d Cir. 2007).

To prevail in an Eighth Amendment claim of excessive force, "the use of force 'must be, objectively, sufficiently serious,' and 'the prison official involved must have a sufficiently culpable state of mind.' " Id. (quoting Boddie v. Schnieder, 105 F.3d 857, 861 (2d Cir. 1997)). The objective component is "contextual and responsive to 'contemporary standards of decency.' " Hudson v. McMillian, 503 U.S. 1, 8 (1992) (quoting Estelle v. Gamble, 429 U.S. 97, 103 (1976)). While there is generally some degree of injury required, "the injury need not be 'serious' or 'significant' 'as long as the amount of force used is not *de minimis.*' " Bellotto, 248 Fed.Appx. at 235 (quoting United States v. Walsh, 194 F.3d 37, 50 (2d Cir. 1999)). For strip searches it is required that a plaintiff "allege that the defendants engaged in egregious conduct." Holland v. City of New York, No. 14-CV-5517, 2016 WL 3636249, at *9 (S.D.N.Y. June 24, 2016). "Even where inmates allege aggressive or inappropriate behavior during strip searches, courts are reluctant to find that such activity rises to the objectively serious level of an Eighth Amendment violation." Vaughn v. Strickland, No. 12-CV-2696, 2013 WL 3481413, at *3 (S.D.N.Y. July 11, 2013). The subjective element is based upon "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson, 503 U.S. at 7.

***12** Plaintiff's Complaint contended that the strip search occurred "for the purpose of harassing and intimidating Plaintiff [by] forcing him to remove his clothing with other officers present as they laughed and mocked him then forcibly pointing an object in Plaintiff's face and forcibly strapping him down to a wheeled chair and wheeling him to the basement of the facility without any food or drink for 24 hours." Proposed Am. Compl. ¶ 111. The actions alleged by Plaintiff do not rise to the level of a constitutional violation. Plaintiff does not assert any actual physical contact between his person and whatever object was pointed in his face. Physical contact may not be necessary for an excessive force claim to succeed. See, e.g., Cortez v. McCauley, 478 F.3d 1108, 1131 (10th Cir. 2007) ("Physical contact is not required for an excessive force claim—patently unreasonable conduct is."); Snoussi v. Bivona, No. 05-CV-3133, 2008 WL 3992157, at *5–6 (E.D.N.Y. Aug. 21, 2008) (acknowledging that the law is unsettled as to whether physical contact is necessary); Duggan v. City of League City, 975 F. Supp. 968, 971 (S.D. Tex. 1997) ("[T]he law is uncertain regarding whether an excessive force claim can arise without physical injury to the Plaintiff."). However, Plaintiff has not pleaded sufficiently egregious conduct flowing solely from the strip search to rise to the level of a Fourteenth Amendment excessive force claim.

Courts have routinely declined Eighth Amendment claims arising from strip searches, even where the strip search was determined to be for the sole purpose of humiliation. George v. City of New York, No. 12-CV-6365, 2013 WL 5943206, at *9 (S.D.N.Y. Nov. 6, 2013). Furthermore, in George, the court noted that "the law of this Circuit indicates that a strip search without elements of sexual harassment, excessive force, or indeed any physical contact at all is not 'sufficiently serious' under the objective prong to support a claim ... under the Eighth Amendment." Id. at *10. Plaintiff has not plausibly alleged facts suggesting sexual harassment or any physical contact. As written, Plaintiff's Complaint suggests that Plaintiff stripped under the threat of whatever object the correctional officers were holding, but there does not appear to have been any physical contact between Plaintiff and either the object or the correctional officers. Proposed Am. Compl. ¶ 56. On its own, the strip search would not be "objectively, sufficiently serious" as to rise to the level of an Eighth—and therefore Fourteenth—Amendment excessive force claim.

However, Plaintiff also alleged that his constitutional rights were violated by correctional officers "forcibly strapping him down to a wheeled chair and wheeling him to the basement of the facility without any food or drink for 24 hours." Proposed Am. Compl. ¶ 111. "While no court has explicitly

held that denial of food is a per se violation of a prisoner's Eighth Amendment rights, under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir. 1983) (citing Moss v. Ward, 450 F. Supp. 591, 596–97 (W.D.N.Y. 1978)). Although neither the strip search, nor the deprivation of food by itself would generally constitute a claim of excessive force, in the aggregate the events of Plaintiff's pretrial detention are sufficient to plead a claim of excessive force. See Ziemba v. Armstrong, 343 F. Supp. 2d 173, 185 ("A twenty-two hour restraint with no penal justification, no food or water, and no access to the bathroom would constitute excessive force."). The Court therefore allows Plaintiff to amend his Complaint to add a claim of excessive force.

*2. Failure to Intervene*

Correctional officers can be held responsible for failing to intervene when they witness a fellow officer violating the constitutional rights of an inmate. Philips v. Lecuyer, No. 08-CV-878, 2013 U.S. Dist. LEXIS 36452, *14 (N.D.N.Y. Feb. 19, 2013). An officer has failed to intervene when "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." Jean-Laurent v. Wilkinson, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008).

***13** Plaintiff's failure to intervene claim appears to be based upon the excessive force claim. Proposed Am. Compl. ¶ 117. Plaintiff's Proposed Amended Complaint stated that "Defendants Correction's Officer Chapman and Corrections Officers John Doe 1–6 were present at said times and places." Id. Plaintiff's Proposed Amended Complaint is sparse in pleading this claim. However, if, as Plaintiff alleged, other correctional officers were present during the events giving rise to Plaintiff's excessive force claim, then Plaintiff may also have a claim for failure to intervene. "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury, unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994). Plaintiff claimed that he was strapped to a chair for twenty-four hours and was denied meals during that time. Proposed Am. Compl. ¶ 61–62. There are sufficient facts to indicate that a jury could find that other correctional officers had sufficient time to intercede. Therefore, Plaintiff is allowed to amend his Complaint to include a claim of failure to intervene.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion to Dismiss (Dkt. No. 10) is **GRANTED in part** as to claims against Oneida County and its departments, claims of supervisory liability, and attorney fees, and **DENIED in part**, as to Plaintiff's claims of malicious prosecution, false arrest, and unlawful strip search against the individual Defendants in their individual capacities; and it is further

**ORDERED**, that Defendants' Motion to Dismiss (Dkt. No. 10) is **DENIED as moot in part** as to all New York state law tort claims and claims of malicious abuse of process; and it is further

**ORDERED**, that Oneida County, Oneida County District Attorney's Office, Oneida County Police Department, Oneida County Sheriff's Department, Oneida County Correctional Facility, and Sergeant John Doe are terminated as Defendants; and it is further

**ORDERED**, that Plaintiff's Motion to Amend (Dkt. No. 19) is **GRANTED**; and it is further

**ORDERED**, that Plaintiff file an amended complaint within **thirty (30) days** consistent with this Memorandum-Decision and Order that will be deemed the operative pleading in this action; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2016 WL 4275727

## Footnotes

1 Counsel for the Town of Marcy advised Plaintiff via communications extrinsic to court filings that the Town of Marcy does not maintain a police force and therefore cannot be responsible for Plaintiff's claims arising out of his arrest. Dkt. No. 24. Plaintiff and the Town of Marcy filed a stipulation of dismissal on January 26, 2016, and the Court terminated the Town of Marcy as a defendant on January 27, 2016. Dkt. Nos. 26, 28.

2 Consistent with the Court's duty to construe a plaintiff's factual allegations in the light most favorable to the plaintiff in addressing a motion to dismiss, the allegations of the Complaint are accepted as true and form the basis for this section. See Matson v. Bd. of Educ., 631 F.3d 57, 72 (2d Cir. 2011).

3 Considering that Plaintiff's Complaint was filed on July 10, 2015, the Court assumes that the year was a typographical error.

4 The Second Circuit has not yet addressed how the Supreme Court's decision in Iqbal may have affected the standards articulated in Colon for establishing supervisory liability. See Grullon v. City of New Haven, 720 F.3d 133, 139 (2d Cir. 2013) (noting that Iqbal may have "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations," but not reaching the impact of Iqbal on Colon because the complaint "did not adequately plead the Warden's personal involvement even under Colon"); see also Hogan v. Fischer, 738 F.3d 509, 519 n.3 (2d Cir. 2013) (expressing "no view on the extent to which [Iqbal] may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations") (citing Grullon, 720 F.3d at 139). The Court assumes here that Colon remains good law.

5 Plaintiff names Sergeant John Doe as a defendant but fails to mention Sergeant John Doe anywhere else in his Complaint. As Plaintiff has alleged no personal involvement of Sergeant John Doe in any deprivation of Plaintiff's constitutional rights, Sergeant John Doe is terminated as a Defendant.

6 Neither party has presented arguments as to whether individual Defendants are entitled to qualified immunity. However, it has been noted that, "[g]iven the factual nature of the qualified immunity inquiry, it is an issue 'often best decided on a motion for summary judgment when the details of the alleged deprivations are more fully developed.' " Rubeor v. Town of Wright, No. 13-CV-612, 2016 WL 3199510, at *3 (N.D.N.Y. June 8, 2016) (Kahn, J.) (quoting Walker v. Schult, 717 F.3d 119, 129 (2d Cir. 2013)). Therefore, the Court declines to address qualified immunity at this point.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

1997 WL 599355
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenneth BROWN, Plaintiff,
v.
Andrew PETERS, Warden, Watertown Correctional Facility; Joseph Williams, Warden, Lincoln Work–Release Center; Francis J. Herman, Senior Parole Officer Interstate Bureau; T. Stanford, Senior Parole Officer; Deborah Stewart, Parole Officer; John Doe # 1, Parole Agent, Watertown Correctional Facility; John Doe # 2, Parole Agent, Lincoln Work Release Center; Susan Bishop, Director of Interstate Compact, South Carolina; Cecil Magee, Parole Officer, South Carolina; Frank Barton, Parole Officer, South Carolina; John McMahan, Parole Officer, South Carolina, Defendants.

No. Civ.A. 95CV1641RSPDS.
|
Sept. 22, 1997.

**Attorneys and Law Firms**

Kenneth Brown, State Court Institute–Greene, Waynesburg, PA, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General, The Capitol Albany, NY, for defendants Peters, Herman Stewart, Doe # 1, Doe # 2, and Williams, Jeffrey M. Dvorin, Assistant Attorney General, Carl N. Lundberg, Chief Legal Counsel, South Carolina Department of Probation, Columbia, SC, for defendants Bishop, Magee, Barton, McMahan, and Stanford, Carl N. Lundberg, of Counsel.

DECISION AND ORDER

POOLER, J.

***1** The above matter comes to me following a Report–Recommendation by Magistrate Judge Daniel Scanlon, Jr., duly filed on April 17, 1997. Following ten days from the service thereof, the Clerk has sent me the entire file, including any and all objections filed by the parties herein.

Plaintiff Kenneth Brown commenced this Section 1983 civil rights action on November 17, 1995. On February 12, 1996, Magistrate Judge Scanlon ordered Brown to submit an amended complaint alleging the specific acts committed by the individuals named as defendants which Brown claimed violated his constitutional rights. Brown filed an amended complaint on March 21, 1996. In his amended complaint, Brown alleged that defendants violated his rights under the Eighth and Fourteenth Amendments by failing to process properly his interstate compact paperwork, resulting in Brown being imprisoned pursuant to a parole hold when in fact he had never violated the conditions of his parole. For a more complete statement of Brown's claims, see his amended complaint. Dkt. No. 5.

On August 5, 1996, defendants Peters and Williams made a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Dkt. No. 13; Dkt. No. 14, at 2. On August 19, 1996, defendants Bishop, Magee, Barton, and McMahan made a motion to dismiss the complaint against them or, in the alternative, for summary judgment. Dkt. No. 20. On October 17, 1996, defendants Herman, Stewart, and Stanford made a motion to dismiss for failure to state a claim. Dkt. No 34. On April 17, 1996, Magistrate Judge Scanlon recommended that all defendants' motions to dismiss be granted and that the complaint be dismissed. Dkt. No. 50.

On June 9, 1997, Brown filed objections to the magistrate judge's report-recommendation, having been granted additional time in which to do so. Dkt. No. 52. In addition, Brown filed on June 9, 1997, a motion for leave to file a second amended complaint and a copy of his proposed amended complaint. Dkt. No. 53. I turn first to the last motion filed, Brown's motion for leave to amend his complaint a second time.

Brown seeks to file a second amended complaint "setting forth in detail the personal involvement of each defendant and how their acts of commission and omission served to deprive plaintiff of Constitutionally secured rights." Dkt. No. 53. The district court has discretion whether to grant leave to amend. *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993). In exercising that discretion, the court should freely grant leave to amend when justice so requires. Fed.R.Civ.P. 15(a). However, the court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile. *Ruffolo,* 987 F.2d at 131.

Here, Brown moved to amend his complaint to add additional allegations against the named defendants. However, the additional allegations fail to cure the deficiency which

forms the basis of defendants' motion to dismiss—the absence of defendants' personal involvement in a constitutional deprivation. Section 1983 imposes liability upon an individual only when personal involvement of that individual subjects a person to deprivation of a federal right. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A complaint is fatally defective if it fails to allege personal involvement sufficient to establish that a supervisor was "directly and personally responsible for the purported unlawful conduct." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987).

***2** Brown's proposed amended complaint alleges in conclusory fashion that defendants acted "in a grossly negligent and concerted manner which breached their duties owed to Plaintiff and is the proximate cause of [the violation of plaintiff's constitutional rights]." Proposed Am. Compl., at 3. Brown continues in the same vein, stating that defendants owed duties to plaintiff to carry out their jobs in a professional manner and they failed to carry out those duties appropriately. The complaint states that defendants held specific responsibilities, such as checking for outstanding warrants, which if performed properly should have alerted them to a problem. However, nowhere does the complaint set forth allegations that these defendants either participated directly in any constitutional infraction or that they were even aware of such an infraction. The proposed amended complaint merely alleges that these defendants failed in performing their supervisory and ministerial functions. "These bare assertions do not state a claim under 42 U.S.C. § 1983." *Smiley v. Davis,* 1988 WL 78306, *2 (S.D.N.Y.).

This plaintiff previously has had the opportunity to amend his complaint for the same reason asserted here, to allege personal involvement on the part of defendants. Brown's first amended complaint failed to accomplish that task, and it appears that even if allowed to amend again Brown would be unable to make the requisite allegations with sufficient specificity to sustain his complaint. Consequently, I find that amendment would be futile, and I deny Brown's motion for leave to amend his complaint.

I turn now to the magistrate judge's report-recommendation and defendants' motions. The magistrate judge recommends that I grant defendants' motions and dismiss the complaint as to all defendants. The report-recommendation clearly describes the grounds on which the magistrate judge recommends dismissal as to each defendant. Fed.R.Civ.P. 72(b) requires the district judge to make a *de novo* determination on "any portion of the magistrate's disposition to which specific, written objection has been made." Brown's objections fail to address directly any of the analysis. Brown's objections state (1) that he has been deprived of his constitutional rights; (2) that he has stated a cause of action; (3) that the court wrongly refused to appoint an attorney for him and wrongly stayed discovery pending the outcome of these motions; (4) that he seeks to file an amended complaint; (5) the standard of review for a Fed.R.Civ.P. 12(b)(6) motion; (6) that he disagrees with the magistrate judge's recommendation to grant defendants' motions because the allegations in his complaint, which he repeats, show that his rights were violated; and (7) the text of the Fourteenth and Eighth Amendments.

Even affording the objections the liberal reading required for *pro se* pleadings, I find that these objections fail to state any basis whatsoever, much less a specific one, for the court not to adopt the magistrate judge's rulings. They simply re-state the relief sought and the facts on which Brown grounds his complaint and conclude that the magistrate judge's conclusions are wrong. When the parties make only frivolous, conclusive, or general objections, the court reviews the report-recommendation for clear error. *See Camardo v. General Motors Hourly–Rate Employees Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusive, or general and constitute a rehashing of the same arguments and positions taken in original pleadings); *Chambrier v. Leonardo,* 1991 WL 44838, *1 (S.D.N.Y.) (restatement of allegations already before the court and assertion that valid constitutional claim exists insufficient to form specific objections); *Schoolfield v. Dep't of Correction,* 1994 WL 119740, *2 (S.D.N.Y.) (objections stating that magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report-recommendation); *Vargas v. Keane,* 1994 WL 693885, *1 (S.D.N.Y.) (general objection that report does not address violation of petitioner's constitutional rights is a general plea that report not be adopted and cannot be treated as objection within the meaning of 28 U.S.C. § 636), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (U.S.1996). *See also Scipio v. Keane,* 1997 WL 375601, *1 (1997) (when objections fail to address analysis directly, court reviews report-recommendation for clear error); Fed.R.Civ.P. 72(b), Advisory Comm. Note (when no specific, written objections filed, "court need only satisfy itself that there is


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

no clear error on the face of the record in order to accept the recommendation").

***3** Because Brown fails to make specific objections or provide any basis for his general objections, I review the report-recommendation for clear error. After careful review, I conclude that the magistrate judge's report-recommendation is well-reasoned and is not clearly erroneous. [1] The magistrate judge employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. Consequently, I adopt the report-recommendation.

CONCLUSION

Because plaintiff's proposed amendment demonstrates that amendment would be futile, I deny plaintiff's motion for leave to amend his complaint. I approve the magistrate judge's recommendation and grant defendants' motions to dismiss. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

**ORDER and REPORT–RECOMMENDATION**

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Currently before this Court are a number of motions. Defendants Peters and Williams have filed a motion to dismiss (dkt.13); defendants Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative to dismiss (dkt.20); and defendants Herman, Stewart and Stanford also have filed a motion to dismiss (dkt.34). Plaintiff opposes these three motions (dkts.27, 29, 33, 38). Defendants Bishop, Magee and McMahan have filed a motion to stay discovery (dkt.41) and plaintiff has filed a motion to extend time (dkt.44) in which to file opposition to the latter motion for a stay of discovery.

The Court addresses these issues *seriatim.*

**BACKGROUND**

Plaintiff's amended complaint, which he has brought pursuant to 42 U.S.C. § 1983, alleges the following facts. In October, 1991, plaintiff was incarcerated in the Watertown Correctional Facility in Watertown, New York. He applied for an interstate compact because he wanted to return to South Carolina to live with his common law wife, Pamela Reid. During the application process, he was interviewed by the facility's parole officer, identified only as defendant John Doe # 1. After signing the necessary papers, his application was forwarded to defendant Andrew Peters, the facility's superintendent, who reviewed, signed and forwarded the papers to the Interstate Bureau. Amend. Compl. at ¶¶ 1–2; Exs. A, B.

On or about January 15, 1992, while his compact was waiting for review at the Interstate Bureau, plaintiff was approved for work release and sent to the Lincoln Work Release Center in New York City. While at the center, plaintiff spoke to a parole officer, defendant John Doe # 2, and told him that he was seeking a compact that would return him to South Carolina upon his conditional release. Plaintiff claims the parole officer told him that he would handle the necessary paperwork, although the officer had had no experience with an interstate compact. Amend. Compl. at ¶¶ 3, 4.

***4** Plaintiff, meanwhile, asked Reid whether any officials had contacted her in South Carolina regarding his prospective residence in that state. Upon discovering no one had contacted her, plaintiff asked a lawyer he knew, Navron Ponds, to inquire as to his compact status. In March, 1992, the lawyer spoke with defendant Susan Bishop, who is the director of the interstate compact program in South Carolina. Bishop allegedly told Ponds that plaintiff "was disapproved because there was a discrepancy about approving plaintiff['s] compact." The "discrepancy" was the fact that plaintiff owed the state of South Carolina eighty-six days of confinement from a previous sentence. Plaintiff claims Bishop told Ponds to contact defendants Cecil Magee and Frank Barton, who worked for the South Carolina Parole Department. Sometime in March, 1992, Ponds made some calls to Barton and Magee. A verbal agreement was reached, and plaintiff, upon speaking with Barton and Magee was told that his compact had been approved. He also was told that he should report to the South Carolina Department of Parole upon being released. Amend. Compl. at ¶¶ 5–7.

Prior to leaving the Lincoln Work Release Center, plaintiff processed paperwork related to his interstate compact. His paperwork was sent by Doe # 2 to defendant Joseph Williams, the superintendent of the center. Williams reviewed, signed and returned the paperwork to plaintiff. On May 1, 1992,

upon his release from the center, plaintiff traveled to South Carolina. Three days later, he entered a South Carolina parole office and promptly was arrested because of the eighty-six days of confinement that he owed the state. Plaintiff's paperwork was given to defendant John McMahan, a parole officer. Plaintiff claims that McMahan never returned this paperwork to him. On May 20, 1992, the state of South Carolina revoked plaintiff's parole and plaintiff was returned to prison to serve the eighty-six days that he owed. When he asked McMahan what would happen to his one year of parole from New York, the officer allegedly told him that his New York parole would run concurrently with his South Carolina parole, and that when he finished his South Carolina parole, he would not owe any parole whatsoever. Plaintiff served the eighty-six days he owed and was released on July 31, 1992. Amend. Compl. at ¶¶ 8–10.

In February, 1993, plaintiff was arrested on robbery charges in South Carolina. The charges ultimately were dropped, but he apparently encountered some difficulties regarding this arrest as a result of a parole hold that New York state had placed upon him. Bishop's office told him that it had nothing to do with his parole hold and that any problem that he had was between him and the state of New York. He talked to authorities in Albany, New York regarding the parole hold, but was not successful in his efforts to have the hold removed. On September 30, 1993, after had been extradited to New York as a fugitive from justice, plaintiff was given a preliminary hearing at Riker's Island, New York. The hearing officer found no probable cause that plaintiff had violated any condition of parole. He was released. Amend. Compl. at ¶¶ 11–14; Exs. C–J.

***5** Plaintiff claims that he would not have suffered hardships if his interstate compact had been handled correctly. He alleges that defendant Deborah Stewart failed to follow up and see whether plaintiff had arrived in South Carolina. If she had, he argues, she would have discovered that he had been arrested upon his arrival. He alleges that defendant Francis Herman, a parole officer at the Interstate Bureau failed to do his job by not investigating plaintiff's violation reports. Amend. Compl. at ¶¶ 15–17; Exs. F–I.

Plaintiff asserts that the foregoing amounts violations of his Eighth and Fourteenth Amendment rights, wherefore he both compensatory and declaratory relief.

## DISCUSSION

A. Motion to Dismiss by Williams and Peters.

Williams and Peters have filed a motion to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that it fails to state a claim upon which relief may be granted. In a Rule 12(b)(6) motion, all factual allegations in the complaint must be taken and construed in plaintiff's favor. *See* *LaBounty v. Adler,* 933 F.2d 121, 122 (2d Cir.1991) (citing *Ortiz v. Cornette,* 867 F.2d 146, 149 (1989)). The Court's role is not to assess whether plaintiffs have raised questions of fact or demonstrated an entitlement to a judgment as a matter of law, as in a motion made pursuant to FED.R.CIV.P. 56 for summary judgment, but rather to determine whether plaintiff's complaint sufficiently alleges all of the necessary legal elements to state a claim under the law. *See* *Christopher v. Laidlaw Transit, Inc.* 899 F.Supp. 1224, 1226 (S.D.N.Y.1995), (citing *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991)). Factual allegations in brief or memoranda may not be considered. *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court now turns to the issues presented.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). As superintendents at New York State Correctional facilities, Williams and Peter may be found personally involved in the alleged deprivation of plaintiff's constitutionally protected rights by a showing that they: (1) directly participated in the infraction; (2) knew of the infraction, but failed to remedy the wrong; (3) created or continued a policy or custom under which unconstitutional practices occurred; or (4) were grossly negligent in managing subordinates who caused unlawful conditions or events. *Id.,* (quoting *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). Supervisory liability also may be imposed against Williams or Peters with a showing of gross negligence or deliberate indifference to plaintiff's constitutional rights. *Id.* Absent some personal involvement by Williams or Peters in the allegedly constitutionally infirm conduct of their subordinates, neither can be held liable under § 1983. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

***6** Plaintiff has not provided any evidence linking either Williams or Peters to his alleged constitutional deprivations. All that plaintiff has alleged is that Williams and Peters, as superintendents, have reviewed and signed paperwork

relating to plaintiff's compact. Though it has long been held that *pro se* complaints are held to “less stringent standards than formal pleadings drafted by lawyers” for the purpose of a motion to dismiss under Rule 12(b)(6), *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972), plaintiff has not explained how the ministerial conduct of these two defendants was violative of the Constitution. Their motion to dimiss should be granted.

B. Motion for Summary Judgment or to Dismiss by Bishop, Magee, Barton and McMahan.

Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative a motion to dismiss. The Court will treat their motion as a motion to dismiss. “[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.” *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). Plaintiff has not alleged specifically how the conduct of these four defendants infringed upon his constitutional rights. In his amended complaint, he contends that defendants violated the Constitution by “continuously breaching [[[their] duty” to him. This language underscores the defect with the complaint: if it alleges anything at all, it alleges that defendants were negligent in handling plaintiff's interstate compact and parole. To state a cognizable § 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice. *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (section 1983 does not encompass a cause of action sounding in negligence).

The Court finds that the claims against Bishop, Magee, Barton and McMahan should be dismissed.

C. Motion to Dismiss by Herman, Stewart and Stanford.

Plaintiff's claim against Stewart is that she failed to follow up and see whether plaintiff had arrived in South Carolina. Herman, he likewise asserts, failed to do his job because he did not investigate plaintiff's violation reports. Plaintiff has not alleged how these actions run afoul of the Constitution; and again, these claims seem to be grounded in negligence, which is not actionable under § 1983. *Hayes,* 84 F.3d at 620.

Plaintiff's claim against Stanford must fail because his complaint literally fails to state a claim against that defendant. Aside from naming Stanford as a defendant, and alleging that he was the appointed Senior Parole Officer at plaintiff's September 30, 1993 revocation hearing at Riker's Island, plaintiff does not detail how Stanford violated his constitutional rights. Absent some personal involvement by Stanford in the allegedly constitutionally infirm conduct of his subordinates, he cannot be held liable under § 1983. *Gill,* 824 F.2d at 196.

***7** Accordingly, the Court finds that Stanford, Stewart and Herman's motion to dismiss should be granted.

D. Plaintiff's “John Doe” Claims.

In so far as neither John Doe # 1 nor John Doe # 2 have been identified and served in this matter, the Court does not have jurisdiction over these parties and does not reach the merits of plaintiff's claims against them.

E. Discovery Motions.

Defendants Bishop, Magee and McMahan have filed a motion to stay discovery until the Court has made a ruling on their motion to dismiss. Plaintiff has filed a motion to extend the time in which he may file opposition to defendants' motion. Plaintiff, however, has filed his opposing response (dkt.47), therefore his instant discovery motion is denied as moot. In that the Court recommends granting defendants' motion to dismiss, discovery in this matter would be fruitless. Accordingly, defendants' motion for a stay of discovery pending the resolution of their motion to dismiss is granted.

## CONCLUSION

WHEREFORE, based upon the foregoing analysis, it is hereby

ORDERED, that plaintiff's motion to extend the time to file an opposing reply (dkt.44) is denied as moot; and it is further

ORDERED, that defendants Bishop, Magee and McMahan's motion to stay discovery until their motion to dismiss is decided (dkt.41) is granted; and it is further

RECOMMENDED, that defendants Peters and Williams' motion to dismiss (dkt.13) be granted; and it is further

RECOMMENDED, that defendants Bishop, Magee, Barton and McMahan's motion to dismiss (dkt.20) be granted; and it is further

RECOMMENDED, that defendants Herman, Stewart and Stanford's motion to dismiss (dkt.34) be granted.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e) and 72.

**All Citations**

Not Reported in F.Supp., 1997 WL 599355

## Footnotes

1 I note, however, that the report-recommendation would survive even *de novo* review.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 9901710
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Houston DOUGLAS, Petitioner,
v.
PEOPLE OF THE STATE OF NEW YORK, [1] Respondent.

12 CV 3839 (NGG)(LB)
|
Signed November 3, 2015

**Attorneys and Law Firms**

Houston Douglas, Sonyea, NY, pro se.

Kings County District Attorneys Office, New York State Attorney Generals Office, Seth M. Lieberman, Brooklyn, NY, for Respondent.

**REPORT & RECOMMENDATION**

BLOOM, United States Magistrate Judge

***1** Petitioner, Houston Douglas, files this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging a 2006 Kings County conviction. The Honorable Nicholas G. Garaufis, United States District Court Judge, referred this petition to me for a Report and Recommendation in accordance with 28 U.S.C. § 636(b). For the reasons set forth below, it is respectfully recommended that the petition should be denied.

## ***BACKGROUND***

According to the evidence adduced at trial, on September 26, 2003, shortly before 11:00 p.m., Karen Williams met Krishna Ramotar, a driver in her commuter van business, at the comer of Ocean and Parkside Avenues in Brooklyn, New York to collect her daily payment. (Tr. at 45, 349, 351.) [2] Williams sat in the van with Ramotar, who was in the driver's seat; Kyron James was in the front passenger seat and Williams was in the first passenger row behind them. (Id, at 45–49, 353.) While Williams was collecting the money from Ramotar, petitioner, who was driving a white Jeep, backed into a vacant spot beside the van. (*Id.* at 50–51, 354–55.) While parking, the Jeep rolled over a glass bottle, causing it to pop; Williams and a couple of people standing nearby were struck with shattered glass. (*Id.* at 354–56.) Allen Williams—Karen Williams' son, who was standing on the sidewalk at the time along with Williams' brother, Michael—told the petitioner to apologize for breaking the bottle, but petitioner just got out of his Jeep and walked into a deli. (*Id.* at 48–52, 355–56.) When petitioner exited the deli, he engaged in a loud and heated altercation with Allen Williams, Michael Williams, and a couple of passerbys. (*Id.* at 51–52, 354–56.) Petitioner then reentered his Jeep, drove a short distance, pulled over to remove something from a panel on the rear of his Jeep, and sped off. (*Id.* at 51–53, 357–58.) Shortly thereafter, petitioner returned, parked his Jeep across the street from the van, exited the vehicle holding a gun in his hand, and ran towards the van. (*Id.* at 53–54, 358.)

As petitioner was running towards the van holding a gun, Karen Williams crouched down and told Ramotar to go, because petitioner had a gun. (*Id.* at 53–55, 99–100, 358–61.) Petitioner ran towards the van and fired a shot that struck James in the leg (*id.* at 53–54), ran passed Karen Williams, stuck the gun through the open front passenger window, and fired a second shot. (Id at 54, 363.) Petitioner continued running alongside the van as it rolled away, stuck his arm further through the open window, and fired a third shot. (Id. at 54, 363.) Petitioner came back to where Karen Williams was still crouched down and pointed the gun at her face. (Id at 364, 382.) Police Officer Mathieu Pierre, who had been a short distance away on foot patrol, had arrived on the scene in time to see petitioner fire the gun twice and then point it at Karen Williams. (Id. at 96–100.) Officer Pierre ordered petitioner to freeze, but petitioner instead ran back to his Jeep and drove off. (*Id.* at 100–02, 155.)

***2** Sergeants Timchenko and Marrone briefly pursued petitioner and eventually apprehended him a few blocks away. (Id. at 104, 178–79, 254–60.) The officers ordered petitioner out of the car, and upon frisking him, recovered a nine-millimeter pistol from his waistband. (*Id.* at 179–80, 263–64.)

*Investigatory Lineup*

At the 70th Precinct the next morning, Detective Neil Siegel chose five fillers with similar physical characteristics to petitioner from a men's shelter to participate in a lineup. (*Id.* at 404.) Fillers with hair on their heads were instructed to shave their heads bald. (*Id.*) Defendant switched shirts with one of the fillers, and chose where to sit in the lineup. (*Id.* at 405.) Karen Williams viewed the six-person lineup conducted by

Detective Siegel. Karen Williams identified petitioner as the shooter at the lineup. (*Id.* at 366–67, 404, 409–10.)

*Charges*

Petitioner was initially charged by a felony complaint with Assault in the First Degree in addition to other offenses. (*See* ECF No. 5–1, Att. 1.) Petitioner thereafter was charged, by Kings County Indictment Number 6977/2003, with two counts each of Attempted Murder in the Second Degree, and Assault in the Second Degree; as well as one count each of Attempted Assault in the First Degree, Assault in the Third Degree, Criminal Possession of a Weapon in the Second, Third, and Fourth Degrees, and Reckless Endangerment in the First Degree. (*See* ECF No. 5–1, Att. 2.) On September 28, 2003, petitioner was arraigned on Indictment Number 6977/2003 and was represented by Calvin Garber at the arraignment. [3]

Petitioner was subsequently charged by a superseding indictment—Indictment Number 6029/2004—with two counts each of Assault in the First Degree and Assault in the Second Degree, and one count each of Attempted Murder in the Second Degree, Criminal Possession of a Weapon in the Second, Third, and Fourth Degrees, Reckless Endangerment in the First Degree, Unlawful Possession of Marihuana, and Possession of Knives/Instruments in Violation of New York City Administrative Code § 10–133(b). (ECF No. 5–1, Att. 4.)

### I. Pre–Trial Motions

Before trial, petitioner's counsel moved to dismiss the superseding indictment— Indictment Number 6029/2004—pursuant to New York Criminal Procedure Law § 30.30. In a decision and order dated November 29, 2005, the Supreme Court, Kings County, denied the motion. (*See* ECF No. 5–1, Att. 9.) Petitioner moved *pro se* to dismiss the superseding indictment on the ground that the indictment had been obtained in violation of New York Procedure Law § 210.20(6) because the State had obtained the indictment, without permission of the court, beyond thirty days after the entry of the order dismissing the count of attempted murder in Indictment Number 6977/2003. The Supreme Court, Kings County, denied the motion and held that the indictment had been lawfully obtained pursuant to N.Y.Crim. Proc. Law § 200.80, which permits the State to file, without court approval, a superseding indictment *at any time* prior to the disposition of a pending indictment. (*See* ECF No. 5–1, Att. 10.) (emphasis added).

### II. Pre–Trial Hearings

***3** On December 8, 2005, a combined *Dunaway, Wade,* and *Mapp* hearing was held. (Hr'g at 6.) [4] Defense counsel moved to suppress the three [5] lineup identifications as unduly suggestive based on an age discrepancy as well as distinguishable physical characteristics between petitioner and the fillers. (Id. at 65–66.) The court made note of the poor quality of the photographs of the lineup, but found no violation. (Id. at 72–73.) The court noted that although there was an age difference between petitioner and some of the fillers, the officer who conducted the lineup was "extremely solicitous" of petitioner's rights, and that petitioner was allowed to switch clothing with one of the fillers. (*Id.* at 75–76.)

### III. Petitioner's Trial

Petitioner's jury trial commenced on March 14, 2006, before the Honorable Gustin Reichbach. The People called nine witnesses to testify, including eyewitnesses Kyron James (Tr. at 41), and Karen Williams (*id.* at 349); Officer Mathieu Pierre (*id.* at 89), who witnessed the shots being fired towards the van and eventually apprehended petitioner (*id*. at 99–102) with Sergeant Yelena Timchenko (*id.* at 168) and Sergeant Christopher Marrone (*id*, at 247); Officer Robert Anderson (*id*, at 284), who witnessed the white Jeep pass by soon after receiving a radio transmission about the incident (*id.* at 287); Detective Michael Sandano (*id.* at 298), a ballistics expert who determined that the gun seized from the petitioner had in fact been fired (*id.* at 312); Detective David DeLaRosa (*id*, at 332), an expert in firearms and munitions (*id*, at 335); and Detective Neil Siegel (*id.* at 402.), who conducted the lineup. (*Id*, at 404.) Petitioner presented no witnesses, and did not testify at the trial. (*Id*, at 390.)

Petitioner was convicted of Assault in the First Degree, Criminal Possession of a Weapon in the Second Degree, and Reckless Endangerment in the First Degree. (*Id.* at 565.) On April 26, 2006, petitioner was sentenced to concurrent prison terms of 16 years for assault, 10 years for criminal possession of a weapon, and one year for reckless endangerment. (*Id.*)

### IV. Post–Trial Litigation

*Post–Conviction Motion*

On May 19, 2006, petitioner moved *pro se* to vacate his judgment of conviction pursuant to N.Y.Crim. Proc. Law § 440.10. (ECF No. 5–2, Ex. B.) Petitioner claimed, *inter alia,*

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

that his constitutional rights had been violated because he was denied the effective assistance of counsel. *Id.* Petitioner's motion to vacate was denied on November 14, 2006. (*See* November 14, 2006, Decision and Order ("Reichbach, J. Decision and Order"), ECF No. 5–2, Ex. D.) The court found that petitioner s ineffective assistance of counsel claim was a record-based claim reviewable on direct appeal, and thus review of the claim was barred pursuant to N.Y.Crim. Proc. Law § 440.10(2)(b).[6] The court further found that even if it reached the merits of petitioner's claims, it would deny petitioner's motion because defense counsel "mounted a zealous and cogent defense." (*Id.*)

*Direct Appeal*

Petitioner appealed his conviction to the New York State Supreme Court, Appellate Division, Second Department, and argued that (1) the evidence was legally insufficient to establish petitioner's guilt of depraved indifference first-degree assault; (2) the trial court erred by failing to properly instruct the jury regarding the State's burden to prove beyond a reasonable doubt that defendant's mental state constituted depraved indifference; (3) the court improperly delegated a judicial function to a court officer who talked to a juror who was "drifting off"; and (4) the New York State Department of Corrections improperly imposed post-release supervision on petitioner. (Pet'r's Appellate Br., ECF No. 5–2, Ex. E.)

***4** Petitioner also filed a *pro se* supplemental brief which raised many of the same claims that he raises in the instant petition: (1) petitioner was deprived of his right to counsel at the investigatory lineup because he was forced into the lineup without the presence of counsel;[7] (2) petitioner was deprived of his right to counsel because he was represented by a purportedly unlicensed attorney at his September 28, 2003 arraignment; (3) the count of Attempted Assault in the First Degree in Indictment number 6977/2003 was jurisdictionally defective, because the felony complaint did not contain either that count or a count that charged a lesser-included offense; (4) petitioner was deprived of his right to counsel because he was not represented by counsel at the March 5, 2004 proceeding; (5) the State obtained Indictment Number 6029/2004 in violation of New York Criminal Procedure Law § 210.20(6), because the State obtained that superseding indictment without permission of the court beyond thirty days after the entry of the order dismissing the count of attempted murder in Indictment Number 6977/2003;[8] and multiple claims regarding ineffective assistance of counsel[9] and the right to a speedy trial.[10] (*See* Pet'r's *Pro Se* Supplemental Br., Jan. 2, 2008, ECF No. 5–2, Ex. G.)

The Appellate Division vacated petitioner's sentence regarding the post-release supervision, but otherwise affirmed the judgment of conviction. *People v. Douglas,* 73 A.D.3d 30 (2d Dep't 2010), *abrogated on other grounds, People v Dubarry,* 25 N.Y.3d 161 (2015). The Court also held that the evidence was legally sufficient to establish petitioner's guilt of depraved indifference first-degree assault and that petitioner's remaining contentions were without merit. *Id.*[11] Petitioner's case was remitted for resentencing to include post-release supervision. *Id.* at 35.

Petitioner sought leave to appeal to the New York Court of Appeals on every ground raised in both his counseled and *pro se* briefs. Petitioner's application for leave to appeal was denied on May 30, 2010. *People v. Douglas,* 15 N.Y.3d 804 (2010) (Jones, J.). Petitioner requested reconsideration *pro se* and his request was denied. *People v. Douglas,* 15 N.Y.3d 920 (2010) (Jones, J.).

***5** On June 16, 2010, petitioner was resentenced to the same terms of imprisonment, and to a period of post-release supervision. Petitioner appealed from his resentence, and the Appellate Division affirmed petitioner's resentence. *People v. Douglas,* 89 A.D.3d 959 (2d Dep't 2011). Petitioner's application for leave to appeal was denied. *People v. Douglas.* 18 N.Y.3d 957 (2012) (Jones, J.).

**V. Instant Petition**

Petitioner timely filed the instant *pro se* petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (ECF No. 1.) Petitioner seeks relief on six grounds: (1) that he was denied the right to counsel pretrial when he was (i) forced into the lineup conducted on September 23, 2003, after he had told officers that he wanted his attorney; (ii) unrepresented by counsel at his September 28, 2003 arraignment; and (iii) unrepresented by counsel at the March 5, 2004 court proceeding;[12] (2) that he was denied the right to effective assistance of counsel when he was denied his request for new counsel on March 13, 2006 which forced him to proceed with assigned attorney Labe Richman against his will; (3) petitioner's constitutional right to a speedy trial was violated when the People proceeded on Indictment Number 6977/2003, and when the People returned Indictment 6029/2004—the superseding indictment; (4) petitioner's right to be prosecuted on a valid indictment was violated; (5)

petitioner's due process right was violated when the People superseded Indictment Number 6977/2003 with Indictment Number 6029/2004 in violation of State law; [13] and (6) petitioner was denied the right to effective assistance of appellate counsel when his appellate counsel refused to raise the issues raised in the instant petition on direct appeal.

Respondent opposed the instant petition (ECF No. 5.), and petitioner filed a reply. (ECF No. 12.)

## *DISCUSSION*

### I. Standard of Review

The Antiterrorism and Effective Death Penalty Act ("AEDPA") provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the AEDPA, the reviewing court may only grant a habeas petition if the petitioner's claim "was adjudicated on the merits in State court proceedings" and the state court proceedings:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). An " 'adjudication on the merits' is one that '(1) disposes of the claim on the merits, *and* (2) reduces its disposition to judgment.' " *Bell v. Miller,* 500 F.3d 149, 155 (2d Cir.2007) (quoting *Sellan v. Kuhlman,* 261 F.3d 303, 312 (2d Cir.2001)). "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster,* 131 S.Ct. 1388, 1398 (2011).

***6** A state court decision is "contrary to" clearly established federal law if "the state court reached a conclusion of law that directly contradicts a holding of the Supreme Court" or, "when presented with 'facts that are materially indistinguishable from a relevant Supreme Court precedent,' " the state court arrived at an opposite result. *Evans v. Fischer,* 712 F.3d 125, 132 (2d Cir.2013) (quoting *Williams v. Taylor,* 529 U.S. 362, 405 (2000)). A state court decision is an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams,* 529 U.S. at 413. The Court cautions, however, that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410; *see also Grayton v. Ercole,* 691 F.3d 165, 174 (2d Cir.2012) ("[T]he writ may only issue where the state court's application of the law was not only wrong, but unreasonable."). A federal habeas court may only "issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington v. Richter,* 131 S.Ct. 770, 786 (2011).

### II. Exhaustion and Procedural Bar

A federal court may not grant a writ of habeas corpus unless a petitioner has exhausted the remedies available in the state court. 28 U.S.C. § 2254(b)(1)(A). A petitioner exhausts statecourt remedies by fairly presenting each federal claim for relief to the highest state court capable of review. *Baldwin v. Reese,* 541 U.S. 27, 29 (2004); *Pickard v. Connor,* 404 U.S. 270, 275–76 (1971) ("[O]nce the federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied."); *Jackson v. Edwards,* 404 F.3d 612, 618 (2d Cir.2005); *Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 808–09 (2d Cir.2000). "The purpose of the exhaustion requirement is to ensure that a state court is given the 'opportunity to pass upon and correct alleged violations of its prisoners' federal rights.' " *Jackson,* 404 F.3d at 618 (quoting *Pickard.* 404 U.S. at 275). Consistent with this principle, "a state prisoner [must] present the state courts with the same claim he urges upon the federal courts." *Pickard,* 404 U.S. at 276.

Federal courts also have no authority to review state court decisions that rest upon independent and adequate state law grounds. *Lee v. Kemna,* 524 U.S. 362, 375 (2002); *see also Green v. Travis,* 414 F.3d 288, 294 (2d Cir.2005) ("A federal habeas court lacks jurisdiction to evaluate questions of federal law decided by a state court where the state court judgment 'rests on a state law ground that is independent of the federal question and adequate to support the judgment' ...." (quoting *Coleman v. Thompson,* 501 U.S. 722, 729 (1991)). "The rule applies with equal force whether the state-law ground is substantive or procedural." *Lee,* 534 U.S. at 375 (citing *Coleman,* 501 U.S. at 729); *accord Whitley v. Ercole,* 642 F.3d 278, 285 (2d Cir.2011). Federal habeas review of a

claim is foreclosed where the state court has expressly relied on the petitioner's procedural default as an independent and adequate state law ground. *Green,* 414 F.3d at 294; *Velasquez v. Leonardo,* 898 F.2d 7, 9 (2d Cir.1990). A petitioner may, nevertheless, obtain federal habeas review of a procedurally defaulted claim, if petitioner demonstrates either "cause for the default and prejudice," or that "failure to consider the claims will result in a miscarriage of justice (i.e., the petitioner is actually innocent)." *Aparicio v. Artuz,* 629 F.3d 78, 90 (2d Cir.2001) (citing *Coleman,* 501 U.S. at 748–50).

**III. State Law Claims**

Petitioner argues that: (1) his right to be prosecuted on a valid indictment was violated; (2) his due process rights were violated when the State improperly superseded the indictment; and (3) his right to a speedy trial was violated. Respondent asserts that these claims are unexhausted, but even if they were not, the claims should be denied because the claims are not cognizable on federal habeas review. The Court agrees.

***7** When reviewing a habeas petition, a federal court is limited to deciding whether petitioner is in custody "in violation of the Constitution, laws, or treaties of the United States." 28 U.S.C. §§ 2241(c), 2254(a); *see also Wainwright v. Goode,* 464 U.S. 78, 83 (1983) ("[F]ederal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension."). "Federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire,* 502 U.S. 62, 67 (1991) (internal quotation marks omitted); *see also Howard v. Walker,* 406 F.3d 114, 121 (2d Cir.2005) ("A claim that a state conviction was obtained in violation of state law is not cognizable in the federal court."); *Ponnapula v. Spitzer,* 297 F.3d 172, 182 (2d Cir.2002) ("It is well established that a federal habeas court does not sit to correct a misapplication of state law....").

Petitioner's claims regarding the indictments are not cognizable on federal habeas review. [14] "The Supreme Court has never held that state criminal defendants enjoy a federal constitutional right to an indictment." *McCray v. New York,* 573 Fed. App'x. 22, 24 (2d Cir.2014) (citing *Alexander v. Louisiana,* 405 U.S. 625, 633 (1972)); *see also Nordahl v. Rivera,* No. 08–CV–5565, 2013 WL 1187478, at *5 (S.D.N.Y. Mar. 21, 2013) ("Challenges to state indictments will merit habeas corpus relief only in the *exceptional* case where the indictment fails to satisfy the basic due process requirements: notice of the time, place, and essential elements of the crime.") (quoting *Edwards v. Mazzuca,* No. 00–CV–2290, 2007 WL 2994449, at *5 (S.D.N.Y. Oct. 15, 2007) (emphasis added)). [15] Petitioner contends that Indictment Number 6977/2003 omitted the charge of Assault in the First Degree, which was charged in the felony complaint. This claim is not cognizable on federal habeas review. Assuming, *arguendo,* that petitioner is contending he lacked notice of the essential elements of the crime with which he was being charged, this claim is entirely without merit. As respondent points out, there is no provision of law—state or federal—that renders an indictment invalid merely because the indictment fails to charge a crime that was charged in the accusatory instrument (i.e., the felony complaint). In any case, petitioner was tried and convicted on the superseding Indictment Number 6029/2004, which charged petitioner with Assault in the First Degree.

Petitioner's claim that the State superseded Indictment Number 6977/2003 without permission from the court is also not cognizable on federal habeas review, and in any case, is without merit. To the extent this claim is derived from the claim that petitioner raised on direct appeal to the Appellate Division—that the State obtained Indictment Number 6029/2004 in violation of N.Y.Crim. Proc. Law § 210.20(6)—petitioner is raising a claim regarding a violation of state law, which is not cognizable on federal habeas review. Moreover, Indictment Number 6029/2004 satisfied the basic due process requirements by providing notice of the time, place, and essential elements of the crime. *See Nordahl, supra.*

Petitioner's speedy trial claim pursuant to N.Y.Crim. Proc. Law § 30.30 is also a state law claim for which habeas relief does not lie. *See Smith v. Murray,* No. 03–CV–6553L, 2007 WL 2581687, at *6 (W.D.N.Y. Sept. 5, 2007) (holding that a claim based on CPL § 30.30 does not raise a federal constitutional claim upon which federal habeas relief may be granted); *Cooke v. Graham,* 06–CV–3053 (DLI) (RER), 2009 WL 3111790, at *7 (E.D.N.Y. Sept. 28, 2009) (finding petitioner's speedy trial claim based on § 30.30 "not cognizable on federal habeas review"); *Wilson v. Goord,* No. 00 Civ. 4849(LTS), 2004 WL 226149, at *4 (S.D.N.Y. Feb. 6, 2004) (stating that petitioner "fail[s] to raise a constitutional claim that is cognizable on federal habeas corpus review" where he "refers only to his statutory speedy trial right" under § 30.30).

***8** Because these claims do not arise under the Constitution and laws of the United States, they are not cognizable on federal habeas review, and the petition should be denied.

### IV. Petitioner's Remaining Claims

#### A. Right to Counsel

As a threshold matter, "before considering a habeas petition on the merits, it must be established that the petitioner's claim of violation of his right to counsel was exhausted in state court." *Madison v. Burge,* No. 07–CV–342(ARR), 2007 WL 3253568, at *4 (E.D.N.Y. Nov. 1, 2007) (internal citations omitted). "It must be shown that the arguments on which petitioner relies were 'fairly present[ed] [...] to the state courts in order to give the state the "opportunity to pass upon and correct" alleged violations of its prisoners' federal rights.' " *Id.* As was stated above, a § 2254 habeas petition shall not be granted unless the petitioner "has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). In order to exhaust a claim in state court, "a petitioner must present the *substance* of the same federal constitutional claims he raises in his federal petition to the highest court in the state." *Carpenter v. Reynolds,* 212 F.Supp.2d 94, 96 (E.D.N.Y.2002) (emphasis added). Here, petitioner raised the substance of his right to counsel claims on all three grounds raised in this petition in his *pro se* appellate brief to the Appellate Division on his direct appeal, and sought leave to appeal to the Court of Appeals. Therefore, the Court should consider these claims on their merits.

#### 1. Investigatory Lineup

Petitioner argues that his Sixth Amendment right to counsel was violated when he was denied his request for counsel at the investigatory lineup. (Pet. at 6, ECF No. 1.) [16] This claim should be denied. On a petition for federal habeas relief, a district court is "limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle,* 502 U.S. at 68; *see also* 28 U.S.C. § 2254(a). It is firmly established that an individual's right to counsel attaches only "at or after the initiation of adversary judicial criminal proceedings— whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois,* 406 U.S. 682, 689 (1972). Once the right to counsel attaches, the right applies only to "critical" stages of the proceedings. *United States v. Wade,* 388 U.S. 218, 224 (1967). State law determines when adversary judicial proceedings have commenced. *Nimkoff v. Dollhausen,* 751 F.Supp.2d 455, 465 (E.D.N.Y.2010). Under New York law, the filing of an accusatory instrument commences a criminal action. *Id.; see also* N.Y.Crim. Proc. Law. § 100.05.

Here, the challenged lineup occurred prior to the filing of the accusatory instrument—the felony complaint. (Hr'g at 30, 36.) Therefore, petitioner's claim that he was denied counsel in violation of his Constitutional rights is without merit. *See, e.g., Miller v. Smith,* No. 05 CV 5076(ENV), 2010 WL 4961666, at *6 (E.D.N.Y. Dec. 1, 2010) ("Since the subject lineup occurred before petitioner was charged, there is no Sixth Amendment violation."); *Manuel v. Conway,* No. 07–CV–6623, 2010 WL 2104302, at *6 (W.D.N.Y. May 25, 2010) ("proceedings against petitioner were initiated after the lineup[;][a]t that time, petitioner had no Sixth Amendment right to counsel, and petitioner thus cannot establish that the lineup was conducted in violation of his constitutional rights."). Accordingly, the state court's decision was not contrary to or an unreasonable application of clearly established Federal Law and this claim should be denied.

#### 2. September 28, 2003 Arraignment

***9** Petitioner next contends that his right to counsel was violated when Calvin Garber, an unlicensed attorney, represented petitioner at his September 28, 2003 arraignment. (Pet. at 7, ECF No. 1.) Respondent argues that (1) on petitioner's direct appeal, he asserted that the attorney who represented him at his arraignment was someone named Calvin *Gaber,* when in fact Calvin *Garber,* a licensed attorney, was present at the arraignment; [17] and (2) even if Calvin Garber had not been a licensed attorney, petitioner's constitutional right to the assistance of counsel would not have been violated because the initial arraignment in New York is not a critical stage of the criminal proceedings. The Court agrees.

In New York State, the initial arraignment is not a critical stage of the proceedings that requires the presence of counsel. *Holland v. Allard,* No. 04–CV–3521(DRH)(MLO), 2005 WL 2786909, at *7 (E.D.N.Y. Oct. 26, 2005); *see also U.S. ex rel. Guber v. Koson,* 273 F.Supp. 998, 1001 (S.D.N.Y.1967) ("Arraignment is not such a crucial juncture of the proceeding in New York."); *U.S. ex rel. John Hussey v. Fey,* 220 F.Supp. 562, 563 (S.D.N.Y.1963) ("Under New York law, a

defendant suffers no such prejudice, for whatever counsel could have done upon arraignment on defendant's behalf, counsel were free to do thereafter.”). The record does not support petitioner's claim that he was unrepresented at his arraignment. (*See* Transcript of Proceedings on Sept. 28, 2003, ECF No. 5–1, Ex. 5.) However, even if petitioner had not been afforded counsel at his initial arraignment, as it is not a critical stage of the proceedings, the state court's decision was not contrary to or an unreasonable application of clearly established Federal law. Therefore, this claim should be denied.

### 3. In–Court Proceedings on March 5, 2004

Petitioner also claims that he was deprived of his right to counsel when his attorney was not present on March 5, 2004. (Pet. at 9–10, ECF No. 1.) Respondent in turn argues that although petitioner's retained counsel did not appear in court on that date, another attorney, Mario Romano, Esq., represented petitioner on that date in lieu of his retained counsel.[18]

The record reflects that petitioner was represented by counsel—Mario Romano, Esq.—at the March 5, 2004 hearing.[19] Even if petitioner was without counsel, the March 5, 2004 hearing was not a critical stage of the proceeding that would warrant the right to counsel. *Wade,* 388 U.S. at 224. Rather, the proceeding was limited to the court providing the prosecutor with a copy of its decision on defendant's motion to dismiss the indictment, and adjourning the case to March 19, 2004, for trial—it was purely procedural. *Carpenter v. Conway,* No. 07–CV–3602(JS), 2011 WL 795860, at *9 (E.D.N.Y. Feb. 25, 2011) (finding that the Sixth Amendment “only guarantees the right to counsel when necessary to assure a meaningful defense[,]” not for procedural matters). Accordingly, the state court's decision that petitioner was not deprived of his right to counsel on March 5, 2004 was not contrary to or an unreasonable application of clearly established Federal Law and this claim should be denied.

### B. Ineffective Assistance of Counsel

Petitioner raises several ineffective assistance of counsel claims.[20] First, petitioner claims that his right to effective assistance of counsel was violated when he was denied his request for new counsel on March 13, 2006. This claim is without merit.

***10** The Sixth Amendment guarantees the right to competent counsel, but an “indigent defendant has no right to choose his counsel.” *Montejo v. Louisiana,* 556 U.S. 778, 784 (2009); *see also Nelson v. Brown,* No. 07 Civ. 3568(JSR)(HBP), 2009 WL 6340020, at *12 (S.D.N.Y. July 1, 2009) (“ '... the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.”) (internal citations omitted); *Felder v. Goord,* 564 F. Supp.2d 201, 220 (S.D.N.Y.2008) (“[I]ndigent defendants do not have a veto over who is appointed to defend them, provided that appointed counsel's representation is adequate.”). Where a defendant requests substitute counsel on the eve of trial or during trial, “the defendant must show good cause, such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict.” *Lopez v. Graham,* No. 10– CV–0468(NGG), 2012 WL 1865502, at *6 (E.D.N.Y. May 22, 2012) (quoting *McKee v. Harris,* 649 F.2d 927, 931 (2d Cir.1981) (internal quotation marks and alteration omitted)); *Pagan v. Brown*, 07–CV–0453(JS)(WDW), 2011 WL 3235769, at *2 (E.D.N.Y. July 28, 2011) (“[R]equests made on the eve of trial should only be granted in ‘unusual circumstances,’ such as a ‘complete breakdown of communication or an irreconcilable conflict.” ’ (quoting *United States v. Miranda,* 152 F.3d 921 (2d Cir.1998))). “Personal dislike and strategic disagreement alone are insufficient.” *Barrett v. Garvin,* No. 98 CIV. 1532(NRB), 2000 WL 1364352, at *4 (S.D.N.Y. Sept. 21, 2000) (internal citations omitted).

Here, on the eve of the trial, petitioner expressed a strategic disagreement with his counsel, Labe Richman: “I'm not proceeding with Mr. Richman. I don't think the Court should force me to proceed with that attorney I don't want to proceed with.” (VD. at 2–3.)[21] Petitioner stated that counsel was unwilling to include issues petitioner wished to raise in a motion that counsel filed. (*Id.* at 4.) The Court told petitioner: “[w]hatever the attorney's advice might be, at the end of the day the defendant has the right to make, such tactical decisions about whether the defendant chooses to testify or not ... *[a]s to legal issues, that's the bailiwick of the attorney and not the defendant*.” (*Id.*) (emphasis added). The record reflects that petitioner's dissatisfaction with counsel's representation stemmed from disagreements regarding strategy, not from a complete breakdown of

communication or an irreconcilable conflict. Thus, the state court's decision not to replace petitioner's attorney on the eve of trial was not contrary to or an unreasonable application of clearly established Federal law.

Next, petitioner contends that his trial counsel was ineffective, again without specifying grounds. This claim is presumably the same claim raised in petitioner's *pro se* brief to the Appellate Division. However, to establish a Sixth Amendment ineffective assistance of counsel claim, petitioner must demonstrate both that (1) that counsel's performance was "deficient" as measured by an "objective standard of reasonableness," and (2) that "the deficient performance prejudiced the defense." *Strickland v. Washington,* 466 U.S. 668, 687–88 (1984). Reasonable probability is "probability sufficient to undermine confidence in the outcome" of the trial. Id. at 694. Considerable deference is accorded to a counsel's performance, as counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690; *see also Bierenbaum v. Graham,* 607 F.3d 36, 50–51 (2d Cir.2010) (stating that the *Strickland* standard is "highly deferential" to eliminate the "distorting effects of hindsight"). The "highly deferential" *Strickland* standard is made "doubly" so on habeas review, as the AEDPA requires deference to the state court's ruling on this claim. *Harrington v. Richter,* 562 U.S. 86, 105, 131 S.Ct. 770, 788 (2011).

***11** Here, petitioner's claims fail because he cannot show that prejudice resulted from any error that his counsel may have committed by failing to raise that he was denied the right to counsel at the investigatory lineup, at the March 5, 2004 proceeding, and at his arraignment; and for failing to raise, in support of petitioner's speedy trial motion, that the superseding indictment was obtained in violation of state law. As previously stated, petitioner's claims are without merit and do not warrant habeas relief.[22] Petitioner has failed to demonstrate that the state court's decision on his ineffective assistance of counsel claims was contrary to or an unreasonable application of Federal law. Accordingly, these claims should be denied.

### C. Ineffective Assistance of Appellate Counsel

Ineffective assistance of appellate counsel claims are also evaluated under the *Strickland* standard. Petitioner asserts that his right to effective assistance of appellate counsel was violated because his appellate counsel failed to raise on appeal the issues that petitioner raised in his *pro se* supplemental brief. (Pet. at 14, ECF No. 1.) Respondent states that this claim is unexhausted, but that it should nonetheless be denied. The Court agrees.

Petitioner did not raise his ineffective assistance of appellate counsel claim in the proper manner by filing a writ of error *coram nobis. Beck v. Conway,* No. 11–CV–0060(SJF), 2014 WL 774967, at *4 (E.D.N.Y. Feb. 25, 2014); *Beuther v. Lefevre,* No. 88 C 2397, 1989 WL 18726, at *1 (E.D.N.Y. Feb. 15, 1989) ("[T]he proper vehicle for raising [an ineffective assistance of appellate counsel] claim before the state court is a writ of error *coram nobis* to the Appellate Division.") (citing *People v. Bachert,* 69 N.Y.2d 593, 596 (1987)). Under New York law, there is no time limit for an application for a writ of error *coram nobis. Beck.* 2014 WL 774967, at *4. Since petitioner did not bring a *coram nobis* proceeding, petitioner's ineffective assistance of appellate counsel claim is unexhausted.

However, even if the claim was exhausted, it is without merit. "A claim for ineffective assistance of appellate counsel is evaluated under the same standard as a claim for ineffective assistance of trial counsel." *Pain v. New York,* 04–CV–1232(NG)(LB), 2007 WL 2902955, at *7 (E.D.N.Y. Oct. 1, 2007) (citing *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir.1994)). "A petitioner alleging ineffective assistance of appellate counsel must prove both that the appellate counsel was objectively unreasonable in failing to raise a particular issue on appeal, and that absent counsel's deficient performance, there was a reasonable probability that defendant's appeal would have been successful." *Id.* (citing *Smith v. Robbins,* 528 U.S. 259, 285 (2000) (applying the *Strickland* test to appellate counsel's performance)). Appellate counsel has no duty to raise every nonfrivolous claim that could be made. *Mayo,* 13 F.3d at 533. Rather, a habeas petitioner claiming ineffective assistance of appellate counsel based on failure to raise certain issues must demonstrate that counsel 'omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker.' " *Farr v. Greiner,* at *36 (E.D.N.Y. Apr. 10, 2007) (quoting *Mayo,* 13 F.3d at 533); *Smith,* 528 U.S. at 288 (a petitioner may establish constitutionally ineffective assistance of counsel only by showing that appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker.").

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

***12** Here, petitioner's appellate counsel filed a brief raising four issues. (*See* Section IV, *supra.*)[23] Appellate counsel was not objectively unreasonable in choosing to raise the claims he did and in advising petitioner to raise the other claims in his *pro se* supplemental brief. Therefore, even though petitioner failed to exhaust his ineffective assistance of appellate counsel claim, this claim should be denied under 22 U.S.C. § 2254(b)(2).

### *CONCLUSION*

Accordingly, it is respectfully recommended that petitioner's application for a writ of habeas corpus should be denied. As petitioner has not made a substantial showing of the denial of any constitutional right, it is recommended that no certificate of appealability should be issued. 28 U.S.C. § 2253; *see Lozada v. United States,* 107 F.3d 1011, 1017 (2d Cir.1997), *abrogated on other grounds, United States v. Perez,* 129 F.3d 255, 259–60 (2d Cir.1997) (discussing the standard for issuing a certificate of appealability); *see also Lucidore v. N.Y. State Div. of Parole,* 209 F.3d 107, 112–13 (2d Cir.2000), *cert. denied,* 531 U.S. 873 (2000). It is further recommended that for the purposes of an appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a) that any appeal from a judgment denying this petition would not be taken in good faith. *Coppedge v. United States,* 369 U.S. 438 (1962).

### FILING OBJECTIONS TO THE REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. *See also* Fed.R.Civ.P. 6. Any request for an extension of time in which to file objections must be made within the fourteen-day period. Failure to timely file an objection to the Report and Recommendation generally waives any further judicial review. *DeLeon v. Strack,* 234 F.3d 84, 86 (2d Cir.2000); *Spence v. Superintendent, Great Meadow Corr. Fac.,* 219 F.3d 162, 174 (2d Cir.2000); *see also Thomas v. Arn,* 474 U.S. 140 (1985).

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 9901710

## Footnotes

1 The Court notes that the proper respondent in this case is the official who has custody of the petitioner, not the People of the State of New York. *See* 28 U.S.C. § 2243.

2 “Tr.” refers to the transcript of the jury trial held in the Supreme Court of the State of New York, King's County, on March 14 through March 20, 2006. (ECF No. 5–1.)

3 In a Decision and Order dated March 5, 2004, the Supreme Court, Kings County, dismissed the count in Indictment Number 6977/2003 charging petitioner with the attempted murder of Karen Williams, on the ground that the grand jury evidence was not legally sufficient to support that count, but held that there was sufficient evidence to support the other counts in the indictment. (*See* ECF No. 5–1, Att. 3.)

4 "Hr'g" refers to the transcript of the pre-trial hearing conducted on Decem?er 8, 20~5. (ECF No. 5-1, Ex. A.)

5 The Hearing transcript states that three lineups were conducted, but the Tnal transcnpt only refers to the one lineup that was viewed by Karen Williams.

6 N.Y. Crim. Proc. Law§ 440.10(2)(b) provides that a court must deny a motion to vacate a judgment when "the judgment is, at the time of the motion appealable ... and sufficient facts appear on the record with respect to the

ground or issue raised upon the motion to permit adequate review thereof upon such an appeal." (emphasis added).

7 In support of his claim that he was denied the right to counsel with respect to the lineup, petitioner relies solely on the facts alleged in his pro se supplemental brief and on the two police reports prepared by Detective Siegel, dated September 27, 2003.

8 Petitioner moved in the Appellate Division and attached a copy of Detective Siegel's police report which stated, inter a/ia, that petitioner "would not answer any questions from the police with [sic] his attorney"; that the detective told petitioner that the detective would contact petitioner's attorney; that at approximately 3 :00 am, the detective gave petitioner "the opportunity to call his attomey[']s cell phone number and notify the attorney regarding his arrest." (See Defendant's Motion, dated Dec. 18, 2008, and police report prepared by Detective Siegel, attached to Resp's Opp. to Habeas Pet., Atts. 12 and 13.)

9 Petitioner alleges that his counsel was ineffective for failing to raise (I) his request for counsel at the lineup at both the Wade hearing and at trial; (2) that the prosecutor purportedly made a false assertion regarding petitioner's representation by counsel at the March 5, 2004 hearing; and (3) that the superseding indictment was obtained in violation of State law in support of petitioner's speedy trial motion.

10 Petitioner alleges violations of his right to a speedy trial on the grounds that (1) the initial indictment (Number 6977 /2003) was jurisdictionally defective and thus the State could not properly announce its readiness for trial; and (2) the superseding indictment was obtained in violation of State law.

11 The Court notes that, while this petition was pending, the Appellate Division's holding that a defendant can simultaneously be convicted of separate charges of intentional and reckless assault for the same conduct was abrogated by the New York Court of Appeals in People v. Dubarry, 25 N.Y.3d 161 (2015). Even if the holding in Dubarry is found to be retroactive and would apply to petitioner's case, this would be a state law claim that r:etitioner would have to pursue in the state court.

12 Petitioner additionally argues that his due process rights were violated "when the court proceeded at a critical stage of the proceedings without petitioner [sic] counsel." (*See* Pet. at 10, ECF No 1.)

13 Petitioner raised the same claim in his *pro se* appellate brief and cites to N.Y.Crim. Proc. § 210.20(6).

14 Petitioner claims: (1) Indictment Number 6977/2003 was jurisdictionally defective, and thus petitioner's right to be prosecuted by a valid indictment was violated; and (2) the State improperly superseded Indictment number 6977/2003 because it obtained Indictment Number 6029/2004 (“superseding indictment”) in violation of N.Y.Crim. Proc. Law § 210.20(6).

15 The Clerk of Court is directed to send petitioner the attached copies of all unreported cases cited herein.

16 There is no record evidence that petitioner ever requested counsel at the September 27, 2003 lineup.

17 *See* Transcript of Proceedings on Sept. 28, 2003, ECF No. 5–1, Ex. 5.

18 “Moreover, defense counsel was not present for the calendar call, having faxed a letter of engagement to the Court. Mario Romano of the 18b panel covered the case for the defense.” (*See* ECF No. 12–2, Exhibit O, excerpt of People's Memorandum of Law in Opposition to Defendant's Speedy Trial Motion, dated Oct. 21, 2005.)

19 19 (ECF No. 5–1, Att. 15.)

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

20 Although petitioner raised his ineffective assistance of counsel claim through the appropriate mechanisms—first by filing a 440 motion, and then by appealing it to the highest state court capable of review—petitioner did not allege with specificity the basis for the claim. Respondent contends that petitioner now seeks habeas relief based on off-the-record claims that should have been raised in a 440 motion, and thus, are unexhausted. It is unclear whether petitioner exhausted his state court remedies by fairly presenting each of his ineffective assistance claims to the New York Court of Appeals. However, whether or not these claims were fairly presented to the state court, they should be denied. *See* 28 U.S.C. § 2254(b)(2) (granting federal courts discretion to deny a claim on the merits even if not properly exhausted).

21 "VD." refers to the transcript of the Voir Dire proceedings conducted on March 13, 2006. (ECF No. 5–1.)

22 *See* Sections IV(A)(1)-(3), *supra see also* *Erdheim v. Greiner,* 22 F.Supp.2d 291, 295 (S.D.N.Y.1998) ("Since petitioner has not proved that he had a meritorious speedy trial claim, there is no reasonable probability that his counsel's failure to raise the motion affected the outcome of the case. Consequently, his ineffective assistance of counsel claim fails.")

23 In a letter dated November 20, 2007, petitioner's appellate counsel, Josh Levine, sent petitioner a letter detailing the claims that he would raise on appeal to the Appellate Division, Second Department. (ECF No. 12–4, Exhibit U.) Appellate counsel noted that he would not be raising certain issues that petitioner asked him to raise, including: § 30.30 arguments, that his lineup was conducted in violation of his right to counsel, and that the superseding indictment was not filed in a timely fashion (*Id.*) Levine further advised petitioner of his right to raise those claims in a *pro se* supplemental brief. (*Id.*)

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 270079
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Houston DOUGLAS, Petitioner,
v.
PEOPLE OF THE STATE OF NEW YORK, Respondent.

12-CV-3839 (NGG) (LB)
|
Signed January 20, 2016
|
Filed 01/21/2016

**Attorneys and Law Firms**

Houston Douglas, Sonyea, NY, pro se.

Kings County District Attorneys Office, New York State Attorney Generals Office, Seth M. Lieberman, New York State Attorney Generals Office, Brooklyn, NY, for Respondent.

**ORDER**

NICHOLAS G. GARAUFIS, United States District Judge.

***1** On August 1, 2012, Petitioner Houston Douglas ("Petitioner") brought this pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging a 2006 conviction from the Supreme Court of the State of New York, Kings County. (Pet. (Dkt. 1).) Respondent filed an opposition brief on October 12, 2012 (Resp. to Order to Show Cause (Dkt. 5)), [1] and Petitioner filed a reply on April 1, 2013 (Pet'r's Reply (Dkt. 12)). By Order dated May 15, 2014, the court referred the Petition to Magistrate Judge Lois Bloom for a Report and Recommendation ("R&R") pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b)(1). (May 15, 2014, Order (Dkt. 15).)

On November 3, 2015, Judge Bloom issued an R&R recommending that the court deny the Petition. (R&R (Dkt. 17) at 22.) On December 28, 2015, Petitioner filed an objection to Judge Bloom's R&R. [2] (Obj. to R&R ("Pl.'s Obj.") (Dkt. 20).) For the reasons set forth below, Plaintiff's objections are OVERRULED and the R&R is ADOPTED IN FULL.

In reviewing the R&R of a dispositive matter from a magistrate judge, the district court "may adopt those portions of the Report to which no objections have been made and which are not facially erroneous." La Torres v. Walker, 216 F. Supp. 2d 157, 159 (S.D.N.Y. 2000); see also Gesualdi v. Mack Excavation & Trailer Serv., Inc., No. 09-CV-2502 (KAM) (JO), 2010 WL 985294, at *1 (E.D.N.Y. Mar. 15, 2010) ("Where no objection to the Report and Recommendation has been filed, the district court need only satisfy itself that there is no clear error on the face of the record." (internal quotation marks and citation omitted)). The district court must review de novo "those portions of the report ... to which objection is made." 28 U.S.C. § 636(b)(1).

However, to obtain this de novo review, an objecting party "must point out the specific portions of the report and recommendation to which they object." U.S. Flour Corp. v. Certified Bakery, Inc., No. 10-CV-2522 (JS) (WDW), 2012 WL 728227, at *2 (E.D.N.Y. Mar. 6, 2012); see also Fed. R. Civ. P. 72(b)(2) ("[A] party may serve and file specific written objections to the [R&R]."). If a party "makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error." Pall Corp. v. Entegris, Inc., 249 F.R.D. 48, 51 (E.D.N.Y. 2008) (internal quotation marks and citation omitted): see also Mario v. P&C Food Mkts., Inc., 313 F.3d 758, 766 (2d Cir. 2002) (holding that plaintiffs objection to an R&R was "not specific enough" to "constitute an adequate objection under ... Fed. R. Civ. P. 72(b)"). "A decision is 'clearly erroneous' when the Court is, 'upon review of the entire record, left with the definite and firm conviction that a mistake has been committed.' " DiPilato v. 7-Eleven, Inc., 662 F. Supp. 2d 333, 339-40 (S.D.N.Y. 2009) (quoting United States v. Snow, 462 F.3d 55, 72 (2d Cir. 2006)).

***2** Where a pro se party objects to an R&R, "the court reads his objections 'liberally and will interpret them to raise the strongest arguments that they suggest.' " Velasquez v. Metro Fuel Oil Corp., 12 F. Supp. 3d 387, 398 (E.D.N.Y. 2014) (quoting Burgos v. Hopkins, 14 F.3d 787, 780 (2d Cir. 1994)). However, a court "need not argue a pro se litigant's case nor create a case for the pro se which does not exist." Molina v. State of N.Y., 956 F. Supp. 257, 259 (E.D.N.Y. 1995).

Plaintiff's objections are entitled only to clear error review because they are either conclusory or are simply reiterations of his original arguments. First, Petitioner asserts that Judge

Bloom is biased and prejudiced against him, and that she should have recused herself from this case. ( Pl.'s Obj. at 1.) This objection is conclusory, as Petitioner does not present any explanation or evidence in support of his allegation. See Person v. General Motors Corp., 730 F. Supp. 516, 518 (W.D.N. Y. 1990) ("In general, unsubstantiated suggestions of personal bias or prejudice do not mandate recusal."). Petitioner's other objections simply repeat his arguments that he was deprived of his Sixth Amendment right to counsel. (See Pl.'s Obj. at 2; Pet. at 6-7, 9-10.) Judge Bloom fully addressed these arguments in her well-reasoned R&R. (See R&R at 14-20.) The court therefore has reviewed Judge Bloom's R&R for clear error and finds none. See Pall Corp., 249 F.R.D. at 51 ("When a party makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error." (internal quotation marks and citation omitted)). In addition, even under de novo review, the court finds no error.

Finding no error, the court OVERRULES Petitioner's objections, ADOPTS IN FULL the R&R and DENIES Petitioner's Petition for a writ of habeas corpus. See Porter v. Potter, 219 F. App'x 112 (2d Cir. 2007) (summary order). Because Petitioner has not made a substantial showing of the denial of a constitutional right, no certificate of appealability shall issue. See 28 U.S.C. § 2253(c)(2). The court certifies pursuant to 28 U.S.C. § 1915(a) that an appeal from this judgment would not be taken in good faith, and in forma pauperis status is therefore denied for the purpose of any appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962). The Clerk of Court is respectfully directed to enter judgment and close the case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 270079

## Footnotes

1 The proper respondent in this case is the official who has custody of Petitioner, not the People of the State of New York. See 28 U.S.C. § 2243. Here, the District Attorney of Kings County represented Respondent by agreement with the Attorney General of the State of New York. (Resp. to Order to Show Cause (Dkt. 5) ¶ 12.)

2 The court granted Petitioner an extension of time to file objections to the R&R (Order (Dkt. 19).)

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

112 Fed.Appx. 85
This case was not selected for publication in the Federal Reporter.
United States Court of Appeals, Second Circuit.

Richard FAUCONIER, Plaintiff–Appellant,
v.
COMMITTEE ON SPECIAL EDUCATION, DISTRICT 3, NEW YORK CITY BOARD OF EDUCATION, Defendant–Appellee.

No. 03–7793–CV.
|
Sept. 30, 2004.

**Synopsis**
**Background:** On behalf of himself and son, noncustodial parent brought pro se action against special education committee under Individuals with Disabilities Act (IDEA), challenging denial of mainstream educational placement for son. Committee moved to dismiss. The United States District Court for the Southern District of New York, Casey, J., 2003 WL 21345549, dismissed complaint. Parent appealed.

**Holdings:** The Court of Appeals held that:

[1] parent, who was not attorney, could not assert claims on son's behalf, and

[2] claims implicating parent's rights were barred by *Rooker-Feldman* doctrine.

Affirmed.

West Headnotes (2)

[1] **Education** Judicial Review or Intervention
**Infants** Schools and education

Nonattorney parent could not assert claims on behalf of son in action brought under Individuals with Disabilities Education Act (IDEA). Individuals with Disabilities Education Act, § 601 et seq., as amended, 20 U.S.C.A. § 1400 et seq.

8 Cases that cite this headnote

[2] **Courts** Constitutional questions, civil rights, and discrimination in general

To the extent that claims asserted by noncustodial father against special education committee pursuant to Individuals with Disabilities Education Act (IDEA) implicated father's own rights, they were barred by *Rooker-Feldman* doctrine, which generally barred federal court review of state-court judgments, inasmuch as any other outcome would presume that father possessed authority, as noncustodial parent, to litigate claims under IDEA on son's behalf, thereby calling into question validity of prior state-court determination holding otherwise. Individuals with Disabilities Education Act, § 601 et seq., as amended, 20 U.S.C.A. § 1400 et seq.

1 Case that cites this headnote

***85** Appeal from the United States District Court for the Southern District of New York (Casey, J.).
***86** UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of the said district court be and it hereby is AFFIRMED.

**Attorneys and Law Firms**

Richard Fauconier, Troy, NY, for Appellant, pro se.

Victoria Scalzo, Assistant Corporation Counsel, Corporation Counsel, City of New York, New York, NY, for Appellees.

PRESENT: FEINBERG, CARDAMONE, and B.D. PARKER, Circuit Judges.

SUMMARY ORDER

****1** Richard Fauconier, *pro se,* appeals the District Court's dismissal of his complaint, in which he had alleged various claims on behalf of his son as well as on his own behalf under

the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.* Familiarity with the underlying facts, procedural context, and specification of appellate issues is assumed.

We review *de novo* the District Court's dismissal of Fauconier's complaint. *Rombach v. Chang,* 355 F.3d 164, 169 (2d Cir.2004) (dismissal under Fed.R.Civ.P. 12(b)(6)); *see also Mackensworth v. S.S. Am. Merch.,* 28 F.3d 246, 252 (2d Cir.1994) (dismissal for lack of jurisdiction). Because "most *pro se* plaintiffs lack familiarity with the formalities of pleading requirements, we must construe *pro se* complaints liberally, applying a more flexible standard to evaluate their sufficiency than we would when reviewing a complaint submitted by counsel." *Lerman v. Bd. of Elections,* 232 F.3d 135, 140 (2d Cir.2000).

**[1]** **[2]** To the extent Fauconier raised claims on behalf of his son, the claims were properly dismissed because, pursuant to *Cheung v. Youth Orchestra Found.,* 906 F.2d 59, 61 (2d Cir.1990), a federal court has an affirmative duty to enforce the rule that "a non-attorney parent must be represented by counsel in bringing an action on behalf of his or her child." To the extent Fauconier's claims implicated his own rights, they were properly dismissed as barred by the *Rooker–Feldman* doctrine, because any other outcome would have presumed that Fauconier possessed the authority, as a non-custodial parent, to litigate claims under the IDEA on behalf of his son. Such a result would have called into question the validity of a prior state court determination holding otherwise. *See Phifer v. City of New York,* 289 F.3d 49, 55 (2d Cir.2002) (noting that the *Rooker–Feldman* doctrine "holds that inferior federal courts lack subject matter jurisdiction over cases that effectively seek review of judgments of state courts and that federal review, if any, can occur only by way of a certiorari petition to the Supreme Court") (citations and internal quotation marks omitted); *see also D.C. Ct. of App. v. Feldman,* 460 U.S. 462, 482–86 & n. 16, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fid. Trust Co.,* 263 U.S. 413, 415–16, 44 S.Ct. 149, 68 L.Ed. 362 (1923).

****2** Accordingly, the decision of the District Court is AFFIRMED.

## All Citations

112 Fed.Appx. 85, 2004 WL 2278541, 193 Ed. Law Rep. 136

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 3336448
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Harry **GASTON**, Plaintiff,
v.
P.O. **RUIZ**, P.O. John Doe, P.O. Jane Doe,
and the City of New York, Defendants.

**17**
-
**CV**
-
**1252**
(NGG) (CLP)
|
Signed 07/03/**2018**
|
Filed 07/06/**2018**

**Attorneys and Law Firms**

Alan D. Levine, Law Offices of Alan D. Levine, Kew Gardens, NY, for Plaintiff.

Megan Patricia Conger, NYC Law Department Office of the Corporation Counsel, Suzanna Publicker Mettham, New York City Law Department, New York, NY, for Defendants.

**MEMORANDUM & ORDER**

NICHOLAS G. GARAUFIS, United States District Judge

***1** Plaintiff Harry **Gaston** brings this action under 42 U.S.C. § 1983 against Defendants the City of New York (the "City") and three individual police officers (the "Individual Defendants"). (Compl. (Dkt. 1).) Plaintiff asserts two counts of false arrest against the Individual Defendants and one claim of municipal liability against the City. (Id. ¶¶ 12-73.) Before the court is Defendants' motion to dismiss Plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Notice of Mot. to Dismiss (Dkt. 15-1); see Mem. in Supp. of Mot. to Dismiss ("Mem.") (Dkt. 15).) For the reasons that follow, the court GRANTS Defendants' motion to dismiss.

## I. BACKGROUND

### A. Facts

The following facts are drawn from Plaintiff's complaint and are assumed to be true for purposes of the motion to dismiss.

At approximately 2:30 A.M. on December 11, 2015, Plaintiff, who was then living at a homeless shelter located at 8 East Third Street in Manhattan, was arrested at the shelter by Officer "Jane Doe." (Compl. ¶¶ 13-14.) Officer Jane Doe told Plaintiff that he was in violation of a bench warrant issued by the Queens Criminal Court on March 27, 1992 (the "Bench Warrant"). (Id. ¶ 15.) Officer Jane Doe, along with other officers who are not party to this case, then transported Plaintiff to the Queens Criminal Court. (Id. ¶ 16.) When Plaintiff's case was called, an assistant district attorney "informed the court that the warrant on which [P]laintiff had been arrested was not for him, but, rather, was for another person." (Id. ¶ 17.) Plaintiff was released from custody at approximately 1:00 P.M. that day, about eleven hours after his arrest. (Id. ¶¶ 18-19.) Before leaving the courthouse, a clerk of the court provided Plaintiff with a signed document (the "Criminal Court Letter") stating, "Please be advised that the Court has determined that the bearer of this letter, **Gaston**, Harry is not the defendant arrested under docket 92Q000805." (Id. ¶¶ 20-21; Dec. 11, 2015, Letter from Queens Crim. Ct. ("Dec. 11, 2015, Letter") (Dkt. 1-3).)

Approximately one year later, on or about November 17, 2016, at approximately 12:30 A.M., Plaintiff was again arrested. (Compl. ¶ 27.) Plaintiff had attempted to use his MetroCard to enter the subway at Jamaica Center; when his card did not work, he used the emergency exit to access the system, whereupon Officer "John Doe" stopped Plaintiff and asked for his identification. (Id. ¶¶ 27-31.) After Plaintiff produced his identification, Officer John Doe said that he would not arrest Plaintiff if no outstanding warrant for his arrest came up on the computer. (Id. ¶¶ 32-33.) Officer John Doe did, however, find on his computer that there was an outstanding bench warrant for Plaintiff. (Id. ¶ 34.) Officer John Doe called over Officer **Ruiz**, who was also present in the subway station, to inform him of what he found on the computer. (Id. ¶ 35.) Plaintiff told both officers that he had a document in his possession attesting to the fact that the warrant had not been issued for him. (Id. ¶ 36.) Officer John Doe allegedly said that he was not interested in seeing the document, and proceeded to place Plaintiff under arrest. (Id. ¶¶ 37-38.) As Officer John Doe was placing Plaintiff in handcuffs, he told him that he "should have taken care of the warrant since its issuance in 1992," to which Plaintiff responded that he had. (Id. ¶¶ 39-40.) Still at the subway station, Officer John Doe saw on the computer that

Plaintiff had "been arrested on three prior occasions for failing to comply with the aforementioned warrant." (Id. ¶ 41.) Plaintiff told the officers to look in his wallet, where they found and read the Criminal Court Letter. (Id. ¶¶ 42-43.) Nevertheless, Officer John Doe allegedly told Plaintiff to "tell it to the judge" and refused to release him. (Id. ¶ 44.) The officers transported Plaintiff to "the stationhouse of District 20, from where [P]laintiff was later transported to Queens Central Booking." (Id. ¶ 46.) On November 18, 2016, Plaintiff appeared before a Queens County Criminal Court judge who, "realizing that [Plaintiff] was not the subject of the warrant on which he had now been arrested for the fourth time, dismissed the warrant." (Id. ¶ 47.) Plaintiff also pleaded guilty to one charge of disorderly conduct. (Certificate of Disposition (Dkt. 15-7); see Pl. Mem. of Law in Opp'n to Mot ("Pl. Opp'n") (Dkt. 16) at ECF p.4.) Plaintiff attests that, by the time of his release, he had been in custody for approximately thirty-nine hours. (Compl. ¶ 49.) According to information in the New York City Police Department's (the "NYPD") Online Prisoner Arraignment Lookup (the "OLPA"), however, Plaintiff only spent 12 hours and 22 minutes in custody following the November 17, 2016, arrest. (See OLPA Report (Dkt. 15-6).)

### B. Procedural History

***2** Plaintiff commenced this action on March 6, 2017. (Compl.) In the complaint, he alleges that the Individual Defendants violated his constitutional right to be free from false arrest on December 11, 2015, and November 17, 2016. (Id. ¶¶ 23-24, 50-51). In addition, he brings a claim of municipal liability against the City, claiming that the NYPD's alleged failure to use the New York State Unified Court System's Criminal Record Information and Management System ("CRIMS") to check for outstanding warrants, and the NYPD's reliance on outdated information, taken together, constitute a policy, practice, and custom of the City that violated Plaintiff's right to be arrested only with probable cause. (Id. ¶¶ 54-73.)

Defendants now move for the dismissal of the complaint on all counts. (Mem.) First, they state that Plaintiff's claims are barred by the probable cause that existed for both arrests. (Id. at 5-8.) Second, they state that Plaintiff's claims stemming from his November 17, 2015, arrest are barred by his subsequent guilty plea for disorderly conduct. (Id. at 9-10.) Third, they contend that the Individual Defendants are, in any event, entitled to qualified immunity. (Id. at 10-13.) Finally, they argue that Plaintiff has failed to properly state a claim for municipal liability under Monell v. Department of Social Services, 436 U.S. 658 (1978). (Mem. at 13-16.)

## II. LEGAL STANDARDS

The purpose of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is to test the legal sufficiency of a plaintiff's claims for relief. Patane v. Clark, 508 F.3d 106, 112-13 (2d Cir. 2007). A complaint will survive a motion to dismiss if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007) ). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.

When considering a motion to dismiss for failure to state a claim, the court must accept as true all allegations of fact in the complaint and draw all reasonable inferences in favor of the plaintiff. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). "In determining the adequacy of the complaint, the court may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint." Subaru Distribs. Corp. v. Subaru of Am., Inc., 425 F.3d 119, 122 (2d Cir. 2005).

## III. DISCUSSION

### A. Consideration of Extrinsic Documents

When considering a Rule 12(b)(6) motion to dismiss, the court may consider only limited materials, including "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010). The court may also consider documents that are "integral" to the complaint, in that the complaint "relies heavily upon [their] terms and effect," so long as these documents are undisputedly authentic and accurate. Id. (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006) ). Additionally, the court may consider "public records of which the court could take judicial notice." Mangiafico, 471 F.3d at 398; see Smart v. Goord, 441 F. Supp. 2d 631, 637 (S.D.N.Y. 2006) ("When ruling on a motion to dismiss, the Court may take judicial notice of records and reports of administrative bodies, items in the record of the case, matters of general public record, and copies of documents attached to the complaint."). "When matters outside the pleadings are presented in response to a 12(b)(6) motion, a district court must either exclude the additional

material and decide the motion on the complaint alone or convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material." Friedl v. City of New York, 210 F.3d 79, 83 (2d Cir. 2000) (alteration adopted) (quotation marks omitted).

***3** If, on a motion to dismiss, the court must "rely on the extrinsic materials, the proper course is to convert the motion to a motion for summary judgment ..., after providing notice to the parties and an opportunity to be heard." Nicosia v. Amazon.com, Inc., 834 F.3d 220, 231 (2d Cir. 2016).

Plaintiff argues that the court should deny Defendants' motion to dismiss as "improperly brought" because the motion includes extrinsic material that "goes well beyond the four corners of [Plaintiff's] complaint." (Pl. Opp'n at ECF p.4; see id. at ECF pp.2-4.) In particular, Plaintiff objects to Defendants' use of "a partially redacted copy of what purports to be a bench warrant for [P]laintiff, a [NYPD] OLPA Report, a certificate of disposition, and, most egregiously, the entire transcript of [P]laintiff's testimony at a hearing held pursuant to General Municipal Law § 50-h." (Id. at 3.)

First, the court takes judicial notice of the Bench Warrant, the OLPA Report, and the certificate of disposition. It is well established that these documents are matters of public record and, as such, the court may consider them on a motion to dismiss. See, e.g., Bryant v. Rourke, No. 15-CV-5564 (SJF) (GRB), 2017 WL 1318545, at *3 (Feb. 8, 2017) (report and recommendation); Harris v. Nassau County, No. 13-CV-4728 (NGG), 2016 WL 3023265, at *3-4 (E.D.N.Y. May 24, 2016); Smith v. City of New York, No. 12-CV-4572 (KPF), 2013 WL 6158485, at *1 (S.D.N.Y. Nov. 25, 2013); see also Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004) ("[Courts] may also look to public records ... in deciding a motion to dismiss.").

By contrast, the court declines to consider the transcript of Plaintiff's 50-h hearing testimony on the instant motion to dismiss. Unlike arrest warrants and other police documents, 50-h hearings are not matters of public record. See Bissinger v. City of New York, No. 06-CV-2325 (WHP), 2007 WL 2826756, at *2 n.l (S.D.N.Y. Sept. 24, 2007). The court may thus only consider the transcript if the complaint "relies heavily upon its terms and effect." See Difolco, 622 F.3d at 111. Courts routinely consider 50-h transcripts at the motion-to-dismiss stage where "both parties have relied upon these extrinsic materials in their submissions." See, e.g., Harley v. City of New York, No. 14-CV-5452 (PKC), 2016 WL 552477, at *3 (E.D.N.Y. Feb. 10, 2016); Dellate v. Great Neck Union Free Sch. Dist., No. 09-CV-2567 (AKT), 2010 WL 3924863, at *4 (E.D.N.Y. Sept. 30, 2010), aff'd, 448 F. App'x 164 (2d Cir. 2012). Here, however, the text of Plaintiff's complaint contains no mention of the 50-h transcript and there is no reason to believe that Plaintiff relied on the transcript in filing the complaint. See Weaver v. City of New York, No. 13-CV-20 (CBA), 2014 WL 950041, at *4 (E.D.N.Y. Mar. 11, 2014); see also id. at *4 (collecting cases). The court will therefore not consider Plaintiff's 50-h testimony in deciding this motion.

The court rejects Plaintiff's contention that Defendants' use of the 50-h transcript requires the court to deny the motion to dismiss. (See Pl. Opp'n at ECF p.4.) When faced with extrinsic documents improperly submitted by a party, the court may either convert the motion to dismiss to one for summary judgment or simply decline to consider the extrinsic documents. See Friedl, 210 F.3d at 83. Here, the court chooses to proceed without considering Plaintiff's 50-h testimony; outright denial of the motion to dismiss would be inappropriate.

### B. Plaintiff's False Arrest Claims

***4** To prevail on a claim for false arrest, a plaintiff must plead that "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." Singer v. Fulton Cry. Sheriff, 63 F.3d 110, 118 (2d Cir. 1995) (quoting Broughton v. State, 335 N.E.2d 310, 314 (N.Y. 1975) ). "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." Gonzalez v. City of Schenectady, 728 F.3d 149, 155 (2d Cir. 2013) (quoting Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) ). "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Id. (emphasis omitted) (quoting Weyant, 101 F.3d at 852). "The inquiry is limited to 'whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest.' " Id. (quoting Jaegly v. Couch, 439 F.3d 149, 153 (2d Cir. 2006) (Sotomayor, J.) ).

"[W]hen an arrest is made pursuant to a facially valid warrant, there is a presumption that it was made with probable cause." Justice v. Kuhnapfel, 985 F. Supp. 2d 334, 339 (E.D.N.Y. 2013) (quotation marks omitted). Additionally, conviction on the offense for which an arrest was made is conclusive evidence of probable cause, as long as that conviction survives appeal. Weyant, 101 F.3d at 852; see also Cameron v. Fogarty, 806 F.2d 380, 387 (2d Cir. 1986) (stating that § 1983 incorporates the common-law rule that a false-arrest plaintiff "can under no circumstances recover if he was convicted of the offense for which he was arrested"). Because an arrest on multiple charges is "still only one arrest, i.e., one intrusion into plaintiff's liberty," John v. Lewis, No. 15-CV-5346 (PKC), 2017 WL 1208428, at *12 (E.D.N.Y. 2017), a conviction on any of the charges for which the arrest was made will preclude a claim of false arrest. See Jaegly, 439 F.3d at 154.

After separately examining Plaintiff's claims against the Individual Defendants, the court finds that there was probable cause for both arrests. Accordingly, the court dismisses Plaintiff's claims against all Individual Defendants.

1. The December 11, 2015, Arrest

Plaintiff claims that there could be no probable cause for his arrest because he was not the intended subject of the Bench Warrant, a fact proven by the Criminal Court Letter. (Pl. Opp'n at ECF p.4.) Defendants, meanwhile, assert probable cause on the grounds that, "where there is a facially valid [b]ench [w]arrant, there is probable cause for an arrest even if the officers are mistaken as to the identity of the intended subject of the warrant, so long as the mistake was reasonable." (Defs. Reply in Supp. of Mot. ("Reply") (Dkt. 17) at 2; see Mem. at 5-7.)

"[A] mistaken identity can provide the basis for probable cause." Martinez v. City of New York, 340 F. App'x 700, 701 (2d Cir. 2009) (summary order) (citing Hill v. California, 401 U.S. 797, 802-03 (1971) ). An arrest based on mistaken identification is still constitutionally valid if there was "probable cause to arrest the person sought and the arresting officer reasonably believed that the arrestee was that person." Id.; see also Caldarola v. Calabrese, 298 F.3d 156, 162 (2d Cir. 2002) (" 'Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause ... and in those situations courts will not hold that they have violated the Constitution.' " (alteration in original) (quoting Saucier v. Katz, 533 U.S. 194, 206(2001) ) ).

Defendants are correct that there was probable cause for Plaintiff's arrest on December 11, 2015. First, there is no doubt that there was probable cause to arrest the person sought in the Bench Warrant. Issuance of a valid bench warrant against a suspect establishes probable cause to arrest that person. See United States v. Miller, 265 F. App'x 5, 7 (2d Cir. 2008) (summary order); see also Pittman v. City of New York, No. 14-CV-4140 (ARR), 2014 WL 7399308, at *3 (E.D.N.Y. Dec. 30, 2014) (collecting cases). The question, then, is whether it was reasonable for Officer Jane Doe to believe that Plaintiff was the person sought in the Bench Warrant. The court finds that it was. Even accepting Plaintiff's contention that the Bench Warrant was not for him but for another individual, Plaintiff's appearance is sufficiently similar to that of the subject of the Bench Warrant that Officer Jane Doe's alleged mistake was clearly reasonable. As seen by comparing the Bench Warrant and the OLPA Report, both photographs look strikingly similar and the two subjects share a name. Any minor discrepancies cannot upset a finding of probable cause on this ground. See Martinez, 340 F. App'x at 701-02. Even without relying on the information obtained from the 50-h hearing, the court has no trouble concluding that it was reasonable for Officer Jane Doe to believe that the Bench Warrant applied to Plaintiff. The fact that Plaintiff received the Criminal Court Letter subsequent to his arrest does not alter the court's conclusion because the analysis of probable cause in this situation turns on what Officer Jane Doe reasonably believed at the time of the arrest. See Zellner v. Summerlin, 494 F.3d 344, 369 (2d Cir. 2007); see also Pittman, 2014 WL 7399308, at *3 ("Reliance on commonly used electronic databases is generally reasonable and sufficient to establish probable cause.").

2. The November 17, 2016, Arrest

***5** In his second cause of action, Plaintiff alleges that his arrest on November 17, 2016, was unconstitutional because he would not have been taken into custody but for the indication by the NYPD computer that there was an outstanding bench warrant for his arrest. Plaintiff was not, however, arrested solely because of the warrant; rather, he was arrested and charged with theft of services in connection with his turnstile jumping. (See OLPA Report.) Plaintiff concedes that his arrest "for a trespass in the subway" is sufficient to defeat his claim for false arrest. (Pl. Opp'n at ECF p.4.)

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

The court agrees: Because the officers had probable cause to believe that Plaintiff was committing theft of services at the time of arrest, his false arrest claim cannot proceed. See Zellner, 494 F.3d at 369 ("[A]n arrest is not unlawful so long as the officer has ... probable cause to believe that the person arrested has committed any crime." (emphasis added) ); see also Ackerson v. City of White Plains, 702 F.3d 15, 20 (2d Cir. 2012) ("Whether probable cause existed for the charge actually invoked by the arresting officer at the time of the arrest is irrelevant." (quotation marks omitted) ). Additionally, Plaintiff's eventual guilty plea to disorderly conduct "provides sufficient evidence that probable cause existed at the time of arrest and precludes a false arrest claim." Soliman v. City of New York, No. 15-CV-5310 (PKC), 2017 WL 1229730, at *14 (E.D.N.Y. Mar. 31, 2017) (alterations adopted) (quotation marks omitted); see Weyant, 101 F.3d at 852.

3. Municipal Liability

"[A] municipality cannot be held liable under § 1983 on a respondeat superior theory." Monell, 436 U.S. at 691. Instead, municipalities are only liable under § 1983 for constitutional deprivations resulting from a governmental policy or custom. Id. at 694; see Lozman v. City of Riviera Beach, 138 S. Ct. 1945, 1951 (2018) ("[I]n a § 1983 case[,] a city or other local governmental entity cannot be subject to liability at all unless the harm was caused in the implementation of 'official municipal policy.' " (quoting Monell, 436 U.S. at 691) ). A plaintiff may demonstrate that such a policy or custom exists by introducing evidence of one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policy makers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

Skates v. Incorporated Village of Freeport, 265 F. Supp. 3d 222, 235 (E.D.N.Y. 2017). A "single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991). A plaintiff bringing a Monell claim also must establish a causal connection between the municipality's official policy and the underlying constitutional violation. See City of Canton v. Harris, 489 U.S. 378, 385 (1989).

Plaintiff claims that the City should be held liable for its alleged "fail[ure] and refus[al] to update its computers to reflect the status of warrants in the New York State court system," including its alleged refusal to use CRIMS, a warrant database maintained by the New York State Unified Court System. (Pl. Opp'n at ECF p.5; see Compl. ¶¶ 54-55, 61.) Plaintiff further claims that, if the NYPD's warrant database were updated to be compatible with CRIMS, he would not have been arrested on either December 11, 2015, or November 17, 2016. (Pl. Opp'n at ECF pp.5, 7.) In response, Defendants state that Plaintiff's Monell claim must fail without an underlying constitutional violation; and, even if the court were to find an underlying constitutional injury, that Plaintiff has not made out the required elements under Monell. (See Mem. at 14-16.)

***6** Defendants are correct that Plaintiff's claim fails for lack of any alleged constitutional injury. Here, as discussed above, Plaintiff alleges two instances of false arrest. Because the court today finds that neither of these arrests was constitutionally problematic, these incidents cannot support Plaintiff's Monell claim. See, e.g., Schultz v. Incorporated Village of Bellport, 479 F. App'x 358, 360 (2d Cir. 2012) (summary order) ("Because [the plaintiff] was unable to establish an underlying violation of his constitutional rights ..., his ... Monell claim necessarily fail[s] as well." (footnote omitted) ).

The court also finds that, even if Plaintiff did have a viable false-arrest claim, he has not pleaded facts sufficient to establish a municipal policy leading to any constitutional injury. Plaintiff's complaint does not mention any incidents other than the two arrests discussed above, something that would ordinarily defeat his assertion of municipal liability.

See Calicchio v. Sachem Cent. Sch. Dist., 185 F. Supp. 3d 303, 316-17 (E.D.N.Y. 2016). In his opposition brief, however, he cites to two cases that he claims demonstrate a municipal policy or custom. (See Pl. Opp'n at ECF pp.6-7.) While a plaintiff may sometimes overcome a motion to dismiss a Monell claim by citing to complaints in other cases that contain similar allegations, see Osterhoudt v. City of New York, No. 10-CV-3173 (RJD), 2012 WL 4481927, at *1 (E.D.N.Y. Sept 27, 2012), Defendants are ultimately correct that Plaintiff's reliance on the two cited cases is "unavailing because both cases are factually dissimilar from [P]laintiff's case" (Reply at 8). Both Gonzalez v. New York City, No. 16-CV-254 (CM), 2016 WL 7188147 (E.D.N.Y. Dec. 2, 2016), and Maragh v. City of New York, No. 11-CV-1748 (JBW), 2012 WL 1745349 (E.D.N.Y. May 16, 2012), concerned allegations that the City "has a practice and policy of unlawfully detaining individuals on account of warrants that have been previously dismissed and vacated." See Gonzalez, 2016 WL 7188147, at *2; Maragh, 2012 WL 1744349, at *l-2. As the City points out, "[P]laintiff is not claiming that the subject Bench Warrant was vacated, or that it should have been vacated, prior to either of his arrests." [1] (Reply at 8; see Compl.) Thus, since Plaintiff's citations to other cases do not support his allegations of a municipal policy or custom, he needed instead to put forth additional examples of the complained-of conduct. Because he did not, his claim of Monell liability would not succeed, even if he had been falsely arrested on December 11, 2015, and November 17, 2016.

### IV. CONCLUSION

For the foregoing reasons, the court GRANTS Defendants' motion to dismiss (Dkt. 15). The court respectfully DIRECTS the Clerk of Court to close the case.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2018 WL 3336448

## Footnotes

1 The court notes that Plaintiff's brief in opposition raises, for the first time, the claim that he was arrested pursuant to a "vacated" warrant. (See Pl. Opp'n at ECF p.7.) Because "it is axiomatic that the [c]omplaint cannot be amended by the briefs in opposition to dismiss," O'Brien v. Nat'l Prop. Analysts Partners, 719 F. Supp. 222, 229 (S.D.N.Y. 1989), the court restricts its view of Plaintiff's claims to the allegations in his complaint.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Distinguished by John v. Lewis, E.D.N.Y., March 31, 2017

2012 WL 1068023
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court,
E.D. New York.

Christopher GORDON, Plaintiff,
v.
The CITY OF NEW YORK, New York City Police Officer Carlos Persalta, Shield # 30640, TD Bank, Elliot Lopez, Curtis Herbert, and Isaac Duncan, Defendants.

No. 10–CV–5148 (CBA)(LB).
|
March 29, 2012.

**Attorneys and Law Firms**

Christopher Gordon, Hasbrouck, NJ, pro se.

Ilan Goldbard, Max Oliver Mccann, NYC Law Department, Mary Theresa O'Flynn, Corporation Counsel of the City of New York, New York, NY, for Defendants.

**MEMORANDUM & ORDER**

AMON, Chief Judge.

***1** Plaintiff Christopher Gordon ("Gordon"), *pro se,* has filed suit pursuant to 42 U.S.C. § 1983 and state law, alleging various violations of his constitutional rights—primarily false arrest and malicious prosecution arising out of his arrest and detention in November 2007 on suspicion that he attempted to cash stolen checks at a TD Bank branch. At the time of this first arrest, Gordon was not prosecuted, but he was later indicted and convicted of larceny and other crimes based on the events at TD Bank. Defendants City of New York and Officer Carlos Peralta now move to dismiss the claims against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Also before the Court is the Report and Recommendation (R & R) of the Honorable Lois Bloom, United States Magistrate Judge, recommending that the Court dismiss the claims against the other four defendants because the amended complaint did not properly allege that they acted under color of state law.

For the reasons stated below, the motion to dismiss filed by the City of New York and Officer Peralta is granted in part and denied in part. The Court also adopts the well-reasoned R & R of the Magistrate Judge, and the claims against the remaining four defendants are dismissed in full.

**I. BACKGROUND**

Gordon's factual narrative is at times difficult to follow, but the following facts appear to be alleged in the First Amended Complaint ("Compl."). On November 2, 2007, Gordon claims that he accompanied a co-worker, defendant Curtis Herbert, to a branch of Commerce Bank (since acquired by TD Bank, as it will be referred to in this Order) to withdraw payments for construction work that had been contracted to Herbert and informally sub-contracted to Gordon. (Compl.¶ 8.) It appears that some time earlier, Herbert had attempted to deposit checks allegedly signed by Isaac Duncan and drawn on Duncan's account at Chase Bank, but TD Bank placed the funds on hold due to a suspicion of misconduct. TD Bank then contacted Duncan, who claimed that the checks were stolen and his signature on them forged. (Compl. ¶¶ 33–34; Pl. Opp., Ex. 4.) Accordingly, when Gordon and Herbert arrived at TD Bank to collect the funds, they were detained by bank staffers, who called 911 to report that the two men were attempting to cash forged checks. Defendant Officer Peralta responded to the call and arrested Gordon and Herbert on the scene. (Compl.¶¶ 8, 30.) Gordon was charged with Grand Larceny in the Second Degree, Identity Theft in the First Degree, and Forgery in the Second Degree. (Compl.¶ 8.) Gordon's complaint asserts that he was detained until November 4, 2007, when he was brought before a judge in the Kings County Criminal Court who promptly dismissed the case against Gordon for lack of evidence and released him. (Compl.¶ 9–10.) The complaint also states that upon his release, he was "without any further knowledge ... of a continuing criminal investigation" against him. (Compl.¶ 10.)

***2** Gordon's Memorandum in Opposition to the Defendants' Motion to Dismiss tells a somewhat different story of the events of November 2–4, 2007. Gordon seems to claim that shortly after his arrest on November 2, the District Attorney's Office notified police that they were declining to prosecute Gordon for the events at TD Bank due to lack of evidence connecting him to the allegedly stolen checks. Gordon claims that the DA's Office instructed the police to release him, but that Officer Peralta nonetheless "unlawfully" and "extrajudicially" detained him for over 48

hours until November 4. [1] (*See* Pl. Opp. at ¶ 3, 9, 11.) Gordon simultaneously seems to maintain that he "was presented before the Kings County Criminal Court on November 4, 2007" and the case was dismissed at that time. (Pl.Opp.¶ 6.) In any event, Gordon's combined account indicates that on November 2–4, 2007, any charges stemming from the TD Bank events were dropped, he was not arraigned, and he was released by November 4 with no knowledge of any pending matters related to that incident. [2]

The prosecution against Herbert, however, continued. (Compl.¶ 58.) Gordon claims that Herbert later entered into an agreement with the DA's Office whereby he agreed to testify against Gordon in exchange for the charges against Herbert being dismissed. (Compl.¶ 58.) Accordingly, charges against Gordon were newly submitted to the grand jury in March 2008, and testimony was presented from Herbert, Officer Peralta, and representatives from TD Bank and Chase Bank. (Compl.¶ 13.) Gordon claims he was then indicted for the previously dismissed charge of Grand Larceny in the Second Degree, along with new charges of Grand Larceny in the Third Degree, Criminal Possession of a Forged Instrument, and Petit Larceny. (Compl.¶ 13.) Gordon was subsequently "re-arrested" on September 23, 2008 pursuant to this indictment. (Compl.¶ 21.)

Gordon's case proceeded to trial and on September 4, 2009, a jury convicted him of Grand Larceny in the Second Degree, Grand Larceny in the Third Degree, Petit Larceny, and two counts of Criminal Possession of a Forged Instrument. (*See* Compl., Ex. H; Pl. Opp., Ex. 1.; O'Flynn Decl., Ex. D.)

## II. DEFENDANTS CITY OF NEW YORK AND OFFICER PERALTA'S MOTION TO DISMISS

### A. Standard of Review

To withstand a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A complaint that contains only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. Neither will a complaint that contains only "naked assertion[s]" without "further factual enhancement." *Id.* at 557.

Iqbal identifies a "two-pronged" approach to determining the sufficiency of a complaint. 129 S.Ct. at 1950. First, courts can "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* Second, they can then identify whether the complaint, stripped of its conclusory pleadings, "plausibly give[s] rise to an entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A court's consideration on a motion to dismiss is "limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991). For example, "courts routinely take judicial notice of documents filed in other courts, ... not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991); *see Staehr v. Hartford Financial Servs. Group, Inc.,* 547 F.3d 406, 425 (2d Cir.2008).

***3** Where the plaintiff appears *pro se,* a court will construe his pleadings liberally and will interpret them "to raise the strongest arguments that they suggest." *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000). However, "[t]he duty to liberally construe a [*pro se* ] plaintiff's complaint is not the equivalent of a duty to rewrite it." *Kirk v. Heppt,* 532 F.Supp.2d 586, 590 (S.D.N.Y.2008) (internal quotation marks and alterations omitted); *see also Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010) ("[T]hough we are obligated to draw the most favorable inferences that [a *pro se* ] complaint supports, we cannot invent factual allegations that he has not pled.")

### B. Discussion

As an initial matter, Gordon does not appear to dispute the proposition, asserted in the defendants' motion, that he can bring neither a false arrest nor a malicious prosecution claim based on his arrest on September 23, 2008, because that arrest directly resulted in a conviction. [3] *See Savino v. City of New York,* 331 F.3d 63, 72 (2d Cir.2003) (malicious prosecution claim requires that proceedings terminated in the plaintiff's favor); *Cameron v. Fogarty,* 806 F.2d 380, 387–89 (2d Cir.1986) (plaintiff cannot recover for false arrest or malicious prosecution if he was convicted of the crime for

which he was arrested). Rather, the amended complaint states, and Gordon's opposition papers repeatedly emphasize, that he brings his false arrest and malicious prosecution claims based only on the November 2, 2007 arrest. (*See* Compl. ¶ 7; Pl Affirmation ¶ 3; Pl. Opp. ¶ 2, 3, 5, 9, 10, 12, 13, 16, 21.) Accordingly, it is only on this former arrest that the Court will focus its analysis, and any false arrest or malicious prosecution claims related to the September 23, 2008 arrest and prosecution are deemed withdrawn. To the extent Gordon's complaint implies that he is bringing other claims related to his trial and conviction, they are dealt with in Section II.B.4.d below.

**1. Claims against the City of New York**

The Court observes at the outset that Gordon's allegations against the City of New York fail to satisfy the requirements of *Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In order to sustain a claim for relief under 42 U.S.C. § 1983 against a municipal defendant, a plaintiff must show the existence of an officially adopted policy or custom, and a direct causal connection between that policy or custom and the deprivation of a constitutional right. *Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which can be attributed to a municipal policymaker." *City of Oklahoma v. Turtle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). Stated differently, the plaintiff must demonstrate that the municipality was the "moving force" behind the alleged injury. *Brown,* 520 U.S. at 404.

***4** Gordon's complaint does not allege the existence of a municipal policy or custom at all. In his opposition memorandum, Gordon occasionally uses the phrase "common policy and practice," (*e.g.* Pl. Opp. ¶¶ 17, 19, 20.), but this allegation is unsupported by anything other than the facts of what occurred in his particular case. *See Ricciuti v. N.Y.C. Transit Authority,* 941 F.2d 119, 123 (2d Cir.1991) ("[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy."); *Santiago v. Campisi,* 91 F.Supp.2d 665, 676 (S.D.N.Y.2000). Moreover, mere conclusory references to a policy or custom, with no supporting facts, will not suffice to state a claim of § 1983 municipal liability. *See Ricciuti,* 941 F.2d at 124 ("[O]ur prior cases suggest that an allegation of municipal policy or custom would be insufficient if wholly conclusory."); *5 Borough Pawn, LLC v. City of New York,* 640 F.Supp.2d 268, 299 (S.D.N.Y.2009) (dismissing *Monell* claim because the plaintiffs' "assertion that the City has an unconstitutional policy is based on nothing more than their unsupported supposition"); *Brodeur v. City of New York,* 2002 WL 424688, at *6 (S.D.N.Y.2002).

Accordingly, since Gordon's complaint is devoid of factual support for his references to a municipal policy, the § 1983 claims against the City of New York are dismissed. The remaining § 1983 causes of action will be analyzed only as pertains to Officer Peralta.

**2. False Arrest**

Gordon has brought a claim for false arrest and false imprisonment, claiming that his November 2007 arrest was not supported by probable cause, and that he was unlawfully detained by the police for two days. The defendants argue that Gordon's false arrest claim arising out of the events of November 2, 2007 is barred by his eventual conviction for those crimes.

A § 1983 claim for false arrest or false imprisonment, based on an individual's right to be free from unreasonable seizures, is substantially the same as a claim for false arrest under New York law. *Boyd v. City of New York,* 336 F.3d 72, 75 (2d Cir.2003). Such a claim requires the plaintiff to show (1) that the defendant intended to confine the plaintiff; (2) that the plaintiff was conscious of the confinement; (3) that the plaintiff did not consent to the confinement; and (4) that the confinement was not otherwise privileged. *Savino v. City of New York,* 331 F.3d 63, 75 (2d Cir.2003). The existence of probable cause to arrest renders an arrest privileged and "is a complete defense to an action for false arrest." *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994); *see Jaegly v. Couch,* 439 F.3d 149, 152 (2d Cir.2006) ("[T]he existence of probable cause is an absolute defense to a false arrest claim.").

As noted above, it has been repeatedly held in this circuit that in an action for false arrest, "the plaintiff can under no circumstances recover if he was convicted of the offense for which he was arrested," because the conviction is treated as conclusive evidence of probable cause to arrest. *Cameron,* 806 F.2d at 387; *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996) (conviction not reversed on appeal is conclusive evidence of probable cause to arrest); *Jones v. King,* 2011 WL 4484360, at *7 (S.D.N.Y.2011) ("Plaintiff's claim of false arrest is barred by the existence of probable cause

for the arrest, which is established as a matter of law by his conviction."); *Kneitel v. Danchuk,* 2007 WL 4441224, at *5 (E.D.N.Y.2007) ("A prosecution and conviction, if not overturned, is conclusive evidence that an arrest was supported by the requisite probable cause.") The plaintiff need not be convicted of every crime for which he was arrested for this bar to apply; the existence of a valid conviction for any of the crimes underlying the arrest will foreclose a later false arrest claim. *Jones,* 2011 WL 4484360, at *7; *Ostroski v. Town of Southold,* 443 F.Supp.2d 325, 335 (E.D.N.Y.2006) (citing *Jaegly v. Couch,* 439 F.3d 149, 154 (2d Cir.2006)); *see DeVito v. Barrant,* 2005 WL 2033722, at *4 (E.D.N.Y.2005).

***5** The defendants argue that because Gordon's arrest on November 2, 2007 was based on the same charges for which he was eventually convicted, the above rule should still bar him from pursuing a false arrest claim, even though Gordon was released at that time, and it was not until 2008 that Gordon was indicted and convicted. This argument raises the question of whether the *Cameron* rule only bars a false arrest claim based on the arrest that immediately preceded the conviction, or if it also forecloses a false arrest claim based on an earlier, unfruitful arrest arising out of the same conduct. The language and logic of *Cameron* would seem to apply to any claim for false arrest when the plaintiff is eventually convicted of an offense underlying that arrest, since *Cameron* expressly rejected the proposition that a "premature" arrest is actionable when it nonetheless produces a conviction:

> The fact of conviction means that the plaintiff was not entitled to escape arrest entirely and that the arrest was simply premature. Though the right to be free from arrest without probable cause is substantial, the injury caused solely by prematurity of arrest is, of itself, insubstantial.... [W]e conclude that the proper accommodation between the individual's interest in preventing unwarranted intrusions into his liberty and society's interest in encouraging the apprehension of criminals requires that § 1983 doctrine be deemed ... to incorporate the common-law principle that, where law enforcement officers have made an arrest, the resulting conviction is a defense to a § 1983 action asserting that the arrest was made without probable cause.

*Cameron,* 806 F.2d at 388–89. The Court concludes that, at least in the circumstances presented here, it would be difficult to draw a principled distinction between Gordon's two arrests wherein his conviction would prevent a false arrest claim based on the second arrest, but would allow a claim based on the first, even though the first arrest arose out of the same conduct. The Court thus finds, based on *Cameron* and its lineage, that Gordon's conviction bars his claim that he was arrested without probable cause at TD Bank on November 2, 2007.

This conclusion, however, does not end the inquiry. In Gordon's opposition papers, he now appears to be alleging that shortly following his arrest, the DA's Office told Officer Peralta that they were not pursuing any charges against Gordon because of a lack of evidence connecting him to the stolen checks, and instructed that Gordon should be released from custody. Gordon claims that Officer Peralta nonetheless detained Gordon unjustifiably and without probable cause for over 48 hours until a judge released him on November 4. Gordon also contends that at that time, "there were no warrants to legally detain him." (Pl.Opp.¶ 3, 17.) Given a court's duty to liberally construe *pro se* pleadings, the Court believes it should view these new facts as amending the allegations of the complaint. *See Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 461 (N.D.N.Y.2009).

***6** On their face, these allegations would appear to state a freestanding claim for false imprisonment that is separable from the initial arrest at TD Bank—that is, a claim that Officer Peralta kept Gordon in police custody, without probable cause, for some reason beyond the TD Bank charges. Furthermore, Gordon's allegations appear to state a claim for unreasonable detention, based his assertions that he was unreasonably held following a warrantless arrest for over 48 hours before being presented to a judge. *See County of Riverside v. McLaughlin,* 500 U.S. 44, 53, 56, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991) (following warrantless arrest, Fourth Amendment requires "prompt" judicial probable cause determination without "unreasonable delay"; over 48 hours presumptively unreasonable); *Bryant v. City of New York,* 404 F.3d 128, 136–39 (2d Cir.2005) (analyzing § 1983 claim based on "prolonged ... postarrest detention"

under Fourth Amendment standards, and upholding dismissal because "the duration of plaintiffs' detentions did not come close to the presumptively unreasonable 48–hour mark"); *Wang v. Vahldieck,* 2012 WL 92423, at *8 (E.D.N.Y.2012) (upholding § 1983 claim for unreasonable detention based on allegation that defendant "deliberately delayed processing of [plaintiff's] paperwork in order to maximize the length of her detention"); *Richardson v. Providence,* 2011 WL 3701887, at *8 (E.D.N.Y.2011) (plaintiff's allegations that "defendants detained him capriciously and arbitrarily" following warrantless arrest stated claim for unreasonable detention under § 1983); *Gonzalez v. Bratton,* 147 F.Supp.2d 180, 199–200 (S.D.N.Y.2001) (finding evidence presented at trial sufficient to support jury's verdict on § 1983 claim for unreasonable detention based on plaintiff's 27–hour detention following arrest).

Moreover, the defendants' Reply concedes that the DA's Office declined prosecution for lack of evidence on November 2, and that Gordon was nonetheless detained for some additional period of time. The defendants argue that Gordon "was not held pursuant to the charges dropped by the prosecution on November 2," but on some other outstanding warrant. (Def. Reply at 3.) In support of this assertion, the defendants have submitted a document from the New York Police Department's booking system dated November 2, 2007 (Gordon's "OLPA History"). Beyond urging the existence of this unspecified "outstanding warrant," the defendants do not offer any other arguments for why Gordon's claims related to this period of detention should be dismissed as a matter of law at this time. (Def. Reply at 3–4.)

The Court does not believe it is appropriate to consider the "OLPA History" document or the warrant it references on a motion to dismiss, since it is not a public filing from another court of which this Court may take judicial notice, but is rather more akin to a police report that is not properly considered at this stage. *See Crews v. County of Nassau,* 2007 WL 4591325, at *6 (E.D.N.Y.2007) (declining to take judicial notice of "non-judicial documents (such as police reports)" that were not appended to the complaint on a motion to dismiss). In any event, this document is far too abbreviated to provide any clear indication of why Gordon was detained. Thus, given the lack of factual clarity, and in light of the defendants' concession that Gordon was held by police for some period of time for charges unrelated to the TD Bank events, the Court will allow § 1983 claims for false imprisonment and unreasonable detention against Officer Peralta to survive at this time.

***7** Accordingly, the Court will grant the motion to dismiss the claim that Gordon was arrested without probable cause for forgery and larceny at TD Bank on November 2, 2007, but will deny the motion to dismiss the claims for false imprisonment and unreasonable detention against Officer Peralta arising out of Gordon's alleged detention from November 2–4, 2007, following the decision by the DA's Office to not pursue charges based on the TD Bank incident.

**3. Malicious Prosecution**

Gordon also brings a malicious prosecution claim based on the fact that after his first arrest, any charges arising out of the TD Bank events were dropped by the DA's Office and/or dismissed by a judge. The defendants argue that Gordon cannot maintain any claim for malicious prosecution based on those events, because he suffered no post-arraignment deprivation of liberty. The Court agrees with the defendants.

Like a claim of false arrest, the elements of a malicious prosecution claim pursuant to 42 U.S.C. § 1983 are drawn from state law. *Boyd,* 336 F.3d at 75; *Jocks v. Tavernier,* 316 F.3d 128, 134 (2d Cir.2003). To succeed on a claim of malicious prosecution, the plaintiff must prove four elements: (1) the defendant initiated or continued a criminal proceeding; (2) the proceeding terminated favorably to the plaintiff, (3) there was no probable cause for the criminal charge; and (4) the defendant acted maliciously. *Rothstein v. Carriere,* 373 F.3d 275, 282 (2d Cir.2004); *Savino v. City of New York,* 331 F.3d 63, 72 (2d Cir.2003). He must also prove a fifth element, which comes from the federal constitution: "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. NYC Transit Authority,* 215 F.3d 208, 215 (2d Cir.2000); *see also Singer v. Fulton County Sheriff,* 63 F.3d 110, 116 (2d Cir.1995) ("A plaintiff asserting a Fourth Amendment malicious prosecution claim under § 1983 must ... show some deprivation of liberty consistent with the concept of 'seizure.' "). "The essence of malicious prosecution is the perversion of proper legal procedures." *Id.* at 117 (quoting *Broughton v. State of New York,* 37 N.Y.2d 451, 373 N.Y.S.2d 87, 93, 335 N.E.2d 310 (1975)). Thus, where the plaintiff's claim arises out of a warrantless arrest, he cannot bring a malicious prosecution claim based only on pre-arraignment events, since there have been no actions taken pursuant to judicial process. *Id.* (holding that "[plaintiff's] arrest cannot serve as the predicate deprivation of liberty because it occurred prior to his arraignment and without a warrant, and therefore was not pursuant to legal process.");

see *Holley v. County of Orange,* 625 F.Supp.2d 131, 142 (S.D.N.Y.2009).

According to Gordon, he was arrested without a warrant on November 2, 2007 based on the 911 call from TD Bank, but the DA's Office declined to prosecute him on those arrest charges. He then claims he was nonetheless detained by the police until November 4, when he was brought before a judge for the first time, and any charges were dismissed. (Compl. ¶¶ 8, 27, 28, 30; Pl. Opp. ¶¶ 2–6, 9.) He makes no allegation that he was arraigned or that any prosecution was commenced at that time; in fact, his account insists upon the opposite—that the police detained him "extrajudicially," in contravention of the DA's instructions, and that upon his initial appearance a judge immediately ordered his release. Gordon himself refers to his detention as "pre-arraignment incarceration." (Pl.Opp.¶ 3.) Further, he emphasizes that he was unaware of any continued investigation into his involvement at TD Bank until he was "re-arrested" in September 2008 following a grand jury indictment of which he was also unaware. It is thus clear that Gordon has not alleged that any judicial process was commenced against him on November 2–4, 2007, or that there was any arraignment or post-arraignment restraint on his liberty at that time.[4] The proper avenue for redressing Gordon's complaints that the police improperly detained him is grounded in false arrest or false imprisonment, as discussed above.

***8** Accordingly, Gordon's malicious prosecution claim against Officer Peralta is dismissed.

**4. Other § 1983 Claims**

Although the defendants have construed Gordon's complaint as only bringing false arrest and malicious prosecution claims under § 1983, Gordon's opposition memorandum makes reference to a few other claims that he believes himself to be asserting that have not been addressed by the defendants. Given that, pursuant to the *in forma pauperis statute* under which Gordon brings this action, the Court must dismiss a claim if it "is frivolous or malicious" or "fails to state a claim on which relief may be granted," the Court will address why these residual federal claims must be dismissed. 28 U.S.C. § 1915(e)(2)(B).

***a) Malicious Abuse of Process***

Gordon argues that an "abuse of process claim lies against the defendants as each defendant aided to each other employing regularly issued legal process to compel the performance of the severely prejudicial conduct in violation of plaintiff's fundamental rights." (Pl.Opp.¶ 8.) This appears to be an attempt to state a claim for malicious abuse of process under § 1983. Any such claim must be dismissed.

"The torts of malicious prosecution and abuse of process are closely allied." *Cook v. Sheldon,* 41 F.3d 73, 80 (2d Cir.1994). Whereas malicious prosecution concerns the improper issuance of process, malicious abuse of process concerns "the improper use of process after it is regularly issued." *Id.* (internal quotations omitted). Like malicious prosecution, state law provides the elements of a malicious abuse of process claim brought pursuant to § 1983. *Id.* "In New York, a malicious abuse of process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Id.*

As already noted in the Court's discussion of the malicious prosecution claim, Gordon has made no allegations that his November 2007 arrest resulted in any "regularly issued legal process," since the charges were dropped and he was released without any arraignment. Moreover, Gordon has not adequately alleged the "collateral objective" element of the claim. To satisfy this element, a plaintiff must allege "not that the defendant acted with an improper motive, but rather an improper purpose—that is, 'he must claim that [the defendant] aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution.' " *Douglas v. City of New York,* 595 F.Supp.2d 233, 344 (S.D.N.Y.2009) (quoting *Savino v. City of New York,* 331 F.3d 63, 76 (2d Cir.2003)); *see also Conte v. County of Nassau,* 2010 WL 3924677, at *18 (E.D.N.Y.2010). Here, Gordon states that "the defendant's objective was to collaterally obtain the unconstituted conviction." (Pl.Opp.¶ 8.) This amounts only to an allegation that the defendants acted out of a desire to see Gordon convicted, which is not a collateral objective.

***9** Accordingly, the malicious abuse of process claim is dismissed.

***b) Section 1985 Conspiracy***

Gordon's memorandum also asserts a claim under 42 U.S.C. § 1985(3). Such a claim requires the plaintiff to allege "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities

under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Cine SK8, Inc. v. Town of Henrietta,* 507 F.3d 778, 790 (2d Cir.2007). In addition, the plaintiff must show that the alleged conspiracy was "motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir.1999) (internal quotation marks omitted).

In addition to the fact that Gordon offers only the conclusory allegation that he was conspired against "because he is of minority race" (Pl.Opp.¶ 3), his claim fails because of the intracorporate conspiracy doctrine. Gordon claims that "there was some sort of conspiracy between the N.Y.C. Police Department and its employees to unlawfully detain him." (*Id.*) However, "[u]nder the intracorporate conspiracy doctrine, officers, agents and employees of a single corporate entity are legally incapable of conspiring together." *Hartline v. Gallo,* 546 F.3d 95, 99 n. 3 (2d Cir.2008); *Nassau County Employee "L" v. County of Nassau,* 345 F.Supp.2d 293, 304–05 (E.D.N.Y.2004). Although "[a]n exception to the intracorporate conspiracy doctrine applies to individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity," Gordon has not alleged that Officer Peralta acted out of any personal interest distinct from those of the police department in general. *Quinn v. Nassau County Police Dep't,* 53 F.Supp.2d 347, 360 (E.D.N.Y.1999).

Accordingly, any claims against Officer Peralta under § 1985(3) are dismissed.

***c) Equal Protection***

To the extent Gordon's complaint makes reference to any equal protection violations, they are wholly conclusory and unsupported, and are hereby dismissed. "To prove a violation of the Equal Protection Clause ... a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). Here, Gordon has offered nothing beyond the occasional bare assertion that the actions alleged were taken because he "is of a minority race." He hasn't alleged any disparity in treatment between himself and another person, and his papers lack any facts related to his race beyond his identification of himself as a minority. Any equal protection claim is dismissed.

***d) Claims against ADA Hilda Mortensen and Related to Gordon's Conviction***

***10** Finally, the Court observes that Gordon's submissions contain repeated allegations directed at the Assistant District Attorney who prosecuted his case, Hilda Mortensen, related to alleged improprieties in Gordon's grand jury indictment, trial, and conviction—including various violations of criminal procedure laws, use of a "defective indictment," and presentation of tainted evidence—all of which Gordon claims resulted in an illegal conviction and sentence. (Compl.¶¶ 38–41, 46, 50.) However, notwithstanding having filed many papers in this case, including an amended complaint that added several defendants, Gordon has never named her as a defendant. Given Gordon's clear understanding of how to add defendants to the cases he files, the Court is hesitant to infer that this complaint brings claims against Mortensen.

In any event, to the extent Gordon attempts to assert claims against Mortensen, they are barred by absolute prosecutorial immunity. *See Buckley v. Fitzsimmons,* 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993); *Parkinson v. Cozzolino,* 238 F.3d 145, 150 (2d Cir.2001). Additionally, any claims against Mortensen (or others) that amount to challenges to the validity of Gordon's conviction are barred by the rule in *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), which holds that a plaintiff may not use § 1983 as a vehicle for bringing a claim that "would necessarily imply the invalidity of his conviction or sentence." *Id.* at 487; *see Wilkinson v. Dotson,* 544 U.S. 74, 81–82, 125 S.Ct. 1242, 161 L.Ed.2d 253 (2005); *Channer v. Mitchell,* 43 F.3d 786 (1994); *Jackson v. County of Nassau,* 2010 WL 335581, at *7–8 (E.D.N.Y.2010). Although Gordon's custody status at the present moment is unclear from the docket sheet, it is clear that he filed his complaint, amended complaint, and opposition papers while incarcerated for the conviction at issue in this case. He thus had available to him at that time the avenues of both direct appeals and habeas review if he wished to challenge the validity of his conviction. Because he has not asserted that his conviction was ever vacated, he is barred from seeking to imply the invalidity of his conviction through a § 1983 action. *See Browdy v. Karpe,* 2004 WL 2203464, at *5–8 (D.Conn.2004), *aff'd,* 131 Fed. App'x 751, 753 (2d Cir.2005); *Amaker v. Coombe,* 2002 WL 523388, at *17–18 (S.D.N.Y.2002).

Accordingly, any claims against ADA Mortensen or any other defendant that are premised on the assertion that Gordon's September 2009 trial and conviction were unconstitutional or otherwise invalid are dismissed.

**5. State law claims**

The City and Officer Peralta have moved to dismiss any state law claims against them based on Gordon's failure to file a notice of claim. *See* N.Y. Gen. Mun. L. §§ 50–e, 50–k(6); *Khaja–Moinuddin v. City of New York,* 2010 WL 3861003, at *7 (E.D.N.Y.2010). Gordon does not appear to contest this proposition in this opposition papers. Accordingly, to the extent the complaint asserts any state tort law claims against Officer Peralta or the City, they are dismissed.

**III. JUDGE BLOOM'S REPORT AND RECOMMENDATION**

***11** On January 28, 2011, Gordon amended his complaint to add four private defendants: TD Bank, Elliot Lopez, Curtis Herbert, and Isaac Duncan. On July 28, 2011, after receiving a request from Gordon for assistance in serving process on these newly added defendants, Magistrate Judge Lois Bloom issued an R & R recommending that the Court dismiss the amended complaint against these four defendants because Gordon did not properly allege that they acted under color of state law, as required for actions under § 1983. Gordon filed objections pursuant to Fed.R.Civ.P. 72(b) and 28 U.S.C. § 636(b) (1) in a submission dated August 31, 2011.

In reviewing an R & R, the Court "must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed.R.Civ.P. 72(b); *see also Edwards v. Fischer,* 414 F.Supp.2d 342, 346–47 (S.D.N.Y.2006); *The European Community v. RJR Nabisco, Inc.,* 134 F.Supp.2d 297, 302 (E.D.N.Y.2001). Upon a review of the record and Gordon's objections, the Court adopts Magistrate Judge Bloom's R & R with the following elaborations, and dismisses all claims against the remaining four defendants.

**A. Discussion**

Gordon's lengthy submission of objections consists mostly of recitations of legal principles, with comparatively little addressed to the particulars of the instant case or to the R & R. Gordon appears to argue that his amended complaint properly pleads that defendants Lopez, Duncan, and Herbert engaged in a conspiracy with state actors, thus rendering their conduct "under color of law" and subject to § 1983. However, apart from Gordon's conclusory iterations of the legal standards for state action, his allegations and arguments remain substantially the same as those already addressed and rejected in the R & R. Although he repeatedly makes the bare assertion that the private defendants participated in "joint activity" with state actors, the only facts underlying this claim are that Lopez provided false information to the police based on "mere speculations" (Pl. Obj. at 10); that Duncan gave "false and misleading information" to the bank, the police department, and the District Attorney's office (*id.* at 15); and that Herbert offered false testimony to the grand jury in exchange for the charges against him being dropped (*id.* at 21). As to TD Bank, Gordon argues only that it "creat[ed] or perpetuat[ed] the policy or custom under which the unconstitutional practice of Mr. Lopez occurred," and that it was grossly negligent in supervising its employees. (*Id.* at 11.)

It is true that a court may find that a private individual acted under color of state law for purposes of § 1983 where the complaint sets forth specific facts indicating that "the private actor operate[d] as a willful participant in joint activity with the State or its agents." *Tancredi v. Metro. Life Ins. Co.,* 316 F.3d 308, 313 (2d Cir.2003) (internal quotation marks omitted). However, a complaint premised on this "joint participation theory" of state action cannot rest on conclusory assertions that the private individuals acted in concert with state officials, but must allege facts demonstrating that private actors and agents of the state "carried out a deliberate, previously agreed upon plan," or that their actions "constitute[d] a conspiracy or meeting of the minds." *Dahlberg v. Becker,* 748 F.2d 85, 92 (2d Cir.1984); *see Rosen v. County of Suffolk,* 53 Fed. App'x 578, 580 (2d Cir.2002) ("[I]t is not enough to make a conclusory allegation that the private and state parties acted in concert, the complaint must allege facts demonstrating that the private entity acted in concert with the state actor."); *Valez v. City of New York,* 2008 WL 5329974, at *3 (S.D.N.Y.2008).

***12** To that end, as explained by the Magistrate Judge, the mere fact that a private person falsely reported criminal conduct to government officials is insufficient to establish liability as a state actor under § 1983. *See Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 939 n. 21, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (private party's "mere invocation of state legal procedures" does not render that party a state actor under § 1983); *Dahlberg,* 748 F.2d at 93 (allegation that private defendant submitted false affidavit to state court that led to plaintiff's arrest did not make the defendant a state actor under § 1983); *Rosen,* 53 Fed. App'x 578 (allegations that private individual filed false petitions seeking orders of protection and false criminal complaint were insufficient to establish state action under § 1983); *Schneider v. Tretola,* 8

F.3d 809 (1st Cir.1993) (table) ("The defendants, all private persons, cannot be held liable under 42 U.S.C. § 1983 for their alleged acts in employing 'false representations and phony process to induce the policemen to falsely arrest' and imprison plaintiff because the private defendants' actions do not constitute 'state action,' a requisite of a § 1983 cause of action."); *Baez v. JetBlue Airways,* 745 F.Supp.2d 214, 221 (E.D.N.Y.2010) (allegation that private defendants "provided false information to law enforcement officials who then interrogated and arrested" the plaintiff is insufficient to establish state action); *Fisk v. Letterman,* 401 F.Supp.2d 362, 377 (S.D.N.Y.2005); *Vazquez v. Combs,* 2004 WL 2404224, at *4 (S.D.N.Y.2004). Here, Gordon asserts only that the private defendants falsely accused him of criminal activity to state officials, which does not establish that they acted under color of state law.

As to the claim related to Herbert's grand jury testimony, "there are two reasons why § 1983 does not allow recovery of damages against a private party for testimony in a judicial proceeding." *Briscoe v. LaHue,* 460 U.S. 325, 329, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). First, witnesses in judicial proceedings are protected by absolute immunity against damages claims based on the substance of their testimony. *See id.* at 334 (concluding that "it is clear that § 1983 did not abrogate the absolute immunity existing at common law" for witnesses); *San Filippo v. U.S. Trust Co. of New York, Inc.,* 737 F.2d 246, 254 (2d Cir.1984) (extending *Bricoe* immunity to grand jury testimony). Second, an allegation that a private individual gave false testimony in a judicial proceeding, without more, does not establish state action for purposes of § 1983. *See Briscoe,* 460 U.S. at 329–30 ("It is beyond question that, when a private party gives testimony in open court in a criminal trial, that act is not performed 'under color of law.' "); *Flores v. Levy,* 2008 WL 4394681, at *7 (E.D.N.Y.2008) ("[T]he fact that plaintiff alleges that [a private actor] perjured herself as a witness at his trial does not transform her into a state actor."); *Cipolla v. County of Rensselaer,* 129 F.Supp.2d 436, 447 (N.D.N.Y.2001); *Elmasri v. England,* 111 F.Supp.2d 212, 221 (E.D.N.Y.2000) ("[T]he mere fact that an individual testifies at a court proceeding does not render that person a state actor.").

***13** Moreover, the fact that Herbert may have agreed to testify in exchange for the dismissal of the charges against him is not a sufficient allegation that he conspired with state actors to deprive Gordon of his constitutional rights. "To state a claim against a private entity on a section 1983 conspiracy theory, the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act." *Ciambriello v. County of Nassau,* 292 F.3d 307, 324 (2d Cir.2002) (quoting *Spear v. Town of West Hartford,* 954 F.2d 63, 68 (2d Cir.1992)). The plaintiff's submissions contain no such facts. Indeed, Gordon's allegations emphasize that Herbert was pursuing a personal vendetta against him, (Compl.¶ 59), and he does not offer any facts demonstrating that the prosecutor was even aware of any perjury on Herbert's part. The only allegation offered to show concerted action with the state is that Herbert offered to testify against Gordon in exchange for his own criminal case being dismissed. (Pl. Obj. at 21.) There is nothing inherently improper in a witness cooperation agreement and, without more, these allegations do not demonstrate a conspiracy with a state actor sufficient to establish that Herbert acted under color of state law.

Finally, as to TD Bank, Gordon has offered no facts demonstrating that it acted under color of law. The vague allegation that the private bank had a "policy or custom" under which its employees' actions occurred, or that it was negligent in supervising its employees, does not make it a state actor for § 1983 purposes, especially since the Court has already determined that its employees did not act under color of state law in reporting information to the police.

In sum, Gordon's submissions do not rise above "merely conclusory allegation [s] that a private entity acted in concert with a state actor," which "do [ ] not suffice to state a § 1983 claim against the private entity." *Ciambriello,* 292 F.3d at 324 (2d Cir.2002). The Court thus agrees with the Magistrate Judge that the § 1983 claims against the private defendants must be dismissed for this reason.

Even if the Court were to find that one or more of these defendants acted under color of law, there is an alternative basis for dismissing Gordon's § 1983 claims: This Court held above that Gordon's conviction barred him from bringing § 1983 challenges to both arrests related the events at TD Bank, or to the prosecution in 2008 that led to his conviction. The Court also held that Gordon alleged no post-arraignment deprivation of liberty that could serve as the basis of a malicious prosecution claim premised on the November 2007 arrest, and that Gordon failed to state any other claims under § 1983. As Gordon's claims against these four defendants are premised only on their alleged involvement in Gordon's arrests, prosecution, and conviction for the events at TD Bank, the dismissal holdings of this Court's prior order would apply equally to them. There are no allegations that any of these

defendants were involved in the separate false imprisonment and unreasonable detention claims that remain against Officer Peralta.

***14** Finally, the Court notes that to the extent Gordon's complaint contains fleeting citations to New York Civil Rights Law § 40–c; the state due process clause, N.Y. Const., art. 1, § 6; or the state equal protection clause, N.Y. Const., art. 1, § 11, he has not articulated such claims with any clarity. Additionally, in his objections to the R & R, he did not argue that he had asserted any state law claims against the private defendants that should be retained. Accordingly, any state law claims, if asserted here, are dismissed.

## IV. CONCLUSION

In sum, all claims against the City of New York are dismissed; and all claims against Officer Peralta are dismissed with the exception of claims for false imprisonment and unreasonable detention based on Gordon's allegations that he was unlawfully detained from November 2–4, 2007. The claims against TD Bank, Elliot Lopez, Curtis Herbert, and Isaac Duncan are dismissed in full.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 1068023

## Footnotes

1 It appears that Gordon is making this new allegation in response to the "Declined Prosecution" form from the DA's Office, which the defendants submitted as an exhibit to their motion to dismiss. (*See* O'Flynn Aff., Ex. E.)

2 Gordon also alleges that the Assistant District Attorney, without his knowledge, presented the case to a grand jury on December 6, 2007, but the grand jury did not return an indictment, and the case was again dismissed and sealed. (Compl.¶¶ 11–12, 21.)

3 While Gordon repeatedly refers to this as an "illegal conviction," (Compl.¶ 15), this assertion appears to be his own personal belief, and he never asserts that this conviction has been overturned or vacated on appeal, or that he has filed a habeas petition. Instead, he refers to it as his "current" conviction, and argues that it should have no bearing on his claims arising out of the November 2, 2007 arrest. (Pl.Opp.¶ 12.) Regardless, as discussed further *infra,* Gordon cannot bring a § 1983 claim that would necessarily imply the invalidity of a standing conviction for which he was serving his sentence when he filed this action. *See Heck v. Humphrey,* 512 U.S. 477, 486–87, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). Thus, any argument that the alleged invalidity of the conviction should lift the bar to challenging the arrest and prosecution that preceded it cannot lie.

4 The Court notes that although the defendants have made reference to an outstanding (and seemingly unrelated) warrant that may have been the basis for Gordon's detention, Gordon's submissions insist that there was no warrant involved in his detention (*e.g.* Pl. Opp. ¶ 3), and the Court accepts that allegation for purposes of this motion. Thus, Gordon has never offered any facts to suggest that he is bringing a malicious prosecution claim attacking a judicially issued warrant, *cf. Singer,* 63 F.3d at 117, but has always maintained that his claim is premised on the charges related to his warrantless arrest at TD Bank, for which there was never an arraignment.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 1550577
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Shahidah HAGANS, Plaintiff,
v.
NASSAU COUNTY DEPARTMENT OF SOCIAL SERVICES, Child Protective Services of Nassau County, Kelly Maher, Roseanne Gittens, Carolyn Rodriguez, Jewish Child Care Association (JCCA), Madonna Heights, Jane and John Does 1-20, whose names are unknown (in their official capacities), Defendants.

18-CV-1917 (JS)(AYS)
|
Signed 03/31/2020

**Attorneys and Law Firms**

For Plaintiff: Shahidah Hagans, pro se, 1 Griggs Drive, Greenlawn, New York 11740.

For Defendants Nassau County: Jennean R. Rogers, Esq., Nassau County Attorney's Office, One West Street, Mineola, New York 11501.

For Defendants Jewish Child Care Association (JCCA): Glen Feinberg, Esq., Wilson, Elser, Moskowitz, Edleman & Dicker LLP, 133 Westchester Avenue, White Plains, New York 10604.

For Defendants Madonna Heights: Robert Scott Delmond, Esq., Conway, Farrel, Curtin & Kelly, P.C., 48 Wall Street, 20th Floor, New York, New York 10005.

MEMORANDUM & ORDER

SEYBERT, District Judge:

***1** Pro se plaintiff Shahidah Hagans ("Plaintiff") initiated this action asserting violations of 42 U.S.C. §§ 1983 ("Section 1983"), 42 U.S.C. § 1985 ("Section 1985"), the New York State Constitution, and New York state tort law against defendants Nassau County Department of Social Services ("DSS"), Child Protective Services of Nassau County ("CPS"), Kelly Maher ("Maher"), Roseanne Gittens ("Gittens"), Carolyn Rodriguez ("Rodriguez") (collectively, the "Nassau County Defendants"), Jewish Child Care Association ("JCCA"), and Madonna Heights ("Madonna Heights") (collectively, "Defendants"). Currently pending before the Court are Defendants' motions to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Nassau Cty. Mot., D.E. 30; Madonna Hts. Mot., D.E. 28; JCCA Mot., D.E. 33.) For the reasons that follow, Defendants' motions to dismiss are GRANTED and Plaintiff is GRANTED leave to file a Second Amended Complaint.

BACKGROUND [1]

Plaintiff alleges that on or around July 2014, CPS, in connection with non-party Nassau County Police Department ("NCPD"), harassed her "for approximately three months" because she declined to speak to CPS without an attorney. (Am. Compl., D.E. 13, at 2.) According to Plaintiff, the NCPD sent police officers to her home when there were no reports of "imminent danger" to her children. (Am. Compl. at 2.)

Plaintiff developed an adverse relationship with the NCPD resulting in her "illegal arrest." (Am. Compl. at 2.) The Amended Complaint does not indicate when this arrest occurred. As a result, Plaintiff's children were removed from her care for two weeks. (Am. Compl. at 2.) An unspecified court granted Plaintiff's petition for her children's return and entered a temporary order of supervision pending litigation regarding the removal. [2] (Am. Compl. at 2.) According to Plaintiff, her children were not comfortable speaking with CPS and CPS disturbed her, and her children at school, by using unreasonable tactics in violation of their rights. (Am. Compl. at 2.)

On March 19, 2015, Defendant Maher, a CPS caseworker, spoke with Plaintiff's five-year-old son ("J.J.H.") at school. (Am. Compl. at 2.) J.J.H. allegedly told Maher that there was a gun in Plaintiff's home and that Plaintiff hit him. (Am. Compl. at 2.) Maher attempted to visit Plaintiff's home and left a note indicating that she would return the next day. (Am. Compl. at 2.) Later that same day, Maher returned and Plaintiff informed her that she would "not entertain any false allegations." (Am. Compl. at. 2.) Maher threatened to return with the police and six hours later removed J.J.H. from Plaintiff's home after she became angry with Plaintiff for not cooperating. (Am. Compl. at 3.) According to Plaintiff, Maher was not concerned for J.J.H.'s safety because Maher "allowed 6 hours to elapse

before making the decision to remove" J.J.H. and "acted off personal motives and vendetta."[3] (Am. Compl. at 3.)

***2** According to Plaintiff, DSS failed to follow proper protocol to reunite Plaintiff with her children and provided her with only vague answers regarding the custody process. (Am. Compl. at 3.) Plaintiff wrote to the Directors of the Foster Care Unit to alert them that Defendant Gittens was not competent and to ask for her to be replaced. (Am. Compl. at 3.) Plaintiff never received a response. (Am. Compl. at 3.)

At an unspecified time, and after her children were in DSS care for eleven months, Plaintiff received a letter detailing the process for regaining custody of her children. (Am. Compl. at 4.) Court officers informed Plaintiff that DSS declined her request for custody due to her "righteously indignant attitude." (Am. Compl. at 4.) After Plaintiff substituted counsel, she was instructed to "refrain from expressing [her] feelings outwardly" and then regained custody of her children. (Am. Compl. at 4.)

At some point after Plaintiff was criminally charged for unspecified conduct, orders of protection were entered in favor of her children against Plaintiff. (Am. Compl. at 4.) The orders of protection hindered Plaintiff's "due process rights" to Family Court hearings pursuant to Section 1028 of the Family Court Act. (Am. Compl. at 4.) Plaintiff alleges that CPS "sabotaged" her request for Family Court to retain "exclusive authority" over the orders of protection. (Am. Compl. at 4.)

Plaintiff further avers that another child ("J.J.H.") was falsely diagnosed and placed on medications that affected her cognitive function. (Am. Compl. at 4.) Moreover, the Amended Complaint alleges that JCCA acted fraudulently and conspired with CPS by maintaining "fraudulent records of [her] children's mental status, mental diagnoses, and family history." (Am. Compl. at 4.) Plaintiff also alleges that JCCA denied access to her children and, with CPS, medicated her children "against [her] will," were negligent in allowing her daughter to "engage in drugs, drinking, and unsupervised absconding," and subjecting her to "sexual molestation." (Am. Compl. at 4.) After Plaintiff's March 2015 arrest, three of her children were committed to psychiatric wards and suffered trauma. (Am. Compl. at 5-6.)

## PROCEDURAL HISTORY

Plaintiff commenced this action on March 19, 2018. (Compl., D.E. 1.) After many extensions, Plaintiff filed an Amended Complaint asserting: (1) a violation of the Child Abuse Prevention and Treatment Act ("CAPTA"), 42 U.S.C. § 5106(g), against CPS; (2) violations of Section 1983 against "each and every CPS caseworker and supervisor who had any involvement in the illegal seizure and unwarranted prolonged detainment of [Plaintiff's] children in CPS custody," who had knowledge that CPS policy and procedure were not followed, and who did not intervene;[4] (3) violations of Section 1983 against the DSS and CPS for failure to train, supervise, and discipline employees municipal liability; (4) violations of Section 1985 and the Fourth, Fifth, and Fourteenth Amendments against the "defendant officers and prosecuting attorneys" for conspiracy and against CPS for attempting to suppress her freedom of speech, for violating the rights of her children to advocate for themselves, and for conspiring to keep her children away from and compromising her rights as a parent; (5) against all Defendants for violations of the New York State Constitution, Article I, Sections 5, 6, 8, 11, and 12; and (6) against all Defendants for violations of various claims sounding in tort. (See Am. Compl. at 5-7.)

***3** Plaintiff seeks $1 million in actual damages, $600,000 in punitive damages, and an order directing the removal of records in the Department of Children and Families database. (Am. Compl. at 7.)

## DISCUSSION

I. Legal Standard

To withstand a motion to dismiss, a complaint must contain factual allegations that " 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)). This plausibility standard is not a "probability requirement" and requires "more than a sheer possibility that a defendant has acted unlawfully." Id. (internal quotation marks and citation omitted).

In deciding a motion to dismiss, the Court is confined to "the allegations contained within the four corners of [the] complaint," Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 71 (2d Cir. 1998), but this has been interpreted broadly to include any document attached to the complaint, any statements or documents incorporated in the complaint by reference, any document on which the complaint heavily

relies, and anything of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152–52 (2d Cir. 2002).

A complaint filed by a pro se litigant is to be construed liberally and "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007). Nevertheless, a pro se complaint must state a plausible claim for relief and comply with the minimal pleading standards set forth in Federal Rule of Civil Procedure 8. Hiller, 2015 WL 4619624, at *7.

II. Claims Against Madonna Heights and JCCA

Plaintiff seeks relief against Madonna Heights although Madonna Heights is mentioned only once in the prayer for relief. (See Am. Compl. at 7.) Plaintiff also seeks relief against JCCA although she refers to JCCA in only one paragraph of the Amended Complaint and in the prayer for relief. (Am. Compl. at 4, 7.)

Madonna Heights moves to dismiss the Amended Complaint because, among other reasons, Plaintiff does not allege any facts under Section 1983 to establish Madonna Heights was involved in an alleged constitutional deprivation. (Madonna Heights Br., D.E. 28-2, at 6-9.) JCCA moves to dismiss the Amended Complaint on the grounds that (1) Plaintiff does not allege how JCCA violated her constitutional rights nor that JCCA is a state actor and (2) state law claims fail as a matter of law. (JCCA Br., D.E. 35, at 3-9.)

In opposition, Plaintiff does not reference or make any arguments as to Madonna Heights or JCCA. (See generally Pl. Opp., D.E. 42.) Thus, Plaintiff's claims against Madonna Heights and JCCA are deemed abandoned and are DISMISSED with leave to amend. Jennings v. Hunt Companies, Inc., 367 F. Supp. 3d 66, 69 (S.D.N.Y. 2019) (collecting cases); Randall v. Dish Network, LLC, No. 17-CV-5428, 2018 WL 3235543, at *5 (E.D.N.Y. July 2, 2018) (collecting cases); Verdi v. City of N.Y., 306 F. Supp. 3d 532, 552 (S.D.N.Y. 2018).

III. Claims Against Defendant Rodriguez

Plaintiff names Defendant Rodriguez in the case caption although the Amended Complaint contains no allegations at all as to Defendant Rodriguez. (See generally Am. Compl.) " 'It is well-settled that where the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted.' " Moschetto v. Nassau Cty. Sheriff, No. 10-CV-1971, 2011 WL 2457927, at *3 (E.D.N.Y. June 16, 2011) (quoting Dove v. Fordham Univ., 56 F. Supp. 2d 330, 335 (S.D.N.Y. 1999)); Kalamaras v. Ewald, No. 13-CV-4274, 2013 WL 6081705, at *3 (E.D.N.Y. Nov. 18, 2013). In opposition, Plaintiff argues that "Rodriguez showed gross negligence in [her] duties ... to withhold my children from me based on practices that were outside the scope of [her] duties." (Pl. Opp. at 8.) However, because Plaintiff may not use "her opposition to a dispositive motion as a means to amend the complaint," claims against Defendant Rodriguez are DISMISSED with leave to amend. Shah v. Helen Hayes Hosp., 252 F. App'x 364, 366 (2d Cir. 2007).

IV. Claims Pursuant to CAPTA (42 U.S.C. § 5106(g)) against CPS

***4** Plaintiff asserts a violation of CAPTA against CPS. (Am. Compl. at 5.) However, "none of the 'provisions of CAPTA provide[ ] for an independent private right of action, or that an implied right of action exists pursuant to 42 U.S.C. § 1983 for a violation of this action.' " Hamrick v. Hamrick, No. 14-CV-0176, 2014 WL 1795163, at *10 (N.D.N.Y. May 6, 2014) (quoting Ingrao v. Cty. of Albany, No. 01–CV-0730, 2006 WL 2827856, at *6 (N.D.N.Y. Oct. 2, 2006)) (alterations in original); see also Daniels v. Murphy, No. 06-CV-5841, 2007 WL 1965303, at *2 n.4 (E.D.N.Y. July 2, 2007). Accordingly, Plaintiff's claims under CAPTA are DISMISSED with prejudice.

V. Claims Asserted on Behalf of Plaintiff's Children

It appears that Plaintiff may assert claims on behalf of her children. (See, e.g., Am. Compl. at 7.) Federal Rule of Civil Procedure 17(c)(1)(A) permits a guardian to bring suit on behalf of a minor. "However, it is well established that '[a] person who has not been admitted to the practice of law may not represent anybody other than himself.' " Bullock v. DSS, No. 17-CV-1302, 2018 WL 1115218, at *4 (N.D.N.Y. Jan. 18, 2018), R&R adopted, 2018 WL 1111059 (N.D.N.Y. Feb. 26, 2018) (quoting Guest v. Hansen, 603 F.3d 15, 20 (2d Cir. 2010)). This rule extends to parents: "[A] parent not admitted to the bar cannot bring an action pro se in federal court on behalf of his or her child." Tindall v. Pultney High Sch. Dist., 414 F.3d 281, 284-85 (2d Cir. 2005).

Plaintiff does not sufficiently state on whose behalf many of her claims are made. Therefore, if Plaintiff files a Second

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Amended Complaint and proceeds pro se, as described below, she should not include any claims on behalf of her minor children.

VI. Plaintiff's Section 1983 Claims

To state a claim under Section 1983, Plaintiff must plead that Defendants deprived her of a federal or constitutional right while acting under color of state law. Cox v. Warwick Valley Cent. Sch. Dist., 654 F.3d 267, 272 (2d Cir. 2011). As a preliminary matter, Plaintiff alleges that CPS workers were "negligent in their duties" in violation of Section 1983. (Am. Compl. at 5, 7.) "Allegations of negligence are insufficient to state a claim under § 1983." Butler v. N.Y. State Corr. Dep't, No. 94-CV-5054, 1996 WL 438128, at *3 (S.D.N.Y. Aug. 2, 1996) (citing Daniels v. Williams, 474 U.S. 327, 331, 106 S. Ct. 662, 665, 88 L. Ed. 2d 662 (1986)). On this basis, claims against the individual named CPS caseworker Defendants, and "each and every CPS caseworker and supervisory who had any involvement" (Am. Compl. at 5), in the removal of Plaintiff's children, are DISMISSED with leave to amend.

Nonetheless, after a liberal reading of the Complaint, the Court construes the Amended Complaint as asserting Section 1983 claims arising out of due process violations for: (1) CPS's decision to remove her children from her home; (2) CPS's failure to follow proper procedure in removing her children from her home; and (3) the decision to pursue an order of protection causing Plaintiff's separation from her children. (See Am. Compl. at 3-4; Pl Opp. at 3-4.) "The state's removal of a child from his or her parent may [ ] give rise to a variety of cognizable constitutional claims." Southerland v. City of N.Y., 680 F.3d 127, 142 (2d Cir. 2012) (explaining that parents may assert a claim for violation of right to substantive due process and due process). The Court addresses each in turn.

A. Substantive Due Process

***5** "Parents have a 'substantive right under the Due Process Clause to remain together with their children without the coercive interference of the awesome power of the state.' " Southerland, 680 F.3d at 142 (quoting Tenenbaum v. Williams, 193 F.3d 581, 600 (2d Cir. 1999)) (alterations omitted). " 'While a procedural due process claim challenges the procedure by which a removal is effected, a substantive due process claim challenges the 'fact of the removal' itself.' " Id. (quoting Bruker v. City of N.Y., 92 F. Supp. 2d 257, 266–67 (S.D.N.Y. 2000)) (alteration in original). To establish a substantive due process violation based on the removal of children from the home, " 'a plaintiff must demonstrate that the state action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " Mortimer v. City of N.Y., No. 15-CV-7186, 2018 WL 1605982, at *14 (S.D.N.Y. Mar. 29, 2018) (quoting Southerland, 680 F.3d at 151) (internal quotation marks omitted).

There is no violation of a parent's constitutionally protected interests where a caseworker "has a reasonable basis for thinking that the child is abused or neglected." Southerland, 680 F.3d at 152. The reasonable basis standard reflects the "need for unusual deference" to those who investigate allegations of child abuse or neglect. Id. A temporary removal for several days does not affect a substantive due process violation where the purpose is to keep the child safe. Id. at 152-53. Of critical significance, once a "court confirmation of the basis for removal is obtained, any liability for the continuation of the allegedly wrongful separation of parent and child can no longer be attributed to the officer who removed the child." Id. at 153 (internal quotation marks and citations omitted).

Accepting all allegations as true, Plaintiff asserts a plausible substantive due process claim if a post-removal judicial proceeding was not "promptly held to confirm that there exists a reasonable basis for the removal." Id., 680 F.3d at 153. However, Plaintiff fails to allege sufficient facts for the Court to ascertain the period of time for which her claim is based. Indeed, it is not entirely clear to the Court whether Plaintiff's claim is based on a removal that occurred in 2014 or 2015, or beyond.

Further, Defendants argue, on information and belief, that "the Nassau County Family Court issued some form of a ruling that substantiated the findings of neglect and removal of her children." (Nass. Co. Br., D.E. 32, at 15.) If true, "any liability for the continuation of the allegedly wrongful separation of parent and child can no longer be attributed to the officer who removed the child." Southerland, 680 F.3d at 153 (citations omitted). Yet, the Court cannot determine the "viability of such a substantive due process cause of action on the facts ... because the record is not entirely clear as to whether such a post-removal judicial proceeding occurred, and if so, the nature of it." Id. at 154. Accordingly, Plaintiff's substantive due process claim arising out of the removal of her children is DISMISSED with leave to amend.

B. Procedural Due Process

Both "parents and the children may have a cause of action for violation of the Fourteenth Amendment under a theory of denial of procedural due process." Southerland, 680 F.3d at 142. In the Second Circuit, "before parents may be deprived of the care, custody, or management of their children without their consent, due process--ordinarily a court proceeding resulting in an order permitting removal--must be accorded to them." Id. at 149 (internal quotation marks and citation omitted). However, "children may be removed without a court order or parental consent in emergency circumstances where there is objectively reasonable evidence that the 'children will be left bereft of care and supervision' and that the risk of harm to the children is imminent." Mortimer, 2018 WL 1605982, at *16 (quoting Southerland, 680 F. 3d at 149).

***6** Plaintiff argues a violation of procedural due process with respect to J.J.H.'s removal because Defendant Maher had no "factual basis to believe there was imminent danger" and instead acted on personal motives. (Pl. Opp. at 4; Am. Compl. at 3.) The Court construes this as asserting a violation of procedural due process based on inadequate pre-removal proceedings. At this stage in the proceedings, Plaintiff's "allegation--that there was no emergency that warranted the children's removal without a court order--is sufficient," and Plaintiff states a claim that J.J.H. was not in imminent danger, and there was "reasonably sufficient time to seek prior judicial authorization." Sulaymu-Bey v. City of N.Y., No. 17-CV-3563, 2019 WL 1434597, at *5 (E.D.N.Y. Mar. 29, 2019); Southerland, 680 F.3d at 149 (citations omitted).

However, like Plaintiff's substantive due process claim, the Court cannot decipher the basis for Plaintiff's remaining claims for violations of procedural due process, if any. Plaintiff alleges that unspecified orders of protection hindered her right to due process pursuant to Family Court Act § 1028.[5] Yet, the Court cannot determine (1) the date(s) on which any other removals occurred and whether it is limited to all or some of her children; (2) whether Plaintiff's due process claims are limited to pre-removal procedures or post-removal procedures; (3) details regarding the time, place or substance of any post-removal hearings or orders of protection. Accordingly, any procedural due process claim based on inadequate pre-removal proceedings (other than the removal of J.J.H. described above) and post-removal proceedings are DISMISSED with leave to amend. See Charles v. ACS Kings, No. 16-CV-6589, 2017 WL 384323, at *4 (E.D.N.Y. Jan. 25, 2017).

C. False Arrest and Malicious Prosecution

The Court also construes the Amended Complaint to allege Section 1983 claims for false arrest and false imprisonment against the individually-named CPS Defendants on the basis that they provided false or misleading evidence that resulted in her arrest. (Am. Compl. 2.)

In the context of Section 1983 false arrest and malicious prosecution claims, " '[a] civilian complainant, by merely seeking police assistance or furnishing information to law enforcement authorities who are then free to exercise their own judgment as to whether an arrest should be made and criminal charged filed, will not be held liable for false arrest or malicious prosecution.' " Gonzalez v. Delaware Cty., No. 17-CV-0373, 2017 WL 6001823, at *8 (N.D.N.Y. Dec. 4, 2017) (quoting Carmellino v. District 20 of N.Y.C. Dep't of Educ., No. 03-CV-5942, 2006 WL 2583019, at *61 (S.D.N.Y. Sept. 6, 2006)). "An officer's independent decision to arrest a suspect normally 'severs the causal connection' between the informant and the arrestee." Id. (quoting Soto v. City of N.Y., 132 F. Supp. 3d 424, 443 (E.D.N.Y. July 22, 2011)). An informant may be held responsible, however, "if she 'takes an active role in the arrest of the plaintiff, such as giving advice and encouragement or importuning the authorities to act, with the intent to confine plaintiff.' " Id. (quoting TADCO Constr. Corp. v. Dormitory Auth. of State of N.Y., 700 F. Supp. 2d 253, 269 (E.D.N.Y. Mar. 19, 2010)) (internal quotation marks and citation omitted). "Such an active role includes the provision of false information leading to an arrest, where the defendants 'lacked reasonable cause for their belief in the plaintiff's culpability.' " Id. (internal quotation marks and citations omitted).

***7** Here, under a liberal review of the Amended Complaint, Plaintiff does not allege any facts surrounding the allegation that the CPS Defendants insisted or even recommended that officers arrest Plaintiff or that prosecutors criminally prosecute Plaintiff. On that basis, these claims are DISMISSED with leave to amend.[6]

VII. Fourth Amendment

To the extent Plaintiff alleges that Defendants violated her Fourth Amendment right to be free from illegal searches and seizures as a parent related to the "seizure" of her children, those claims are DISMISSED with prejudice. " 'Fourth Amendment rights are personal rights' that 'may not be vicariously asserted,' such that only the allegedly seized children--not their parents--may assert a violation of

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

the Fourth Amendment related to seizure of a child by a governmental entity." Smith v. Tkach, No. 17-CV-0286, 2019 WL 3975440, at *12–13 (N.D.N.Y. Aug. 22, 2019) (quoting Uwadiegwu v. Dep't of Soc. Servs. of the Cty. of Suffolk, 91 F. Supp. 3d 391, 395 (E.D.N.Y. 2015)) (additional citation omitted). Here, Plaintiff seeks to vindicate only her personal Fourth Amendment rights and not those of her children. Therefore, such a claim necessarily fails. Southerland, 680 F.3d at 143.

VIII. Municipal Liability Claim Against DSS and CPS

Plaintiff argues that DSS and CPS "failed to properly train their caseworkers, or supervise and discipline their case workers to correct illegal practices in investigations, abuse of power, illegal detainment of children, obligation not to promote or condone perjury and/or assist prosecution of innocent persons, and failure to reunify the family." (Am. Compl. at 5-6.)

Plaintiff's request for relief against DSS and CPS is DISMISSED with prejudice because they are administrative arms of Nassau County and lack the capacity to be sued as separate entities. See, e.g., Bullock v. DSS, CPS, Comm'r, No. 17-CV-1302, 2018 WL 1115218, at *5 (N.D.N.Y. Jan. 18, 2018), R&R adopted, 2018 WL 1111059 (N.D.N.Y. Feb. 26, 2018) (citing Rose v. Cty. of Nassau, 904 F. Supp. 2d 244, 247 (E.D.N.Y. 2012)); Schweitzer v. Crofton, 935 F. Supp. 2d 527, 551 (E.D.N.Y. 2013) ("Plaintiffs' claim against the Suffolk County Department of Social Services must be dismissed because it is not a sueable entity."); Bey v. State of N.Y., No. 11-CV-3296, 2013 WL 3282277, at *5 (E.D.N.Y. June 25, 2013) (dismissing claims against Nassau County Child Protective Services because it "is an administrative arm of the County, and not an independent legal entity, it lacks the capacity to be sued").

***8** Given Plaintiff's pro se status and affording the Amended Complaint a liberal construction, the Court considers whether Plaintiff has alleged a plausible Section 1983 claim against Nassau County and finds that she has not. Beyond the facts alleged in this particular case, Plaintiff has not articulated facts regarding the existence of a custom or policy in Nassau County. See Cash v. Cty. of Erie, 654 F.3d 324, 333 (2d Cir. 2011). "It is well-established that 'a single incident in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy.' " Raphael v. Cty. of Nassau, 387 F. Supp. 2d 127, 131 (E.D.N.Y. 2005) (quoting Ricciuti v. N.Y. City Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991)). Plaintiff has not alleged, nor has she argued, the existence of similar incidents and her "reliance on the facts alleged in this single incident fail to rise to the level of custom or policy required for municipal liability." Id. Therefore, to the extent alleged, Plaintiff's municipal liability claim against Nassau County is DISMISSED with leave to amend.

IX. Conspiracy under Sections 1983 and 1985

Plaintiff argues that CPS (1) conspired with the County Attorney for Nassau County Family Court to keep her children from her custody and (2) conspired with the police department during her arrest. (Pl. Opp. at 10-11; Am. Compl. at 5-6.) The Nassau County Defendants argue that the intra-corporate conspiracy doctrine bars Plaintiff's conspiracy claims. (Nass. Co. Br. at 23.)

To state a claim for conspiracy in violation of an individual's constitutional rights, a plaintiff must show: "(1) a conspiracy (2) for the purpose of depriving a person of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." Salgado v. City of N.Y., 00-CV-3667, 2001 WL 290051, at *8 (S.D.N.Y. Mar. 26, 2001) (citations omitted).

The intra-corporate conspiracy doctrine "posits that the officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other." Daniel v. Long Island Hous. P'ship, Inc., No. 08–CV–1455, 2009 WL 702209, at *9 (E.D.N.Y. Mar. 13, 2009) (collecting cases); see also Herrmann v. Moore, 576 F.2d 453, 459 (2d Cir. 1978) ("[T]here is no conspiracy [under Section 1985] if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own ... officers [ ] and employees, each acting within the scope of his employment."); Rini v. Zwirn, 886 F. Supp. 270, 292 (E.D.N.Y. 1995). "An exception to the intra-corporate conspiracy doctrine applies to individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity." Tardd v. Brookhaven Nat'l Lab., 407 F. Supp. 2d 404, 414 (E.D.N.Y. 2006) (quoting Bond v. Bd. of Educ., No. 97-CV-1337, 1999 WL 151702, *1 (E.D.N.Y. Mar. 17, 1999)).

Plaintiff alleges that Defendant Maher was acting "off of personal motives and vendetta" when removing her children

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

from her home. (Am. Compl. at 3.) However, "personal bias or prejudice alone, does not support application of the exception; rather there must be some other personal interest or stake alleged on the part of the individual defendants." Broich v. Inc. Vill. of Southampton, 650 F. Supp. 2d 234, 247 (E.D.N.Y. 2009) (citations omitted). Having carefully reviewed the allegations in the Amended Complaint, Plaintiff has not alleged facts from which it could be inferred that Defendant Maher, in connection with other unnamed Nassau County Police Officers and County Attorneys, was motivated by some "personal stake" rather than carrying out CPS policy. See Dunlop v. City of N.Y., No. 06-CV-0433, 2008 WL 1970002, at *10 (S.D.N.Y. May 6, 2008); cf. Ali v. Connick, 136 F. Supp. 3d 270, 282-83 (E.D.N.Y. 2015).

***9** Moreover, although the Amended Complaint does not name the County Attorney, NCPD, nor the individual Nassau County Police Officers as defendants, Plaintiff's vague and conclusory allegations that Defendants have engaged in a conspiracy to violate her constitutional rights are insufficient to state a claim. Salgado, 2001 WL 290051, at *8-9; Ciambriello v. Cty. of Nassau, 292 F.3d 307, 325 (2d Cir. 2002) (dismissing conspiracy allegations where they were found "strictly conclusory"); Walker v. Jastremski, 430 F.3d 560, 564 n.5 (2d Cir. 2005) ("[C]onclusory or general allegations are insufficient to state a claim for conspiracy under § 1983." (citing Ciambriello, 292 F.3d at 325)); Sommer v. Dixon, 709 F.2d 173, 175 (2d Cir. 1983). Therefore, Plaintiff's conspiracy claims are DISMISSED with leave to amend. Salgado, 2001 WL 290051, at *9.

X. Remaining State Law Claims

Having dismissed Plaintiff's federal claims, the Court declines to retain jurisdiction to address Plaintiff's remaining state law claims. One Commc'ns Corp. v. J.P. Morgan SBIC LLC, 381 F. App'x 75, 82 (2d Cir. 2010) ("If all of a plaintiff's federal claims are dismissed, a district court is well within its discretion to decline to assert supplemental jurisdiction over any state law claims.").

However, the Nassau County Defendants argue that Plaintiff's state law claims must be dismissed for failure to comply with New York General Municipal law § 50 et seq. (Nassau Cty. Br. at 20-21.) Plaintiff argues she filed a "Notice of Claim with the Nassau County Clerk to notify the Defendant[s] of my intent to sue within the 3-month period." (Pl. Opp. at 1.) Plaintiff does not allege the date on which she filed a Notice of Claim. Any Amended Complaint should state the date on which Plaintiff filed her Notice of Claim and to whom.

XI. Leave to Amend

Given the Second Circuit's guidance that a pro se complaint should not be dismissed without leave to amend unless amendment would be futile, Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000), the Court has carefully considered whether leave to amend is warranted and GRANTS Plaintiff a second opportunity to amend the Complaint to allege her claims in accordance with Federal Rule of Civil Procedure 8 and Federal Rule of Civil Procedure 10 and the guidance set forth above. If needed, Plaintiff shall contact the Hofstra Pro Se Legal Clinic (631-297-2575) or the Pro Se Office (631-712-6060) should she have any questions about obtaining legal assistance. Plaintiff is advised that due to current health concerns, the Hofstra Pro Se Legal Clinic is CLOSED until further notice. However, where appropriate, it will conduct appointments via telephone until it reopens. If Plaintiff wishes to schedule a phone appointment with the Clinic, she should email PSLAP@Hofstra.edu or leave a message at 631-297-2575 and the Clinic will respond and schedule a phone conference appointment.

Any Amended Complaint shall be clearly labeled "Second Amended Complaint," shall bear docket number 18-CV-1917, and shall be filed within thirty (30) days from the date of this Memorandum and Order. Plaintiff shall also parse out her factual allegations into numbered paragraphs, each limited to a single set of circumstances pursuant to Federal Rule of Civil Procedure 10. If there are individuals that Plaintiff seeks to name as Defendants in her Second Amended Complaint and she cannot identify the individuals personally involved in the constitutional deprivations within the time allowed in this Order, she may designate those Defendants as "John/Jane Doe, working at (location) on (date)" in the caption and provide descriptive information of those individuals in the body of the Second Amended Complaint to allow for their subsequent identification. Plaintiff should not include any claims on behalf of her minor children if she proceeds pro se.

***10** Plaintiff is cautioned that the Second Amended Complaint COMPLETELY replaces the original Complaint and the Amended Complaint. Therefore, all claims and allegations Plaintiff wishes to pursue must be included in the Second Amended Complaint. If Plaintiff does not timely file a Second Amended Complaint, judgment shall enter and this case will be marked closed.

CONCLUSION

For the reasons stated, Defendants' motions to dismiss (Nassau Cty. Mot., D.E. 30; Madonna Heights Mot., D.E. 28; JCCA Mot., D.E. 33) are GRANTED. Plaintiff's claims under CAPTA, for municipal liability against DSS and CPS, for violations of the Fourth Amendment, and on behalf of her minor children (to the extent she proceeds pro se) are DISMISSED WITH PREJUDICE. Plaintiff's claims against Maddona Heights, JCCA, and Rodriguez as well as Plaintiff's Section 1983 claims for violations of substantive and procedural due process, false arrest, malicious prosecution, unlawful search, municipal liability against Nassau County, and Section 1983 and 1985 conspiracy claims are DISMISSED WITHOUT PREJUDICE. The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims.

Plaintiff is GRANTED leave to file a Second Amended Complaint in accordance with this Memorandum and Order. Any Second Amended Complaint shall be clearly labeled "Second Amended Complaint," bearing docket number 18-CV-1917, and shall be filed within thirty (30) days from the date of this Memorandum and Order. If Plaintiff does not timely file a Second Amended Complaint, judgment shall enter and this case will be marked closed.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and therefore in forma pauperis status is denied for purpose of an appeal. Coppedge v. United States, 369 U.S. 438, 444-45, 82 S. Ct. 917, 920-21, 8 L. Ed. 2d 21 (1962). The Clerk of the Court is directed to mail a copy of this Memorandum and Order to the pro se Plaintiff.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1550577

## Footnotes

1 The allegations in the Amended Complaint are assumed to be true for purposes of this Memorandum and Order. Dick v. Enhanced Recovery Co., LLC, No. 15-CV-2631, 2016 WL 5678556, at *2 (E.D.N.Y. Sept. 28, 2016) (citation omitted).

2 Plaintiff references "civil litigation pending for the wrongful arrest." (Am. Compl. at 2.) The Court assumes Plaintiff is referring to the separate action pending before this Court at No. 18-CV-1918.

3 Although not named as Defendants, Plaintiff alleges that between November 2014 and March "20165," the principal of Westbury School District and Dryden Elementary School aided CPS by disclosing privileged information that "in no way constituted any neglect or abuse" rather than by official report. (Am. Compl. at 3.) The school district ignored Plaintiff's request to prohibit her children from speaking with CPS without her authorization. (Am. Compl. at 3.) Plaintiff initiated a separate action against North Babylon School District and various school officials at Case No. 18-CV-0464.

4 As for the first cause of action, Plaintiff alleges a variety of claims as the basis for Section 1983 liability. (Am. Compl. at 5.)

5 To the extent Plaintiff asserts claims regarding the adequacy of the Family Court proceedings, the court lacks subject matter jurisdiction. Under the Rooker-Feldman doctrine, the Court is barred from reviewing issues that have been adjudicated in state court. See Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 283-84, 125 S. Ct. 1517, 161 L. Ed. 2d 454 (2005). The Court also cannot decide issues "inextricably intertwined" with state court decisions. See e.g., Exxon Mobil Corp., 544 U.S. at 286 n.1 (citation omitted). There are no allegations regarding proceedings in the underlying Family Court case. Nonetheless, "whether ongoing or final, the court lacks subject matter jurisdiction to address issues dealing with child custody, neglect

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

and visitation." Johnson v. N.Y., No. 04-CV-1070, 2007 WL 764514, at *5 n.2 (E.D.N.Y. Mar. 9, 2007), aff'd, 283 F. App'x 877 (2d Cir. 2008) (citing Phifer v. City of N.Y., 289 F.3d 49, 57 (2d Cir. 2002)).

6 Plaintiff argues in opposition that an unspecified person used "her authority to encite [sic] and influence the invasion into my home and property." (Pl. Opp. at 4.) However, for the reasons stated above, Plaintiff's claim, to the extent alleged, for unlawful search against the individually-named CPS Defendants on the basis that they provided false or misleading evidence resulting in a search of Plaintiff's home, is DISMISSED. See Cook v. City of N.Y., 243 F. Supp. 3d 332, 345 (E.D.N.Y. 2017) ("A plaintiff can demonstrate that her right not to be searched without a warrant 'was violated where the officer submitting the probable cause affidavit 'knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit' or omitted material information, and that such false or omitted information was 'necessary to the finding of probable cause.' ' ") (quoting McColley v. Cty. of Rensselaer, 740 F.3d 817, 823 (2d Cir. 2014)) (additional citation omitted).

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Distinguished by Buari v. City of New York, S.D.N.Y., March 30, 2021

2018 WL 5020173
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Nathaniel ISAAC, Plaintiff,
v.
The CITY OF NEW YORK, et al., Defendants.

16-CV-4729 (KAM)
|
Signed 08/06/2018

**Attorneys and Law Firms**

Ameer Nadav Benno, Finz & Finz PC, Mineola, NY, Corey T. Lee, C.T. Lee & Associates, New York, NY, for Plaintiff.

Andrew W. Manoff, Elissa Paulette Fudim, Corporation Counsel of the City of New York, Qiana Charmaine Smith-Williams, New York City Law Department, New York, NY, for Defendants.

## REPORT AND RECOMMENDATION

ROANNE L. MANN, CHIEF UNITED STATES MAGISTRATE JUDGE

***1** Plaintiff Nathaniel Isaac ("plaintiff") brings this action pursuant to 42 U.S.C. § 1983 against the City of New York (the "City"), and employees of the New York Police Department (the "NYPD"), i.e., Police Officer ("P.O.") Roberto Assencao, P.O. Lisaura Messa, Lieutenant ("Lt.") Brian Kenny, Detective ("Det.") John Hachadoorian, Det. Ronald Buell (collectively, "defendants"), along with John Does 1-10, alleging violations of his constitutional rights and related state law claims. See Amended Complaint (Jan. 3, 2017) ("Am. Compl."), Electronic Case Filing Docket Entry ("DE") #13. Currently pending before this Court, on a referral from the Honorable Kiyo A. Matsumoto, is defendants' motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. See Electronic Order Referring Motion (Apr. 27, 2018); Motion to Dismiss (Oct. 24, 2017), DE #39.

For the reasons discussed below, this Court recommends that defendants' Rule 12(c) motion be granted in part and denied in part.

## FACTUAL BACKGROUND

The following facts are drawn from plaintiff's Amended Complaint and are accepted as true for purposes of this motion.

### I. Plaintiff's First Arrest

At approximately 7:50 p.m. on May 27, 2008, Gagan Kharbanda and George Stefas were standing on 22nd Street between 39th and 40th Avenues in Long Island City, Queens, New York, [1] when they saw two boxes fall from the roof of 39-40 22nd Street, an industrial warehouse that was across the street and up the block from where they were standing. See Am. Compl. ¶ 39. Kharbanda and Stefas then observed a person slide down a pole that was attached to the side of the building, land on the street and run away, leaving the boxes in front of the building. See id. ¶ 40. Kharbanda called 911 and described the person he had seen as a 40-year old black male, who ran down 22nd Street toward 40th Avenue, and made a right turn onto 40th Avenue. See id. ¶ 41.

NYPD Officers Assencao and Messa of the PSA 9th Precinct were driving south on 22nd Street towards 40th Avenue when they were flagged down by Stefas. See id. ¶¶ 42, 43. As they were being flagged down, the officers heard over the police radio the information provided to the 911 operator by Kharbanda. See id. ¶ 43. When the officers pulled over, Stefas and Kharbanda told them the same information that Kharbanda had provided the 911 operator. See id. ¶ 44. At this time, there were several people on the block, including plaintiff, who was about 100 feet away, walking on 22nd Street toward 39th Avenue, the direction opposite from that of the man whose actions had been described by Kharbanda to the 911 operator. See id. ¶ 45. "Other than being a black male, plaintiff did not match the description" provided to the 911 operator and transmitted over the police radio, or the description provided by the two civilian witnesses in person. See id. ¶ 46. Nevertheless, the officers drove over to plaintiff and immediately stopped and handcuffed him. See id. ¶ 47. Plaintiff was carrying only a small bag containing his personal effects. See id. ¶ 48. Lt. Kenny, the officers' supervisor, arrived at the scene, whereupon Stefas and Kharbanda gave

him the same information that had been communicated to the 911 operator and Officers Assencao and Messa. See id. ¶ 49.

***2** Officer Assencao and Lt. Kenny went up to the roof of 39-40 22nd Street to investigate, along with members of the NYPD's Emergency Services Unit ("ESU"). See id. ¶¶ 51-52. None of the officers saw any signs of forced entry into the building or the adjoining buildings, or any property damage. See id. ¶¶ 52-53. Officers Assencao and Messa, with Lt. Kenny's authorization, then arrested plaintiff for trespassing and Assencao vouchered the two boxes, which contained women's shoes. [2] See id. ¶ 54.

Later that day, or early the next morning, Assencao told Assistant District Attorney ("ADA") Richard Giordano of the Queens County District Attorney's Office that there were no signs of forced entry at the subject building or the adjoining premises. See id. ¶ 55. Nevertheless, in order to justify the arrest, and to corroborate the statement of one of the civilian witnesses that the person from the roof had been pushing a shopping cart, Assencao falsely added that when he stopped plaintiff, plaintiff was pushing a shopping cart. See id. ¶ 56. Assencao also falsely told ADA Giordano that he had seen plaintiff carrying the two boxes of women's shoes and that Kharbanda and Stefas identified plaintiff as the person they had observed throw the boxes off the roof. See id. ¶¶ 57, 58. In addition, Assencao falsely told Giordano that plaintiff was the only other person on the block when Assencao and Messa stopped him. See id. ¶ 60. According to the Amended Complaint, Assencao lied in an effort to convince the prosecutors that plaintiff's arrest was proper and thereby protect the officers and their precinct. See id. ¶ 62. The lies he told them appeared in the Criminal Court complaint, which was signed by Assencao. See id. ¶ 65.

Plaintiff was subsequently arraigned in Queens County Criminal Court on one count of Criminal Trespass in the Third Degree, a class B misdemeanor. See id. ¶ 64. Plaintiff pled not guilty, was unable to post bail, and was not released from custody until June 2, 2008, when the prosecution failed to convert the criminal complaint into an information and the charge was dismissed. See id. ¶¶ 70-71.

**II. Plaintiff's Second Arrest**

Meanwhile, on May 29, 2008, Paoling Hsia, the owner of the building located at 39-35 21st Street, which was one of the buildings adjacent to the building located at 39-40 22nd Street, returned from a six-day absence. See id. ¶ 72. Hsia discovered that one of her building's second-floor windows was broken, and that bricks that had been used to secure the window frame and a metal security gate had been removed. See id. Hsia also observed that 8 of the 10 cartons of boots that had been stored on the second floor were missing, along with a circular saw, a compressor, and a 70- to 100-pound generator. See id. ¶ 74. Hsia reported the incident to the police, and she met with Det. Hachadoorian on June 19, 2008. See id. ¶¶ 75-76. At that meeting, Det. Hachadoorian showed Hsia the two boxes of shoes that had been vouchered by P.O. Assencao in connection with plaintiff's May 27, 2008 arrest, but Hsia could not definitively identify the shoes as having been taken from her warehouse. See id. ¶¶ 76-77.

On June 24, 2008, Det. Hachadoorian interviewed Kharbanda, who repeated the same story he had told the 911 operator and Assencao and Messa on the day of plaintiff's arrest. See id. ¶ 79. Det. Hachadoorian falsely recorded in his notes that Kharbanda told him that the person Assencao and Messa stopped on May 27, 2008 was the same person he had observed pushing boxes off the roof. See id. ¶ 80.

***3** On June 25, 2008, plaintiff was arrested again and charged with one count each of Burglary in the Third Degree, Criminal Mischief in the Third Degree and Criminal Possession of Stolen Property in the Fourth Degree. See id. ¶ 85. The criminal complaint filed in Queens County Criminal Court was signed by Det. Hachadoorian, see id. ¶ 87, and stated the following: The building located at 39-35 21st Street, which was adjacent to the building located at 39-40 22nd Street, housed a company named Forenzi Incorporated. See id. ¶ 88. The complaint falsely stated that on May 29, 2008, Paoling Hsia, the owner of Forenzi Incorporated and its building, observed that the fence on the roof of 39-40 22nd Street had been dislodged from a post, and that a window frame on a second-story window of the Forenzi Incorporated building had been removed and the window pane broken, but that the fence had been undamaged when Hsia had last left the building on May 23, 2008. See id. ¶¶ 88-90. "[O]ne generator, one compressor, one circular saw and an unknown quantity of shoes" were discovered missing from inside the building. See id. ¶ 89. [3] The new criminal complaint also falsely stated that Kharbanda told Det. Hachadoorian that he had seen plaintiff throw two boxes off the roof of 39-40 22nd Street, jump down and run away with the two boxes. See id. ¶ 91. Hachadoorian further falsely stated in the criminal complaint that P.O. Assencao had recovered the two boxes, containing approximately 24 pairs of shoes, from plaintiff's person. See id. ¶ 92.

Plaintiff pleaded not guilty to the charges and, again unable to afford bail, remained incarcerated. See id. ¶¶ 97-98.

Thereafter, P.O. Assencao and Det. Hachadoorian gave false testimony to the grand jury. See id. ¶¶ 99-100. P.O. Assencao testified that "a complainant" had reported that plaintiff tossed the boxes of women's shoes off the roof, and, Assencao claimed, plaintiff had been pushing a shopping cart when he stopped him. See id. ¶¶ 101-03. Assencao further falsely testified that when stopped, plaintiff admitted that prior to the officers' arrival, he had been looking at the boxes of women's shoes. See id. ¶¶ 106-07. Assencao also falsely testified that when he went to the roof to investigate, he observed that a portion of the fence separating the buildings located at 39-40 22nd Street and at 39-35 21st Street was peeled up at the corner. See id. ¶¶ 108-09.

In his appearance before the grand jury, Det. Hachadoorian repeated the false statements he had made in the second Criminal Court complaint. See id. ¶ 112.

Plaintiff was subsequently indicted for Burglary in the Third Degree, Criminal Mischief in the Fourth Degree, Trespass in the Third Degree and Criminal Possession of Stolen Property in the Fifth Degree. See id. ¶ 115. Plaintiff pleaded not guilty to all counts of the indictment. See id. ¶ 117.

In July 2010, plaintiff was tried without a jury before the Honorable Stephen Knopf in Queens County Criminal Court. See id. ¶ 125. Plaintiff, proceeding *pro se*, unsuccessfully moved to preclude Kharbanda's testimony on the ground that the prosecution had failed to produce the recording of Kharbanda's 911 call.[4] See id. ¶¶ 126, 128. Kharbanda was unable to make an in-court identification of plaintiff at trial. See id. ¶ 131. Kharbanda testified that on May 27, 2008, he saw a person throw boxes off the roof of 39-40 22nd Street. See id. ¶ 136. That person fled with the boxes in a shopping cart, but later returned and placed the boxes in front of 39-40 22nd Street. See id. According to Kharbanda, when the police arrived on the scene, he pointed out the person he had observed on the roof. See id. Plaintiff alleges that Kharbanda's testimony was false and the result of pressure from defendants. See id.

Hsia testified that on May 29, 2008, she observed that the fence on the roof of 39-40 22nd Street was dislodged from a post and that when she had last seen the fence on May 22, 2008, it was undamaged. See id. ¶ 135. Hsia later admitted that the police told her what to say in her grand jury and trial testimony. See id.

Officer Assencao also testified at plaintiff's trial and, the pleading alleges, gave the following false testimony: Upon Assencao's arrival at the scene, Kharbanda described his observations and pointed out plaintiff as the person he had seen on the roof; when the officers stopped him, plaintiff was pushing a shopping cart and was the only person on the street. See id. ¶ 137.[5] Assencao also falsely testified that when he went up to the roof, he observed that a portion of the fence separating the roof of 39-40 22nd Street from that of 39-35 21st Street was peeled up in the corner. See id.

***4** On July 21, 2010, after the close of the People's case, the trial court dismissed the trespass count on the ground that no evidence had been adduced that plaintiff was on property without permission or authority of the property's owner. See id. ¶ 138. The court found plaintiff guilty of one count each of Third Degree Burglary, Fourth Degree Criminal Mischief and Fifth Degree Criminal Possession of Stolen Property. See id. ¶ 143. On September 8, 2010, plaintiff was sentenced to 3½ to 7 years in state prison on the burglary conviction, to run concurrently with one-year sentences on the criminal mischief and criminal possession of stolen property counts. See id. ¶ 146.

On October 8, 2014, on appeal to the Appellate Division, Second Department, plaintiff's judgment of conviction was reversed and the indictment dismissed due to the prosecution's "fail[ure] to adduce legally sufficient evidence of his guilt with respect to the burglary and criminal mischief counts." See id. ¶ 149.[6] The state appeals court found that the prosecution "adduced no proof as to, inter alia, the time of the burglary that formed the basis of those counts." See id.[7] Although the evidence showed that plaintiff was in possession of some of the alleged proceeds of the burglary, "there was no other evidence connecting him to the burglary or the damage to the warehouse...." Id. (quoting People v. Is[a]ac, 121 A.D.3d 816, 817 (2d Dep't 2014) ).

On October 9, 2014, plaintiff was released from custody, see id. ¶ 150, and, on November 7, 2014, the criminal case against him was dismissed by the Supreme Court, Queens County, see id. ¶ 151.

## PROCEDURAL HISTORY

The City removed the instant civil action to this Court from the Supreme Court, Queens County, on August 24, 2016. See Notice of Removal (Aug. 24, 2016), DE #1. Plaintiff filed his Amended Complaint on January 3, 2017, see Amended Complaint (Jan. 3, 2017), DE #13, and defendants answered on January 31, 2017, see Answer (Jan. 31, 2017), DE #25. The Amended Complaint contains nine counts, the first six of which are asserted under section 1983, against all the individual (and John Doe) defendants: malicious prosecution, malicious abuse of process, failure to intervene, unreasonably prolonged detention, denial of fair trial, and Brady violations. The seventh count, a Monell claim against the City, asserts a cause of action for municipal liability under section 1983. The eighth count charges supervisory defendants Kenny and Buell, under section 1983, with failure to train and/or supervise. The ninth and final count alleges violations of the New York State Constitution. See generally Am. Compl.

Following proceedings before this Court and Judge Matsumoto, and the exchange of documentary discovery, see, e.g., Motion for Reconsideration (Nov. 2, 2017) ("11/2/17 Letter") at 2, DE #45,[8] defendants filed their motion for judgment on the pleadings.

## DISCUSSION

### I. Motion to Dismiss Legal Standard

"The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." Hogan v. Fischer, 738 F.3d 509, 514-15 (2d Cir. 2013). In considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept the complaint's factual allegations as true, drawing all reasonable inferences in favor of the plaintiff. See Christiansen v. Omnicom Grp., Inc., 852 F.3d 195, 199 (2d Cir. 2017). To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); see Hogan, 738 F.3d at 514. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. "Factual allegations must be enough to raise a right to relief above the speculative level...." Twombly, 550 U.S. at 555. A complaint should be dismissed where a plaintiff has not "nudged [its] claims across the line from conceivable to plausible[.]" Id. at 570.

***5** In evaluating a complaint being challenged on a motion to dismiss, courts are limited to the facts alleged therein, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint. See DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010). Where a complaint relies heavily upon the terms and effect of a document not incorporated by reference, the Court may consider such an "integral" document on a motion to dismiss, but only where it is "clear on the record that no dispute exists regarding [the document's] authenticity or accuracy[.]" Id. (quoting Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006) ) (internal quotation marks omitted). Courts may also "take judicial notice of documents in the public record...." Redd v. Leftenant, No. 16-CV-4919 (JFB)(SIL), 2017 WL 9487173, at *4 (E.D.N.Y. Aug. 9, 2017) (internal quotation marks omitted), adopted, 2017 WL 3973926 (E.D.N.Y. Sept. 7, 2017), appeal pending.

In support of their motion to dismiss, defendants have submitted and rely upon several extra-pleading documents, including an arrest report, complaint report, DD-5, Sprint Report, Criminal Court Complaint, transcript of trial testimony, and Intake Bureau crime reports. See Declaration of Qiana Smith-Williams and Exs. B-H (Oct. 24, 2017), DE #41. While district courts in this Circuit have repeatedly ruled that court records (such as indictments and criminal court orders) may be judicially noticed on a motion to dismiss, there is disagreement as to whether police reports and records may be judicially noticed. See Bejaoui v. City of New York, No. 13-CV-5667 (NGG)(RML), 2015 WL 1529633, at *5-6 (E.D.N.Y. Mar. 31, 2015) (collecting cases). In any event, it is settled law that where the court takes judicial notice, it considers such records "not for the truth of the matters asserted," but only "to determine what statements [they] contained...." McLennon v. New York City, No. 13-CV-128 (KAM)(SMG), 2015 WL 1475819, at *4 (E.D.N.Y. Mar. 31, 2015) (internal quotation marks omitted); see Ying Li v. City of New York, 15-CV-1599 (PKC), 246 F.Supp.3d 578, 595-96 (E.D.N.Y. 2017).

### II. Section 1983 Claims

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom or usage, of any

State ..., subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured....” 42 U.S.C. § 1983. “Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights ‘under color’ of state law.” Filarsky v. Delia, 566 U.S. 377, 383 (2012). Section 1983 does not itself create substantive rights; rather, it “provides a method for vindicating federal rights elsewhere conferred[.]” Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir. 2004) (internal quotation marks omitted).

**A. Malicious Prosecution**

Plaintiff asserts a claim for malicious prosecution against all defendants. To state a section 1983 claim for malicious prosecution, a plaintiff must allege a sufficient post-arraignment restraint to violate his or her Fourth Amendment rights, as well as the four elements of a malicious prosecution claim under New York law: (1) the initiation or continuation of a criminal proceeding against the plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for the defendant's action. Manganiello v. City of New York, 612 F.3d 149, 160-61 (2d Cir. 2010); Jocks v. Tavernier, 316 F.3d 128, 136 (2d Cir. 2003). Defendants contend that plaintiff has failed to satisfy the initiation and probable cause elements of his claim. See Defendants' Memorandum of Law in Support (Oct. 24, 2017) (“Def. Mem.”) at 7, DE #40.

*1. Initiation*

***6** Under New York law, police officers can “initiate” a prosecution by filling out complaining and corroborating affidavits or signing felony complaints. See Cameron v. City of New York, 598 F.3d 50, 63 (2d Cir. 2010); Benitez v. City of New York, 17 CV 3827 (SJ) (SJB), 2018 WL 2973387, at *4 (E.D.N.Y. June 13, 2018); Ying Li, 246 F.Supp.3d at 605. An officer can also be found to have initiated a prosecution “ ‘by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor.’ ” Ying Li, 246 F.Supp.3d at 605 (quoting Costello v. Milano, 20 F.Supp.3d 406, 415 (S.D.N.Y. 2014) ); accord Benitez, 2018 WL 2973387, at *4 (holding that officers initiated prosecution by manufacturing photo array and anonymous tip).

Defendants argue that although Officer Assencao and Det. Hachadoorian swore to criminal court complaints against plaintiff, they cannot be liable because they simply relayed information to the prosecutor's office from eyewitnesses and the complaining victim. See Def. Mem. at 8. Under defendants' theory, the prosecutor's exercise of independent judgment breaks the chain of causation initiated by the officers. See id. at 7. However, defendants “ ‘cannot hide behind the decision of the DA to prosecute’ when they, according to [p]laintiff's allegations, provided the prosecutor with false information.” Ying Li, 246 F.Supp.3d at 606 (quoting Blake v. Race, 487 F.Supp.2d 187, 211 (E.D.N.Y. 2007) ); accord Benitez, 2018 WL 2973387, at *4; see also Zahrey v. Coffey, 221 F.3d 342, 352 (2d Cir. 2000) (“[I]t is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an ‘independent’ decision that results in a deprivation of liberty.”). Here, plaintiff alleges that Officer Assencao “lied” to prosecutors about what he observed and what occurred on May 27th, included this fabricated information in the initial criminal complaint, and testified falsely before the grand jury. See Am. Compl. ¶¶ 56-58, 60-62, 65-66, 101-04, 106-111. Likewise, plaintiff alleges that Det. Hachadoorian made false allegations in the criminal complaint that he signed, repeated those false claims to the grand jury, and withheld exculpatory evidence from prosecutors. See id. ¶¶ 83, 87-93, 112. These allegations, which are assumed to be true on this motion, are sufficient to support a claim that Officer Assencao and Det. Hachadoorian initiated the criminal prosecutions of plaintiff.

As to Officer Messa, Lt. Kenny and Det. Buell, however, the Amended Complaint contains insufficient factual allegations to support the inference that they “played an active role in initiating [p]laintiff's prosecution.” Ying Li, 246 F.Supp.3d at 606-07. Those defendants are not alleged to have sworn to a criminal complaint or corroborating affidavit, testified before the grand jury or at trial, or otherwise presented information to or encouraged the prosecutors to pursue plaintiff's prosecution.[9] Plaintiff's vague and conclusory allegations that Messa and Kenny “knew that the many statements provided by P.O. Assencao” to the prosecutors “were untrue and fabricated,” Am. Compl. ¶ 63, see also id. ¶¶ 65, 67-68, that the allegations contained in the first criminal complaint “came from” Messa, in addition to P.O. Assencao, who was the deponent in the complaint, id. ¶ 65, and that Buell “knew that several material allegations in the [second criminal] complaint were fabricated and false,” id. ¶ 94, are insufficient as a matter of law to plausibly

charge Officer Messa, Lt. Kenny and Det. Buell with having initiated plaintiff's prosecution. See Leibovitz v. City of New York, 14-CV-7106(KAM)(LB), 2018 WL 1157872, at *14 (E.D.N.Y. Mar. 2, 2018); Ying Li, 246 F.Supp.3d at 606-07; Jean-Laurent v. Bowman, No. 12-cv-2954 (KAM) (LB), 2014 WL 4662221, at *6 (E.D.N.Y. July 7, 2014), adopted, 2014 WL 4662232 (E.D.N.Y. Sept. 18, 2014); see also Pizarro v. City of New York, No. 14-CV-507 (KAM) (VVP), 2015 WL 5719678, at *5 n.5 (E.D.N.Y. Sept 29, 2015) (dismissing malicious prosecution claims against John Doe police captain and officers, where the complaint failed to allege "any facts suggesting that [they] were in any way involved in the initiation of the prosecution."). Therefore, this Court recommends that the malicious prosecution claim asserted against those defendants be dismissed.

*2. Probable Cause*

***7** Defendants next argue that plaintiff cannot rebut the presumption of probable cause that arises by virtue of his indictment by the grand jury. See Def. Mem. at 8-9. Moreover, according to defendants, even apart from the presumption arising from the indictment, probable cause existed to prosecute plaintiff based on the allegations of the eyewitnesses and complaining victim. See id. at 9-11.

"[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York." Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003). As an initial matter, the Court observes that the test for probable cause in the context of a malicious prosecution claim should not be conflated with probable cause in the context of a false arrest claim: while a false arrest claim will be defeated by the existence of probable cause to arrest, the probable cause element of a malicious prosecution claim turns on "probability of success"; in other words, "the relevant question is whether there was probable cause to believe the prosecution of [the plaintiff] could succeed." Boyd v. City of New York, 336 F.3d 72, 76 n.7 (2d Cir. 2003); Posr v. Court Officer Shield No. 207, 108 F.3d 409, 417 (2d Cir. 1999) ("The defendants seem to conflate probable cause to arrest with probable cause to believe that Posr could be successfully prosecuted. Only the latter kind of probable cause is at issue with respect to a malicious prosecution claim[.]"); accord Pizarro, 2015 WL 5719678, at *4-5. Because probable cause to prosecute is evaluated "in light of the facts known or reasonably believed at the time the prosecution was initiated, as opposed to at the time of arrest[,]" Ying Li, 246 F.Supp.3d at 611 (internal quotation marks omitted), the existence of probable cause to arrest does not necessarily defeat a malicious prosecution claim, see Boyd, 336 F.3d at 77 (finding issues of fact as to whether criminal prosecution for possession of stolen property was supported by probable cause even though police had probable cause to arrest the plaintiff on that charge). Moreover, unlike the defense of probable cause in the context of a false arrest claim, "probable cause [to prosecute] must be shown as to each criminal charge underlying the malicious prosecution claim." Burton v. Undercover Officer, 671 F.App'x 4, 5 (2d Cir. 2016) (collecting cases).

An "indictment by a grand jury creates a presumption of probable cause that may *only* be rebutted by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." Savino, 331 F.3d at 72 (emphasis in original) (internal quotation marks omitted); see McClellan v. Smith, 439 F.3d 137, 145 (2d Cir. 2006). In other words, " '[t]he presumption may be overcome only by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith.' " Rothstein v. Carriere, 373 F.3d 275, 283 (2d Cir. 2004) (quoting Colon v. City of New York, 60 N.Y.2d 78, 82-83 (1983) ).

The Amended Complaint alleges that Officer Assencao and Det. Hachadoorian testified falsely, withheld exculpatory evidence, made false assertions to the prosecutors and included those fabrications in the criminal complaints; the pleading further alleges that they instructed the civilian witnesses what to say to the grand jury and intimidated and pressured those witnesses to testify falsely. See generally Plaintiff's Opposition to Defendants' Motion (Oct. 27, 2018) ("Pl. Opp.") at 27, DE #35; *infra* pp. 19-20. These non-conclusory allegations, which the Court accepts as true for purposes of this motion, are sufficient to rebut the presumption of probable cause that arose from the grand jury indictment. [10] See Ying Li, 246 F.Supp.3d at 612 (court holds that the following allegations in the pleading were "sufficient to rebut the presumption of probable cause created by the grand jury indictment": the officer defendants "failed to obtain or disclose evidence inconsistent with plaintiff's guilt, did not document or inform the district attorney's office of exculpatory evidence, falsely reported facts in reports and search warrant affidavits, and fabricated oral statements of witnesses"); Pizarro, 2015 WL 5719678, at *6 (Matsumoto,

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

J.); McLennon, 2015 WL 1475819, at *8 (Matsumoto, J.) (denying motion to dismiss malicious prosecution claim where the challenged pleading alleged "that the officer defendants failed to obtain or disclose evidence inconsistent with plaintiffs' guilt, did not document or inform the district attorney's office of exculpatory evidence, falsely reported facts in reports and search warrant affidavits, and fabricated oral statements by [one plaintiff] and other witnesses"); Smalls v. City of New York, 181 F.Supp.3d 178, 187 (E.D.N.Y. 2016).

***8** Defendants' argument that plaintiff cannot rebut the presumption of probable cause by referring to grand jury testimony misses the mark. Defendants correctly observe that police officers are entitled to absolute immunity from civil liability for testimony given before the grand jury. See Rehberg v. Paulk, 566 U.S. 356, 369 (2012). Nevertheless, the absolute immunity afforded to police officers testifying before a grand jury does not extend to "conduct prior to and independent of [their] perjurious grand jury appearance." Coggins v. Buonora, 776 F.3d 108, 113 (2d Cir. 2015). Here, as with the claims addressed by Judge Matsumoto in Pizarro, 2015 WL 5719678, at *6 n.7, and McLennon, 2015 WL 1475819, at *8 n.19, the alleged misconduct underlying the claim of malicious prosecution goes beyond Assencao's and Hachadoorian's grand jury testimony, and concerns supplying prosecutors with false information, withholding exculpatory evidence and pressuring witnesses to testify falsely. See Ying Li, 246 F.Supp.3d at 613 (recognizing that bad faith conduct "separate and apart" from grand jury testimony may be used to rebut the presumption of probable cause); see also Nnodimele v. Derienzo, 13-CV-3461 (ARR) (RLM), 2016 WL 337751, at *14 (E.D.N.Y. Jan. 27, 2016) (although officers enjoyed absolute immunity for their trial testimony, plaintiff's fair trial claim survived summary judgment where plaintiff alleged that officers fabricated evidence and forwarded it to prosecutors). Therefore, plaintiff need not rely on defendants' grand jury testimony to rebut the presumption of probable cause. [11]

For the same reasons discussed above, plaintiff's allegations are sufficient to raise a plausible inference that there was no probable cause to prosecute plaintiff at the time he was indicted. The charge of criminal trespass was necessarily predicated on Stefas' and Kharbanda's purported identification of plaintiff as the person they saw on the roof of 39-40 22nd Street. However, the Amended Complaint alleges that neither Stefas nor Kharbanda identified plaintiff on the scene and that defendants fabricated the identification when they spoke to prosecutors. See Am. Compl. ¶¶ 58-59. In fact, according to the pleading, Kharbanda was unable to identify plaintiff at trial as the person he saw on the roof. See id. ¶ 131. To the extent that Kharbanda testified at trial that the person stopped by the police on May 27th was the same person he had seen on the roof, that testimony, plaintiff claims, was the result of pressure and intimidation by defendants. See id. ¶ 136. Moreover, the trial court dismissed the trespass count, with the prosecutor's consent, for lack of evidence that plaintiff was on the property without permission or authority of the property's owner. See id. ¶ 138.

Relatedly, the only evidence cited by defendants to support the charges of criminal mischief, burglary and possession of stolen property arises from what plaintiff alleges was a fabricated identification of plaintiff as the person throwing boxes off the roof and a fabricated claim that the boxes of shoes were recovered from plaintiff. See Def. Mem. at 11. There was no evidence of plaintiff's entry into the warehouse, his presence in the area of the warehouse other than on May 27, 2008, [12] or his possession of the stolen generator, compressor, circular saw or other boxes of shoes. The trial court observed that there was " 'no direct evidence that plaintiff at anytime actually entered or remained in that building of Paoling Hsia with intent to commit a crime therein,' no direct evidence of when the allegedly stolen property was actually taken, 'no direct evidence of the defendant actually entering the premises or actually taking the property inside,' and 'no direct evidence that the defendant actually damaged the fence or the window' of the allegedly burglarized building." Am. Compl. ¶ 139. Indeed, the Appellate Division found that the evidence at trial failed to establish the necessary elements for any factfinder to believe that plaintiff committed burglary and criminal mischief. Id. ¶ 149. [13] Assuming the truth of the allegations made by plaintiff, he has raised a plausible inference that, at the time of his indictment, there was no probable cause to prosecute him. Therefore, this Court recommends that defendants' motion to dismiss the malicious prosecution claims against Assencao and Hachadoorian (in contrast to the other individual defendants) be denied.

### B. Abuse of Process

***9** Plaintiff additionally asserts a claim of abuse of process under section 1983. "As with malicious prosecution, the Court looks to State law for the elements of a Section 1983 abuse of process claim." Ying Li, 246 F.Supp.3d at 615. Under New York law, an abuse of process claim "lies against a

defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." Savino, 331 F.3d at 76. " 'The crux of a malicious abuse of process claim is the collateral objective element.' " Johnson v. City of New York, No. 06-CV-630 (KAM)(ALC), 2010 WL 2771834, at *10 (E.D.N.Y. July 13, 2010) (quoting Douglas v. City of New York, 595 F.Supp.2d 333, 344 (S.D.N.Y. 2009) (Chin, J.) ).

Consequently, in order to state a section 1983 claim for abuse of process, a plaintiff must allege that the defendant "aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." Savino, 331 F.3d at 77. That is, the defendants must have acted with an "improper *purpose*" and not just " 'a malicious motive[.]' " Id. (quoting Curiano v. Suozzi, 63 N.Y.2d 113, 117 (1984) ). Such an improper purpose is usually characterized by personal animus, and may include " 'infliction of economic harm, extortion, blackmail [or] retribution.' " Folk v. City of New York, 243 F.Supp.3d 363, 375 (E.D.N.Y. 2017) (quoting Brandon v. City of New York, 705 F.Supp.2d 261, 275 (S.D.N.Y. 2010) ).

Defendants persuasively argue that the pleading fails to allege any collateral objective on the part of defendants in connection with the issuance of legal process. See Def. Mem. at 12. [14] Plaintiff contends that defendants acted with an improper motive, i.e., to cover up their false arrest, meet performance/productivity goals, and close out an open burglary complaint. See Pl. Opp. at 21. Such motives are, however, related to the ultimate purpose of defendants' alleged conduct: to successfully prosecute plaintiff. Whatever defendants' ulterior motive, the conduct complained of - lying to prosecutors and pressuring witnesses to provide false testimony - was undertaken to secure plaintiff's conviction. Hence, the Amended Complaint fails to articulate the requisite collateral objective. [15] See Hoffman v. Town of Southampton, 523 F.App'x 770, 772 (2d Cir. 2013) (attempting to coerce plaintiffs into refraining from asserting criminal defenses is directly related to the underlying criminal prosecution rather than collateral to it); Leibovitz, 2018 WL 1157872, at *17 (Matsumoto, J.) (granting motion to dismiss abuse of process claim where plaintiff alleged defendants acted in retaliation for exercising his First Amendment rights, an objective that was not unrelated to his arrest and prosecution); Folk, 243 F.Supp.3d at 375 (granting motion to dismiss where alleged motive - to receive credit for arrest and additional overtime - was not collateral objective unrelated to the criminal prosecution); Jean-Laurent, 2014 WL 4662221, at *9 (attempting to meet arrest quotas is not a collateral objective); Johnson, 2010 WL 2771834, at *10 (granting defendants' motion for summary judgment where alleged collateral objective was "making an arrest while doing the absolute minimum work possible"). Accordingly, this Court recommends that plaintiff's abuse of process claim be dismissed as to all defendants.

### C. Unreasonably Prolonged Detention

***10** In connection with his claim for excessive detention, "plaintiff must demonstrate '(1) that he has a right to be free from continued detention stemming from law enforcement officials' mishandling or suppression of exculpatory evidence, (2) that the actions of the officers violated that right, and (3) that the officers' conduct shocks the conscience.' " Nzegwu v. Friedman, 605 F.App'x 27, 32 (2d Cir. 2015) (quoting Russo v. City of Bridgeport, 479 F.3d 196, 205 (2d Cir. 2007) ). In Russo, the Second Circuit reversed the lower court's grant of summary judgment in defendants' favor on the prolonged detention claim, citing evidence that officers suppressed available exculpatory evidence in the form of a video surveillance tape showing that the robber did not have any tattoos, whereas the plaintiff had prominent tattoos on his arms. See 479 F.3d at 206. After concluding that the plaintiff's arrest was supported by probable cause based on eyewitness identification, see id. at 204, the Court of Appeals nevertheless held that the plaintiff's prolonged detention may have been caused by the officers' deliberate withholding of the video from the prosecutor and defense counsel, in violation of the plaintiff's constitutional rights, see 479 F.3d at 209.

Defendants argue that plaintiff has not stated a claim for an unreasonably prolonged detention. First, defendants argue that plaintiff fails to identify which defendants withheld or suppressed exculpatory evidence. See Def. Mem. at 13. Second, defendants contend that plaintiff has not identified any withheld evidence that would have conclusively established plaintiff's innocence. See id.

With respect to defendants Assencao and Hachadoorian, defendants' assertion that the Amended Complaint fails to distinguish among the defendants and their conduct is belied by the pleading. The Amended Complaint alleges that Officer Assencao and Det. Hachadoorian testified falsely, withheld exculpatory evidence, made false assertions to the prosecutors and included those fabrications in the criminal complaints filed in court; the pleading further alleges that these defendants instructed the civilian witnesses what to


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

say to the grand jury and intimidated and pressured those witnesses to testify falsely. In contrast, with respect to Officer Messa, Det. Buell and Lt. Kenny, the pleading either fails to distinguish among defendants or makes vague and conclusory assertions as to what he or she did to pursue the investigation and plaintiff's prolonged detention. See *supra* p. 14. As plaintiff failed to plausibly allege the personal involvement of Messa, Kenny, and Buell in plaintiff's prolonged detention, see generally Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 122 (2d Cir. 2004), the excessive detention claim against them should be dismissed, see Ying Li, 246 F.Supp.3d at 623 (dismissing prolonged detention claims against all city defendants other than those whom the pleading plausibly alleged had taken "an active role in investigating" the plaintiffs); see also id. at 598-600.

As to the merits of the prolonged detention claim, the pleading alleges that Officer Assencao lied about the identification of plaintiff by Stefas and Kharbanda, lied about finding plaintiff in possession of the boxes of shoes, and withheld the following information: that plaintiff did not match the description given by Stefas and Kharbanda of the person that they observed on the roof, that when Assencao encountered plaintiff he was walking in the direction opposite from where the officer had been told the man on the roof was headed, and that Assencao and Kenny found no signs of forced entry or property damage when they went up to the roof. In addition, according to the Amended Complaint, Assencao pressured the civilian witnesses to testify falsely to support his version of events. The pleading further alleges that Det. Hachadoorian lied about Kharbanda telling him that the person stopped by Assencao and Messa was the same person he had seen on the roof and that Assencao had recovered boxes of shoes from plaintiff's person.

***11** The above allegations, assumed to be true on this motion, are sufficient to satisfy the requirements of an unreasonably prolonged detention claim, as they point to the absence of evidence inculpating plaintiff in the crimes charged. See Ying Li, 246 F.Supp.3d at 623 (denying motion to dismiss prolonged detention claim, where pleading alleged that police knew there was no medical support for conclusions that were central to the case against plaintiff); Gallimore v. Feliciano, No. 14-cv-1519 (NSR)(LMS), 2015 WL 3856694, at *8 (S.D.N.Y. June 19, 2015) (denying motion to dismiss prolonged detention claim, where plaintiff sufficiently alleged the suppression of exculpatory evidence that would have established his innocence, including knowledge of probation officer that he lied in identifying plaintiff). [16]

Therefore, this Court recommends that defendants' motion to dismiss the prolonged detention claim be denied as to defendants Assencao and Hachadoorian and granted as to the other named defendants.

### D. Claims for Denial of Fair Trial and Brady Violations

Plaintiff's fifth and sixth claims allege, respectively, a denial of his right to a fair trial and Brady violations. The Court addresses them together, because, as defendants correctly note, the two claims are closely related. See Def. Mem. at 18 n.8.

"A police officer denies a defendant a fair trial when she creates 'false information likely to influence a jury's decision and forwards that information to prosecutors.' " Fappiano v. City of New York, 640 F.App'x 115, 118 (2d Cir. 2016) (quoting Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997) ). A fair trial violation may also be based on an officer's intentional withholding of exculpatory evidence, which is essentially a fair trial claim sounding in a Brady violation. See id.; see also Ying Li, 246 F.Supp.3d at 626-28.

Defendants argue that plaintiff's allegations of fabricated evidence and withheld exculpatory evidence are either implausible or too speculative. See Def. Mem. at 15. On the contrary, plaintiff specifically identifies the evidence that was allegedly fabricated and provides sufficient facts from which to infer how that evidence was relied on to convict him. For example, the Amended Complaint alleges that defendants pressured Hsia to falsely testify that on May 29, 2008, she observed for the first time that the fence on the roof of 39-40 22nd Street was dislodged, and that it had been undamaged one week earlier, when she had last seen it. See Am. Compl. ¶ 135. The pleading further alleges that defendants coerced Kharbanda to falsely testify that he pointed out to the police the person he had seen on the roof. See id. ¶ 136. According to the Amended Complaint, Officer Assencao falsely reported to prosecutors, and included in his reports and the sworn complaint, that Kharbanda identified plaintiff as the person Kharbanda had seen on the roof, that plaintiff was pushing a shopping cart when the officers stopped him, that he personally observed plaintiff carrying two boxes of women's shoes, and that plaintiff was the only person on the street when he was stopped. See id. ¶¶ 56-60, 65-66. Similarly, Hachadoorian is alleged to have falsely stated in his investigation reports and the second criminal complaint that Kharbanda told him that the person stopped by

the police on March 27, 2008 was the same person that he had seen on the roof. See id. ¶¶ 80, 87, 91. [17]

***12** Accepting plaintiff's allegations as true and drawing all reasonable inferences in his favor, this Court concludes that the Amended Complaint, which specifically identifies the evidence that Assencao and Hachadoorian allegedly fabricated and transmitted to the prosecutors, adequately alleges a fair trial claim against those defendants. See Hicks v. Marchman, 719 F.App'x 61, 63-64 (2d Cir. 2018) (vacating dismissal of fair trial claim, where allegations were sufficient to raise a plausible inference that the officers fabricated evidence and forwarded that information to prosecutors); Benitez, 2018 WL 2973387, at *3 (denying motion to dismiss fair trial claim where allegedly fabricated evidence, though not admitted at trial, was given to prosecutors and used to prosecute plaintiff); Ying Li, 246 F.Supp.3d at 627-29 (plaintiff sufficiently pled claim for Brady violations and fabrication of evidence against officers who allegedly falsely reported facts in reports and search warrant affidavits); Case v. City of New York, 233 F.Supp.3d 372, 388-89, 399 (S.D.N.Y. 2017) (allegations that subordinate officers' sworn affidavits contained false statements that formed the basis for the ADA's decision to prosecute sufficed to state false trial claim); Marom v. City of New York, 15-cv-2017 (PKC), 2016 WL 5900217, at *2 (E.D.N.Y. July 29, 2016) (on reconsideration, denying motion to dismiss fair trial claim where plaintiff alleged with sufficient specificity what was false about police reports and accusatory instruments); see also Struthers v. City of New York, No. 12-CV-242, 2013 WL 2390721, at *13 (E.D.N.Y. May 31, 2013) (denying defendants' motion for summary judgment where plaintiff alleged that officer fabricated victim's identification of plaintiff as the assailant). [18]

For the same reasons, plaintiff's allegations are adequate to state a Brady violation claim, against Assencao and Hachadoorian. See Ying Li, 246 F.Supp.3d at 627. The Amended Complaint, as discussed above, alleges that Officer Assencao withheld exculpatory information by giving false information to prosecutors as to plaintiff's identification and coercing Kharbanda into providing corroborating testimony. For his part, Det. Hachadoorian is alleged to have withheld exculpatory information by falsely stating in his reports and the criminal complaint that Kharbanda told him that the person stopped by officers on March 27, 2008 was the same person that he had seen on the roof. Contrary to defendants' argument that the only plausible allegation of fabricated evidence was the claim that plaintiff was pushing a shopping cart at the time he was stopped, see Def. Mem. at 17 & n.6, the allegations discussed above are sufficiently specific and are material to the determination of plaintiff's guilt. [19]

***13** On the other hand, defendants correctly argue that plaintiff has not stated a claim against supervisory defendants Kenny and Buell for forwarding fabricated evidence to the prosecutors. Plaintiff alleges that those defendants knew that false information was being included in the criminal complaints but approved of their inclusion. See Am. Compl. ¶¶ 67, 93-94. However, more is required for individual liability based on direct participation. [20] "Unlike its allegations as to the subordinate officers, ... the [amended] complaint does not supply any factual detail indicating the nature of the purportedly false information provided by the supervisors." Case, 233 F.Supp.3d at 399 (holding that allegations that supervisors were responsible for ensuring accuracy of processing arrest paperwork were insufficient to sustain personal involvement in fair trial claim); see Bertuglia v. City of New York, 839 F.Supp.2d 703, 724 (S.D.N.Y. 2012) (dismissing fair trial claim against supervisory defendants, but not "primary" defendants, where plaintiffs failed to plead that the supervisors "made any such false statements, or took such *specific* action or inaction as to make them liable for those false statements") (emphasis added); see also Jean-Laurent, 2014 WL 4662221, at *6, *12-13 (recommending dismissal, on summary judgment, of malicious prosecution and fabrication of evidence claims against three police officers who were respectively alleged to have "participated in plaintiff's arrest," "assisted in plaintiff's arrest and completed the online arrest worksheet," and "authorized, approved and/or participated, in plaintiff's prosecution," as none "played an active role in plaintiff's prosecution").

Defendants Kenny and Buell are not alleged to have been personally involved in preparing either criminal complaint or in forwarding any of the alleged fabrications to prosecutors. Plaintiff's assertions that each of the two supervisors approved the complaint prepared by his subordinate, "knowing full well that its contents were false and would lead to the arraignment and prosecution of plaintiff[,]" Am. Compl. ¶ 67; see id. ¶¶ 93-94, are nothing more than formulaic recitations of the elements of a cause of action based on fabrication of evidence, see generally Iqbal, 556 U. S. at 678, and, as such, are too conclusory to survive a motion to dismiss. [21] See, e.g., Ying Li, 246 F.Supp.3d at 629 n.48 ("[B]ecause the Amended Complaint does not allege direct involvement by all Defendants in the investigation of Plaintiff's case,

the group pleadings are insufficient in themselves to state a fabrication of evidence claim as to those City Defendants as to whom there are no specific allegations of involvement."); John v. Lewis, 15-CV-5346 (PKC), 2017 WL 1208428, at *18 (E.D.N.Y. Mar. 31, 2017) (dismissing claim as against one of two defendants, where the allegations against him consisted of "conclusory recitations of the elements of a fabrication of evidence claim"); see also Ganek v. Leibowitz, 874 F.3d 73, 92-93 (2d Cir. 2015) (rejecting as implausible allegation that supervisors knew that statement in affidavit was false where plaintiff did not deny that supervisors routinely rely on subordinates to accurately report the statements made to them by witnesses); cf. Iqbal, 556 U.S. at 680-81 (concluding that allegation that department head was "principal architect" of challenged policy was too conclusory to support claim against him based on how subordinates effected policy); Abdul-Rahman v. City of New York, No. 10 Civ. 2778, 2012 WL 1077762, at *12 (E.D.N.Y. Mar. 20, 2012) (dismissing fair trial claim where plaintiff "presented only the most conclusory and generalized allegations").

***14** The allegations against Officer Messa present a closer question. Like Officer Assencao, she was present when Stefas and Kharbanda first reported their observations and when plaintiff was detained on the basis of that information. See Am. Compl. ¶¶ 43-48. But the sole reference in the pleading to any action taken by Messa thereafter to pursue the prosecution of plaintiff is the perfunctory assertion that the information in the first criminal complaint came from Assencao, the deponent thereof, "and Officer Messa." Id. ¶ 65. All of the pleading's allegations concerning specific acts taken to procure plaintiff's conviction are attributed to Assencao, who spoke with ADA Giordano on May 28, 2008, see id. ¶¶ 55-58, and "[t]hroughout plaintiff's prosecution," see id. ¶¶ 60-62, and who falsely testified before the grand jury and at trial, see id. ¶¶ 101-111, 137. Absent some factual basis underlying plaintiff's conclusory assertion that Messa actively pursued plaintiff's conviction, the pleading's vague assertion that she contributed to the allegations in the first criminal complaint should not defeat a motion to dismiss the fair trial/Brady claims against her. See, e.g., Smalls, 181 F.Supp.3d at 185 (fabrication of evidence claim "fails to identify what, if any, fabricated evidence was offered" by four of the defendant officers); Jean Laurent, 2014 WL 466221, at *6, *12-13.

Accordingly, the fair trial and Brady claims should be dismissed as to all defendants other than P.O. Assencao and Det. Hachadoorian.

**E. Failure to Intervene**

The Amended Complaint charges, in the alternative, that each individual defendant failed to intervene to prevent each of the constitutional violations discussed above. As an initial matter, while defendants correctly argue that the individual defendants cannot be liable for both the underlying constitutional deprivation and a failure to intervene to stop themselves from committing that violation, see Def. Mem. at 19-20, a plaintiff may plead direct participation and failure to intervene in the alternative, see Lanorith v. Truscelli, 15-CV-617 (NGG) (LB), 2017 WL 3634600, at *13 (E.D.N.Y. Aug. 22, 2017) (collecting cases).

" 'It is widely recognized that law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.' " Terebesi v. Torreso, 764 F.3d 217, 243 (2d Cir. 2014) (quoting Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994) ). To support a claim for failure to intervene, and to "overcome the hurdle of qualified immunity[,]" a plaintiff must show that (1) the officer's failure "permitted fellow officers to violate [plaintiff's] clearly established statutory or constitutional rights," and (2) it was "objectively unreasonable for him to believe that his fellow officers' conduct did not violate those rights." Ricciuti, 124 F.3d at 129. In addition, a plaintiff must show that the officer had " 'a realistic opportunity to intervene to prevent the harm from occurring' but failed to do so." Ying Li, 246 F.Supp.3d at 619 (quoting Cerbelli v. City of New York, No. 99-CV-6846, 2008 WL 4449634, at *11 (E.D.N.Y. Oct. 1, 2008) ). "The essential inquiry is whether, under the circumstances actually presented, an officer's failure to intervene permits a reasonable conclusion that he became a 'tacit collaborator' in the unlawful conduct of another." Figueroa v. Mazza, 825 F.3d 89, 107–08 (2d Cir. 2016).

Here, the Amended Complaint's allegations regarding Lt. Buell are entirely too conclusory to state a claim for failure to intervene. The pleading vaguely asserts that Buell reviewed the second criminal complaint and knew that it contained "several material allegations [that] were fabricated and false," Am. Compl. ¶ 94, and knew of "Hachadoorian's propensity for falsifying evidence," id. ¶ 95. Plaintiff fails to identify which allegations Buell knew to be false or how he became aware they were fabricated; nor does he provide any factual basis for Hachadoorian's alleged propensity for falsifying evidence and/or Buell's purported awareness of that propensity. Simply put, the allegations against Buell "lack[ ] the specificity required to withstand a motion to

dismiss." Hardy v. City of New York, No. 12 Civ. 17(RJS), 2013 WL 5231459, at *4 (S.D.N.Y. July 9, 2013) (dismissing failure to intervene claim where the pleading "fails to explain whether any of [the officers] was in another's presence at the time of the submission of false evidence"); see Clay v. County of Clinton, No. 8:10-CV-00239 (LEK/RFT), 2012 WL 4485952, at *14 (N.D.N.Y. Sept. 27, 2012) ("vague and conclusory allegations" with respect to three defendants did not suffice to "plausibly suggest their liability" for failure to intervene); Bouche v. City of Mount Vernon, No. 11 Civ. 5246(SAS), 2012 WL 987592, at *7 (S.D.N.Y. Mar. 23, 2012) (dismissing "vague and conclusory" failure to intervene claim).

***15** Defendants Messa and Kenny stand on a different footing. To be sure, the allegations against them are similarly conclusory, and the above-cited caselaw would seem to support dismissal of the failure to intervene claim against them as well. On the other hand, they were on the scene for all or part of the encounter with plaintiff on May 27, 2008, and, to the extent that evidence was fabricated concerning what transpired at that time, they would have known of its falsity and were in a position to take corrective action. Thus, had plaintiff asserted a false arrest claim, defendants would be hard pressed to argue that those two defendants could not plausibly have intervened to prevent plaintiff's arrest. See Arbuckle v. City of New York, 14 Civ. 10248 (ER), 2016 WL 5793741, at *15 (S.D.N.Y. Sept. 30, 2016) (finding that plaintiffs plausibly alleged that supervisor on the scene who witnessed circumstances leading to arrest had realistic opportunity to prevent false arrest). Whether Messa and Kenny had a realistic opportunity to prevent a malicious prosecution of plaintiff – or his prolonged detention, or the deprivation of his right to a fair trial - is a more complex, highly fact-based question. Suffice it to say, other courts in this Circuit have refused to dismiss similar failure to intervene claims against officers who were present at the scene of the crime and/or at the time of the plaintiff's arrest. See, e.g., Jeanty v. City of Utica, No. 6:16-cv-00966 (BKS/TWD), 2017 WL 6408878, at *8-9 (N.D.N. Y Aug. 18, 2017), on partial reconsideration, 2018 WL 2383582 (N.D.N. Y May 25, 2018); Marom, 2016 WL 5900217, at *4; see also Coggins v. County of Nassau, 988 F.Supp.2d 231, 244-45 (E.D.N.Y. 2013), aff'd in part, appeal dismissed in part subnom. Coggins v. Buonora, 776 F.3d 108 (2d Cir. 2015). Therefore, drawing all reasonable inferences in plaintiff's favor, this Court concludes that the failure to intervene claim against Messa and Kenny should not be dismissed; whether plaintiff will be able to prove that claim remains to be seen.

In short, this Court recommends that defendants' motion to dismiss plaintiff's failure to intervene claim be granted only as to defendant Buell.

**F. John Doe Defendants**

As discussed above, personal involvement of defendants is a prerequisite to liability under section 1983. Here, the Amended Complaint fails to allege any facts regarding the John Doe police officers' conduct. Absent any allegations that would suggest that they were personally involved in the alleged constitutional deprivations at issue, the claims against them should be dismissed. See Pizarro, 2015 WL 5719678, at *5 n.5, *7 n.10 (dismissing malicious prosecution and Fifth Amendment claims against John Doe officers); Levantino v. Skala, 56 F.Supp.3d 191, 207 (E.D.N.Y. 2014) (denying as futile cross-motion to amend to add John Doe defendant); Melendez v. Nassau Cty., No. 10-CV-2516 SJF WDW, 2010 WL 3748743, at *5 (E.D.N.Y. Sept. 17, 2010) (dismissing unidentified officers where complaint did not provide factual basis for their involvement). Therefore, this Court recommends dismissing the claims against "John Does 1-10."

**G. Qualified Immunity**

Defendants argue that they are entitled to qualified immunity for plaintiff's claims for malicious prosecution, excessive detention, denial of a fair trial and failure to intervene. See Def. Mem. at 21-22.

"Qualified immunity shields law enforcement officers from § 1983 claims for money damages provided that their conduct does not violate clearly established constitutional rights of which a reasonable person would have been aware." Barboza v. D'Agata, 676 F.App'x 9, 12 (2d Cir. 2017). In analyzing the applicability of qualified immunity, courts conduct a two-step analysis: "First, do the facts show that the officer's conduct violated plaintiff's constitutional rights? Second, if there was a constitutional violation, was the right clearly established at the time of the officer's actions?" Id. "[E]ven if the right at issue was clearly established[,] ... an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." Id. (quoting Walczyk v. Rio, 496 F.3d 139, 154 (2d Cir. 2007) ) (alterations omitted).

Defendants contend that they are entitled to qualified immunity for malicious prosecution, prolonged detention

and failure to intervene because they reasonably relied on "eyewitness and complaining victim reports." See Def. Mem. at 21. However, defendants again ignore the gravamen of plaintiff's Amended Complaint, which alleges that: the eyewitnesses did not see plaintiff throw boxes of shoes off the roof or identify plaintiff as the person they had seen on the roof, that plaintiff was not in the vicinity of where the eyewitnesses had said the person on the roof had fled; and that the description given to defendants of the person on the roof did not match plaintiff. As to the burglary, plaintiff alleges that Hsia did not observe that the fence separating her warehouse from 39-40 22nd Street had been undamaged prior to her trip. Moreover, the Appellate Division found that there was no evidence from which a reasonable trier of fact could conclude that plaintiff committed burglary or criminal mischief. See Is[a]ac, 121 A.D.3d at 817. At this stage of the litigation, faced with allegations that defendants deliberately fabricated evidence, pressured witnesses to lie and suppressed exculpatory evidence, they are not entitled to dismissal of the claims for malicious prosecution, prolonged detention, denial of a fair trial and failure to intervene based on qualified immunity. See, e.g., Coggins, 776 F.3d at 114 (affirming denial of motion to dismiss based on qualified immunity for falsification of evidence); Ying Li, 246 F.Supp.3d at 641-42; Shabazz v. Kailer, 201 F.Supp.3d 386, 399 (S.D.N.Y. 2016); see also Ricciuti, 124 F.3d at 130 (reversing grant of summary judgment on qualified immunity grounds with respect to fabrication of evidence claim).

### H. Monell Claim

***16** Defendants argue that plaintiff's Monell claim is insufficiently pled. See Def. Mem. at 22-25. Plaintiff counters that he has adequately alleged that the City maintains a custom of "arresting innocent persons in order to meet 'performance/productivity goals' (i.e., arrest quotas)" and fabricating evidence to conceal the illegitimacy of those arrests. See Pl. Opp. at 33. In addition, plaintiff argues that he adequately alleges Monell liability based on a theory of the City's failure to train or supervise officers about perjury and falsification of evidence. See id. at 33-34.

As with any defendant in a section 1983 claim, a municipality is liable only for its own involvement in a civil rights violation. See Connick v. Thompson, 563 U.S. 51, 60 (2011) (noting that municipalities are not "vicariously liable under § 1983 for their employees' actions"). Accordingly, a plaintiff must allege a municipal policy, custom, or practice that caused the claimed civil rights violation. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 692-94 (1978). This causal link must be sufficiently strong such that the municipal policy, custom, or practice can be considered a "moving force" behind the municipal employee's alleged misconduct. See id. at 694.

A municipal policy, custom, or practice may be shown with evidence of either (1) a formal, express policy, see id. at 690; (2) a practice of similar constitutional violations that is so widespread and persistent as to constitute a custom or usage of the state (or municipality), see Adickes v. S.H. Kress & Co., 398 U.S. 144, 167–68 (1970); (3) a decision to follow a particular course of action made by the official or officials responsible for establishing final policy with respect to the subject matter in question, see Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986); or (4) a failure to properly train municipal employees, amounting to deliberate indifference to the rights of persons with whom the police came in contact, see City of Canton v. Harris, 489 U.S. 378, 387-88 (1989). "[T]o survive a motion to dismiss, a plaintiff must allege 'sufficient factual detail' and not mere 'boilerplate allegations' that the violation of the plaintiff's constitutional rights resulted from the municipality's custom or official policy." Ying Li, 246 F.Supp.3d at 636 (quoting Plair v. City of New York, 789 F.Supp.2d 459, 469 (S.D.N.Y. 2011) ); see Matthews v. City of New York, 889 F.Supp.2d 418, 444 (E.D.N.Y. 2012).

As noted above, plaintiff relies on only two of the above theories: a widespread custom or practice and a failure to train and supervise. His pleading does not sufficiently plead either one.

#### *1. Widespread Custom and Practice*

To support a custom-and-usage theory of municipal liability, plaintiff must plausibly allege that he has suffered a constitutional violation and that the violation was caused by a custom or policy of the City. See Monell, 436 U.S. at 690. A complaint's "mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993), overruled on other grounds, Leatherman v. Tarrant Cty. Narcotics & Coordination Unit, 507 U.S. 163 (1993). "[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991); see Jones v. Town of E. Haven, 691 F.3d 72, 81 (2d Cir. 2012).

***17** Here, plaintiff claims that the City has a custom of arresting innocent people and fabricating evidence to satisfy arrest quotas. See Am. Compl. ¶ 191. Such boilerplate assertions are insufficient to sustain a Monell claim, see Pizarro, 2015 WL 5719678, at *9; Matthews, 889 F.Supp.2d at 444, and must be disregarded, see Tieman v. City of Newburgh, No. 13-CV-4178 (KMK), 2015 WL 1379652, at *14 (S.D.N.Y. Mar. 26, 2015). Nor does plaintiff's citation to several cases in state and federal court support the existence of such "de facto" policies. See Am. Compl. ¶ 201; see also id. ¶ 188. Plaintiff alleges no facts regarding those cases, and upon inspection, none involved police officers providing prosecutors with false information or coercing witnesses into providing false testimony. Hence, they "do not support [plaintiff's] allegations of a policy or custom" of engaging in the conduct complained of. See Gaston v. Ruiz, No. 17-CV-1252 (NGG) (CLP), 2018 WL 3336448, at *6 (E.D.N.Y. July 6, 2018) (dismissing Monell claim, as citations to factually dissimilar cases did not demonstrate the requisite municipal policy or custom).

Equally unavailing is plaintiff's reliance on the Mollen Commission Report, and other pronouncements from years ago. "Research reports may be used to bolster Monell claims, but only if those reports are sufficiently connected to the specific facts of the case" and are of relatively recent vintage. See Gomez v. City of New York, No. 16-CV-1274 (NGG) (LB), 2017 WL 1034690, at *11 (E.D.N.Y. Mar. 16, 2017) (plaintiff's reliance on 13-year old bar association report regarding civil actions alleging police misconduct was insufficient to defeat summary judgment). The pleading in this case fails to make that connection. See Aguirre v. City of New York, 15-CV-6043 (PKC), 2017 WL 4236552, at *6 (E.D.N.Y. Sept. 22, 2017) ("As other courts in this Circuit have found in similar Section 1983 actions, Plaintiff's reliance on reports and articles regarding misconduct by NYPD officers are inadequate to allege a policy or custom of the City, let alone allege that policy or custom is the one that gave rise to *Plaintiff's* alleged violation.") (citations omitted; granting motion for judgment on the pleadings as to Monell claim); see also Yanez v. City of New York, 29 F.Supp.2d 100, 112 & n.6 (E.D.N.Y. 1998) (granting summary judgment dismissing plaintiff's Monell claims, where "plaintiff has not adequately explained the connection between the alleged plot among these police officers and the 'blue wall of silence' described in the Mollen report[,]" which was issued in 1994 and "would probably be inadmissible evidence").

Plaintiff also contends that his Monell claim "draws on the fact that the named defendants have been repeatedly sued for police misconduct." Pl. Opp. at 34 (citing Am. Compl. ¶ 201). Several of the cases cited by plaintiff, however, do not involve any of the individual defendants. See Smith v. City of New York, Index No. 700464/2014 (Sup. Ct. Queens Co.); Valeri v. City of New York, 13-cv-01259 (BMC) (E.D.N.Y.); Floyd v. City of New York, Index No. 7012/1995 (Sup. Ct. Queens Co.). Even if those few cases involving a named defendant had involved similar facts, [22] they do not support a claim for municipal liability, as they either were resolved by settlement or the City prevailed. [23] Contrary to the premise of plaintiff's argument, unproven allegations in a handful of cases -- whether involving these defendants or other officers —do not plausibly allege the existence of an unconstitutional policy, sufficient to defeat a motion to dismiss a Monell claim. See Harris v. City of Newburgh, No. 16-CV-2731 (KMK), 2017 WL 4334141, at *5 (S.D.N.Y. Sept. 27, 2017); An v. City of New York, 230 F.Supp.3d 224, 229-30 (S.D.N.Y. 2017) ("But the Complaint fails to allege that any of the six lawsuits, which were filed over the course of four years, resulted in a finding that the NYPD officers" committed violations similar to those at issue in that case); Calderon v. City of New York, 138 F.Supp.3d 593, 613 (S.D.N.Y. 2015) ("None of the [16] lawsuits cited resulted in an adjudication of liability and the number of suits does not suggest a pervasive legal practice."), on partial reconsideration, 2015 WL 6143711 (S.D.N.Y. Oct. 19, 2015); Tieman, 2015 WL 1379652, at *17 ("[E]ven if the [nine] civil complaints involved comparable conduct to that alleged here, none resulted in an adjudication of liability.") (internal quotation marks and alteration omitted); see also Jean-Laurent v. Wilkerson, 461 F.App'x 18, 22-23 (2d Cir. 2012) (rejecting plaintiff's reliance on the existence of similar lawsuits and affirming summary judgment dismissing Monell claim); Vasquez v. City of New York, No. 11-CV-3024 (SLT) (VVP), 2013 WL 5519981, at *11 (E.D.N.Y. Sept. 30, 2013) (granting summary judgment dismissing Monell claim and holding that evidence of five prior CCRB complaints of excessive force and two settled lawsuits against the defendant officer was insufficient to defeat summary judgment because, in part, such "allegations were not sustained").

*2. Failure to Train/Supervise*

***18** Plaintiff also asserts a failure-to-train theory of municipal liability, which requires an act, a mental state, and causation. See City of Canton, 489 U.S. at 388-92. To support a Monell claim under this theory, plaintiff must show


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

that the municipality failed to adequately train its employees, and that such inadequate training was the product of the municipality's deliberate indifference. See id. In addition, plaintiff must "identify a specific deficiency in the city's training program and establish that [the] deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 129 (2d Cir. 2004) (quoting City of Canton, 489 U.S. at 391).

Further, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick, 563 U.S. at 61 (citing City of Oklahoma City v. Tuttle, 471 U.S. 808, 822–23 (1985) ). A plaintiff must allege facts tending to show a pattern of similar constitutional violations by police officers that went unaddressed by the City. See id. at 62; see also Tuttle, 471 U.S. at 821-24 (holding that it was reversible error to allow jury to infer an implicit municipal policy of inadequate training, and thus to find municipal liability, based on a single incident of unjustified police shooting). Even at the pleading stage, some "non-conclusory allegation as to deficient training programs is necessary...." Calderon, 138 F.Supp.3d at 614 (collecting cases).

Citing the findings of the Mollen Commission and various statements and reports issued by the City, plaintiff argues that his allegations of the City's failure to train or supervise its officers about police perjury and falsification of evidence are well founded. See Am. Compl. ¶ 193; Pl. Opp. at 33-34. However, several courts have rejected the use of such reports to support Monell claims where, as here, the plaintiff failed to connect his claims to the practices described in these reports. See, e.g., Aguirre, 2017 WL 4236552, at *8 (granting motion for judgment on the pleadings dismissing Monell claim); see also Granato v. City of New York, No. 98-CV-667 (ILG), 1999 WL 1129611, at *9 n.18 (E.D.N.Y. Oct. 18, 1999) (granting summary judgment dismissing plaintiff's Monell claim where, "in the absence of specific allegations showing some resemblance between the corrupt practices detailed in the Mollen Commission report and the circumstances of this case, neither the report, nor vague allusions to the 'blue wall' suffice to create a genuine issue of material fact"). And where the complaint relies on prior allegations of misconduct by the defendant officers to support a theory of failure to supervise or train, the pleading must offer specific facts regarding whether the City investigated or disciplined the officers; as plaintiff's pleading fails to do so, it does not adequately allege a Monell claim for failure to supervise or train. See Walker v. City of New York, No. 14-CV-808(ER), 2015 WL 4254026, at *11 (S.D.N.Y. July 14, 2015); Tieman, 2015 WL 1379652, at *21.

In any event, plaintiff has failed to allege any "specific deficiency in the city's training program." Amnesty Am., 361 F.3d at 129; see Pizarro, 2015 WL 5719678, at *9-10, or any facts that the City's deliberate indifference and failure to train were the "moving force" behind plaintiff's constitutional injuries, see Aguirre, 2017 WL 4236552, at *8. In fact, plaintiff has not pled any specific allegations regarding the City's training, discipline or supervision programs.

***19** Therefore, this Court recommends granting defendants' motion to dismiss plaintiff's Monell claim against the City. [24]

**III. State Constitutional Claims**

Plaintiff alleges that by "engag[ing] in a deliberate and unjustified effort to manufacture guilt against plaintiff" and thus secure "an unjust conviction[,]" defendants deprived him of his right to due process and to be free from unreasonable seizures, in violation of sections 6 and 12 of Article I of the New York State Constitution. Am. Compl. ¶¶ 217, 220-21. The pleading further asserts that the City is liable for the damage caused by its employees "under the doctrine of respondeat superior." Id. ¶ 223.

In response to plaintiff's state constitutional claims, defendants correctly contend that "there is no private right of action under the New York State Constitution for claims that are remediable under Section 1983 or other state laws." Def. Mem. at 25 (quoting Maldonado v. City of New York, No. 11 Civ. 3514(RA), 2014 WL 787814, at *12 (S.D.N.Y. Feb. 26, 2014) ). Because plaintiff's state constitutional claims are based on the same conduct as those he asserts under section 1983, this Court recommends dismissal of his state constitutional claims against the individual defendants. See Allen v. Antal, 665 F.App'x 9, 13-14 (2d Cir. 2016) ("Because alternative remedies were available under § 1983 and common law here, ... the district court properly dismissed Allen's [New York] state constitutional claims.").

***20** As for plaintiff's state constitutional claims against the City, plaintiff suggests that section 1983 does not provide an adequate remedy because, unlike state law, section 1983 does not recognize municipal liability under a theory of *respondeat superior*. See Pl. Opp. at 35; see also Leibovitz, 2018 WL 1157872, at *24. Even assuming *arguendo* that section 1983 therefore fails to provide an adequate alternative remedy for

state constitutional claims against the City,[25] this does not end the inquiry: there likewise is no separate right of action under the New York State Constitution where state *common law* provides an alternative means of redress. See Allen, 665 F.App'x at 13.

Where, as here, a plaintiff claims to have been subjected to a "bad-faith prosecution," New York common law provides a variety of remedies that preclude analogous tort claims under the state constitution. See Newton v. City of New York, 566 F.Supp.2d 256, 282 (S.D.N.Y. 2008). Indeed, courts in this Circuit have repeatedly dismissed similar state constitutional claims, concluding that New York common law provides alternative means of redress via claims for malicious prosecution, see Bleiwas v. City of New York, No. 15 CIV. 10046 (ER), 2017 WL 3524679, at *11 (S.D.N.Y. Aug. 15, 2017), on partial reconsideration, 2018 WL 401321 (S.D.N.Y. Jan. 11, 2018); Allen v. Antal, No. 12 Civ. 8024(NSR), 2014 WL 2526977, at *11 (S.D.N.Y. Mar. 13, 2014), aff'd, 665 F.Appp'x 9 (2d Cir. 2016); Maldonado, 2014 WL 787814, at *12 & n.10; Struthers, 2013 WL 2390721, at *9 n.15; false imprisonment, see Allen, 2014 WL 2526977, at *11; Maldonado, 2014 WL 787814, at *12 & n.10; Biswas v. City of New York, 973 F.Supp.2d 504, 522 (S.D.N.Y. 2013), appeal dismissed, 576 F.App'x 58 (2d Cir. 2014); and abuse of process, see Allen, 2014 WL 2526977, at *11.[26] Plaintiff thus has no viable state constitutional claim against any of the defendants, including the City.

In conclusion, defendants' motion to dismiss plaintiff's claims under the New York State Constitution should be granted in its entirety.[27]

## CONCLUSION

***21** For the foregoing reasons, this Court respectfully recommends that defendants' motion for judgment on pleadings be granted only as to (1) plaintiff's malicious prosecution, prolonged detention and fair trial/Brady claims against defendants Messa, Kenny and Buell; (2) plaintiff's claims against all defendants for abuse of process and supervisory liability; (3) plaintiff's failure to intervene claim against Buell; (4) plaintiff's claims against John Does 1-10; (5) plaintiff's Monell claim against the City; and (6) plaintiff's claims under the New York State Constitution. Defendants' motion should be denied in all other respects.

Any objections to the recommendations contained herein must be filed with Judge Matsumoto on or before August 20, 2018. Failure to file objections in a timely manner may waive a right to appeal the District Court order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam* ).

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 5020173

## Footnotes

1 Both men worked for Venus Auto Parts, located at 39-11 22nd Street. See Am. Comp. ¶ 39.

2 Elsewhere in the Amended Complaint, plaintiff alleges that plaintiff "had been arrested, searched, handcuffed, and placed in a police vehicle immediately upon being stopped by Assencao and Messa." Am. Compl. ¶ 61.

3 According to the pleading, the generator, compressor, circular saw, and "cartons of boots" taken from the warehouse were never recovered. See Am. Compl. ¶ 133.

4 Plaintiff contends that the prosecution also refused to produce records created by ESU officers in connection with their search and investigation of the roof of 39-40 22nd Street. See Am. Compl. ¶ 129.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

5 The Amended Complaint also asserts that defendants fabricated evidence that the seized boxes "were recovered from plaintiff; [and] that plaintiff admitted to having looked at and/or possessed those boxes[.]" Am. Compl. ¶ 140. However, the pleading is unclear as to whether that allegedly fabricated evidence was presented through testimony at trial and, if so, from Assencao and/or the civilian witness.

6 Finding a violation of plaintiff's right to counsel, the Second Department also reversed plaintiff's conviction for possession of stolen property and ordered dismissal of that count, because plaintiff had already served the maximum sentence for that crime. See People v. Is[a]ac, 121 A.D.3d 816, 817-18 (2d Dep't 2014).

7 The prosecutor conceded at trial that the burglary did not occur on May 27, 2008, the date of plaintiff's initial arrest. Am. Compl. ¶ 132.

8 Although fact discovery, which closed on October 31, 2017, had not been stayed, see Electronic Order (Nov. 1, 2017), the parties reportedly conducted no depositions, see 11/2/17 Letter at 2.

9 The pleading's assertion that "Kenny permitted Assencao and Messa to detain plaintiff without legal basis," Am. Compl. ¶ 50, does not implicate "post-arraignment deprivations of liberty," and thus fails to support a claim of malicious prosecution (as opposed to false arrest, which is not charged here) against Messa and Kenny. See Singer v. Fulton County Sheriff, 63 F.3d 110, 117 (2d Cir. 1995); Leibovitz v. City of New York, 14-CV-7106 (KAM)(LB), 2018 WL 1157872, at *14 & n.16 (E.D.N.Y. Mar. 2, 2018).

10 In addition to plaintiff's more general assertions of witness-tampering, the Amended Complaint alleges that civilian witness Hsia "later admitted that the police had told her what to say in both the Grand Jury and at trial." Am. Compl. ¶ 135. This specific accusation, assumed to be true on this motion, makes more plausible the pleading's other allegations regarding subornation of perjury.

11 Defendants further argue that the Court need not accept as true plaintiff's allegations of fabrication of statements by the eyewitness and complaining victim, because those allegations are contradicted by documentary evidence, such as police documents, criminal court records and trial testimony. See Def. Mem. at 9 n.3. However, the law is clear that the Court may not consider such documents for the truth of the statements contained therein. See Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007); Ying Li, 246 F.Supp.3d at 595, 611; *supra* pp 10-11. Defendants' suggestion that the documents are not being offered "to establish the truth of the [witnesses'] statements" (see Defendants' Reply Memorandum in Support (Oct. 24, 2017) at 5 n.9, DE #42) is unavailing, since they are being offered to prove the disputed fact that the witnesses made the statements attributed to them in the police documents. Plaintiff's Amended Complaint alleges that the documents contain statements fabricated by defendants and witness statements obtained by defendants through coercion. Therefore, the statements in the documents submitted by defendants do not entitle them to dismissal of plaintiff's malicious prosecution claim.

12 The prosecutor conceded at trial that the burglary did not occur on May 27, 2008. See Am. Compl. ¶ 132.

13 In fact, the Second Department concluded that apart from the (disputed) evidence that the plaintiff herein "was in possession of some of the alleged proceeds" at the time of his arrest, "there was *no* other evidence connecting him to the burglary or the damage to the warehouse...." Is[a]ac, 121 A.D.3d at 817 (emphasis added); Am. Compl. ¶ 149.

14 Defendants also argue that the existence of probable cause is a complete defense to plaintiff's abuse of process claim. See Def. Mem. at 12. However, as discussed above, the Court cannot find as a matter of law that plaintiff's prosecutions were supported by probable cause.

15 Plaintiff argues that the absence of probable cause constitutes a sufficient basis on which to infer that defendants had a collateral objective. See Pl. Opp. at 20-21. However, even where probable cause does

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

not support a plaintiff's prosecution, the failure to plead a collateral objective is fatal to an abuse of process claim. See Folk, 243 F.Supp.3d at 375 (dismissing abuse of process claim despite plausible allegation of lack of probable cause); Coggins v. County of Nassau, 254 F.Supp.3d 500, 518-19 (E.D.N.Y. 2017) (granting defendants' summary judgment motion on abuse of process claim but finding issues of fact as to whether there was probable cause to prosecute); Burbar v. Inc. Vill. of Garden City, 961 F.Supp.2d 462, 473-74 (E.D.N.Y. 2013).

16 Notably, on appeal from his conviction, the Appellate Division concluded that the *only* proof linking plaintiff to the most serious of the charges – burglary – was the (disputed) evidence that plaintiff was in possession of some of the alleged proceeds at the time of his arrest. See *supra* p. 20 n.13.

17 Plaintiff states a section 1983 claim for deprivation of a fair trial without reference to grand jury or trial testimony, for which defendants are entitled to absolute immunity. See Coggins, 776 F.3d at 113.

18 Defendants cite Mitchell v. Kugler, No. 07 CV 1801(JG)(LB), 2009 WL 160798 (E.D.N.Y. Jan. 23, 2009), for the proposition that plaintiff's "conclusory allegation of witness coercion" should not be accepted as true for purposes of the instant motion. See Def. Motion at 15-16. Yet in Mitchell, the court *denied* the defendants' motion for judgment on the pleadings, see id. at *8, where the pleading "appeared to support a claim that the law enforcement authorities had cajoled a witness who had described someone else as the perpetrator to identify [the plaintiff] instead," id. at *10. In fact, the court observed that "it is difficult to imagine what" more plaintiff could have alleged to render his claim plausible. See id. at *8. Defendants appear to be relying on dictum in Mitchell concerning the court's review of extra-pleading materials - i.e., the grand jury transcripts and transcripts of plaintiff's two criminal trials – and its skepticism that the plaintiff's claims would survive a motion for summary judgment. See id. at *10. This Court is now faced with a Rule 12(c) motion and declines to speculate about the outcome of the instant case at trial, or on summary judgment, based on a full record.

Betts v. Shearman, 751 F.3d 78 (2d Cir. 2014), relied on by defendants, is likewise distinguishable. As defendants acknowledge, there, the Second Circuit found it implausible that the complaining victim was coached into accusing her husband of assault since she had reported the assault to the 911 operator prior to having any contact with the defendants. See id. at 84. In contrast, here, defendants are alleged to have lied about the eyewitnesses' identification of plaintiff as the perpetrator at the scene and to have coerced them into subsequently corroborating the purported identification. In his call to the 911 operator, Stefas did not specifically identify plaintiff or provide a description that matched him. See Am. Compl. ¶ 46. With respect to Hsia, the pleading alleges that she did not originally tell Det. Hachadoorian that the fence on the roof of 39-40 22nd Street had been undamaged when she last left the building on May 23, 2008. See id. ¶¶ 72, 90. Nevertheless, Hachadoorian included that allegedly false statement in the criminal complaint.

19 The Amended Complaint also asserts that defendants failed to preserve and produce to plaintiff "the recordings of the 911 calls and all related radio transmissions," as well as the records created by the ESU officers in connection with their investigation of the rooftops on May 27, 2008. See Am. Compl. ¶¶ 82-83, 128-30. These allegations, without more, are insufficient to support a Brady claim. See Leibovitz, 2018 WL 1157872, at *17 (dismissing similar Brady claim where the complaint was "devoid of any allegations that would support a conclusion that any of the individual defendants (as opposed to the Queens County District Attorney's Office) was obligated to turn over Brady material to plaintiff and impermissibly failed to do so, or otherwise interfered with his right to receive such materials").

20 "The liability of a supervisor in a section 1983 action "depends upon a showing of some personal responsibility, and cannot rest on *respondeat superior*." Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003).

21 With one exception, the pleading does not even identify the subordinate's statements that Kenny and Buell allegedly knew to be false. The one exception is the allegation that after plaintiff was detained on May 27,

2008, Kenny arrived on the scene and “observed that plaintiff did not match the description that he had heard relayed by the 911 dispatcher over the police radio, and that plaintiff did not match the description that Stefas and Kharbanda gave to Kenny in person.” Am. Compl. ¶ 50. The Amended Complaint does not explain how plaintiff's appearance differed from the aforesaid descriptions. While the vagueness of this assertion, in combination with additional, more particularized falsehoods, is not fatal to the various claims against Assencao, it constitutes too slim a reed on which to support a claim against Kenny for violating plaintiff's right to a fair trial.

22 But see, e.g., Taant v. City of New York, Index No. 709517/2015 (Sup. Ct. Queens Co.) (charging Assencao with accidentally hitting a bicyclist with his patrol car).

23 For example, in Roche v. Buell, 04-cv-00293 (NGG)(MDG) (E.D.N.Y.), a case from 2004 involving an alleged police stop because of race, the case was settled with an offer of judgment pursuant to Rule 68 of the Federal Rules or Civil Procedure.

24 Defendants argue in a footnote that plaintiff's eighth count, charging Buell and Kenny with supervisory liability for failure to train and/or supervise the other individual defendants and deliberate indifference to their misconduct, see Am. Compl. ¶¶ 211-215, is subject to dismissal for the same reasons as is his Monell claim, see Def. Mem. at 25 n.12; see generally Hernandez, 341 F.3d at 144 (holding that supervisory liability under section 1983 requires “some personal involvement” or “responsibility,” and outlining different methods by which a plaintiff may establish supervisory liability). Plaintiff does not separately address defendants' challenge to the eighth count, thereby abandoning that claim. See Raffaele v. City of New York, 242 F.Supp.3d 152, 159 (E.D.N.Y. 2017) (Matsumoto, J.).

In any event, this Court agrees with defendants that the pleading's failure to allege any specific training deficiencies applies with equal force to plaintiff's claim for supervisory liability. As for the alleged failure to supervise, the Amended Complaint contains only conclusory assertions for holding Buell accountable for Hachadoorian's alleged misconduct, see, e.g., *supra* pp. 14, 29-30, and, for this additional reason, Buell would be entitled to the dismissal of that claim even if it had not been abandoned.

Kenny, in contrast, is alleged to have come on the scene after plaintiff was first detained by Kenny's subordinates and, for that reason, this Court has recommended denying defendants' motion to dismiss the failure to intervene claim against Kenny. See *supra* pp. 33-34. While that claim should stand, the boilerplate allegations in the eighth count, which charge Buell and Kenny, in identical language, with “[a]llowing innocent persons to be arrested or prosecuted” in order to meet arrest quotas, and with “[e]ncouraging and/or failing to discipline officers for ‘testifying’ and/or fabricating false evidence,” see Am. Compl. ¶ 214, are insufficient to state a plausible claim of supervisory liability, see Pizarro, 2015 WL 5719678, at *8.

25 The case law in this Circuit is split on the issue of whether section 1983 provides an adequate alternative remedy for state constitutional claims predicated on a theory of *respondeat superior.* See, e.g., Alwan v. City of New York, 14-cv-4556 (NGG)(VMS), ––– F.Supp.3d ––––, 2018 WL 2048366, at *11 (E.D.N.Y. May 2, 2018) (citing cases on both sides of the issue).

26 Citing the New York State Court of Appeals' decision in Brown v. State, 89 N.Y. 2d 172 (1996), plaintiff argues in a footnote that “a common law claim for malicious prosecution is not an acceptable alternative remedy for a state constitutional claim....” Pl. Opp. at 34 n.21. But the Court of Appeals subsequently emphasized, in Martinez v. City of Schenectady, 97 N.Y. 2d 78, 83, (2001), that Brown created “a narrow remedy.” See, e.g., Muhammad v. New York City Transit Auth., 450 F.Supp.2d 198, 211 (E.D.N.Y. 2006). Plaintiff's broad construction of Brown was flatly rejected by the Second Circuit in Allen, 665 F.App'x at 13, a case that plaintiff fails to acknowledge, let alone distinguish.

27 Although titled "Violations of the New York State Constitution," the ninth count in the Amended Complaint vaguely alleges that defendants' conduct violated plaintiff's "statutory and common law rights as guaranteed by the laws and Constitution of the State of New York." Am. Compl. ¶ 222. To the extent that plaintiff purports to assert state common law torts - and even assuming *arguendo* his perfunctory reference to his common law rights is somehow sufficient to plead unnamed common law torts - all of his state law claims, including his state constitutional claim against the City, should be dismissed, based on plaintiff's failure to plead compliance with New York State's notice-of-claim requirements. See N.Y. Gen. Mun. Law § 50-e; Hardy v. New York City Health & Hosp. Corp., 164 F.3d 789, 793-96 (2d Cir. 1999); Calicchio v. Sachem Cent. Sch. Dist., 185 F.Supp.3d 303, 317 (E.D.N.Y. 2016); Brooks v. County of Nassau, 54 F.Supp.3d 254, 257-58 (E.D.N.Y. 2014).

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2756489
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Raymond L. JACKSON, Plaintiff,
v.
Lt. Col. Scott A. WILCOX, Defendant.

No. 1:23-CV-130 (MAD/CFH)
|
Signed April 3, 2023

**Attorneys and Law Firms**

Raymond L. Jackson, 15-A-3740, Fishkill Correctional Facility, P.O. Box 1245, Beacon, New York 12508, Plaintiff pro se.

**REPORT-RECOMMENDATION AND ORDER**

Christian F. Hummel, United States Magistrate Judge

**I. Background**

***1** Plaintiff pro se Raymond L. Jackson ("plaintiff") purported to commence this action on January 30, 2023, by filing a complaint. See Dkt. No. 1 ("Compl."). Plaintiff did not pay the filing fee for his complaint or submit a motion to proceed in forma pauperis ("IFP"), and the Court administratively closed the action. See Dkt. No. 4. The Court ordered plaintiff to either pay the full $402.00 filing fee or to submit a complete IFP application. See id. Plaintiff then filed an IFP application. See Dkt. No. 6. The Court reopened, but then again closed, the case for failure to submit a complete and certified application. See Dkt. Nos. 7, 8. On March 13, 2023, plaintiff filed a complete IFP application. See Dkt. Nos. 9, 10. The undersigned has reviewed plaintiff's IFP motion and determines that he financially qualifies to proceed IFP for the purpose of filing. [1]

**II. Initial Review**

**A. Legal Standard**

Section 1915 of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action or appeal (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). It is a court's responsibility to determine that a plaintiff may properly maintain his complaint before permitting him to proceed with his action.

Where, as here, the plaintiff proceeds pro se, "the court must construe his [or her] submissions liberally and interpret them to raise the strongest arguments that they suggest." Kirkland v. Cablevision Sys., 760 F.3d 223, 224 (2d Cir. 2014) (per curiam) (citation and internal quotation marks omitted). This does not mean the Court is required to accept unsupported allegations that are devoid of sufficient facts or claims. Although detailed allegations are not required at the pleading stage, the complaint must still include enough facts to provide the defendants with notice of the claims against them and the grounds on which these claims are based. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atlantic v. Twombly, 550 U.S. 544, 555-56 (2007). Pro se litigants are "not exempt ... from compliance with relevant rules of procedural and substantive law[.]" Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983) (citation omitted). Ultimately, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citation omitted).

Pleading guidelines are set forth in the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Specifically, Rule 8 provides that a pleading which sets forth a claim for relief shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "The purpose ... is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." Flores v. Graphtex, 189 F.R.D. 54, 55 (N.D.N.Y. 1999) (internal quotation marks and citations omitted). Rule 8 also requires the pleading to include "a short and plain statement of the grounds for the court's jurisdiction" and "a demand for the relief sought...." FED. R. CIV. P. 8(a)(1), (3). Although "[n]o technical form is required," the Federal Rules make clear that each allegation contained in the pleading "must be simple, concise, and direct." Id. at 8(d)(1).

***2** Further, Rule 10 provides in pertinent part that:

> [a] party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. A later pleading may refer by number to a paragraph in an earlier pleading. If doing so would promote clarity, each claim founded on a separate transaction or occurrence – and each defense other than a denial – must be stated in a separate count or defense.

FED. R. CIV. P. 10(b). This serves the purpose of "provid[ing] an easy mode of identification for referring to a particular paragraph in a prior pleading[.]" Flores, 189 F.R.D. at 55 (internal quotation marks and citations omitted). A complaint that fails to comply with the pleading requirements "presents far too [ ] heavy [a] burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of their claims." Gonzales v. Wing, 167 F.R.D. 352, 355 (N.D.N.Y. 1996). The Second Circuit has held that "[w]hen a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative ... to dismiss the complaint." Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (citation omitted). However, "[d]ismissal ... is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." Id. (citation omitted). If dismissal is warranted and the plaintiff is pro se, the court generally affords the plaintiff leave to amend the complaint. See Simmons v. Abruzzo, 49 F.3d 83, 86-87 (2d Cir. 1995).

### B. Plaintiff's Complaint

Plaintiff seeks to bring this action against Lieutenant Colonel Scott A. Wilcox, a New York State Trooper, for purported statutory violations and violations of his constitutional rights pursuant to 42 U.S.C. § 1983. See generally Compl.

Plaintiff alleges that he filed a request under New York's Freedom of Information Law ("FOIL") to the New York State Police headquarters in Albany, New York, for "information in regards to three (3) criminal sale's in plaintiff's criminal case." Compl. at 2. In a letter dated December 19, 2016, Wilcox "made available (2) JPEG images burned on CD/DVD, and contact sheet for the criminal sales for a total of $75.00." Id. Plaintiff paid the requested amount and Wilcox sent a follow-up letter on February 14, 2019, confirming receipt of the money. See id. Plaintiff alleges that he did not receive the documents he paid for. See id. Plaintiff subsequently filed two Article 78 petitions which were unsuccessful. See id. The first petition was dismissed "for failure to provide the A.G. Office[ ]" and the second petition was denied "for procedural process." Id. They were denied on October 15, 2019, and January 4, 2021, respectively. See id. Plaintiff alleges that he appealed to the Appellate Division and both appeals were dismissed. See id. at 2-3. The Court of Appeals then informed plaintiff on February 23, 2022, that unless he "can show motion to leave appeal, proof of service, timeliness of an appeal, and a Notice of Entry from the 3rd Dep't etc. plaintiff cannot appeal." Id. at 3.

***3** Plaintiff contends that "[t]he Appellate Court failed to hear the case on it[s] merits leaving [him] with nowhere else to[ ] go." Compl. at 3. Plaintiff asserts that the appellate "process is fundamentally inadequate to protect plaintiff substantive rights to a fair procedural due process protection." Id. Plaintiff "seeks injunction [sic] relief and declaratory judgment [h]opefully to obtain the evidence." Id. Plaintiff asserts that Wilcox was acting under the color of state law and violated a "statutory law", plaintiff's "liberty interest of life a U.S. Const. of a substantive right of a fair procedural due process", and his "substantive rights and procedural due process right of equal protection of the U.S. Const. and N.Y.S. Const." Id. at 4. Plaintiff asks the Court to "compel NYSP Agency to turn over the documents so that the plaintiff can challenge his state conviction." Id. at 5.

### C. Additional Background

Plaintiff filed two Article 78 petitions both of which sought to compel Wilcox to produce specific evidence in response to plaintiff's FOIL request. See Jackson v. Wilcox, 136 N.Y.S.3d 696, 2, n.1 (Sup. Ct. 2021) (Table). Plaintiff's first petition was dismissed on October 19, 2019, for lack of jurisdiction. See id. at 2. His second was dismissed on January 4, 2021, because it was untimely filed. See id. However, the Albany County Supreme Court analyzed the merits of plaintiff's petition assuming that it was timely and determined that "there is no merit to his Petition." Id. at 3. The court concluded that "[t]he record amply establishes that

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

the respondent provided the petitioner with all the information it was required to provide[ ]" because plaintiff "admitted on several occasions that he has been provided with the images he sought, and made no attempt to differentiate between hard copy photos, contact sheets, or CD/DVD." Id. The court stated that plaintiff's "argument that sought images might be altered on the hard copy photos, but not on the CD/DVD is nonsensical." Id. Thus, the court concluded that plaintiff "failed to demonstrate that the respondent has not fully complied with his FOIL request, and his Petition must also be denied on the merits." Id.

On February 3, 2020, plaintiff filed a complaint in this Court under 42 U.S.C. § 1983 seeking the exact same relief that he presently seeks. See Jackson v. Wilcox, et al., 1:20-CV-110 (MAD/ATB), Dkt. No. 1 at 12. Following initial review of the complaint pursuant to 28 U.S.C. § 1915A, the Court dismissed plaintiff's complaint without prejudice for lack of subject matter jurisdiction. See id., Dkt. Nos 7, 9. The Court explained, "to the extent that [p]laintiff's claims are premised on a violation of New York State FOIL, it is well settled that such a claim, standing alone, is insufficient to support a Section 1983 claim." Jackson v. Wilcox, No. 1:20-CV-110 (MAD/ATB), 2020 WL 1899142, at *2 (N.D.N.Y. Apr. 17, 2020).[2]

On September 24, 2021, the Appellate Division, Third Department, denied plaintiff motions to proceed as a poor person and for FOIL relief, but granted his application for time to perfect his appeal. See Raymond L. Jackson v. Lt. Col. Scott A. Wilcox New York State Police, 2021 NY Slip Op 72455 (App. Div. Sept. 24, 2021). On July 22, 2022, the Appellate Division denied plaintiff's motion for an Article 78 petition. See Raymond L. Jackson v. Lt. Col. Scott A. Wilcox New York State Police, 2022 NY Slip Op 69225 (App. Div. July 22, 2022). Then, on December 8, 2022, the court denied plaintiff's "[m]otion to vacate dismissal of appeal, for extension of time to perfect appeal and for further relief." Raymond L. Jackson v. Lt. Col. Scott A. Wilcox, N.Y. State Police, 2022 NY Slip Op 75394 (App. Div. Dec. 8, 2022).[3]

**D. Analysis**

***4** The doctrine of res judicata bars an individual from relitigating the same things if "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." Soules v. Connecticut, Dep't of Emergency Servs. & Pub. Prot., 882 F.3d 52, 55 (2d Cir. 2018) (quoting Monahan v. N.Y.C. Dep't of Corr., 214 F.3d 275, 285 (2d Cir. 2000)).

There is no question that prongs two and three are satisfied here by plaintiff's previous § 1983 action: it involved the same plaintiff and identical claims were raised. Compare Compl. at 5, with Jackson, 2020 WL 1899142, at *1.[4] However, the 2020 action was dismissed without prejudice for lack of subject matter jurisdiction and "[a] dismissal without prejudice for lack of subject matter jurisdiction is not a dismissal 'on the merits' for claim preclusion purposes." Diaz v. Judge Advoc. Gen. of the Navy, 413 F. App'x 342, 343 (2d Cir. 2011)[5] (summary order) (citations omitted); St. Pierre v. Dyer, 208 F.3d 394, 400 (2d Cir. 2000) ("[A] dismissal for lack of subject matter jurisdiction is not an adjudication on the merits and hence has no res judicata effect."); Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 431 (2007) (citation and quotation marks omitted) ("Without jurisdiction the court cannot proceed at all in any cause; it may not assume jurisdiction for the purpose of deciding the merits of the case."). As plaintiff's previous § 1983 action was dismissed without prejudice for lack of subject matter jurisdiction, it does not bar the Court from considering his present complaint.

However, as was determined in his 2020 action, this Court lacks jurisdiction to review the merits of plaintiff's present complaint as it is based on the alleged denial of his FOIL request. See Jackson, 2020 WL 1899142, at *2. This is because "[i]t appears that federal district courts do not have jurisdiction to consider FOIL claims." Jeanty v. Utica Police Dep't, No. 6:20-CV-00221 (BKS/TWD), 2021 WL 1055153, at *4 (N.D.N.Y. Mar. 19, 2021) (collecting cases), appeal dismissed, No. 21-1797, 2021 WL 5071864 (2d Cir. Aug. 26, 2021); see also Ataroua v. Tamir, No. 22-CV-10371 (LTS), 2022 WL 17822720, at *3 (S.D.N.Y. Dec. 19, 2022) ("[The p]laintiff's allegations that, in 2021, [defendants] ... did not respond to letters about his FOIL requests that were directed to them personally, do not indicate that [the p]laintiff can establish any right to relief that turns on resolution of a question of federal law."); Cammarata v. City Univ. of N.Y., No. 17-CV-6456 (MKB), 2019 WL 3859401, at *9 (E.D.N.Y. Aug. 15, 2019) (citations omitted) ("Federal courts, however, do 'not have jurisdiction to enforce state laws granting public access to official state records.' "); Youngs v. Orange Cnty. Sheriffs Org., No. 22-CV-4918 (LTS), 2022 WL 4124796, at *3 (S.D.N.Y. Sept. 2, 2022) ("[The p]laintiff's allegation that his FOIL request for video footage was denied

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

does not give rise to a constitutional claim, and thus the facts alleged do not state a viable Section 1983 claim."). Rather, "[t]he appropriate vehicle for challenging denials of access guaranteed by the New York Freedom of Information Law is a state court proceeding pursuant to N.Y.C.P.L.R. Article 78 upon exhaustion of administrative remedies." Ramos v. Culick, No. 6:16-CV-01312 (FJS/TWD), 2017 WL 835406, at *4 (N.D.N.Y. Feb. 9, 2017) (quoting Schuloff v. Fields, 950 F. Supp. 66, 67-68 (E.D.N.Y. 1997)), report and recommendation adopted, 2017 WL 823580 (N.D.N.Y. Mar. 2, 2017); see also Posr v. City of New York, No. 10-CV-2551, 2013 WL 2419142, at *14 (S.D.N.Y. June 4, 2013) (finding that the court was "without jurisdiction to consider [p]laintiff's FOIL-related claims" because the proper remedy would be through "an administrative appeal or seek remedies in state court"), aff'd sub nom., Posr v. Ueberbacher, 569 F. App'x 32 (2d Cir. 2014) (summary order); Abreu v. Bascue, No. 9:18-CV-0186 (MAD/ATB), 2018 WL 11466956, at *25 (N.D.N.Y. May 1, 2018) ("[A] violation of New York State FOIL does not give rise to a federal claim under 42 U.S.C. § 1983. Rather, plaintiff's remedy for an alleged violation of FOIL is to follow procedures set forth in state laws or regulations.").

***5** As courts have repeatedly held that federal courts lack jurisdiction to review FOIL claims, this Court lacks jurisdiction to review Wilcox' alleged denial of plaintiff's FOIL request. Thus, it is recommended that the complaint be dismissed without prejudice for lack of subject matter jurisdiction.

The undersigned notes, however, that even if plaintiff could state a cognizable § 1983 claim from the alleged denial of his FOIL request, review of the claim would likely be barred by the statute of limitations. "Congress did not statutorily create a limitations period for actions brought in federal court under 42 U.S.C. § 1983[.]" Branch v. Guilderland Cent. Sch. Dist., 239 F. Supp. 2d 242, 248 (N.D.N.Y. 2003). "[T]he Supreme Court held ... that claims brought under § 1983 are governed by the limitations period for personal injury suits under the laws of state where the cause of action arose." Id. (citing Lounsbury v. Jeffries, 25 F.3d 131, 133 (2d Cir. 1994)). "In New York, the statute of limitations for personal injury actions, and thus claims under § 1983, is three years." Id. (citations omitted). "[W]hen that statute of limitations begins to run, i.e., when the cause of action 'accrues,' is governed by federal law." Id. (citing Jaghory v. N.Y. State Dep't. of Educ., 131 F.3d 326, 331 (2d Cir. 1997)). "Under federal law, the accrual date for a § 1983 claim is when 'the plaintiff knows or has reason to know of the injury which is the basis of his action.' " Id. (quoting Pinaud v. Cty. of Suffolk, 52 F.3d 1139, 1156 (2d Cir. 1995)).

Plaintiff alleges that Wilcox acknowledged the receipt of plaintiff's payment but did not produce the specific evidence in response his FOIL request on February 14, 2019. See Compl. at 2. This means that plaintiff would have had until January 14, 2022, to bring a § 1983 action alleging due process and equal protection claims. He did not bring this action until January 30, 2023. See generally Compl. Thus, any possible constitutional claims that plaintiff could bring would be time barred. This is the case even though he filed Article 78 proceedings and appeals therefrom because such proceedings do not toll the statute of limitations for a § 1983 action. See Abbas v. Dixon, 480 F.3d 636, 641 (2d Cir. 2007) ("[A] plaintiff's pursuit of a state remedy, such as an Article 78 proceeding, does not toll the statute of limitations for filing a claim pursuant to section 1983.").

Finally, even if the Court were to be able to consider the merits of plaintiff's complaint, the complaint would likely be dismissed for failure to state a claim. For a due process claim, "[t]he threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution." Narumanchi v. Bd. of Trustees of Conn. State Univ., 850 F.2d 70, 72 (2d Cir. 1988). "If a protected interest is identified, a court must then consider whether the government deprived the plaintiff of that interest without due process." Id. "As several courts in th[is] Circuit have held, 'a plaintiff has no property interest in obtaining FOIL documents.' " Lawrence v. Baxter, No. 03-CV-228S, 2004 WL 1941347, at *3 (W.D.N.Y. Aug. 31, 2004) (collecting cases) (citations omitted), aff'd, 139 F. App'x. 365 (2d Cir. 2005) (summary order). "Specifically, because FOIL documents need only be produced after a request and investigation by the state entity, individuals making such request do not have anything beyond a mere expectation in such documents, and, thus, do not have an entitlement to requested documents that is protected by the Fourteenth Amendment." Simpson v. Town of South Hampton, No. 06-CV-6743, 2007 WL 1755749, at *4 (E.D.N.Y. 2007); see also Abreu, 2018 WL 11466956, at *25 ("Multiple district courts in this circuit have held that a plaintiff has no constitutionally protected interest in obtaining FOIL documents.").

***6** Further, "[t]he sufficiency of Article 78 proceedings to satisfy due process requirements is well established." Ramos, 2017 WL 835406, at *4 (citing, inter alia, Hellenic Am.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Neighborhood Action Comm., 101 F.3d 877, 880-81 (2d Cir. 1996) ("An Article 78 proceeding is adequate for due process purposes even though the petitioner may not be able to recover the same relief that he could in a § 1983 suit."); Davis v. Guarino, 52 F. App'x. 568, 569 (2d Cir. 2002) (summary order) (denial of a plaintiff's FOIL request did not violate due process because "an Article 78 proceeding is a perfectly adequate post-deprivation remedy.")). Thus, this Court has concluded that a plaintiff failed to assert a § 1983 claim for denial of a FOIL request because "the New York FOIL procedures are sufficient to protect any property interest [the p]laintiff may have in the receipt of FOIL documents." Id.; see also Lawrence v. Antonucci, No. 04-CV-356S, 2005 WL 643457, at *4 (W.D.N.Y. Mar. 16, 2005) ("[T]he procedures set forth under New York law are sufficient to protect any property interest that a person might have in the receipt of FOIL documents."), aff'd, 144 F. App'x 193 (2d Cir. 2005) (summary order).

Here, plaintiff summarily states, "[t]he appeal process is fundamentally inadequate to protect plaintiff['s] substantive rights to a fair procedural due process protection." Compl. at 3. However, he does not allege any facts indicating that the process is inadequate; rather, he complains that the "[t]he Appellate Court failed to hear the case on it[s] merits[.]" Id. Plaintiff's disagreement with the state court decisions does not establish a due process claim. See Torres v. City of New York through New York City Dep't, 590 F. Supp. 3d 610, 618 (S.D.N.Y. 2022) (citation omitted) ("[F]or a procedural due process claim, 'the relevant inquiry is what process [the plaintiff] received, not whether the state court decided the case correctly.' "). Further, he has not asked for any relief concerning the state court decisions and instead names only Wilcox as a defendant and seeks relief from his denial of the FOIL request. [6] See Compl. at 4-5. As plaintiff does not have a property interest in the FOIL documents, the sufficiency of Article 78 proceedings is well-established, and plaintiff has not stated any facts indicating that the state appellate procedures were inadequate, any possible due process claim against Wilcox would fail as a matter of law.

To the extent plaintiff summarily mentions "equal protection", to state such a claim, plaintiff must plead "adverse treatment of individuals compared with other similarly situated individuals and that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Compl. at 4; Terrill v. Windham-Ashland-Jewett Cent. Sch. Dist., 176 F. Supp. 3d 101, 110 (N.D.N.Y. 2016) (quoting Miner v. Clinton County, 541 F.3d 464, 474 (2d Cir. 2008)). Plaintiff has not alleged any facts that could be construed as stating an equal protection claim; thus, his complaint would likely be dismissed for failure to state a claim. See generally Compl. [7]

***7** In sum, it is recommended that plaintiff's complaint be dismissed without prejudice for lack of subject matter jurisdiction. Generally, "[a] *pro se* complaint should not be dismissed without the Court granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Nielsen v. Rabin, 746 F.3d 58, 62 (2d Cir. 2014) (citation omitted). "However, if the problems with a complaint are 'substantive' rather than the result of an 'inadequately or inartfully pleaded' complaint, an opportunity to re-plead would be 'futile' and 'should be denied.' " Edwards v. Penix, 388 F. Supp. 3d 135, 144-45 (N.D.N.Y. 2019) (quoting Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000)). As the problem with plaintiff's complaint is substantive—the Court lacks subjective matter jurisdiction—amendment would be futile. See Ramos, 2017 WL 835406, at *4 (dismissing complaint alleging improper denial of FOIL request without prejudice but without leave to amend); see also Kirschenbaum v. Fed. Ins. Co., 505 B.R. 126, 131 (E.D.N.Y. 2014) (citation omitted) ("An amendment is considered futile if, for example, it could not defeat a motion to dismiss for failure to state a claim or for lack of subject matter jurisdiction."); Johnson v. Oneida Nation Enters., LLC, No. 5:19-CV-853 (MAD/ATB), 2019 WL 5091952, at *2 (N.D.N.Y. Oct. 11, 2019) ("[A]mendment would be futile as [the p]laintiff has not alleged any claims which would give the Court subject matter jurisdiction."). Thus, it is recommended that plaintiff's complaint be dismissed without prejudice, but without leave to amend.

### III. Conclusion

**WHEREFORE**, for the reasons set forth herein, it is hereby

**ORDERED**, that plaintiff's application to proceed in forma pauperis (Dkt. No. 9) is **GRANTED** for purposes of filing only; and it is further

**RECOMMENDED**, that plaintiff's complaint (Dkt. No. 1) be **DISMISSED WITHOUT PREJUDICE AND WITHOUT LEAVE TO AMEND**; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1), plaintiff has **FOURTEEN (14)** days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a). [8]

**All Citations**

Not Reported in Fed. Supp., 2023 WL 2756489

## Footnotes

1 Plaintiff is advised that although he has been granted IFP status, he is still required to pay any fees and costs he may incur in this action.

2 On December 13, 2019, plaintiff filed a habeas corpus petition stating, among other things, that he filed an Article 78 petition "hoping to receive a tangible document of the CD jpeg disc, and contact sheet to bolster a stronger argument and to show the claims have merits." Jackson v. Capra, 9:19-CV-1542 (DNH/CFH), Dkt. No. 9 at 4-5. Plaintiff's petition for a writ of habeas corpus is fully briefed and pending the Court's review. See id., Dkt. No. 72.

3 New York State court decisions can be searched through the following website: https://nycourts.gov/reporter/Decisions.shtml.

4 Plaintiff named additional defendants, not only Wilcox, in his 2020 complaint. See Jackson v. Wilcox, No. 1:20-CV-110 (MAD/ATB), 2020 WL 871180, at *2 (N.D.N.Y. Feb. 21, 2020), report and recommendation adopted, 2020 WL 1899142 (N.D.N.Y. Apr. 17, 2020).

5 All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff. The undersigned will not provide plaintiff copies of the unpublished cases that are his, such as the state court cases, the 2020 § 1983 action, or his writ for a habeas corpus petition.

6 Any potential challenge to the state court's Article 78 decision or appeals would likely be barred by the Rooker-Feldman doctrine which prohibits a federal court's review of a state court decision in which the plaintiff lost. See Dorce v. City of New York, 2 F.4th 82, 101 (2d Cir. 2021) (citation and quotation marks omitted) ("[O]ur court has articulated four requirements that must be met for Rooker-Feldman to apply: (1) the federal-court plaintiff must have lost in state court[;]" (2) the plaintiff must complain of injuries caused by a state-court judgment[;]" (3) the plaintiff must invite district court review and rejection of that judgment[;] and (4) the state-court judgment must have been rendered before the district court proceedings commenced.").

7 The undersigned also notes that review of plaintiff's complaint is likely barred by res judicata because of the January 2021 Article 78 proceeding. "The doctrine of claim preclusion ... holds that 'a prior decision dismissed 'on the merits' is binding in all subsequent litigation between the same parties on claims arising out of the same facts, even if based upon different legal theories or seeking different relief on issues which were or might have been litigated in the prior action but were not.' " N. Assur. Co. of Am. v. Square D Co., 201 F.3d 84, 87 (2d Cir. 2000) (citation omitted). "The import of claim preclusion is that it operates in two ways: (1) it bars claims that were brought and decided in a prior litigation; and (2) it bars all other claims relating to the same transaction

against the same defendant that could have been brought at that time." Id. "[G]enerally[,] res judicata 'does not operate to bar a § 1983 suit following the resolution of an Article 78 proceeding, since the full measure of relief available in the former action is not available in the latter.' " D.B. v. Sullivan, No. 1:22-CV-282 (MAD/CFH), 2023 WL 2456070, at *6 (N.D.N.Y. Mar. 9, 2023) (quoting Colon v. Coughlin, 58 F.3d 865, 870 n.3 (2d Cir. 1995), abrogated on other grounds by Tangreti v. Bachmann, 983 F.3d 609 (2d Cir. 2020)). However, plaintiff did not seek relief in his Article 78 proceeding that was unavailable in that proceeding, but available in a section 1983 action. Rather, he sought identical relief in his Article 78 proceeding that he seeks here, and which was available in the Article 78 proceeding: for Wilcox to be compelled to produce specific evidence. See Compl. at 5; see also Jackson, 136 N.Y.S.3d at 1-2; Vandor, Inc. v. Militello, 301 F.3d 37, 39 (2d Cir. 2002) (per curiam) ("Article 78 is a form of proceeding available to compel public officials to comply with their responsibilities."); N.Y.C.P.L.R. § 7806 ("The judgment may grant the petitioner the relief to which he is entitled, ... and may direct or prohibit specified action by the respondent."). As the Albany County Supreme Court ruled on the merits of plaintiff's petition in the January 2021 Article 78 proceeding, it is likely that his complaint is barred by res judicata. See Jackson, 136 N.Y.S.3d at 2; see also D.B., 2023 WL 2456070, at *6 (explaining that in Kern v. Joyce, 857 F. App'x 691, 694 (2d Cir. 2021) (summary order), the Second Circuit determined that "the plaintiff's Section 1983 claims were barred by res judicata applied to a prior Article 78 proceeding because the plaintiff did not seek damages in federal court, but simply the same relief of vacating an ALJ's determination."). However, the undersigned does not make a more definitive conclusion because it is not clear whether plaintiff raised his constitutional challenges in the Article 78 proceeding and whether the court treated his petition as a hybrid petition. See D.B., 2023 WL 2456070, at *6 (explaining that res judicata may apply when the Article 78 proceeding was a "hybrid" proceeding which concerns relief that is and is not available in an Article 78 proceeding).

8 If you are proceeding pro se and are served with this Report-Recommendation & Order by mail, three (3) additional days will be added to the fourteen (14) day period, meaning that you have seventeen (17) days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(c).

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 4230351
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Raymond L. JACKSON, Plaintiff,
v.
Lt. Col. Scott A. WILCOX,
NYSP/State Trooper, Defendant.

1:23-CV-130 (MAD/CFH)
|
Signed June 28, 2023

**Attorneys and Law Firms**

RAYMOND L. JACKSON, 15-A-3740, Fishkill Correctional Facility, P.O. Box 1245, Beacon, New York 12508, Plaintiff, Pro Se.

**ORDER**

Mae A. D'Agostino, United States District Judge:

***1** On January 30, 2023,[1] Plaintiff Raymond L. Jackson ("Plaintiff") filed a complaint with a jury demand. *See* Dkt. No. 1. On February 16, 2023, and again on March 13, 2023, Plaintiff filed a motion to proceed *in forma pauperis* ("IFP"). *See* Dkt. Nos. 6, 9. On April 3, 2023, Magistrate Judge Christian F. Hummel issued a Report-Recommendation and Order granting Plaintiff's request to proceed IFP and recommending the complaint be dismissed without prejudice and without leave to amend. *See* Dkt. No. 12. On April 24, 2023, Plaintiff filed an untimely objection. *See* Dkt. No. 13; Dkt. No. 12 (instructing Plaintiff to file within seventeen days of the sending of the Report-Recommendation and Order).

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has held that the court is obligated to " 'make reasonable allowances to protect *pro se* litigants' " from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan*, 289 F. Supp. 2d at 295 (quoting *Taguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). However, as Plaintiff appears IFP, "the court shall dismiss the case at any time if the court determines ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). When a party declines to file objections to a magistrate judge's report-recommendation or files "[g]eneral or conclusory objections or objections which merely recite the same arguments [presented] to the magistrate judge," the district court reviews those recommendations for clear error. *O'Diah v. Mawhir*, No. 9:08-CV-322, 2011 WL 933846, at *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted); *see also McAllan v. Von Essen*, 517 F. Supp. 2d 672, 679 (S.D.N.Y. 2007). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). Plaintiff failed to file a timely objection. However, even reviewing the subjects of the objections *de novo*, the Court adopts Magistrate Judge Hummel's findings in their entirety.

First, Plaintiff argues that Magistrate Judge Hummel utilized the wrong portion of *Jeanty v. Utica Police Dep't* in its analysis, and that the Court should exercise supplemental jurisdiction over this complaint as "the argument ... arises out of the same controversy" of his pending *habeas corpus* petition. Dkt. No. 13 at 1; *see Jeanty v. Utica Police Dep't*, No. 6:20-CV-00221, 2021 WL 1055153, *4 (N.D.N.Y. Mar. 19, 2021). Magistrate Judge Hummel correctly quoted *Jeanty*'s finding "that federal district courts do not have jurisdiction to consider FOIL claims." *Jeanty*, 2021 WL 1055153, at *4. However, Plaintiff argues that Magistrate Judge Hummel utilized the wrong or inapplicable finding in *Jeanty* and should have instead applied the decision's section discussing supplemental jurisdiction. *See* Dkt. No. 13 at 1-2. The *Jeanty* court declined to exercise supplemental jurisdiction over the FOIL claims as the state claims and federal claims were unrelated. *Jeanty*, 2021 WL 1055153, at *4 (quoting *Sovereign Bank, N.A. v. Lee*, 968 F. Supp. 2d 515, 518 (E.D.N.Y. 2013)) ("While the supplemental jurisdiction statute allows a district court to exercise jurisdiction over claims that are 'so related' that they 'form part of the same case or controversy,' 28 U.S.C. § 1367, that statute cannot form the basis for removal"). Here, too, the state law claims for FOIL denials and the federal claim for habeas relief are

not connected by a "common nucleus of operative fact." *See Jeanty*, 2021 WL 1055153, at *4 (quoting *Young v. New York City Transit Auth.*, 903 F.2d 146, 164 (2d Cir. 1990)). As such, the Court declines to exercise supplemental jurisdiction.

***2** Next, Plaintiff seems to argue that Magistrate Judge Hummel incorrectly found that his Article 78 petition was time barred, as Plaintiff claims it is nonsensical that the lower court found the petition was time-barred but still reviewed it in the alternative on the merits. *See* Dkt. No. 13 at 2. However, this was a recitation of the background of the complaint, rather than a finding by Magistrate Judge Hummel. As such, this "objection" is not pertinent to the matter at hand. Magistrate Judge Hummel recommended the complaint be dismissed for lack of federal subject matter jurisdiction over § 1983 cases relating to FOIL claims and for failure to state equal protection or due process claims. *See* Dkt. No. 12 at 6. As such, this is not an objection that the Court need address.

Magistrate Judge Hummel correctly determined that the Court lacks subject matter jurisdiction over the complaint as federal courts do not have jurisdiction over claims related to FOIL request denials. *See McTerrell v. Koenigsmann*, No. 18-CV-1028, 2021 WL 1298488, *1 (W.D.N.Y. Apr. 7, 2021) (quoting *Jeanty*, 2021 WL 1055153, at *4); *see also Rios v. Mantellino*, No. 16-CV-726, 2016 WL 927181, *2 (E.D.N.Y. Mar. 4, 2016) ("FOIL claims which are not resolved by the state or city agency must be brought in the New York State Supreme Court pursuant to Article 78 of the New York Civil Practice Law and Rules").

Even if Plaintiff had a cognizable claim for the FOIL request, such claim would likely be barred by the statute of limitations. *See* Dkt. No. 12 at 10. For § 1983 actions, "courts apply the statute of limitations for personal injury actions under state law," *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013), which is three years in New York State. *See Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002). Plaintiff filed his claim nearly four years after the alleged injury, *see* Dkt. No. 1 at 2, and thus the claim is time-barred. Plaintiff's Article 78 petitions did not toll the statute of limitations. *See Brown v. Bullis*, No. 9:11-CV-647, 2013 WL 1294488, at *3 (N.D.N.Y. Mar. 26, 2013) (citing *Abbas v. Dixon*, 480 F.3d 636, 641 (2d Cir. 1997)).

Magistrate Judge Hummel correctly found that there is no due process claim for the process of obtaining FOIL documents because Plaintiff lacks a property or liberty interest in the documents. *See Sharp v. Inc. Vill. of Farmingdale*, No. 16-CV-2994, 2017 WL 9485681, *14 (E.D.N.Y. Aug. 21, 2017) (quoting *Simpson v. Town of Southampton*, No. 06-CV-6743, 2007 WL 1755749, *4 (E.D.N.Y. June 15, 2007)). Further, an Article 78 proceeding for FOIL claims is adequate for due process purposes. *See Blount v. Brown*, No. 10-CV-01548, 2010 WL 1945858, at *2 (E.D.N.Y. May 11, 2010) ("[T]he procedures set forth under New York law are sufficient to protect any property interest that a person might have in the receipt of FOIL documents").

To the extent Plaintiff sought to allege an equal protection claim, Plaintiff failed to do so as Plaintiff did not plead that he, " 'compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race ... to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person[.]' " *Knighton v. City of Syracuse Fire Dep't*, 145 F. Supp. 2d 217, 222–23 (N.D.N.Y. 2001) (quoting *Laverpool v. New York City Transit Auth.*, 835 F. Supp. 1440, 1459 (E.D.N.Y. 1993) (quotation marks omitted)).

For *pro se* plaintiffs appearing IFP,

> [a]lthough the language of § 1915 is mandatory, stating that "the court shall dismiss the case" in the enumerated circumstances, we conclude that a *pro se* plaintiff who is proceeding *in forma pauperis* should be afforded the same opportunity as a *pro se* fee-paid plaintiff to amend his complaint prior to its dismissal for failure to state a claim, unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim.

***3** *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999). "[M]otions to amend should be granted freely in the interests of justice, [and] a *pro se* complaint generally should not be dismissed without granting the plaintiff leave to amend at least once." *Id.*; *see also Romano v. Lisson*, 711 Fed. Appx. 17, 19 (2d Cir. 2017). As Plaintiff cannot cure the Court's lack of subject matter jurisdiction, the complaint is dismissed without leave to amend.

After carefully reviewing the Report-Recommendation and Order, the entire record in this matter, and the applicable law, the Court hereby

**ORDERS** that the Report-Recommendation and Order (Dkt. No. 12) is **ADOPTED in its entirety**; and the Court further

**ORDERS** that Plaintiff's complaint (Dkt. No. 1) is **DISMISSED without leave to amend**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2023 WL 4230351

## Footnotes

1 On January 31, 2023, and February 27, 2023, Magistrate Judge Hummel entered orders directing administrative closure. *See* Dkt. Nos. 4, 8. The case was reopened on February 16, 2023, and most recently on March 13, 2023. *See* Dkt. Nos. 7, 11.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 4906112
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

David L. KIRBY, III, Plaintiff,
v.
Mamoun ABRAHAM, [1] Defendant.

5:24-cv-0522 (BKS/TWD)
|
Signed October 25, 2024

**Attorneys and Law Firms**

DAVID L. KIRBY, III, Plaintiff, pro se, 05002304, Onondaga County Justice Center, 555 South State Street, Syracuse, NY 13202.

**REPORT-RECOMMENDATION AND ORDER**

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**I. INTRODUCTION**

***1** On April 15, 2024, *pro se* Plaintiff David L. Kirby, III, commenced this action by filing a complaint naming the Syracuse Police Department as the sole defendant. Dkt. No. 1. Plaintiff did not pay the Court's filing fee or file a motion to proceed *in forma pauperis* ("IFP"), and the Court administratively closed the case. Dkt. No. 2. Plaintiff subsequently submitted a complete application to proceed IFP, and the case was reopened. Dkt. Nos. 3, 4, 5. On June 14, 2024, the undersigned granted Plaintiff's EFP application and performed an initial review of the complaint. Dkt. No. 6. On June 24, 2024, Plaintiff filed an amended complaint. Dkt. No. 7. In light of Plaintiff's amended complaint, the Court terminated the pending Report-Recommendation, and referred the action back to the undersigned for an initial review of the amended complaint. [2] Dkt. No. 9.

**II. SUFFICIENCY OF THE AMENDED COMPLAINT**

Because Plaintiff is proceeding IFP and is a prisoner suing one or more government employees, his amended complaint must be reviewed in accordance with 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b). [3]

**A. Relevant Legal Standard**

The Court shall dismiss a complaint in a civil action if it is frivolous, malicious, fails to state a claim on which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B)(i)-(iii); 28 U.S.C. § 1915A(b).

A claim is frivolous when it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *see also Denton v. Hernandez*, 504 U.S. 25, 33 (1992) (holding that "a finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible"); *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) ("[A]n action is 'frivolous' when either: (1) the factual contentions are clearly baseless ... or (2) the claim is based on an indisputably meritless legal theory.").

***2** To survive dismissal for failure to state a claim, a complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This short and plain statement of the claim must be "plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The statement of the claim must do more than present "an unadorned, the-defendant-harmed-me accusation." *Id.* It must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (internal punctuation and citations omitted); *see also* Fed. R. Civ. P. 8(a)(2).

In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

In reviewing a *pro se* complaint, the court has a duty to show liberality toward *pro se* litigants, *see Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and should exercise "extreme caution ... in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

and both parties (but particularly the plaintiff) have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted).

Generally, before the Court dismisses a *pro se* complaint or any part of the complaint *sua sponte*, the Court should afford the plaintiff the opportunity to amend at least once; however, leave to re-plead may be denied where any amendment would be futile. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993).

### B. Summary of the Amended Complaint [4]

Plaintiff brings this action against Defendant John Doe, a Syracuse Police Officer. Dkt. No. 7. In the "Statement of Facts" section, Plaintiff states, in full:

> John Doe hit me with his police car while he was off-duty working as an security guard. The results of me getting hit by car my neck, arm on right side and upper body collarbone was hurting very bad. I had to walk to court holding my arm in my left hand after being deny an arm slang by Justice Center medical staff. Also after that I was placed in handcuffs. Also John Doe illegally searched me which is violating my rights 4 th Amendment he searched me after hitting me with car and placing me in handcuffs. Then I was sent to hospital. And that is false arrest and false imprisonment.

*Id.* at 4. Plaintiff lists his first claim as "excessive force" and his second claim as "unconstitutional conditions of confinement." *Id.* at 5. Plaintiff seeks monetary damages. *Id.*

On July 2, 2024, Plaintiff filed a letter stating, "Officer Mamoun Abraham was the officer that struck me with deadly force using his car off-duty knowing that he was not supposed to do that." Dkt. No. 10. On August 14, 2024, Plaintiff filed another letter, stating, in part, "Brandon Hanks used excessive force, violated my 4 th Amendment right by his unreasonable search which led to false arrest and false imprisonment because my rights were violated and no probable cause to arrest me." [5] Dkt. No. 11.

## III. ANALYSIS

***3** Plaintiff brings this action pursuant to 42 U.S.C. § 1983 ("Section 1983"), which establishes a cause of action for " 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *German v. Fed. Home Loan Mortg. Corp.*, 885 F. Supp. 537, 573 (S.D.N.Y. 1995) (citing *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983)) (footnote omitted). "Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted).

To state a valid claim under Section 1983, a plaintiff must allege that the challenged conduct: (1) was attributable to a person acting under color of state law; and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Whalen v. Cnty. of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997).

### A. Defendant John Doe

The Court has reviewed Dkt. No. 10, wherein Plaintiff has identified the Doe defendant by name. Therefore, the Court construes Dkt. No. 10 as a request to substitute the name of "Mamoun Abraham" for John Doe, which is granted. While piecemeal pleadings are generally not accepted by the Court, an exception will be made since the letter was filed while the amended complaint was still under initial review. The amended complaint will be deemed to name Mamoun Abraham in place of John Doe and the Court will conduct its initial review accordingly. [6]

### B. Color of State Law

By its terms, Section 1983 applies only where the defendant acts "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983; *Kern v. City of Rochester*, 93 F.3d 38, 43 (2d Cir. 1996) ("[A] plaintiff must allege a violation of rights secured by the Constitution or laws of the United States, and that such violation was committed by a person acting under the color of state law."). A "defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State." *West v. Atkins*, 487 U.S. 42, 49-50 (1988). By contrast, "acts of officers in the ambit of

their personal pursuits are plainly excluded." *United States v. Giordano*, 442 F.3d 30, 42-43 (2d Cir. 2006) (quoting *Screws v. United States*, 325 U.S. 91, 111 (1945) (plurality opinion)).

"[T]here is no bright line test for distinguishing 'personal pursuits' from activities taken under color of law." *Pitchell v. Callan*, 13 F.3d 545, 548 (2d Cir. 1994). A defendant acts under color of state law for the purposes of Section 1983 when he exercises a power "possessed by virtue of state law and made possible only because the wrongdoer is cloaked with the authority of state law." *Colombo v. O'Connell*, 310 F.3d 115, 117-18 (2d Cir. 2002) (citation omitted). The "focus" of the color of law inquiry is on "whether there was an abuse or misuse of a power conferred upon [the state employee] by state authority," and "look[s] to the nature of the officer's act, not simply his duty status." *Pitchell*, 13 F.3d at 548-49.

***4** Courts therefore "look at a variety of factors, including, *inter alia*, whether the officer: (1) was off-duty; (2) identified himself as an officer of the law; (3) was in uniform; (4) was authorized to make an arrest at the time; (5) was carrying handcuffs; (6) was carrying any weapons; (7) flashed a police badge; and (8) placed the plaintiff under arrest or otherwise detained her." *Cotz v. Mastroeni*, 476 F. Supp. 2d 332, 372 (S.D.N.Y. 2007). An individual engaging in conduct as a private actor can still be liable under Section 1983, but only if he "is a willful participant in joint action with the State or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980). "Conclusory allegations that [the] private individual conspired or took concerted action with state actors will not suffice" to establish this element. *Lienau v. Garcia*, No. 12-CV-6572, 2013 WL 6697834, at *5 (S.D.N.Y. Dec. 19, 2013) (citation and internal punctuation omitted).

Mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g.*, *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the Court assumes for purposes of initial review that defendant Abraham was acting under color of state law.

### C. Excessive Force

As noted above, Plaintiff lists excessive force as his first claim. Dkt. No. 7 at 5. " '[A]ll claims that law enforcement officers have used excessive force ... in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard.' " *Ketcham v. City of Mount Vernon*, 992 F.3d 144, 148-49 (2d Cir. 2021) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis and internal quotation marks omitted)). Examining the reasonableness of the force used "requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham*, 490 U.S. at 396). An officer may not constitutionally employ "a degree of force beyond that which is warranted by the objective circumstances of an arrest." *Cugini v. City of New York*, 941 F.3d 604, 612 (2d Cir. 2019). Additionally, "[w]hile handcuffs must be reasonably tight to be effective, overly tight handcuffing may constitute excessive force." *Lynch ex rel. Lynch v. City of Mt. Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008).

It is well-established "that the use of entirely gratuitous force is unreasonable and therefore excessive." *Tracy v. Freshwater*, 623 F.3d 90, 99 n.5 (2d Cir. 2010). But " '[n]ot every push or shove' amounts to a Fourth Amendment violation. Indeed, a '*de minimis* use of force will rarely suffice to state a Constitutional claim.' " *Acosta v. City of New York*, No. 11 Civ. 856, 2012 WL 1506954, at *10 (S.D.N.Y. Apr. 26, 2012) (citing *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 2005)).

Here, Plaintiff's explanation of the alleged incident with defendant Abraham is conclusory and vague. He has not listed a date on which he was "struck" by the police vehicle and has not described *any* facts surrounding the alleged incident. Thus, Plaintiff has not provided "a short and plain statement of the claim showing that he is entitled to relief." Fed. R. Civ. P. 8(a)(2).

Accordingly, the Court recommends dismissal of the excessive force claim without prejudice for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A).

### D. False Arrest and False Imprisonment

Liberally construed, Plaintiff alleges he was subjected to "false arrest and false imprisonment." Dkt. No. 7 at 4. A claim for false arrest or false imprisonment "rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause ...." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citing *Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995)). Such claims are one and the same because "[f]alse arrest and false imprisonment overlap; the former is a species of the latter." *Wallace v. Kato*, 549 U.S. 384, 388 (2007); *see*

*also Jenkins v. City of New York*, 478 F.3d 76, 88 n. 10 (2d Cir. 2007) ("False arrest is simply false imprisonment accomplished by means of an unlawful arrest.") (citation omitted).

***5** "A section 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law." *Jenkins*, 478 F.3d at 84 (citing *Weyant*, 101 F.3d at 852). Accordingly, to state a claim for false arrest and imprisonment, "a plaintiff must show that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003) (citing *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)) (internal punctuation omitted). An arrest is privileged if it is based on probable cause. *Jenkins*, 478 F.3d at 84 ("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest.") (internal punctuation and citations omitted). "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant*, 101 F.3d at 852.

Here, Plaintiff alleges in wholly conclusory fashion he was subject to a false arrest and false imprisonment. He alleges no facts related to his arrest suggesting there was no probable cause for his arrest. Further, to the extent that Plaintiff may be claiming that the alleged unlawful search led to his arrest and, thus, the arrest was unlawful, said claim does not set forth a cognizable false arrest claim because the "fruit of poisonous tree" doctrine applied in criminal cases to exclude evidence derived from an unlawful act—e.g., an unlawful search or seizure—does not apply to § 1983 actions. *See Tinsdale v. Hartley*, 442 F. Supp. 3d 569, 573 (W.D.N.Y. 2020) (citing, *inter alia, DiMascio v. City of Albany*, 205 F.3d 1322 (Table), No. 99-7653, 2000 WL 232053, at *1 (2d Cir. 2000) ("We have held ... that the fruit of the poisonous tree doctrine is inapplicable to civil § 1983 actions." (internal punctuation omitted))).

Therefore, the Court recommends dismissal of Plaintiff's false arrest or false imprisonment claim without prejudice for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A).

**E. Illegal Search**

Plaintiff also alleges he was searched "illegally" by defendant Abraham. Dkt. No. 7 at 4. The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. "A warrantless search is 'per se unreasonable ... subject to only a few specifically established and well-delineated exceptions.' " *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1996) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). A search incident to an arrest, however, "constitutes an exception to the warrant requirement" imposed by the Fourth Amendment. *Riley v. California*, 573 U.S. 373, 382 (2014). Nevertheless, there are limitations upon the scope of an appropriate search incident to an arrest. *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995). Indeed, whether a search incident to an arrest was lawful turns upon whether such search was reasonable. *Id.* The permissibility of a search "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989).

Here, the Court finds Plaintiff's allegations regarding the alleged illegal search are entirely conclusory and insufficient to plead a plausible cause of action. Plaintiff merely alleges that defendant Abraham "searched me which is violating my rights," Dkt. No. 7 at 4, "but fails to support this assertion with any supporting factual allegations." *Lautman v. Vill. of Saugerties, N.Y.*, No. 1:13-CV-00264 (MAD), 2014 WL 1653189, at *6 (N.D.N.Y. Apr. 23, 2014) (citing *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994)); *see also Cannon v. Wood*, No. 9:10-cv-1332 (GTS/RFT), 2011 WL 7071100, *7 (N.D.N.Y. Aug. 12, 2011) (dismissing the plaintiff's illegal search claim where the plaintiff merely "states in a conclusory fashion that he was subjected to an illegal search" and the complaint was "devoid of any factual allegations to support this claim").

***6** Accordingly, the Court recommends dismissal of Plaintiff's illegal search claim without prejudice for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A).

**F. Conditions of Confinement**

Plaintiff lists "unconstitutional conditions of confinement" as his second claim. Dkt. No. 7 at 5. Even when liberally construed, it is entirely unclear to the Court what "conditions"

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Plaintiff claims are "unconstitutional" or who was personally involved in the constitutional violation or when and where the alleged deprivation occurred. Accordingly, the Court recommends dismissal of Plaintiff's condition of confinement claim without prejudice for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A).

**G. Rule 10**

Plaintiff refers to the "Justice Center medical staff" in the body of the amended complaint. *See* Dkt. No. 7 at 4. Rule 10(a) of the Federal Rules of Civil Procedure provides that, "the title of the complaint must name all the parties." Fed. R. Civ. P. 10(a). A party not named in the caption of the complaint is not a party to the action. *Abbas v. U.S.*, No. 10-CV-0141, 2014 WL 3858398, at *2 (W.D.N.Y. Aug. 1, 2014) (holding that the failure to name the individual defendants against whom the plaintiff intends to assert claims makes it "infeasible for the Court to determine which of the individual officers mentioned in the body of the complaint should be deemed to be defendants to which claims").

Accordingly, the Court does not construe any claims in the amended complaint to be asserted against the Justice Center medical staff. *See Whitley v. Krinser*, No. 06-CV-0575, 2007 WL 2375814, at *1 (W.D.N.Y. Aug. 15, 2007) ("If people are not also named in the caption of the [ ] complaint, they will not be defendants in the case.").

Even if the amended complaint was liberally construed to assert a Fourteenth Amendment medical indifference claim against the Justice Center medical staff, the claim would fail for two reasons. First, "[p]leadings that do not differentiate which defendant was involved in the unlawful conduct are insufficient to state a claim." *Ying Li v. City of New York*, No. 15-CV-1599, 2017 WL 1208422, at *6 (E.D.N.Y. Mar. 31, 2017); *see also Wright v. Orleans Cnty.*, No. 14-CV-0622, 2015 WL 5316410, at *13 (W.D.N.Y. Sept. 10, 2015) (noting in a Section 1983 case that "[g]roup pleading is insufficient for purposes of Rule 8(a)(2) which requires a short and plain statement of the claim showing that the pleader is entitled to relief (citation and internal punctuation omitted)); *Holmes v. Allstate Corp.*, No. 11-CV-1543, 2012 WL 627238, at *7 (S.D.N.Y. Jan. 27, 2012) ("Rule 8(a) is violated where a plaintiff, by engaging in 'group pleading,' fails to give each defendant fair notice of the claims against it."); *see, e.g.*, *Little v. Mun. Corp.*, 51 F. Supp. 3d 473, 493-94 (S.D.N.Y. 2014) (dismissing without prejudice excessive force claim asserted against "members of the 'Special Search Team' and 'ESU Officers' " and noting that, "[t]o the extent that [plaintiff] does not know the names of the members of the Special Search Team or ESU Officers involved, he may name 'John Doe' defendants and include as much identifying information as he has knowledge of, for the purpose of filing an amended complaint" should he choose to do so).

***7** Second, to state a Fourteenth Amendment medical indifference claim, a detainee "must meet two requirements: (1) that Plaintiff[ ] had a serious medical need ..., and (2) that the Defendants acted with deliberate indifference to such needs." *Charles v. Orange Cnty.*, 925 F.3d 73, 86 (2d Cir. 2019) (citing *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); and *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017)). A detainee's medical need is "sufficiently serious" where it "contemplates a condition of urgency such as one that may produce death, degeneration, or extreme pain." *Charles*, 925 F.3d at 86 (citing *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). To satisfy the deliberate indifference requirement, a pretrial detainee "can allege either that the defendants *knew* that failing to provide the complained of medical treatment would pose a substantial risk to his health or that the defendants *should have known* that failing to provide the omitted medical treatment would pose a substantial risk to the detainee's health." *Id.* at 87 (emphasis in original).

Here, even if Plaintiff had alleged a defendant's personal involvement, Plaintiff's sparse allegations do not satisfy either prong of a plausible deliberate indifference to medical needs claim. Plaintiff's conclusory allegation that "I had to walk to court holding my arm in my left hand after being deny an arm slang by Justice Center medical staff is insufficient given that the Second Circuit has made clear that "mere disagreement over the proper treatment does not create a constitutional claim." *Chance*, 143 F.3d at 703. "Nor does the fact that an inmate might prefer an alternative treatment, or feels that he did not get the level of medical attention he preferred." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (*citing Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)).

Thus, dismissal without prejudice would also be warranted for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A).

**IV. CONCLUSION**

For these reasons, the Court recommends Plaintiff's amended complaint be dismissed in its entirely for failure to state a

claim upon which relief may be granted. In recognition of his *pro se* status, the Court also recommends Plaintiff be granted leave to file a second amended complaint to cure the deficiencies identified above.[7] *See Ruffolo*, 987 F.2d at 131.

**WHEREFORE**, it is hereby

**ORDERED** that the Clerk provide the Superintendent of the facility, designated by Plaintiff as his current location, with a copy of Plaintiff's inmate authorization (Dkt. No. 4), and notify the official that this action has been filed and that Plaintiff is required to pay the Northern District of New York the statutory filing fee of $350.00 in installments, over time, pursuant to 28 U.S.C. § 1915;[8] and it is further

***8 ORDERED** that the Clerk provide a copy of Plaintiff's inmate authorization (Dkt. No. 4) to the Financial Deputy of the Clerk's Office; and it is further

**ORDERED** that the Clerk update the docket to substitute Mamoun Abraham for John Doe; and it is further

**RECOMMENDED** that Plaintiff's amended complaint (Dkt. No. 7) be **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A) for failure to state a claim upon which relief may be granted; and it is further

**RECOMMENDED** that Plaintiff be granted leave to file a second amended complaint that cures the deficiencies identified in this Report-Recommendation; and it is further

**ORDERED** that the Clerk provide Plaintiff a copy of this Report-Recommendation and Order, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), Plaintiff has fourteen (14) days within which to file written objections to the foregoing report.[9] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2024 WL 4906112

## Footnotes

1 For reasons discussed below, the Clerk is directed to update the docket to substitute "Mamoun Abraham" for Defendant John Doe.

2 The Court will also consider the two letters, Dkt. Nos. 10 and 11, filed by Plaintiff. See Dkt. No. 12.

3 *See* 28 U.S.C. § 1915A(c) ("As used in this section, the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."). Prisoners are not exempt from paying the full filing fee even when they have been granted permission to proceed IFP. *See* 28 U.S.C. § 1915(b)(1); *see also Cash v. Bernstein*, No. 09-CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct. 26, 2010) ("Although an indigent, incarcerated individual need not prepay the filing fee at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts.") *Id.* (citing 28 U.S.C. § 1915(b) and *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)).

4 Plaintiff utilized the Court's form complaint for civil rights actions under 42 U.S.C. § 1983. Citations to Plaintiff's amended complaint will be to the pagination generated by CM/ECF, the Court's electronic filing system.

Unless otherwise indicated, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

5 At the top of the letter, Plaintiff lists three civil action numbers: 5:21-cv-886, 5:24-cv-124, and 5:24-cv-522. Dkt. No. 11. Thus, the letter was filed in all three of Plaintiff's cases. The Clerk's Office and the Court should not be tasked with determining which case Plaintiff's filing should be filed in. In this District, if a litigant has more than one action pending, any paper filed in a case must contain and relate to one civil action number unless the civil actions have been consolidated by the Court. Any motion or other papers purporting to relate to more than one action will not be accepted for filing and may be stricken by the Court. N.D.N.Y. L.R. 10.1(c)(1). On August 15, 2024, Plaintiff was advised by Text Order in *Kirby v. Hanks*, 5:24-cv-0124 (MAD/ML), proper case identification is required for all filings, which should include a case number, case name, and what relief Plaintiff is seeking.

6 The Court reaches a different result, however, with respect to Dkt. No. 11. Because Plaintiff's letter includes three civil action numbers, the submission does not include a caption and, based upon the allegations in the letter, it is not clear which action Plaintiff intended this letter to supplement, the Court does not construe Dkt. No. 11 as a request to amend the amended complaint. Moving forward, Plaintiff is advised he may not attempt to amend his pleadings in a piecemeal manner. *See* L.R. 15.1.

7 If the District Court adopts this Report-Recommendation, the second amended complaint must comply with Rules 8 and 10 of the Federal Rules of Civil Procedure. Any second amended complaint should contain *all* factual allegations relevant to Plaintiff's claims, including, when possible, the dates, times, and places of the alleged underlying acts, as well as each individual who committed each alleged wrongful act, and the paragraphs should be correctly numbered. Any second amended complaint should allege facts demonstrating the personal involvement of any named defendant. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). Any second amended complaint will replace the existing amended complaint and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Jeanty v. Sciortino*, No. 6:22-CV-319 (BKS/TWD), 2023 WL 2931863, *14 (N.D.N.Y. Apr. 13, 2023).

8 Plaintiff will also be required to pay fees he may incur in this action, including copying and/or witness fees.

9 If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 4905131
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

David L. KIRBY, III, Plaintiff,
v.
Mamoun ABRAHAM, Defendant.

5:24-cv-522 (BKS/TWD)
|
Signed November 27, 2024

**Attorneys and Law Firms**

Plaintiff pro se: David L. Kirby, III, 05002304, Onondaga County Justice Center, 555 South State Street, Syracuse, NY 13202.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, Chief United States District Judge:

***1** Plaintiff David L. Kirby, III brought this action under 42 U.S.C. § 1983 against the Syracuse Police Department and sought leave to proceed *in forma pauperis* ("IFP"). (Dkt. Nos. 1, 3). This matter was referred to United States Magistrate Judge Therese Wiley Dancks who, on June 14, 2024, granted Plaintiff's application to proceed IFP and issued a Report-Recommendation, recommending that Plaintiff's complaint be dismissed with prejudice and without leave to amend as to the Syracuse Police Department, pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A), but with leave to file an amended complaint. (Dkt. No. 6). Plaintiff did not file objections to the Report-Recommendation, but instead filed an amended complaint. (Dkt. No. 7). On June 26, 2024, this Court issued a text order terminating the recommendations in the Report-Recommendation as moot and recommitting the matter to Magistrate Judge Dancks for an initial review of the amended complaint. (Dkt. No. 9). On October 25, 2024, Magistrate Judge Dancks issued a Report-Recommendation recommending that Plaintiff's amended complaint be dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A) for failure to state a claim upon which relief may be granted, and that Plaintiff be granted leave to file a second amended complaint. (Dkt. No. 15). Magistrate Judge Dancks informed Plaintiff that he had fourteen days within which to file written objections to the Report under 28 U.S.C. § 636(b)(1), and that the failure to object to the Report within fourteen days would preclude appellate review. (*Id.* at 16). No objections to the Report-Recommendation have been filed.

As no objections to the Report-Recommendation have been filed, and the time for filing objections has expired, the Court reviews the Report-Recommendation for clear error. *See Petersen v. Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); Fed. R. Civ. P. 72(b) advisory committee's note to 1983 amendment. Having reviewed the Report-Recommendation for clear error and found none, the Court adopts the Report-Recommendation in its entirety.

For these reasons, it is hereby

**ORDERED** that the Report-Recommendation (Dkt. No. 15) is **ADOPTED**; and it is further

**ORDERED** that the amended complaint (Dkt. No. 7) is **DISMISSED WITHOUT PREJUDICE AND WITH LEAVE TO AMEND**; and it is further

**ORDERED** that any second amended complaint must be filed **within thirty (30) days** of the date of this Order. Any second amended complaint must be a complete pleading which will replace the current complaint in total and must comply with the directions in the Report-Recommendation (Dkt. No. 15, at 14–15, n. 7); and it is further

**ORDERED** that if Plaintiff files a timely second amended complaint, it shall be referred to Magistrate Judge Dancks for review; and it is further

**ORDERED** that if Plaintiff fails to file a timely second amended complaint, the Clerk shall close this case without further order; and it is further

**ORDERED** that the Clerk serve a copy of this Order on Plaintiff in accordance with the Local Rules.

***2 IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2024 WL 4905131

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 1210941
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Daniel KISS, Plaintiff,
v.
Rafael A. TORRES, et al., Defendants.

No. 21-CV-10391 (KMK)
|
Signed March 19, 2024

**Attorneys and Law Firms**

Daniel Kiss, Poughkeepsie, NY, Pro Se Plaintiff.

Daniel S. Kirschbaum, Esq., Office of the New York State Attorney General, New York, NY, Counsel for Defendant James Schulhoff.

James A. Randazzo, Esq., Drew W. Sumner, Esq., Portale Randazzo LLP, White Plains, NY, Counsel for Defendants Rafael Torres, Town of Hyde Park, Daniel Ferrara, Michael Stallone, Joshua Tucker.

OPINION & ORDER

KENNETH M. KARAS, United States District Judge:

***1** Plaintiff Daniel Kiss ("Plaintiff") brings this Action pro se against Hyde Park Police Officers Rafael Torres ("Torres"), Daniel Ferrara ("Ferrara"), Michael Stallone ("Stallone"), and Joshua Tucker ("Tucker"), as well as New York State Trooper James Schulhoff ("Schulhoff," and collectively the "Officer Defendants" or the "Officers"); and the Town of Hyde Park ("Hyde Park," and with the Officer Defendants, the "Defendants"). [1] (*See* Am. Compl. (Dkt. No. 39).) As in his initial Complaint, Plaintiff raises various claims pursuant to 42 U.S.C. § 1983 ("§ 1983"), alleging violations of his rights under the Fourth and Fourteenth Amendments, and also—construing his pleadings liberally as the Court must —brings a number of claims under New York state law, including unlawful detainer, unlawful eviction, conversion, false arrest, unlawful seizure of Plaintiff's person and property, negligence, and intentional and negligent infliction of emotional distress. (*See* Am. Compl. ¶¶ 4, 66–88; Pl's Opp'n to Schulhoff's Mot. To Dismiss ("Pl's Schulhoff Opp'n") 2, 22–24 (Dkt. No. 60); Pl's Opp'n to Hyde Park Defs' Mot. To Dismiss ("Pl's Hyde Park Opp'n") 2, 22–24 (Dkt. No. 61).) [2] Before the Court are Schulhoff's and the Hyde Park Defendants' respective Motions To Dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motions"). (*See* Schulhoff Not. of Mot. (Dkt. No. 47); Hyde Park Defs' Not. of Mot. (Dkt. No. 49).) [3] For the reasons that follow, Defendants' Motions are granted in part, and denied in part.

I. Background

A. Materials Considered

Beyond the allegations in his Amended Complaint, Plaintiff has—again, (*see* Op. & Order ("March 2023 Op.") 2 & n.1 (Dkt. No. 36))—raised numerous additional factual assertions in his Opposition briefs, (*see generally*, *e.g.*, Pl's Schulhoff Opp'n.) [4]

***2** Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the pleadings themselves" because "[t]o go beyond the allegations in the Complaint would convert the Rule 12(b)(6) motion into one for summary judgment pursuant to [Rule] 56." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002). "Nevertheless, the Court's consideration of documents attached to, or incorporated by reference in the Complaint, and matters of which judicial notice may be taken, would not convert the motion to dismiss into one for summary judgment." *Id.*; *see also* *Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (explaining that "when ruling on Rule 12(b)(6) motions to dismiss," courts may "consider the complaint in its entirety ..., documents incorporated into the complaint by reference, and matters of which a court may take judicial notice" (quotation marks omitted)); *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) ("In deciding a Rule 12(b)(6) motion, the court may consider 'only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken.' " (alteration adopted) (quoting *Samuels v. Air Transp. Loc. 504*, 992 F.2d 12, 15 (2d Cir. 1993))).

However, when reviewing a complaint submitted by a pro se plaintiff, the Court may also consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including "[the

plaintiff's] opposition memorandum," *Gadson v. Goord*, No. 96-CV-7544, 1997 WL 714878, at *1 n.2 (S.D.N.Y. Nov. 17, 1997), "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a defendant's] request for a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at *2 (E.D.N.Y. Sept. 19, 2013), and "documents either in [the plaintiff's] possession or of which [the] plaintiff[ ] had knowledge and relied on in bringing suit," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quotation marks omitted).

Because Plaintiff is proceeding pro se, the Court will again consider the factual assertions raised for the first time in his Opposition briefs to the extent they are consistent with the Amended Complaint. *See* *Gadson*, 1997 WL 714878, at *1 n.2; *accord* *Walker v. Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013) ("A district court deciding a motion to dismiss may consider factual allegations made by a pro se party in his papers opposing the motion." (italics omitted)); *Haywood v. Annucci*, No. 18-CV-10913, 2020 WL 5751530, at *1 n.1 (S.D.N.Y. Sept. 25, 2020) ("Where appropriate, the Court also considers factual allegations contained in Plaintiff's opposition papers, to the extent that those allegations are consistent with the Amended Complaint."). (*See also* March 2023 Op. 2 & n.1 (considering Plaintiff's Opposition briefs in connection with deciding Defendants' first Motions To Dismiss).)

B. Factual Background

Unless otherwise stated, the following facts are drawn from the Amended Complaint and Plaintiff's Opposition briefs. (*See generally* Am. Compl.; Pl's Schulhoff Opp'n.) The facts alleged are assumed true for the purpose of resolving the instant Motions. *See* *Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam). However, given that Plaintiff's Amended Complaint is replete with legal conclusions, (*see, e.g.*, Am. Compl. ¶ 57) ("As the legitimate tenant in the Residence [at issue] on February 13, 2020, Plaintiff had a reasonable expectation of privacy and a right to due process, including notice of termination of his tenancy and a reasonable opportunity to recover his personal belongings, prior to being forcibly evicted from his home."), the Court emphasizes at the outset that it need not—and will not—accept such conclusions as true, *Cadet v. All. Nursing Staffing of N.Y., Inc.*, 632 F. Supp. 3d 202, 219 (S.D.N.Y. 2022) ("Even in the pro se context, the Court is not bound to accept 'conclusory allegations or legal conclusions masquerading as factual conclusions.' " (italics omitted) (quoting *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008))).

1. Plaintiff's Arrangement with Members of the Kenny Family

***3** Since as early as 2010, Plaintiff helped care for Jules Kenny ("Jules"), the ailing father of his close friend Sharon Kenny ("Sharon"), and in return was paid "an hourly rate." (Am. Compl. ¶¶ 11–12.) Years before that, Plaintiff and Sharon had been engaged—though they did not, in fact, marry—"and continued to remain very close friends" over the years, such that Sharon trusted Plaintiff with Jules' care. (*Id.* ¶ 11.) In or around 2018, following a divorce, Sharon "confided in Plaintiff that she was feeling emotionally and physically overwhelmed by taking care of Jules, who was [then around eighty years old], physically frail[,] and suffering from dementia[,]" so she asked Plaintiff to "increase his hours assisting with Jules' care." (*Id.* ¶ 12.) Although he was willing to increase his hours caring for Jules, Plaintiff was living in New Jersey at that time, and was therefore not interested in commuting to Sharon and Jules' home at 4 Potter Bend, Hyde Park, New York (the "Residence"). (*Id.* ¶ 13; Pl's Schulhoff Opp'n 3.) So, Sharon "suggested a solution" that "offered a mutually beneficial living arrangement[,]" where "she would give Plaintiff [and his wife access to their] own room in the Residence [for an indefinite period of time] and, in addition to assisting with Jules at the same hourly rate, Plaintiff would contribute to expenses[,] and would provide maintenance and repair around the Residence." (Am. Compl. ¶ 13; Pl's Schulhoff Opp'n 2–3.) [5]

Ultimately, Plaintiff took Sharon up on her offer and, in June 2019, he "moved all of his personal belongings into the Residence," "storing quite a few of his belongings in the basement and attic." (Am. Compl. ¶¶ 14, 16.) As alleged, Plaintiff and his wife received a second-floor bedroom for their own, exclusive use, and they shared the remainder of the Residence, except for Sharon's bedroom, with Sharon and Jules. (*See id.* ¶ 14; Pl's Schulhoff Opp'n 3.) Plaintiff and Sharon had an understanding pursuant to which Plaintiff "would ... contribute to the maintenance and cost of the Residence." (Am. Compl. ¶ 14.)

From June 2019 until December 17, 2019, Plaintiff and his wife made the Residence their home. (Am. Compl. ¶ 15; Pl's

Schulhoff Opp'n 3.) During that time, "Plaintiff continued helping Sharon with caretaking for Jules at the same hourly rate as before, but in return for the exclusive use of [his r]oom and shared access to the rest of the Residence, he also contributed to the maintenance and cost of the Residence and provided companionship to Sharon." (Am. Compl. ¶ 15.) In terms of improvements and maintenance, Plaintiff built a shed in the backyard of the Residence, repaired and painted the "back deck" and various areas in the Residence, and repaired or replaced various fixtures in the residence, "all using his own money." (*Id.*; Pl's Schulhoff Opp'n 4.) "Plaintiff also contributed regularly and meaningfully to the ongoing maintenance and living expenses at the Residence, including utilities, landscaping, cleaning and grocery shopping." (*Id.* ¶ 15.) [6]

On December 17, 2019, Sharon died suddenly in a skiing accident. (*Id.* ¶ 17.) At that time, "Sharon's family assured Plaintiff that he was like family to them and asked him to remain living at the Residence." (*Id.* ¶ 18.) Moreover, Sharon's sisters Janet Kenny ("Janet") and Debra Rubin ("Debra") asked that Plaintiff and his wife "continue the arrangement they had had with Sharon, continuing to provide care for Jules and caring for and maintaining the Residence." (*Id.*) Janet and Debra also authorized Plaintiff to call the authorities if Sharon's ex-husband came to the Residence. (*Id.*) According to Plaintiff, his understanding with Janet and Debra was that he would continue living at the Residence until the probate proceedings for Sharon's estate took place on March 20, 2020. (*Id.* ¶¶ 19, 25.) [7] As he put it, "Janet and Debra strongly urged Plaintiff and his wife to [continue living] at the Residence, explaining that they wanted Plaintiff to remain [there] until probate proceedings for Janet's [e]state were settled because they said it would be better to have someone living in the Residence for security and insurance purposes." (*Id.* ¶ 24.) [8] Plaintiff agreed to continuing living at the Residence and, therefore, delayed looking for alternative living arraignments. (*See id.* ¶ 25.)

***4** After Sharon's death, her family members visited the Residence on multiple occasions, and "appeared to either inventory or take most items of valuable personal property, including all of the computers in the house and the petty cash that Sharon had there which had been used primarily to cover expenses for Jules' care." (*Id.* ¶ 21.) These family members "always called Plaintiff before visiting the Residence," did not enter Plaintiff and his wife's room during their visits, and "explicitly stated to Plaintiff on one occasion that they had taken all of the items that were of value to them and were expecting to dispose of anything left." (*Id.* ¶¶ 20–21.)

On January 29, 2020, Jules' family members moved him to a senior care facility, but Plaintiff continued living in the Residence at Janet and other Kenny family members' request. (*Id.* ¶ 23; Pl's Schulhoff Opp'n 5.) Thus, he and his wife had the Residence to themselves until February 13, 2020. (Am. Compl. ¶ 25.) During that time, Plaintiff mentioned to Janet that he was going to start moving his personal property out of the Residence, but Janet's "reaction was unequivocal"—she "strongly discouraged him from moving out and forbade Plaintiff from removing any items from the Residence, even though Plaintiff advised Janet that he had all of his personal belongings stored there." (*Id.* ¶ 26 (emphasis omitted).) According to Plaintiff, Janet lived in Florida, but she insisted that he could not remove anything from the Residence unless she was physically present. (*Id.*) Indeed, Plaintiff alleges that Janet called his wife and threatened to call the police if they attempted to remove anything from the Residence "because she did not know what belonged to them" and what belonged to Sharon's estate. (*Id.*)

<u>2. Events of February 13, 2020</u>

On the morning of February 13, 2020, Janet called Plaintiff to inform him that Jules had died. (Am. Compl. ¶ 27.) [9] That afternoon, Janet—who had been observing Plaintiff and his wife on external security cameras, (Pl's Schulhoff Opp'n 6) —proceeded to call the police to report "that she was the executor of the estate with legal ownership of the property, that Plaintiff was in the Residence without authorization[,] and that Plaintiff was criminally removing property from the Residence that did not belong to him," (Am. Compl. ¶ 29). [10] Plaintiff alleges that Janet was aware that she was making a false report to the police. (*See id.*) Additionally, Plaintiff alleges that Janet "acknowledged that she was calling from her home in Florida"; that she "falsely reported that she had witnessed through a remote security camera a burglary at the Residence because she claimed to have seen Plaintiff taking various items out of the Residence without her permission"; and that she "was unable to specify what property was being removed from the Residence or even that it was the Estate's property rather than Plaintiff's." (*Id.*; *see also* Pl's Schulhoff Opp'n 6.)

In response to Janet's call, the Officer Defendants were all dispatched to the Residence to investigate "suspicious

activity" and arrived—with neither a search warrant nor a warrant of eviction, (Pl's Schulhoff Opp'n 2)—at around the same time, (Am. Compl. ¶¶ 31, 33).[11] Some of the Officer Defendants went around to the back of the Residence rather than knocking on the front door. (*Id.* ¶¶ 33–34.) Plaintiff, who at that time was putting away groceries in the Residence while his wife was downstairs doing the laundry, (Pl's Schulhoff Opp'n 6–7), heard some noises, went out onto the back deck, and saw those Officer Defendants, at which point Schulhoff asked him something like, "what [is] going on here?" (Am. Compl. ¶ 34; Pl's Schulhoff Opp'n 7). Startled, Plaintiff responded that he lived in the Residence and that nothing untoward was going on. (*See* Am. Compl. ¶ 34.) Plaintiff alleges that "[s]everal of the [Officer Defendants, including Schulhoff,] then followed Plaintiff into the Residence" without his permission and that one of Torres, Ferrara, Stallone, or Tucker "came uninvited through the front door of the Residence." (*Id.*; Pl's Schulhoff Opp'n 7.)

***5** Once the Officer Defendants were inside the Residence, Schulhoff, "with the cooperation of the other [Officer Defendants], ordered Plaintiff and his wife to stay in the living room." (Pl's Schulhoff Opp'n 7; *see also* Am. Compl. ¶ 42.)[12] At that point, Plaintiff reiterated that he lived in the Residence, explained that he and his wife were just doing chores, and offered to show the Officers "the many items of personal belongings that he had in the Residence, some of which had markings that proved they were his." (Am. Compl. ¶¶ 35, 37.) Plaintiff alleges, however, that the Officer Defendants "completely ignored [his] attempts to explain the situation and would not give him an opportunity to prove that he was legitimately occupying the Residence." (*Id.* ¶ 39.)[13] Further, Plaintiff alleges that "none of the [Defendant] Officers made any effort to verify Plaintiff's assertions that he and his wife were legal occupants [of] the Residence and that much of the personal property in the Residence was his." (*Id.* ¶ 55; *see also* Pl's Schulhoff Opp'n 7.)

After they entered, the Officer Defendants conducted a search of the Residence. (*See* Am. Compl. ¶¶ 3, 41.) Because Janet had reported that she had seen Plaintiff take items out of the shed at the Residence, Schulhoff took a look outside. (*Id.* ¶ 43.) He "stated for everyone to hear that there was no sign of footprints in the freshly fallen snow [along] the path to the shed" and, therefore, that "no one could have gone out to the shed that day." (*Id.*)

Schulhoff spoke with Janet by phone multiple times during the course of the search and shared what he learned with the other Officer Defendants. (*See id.* ¶¶ 45, 48.) Based on these conversations Plaintiff alleges that Schulhoff determined that Janet did not know what items Plaintiff and his wife had purportedly taken out of the Residence, and that Janet "apparently admitted that she did not know which items of personal property actually belonged to Plaintiff," as opposed to the Kenny family. (*Id.* ¶ 45; *see also* Pl's Schulhoff Opp'n 7–8.) He further alleges that Schulhoff "asked Janet if she had indeed directed Plaintiff to leave a key for her to pick up the next day," and that "Janet admitted that she had made such a request and that Plaintiff lawfully had keys to the Residence." (Pl's Schulhoff Opp'n 9.)

While the Officer Defendants were still at the Residence, they told Plaintiff's wife that they wanted to search her car and, as alleged, she felt "intimidated and ... pressured to [give them her] consent." (Am. Compl. ¶ 47.) The Officer Defendants recovered "some groceries as well as a backpack with a computer and some dirty clothes" from Plaintiff's wife's car. (*Id.*) Plaintiff's wife informed Schulhoff that the computer belonged to her. (Pl's Schulhoff Opp'n 8.) Schulhoff then "called Janet to ask her about the computer and Janet confirmed that she had already removed all of the computers that belonged" to members of the Kenny family. (Am. Compl. ¶ 48.)

Next, the Officer Defendants proceeded to search Plaintiff's van, from which they recovered certain power tools and other construction materials. (*Id.* ¶¶ 50, 52.)[14] After Plaintiff told the Officers that those items belonged to him, Schulhoff again called Janet and she informed him that "she did not know who owned the construction equipment, even though she knew Plaintiff was a contractor." (*Id.* ¶ 52.) Nevertheless, the Officer Defendants "confiscated ... the power tools and placed them in the [Residence's] garage, depriving [Plaintiff] of the tools he used for his construction work." (*Id.*) They also told Plaintiff "he had nothing to worry about, that Janet ... was coming tomorrow[,] and he would recover the tools then." (*Id.* ¶ 53.)[15]

***6** Ultimately, the Officer Defendants "ordered Plaintiff and his wife to surrender their keys" and "under the threat of arrest" demanded that they vacate the Residence, thereby forcing Plaintiff to "leave behind his personal items stored" therein. (*Id.* ¶ 58.) The Officer Defendants would not allow Plaintiff to retrieve his laptop, even though he offered to "show it was his computer by accessing it with his password" and Janet had confirmed to Schulhoff that any computers belonging to Kenny family members had already

been retrieved from the Residence. (Pl's Schulhoff Opp'n 10.) Further, the Officers warned Plaintiff and his wife "not to return to the Residence to recover their belongings and advised Plaintiff to contact Janet to recover any property that belonged to them." (Am. Compl. ¶ 60.) The personal property that Plaintiff left behind included "irreplaceable items such as heirlooms [and] family photo albums." (*Id.* ¶ 59.) Plaintiff and his wife were permitted to take with them "medications they could show were theirs." (Pl's Schulhoff Opp'n 10.)

Following the events of February 13, 2020, Janet "confirmed to the police that nothing had been stolen from the Residence" and she also declined to press any charges against Plaintiff or his wife. (Am. Compl. ¶ 61.) In the time since, "Plaintiff [has] recovered [only] one of his two computers, [his] glasses[,] and his cash, but he was unable to recover the rest of his property." (*Id.* ¶ 63.) In fact, Janet has ignored Plaintiff's "repeated attempts to get his property back." (Pl's Schulhoff Opp'n 10.) [16] "When Plaintiff attempted to go to the police station a short time after [February 13, 2020], they simply gave him a vague direction to 'go to court.' " (*Id.*)

C. Procedural History [17]

On March 27, 2023, the Court issued an Opinion & Order granting Defendants' first Motions To Dismiss (the "March 2023 Opinion"). (*See generally* March 2023 Op.) In that Opinion, the Court granted Plaintiff leave to file an amended complaint. (*Id.* at 33.) After receiving an extension from the Court, (*see* Dkt. Nos. 37–38), Plaintiff filed his Amended Complaint on May 25, 2023, (*see generally* Am. Compl.).

On June 8, 2023, Schulhoff submitted a letter requesting leave to file a Motion To Dismiss. (*See* Letter from Amanda Yoon, Esq. to Court (June 8, 2023) (Dkt. No. 40).) The Court issued an order setting a briefing schedule on June 9, 2023. (*See* Order (Dkt. No. 41).) On June 14, 2023, the Hyde Park Defendants submitted their own letter requesting leave to file a Motion To Dismiss. (*See* Letter from James A. Randazzo, Esq. to Court (June 14, 2023) (Dkt. No. 42).) The Court issued another order setting a briefing schedule for the Hyde Park Defendants' Motion on June 22, 2023. (*See* Order (Dkt. No. 43).) On June 26, 2023, Plaintiff filed a response to Defendants' pre-motion letters. (*See* Letter from Daniel Kiss to Court (June 26, 2023) (Dkt. No. 44).) Thereafter, on July 6, 2023, Schulhoff filed a letter requesting an extension of time to file his Motion such that his briefing schedule would align with that of the Hyde Park Defendants, (*see* Letter from Amanda Yoon, Esq. to Court (July 6, 2023) (Dkt. No. 45)), which request the Court granted that same day, (*see* Order (Dkt. No. 46)).

Defendants filed their respective Motions To Dismiss on July 24, 2023. (*See* Schulhoff Not. of Mot.; Schulhoff Mem.; Hyde Park Defs' Not of Mot.; Decl. of James A. Randazzo in Supp. of Mot. To. Dismiss (Dkt. No. 50); Mem. of Law in Supp. of Mot. To Dismiss ("Hyde Park Defs' Mem.") (Dkt. No. 51).) After Plaintiff missed his deadline to oppose Defendants' Motion—and over a week after Schulhoff's deadline to file his Reply—former counsel for Schulhoff received Plaintiff's Opposition via an email from Plaintiff, so Schulhoff's current counsel submitted a letter to the Court seeking guidance on how to proceed. (*See* Letter from Daniel S. Kirschbaum, Esq. to Court (Sept. 26, 2023) (Dkt. No. 55).) On September 27, 2023, the Court memo endorsed that letter, indicated that it would consider Plaintiff's Opposition, directed counsel to file the Opposition with the Court, and granted Schulhoff until October 17, 2023 to file his Reply. (*See* Memo Endorsement (Dkt. No. 56).) Counsel for the Hyde Park Defendants also received Plaintiff's Opposition to their Motion via email and submitted a similar letter to the Court on September 27, 2023. (*See* Letter from James A. Randazzo, Esq. to Court (Sept. 27, 2023) (Dkt. No. 57).) The outcome was the same. (*See* Memo Endorsement (Dkt. No. 58).) Ultimately, Plaintiff's two Opposition submissions were filed on October 12, 2023. (*See* Pl's Schulhoff Opp'n; Pl's Hyde Park Opp'n.) [18] Pursuant to the Court's orders, (*see* Dkt. Nos. 56, 58), Defendants' respective Replies were filed on October 17, 2023, (*see* Schulhoff Reply (Dkt. No. 62); Hyde Park Defs' Reply (Dkt. No. 63)).

II. Discussion

A. Standard of Review

***7** The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his [or her] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation

marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also* *Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[ ] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (citation and quotation marks omitted); *see also* *Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same). However, as noted, when the complaint is from a pro se plaintiff, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah*, 2013 WL 3972514, at *4 n.3 (quotation marks omitted), including "[plaintiff's] opposition memorandum," *Gadson*, 1997 WL 714878, at *1 n.2, "documents that a pro se litigant attaches to his opposition papers," *Agu*, 2010 WL 5186839, at *4 n.6 (italics omitted), statements by the plaintiff "submitted in response to [a defendant's] request for a pre-motion conference," *Jones*, 2013 WL 5300721, at *2, and "documents either in [the plaintiff's] possession or of which [the] plaintiff[ ] had knowledge and relied on in bringing suit," *Chambers*, 282 F.3d at 153 (quotation marks omitted).

Where, as here, a plaintiff proceeds pro se, the court must "construe[ ] [the plaintiff's] [complaint] liberally and interpret[ ] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (citation omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (citation and quotation marks omitted); *see also* *Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and citation omitted)).

B. Analysis

Liberally construed, Plaintiff's Amended Complaint raises numerous claims arising under federal and state law that substantially mirror the claims raised in his original Complaint. First, Plaintiff again alleges that the Officer Defendants violated his Fourteenth Amendment right to procedural due process when they evicted him from the Residence and deprived him of his personal property located at the Residence and in his van. (*See* Am. Compl. 8–9; Pl's Schulhoff Opp'n 19–20; Pl's Hyde Park Opp'n 19–20.) Second, Plaintiff again contends that the Officer Defendants violated his Fourth Amendment right to be free from unlawful searches by entering and searching the Residence and by searching his van. (*See* Am. Compl. 8–9; Pl's Schulhoff Opp'n 13–19; Pl's Hyde Park Opp'n 13–19.) Third, Plaintiff now alleges that the Officer Defendants violated his Fourth Amendment rights when they "seized [him] and restricted his liberty[ ] when he was peacefully occupying his own home" on February 13, 2020. (Am. Compl. 8–9.) Fourth, Plaintiff asserts a municipal liability claim against Hyde Park pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), based on the alleged actions of Torres, Ferrara, Stallone, and Tucker. (*See* Compl. 8–9; Pl's Hyde Park Opp'n 11.) Fifth, Plaintiff raises numerous state claims arising from the same events underlying his federal claims. (*See* Am. Compl. 9–10; Pl's Schulhoff Opp'n 2, 22–24; Pl's Hyde Park Opp'n 2, 22–24.)

***8** Defendants' responses are likewise rather similar to those made in their initial Motions To Dismiss. Specifically, with respect to Plaintiff's Fourteenth Amendment claims, they argue that Plaintiff has failed to state a claim for his alleged

eviction because he had no cognizable property interest in the Residence under New York law, (*see* Schulhoff Mem. 17–19; Hyde Park Defs' Mem. 8–9), and that he has failed to state a claim for the deprivation of property because New York provides adequate post-deprivation remedies, (*see* Schulhoff Mem. 19–20; Hyde Park Defs' Mem. 9–10). Defendants also assert that Plaintiff cannot state a Fourth Amendment claim for the search of the Residence because the Officer Defendants reasonably believed Janet could consent to the search of the Residence. (*See* Schulhoff Mem. 11–14; Hyde Park Defs' Mem. 11–13). Defendants further argue that Plaintiff cannot object on Fourth Amendment grounds to the search of his van because the Officer Defendants had probable cause to believe that there might be evidence of a crime in the van such that the automobile exception to the Fourth Amendment warrant requirement applies. (*See* Schulhoff Mem. 14–16; Hyde Park Defs' Mem. 13–14.) Additionally, Schulhoff contends that there was no unlawful seizure of Plaintiff's person and, even if there were, there existed the requisite reasonable suspicion to effect such a seizure. (*See* Schulhoff Mem. 16–17.) [19] Defendants also assert, again, that the Officer Defendants are entitled to qualified immunity, (*see* Schulhoff Mem. 21–23; Hyde Park Defs' Mem. 14), and that Plaintiff failed to properly allege the personal involvement of any of the Officer Defendants, (*see* Schulhoff Mem. 20–21; Hyde Park Defs' Mem. 15). [20] For their part, the Hyde Park Defendants assert that Plaintiff cannot state a *Monell* claim. (*See* Hyde Park Defs' Mem. 15–16.) Finally, with respect to Plaintiff's state-law claims, Schulhoff argues that he is immune for liability for those claims under the common law doctrine of governmental immunity, (*see* Schulhoff Mem. 23–24), and all Defendants argue that—in the event that Plaintiff's federal-law claims are all dismissed—the Court should decline to exercise supplemental jurisdiction over those claims, (*see id.* at 24; Hyde Park Defs' Mem. 16).

The Court will address each of Defendants' arguments to the extent necessary to resolve the instant Motions.

### 1. Personal Involvement

The Hyde Park Defendants briefly assert—in a single paragraph—that Plaintiff has failed to properly allege the personal involvement of Torres, Ferrara, Stallone, and Tucker. (*See* Hyde Park Defs' Mem. 15.)

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under [42 U.S.C.] § 1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013); *see also Davila v. Johnson*, No. 15-CV-2665, 2015 WL 8968357, at *4 (S.D.N.Y. Dec. 15, 2015) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (internal quotation marks omitted)).

Here, although Plaintiff has not been able to differentiate between the four Hyde Park police officers, he has alleged that they all came to the Residence, entered it, and worked together to search it. (*See*, *e.g.*, Am. Compl. ¶¶ 31–34.) These allegations are sufficient to establish the personal involvement of Torres, Ferrara, Stallone, and Tucker as to the Fourth Amendment claims. *See Byrne v. Trudell*, No. 12-CV-245, 2013 WL 2237820, at *10 (D. Vt. May 21, 2013) (adopting report and recommendation finding that the plaintiff adequately alleged personal involvement against two officers who conducted warrantless search.).

As to the Fourteenth Amendment claims, Plaintiff has alleged that all of the Officer Defendants were present at the Residence when he was instructed not to return. (*See*, *e.g.*, Am. Compl. ¶¶ 58, 60.) Construed liberally, these allegations are sufficient to demonstrate Torres, Ferrara, Stallone, and Tucker's personal involvement in the alleged constitutional deprivations.

### 2. Fourteenth Amendment Claims

Next, the Court considers whether Plaintiff has adequately alleged that the Officer Defendants violated his Fourteenth Amendment right to procedural due process. (*See* Am. Compl. 8–9; Pl's Schulhoff Opp'n 19–20; Pl's Hyde Park Opp'n 19–20.)

The Fourteenth Amendment's Due Process Clause provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. The Due Process Clause thus "bars arbitrary, wrongful government actions, and guarantees procedural fairness when a state action deprives a citizen of a protected interest in life, liberty, or property." *Wiesner v. Rosenberger*, No. 98-CV-1512, 1998 WL 695927, at *3 (S.D.N.Y. Oct. 6, 1998) (citing *Daniels v. Williams*, 474 U.S. 327, 330–32 (1986)); *accord Polardo v. Adelberg*, No. 22-CV-2533, 2023 WL 2664612, at *11 (S.D.N.Y. Mar. 28, 2023). "The

fundamental requirement of the Due Process Clause is that an individual be given the opportunity to be heard at 'a meaningful time and in a meaningful manner.' " *Patterson v. City of Utica*, 370 F.3d 322, 336 (2d Cir. 2004) (quoting *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970)); *accord Smalls v. N.Y.C. Emp.s' Ret. Sys.*, No. 18-CV-5428, 2020 WL 5525746, at *4 (S.D.N.Y. Sept. 15, 2020). "To plead a violation of procedural due process, ... a plaintiff must first identify a property right, second show that the government has deprived him of that right, and third show that the deprivation was effected without due process." *Akinde v. N.Y.C. Health & Hosp. Corp.*, No. 16-CV-8882, 2019 WL 4392959, at *5 (S.D.N.Y. Sept. 13, 2019) (quoting *J.S. v. T'Kach*, 714 F.3d 99, 105 (2d Cir. 2013)). "The appropriate process depends on the balancing of three factors: (1) 'the private interest that will be affected by the official action;' (2) 'the risk of erroneous deprivation of such interest through the procedures used;' and (3) 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' " *Panzella v. Sposato*, 863 F.3d 210, 218 (2d Cir. 2017) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

a. Plaintiff's Removal from the Residence

***9** As before, Plaintiff argues that he was a tenant when removed from the Residence and was therefore denied due process when the Officer Defendants unlawfully evicted him. (*See* Am. Compl. ¶ 57; Pl's Schulhoff Opp'n 19–20; Pl's Hyde Park Opp'n 19–20.) Defendants again contend that Plaintiff has alleged facts that show he was no more than a mere licensee and thus not entitled to any process under New York law. (*See* Schulhoff Mem. 17–19; Hyde Park Defs' Mem. 8–9.) [21]

"Property interests are not created by the Constitution; rather, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.' " *Ciambriello v. County of Nassau*, 292 F.3d 307, 313 (2d Cir. 2002) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). Thus, the Court first considers whether Plaintiff's Amended Complaint plausibly alleges that he is a tenant, rather than a licensee, because the category he falls within is dispositive of whether he has the requisite property interest in the Residence to state a procedural due process claim. *See Pelt v. City of New York*, No. 11-CV-5633, 2013 WL 4647500, at *8 (E.D.N.Y. Aug. 28, 2013) ("Under New York law, it is well settled that a licensee acquires no possessory interest in property." (citation and quotation marks omitted) (collecting cases)); *Gladsky v. Sessa*, No. 06-CV-3134, 2007 WL 2769494, at *8 (E.D.N.Y. Sept. 21, 2007) ("It has long been the rule in New York that a licensee, as opposed to a tenant ..., cannot maintain an action for wrongful ejection." (quoting *Carter v. Helmsley-Spear, Inc.*, 861 F. Supp. 303, 334 (S.D.N.Y. 1994))).

A licensee has been defined as "[a] person who has a privilege to enter upon land arising from the permission or consent, express or implied, of the possessor of land but who goes on the land for his own purpose rather than for any purpose or interest of the possessor." *Gladsky*, 2007 WL 2769494, at *8 (alteration in original) (quoting Black's Law Dictionary 921 (6th Ed. 1990)); *see also id.* (noting "[t]his definition is consistent with [the interpretation] employed by New York courts" (citation and quotation marks omitted) (collecting cases)); *Nauth v. Nauth*, 981 N.Y.S.2d 266, 268 (Civ. Ct. 2013) ("While no explicit definition of 'licensee' is provided [in the relevant section of New York Real Property Actions and Proceedings Law], a licensee in [the] landlord[-]tenant context is generally defined as someone who is granted permission, express or implied, by the owner to use and/or occupy the subject premises." (citation omitted)). A license is "cancellable at will, and without cause." *Am. Jewish Theatre, Inc. v. Roundabout Theatre Co.*, 610 N.Y.S.2d 256, 257 (App. Div. 1994) (citation omitted). Accordingly, licensees do not have a cognizable property interest in the continued occupancy of a property. *See Pelt*, 2013 WL 4647500, at *8–9.

***10** As set forth in the March 2023 Opinion, (*see* March 2023 Op. 16), New York courts have explained that "the transfer of absolute control and possession is what differentiates a lease from a license ... [w]hereas a license connotes use or occupancy of the grantor's premises, a lease grants exclusive possession of designated space to a tenant, subject to rights specifically reserved by the lessor." *Am. Jewish Theatre*, 610 N.Y.S.2d at 257 (citations omitted); *Nextel of N.Y., Inc. v. Time Mgmt. Corp.*, 746 N.Y.S.2d 169, 170 (App. Div. 2002) ("The central distinguishing characteristic of a lease is the surrender of absolute possession and control of property to another party for an agreed-upon rental." (citations and quotation marks omitted)). While a tenant must be provided with due process pursuant to N.Y. Real Prop. Acts. Law § 711, a licensee may be "peaceably exclude[d] ... from [a dwelling] without resort to legal

process." *Coppa v. LaSpina*, 839 N.Y.S.2d 780, 783 (App. Div. 2007) (citations omitted); *see also* *Smith v. County of Nassau*, No. 10-CV-4874, 2015 WL 1507767, at *8 (E.D.N.Y. Mar. 31, 2015) (holding that the plaintiff could not "sustain a due process claim based on his eviction" because "his status as a licensee conferred no cognizable property interest"), *aff'd*, 643 F. App'x 28 (2d Cir. 2016) (summary order); *Visken v. Oriole Realty Corp.*, 759 N.Y.S.2d 523, 525 (App. Div. 2003) ("Since the plaintiff was a mere licensee ... [the defendant], as owner, had an owner's common-law right to oust her without legal process." (citation omitted)).

In his submissions, Plaintiff alleges that Sharon informed him that she would give him and his wife access to their own room at the Residence—indeed, that she would let them "rent a room"—and that, in return, Plaintiff was expected to contribute to expenses and provide maintenance and repair services at the Residence. (*See* Am. Compl. ¶¶ 13–14; Pl's Schulhoff Opp'n 2–3.) Plaintiff further alleges that he and his wife did in fact receive exclusive use of a second-floor room at the Residence, that he contributed to household expenses using his own money, and that he completed a number of household projects at the Residence (again using his own money), such as building a shed in the backyard and repairing a deck. (*See* Am. Compl. ¶ 15; Pl's Schulhoff Opp'n 4.) Plaintiff alleges that, after Sharon's untimely passing, Janet and Debra asked that Plaintiff and his wife "continue the arrangement they had had with Sharon, continuing to provide care for Jules and caring for and maintaining the Residence," at least until the probate proceedings for Sharon's estate took place on March 20, 2020. (*See* Am. Compl. ¶¶ 18–19, 25.) Moreover, Plaintiff alleges that Janet and Debra further authorized Plaintiff to call the authorities if Sharon's ex-husband came to the Residence. (Am. Compl. ¶ 18.) Indeed, "Janet and Debra strongly urged Plaintiff and his wife to [continue living] at the Residence [after they moved Jules out], explaining that they wanted Plaintiff to remain [there] until probate proceedings for Janet's [e]state were settled because they said it would be better to have someone living in the Residence for security and insurance purposes." (*Id.* ¶ 24.) And before the events of February 13, 2020, whenever Kenny family members would visit the Residence—for example, to inventory Sharon's personal property—they would "always call[ ] Plaintiff" in advance of visiting, and did not enter Plaintiff and his wife's room during their visits." (*Id.* ¶ 20–21.)

In light of that record, and given that it is bound to accept as true Plaintiff's factual allegations at this stage of the case, *see* *Erickson*, 551 U.S. at 94, the Court finds that Plaintiff has alleged sufficient facts plausibly demonstrating that he was a tenant, rather than a licensee, at the Residence. In other words, the Amended Complaint—as supplemented by Plaintiff's Opposition, *see supra* Section I.A—plausibly alleges that Plaintiff was granted "exclusive possession of [the Residence] ..., subject to rights specifically reserved by [Kenny family members]." *Am. Jewish Theatre*, 610 N.Y.S.2d at 257; *see also* *Fed'n of Orgs., Inc. v. Bauer*, 788 N.Y.S.2d 806, 808 (App. Div. 2004) (explaining that "exclusive possession and control of specified real property" are "essential to the existence of a landlord-tenant relationship"); *Nextel of N.Y., Inc.*, 746 N.Y.S.2d at 170 ("The central distinguishing characteristic of a lease is the surrender of absolute possession and control of property to another party for an agreed-upon rental." (citations omitted)).[22] Consequently, Plaintiff has adequately alleged that he had a cognizable property interest in the Residence. *See, e.g.*, *Smith*, 2015 WL 1507767, at *8. Thus, the Court denies the Defendants' Motions with respect to Plaintiff's procedural due process claim relating to his removal from the Residence.[23]

***11** In their Motions, Defendants fail to seriously engage with the factual allegations in Plaintiff's Amended Complaint. (*See* Schulhoff Mem. 17–19; Hyde Park Defs' Mem. 8–9.) For example, Schulhoff asserts that "Plaintiff [has] made no showing that the Kenny family was contractually bound not to enter his room," but fails to cite any authority demonstrating why that assertion matters here. (Schulhoff Mem. 18.) Moreover, in response to Plaintiff's Oppositions, rather than address Plaintiff's additional factual allegations, Defendants' Replies do nothing more than double-down on the Court's holding that Plaintiff's original Complaint alleged that he was a mere licensee in the March 2023 Opinion. (Schulhoff Reply 11–12; Hyde Park Defs' Reply 6.)

To be clear, discovery may well reveal that Plaintiff was, in fact, a licensee at the Residence, and therefore was entitled to no process whatsoever before he was removed from the Residence. *See* *Coppa*, 839 N.Y.S.2d at 783 (explaining that a licensee may be "peaceably exclude[d] ... from [a dwelling] without resort to legal process"). The Court simply holds that Plaintiff has alleged sufficient facts to make it *plausible*, at this juncture, that he was a tenant at the Residence. *See* *Twombly*, 550 U.S. at 570 (explaining that, to survive a motion to dismiss, a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face").

b. Plaintiff's Personal Property

Plaintiff also asserts that the Officer Defendants violated his right to due process when they deprived him of the personal property that he was forced to leave at the Residence, including, among other things, a laptop, certain construction tools, and "irreplaceable items such as heirlooms [and] family photo albums." (Am. Compl. ¶ 59; *see also* Pl's Schulhoff Opp'n 10.) In their Motions, Defendants assert that there was no due process violation because Plaintiff had "adequate post-deprivation remedies" available to him. (Schulhoff Mem. 19–20; *see also* Hyde Park Defs' Mem. 9–10 (charactering this argument as Plaintiff's "fail[ure] to exhaust his available post-deprivation remedies under New York state law").) [24]

As explained in the Court's March 2023 Opinion, (*see* March 2023 Op. 18), "[w]hen reviewing alleged procedural due process violations, the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees." *Hellenic Am. Neighborhood Action Comm. (HANAC) v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996) (citing, inter alia, *Hudson v. Palmer*, 468 U.S. 517, 532 (1984)); *accord Joseph v. Castillo*, No. 20-CV-3957, 2022 WL 4485061, at *4 (E.D.N.Y. Sept. 27, 2022). With respect to claims based on random, unauthorized acts by state employees, "the Due Process Clause of the Fourteenth Amendment is not violated when a state employee intentionally deprives an individual of property or liberty, so long as the State provides a meaningful post[-]deprivation remedy." *HANAC*, 101 F.3d at 880 (citing *Hudson*, 468 U.S. at 531, 533). In other words, where a state employee's random, unauthorized act makes "a pre-deprivation hearing ... impractical and a post-deprivation hearing is meaningful, the State satisfies its constitutional obligations by providing the latter." *Stokes v. City of Mount Vernon*, No. 11-CV-7675, 2012 WL 3536461, at *9 (S.D.N.Y. Aug. 14, 2012) (quoting *Giglio v. Dunn*, 732 F.2d 1133, 1135 (2d Cir. 1984)), *modified in part on reconsideration*, 2012 WL 6691078 (S.D.N.Y. Dec. 17, 2012).

***12** As to claims based on established state procedures, such conduct occurs when, for example, it is "pursuant to a statute, code, regulation, or custom," or is the result of a decision made by a high-ranking official with "final authority over significant matters." *See Viteritti v. Inc. Village of Bayville*, 918 F. Supp. 2d 126, 134 (E.D.N.Y. 2013) (quoting *Chase Grp. Alliance LLC v. City of N.Y. Dep't of Fin.*, 620 F.3d 146, 152 n.3 (2d Cir. 2010)). "When the deprivation occurs in the more structured environment of established state procedures, rather than random acts, the availability of post[-]deprivation procedures will not, ipso facto, satisfy due process." *HANAC*, 101 F.3d at 880 (citing *Hudson*, 468 U.S. at 532). Rather, where a plaintiff is deprived of property "pursuant to an established state procedure, [ ] some pre-deprivation process [is] required." *Teichmann v. N.Y.C. Emps.' Ret. Sys.*, No. 21-CV-5082, 2022 WL 4237110, at *5 (S.D.N.Y. Sept. 14, 2022); *see also Panzella*, 863 F.3d at 218 (listing the factors courts must balance when determining how much process is due under given circumstances and quoting *Mathews*, 424 U.S. at 335).

Plaintiff's Amended Complaint does not allege that the Officer Defendants acted pursuant to an established state procedure on February 13, 2020. (*See generally* Am. Compl.) However, Plaintiff avers in his Opposition that the Officer Defendants' conduct on February 13, 2020, "suggests" that they were "either following an established law enforcement practice or were empowered to believe that they had broad discretion to adjudicate a dispute between a nonowner resident of a private home and an out-of-state individual claiming to represent an [e]state[-]owner of the home without regard to constitutional protections ...." (Pl's Hyde Park Opp'n 12–13; *see also* Pl's Schulhoff Opp'n 12–13.)

"[C]onstru[ing Plaintiff's submissions] liberally and interpret[ing them] to raise the strongest arguments that they suggest," *Sykes*, 723 F.3d at 403, the Court concludes that Plaintiff has plausibly alleged that the Officer Defendants were "following an established ... practice" when they allegedly deprived him of his personal property during the events of February 13, 2020, (Pl's Hyde Park Opp'n 12–13; Pl's Schulhoff Opp'n 12–13). Moreover, Plaintiff's allegations throughout his submissions plausibly state that he received *no* pre-deprivation process when he was forced to leave his personal property at the Residence. *See Teichmann*, 2022 WL 4237110, at *5 (explaining that "*some* pre-deprivation process [is] required" when a plaintiff is deprived of property "pursuant to an established state procedure" (emphasis added)). Thus, accepting his allegations as true and drawing all reasonable inferences in his favor, Plaintiff has stated a plausible procedural due process claim relating to his personal property. The Court therefore denies Defendants' Motions To Dismiss this claim. [25]

3. Fourth Amendment Claims

The Court next considers whether Plaintiff has adequately alleged that the Officer Defendants violated his Fourth Amendment rights. (*See* Am. Compl. 8–9; Pl's Schulhoff Opp'n 13–19; Pl's Hyde Park Opp'n 13–19.)

***13** The Fourth Amendment to the United States Constitution guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause ...." U.S. Const. amend. IV. "A search occurs when the Government acquires information by either physically intruding on persons, houses, papers, or effects, or otherwise invading an area in which the individual has a reasonable expectation of privacy." *United States v. Ganias*, 755 F.3d 125, 133 (2d Cir. 2014) (quotation marks and citation omitted), *on reh'g en banc*, 824 F.3d 199 (2d Cir. 2016). "A seizure occurs when the Government interferes in some meaningful way with the individual's possession of property." *Id.* "The Fourth Amendment's warrant requirement protects one's privacy interest in home or property. Absent exigent circumstances or some other exception, [law enforcement officials] must obtain a warrant before they enter the home to conduct a search or otherwise intrude on an individual's legitimate expectation of privacy." *United States v. Gori*, 230 F.3d 44, 50 (2d Cir. 2000). Similarly, to be valid, a "warrantless seizure must meet one of the recognized exceptions to the [F]ourth [A]mendment's warrant requirement." *United States v. Cosme*, 796 F.3d 226, 235 (2d Cir. 2015) (quotation marks and citation omitted).

The Supreme Court has "uniformly [ ] held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *El-Nahal v. Yassky*, 835 F.3d 248, 253 n.2 (2d Cir. 2016) (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). "Thus, a Fourth Amendment search[ ] ... does not occur unless the search invades an object or area [in which] one has a subjective expectation of privacy that society is prepared to accept as objectively reasonable." *United States v. Ulbricht*, 858 F.3d 71, 96 (2d Cir. 2017) (alterations in original) (quotation marks omitted) (quoting *United States v. Hayes*, 551 F.3d 138, 143 (2d Cir. 2008)); *see also Illinois v. Caballes*, 543 U.S. 405, 408 (2005) ("Official conduct that does not compromise any legitimate interest in privacy is not a search subject to the Fourth Amendment." (quotation marks omitted)).

"A [plaintiff] can demonstrate that his ... legitimate expectation of privacy has been infringed by showing that he owns the premises or property subjected to search, or by showing that he occupies and has dominion and control over the premises or property by leave of the owner." *Gill v. City of New York*, No. 15-CV-5513, 2017 WL 1097080, at *5 (E.D.N.Y. Mar. 23, 2017) (alterations and quotation marks omitted) (quoting *United States v. Sanchez*, 635 F.2d 47, 63–64 (2d Cir. 1980)); *Lagasse v. City of Waterbury*, No. 09-CV-391, 2011 WL 2709749, at *9–10 (D. Conn. July 12, 2011) (finding trespasser had no reasonable expectation of privacy and therefore could not object to warrantless entry). However, an explicit property interest is not always necessary, as, for example, "a guest [who] has permission to use [a] [home], is given a key, and uses the [home] in the owner's absence" may have a reasonable expectation of privacy, "even though no property interest exists." *United States v. Fields*, 113 F.3d 313, 320 (2d Cir. 1997) (citation omitted). [26]

Where an individual has a legitimate expectation of privacy, "[a] warrantless search is per se unreasonable under the Fourth Amendment, unless the search can be justified by one of the narrowly drawn exceptions to the warrant requirement." *United States v. Turner*, 23 F. Supp. 3d 290, 303 (S.D.N.Y. 2014) (italics omitted); *see also Kentucky v. King*, 563 U.S. 452, 459 (2011) ("It is a basic principle of Fourth Amendment law, we have often said, that searches and seizures inside a home without a warrant are presumptively unreasonable. But we have also recognized that this presumption may be overcome in some circumstances because the ultimate touchstone of the Fourth Amendment is reasonableness. Accordingly, the warrant requirement is subject to certain reasonable exceptions." (alteration, citations, and quotation marks omitted)); *Steagald v. United States*, 451 U.S. 204, 211 (1981) ("Except in ... special situations, we have consistently held that the entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant.").

***14** To start, and for the reasons set forth above, *see supra* Section II.B.2.a, the Court again concludes that Plaintiff had a reasonable expectation of privacy in the Residence. *See United States v. Ray*, 541 F. Supp. 3d 355, 380 (S.D.N.Y. 2021) ("A defendant can establish that he had a legitimate expectation of privacy with respect to a home sufficient to invoke Fourth Amendment rights 'by showing that he owned

the premises or that he occupied them and had dominion and control over them by leave of the owner.' ") (quoting *United States v. Watson*, 404 F.3d 163, 166 (2d Cir. 2005)); *see also* *Dos Santos v. Syracuse Police Dep't*, No. 22-CV-1102, 2023 WL 3612842, at *2 (N.D.N.Y. May 24, 2023) (same). (*Cf.* March 2023 Op. 24 (finding that Plaintiff had a reasonable expectation of privacy the Residence, even if considered a licensee).)

The Court now considers each of Plaintiff's Fourth Amendment claims in turn.

a. Search of the Residence

Plaintiff again alleges that the Officer Defendants violated his Fourth Amendment rights when they searched the Residence without a warrant. (*See* Am. Compl. 8–9; Pl's Schulhoff Opp'n 13–19; Pl's Hyde Park Opp'n 13–19.)

One exception to the warrant requirement is where "proper consent" is "voluntarily given." *United States v. Matlock*, 415 U.S. 164, 165–66 (1974). "Consent may validly be granted by the individual whose property is to be searched, or by a third party who possesses common authority over the premises." *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995) (citation omitted) (citing *Matlock*, 415 U.S. at 171). When examining whether a third party may consent to the search of a common premises, the inquiry is "whether the third party possessed 'a sufficient relationship to the searched premises to validate the search.' " *Id.* at 185–86 (quoting *United States v. Trzaska*, 859 F.2d 1118, 1120 (2d Cir. 1988)). Accordingly, "a third party may validly grant the requisite consent if [s]he has joint access or control of the property for most purposes," *id.* at 186; *see also* *United States v. McGee*, 564 F.3d 136, 139 (2d Cir. 2009) ("Authority to consent to a search rests on 'mutual use of the property by persons generally having joint access or control for most purposes ....' " (quoting *Matlock*, 415 U.S. at 171 n.7)), or "if it was reasonable for the officers to believe [the third party] had the requisite relationship," *Elliott*, 50 F.3d at 186 (citing *Illinois v. Rodriguez*, 497 U.S. 177, 179 (1990)). Moreover, "if the search exceeded the scope of the consent given, an officer's objectively reasonable belief that the search was within the scope of that consent is sufficient to validate the search." *Id.* The Second Circuit has held that a third-party will have actual authority "if two prongs are present: first, the third party had access to the area searched, and, second, either: (a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access." *United States v. Davis*, 967 F.2d 84, 87 (2d Cir. 1992).

"[E]ven if a third party lacks actual authority to consent to a search of a particular area, [s]he still may have apparent authority to consent to the search." *Moore v. Andreno*, 505 F.3d 203, 209 (2d Cir. 2007) (citing *United States v. Buckner*, 473 F.3d 551, 555 (4th Cir. 2007)). "The Supreme Court has explained that apparent authority to give consent 'must be judged against an objective standard: would the facts available to the officer at the moment ... warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?' " *McGee*, 564 F.3d at 139. Additionally, "[the] apparent authority rule applies only to mistakes of fact and not mistakes of law." *Moore*, 505 F.3d at 209 (alterations adopted) (quotation marks omitted) (citing, inter alia, *United States v. Brown*, 961 F.2d 1039, 1041 (2d Cir. 1992) (per curiam) ("*Rodriguez*[, 497 U.S. at 177,] would not validate, however, a search premised upon an erroneous view of the law. For example, an investigator's erroneous belief that landladies are generally authorized to consent to a search of a tenant's premises could not provide the authorization necessary for a warrantless search." (citation omitted))).

***15** Defendants argue that Plaintiff's Amended Complaint still demonstrates that Janet had apparent authority to consent to the search of the Residence. (*See* Schulhoff Mem. 13–14; Hyde Park Defs' Mem 11–12.) The Court agrees.

As alleged, Janet called the police to report "that she was the executor of the estate with legal ownership of the property, that Plaintiff was in the Residence without authorization and that Plaintiff was criminally removing property from the Residence that did not belong to him." (Am. Compl. ¶ 29.) Indeed, in his Opposition, Plaintiff alleges that Janet reported to the police that:

> Plaintiff and his wife had no rights to be in the Residence and [ ] that they were engaged in "suspicious activity," specifically, that they were removing items from the Residence when they had been expressly told to not remove items without [Janet] being present[, and] that she was the appointed executor of the [e]state which owned the Residence.

(Pl's Hyde Park Opp'n 6.) These allegations are substantially the same as those raised in Plaintiff's initial submissions, (*see* March 2023 Op. 26), and would "warrant a [person] of reasonable caution in the belief that the consenting party had authority over the premises," *McGee*, 564 F.3d at 139. Thus, for substantially the same reasons set forth in the March 2023 Opinion, the Court concludes that a reasonable person in the position of each of the Officer Defendants would have concluded he had consent from a party with the requisite authority over the Residence to search it for evidence of the alleged crimes being committed therein. (*See id.* at 26–27.) *See also* *United States v. Thomas*, No. 14-CR-31, 2015 WL 164075, at *6–7 (D. Conn. Jan. 13, 2015) (holding that alleged victim of sex trafficking, who was a minor, had apparent authority to consent to search of hotel room she had access to and stayed in, even though victim was not listed as guest by the hotel), *aff'd sub nom.* *United States v. Walters*, 678 F. App'x 44 (2d Cir. 2017); *Turner*, 23 F. Supp. 3d at 305 (finding alleged victim of domestic violence had apparent authority to consent to search of suspect's apartment where she had informed law enforcement she had lived with the suspect at the apartment for a substantial period over the previous three months and had returned her keys immediately prior to making a report). [27]

Insofar as Plaintiff raises any arguments to the contrary, he seems to suggest that the Officer Defendants should not have believed Janet or should have conducted a more thorough investigation into the ownership of the Residence upon their arrival. (*See*, *e.g.*, Pl's Schulhoff Opp'n 16–17; Pl's Hyde Park Opp'n 16–17.) However, as this Court has previously explained, the law is clear that law enforcement officials are entitled to presume the truthfulness of the reports of crime victims when determining whether they have probable cause to arrest. *See* *Alexander v. City of Syracuse*, 573 F. Supp. 3d 711, 729 (N.D.N.Y. 2021) ("[C]ourts assume '[t]he veracity of citizen complaints [by] the victims of the very crime they report to the police ....") (second and third alterations in original) (quoting *Miloslavsky v. AES Eng'g Soc., Inc.*, 808 F. Supp. 351, 355 (S.D.N.Y. 1992)); *Torres v. City of New York*, No. 16-CV-6719, 2017 WL 4325822, at *3 (E.D.N.Y. Sept. 27, 2017) ("It is well-settled that even where the information on which a police officer relies later turns out to be mistaken, probable cause still exists as long as the arresting officer acted reasonably in relying on that information." (citing *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)). "While these holdings do not directly apply in the context of determining whether officers could reasonably rely upon a third party's consent to a search, the Court finds them relevant, given the somewhat unique facts of this case." (March 2023 Op. 27 n.13.)

***16** Accordingly, the Court again dismisses Plaintiff's Fourth Amendment claim regarding the warrantless search of the Residence.

b. Search of Plaintiff's Vehicle

Plaintiff also reargues that that the Officer Defendants violated his Fourth Amendment rights when they searched his van without a warrant. (*See* Am. Compl. 8–9; Pl's Schulhoff Opp'n 13–19; Pl's Hyde Park Opp'n 13–19.) [28]

Under the automobile exception to the warrant requirement, "officers 'may conduct a warrantless search of a movable vehicle when they have probable cause to believe it contains contraband or evidence of a crime.' " *Martinez v. City of New York*, 564 F. Supp. 3d 88, 99 (E.D.N.Y. 2021) (quoting *United States v. Vassiliou*, 820 F.2d 28, 30 (2d Cir. 1987)); *see also* *Florida v. Harris*, 568 U.S. 237, 243 (2013) (holding that a police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present). "The Supreme Court has justified the automobile exception under two rationales: first, 'a person's expectation of privacy in a vehicle is less than his or her expectation of privacy in a home'; and second, 'because a vehicle is readily movable, exigent circumstances might require a warrantless search.' " *United States v. Samms*, No. 22-CR-130, 2023 WL 386819, at *9 (D. Conn. Jan. 25, 2023) (quoting *United States v. Howard*, 489 F.3d 484, 492 (2d Cir. 2007)).

Probable cause exists "if [an officer], on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Hawkins*, 37 F.4th 854, 858 (2d Cir. 2022) (per curiam) (citations omitted). Probable cause is satisfied by "the kind of fair probability on which reasonable and prudent people ... act." *Id.* at 858 (quotation marks omitted) (quoting *Harris*, 568 U.S. at 244). "To establish probable cause, officers may rely on hearsay." *Martinez*, 564 F. Supp. 3d at 99 (citing *United States v. Premises & Real Prop. at 4492 S. Livonia Rd.*, 889 F.2d 1258, 1267 (2d Cir. 1989)). Moreover, law enforcement officials are entitled to rely on the veracity of

complaints they receive from victims or eyewitnesses. *See Mittelman v. County of Rockland*, No. 07-CV-6382, 2013 WL 1248623, at *11 (S.D.N.Y. Mar. 26, 2013) (granting summary judgment on a Fourth Amendment claim because "[a]s a matter of law, it was reasonable for the police to rely on [the] veracity [of information provided to the police] in making their decision to search [the] [p]laintiffs' home" (citing *Bernard*, 25 F.3d at 102)).

As the Court previously found, the Officer Defendants clearly had probable cause to search Plaintiff's van. (*See* March 2023 Op. 28–29.) As alleged, Janet informed law enforcement officials that "Plaintiff was criminally removing property from the Residence that did not belong to him," and that "she had witnessed through a remote security camera a burglary at the Residence because she claimed to have seen Plaintiff taking various items out of the Residence without her permission." (Am. Compl. ¶ 29.) Those allegations alone are sufficient to demonstrate that the Officer Defendants had probable cause to search Plaintiff's van, because a reasonable inference therefrom was that Plaintiff may have been moving the purportedly stolen property into his van. *See Micalizzi v. Ciamarra*, 206 F. Supp. 2d 564, 578 (S.D.N.Y. 2002) (holding that the automobile exception applied where detective who searched automobile was relying on report from fellow officer that a naked man who had allegedly been exposing himself to children in the area had been sitting in the car).

***17** Throughout his Amended Complaint and Oppositions, Plaintiff is *adamant* that the Officer Defendants could not possibly have had probable cause given the facts on the ground—namely, that he and his wife were not, in fact, stealing anything from their own home and that Janet fabricated the burglary accusation. (*See generally* Am. Compl.; Pl's Schulhoff Opp'n; Pl's Hyde Park Opp'n.) However, it bears restating what the Court previously noted, (*see* March 2023 Op. 29): "It is well-settled that even where the information on which a police officer relies later turns out to be mistaken, probable cause still exists as long as the ... officer acted reasonably in relying on that information." *Torres*, 2017 WL 4325822, at *3 (citing *Bernard*, 25 F.3d at 102); *see also Mittelman*, 2013 WL 1248623, at *11 (concluding that the police were entitled to rely on reports of witnesses in determining whether to search the plaintiff's home, even though those reports were later determined to be erroneous); *cf. Panetta v. Crowley*, 460 F.3d 388, 395–96 (2d Cir. 2006) (explaining that " '[t]he fact that an innocent explanation may be consistent with the facts alleged ... does not negate probable cause,' and an officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause" (alterations in original) (citation omitted)); *Mistretta v. Prokesch*, 5 F. Supp. 2d 128, 135 (E.D.N.Y. 1998) (explaining that "[o]nce a police officer has probable cause, he need not explore 'every theoretically plausible claim of innocence before making an arrest[;]' ... [officers] have no duty to investigate an exculpatory statement of the accused, and their refusal to do so does not defeat probable cause") (citations omitted) (quoting, inter alia, *Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123, 129 (2d Cir. 1997)). [29]

In sum, the Court again dismisses Plaintiff's Fourth Amendment claim regarding the warrantless search of the Residence.

c. Temporary Detention of Plaintiff

In the Amended Complaint, Plaintiff raises the new allegation that the Officer Defendants violated his Fourth Amendment rights in that they "seized [him] and restricted his liberty[ ] when he was peacefully occupying his own home" on February 13, 2020. (Am. Compl. 9.) In light of Plaintiff's allegation, which are accepted as true at this stage of the litigation, the Court construes Plaintiff's claim to be that the Officer Defendants unlawfully detained him during their search of the Residence. (*See* Pl's Schulhoff Opp'n 7 (alleging that Schulhoff, "with the cooperation of the other [Officer Defendants], ordered Plaintiff and his wife to stay in the living room" after they arrived at the Residence).) As noted, the Hyde Park Defendants have not moved to dismiss this claim, so the focus of the Court's analysis in this sub-section will be Schulhoff.

***18** Although Schulhoff fails to make this argument, the Court notes at the outset that "[a]n officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention ....' " *Muehler v. Mena*, 544 U.S. 93, 98 (2005) (quoting *Michigan v. Summers*, 452 U.S. 692, 705 n.19 (1981)). The Supreme Court has explained that, in a detention incident to a lawful search of a house, "the detention of an occupant is surely less intrusive than the search itself," and that this "incremental intrusion" is outweighed by "legitimate law enforcement interests that provide substantial justification for detaining an occupant," such as "preventing flight in the event that incriminating evidence is found; minimizing the risk of harm to the officers; and facilitating the orderly completion of the

search." *Id.* (quotation marks omitted) (quoting *Summers*, 452 U.S. at 701–03). Accordingly, courts have consistently held that law enforcement officers may temporarily detain individuals incident to otherwise lawful searches without violating the Fourth Amendment. *See B. v. City of New York*, No. 14-CV-1021, 2016 WL 4530455, at *9 (E.D.N.Y. Aug. 29, 2016) ("Officers may ... 'detain the occupants of the premises while a proper search is conducted[.]' " (quoting *Summers*, 452 U.S. at 705)); *see also United States v. Whitlock*, No. 20-CR-17, 2021 WL 1439846, at *7 (D. Vt. Apr. 16, 2021) (concluding that a criminal defendant could "be lawfully detained during the search [of a car]" where "[t]he smell of marijuana established probable cause for federal law enforcement's search of the [car] under the automobile exception [to the Fourth Amendment warrant requirement]"); *Foster v. McCabe*, No. 19-CV-843, 2020 WL 2840060, at *6–8 (W.D.N.Y. June 1, 2020) (relying on *Muehler* and *Summers* and concluding that, because the defendants were "entitled to qualified immunity as to the search, they are also entitled to qualified immunity ... as to the detentions during the search" where the defendants searched a plaintiff-parolee's residence without a warrant for four hours "during which time both [p]laintiffs were required to sit at a table, and [one plaintiff] was handcuffed"); *Crismale v. Reilly*, No. 13-CV-470, 2014 WL 3738151, at *1 (D. Conn. July 29, 2014) (concluding that the plaintiff's temporary detention was reasonable under the Fourth Amendment where the plaintiff was "detained outside in his boat yard for over an hour" by the defendant-officer "who was investigating a complaint that [the] plaintiff had illegally harvested shellfish"); *Cooper v. City of New Rochelle*, 925 F. Supp. 2d 588, 612 (S.D.N.Y. 2013) (explaining that "any detention incident to the lawful search of [the plaintiff's] vehicle [could not] give rise to a Fourth Amendment violation"); *United States v. Obbanya*, No. 11-CR-677, 2012 WL 851129, at *5 (N.D. Cal. Mar. 13, 2012) (determining that law enforcement officers had the authority to detain the criminal defendant incident to a protective sweep of a house "where the officers had reason to believe that there was someone inside the house in immediate need of assistance, possibly due to [the d]efendant's acts").

Applying the foregoing principles here, Plaintiff's temporary detention at the Residence, as alleged, was plainly appropriate. In other words, because the Officers Defendants were conducting a lawful search of the Residence pursuant to Janet's apparent authority, *see supra* Section II.B.3.a, their investigative detention of Plaintiff during that search was reasonable under the Fourth Amendment. *See United States v. Williams*, No. 12-CR-6152, 2015 WL 429087, at *18 (W.D.N.Y. Feb. 2, 2015) (concluding—where law enforcement officers conducted a warrantless search of an apartment—that the temporary detention of a criminal defendant was permissible "during the sweep of the apartment and pending [an] immediate further investigation" and collecting cases), *report and recommendation adopted*, 2015 WL 3454430 (W.D.N.Y. May 29, 2015).

In his Motion, Schulhoff argues that Plaintiff did not plausibly allege that he was "seized" within the meaning of the Fourth Amendment and that, even if he did, such a seizure was founded on reasonable suspicion. (Schulhoff Mem. 16–17.) "A Fourth Amendment 'seizure' occurs when police detain an individual under circumstances in which a reasonable person would believe he or she is not 'free to leave.' " *Rivera v. Town of New Fairfield*, No. 22-CV-1874, 2023 WL 6611062, at *4 (S.D.N.Y. Oct. 10, 2023) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). "Beginning with *Terry v. Ohio*, 392 U.S. 1 [(1968)], the [Supreme] Court has recognized that a law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further." *Hiibel v. Sixth Judicial Dist. Ct. of Nev., Humboldt Cnty.*, 542 U.S. 177, 185 (2004). "To ensure that the resulting seizure is constitutionally reasonable, a *Terry* stop must be limited. The officer's action must be justified at its inception, and ... reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (quotation marks omitted). "For example, the seizure cannot continue for an excessive period of time, or resemble a traditional arrest." *Id.* at 185–86 (citations omitted); *see also Gilles v. Repicky*, 511 F.3d 239, 245 (2d Cir. 2007) ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." (quotation marks omitted)). "In assessing whether a detention is too long in duration to be justified as an investigative stop, ... it [is] appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the [suspect]." *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

***19** With regard to reasonable suspicion, "[t]he reasonable suspicion standard is 'not high' and is 'less demanding than probable cause, requiring only facts sufficient to give rise to a reasonable suspicion that criminal activity *may* be

afoot.' " *United States v. Santillan*, 902 F.3d 49, 56 (2d Cir. 2018) (emphasis in original) (quoting *United States v. Singletary*, 798 F.3d 55, 60 (2d Cir. 2015)). Notably, "[c]onduct that is as consistent with innocence as with guilt may provide the basis for reasonable suspicion where there is some indication of possible illicit activity." *Id.* (citing *United States v. Padilla*, 548 F.3d 179, 187 (2d Cir. 2008)). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). To establish reasonable suspicion, an officer "must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch." ' " *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 27); *see also Alabama v. White*, 496 U.S. 325, 329 (1990) (same). "Reasonable suspicion is an objective standard; hence, the subjective intentions or motives of the officer making the stop are irrelevant." *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000).

"In assessing the reasonableness of an officer's suspicion, [courts] must take into account the totality of the circumstances and must evaluate those circumstances through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States v. Compton*, 830 F.3d 55, 61 (2d Cir. 2016) (quotation marks omitted). "[T]he proper inquiry is not whether each fact considered in isolation denotes unlawful behavior, but whether all the facts taken together support a reasonable suspicion of wrongdoing." *United States v. Lee*, 916 F.2d 814, 820 (2d Cir. 1990).

Notwithstanding Schulhoff's conclusory and unsupported argument to the contrary, (*see* Schulhoff Mem. 16), the Court has little trouble concluding that Plaintiff did not feel free to leave the Residence when four police officers and a state trooper arrived at the Residence to investigate allegations that a burglary was underway, and proceeded to enter the Residence without invitation. (*See* Am. Compl. ¶¶ 32–34.) *See Brown v. Oneonta County*, 221 F.3d 329, 340 (2d Cir. 2000) (explaining that "[p]ertient factors identifying a police seizure can include," among other things, "the threatening presence of several officers" (citation omitted)). Thus, Plaintiff has plausibly alleged that he was seized for Fourth Amendment purposes on February 13, 2020.

However, for substantially the same reasons set forth above with respect to the Officer Defendants having probable cause to search Plaintiff's van, *see supra* Section II.B.3.b, Schulhoff had the reasonable suspicion required to temporarily detain Plaintiff in the Residence's living room, *see Wardlow*, 528 U.S. at 123 (explaining that " 'reasonable suspicion' is a less demanding standard than probable cause"). Again, Schulhoff arrived at the Residence in response to Janet's reports that "Plaintiff was criminally removing property from the Residence that did not belong to him." (Am. Compl. ¶ 29.) Upon arriving at the Residence to investigate "suspicious activity," Schulhoff encountered Plaintiff. (*Id.* ¶¶ 31, 33–34.) In light of these facts, it was certainly reasonable for Schulhoff to suspect "criminal activity *may* be afoot." *Santillan*, 902 F.3d at 56 (emphasis in original) (citation omitted). And to the degree Plaintiff continues to assert that Schulhoff should have taken his claims of innocence more seriously, "[a] determination that reasonable suspicion exists[ ] ... need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 270 (2002) (citing *Wardlow*, 528 U.S. at 125).

To be sure, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Brush v. Old Navy LLC*, ––– F. Supp. 3d ––––, 2023 WL 5311434, at *20 (D. Vt. Aug. 17, 2023) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Plaintiff's submissions, however, provide no basis from which to conclude that his detention lasted too long. Indeed, he offers no allegations *at all* as to the amount of time between when the Officer Defendants arrived at the Residence, and when they made him leave.

***20** The Court thus dismisses Plaintiff's Fourth Amendment claim relating to his detention at the Residence. Such dismissal pertains to the claim against Schulhoff only, as the Hyde Park Defendants have not moved to dismiss this claim. [30]

4. *Monell* Liability

The Hyde Park Defendants argue that Plaintiff has failed to adequately allege the existence of any official policy or custom that could provide the basis for imposing municipal liability against Hyde Park pursuant to *Monell* and its progeny. (*See* Hyde Park Defs' Mem. 15–16; Hyde Park Defs' Reply 7–8.)

"To state a claim under [§ 1983], the plaintiff must show that a defendant, acting under color of state law, deprived him of a federal constitutional or statutory right." *Sykes*, 723 F.3d at 405–06. However, "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell*, 436 U.S. at 691. Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008).

This multi-factor test, and particularly its fifth element, reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *see also Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). In other words, a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (italics omitted); *see also Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity itself commits a wrong"). Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

"In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.' " *Davis v. City of New York*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003). Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton*, 566 F. Supp. 2d at 271; *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Santana v. City of New York*, No. 15-CV-6715, 2018 WL 1633563, at *10 (S.D.N.Y. Mar. 29, 2018) ("[A] 'single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy.' " (quoting *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998))); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").

***21** A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted); *accord Atadzhanov v. City of New York*, No. 21-CV-5098, 2022 WL 4331304, at *11 (S.D.N.Y. Sept. 19, 2022). Moreover, as noted, a plaintiff must also establish a causal link between the municipality's policy, custom, or practice and the alleged constitutional injury. *See Tuttle*, 471 U.S. at 824 n.8 ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a constitutional violation. There must at least be an affirmative link between[, for example,] the training inadequacies alleged, and the particular constitutional violation at issue." (emphasis omitted)); *Roe*,

542 F.3d at 37 (holding that "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury" (quoting *Brown*, 520 U.S. at 404)); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiff['s] injury, *Monell* prohibits a finding of liability against the [c]ity."); *Johnson v. City of New York*, No. 06-CV-9426, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (noting that after demonstrating the existence of a municipal policy or custom, "a plaintiff must establish a causal connection—an affirmative link—between the policy and the deprivation of his constitutional rights" (quotation marks omitted)).

Here, Plaintiff's alleges that Hyde Park "promoted the unlawful behavior of the police officers through official policies," (Am. Compl. ¶ 72), and that it "promoted the unlawful behavior of the police officers through official policies that required officers to defer to decisions of a State law enforcement officer even as such decisions constituted violations of civil rights," (*id.* ¶ 80). In his Opposition to Hyde Park's Motion, Plaintiff supplements his *Monell* allegations as follows:

> Based on the concerted action by all of the [Officer Defendants], Plaintiff concludes that ... Hyde Park has given [its] officers overly broad discretion when they encounter disputes regarding whether a non-owner resident has a lawful right to occupy a home. [Hyde Park] has also given its officers overly broad discretion to resolve disputes over specific ownership of chattel. As far as Plaintiff can tell, the [Officer Defendants] had broad discretion to resolve these disputes without regard to legal procedural requirements or the respective rights of the parties. Moreover, as far as Plaintiff can tell, the [Hyde Park] lacks procedures requiring officers to provide written notices to persons being evicted who dispute the validity of their eviction or are deprived of their chattel.

***22** (Pl's Hyde Park Opp'n 11.)

Plaintiff is unclear as to which theory of municipal liability he is invoking. Nevertheless—construing his pleadings liberally with "special solicitude" and interpreting them to raise the strongest claims that they suggest, *see Oquendo v. Quality Choice Corr. Healthcare*, No. 16-CV-1828, 2017 WL 3927293, at *3 (S.D.N.Y. Sept. 6, 2017) (citation omitted)—the Court will analyze whether Plaintiff has plausibly alleged *any* such theory, *see Atadzhanov*, 2022 WL 4331304, at *11 (listing the modes of proving a policy, custom, or practice under *Monell*).

a. Formal Policy

The Court first considers whether Plaintiff plausibly alleged the existence of a formal policy officially endorsed by Hyde Park. *See id.* As noted, Plaintiff does assert that Hyde Park "promoted the unlawful behavior of [its] police officers through *official policies* that required officers to defer to decisions of a State law enforcement officer even as such decisions constituted violations of civil rights." (Am. Comp. ¶ 80 (emphasis added); *see also id.* ¶ 72.) "[U]nder *Monell*, the terms 'official policy' and 'formal policy' are different and not interchangeable." *Clarke v. Antonini*, No. 21-CV-1877, 2022 WL 4387357, at *6 n.1 (S.D.N.Y. Sept. 22, 2022) (citing *Monell*, 436 U.S. at 690–91 (explaining that municipalities can be sued under § 1983 for an allegedly unconstitutional formal "policy statement, ordinance, regulation, or decision officially adopted and promulgated" by the municipalities' officers, as well as for "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision[-]making channels")). In other words, an official policy is not necessarily a *formal* policy for *Monell* purposes. Moreover, the Court highlights that Plaintiff at no point states that Hyde Park has a formal policy—be it a "policy statement, ordinance, regulation, or decision officially adopted and promulgated," *Monell*, 436 U.S. at 690—that is applicable to the constitutional violations he alleges in this case, (*see generally* Am. Compl.; Pl's Hyde Park Opp'n). Given the lack of factual support for his conclusory allegations, the Court cannot "infer more than the mere possibility" that there exists a formal policy in Hyde Park relevant to Plaintiff's *Monell* claim. *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 557). Indeed, the Court must disregard such threadbare, conclusory allegations.

*See* *Lowery v. City of New York*, No. 10-CV-7284, 2014 WL 2567104, at *6 (S.D.N.Y. June 6, 2014) (dismissing a pro se plaintiff's *Monell* claim for failing to allege either an underlying constitutional violation or sufficient facts beyond "boilerplate, conclusory allegations"); *Simms v. City of New York*, No. 10-CV-3420, 2011 WL 4543051, at *3 (E.D.N.Y. Sept. 28, 2011) (dismissing conclusory allegations that did not provide sufficient facts to allow the court to infer what city policies or practices led to the alleged training deficiency); *Moore v. City of New York*, No. 08-CV-8879, 2010 WL 742981, at *6 (S.D.N.Y. Mar. 2, 2010) ("Allegations that a defendant acted pursuant to a policy or custom without any facts suggesting the policy's existence, are plainly insufficient." (quotation marks omitted)). Thus, Plaintiff cannot rely on the existence of a formal Hyde Park policy to survive this aspect of the Hyde Park Defendants' Motion. [31]

b. Final Policymaker

***23** Next the Court considers whether Plaintiff plausibly alleged any "actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question." *See* *Atadzhanov*, 2022 WL 4331304, at *11. "Actions by an individual with final decision-making authority in a municipality constitute official policy for purposes of a § 1983 claim." *Anthony v. City of New York*, 339 F.3d 129, 139 (2d Cir. 2003). "An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions." *Id.* "[E]ven a single action by a decisionmaker who possesses final authority to establish municipal policy with respect to the action ordered is sufficient to implicate the municipality in the constitutional deprivation for the purposes of § 1983." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) (internal quotation marks and citation omitted). When a non-decisionmaker committed the constitutional violation "a plaintiff must allege facts suggesting that an officer with final policymaking authority ordered, ratified, or 'was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions.' " *Hu v. City of New York*, 927 F.3d 81, 105 (2d Cir. 2019) (quoting *Amnesty Am.*, 361 F.3d at 126). Here, Plaintiff has alleged *no* facts whatsoever suggesting that Torres, Ferrara, Stallone, and Tucker were final decisionmakers for Hyde Park, or that any final policymaking authority for Hyde Park ordered, ratified, or was aware of their allegedly unconstitutional actions. *See id.* (*See generally* Am. Compl.; Pl's Hyde Park Opp'n.) Thus, Plaintiff cannot rely on this theory of *Monell* liability. *See* *Guity v. Uniondale Union Free Sch. Dist.*, No. 18-CV-4369, 2019 WL 3402280, at *7–8 (E.D.N.Y. July 26, 2019) (dismissing a pro se plaintiff's *Monell* claims where she only made the "conclusory allegation" that a defendant was a policymaker, and otherwise "allege[d] no facts that demonstrate that [that defendant] or any of the other defendants were final policymakers for any official municipal policy or custom").

c. Widespread Practice

Turning to the "widespread practice" theory of *Monell* liability, *see* *Atadzhanov*, 2022 WL 4331304, at *11, to demonstrate a de facto policy or custom through a widespread practice, a plaintiff must "show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions," *Buari v. City of New York*, 530 F. Supp. 3d 356, 398 (S.D.N.Y. 2021) (quoting *Amnesty Am.*, 361 F.3d at 126). A practice can constitute a custom under *Monell* when the practice is "persistent and widespread," or "permanent and well settled as to constitute a 'custom or usage' with the force of law" and to "imply the constructive knowledge of policymaking officials." *In re N.Y.C. Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 400 (S.D.N.Y. 2021) (quoting *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870–71 (2d Cir. 1992)); *see also* *Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 532 (S.D.N.Y. 2012) (noting that to demonstrate a practice is sufficiently widespread and crystalized to constitute a custom under *Monell*, "a plaintiff must prove that the custom at issue is permanent and well-settled" (citing *Praprotnik*, 485 U.S. at 127)).

In the instant case, Plaintiff only points to the alleged constitutional deprivations that he suffered on February 13, 2020, and he entirely fails to identify any other incidents that would indicate a pattern or practice, which is insufficient to state a *Monell* claim. (*See generally* Am. Compl.; Pl's Hyde Park Opp'n.) *See* *McKeefry v. Town of Bedford*, No. 18-CV-10386, 2019 WL 6498312, at *4 (S.D.N.Y. Dec. 2, 2019) ("Plaintiff's opposition claims that the [complaint] 'clearly shows the pattern, practice or custom employed by [the d]efendants,' ... but she provides facts only about her case, which is insufficient to show a pattern, practice, policy or custom."); *see also* *Barkai v. Nuendorf*, No. 21-CV-4060, 2023 WL 2691712, at *35 (S.D.N.Y. Mar.


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

29, 2023) (explaining that the pro se plaintiff had "not point[ed] to any instance of [the defendant-county] allegedly implementing th[e alleged] widespread practice beyond his own case" and that that "alone would be fatal to Plaintiff's *Monell* claim"); *Aragon v. New York*, No. 14-CV-9797, 2017 WL 2703562, at *6 (S.D.N.Y. June 22, 2017) (dismissing claims where the pro se "[p]laintiff seem[ed] to allege the existence of a practice adopted by the [municipal defendant] solely based on [the p]laintiff's alleged experience"); *Gordon v. City of New York*, No. 10-CV-5148, 2012 WL 1068023, at *4 (E.D.N.Y. Mar. 29, 2012) (dismissing *Monell* claim where the pro se plaintiff's "allegation [was] unsupported by anything other than the facts of what occurred in his particular case" (citations omitted)); *cf. D'Alessandro v. City of New York*, 713 F. App'x 1, 10 (2d Cir. 2017) (summary order) (finding that the plaintiff "[did] not sufficiently allege a pattern of similar constitutional violations by the [defendant]" because he "never mention[ed] specific instances of prosecutorial misconduct beyond [his] own case"). Moreover, to the degree that the Officer Defendants' actions on February 13, 2020, led to a violation of Plaintiff's constitutional rights, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by [ ] mere employee[s] of the municipality." *Sagaria v. Orange Cnty. Jail*, No. 20-CV-2287, 2021 WL 4392422, at *8 n.11 (S.D.N.Y. Sept. 24, 2021); *accord Boykins v. Lopez*, No. 21-CV-2831, 2022 WL 2307684, at *7 (S.D.N.Y. June 27, 2022) ("Plaintiff's claim is based on a *single* incident of [the defendants'] failure to follow protocol, which generally is insufficient to establish a *Monell* claim." (emphasis in original) (citation omitted)); *see also Fernandez v. N.Y.C. Dep't of Corr.*, No. 08-CV-4294, 2010 WL 1222017, at *6 (S.D.N.Y. Mar. 29, 2010) ("[The] [p]laintiff appears to allege a single, isolated episode of misconduct by correction officers ... in failing to adequately provide for his safety and medical needs. Thus, [the] [p]laintiff's claim for municipal liability must be dismissed."); *cf. Brogdon*, 200 F. Supp. 2d at 427 ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation."). Thus, insofar as he relies on a "widespread practice" theory of *Monell* liability, such reliance is unavailing. *See Pettiford v. City of Yonkers*, No. 14-CV-6271, 2021 WL 2556172, at *12 (S.D.N.Y. June 21, 2021) ("Pleadings articulating only isolated instances of unconstitutional behavior do not plausibly allege a well-settled custom.").

d. Failure to Train or Supervise

***24** Finally, the Court considers whether Plaintiff plausibly alleged "a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *See Atadzhanov*, 2022 WL 4331304, at *11 (quotation marks omitted). A failure to train constitutes a policy or custom that is actionable under § 1983 only where "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390. The Second Circuit has held that a finding of deliberate indifference requires: (1) "that a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "that the wrong choice by the ... employee will frequently cause the deprivation of a citizen's constitutional rights." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (alteration in original) (quoting *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

Similarly, "[t]o establish *Monell* liability premised on a failure to supervise, a plaintiff must plead that (1) there was a pattern of allegations of or complaints about, or a pattern of actual, similar unconstitutional activity, and (2) the municipality consistently failed to investigate those allegations." *Lopes v. Westchester County*, No. 18-CV-8205, 2020 WL 1445729, at *5 (S.D.N.Y. Mar. 25, 2020). Alternatively, "a plaintiff may plead (1) that there was a pattern of actual similar constitutional violations and (2) the municipality consistently failed to discipline those involved." *Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *21 (S.D.N.Y. Mar. 26, 2015) (emphasis omitted). To establish deliberate indifference for a failure to supervise and/or discipline claim, the plaintiff must show that "the need for more or better supervision to protect against constitutional violations was obvious," which may be established "through proof of repeated complaints of civil rights violations ... if

the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Buari*, 530 F. Supp. 3d at 400 (quoting *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)).

As to training, Plaintiff's claim fails because he has not alleged any specific training deficiency. *See Taranto v. Putnam County*, No. 21-CV-2455, 2023 WL 6318280, at *19 (S.D.N.Y. Sept. 28, 2023) (dismissing the plaintiff's *Monell* claim because, insofar as it sounded in a failure-to-train theory, "they ha[d] not alleged a specific training deficiency"); *see also Tieman*, 2015 WL 1379652, at *22 ("[A] plaintiff must plausibly allege a *specific* deficiency in the municipality's training." (emphasis added)). Moreover, to the extent Plaintiff's *Monell* claim is based on a failure to supervise, the Court again points out that Plaintiff has *not* alleged that there was a "pattern of allegations of or complaints about, or a pattern of actual, similar unconstitutional activity." *Lopes*, 2020 WL 1445729, at *5; *see also Tieman*, 2015 WL 1379652, at *21 (similar); *see also supra* Section II.B.4.c (explaining that, beyond the allegations relating to his own experience on February 13, 2020, Plaintiff has not identified any other incidents that would indicate a pattern of similar unconstitutional activity).

Accordingly, the Court dismisses Plaintiff's *Monell* claim because, as set forth above, it fails for multiple, independent reasons. *See Jackson v. Westchester County*, No. 18-CV-7207, 2019 WL 3338020, at *4 (S.D.N.Y. July 25, 2019) (dismissing a *Monell* claim where the plaintiff failed to "allege the existence of any policy, any actions taken or decisions made by any ... policymaking officials, any systemic failures to train or supervise, or any practices so widespread that they practically have the force of law" and failed to "provide any factual details regarding ... other [purported] lawsuits and grievances" on similar issues, and collecting cases).

5. State Claims

***25** As noted, Plaintiff raises a number of claims under New York state law, including unlawful detainer, unlawful eviction, conversion, false arrest, unlawful seizure of Plaintiff's person and property, negligence, and intentional and negligent infliction of emotional distress. (Am. Compl. 9–10; Pl's Schulhoff Opp'n 22–24; Pl's Hyde Park Opp'n 22–24.)

The Court has "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *See* 28 U.S.C. § 1367(a). Because certain federal claims survive the instant Motions, the Court may decide to exercise supplemental jurisdiction over the state law claims against Defendants, provided they "derive from a common nucleus of operative fact[s]." *Masciotta v. Clarkstown Cent. Sch. Dist.*, 136 F. Supp. 3d 527, 547 (S.D.N.Y. 2015) (alteration in original) (citation omitted); *accord Kaplan v. County of Orange*, 528 F. Supp. 3d 141, 171 (S.D.N.Y. 2021). Here, Plaintiff's federal-and state-law claims all arise out of a common nucleus of operative facts—namely, the alleged events at the Residence involving the Officer Defendants on February 13, 2020. The Court will therefore exercise jurisdiction over Plaintiff's state law claims.

Beyond Defendants' principal (and now-fruitless) argument that, to the extent Plaintiff's federal-law claims are all dismissed, the Court should decline to exercise supplemental jurisdiction over Plaintiff's state-law claims, (*see* Schulhoff Mem. 24; Hyde Park Defs' Mem. 16), Schulhoff independently contends that he is immune from Plaintiff's state claims, (Schulhoff Mem. 23–24; Schulhoff Reply 15). More specifically, Schulhoff asserts that "the [New York] common law doctrine of governmental immunity shields [him] from liability for discretionary actions taken during the performance of governmental functions." (Schulhoff Mem. 23.)

The doctrine of governmental immunity under New York law is "an affirmative defense on which [Schulhoff] bears the burden of proof." *Villar v. Howard*, 64 N.E.3d 280, 283 (N.Y. 2016). Further, the New York Court of Appeals has made clear that "resolution of [a] defendant's argument that he is entitled to governmental immunity ... is not appropriate at th[e pleading] stage of the proceedings." *Id.*; *accord Maldonado v. Town of Greenburgh*, 460 F. Supp. 3d 382, 401 (S.D.N.Y. 2020). With that in mind—and noting Schulhoff's rather meager briefing of this issue, *see Piotrowski v. Rocky Point Union Free Sch. Dist.*, No. 18-CV-6262, 2023 WL 2710341, at *13 (E.D.N.Y. Mar. 30, 2023) (holding, where the party had only made passing references to its argument in its briefing, that the party's argument was "so underdeveloped that the Court deem[ed] it waived" (citation omitted))—the Court declines to hold, as a matter of law, that Schulhoff is immune from suit under New York's common law doctrine of governmental immunity at this early stage of the case.

III. Conclusion

For the foregoing reasons, the Court grants in part and denies in part Defendants' Motions To Dismiss. Specifically, the Court dismisses: (1) Plaintiff's Fourth Amendment claims relating to the Officer Defendants' searches of the Residence and Plaintiff's van; (2) Plaintiff's Fourth Amendment claim arising out of his temporary detention in the Residence *as against Schulhoff only*; and (3) Plaintiff's *Monell* claim against Hyde Park. Thus, Plaintiff's Fourteenth Amendment due process claims relating to his removal from the Residence and his depravation of his personal property, along with Plaintiff's state-law claims, survive Defendants' Motions. Further, Plaintiff's Fourth Amendment claim arising out of his temporary detention in the Residence remains alive as against the Hyde Park Defendants.

***26** Because this is the second adjudication of Plaintiff's claims on the merits, the claims dismissed herein—except for Plaintiff's Fourth Amendment claim relating to his temporary detention in the Residence as against Schulhoff —are dismissed *with prejudice*. *See* *Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978) (holding that the plaintiff was not entitled to "a third go-around"); *see also* *Melvin v. County of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at *24 n.19 (S.D.N.Y. Mar. 29, 2016) (granting motion to dismiss with prejudice where "[the p]laintiff has already had two bites at the apple, and they have proven fruitless" (alteration adopted and quotation marks omitted)); *see also* *Chavez*, 2022 WL 1487781, at *7 (same). However, with respect to Plaintiff's Fourth Amendment claim relating to his temporary detention in the Residence as against Schulhoff, in light of Plaintiff's pro se status and because this is the first adjudication of that claim on the merits, that claim is dismissed *without prejudice*. If Plaintiff wishes to file a second amended complaint, alleging additional facts and otherwise addressing the deficiencies identified above regarding his Fourth Amendment claim relating to his temporary detention in the Residence, Plaintiff must do so within 30 days of the date of this Order. There will be *no extensions*. The second amended complaint will replace, not supplement, the original and first amended complaint. The second amended complaint must therefore contain all of the claims, defendants, and factual allegations that Plaintiff wishes the Court to consider. The failure to timely file a second amended complaint may result in the dismissal of that claim with prejudice.

The Court will hold a telephonic status conference for this case on May 7, 2024, at 11:00 a.m.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 1210941

## Footnotes

1 Hyde Park, Torres, Ferrara, Stallone, and Tucker will be collectively referred to herein as the "Hyde Park Defendants."

2 The Court cites to the ECF-stamped page number at the upper right-hand corner of all documents, unless otherwise noted.

3 Although Schulhoff's Notice of Motion states that he is seeking to dismiss the Amended Complaint pursuant to Rule 12(b)(1) as well, (*see* Schulhoff Not. of Mot. 1), it does so in a boilerplate fashion and, in addition, Schulhoff fails to argue in his papers that the Court should dismiss this case for lack of subject matter jurisdiction, (*see generally* Mem. of Law in Supp. of Mot. To. Dismiss ("Schulhoff Mem.") (Dkt. No. 48); *see also id.* at 11 (merely listing the standard of review for Rule 12(b)(1) motions)). *See* Fed. R. Civ. P. 12(b)(1). In any event, the Court is satisfied that—at this juncture—it has subject matter jurisdiction over this Action, which was brought in large part pursuant to § 1983. *See* 28 U.S.C. § 1331 (providing that "district courts

shall have original jurisdiction of all civil actions arising under[, among other things] the ... laws[ ] ... of the United States[ ]").

4 Having closely reviewed Plaintiff's Opposition briefs, the Court notes that they are virtually identical to one another. (*Compare* Pl's Schulhoff Opp'n, *with* Pl's Hyde Park Opp'n.) Thus, for the sake of clarity and concision, the Court will, in general, cite only to Plaintiff's Opposition to Schulhoff's Motion for factual propositions.

5 Plaintiff asserts in his Opposition briefing that Sharon suggested Plaintiff could "rent a room" in the Residence. (Pl's Schulhoff Opp'n 3.)

6 Plaintiff also "made himself available on an as-needed basis as a care-taker [sic], a handyman[,] and a friend." (Am. Compl. ¶ 16.)

7 Plaintiff alleges that Sharon died intestate, such that her entire estate passed to Jules as her sole heir. (Am. Compl. ¶ 22.) He also states that immediately after Sharon's death, Janet "began asserting that she was the administrator of Sharon's [e]state." (Pl's Schulhoff Opp'n 4.)

8 With regard to security, Kenny family members went so far as to install security cameras on the outside of the Residence, telling Plaintiff it was for his protection. (Am. Compl. ¶ 24.)

9 Plaintiff alleges that when Jules died, his will named a trust as the sole beneficiary of his estate, including the Residence, and that Debra was the sole trustee of the estate, such that Janet was neither a beneficiary under, nor the executor of, Jules' will. (Am. Comp. ¶ 28.)

10 In his Opposition briefing, Plaintiff asserts that Janet called both "the New York State Police and the Hyde Park Police." (Pl's Schulhoff Opp'n 6.)

11 With the exception of Schulhoff, Plaintiff does not identify any of the other Officer Defendants by name in connection with his factual allegations. (*See generally* Am. Compl.; Pl's Schulhoff Opp'n.)

12 Plaintiff alleges that, at one point, either Torres, Ferrara, Stallone, or Tucker, "threatened Plaintiff's wife with handcuffing when she got up to use the restroom and check on the laundry[.]" (Am Compl. ¶ 42.)

13 Indeed, Plaintiff alleges that the Officer Defendants knew "[he] had at some time legally occupied the Residence because Janet had told them that [he] and his wife had formerly cared for her father at the Residence and were in possession of their own key" and, moreover, that "[t]here was abundant evidence that [he] had been occupying the Residence openly and for an extended period of time[.]" (Am. Compl. ¶ 39.)

14 Plaintiff alleges that the Officer Defendants "offered their opinion that it looked like Plaintiff was planning on taking items from the [Residence] because he had an empty bucket in his van." (Am. Compl. ¶ 54.) He further asserts that his van "was clearly a construction van—basically a giant toolbox"—containing "power tools, boxes of screws and nails, hammers, [and] screwdrivers," among other things. (Pl's Schulhoff Opp'n 9.)

15 However, "despite repeated requests to the Kennys and the police, Plaintiff[ ] has never recovered his tools." (Am. Compl. ¶ 53.)

16 Plaintiff alleges that, in January 2022, a New York State Trooper called and directed Plaintiff to stop contacting Janet or Debra to recover his property. (Am. Compl. ¶ 63.). It is unclear whether or not the Trooper was Schulhoff.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

17 The Court assumes the Parties' familiarity with the procedural history of this case as described in its prior Opinion & Order, (*see* March 2023 Op. 8–9), and will therefore recount only the procedural background relevant to the instant Motions.

18 A duplicate version of the Schulhoff Opposition also appears on the docket. (*See* Dkt. No. 59.)

19 The Hyde Park Defendants have not moved to dismiss Plaintiff's newly alleged claim that he was seized in violation of the Fourth Amendment during the events of February 13, 2020. (*See generally* Hyde Park Defs' Mem.; Hyde Park Defs' Reply.) The Court assumes that this was a strategic decision on the part of counsel for the Hyde Park Defendants.

20 Schulhoff withdrew his personal-involvement argument on Reply. (*See* Schulhoff Reply 6 n.1.)

21 In response to Plaintiff's procedural due process claim relating to his removal from the Residence, Schulhoff also asserts that "Plaintiff should be precluded from relitigating this [issue], under the doctrines of collateral estoppel or 'the law of the case.' " Schulhoff Reply 11–12. As an initial matter, only "[t]he doctrine of the law of the case, rather than ... collateral estoppel, [would] appl[y] in a case, such as this one, where there has been no final judgment." *State Farm Mut. Auto. Ins. Co. v. Mallela*, No. CV-00-4923, 2002 WL 31946762, at *8 (E.D.N.Y. Nov. 21, 2002); *see also* *Bifolck v. Philip Morris USA Inc.*, 936 F.3d 74, 80 (2d Cir. 2019) (noting that, inter alia, "a valid and final judgment on the merits" is a required condition to invoke the doctrine of collateral estoppel). With respect to the law of the case doctrine, in certain circumstances, that doctrine may be invoked in this context, *see*, *e.g.*, *Chavez v. Gutwein*, No. 20-CV-342, 2022 WL 1487781, at *7 (S.D.N.Y. May 11, 2022) (collecting cases), but "where, as here, a plaintiff has filed an amended complaint following an earlier ruling, the law of the case doctrine does not apply to the extent that the plaintiff has offered new claims or factual allegations," *Streamlined Consultants, Inc. v. EBF Holdings, LLC*, No. 21-CV-9528, 2023 WL 5835748, at *6 (S.D.N.Y. Sept. 8, 2023) (alteration adopted and quotation marks omitted). And, in any event, the Court did not *hold* that Plaintiff was *in fact* a licensee, but rather concluded that, the facts *as alleged* in Plaintiff's initial Complaint only tended to show that he was licensee, and did not plausibly plead that he was a tenant.

22 Put another way, the Amended Complaint plausibly alleges that the "manifest intention of the parties," here Plaintiff and various Kenny family members, was for Plaintiff to be a tenant at the Residence. *Am. Jewish Theatre*, 610 N.Y.S.2d at 257.

23 Notwithstanding this holding, the Court is not convinced by Plaintiff's reliance on N.Y. Real Prop. Acts. Law § 711. (*See* Pl's Schulhoff Opp'n 23; Pl's Hyde Park Opp'n 23.) That provision states: "A tenant shall include an occupant of one or more rooms in a *rooming house* or a resident, not including a transient occupant, of one or more rooms in a *hotel* who has been in possession for thirty consecutive days or longer." N.Y. Real Prop. Acts. Law § 711 (emphases added). Nowhere in his submissions has Plaintiff mentioned—much less plausibly alleged—that the Residence is a "rooming house" or "hotel" under New York law.

24 Notwithstanding the Hyde Park Defendants' decision to frame their argument in terms of "exhaustion," the Court notes that, in general, "exhaustion of state remedies 'is *not* a prerequisite to an action under § 1983.' " *Heck v. Humphrey*, 512 U.S. 477, 480 (1994) (emphasis in original) (quoting *Patsy v. Bd. of Regents*, 457 U.S. 496, 501 (1982)); *see also* *Susser v. N.Y.C. Dep't of Educ.*, No. 22-CV-51, 2023 WL 3765006, at *4 n.2 (E.D.N.Y. June 1, 2023) (same). Thus, Plaintiff's failure to take advantage of available post-deprivation remedies as discussed herein "does not impose a procedural bar." *Susser*, 2023 WL 3765006, at *4 n.2.

25 Notably, Defendants' arguments for dismissal as to this claim all rely on or mirror the Court's March 2023 Opinion dismissing the original, now-superseded Complaint. (*See* Schulhoff Mem. 19–20; Hyde Park Defs' Mem. 9–10; Schulhoff Reply 9–11; *see also* March 2023 Op. 33 (granting leave to replead and explaining

that any amended complaint would "replace, not supplement" the initial Complaint).) Accordingly, Defendants offer no rebuttal to Plaintiff's allegation that his claim is subject to the more exacting standard applicable to claims based on established state procedures. *See* *HANAC*, 101 F.3d at 880.

26 The Second Circuit has also explained that "[w]hether [an individual] qualifie[s] as a tenant or sublessee is not determinative. Possessory interests defined in the common law, while sometimes helpful, contain distinctions that are largely historical and do not control the Fourth Amendment inquiry." *Fields*, 113 F.3d at 320 (citing *Jones v. United States*, 362 U.S. 257, 266 (1960)).

27 In light of this holding, the Court need not, and will not, re-address the difficult question of whether Janet had actual authority over the Residence. (*See* March 2023 Op. 25–26.)

28 Although Schulhoff suggests that Plaintiff may also be asserting a claim under the Fourth Amendment for the search of his *wife's* car, (*see* Schulhoff Mem. 14–16), the Court will not construe the Amended Complaint to raise such a claim, which would implicate standing issues that the Parties have not mentioned, let alone raised for the Court's consideration.

29 Moreover, Plaintiff's reliance on *Triolo v. Nassau County*, 24 F.4th 98 (2d Cir. 2022) is misplaced. (Pl's Schulhoff Opp'n 17; Pl's Hyde Park Opp'n 17.) In *Triolo*, the Second Circuit affirmed the district court's conclusion that a jury had properly found an absence of probable cause under the circumstances of that case. *Triolo*, 24 F.4th at 107. There, purported assault victims "signed sworn statements attesting to [an] alleged assault," but the alleged victims "had [no] visible injuries after allegedly being grabbed, choked, or punched," there was a relevant domestic incident report, which indicated that "no offence was committed," and a law enforcement officer ignored photographic evidence that undermined the assault allegations. *Id.* at 106–07 (alteration adopted). Thus, the Second Circuit stated that the officer "was not free to disregard the plainly exculpatory evidence that was presented to him." *Id.* at 107. Here, by contrast, Plaintiff does not point to such resoundingly clear exculpatory evidence; instead, he merely points to Janet's lack of specific knowledge regarding the allegedly stolen items—which is not entirely surprising given that she was in Florida—the fact that he and his wife were handling groceries and appeared to be doing laundry, and Janet's mistaken (or false) allegation regarding Plaintiff removing items from the shed. (Pl's Schulhoff Opp'n 6–7, 18–19; Pl's Hyde Park Opp'n 6–7, 18–19.) These facts were insufficient to negate probable cause. *See* *Panetta*, 460 F.3d at 395–96 ("The fact that an innocent explanation may be consistent with the facts alleged ... does not negate probable cause ...." (quotation marks, citation, and alteration omitted)); *see also* *Mittelman*, 2013 WL 1248623, at *11 (concluding that it was reasonable for police to rely on witness reports that later turned out to be false).

30 In light of the holdings herein, the Court need not consider Defendants' claims of qualified immunity.

31 Plaintiff does assert that Hyde Park "lacks procedures requiring officers to provide written notices to persons being evicted who dispute the validity of their eviction or are deprived of their chattel." (Pl's Hyde Park Opp'n 11.) However, an alleged absence of a formal policy "is not a policy and is not actionable under *Monell*." *Zachary v. City of Newburgh*, No. 13-CV-5737, 2014 WL 1508705, at *5 (S.D.N.Y. Apr. 1, 2014) (citing *Monell*, 436 U.S. at 690–91); *see also* *Quinones v. New York City*, No. 19-CV-5400, 2020 WL 5665142, at *19 (S.D.N.Y. Aug. 17, 2020) ("[B]ut, under *Monell*, a municipality's failure to put a formal policy in place to prevent unlawful conduct is not the same thing as an actionable policy." (citation omitted)), *report and recommendation adopted*, No. 19-CV-5400, 2020 WL 6901340 (S.D.N.Y. Nov. 23, 2020). "Nonetheless, the Supreme Court has left a narrow opening for § 1983 claims like the one [the Court] address[es] here seeking liability based not on affirmative conduct but on a government official's failure to act." *Reynolds v. Giuliani*, 506 F.3d 183, 191–92 (2d Cir. 2007) (citing *City of Canton*, 489 U.S. at 394–95 (O'Connor, J., concurring in part and dissenting in part) ("Where ... a claim of municipal liability is predicated upon a failure to act, the requisite degree of fault must be shown by proof of background events and circumstances which establish that the 'policy of inaction' is the functional equivalent of a decision by the city itself to violate the Constitution.")).

When a municipality "does not have an adequate policy ... *Monell* liability exists 'where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Fraser v. City of New York*, No. 20-CV-4926, 2021 WL 1338795, at *10 (S.D.N.Y. Apr. 9, 2021) (quoting *Reynolds*, 506 F.3d at 192). "Such a pattern, if sufficiently persistent or widespread as to acquire the force of law, may constitute a policy or custom within the meaning of *Monell*." *Id.* As discussed *infra*, however, Plaintiff does not state a claim under this category of *Monell* liability.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 1445729
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Christopher LOPES, Plaintiff,
v.
WESTCHESTER COUNTY, et al., Defendants.

No. 18-CV-8205 (KMK)
|
Signed 03/25/2020

**Attorneys and Law Firms**

Christopher Lopes, Malone, NY, Pro se Plaintiff.

Thomas J. Bracken, Esq., Bennett, Bricklin & Saltzburg, LLC, New York, NY, Counsel for Defendant Aramark Correctional Services, LLC.

OPINION & ORDER

KENNETH M. KARAS, United States District Judge:

***1** Pro se Plaintiff Christopher Lopes ("Plaintiff"), currently incarcerated at Franklin Correctional Facility ("Franklin"), brings this Action, pursuant to 42 U.S.C. § 1983, against Westchester County, Aramark Correctional Services, LLC ("Aramark," or "Moving Defendant"), Joseph K. Spano ("Spano"), Warden Frances Delgrosso ("Delgrosso"), and Sergeant Martinez ("Martinez"; collectively, "Defendants"), alleging violations of his constitutional rights under the First, Eighth, and Fourteenth Amendments. (*See* Compl. (Dkt. No. 2).)[1] Before the Court is Aramark's Motion To Dismiss the Complaint (the "Motion"), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Moving Def.'s Not. of Mot. ("Not. of Mot.") (Dkt. No. 23).) For the reasons explained herein, Moving Defendant's Motion is granted.

## I. Background

### A. Factual Background

The following facts, drawn from Plaintiff's Amended Complaint, are assumed to be true for the purposes of this Motion. According to Plaintiff, the alleged incidents occurred at Westchester County Department of Correction ("WCDOC"), beginning on July 25, 2018 and continuing through the present. (Compl. 2.)[2]

On July 25, 2018, while Plaintiff was "confined to 3SW of the ... [WCDOC]," Plaintiff received a breakfast that "smelled horrible." (*Id.* at 4.) There were "several spots of black mold" on the tray, and plastic peeled from the tray into Plaintiff's food whenever he took a bite. (*Id.*) The following day, Plaintiff attempted to file a grievance about the meal with Martinez, but Martinez refused to accept it, instead responding that he did not "deal with bull shit" and instructing Plaintiff to save his "grievance shit" for a different sergeant, "like Scott." (*Id.*) On July 29, 2018, Plaintiff received a food tray that was covered in "puddles of molded water," which Plaintiff thought had come from the tray that was stacked on top of his. (*Id.*) Plaintiff asked to replace the tray, but his request was denied. (*Id.*) On July 30, 2018, Plaintiff noticed that his juice container was "covered in black mold," and, as a result, he was unable to drink from it. (*Id.*) On the same day, Plaintiff received undercooked and "raw" meat, and when he asked for a replacement meal, he was told that he could cook the meat in the microwave. (*Id.* at 5.) Plaintiff attempted to file another grievance with Martinez, but Martinez again refused to accept it, calling Plaintiff a "cry baby" and telling him that he would not accept grievances related to Aramark. (*Id.*) According to Plaintiff, he receives undercooked meat four to five times a week, and despite complaining, does not receive new meals. (*Id.*)

***2** On August 5, 11, 16, 24, and 29, 2018, Plaintiff found human hair in his food. (*Id.*) Plaintiff alleges that "inmate workers" comb or pick their hair near the "food preparation table," do not wear gloves or hairnets, and are not supervised when they prepare meals. (*Id.*) On these dates, Plaintiff complained about his food, but he was not provided with replacement meals. (*Id.*) Instead, Martinez told Plaintiff that because Plaintiff liked to complain, he would go "to the old jail." (*Id.*) Plaintiff also alleges that on August 29, 2018, he tried to submit three grievances to Martinez, but Martinez again refused to accept the grievances, citing a "policy that prohibits him from accepting" them. (*Id.* at 8.) Subsequently, Plaintiff was transferred to the "old jail 1-East housing unit," which according to Plaintiff, is a "form of punitive segregation" to which "countless inmates ... disliked by the administration" are sent without receiving disciplinary hearings. (*Id.* at 5–6.) For example, when an inmate receives a disciplinary report, he is sent to the "old jail or pen" and is "placed on keeplock pending a hearing." (*Id.* at 6.) Thus, in Plaintiff's view, this housing unit is "a form of discrimination

and liberty interest due process violations because other section[s] of the jail are not confined to this magnitude.” (*Id.* at 5.)

On August 3 and 31, 2018, Plaintiff found a used band-aid and a hard piece of plastic in his food. (*Id.* at 6.) He asked for a replacement meal, which was denied. More generally, Plaintiff's trays “always contained old food” and leftovers from previous meals due to improper cleaning, which caused Plaintiff to become sick on five occasions. (*Id.*) Plaintiff has suffered from nausea, diarrhea, stomach cramps, vomiting, headaches, “shakes,” blurred vision, dehydration, and a “fatigued feeling through[out] the day” as a result of the food at WCDOC. (*Id.* at 3.) Plaintiff claims that Delgrosso and Spano have directed supervisors not to accept grievances related to Aramark, even though Delgrosso and Spano have received notice about the conditions of the food at WCDOC because they have been named in “dozens of food[-]related grievances and lawsuits,” and because these Defendants “personally investigate and respond to all food[-]related grievances.” (*Id.* at 7.) According to Plaintiff, Aramark and Westchester County have been named in approximately 60 similar federal lawsuits, but they continue to fail to remedy the situation. (*Id.*) Plaintiff seeks $10,000,000 in compensatory damages and $20,000,000 in punitive damages. (*Id.* at 9.)

B. Procedural Background

Plaintiff filed his Complaint on September 6, 2018. (*See* Compl.) Plaintiff's request to proceed in forma pauperis (“IFP”) was granted on October 15, 2018. (Dkt. No. 5.) On October 18, 2018, the Court directed service on Defendants. (Dkt. No. 7.) After receiving an extension to file a response to the Complaint, (Dkt. No. 18), Moving Defendant filed a Pre-Motion Letter on January 22, 2019, pursuant to the Court's individual rules, (Dkt. No. 19), and the Court set a briefing schedule for Defendant's Motion, (Dkt. No. 22). On March 8, 2019, Moving Defendant filed the instant Motion. (Not. of Mot.; Moving Def.'s Mem. of Law in Supp. of Mot. (“Def.'s Mem.”) (Dkt. No. 24).) On March 28, 2019, counsel for Moving Defendant informed the Court that the Motion had been sent to Plaintiff at the wrong correctional facility. (Dkt. No. 27.) Moving Defendant re-sent the Motion and related documents to Plaintiff at Franklin but received the envelope back on March 27, 2019 due to a problem with the inmate identification number on the mailing. (*Id.*) Moving Defendant once again re-sent the Motion and related documents on March 28, 2019, using the correct inmate number. (*Id.*) Plaintiff did not file a response in opposition to Moving Defendant's Motion, and, therefore, Moving Defendant did not file a reply. The Court now deems the Motion fully submitted.

## II. Discussion

A. Standard of Review

The Supreme Court has held that although a complaint “does not need detailed factual allegations” to survive a motion to dismiss, “a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.” *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure “demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.” *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). “Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.” *Id.* (alteration and quotation marks omitted). Instead, a complaint's “[f]actual allegations must be enough to raise a right to relief above the speculative level.” *Twombly*, 550 U.S. at 555. Although “once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint,” *id.* at 563, and a plaintiff must allege “only enough facts to state a claim to relief that is plausible on its face,” *id.* at 570, if a plaintiff has not “nudged [his or her] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed,” *id.*; *see also* *Iqbal*, 556 U.S. at 679 (“Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not ‘show[n]’—'that the pleader is entitled to relief.’ ” (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2)); *id.* at 678–79 (“Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.”).

***3** In considering Moving Defendant's Motion, the Court is required to “accept as true all of the factual allegations contained in the [C]omplaint.” *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also* *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). And, the Court must “draw[ ] all reasonable inferences in favor of the plaintiff.” *Daniel*

*v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Where, as here, a plaintiff proceeds pro se, the Court must "construe[ ] [his complaint] liberally and interpret[ ] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedure and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and quotation marks omitted)).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted). However, when the complaint is drafted by a pro se plaintiff, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including "documents either in [the] plaintiff[']s possession or of which [the] plaintiff[ ] had knowledge and relied on in bringing suit," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quotation marks omitted).

B. Analysis

Moving Defendant argues, among other things, that Plaintiff fails to state a *Monell* claim against Aramark. (Def.'s Mem. 8–10.)[3] "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citation omitted). The fifth element reflects the notion that a *Monell* defendant "may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cty. Comm'rs, Okl. v. Brown*, 520 U.S. 397, 403 (1997); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (holding that a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior" (citation and italics omitted)). Rather, "municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right." *Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008).

***4** A plaintiff may satisfy the "policy, custom[,] or practice" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations and quotation marks omitted); *see also Patterson v. County of Oneida*, 375 F.3d 206, 227–28 (2d Cir. 2004) (describing methods of establishing *Monell* liability). Moreover, a plaintiff must also establish a causal link between the municipality's policy, custom, or practice and the alleged constitutional injury. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 n.8 (1985) ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a *constitutional* violation. There must at least be an affirmative link between[, for example,] the training inadequacies alleged, and the particular constitutional violation at issue." (emphasis in original)); *see also Simms v. City of New York*, 480 F. App'x 627, 629 (2d Cir. 2012) (finding that the plaintiff "must 'demonstrate

that, through its deliberate conduct, the [entity] itself was the moving force behind the alleged injury' " (citation and alteration omitted)). Thus, Plaintiff cannot merely allege the existence of a policy or custom but "must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." *Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012) (citation omitted).

To the extent Plaintiff alleges that Moving Defendant endorsed or established a policy prohibiting inmates from filing Aramark-related grievances, this claim fails. The Complaint alleges that Delgrosso and Spano, non-Aramark Defendants, created the policy and directed supervisors not to accept "Aramark food[-]related grievances." (Compl. 7.) Plaintiff makes no allegations that Moving Defendant was involved in devising or implementing this policy, or had an independent ability to accept or refuse grievances. Further, beyond generally stating that Moving Defendant has been named in other federal lawsuits for "similar conduct," (*id.*), Plaintiff does not detail what that conduct is, and does not allege that Moving Defendant knew about the grievance policy at WCDOC. These allegations are insufficient to allege that an Aramark policy was "the 'moving force' behind a constitutional violation." *See Ackridge v. Aramark Corr. Food Servs.*, No. 16-CV-6301, 2018 WL 1626175, at *13 (S.D.N.Y. Mar. 30, 2018) (finding that the plaintiff did not demonstrate the existence of an Aramark policy or custom because the plaintiff alleged that WCDOC was responsible for the policy at issue and did not allege that Aramark was involved in WCDOC policies and procedures or knew of related constitutional violations).

***5** Liberally construed, Plaintiff also seeks to establish *Monell* liability based on the third and fourth prongs set forth in *Brandon*. However, Plaintiff "does not [sufficiently] allege the existence of any policy, any actions taken or decisions made by any Aramark policymaking officials, any systemic failures to train or supervise, or any practices so widespread that they practically have the force of law." *Jackson v. Westchester County*, No. 18-CV-7207, 2019 WL 3338020, at *4 (S.D.N.Y. July 25, 2019) (record citation omitted). Plaintiff alleges that the food workers are "not supervised when preparing meals," that they do not wear gloves or hairnets, and that they "comb[ ] or pick[ ]" their hair near the food preparation area. (Compl. 5.) However, Plaintiff's Complaint does not contain sufficient factual matter to state a claim against Moving Defendant for failure to supervise. Although "[a] municipality's failure to properly train [and/or supervise] its employees can under certain circumstances give rise to *Monell* liability, ... a claim based on this theory must still be properly pled under *Iqbal*." *Simms v. City of New York*, No. 10-CV-3420, 2011 WL 4543051, at *2 (E.D.N.Y. Sept. 28, 2011) (citation and footnote omitted), *aff'd*, 480 F. App'x 627 (2d Cir. 2012). "To establish *Monell* liability premised on a failure to supervise, a plaintiff must plead that (1) there was a pattern of allegations of or complaints about, or a pattern of actual, similar unconstitutional activity, and (2) the municipality consistently failed to investigate those allegations." *Treadwell v. County of Putnam*, No. 14-CV-10137, 2016 WL 1268279, at *4 (S.D.N.Y. Mar. 30, 2016) (citation omitted); *see also Johnson v. City of New York*, No. 06-CV-9426, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (explaining that a plaintiff may demonstrate the existence of a custom or policy by alleging "a failure by policymakers to provide adequate ... supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees" (citations and footnote omitted)).

Here, Plaintiff has not pled facts sufficient to establish inadequate supervision, amounting to deliberate indifference, by Moving Defendant. First, Plaintiff does not allege *who* failed to supervise the food workers; thus, it is not even clear that this claim applies to Moving Defendant. Second, Plaintiff does not detail any other facts to suggest that Moving Defendant lacks "a relevant training or supervisory program," or that it "was otherwise deliberately indifferent to food preparation problems." *Quick v. Westchester County*, No. 18-CV-243, 2019 WL 1083784, at *5 (S.D.N.Y. Mar. 7, 2019) (dismissing *Monell* claim where the plaintiff alleged a failure to supervise kitchen workers who did not wear hairnets, among other shortcomings, because the complaint was "devoid of any detailed factual allegations" about WCDOC's lack of training or supervisory program or its deliberate indifference to food preparation); *see also Rivera v. Westchester County*, No. 18-CV-8354, 2019 WL 3958425, at *5 (S.D.N.Y. Aug. 22, 2019) (finding that the plaintiff's claim that Aramark failed to train and supervise its staff was a "boilerplate assertion" and that the plaintiff had "cited no specific deficiency in Aramark's training or supervision protocols" (citation, alteration, and quotation marks omitted)); *Mercedes v. Westchester County*, No. 18-CV-4087, 2019 WL 1429566, at *4–5 (S.D.N.Y. Mar. 29, 2019) (dismissing *Monell* claim against Aramark where the plaintiff did not allege, inter alia, any systemic failures to train or supervise).

Further, although under some circumstances, a plaintiff may be able to establish a municipal defendant's deliberately indifferent failure to supervise by showing "that the need for more or better supervision to protect against constitutional violations was obvious" from the fact that there "were repeated complaints of civil rights violations," and that "the complaints [were] followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents," Plaintiff has failed to establish a claim on these grounds. *Shepherd v. Powers*, No. 11-CV-6860, 2012 WL 4477241, at *9 (S.D.N.Y. Sept. 27, 2012) (citations and quotation marks omitted). Plaintiff alleges that Moving Defendant has been named in "approx[imately] 60 federal lawsuits for similar conduct," but has "fail[ed] to intervene and prevent further harm." (Compl. 7.) Plaintiff does not provide the names of any of these lawsuits, and does not set forth factual details to allow the Court to assess whether Moving Defendant's conduct in these cases was, in fact, similar to the conduct alleged here. "These lacking details doom Plaintiff's Complaint." *Jackson*, 2019 WL 3338020, at *4 (citations omitted) (collecting cases). Indeed, cases where the plaintiffs have successfully established deliberate indifference by pointing to past grievances and lawsuits have named and provided factual details on the previous suits. *See Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *19–21 (S.D.N.Y. Mar. 26, 2015) (holding that the plaintiff sufficiently alleged the need for better training or supervision where the plaintiff listed and detailed nine other complaints raising similar allegations against the same defendants); *McCants v. City of Newburgh*, No. 14-CV-556, 2014 WL 6645987, at *4–5 (S.D.N.Y. Nov. 21, 2014) (holding that the plaintiff sufficiently alleged the need for better training or supervision where the plaintiff listed and detailed 17 other complaints over a seven-year period raising similar allegations against the same defendants).

***6** For the same reasons, Plaintiff's claim regarding the number of federal lawsuits in which Aramark is a defendant is insufficient to plead "a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policymaker must have been aware." *Brandon*, 705 F. Supp. 2d at 276–77 (citations omitted); *see Rutherford v. Westchester County*, No. 18-CV-4872, 2020 WL 433841, at *12 (S.D.N.Y. Jan. 28, 2020) (finding that the plaintiff insufficiently alleged a policy or custom when he named several lawsuits against the defendants for "similar conduct" but did not describe the conduct alleged in the suits and did not explain "whether and how the conduct alleged in those suits was widespread and consistent" (collecting cases)); *Jackson*, 2019 WL 3338020, at *4 (determining that although the plaintiff "summarily allege[d]" that the defendants were aware of food-related problems because of previous lawsuits and grievances, the plaintiff failed to provide any facts about these lawsuits and grievances). Therefore, Plaintiff fails to plausibly allege claims for a failure to supervise or a consistent and widespread practice of which Moving Defendant must have been aware.

Accordingly, Plaintiff's claims against Moving Defendant must be dismissed. *See McKenzie v. City of Mount Vernon*, No. 18-CV-603, 2018 WL 6831157, at *7 (S.D.N.Y. Dec. 28, 2018) (dismissing *Monell* claim where the plaintiff did "not allege any facts suggesting a policy or custom that led to [the] alleged" constitutional deprivation); *Voltaire v. Westchester Cty. Dep't of Soc. Servs.*, No. 11-CV-8876, 2016 WL 4540837, at *7 (S.D.N.Y. Aug. 29, 2016) (dismissing the plaintiff's claims against municipal employees in their official capacities where the complaint "provided no facts that would allow [the court] to plausibly infer that [the defendants] acted pursuant to a municipal custom or practice"). [4]

## III. Conclusion

For the foregoing reasons, Moving Defendant's Motion To Dismiss is granted. [5] Because this is the first adjudication of Plaintiff's claims, the dismissal is without prejudice. Plaintiff may file an Amended Complaint within 30 days of the date of this Opinion. The Amended Complaint should contain appropriate changes to remedy the deficiencies in this Opinion. Plaintiff is advised that the Amended Complaint will replace, not supplement, the instant Complaint, and therefore must contain *all* of the claims, factual allegations, and exhibits that Plaintiff wishes the Court to consider. If Plaintiff fails to abide by the 30-day deadline, his claims may be dismissed with prejudice.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1445729

## Footnotes

1 Defendants Westchester County, Spano, Delgrosso, and Martinez have all been served but have not filed their answers or otherwise responded, and have never appeared in this case. (Dkt. Nos. 7, 10–12, 14–15.) The Court notes that Moving Defendant is involved in Plaintiff's allegations related to the poor food conditions, and does not appear to be involved in his claims of violations of his rights under the First and Fourteenth Amendments. Defendants involved in those allegations are the ones who have failed to appear, and the Court will not herein consider dismissing claims against Defendants who have been served but have failed to appear. Plaintiff may consider seeking default judgments against Defendants who have not answered. *See* *Thompson v. Booth*, No. 16-CV-3477, 2018 WL 4760663, at *12 (S.D.N.Y. Sept. 28, 2018) (stating that the court could enter default judgment against defendants who had been served but had failed to appear); *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 332 (S.D.N.Y. Sept. 9, 2014) (instructing the plaintiff to consider seeking a default judgment against a defendant who had been served but failed to appear).

2 The pages of Plaintiff's Complaint are inconsistently numbered. Thus, the Court refers to the ECF-stamped page numbers at the top of the document to avoid confusion.

3 Moving Defendant states that for the purposes of this Motion only, it concedes to being deemed a state actor. (Def.'s Mem. 8 n.1.) Thus, the principles articulated in *Monell*, which addresses municipal liability, may be applied to Moving Defendant. The Court notes that in any event, "[i]n determining whether or not a private employer may be held liable in a § 1983 claim, courts are guided by the principles articulated in *Monell* ... and its progeny." *Torres v. Aramark Food*, No. 14-CV-7498, 2015 WL 9077472, at *10 (S.D.N.Y. Dec. 16, 2015) (citations omitted); *see also* *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 409 (2d Cir. 1990) ("Although *Monell* dealt with municipal employers, its rationale has been extended to private businesses."); *Gitter v. Target Corp.*, No. 14-CV-4460, 2015 WL 5710454, at *3 n.4 (S.D.N.Y. Sept. 29, 2015) ("The Second Circuit has extended *Monell*'s rationale to private businesses." (citation omitted)). The Court may therefore apply the *Monell* analysis to Moving Defendant.

4 Moving Defendant also argues that Plaintiff's injuries are not recoverable under the Prison Litigation Reform Act ("PLRA"), (Defs.' Mem. at 6–7), Plaintiff does not have a constitutional right to an internal grievance process, (*id.* at 7–8), and Plaintiff's conditions of confinement claim does not rise to the level of a constitutional violation, (*id.* at 10–13). Because Plaintiff's claims against Moving Defendant must be dismissed for failure to state a *Monell* claim, the Court need not resolve these additional arguments. Plaintiff will have the opportunity to respond to these arguments if he decides to file an amended complaint.

5 The Court again notes that nearly identical allegations about the poor food quality and sanitation have been made in numerous other actions against Westchester County and Aramark in this District. *See* *Dawson v. Westchester County*, No. 18-CV-7790, 2019 WL 3408899, at *6 n.6 (S.D.N.Y. July 29, 2019) (collecting cases). As previously instructed, "[t]he Court expects that Counsel for [Moving] Defendant[ ] also takes note and will discuss the serious allegations raised in these cases with h[is] client[ ]." *Id.*

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 2804435
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Anthony MILLER, Plaintiff,
v.
COUNTY OF MONROE, Defendant.

Case No. 23-CV-06649-FPG
|
Signed May 31, 2024

**Attorneys and Law Firms**

Elliot Dolby Shields, Roth & Roth, LLP, New York, NY, for Plaintiff.

Robert John Shoemaker, Monroe County Law Department, Rochester, NY, for Defendant.

DECISION AND ORDER

FRANK P. GERACI, JR., United States District Judge

**INTRODUCTION**

***1** On November 9, 2023, Plaintiff Anthony Miller ("Plaintiff") brought this action pursuant to 42 U.S.C. § 1983 against Defendant County of Monroe ("Defendant" or the "County"). ECF No. 1. Plaintiff alleges that a prosecutor with the Monroe County District Attorney's Office ("MCDAO") failed to disclose exculpatory and impeachment information during Plaintiff's prosecution for criminal robbery in violation of Plaintiff's constitutional rights, pursuant to a policy or custom. *See* ECF No. 1.

Defendant has moved to dismiss Plaintiff's complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiff has failed to articulate a claim under *Monell v. City of New York*, 436 U.S. 658 (1978). ECF No. 4. For the reasons set forth below, Defendant's motion is GRANTED.

**BACKGROUND** [1]

On or about October 1, 2013, a grand jury indicted Plaintiff with a charge of robbery in the first degree and other charges. *See* ECF No. 1 at 11. During the MCDAO's prosecution of Plaintiff, Assistant District Attorney Michael Harrigan ("Harrigan") failed to disclose discoverable exculpatory and impeachment material to defense counsel before Plaintiff's trial. *Id.* at 11. Specifically, Harrigan failed to disclose a September 28, 2013 police report regarding Rochester Police Department Investigator Nolan Wengert's ("Wengert") use of a "Find My iPhone" application to track a phone which belonged to Jack Moseley, the victim of the robbery for which Plaintiff was convicted. *Id.* After Plaintiff had already been arrested, the application had tracked the allegedly stolen iPhone to a location close to the scene of the robbery, while Plaintiff was in custody at Monroe County Jail pending the grand jury indictment. *Id.* at 10-11.

Harrigan did not disclose this report to Plaintiff and defense counsel until "the eve of trial" on September 8, 2014. *Id.* at 11. As a result, the trial was adjourned for two months. *Id.* Because of Harrigan's delay in disclosing the "Find My iPhone" report, Plaintiff and defense counsel were unable to gather certain information from Mosely's cell phone carrier or Apple regarding the use of the "Find My iPhone" application. *Id.*

In addition, Harrigan failed to disclose recordings of radio calls in which Officer Jason Prinzi directed Officers Daryl Hogg and Daniel Watson to respond to Millbank and Bradburn Streets, an area near the scene of robbery. During the calls, Prinzi stated that an individual who fit the description of the suspect of the robbery was present, remarking that it "could be one of the See Set kids, as the description matches my call from earlier[.]" *Id.* at 12. Officers Hogg and Watson stated that they were in that area and would respond to Millbank and Bradburn Streets. *Id.* at 6-7, 12.

***2** After the delay in Plaintiff's trial, the trial commenced on November 19, 2014, before Monroe County Supreme Court Justice Thomas E. Moran. *Id.* at 12. The radio call recordings were not disclosed before or during the trial. *Id.* The calls indicated Officer Prinzi's belief that the suspect of the robbery at the time could have been an individual other than Plaintiff; that is, a member of the See Set gang. *Id.* The calls also indicated that Prinzi directed Hogg and Watson to respond to Millbank and Bradburn Streets. Officer Hogg testified at trial, but did not disclose or testify to Prinzi's direction. *Id.* at 12-13. Wengert testified to the use of the "Find My iPhone" application and stated that phone was found in the

possession of another unidentified individual after Plaintiff was in custody at Monroe County Jail pending the indictment. *Id.* at 14.

On November 21, 2014, Plaintiff was convicted of all charges, and then sentenced to ten years in prison and five years of supervised release. *Id*. In May 2020, Plaintiff appealed his conviction to the Appellate Division, Fourth Department, arguing that Harrigan engaged in summation misconduct, that the police lacked reasonable cause to stop Plaintiff or probable cause to arrest him, and that his conviction was against the weight of the evidence. *Id.*

On November 13, 2020, the Appellate Division reversed Plaintiff's conviction, and dismissed the indictment as against the weight of the evidence. *Id.* at 15. The Appellate Division also found that Hogg and Watson lacked reasonable suspicion to stop Plaintiff in the first instance, and that they racially profiled him. *Id.* Plaintiff was released from custody on November 17, 2020. *Id.* at 16.

Plaintiff alleges that "Harrigan's failure or refusal to disclose material exculpatory and impeachment evidence in Plaintiff's case, including the Find My iPhone report and the recording of the police radio communications, and Harrigan's presentation of false and misleading evidence during Plaintiff's trial, was a result of the unconstitutional polices, practices, or customs of the County and MCDAO at the time." *Id.* at 16. Plaintiff asserts that the MCDAO, since 1985, has among other things, "directed prosecutors to shirk, avoid, or flagrantly violate their *Brady* obligations." *Id.* at 17. He also claims that the MCDAO has a "*de facto* policy" of ignoring and suppressing, rather than disclosing, *Brady* material, and has failed to supervise, train, and discipline prosecutors for such misconduct. *Id.* Plaintiff has provided a list of twenty-seven cases in which prosecutorial misconduct at the MCDAO was found by the Appellate Division. *Id.* at 22-26.

## LEGAL STANDARD

To survive a Rule 12(b)(6) challenge, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The "plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted). A district court must accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the nonmoving party. *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008). In considering the plausibility of a claim, the Court must accept factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). At the same time, the Court is not required to accord "[l]egal conclusions, deductions, or opinions couched as factual allegations ... a presumption of truthfulness." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (quotation marks omitted).

***3** When deciding a motion under Rule 12(b)(6), a court ordinarily may not rely on matters outside the pleadings. *See* *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). For the purposes of this rule, "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)); *see also* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.").

## DISCUSSION

Defendant has moved to dismiss Plaintiff's complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* ECF No. 4. For the reasons explained below, Defendant's motion to dismiss is GRANTED.

### I. *Monell* Claim

Plaintiff's *Monell* claim rests on the following allegations. First, Plaintiff alleges that Defendant's policy of permitting *Brady* violations caused Harrigan to "fail[ ] to disclose critical exculpatory and impeachment evidence to Plaintiff before, during, or after his trial," in violation of *Brady* and Plaintiff's right to due process, a fair trial, and to be free from prosecution absent probable cause. *Id.* at 31-32. Specifically, this failure was "caused by the MCDAO's [...] policy of failing or refusing to seek out, collect, or track any exculpatory or impeachment information not affirmatively provided to prosecutors, or, alternatively, of suppressing material exculpatory and impeachment evidence in their possession and control." *Id.* at 32. "Harrigan's unconstitutional acts and

omissions in Plaintiff's case were undertaken and carried out pursuant to [...] unconstitutional policies, practices, or customs of the County and MCDAO which were in existence at the time of the conduct alleged herein, and with the full knowledge, consent, and under the supervisory authority of the MCDAO." *Id.* at 22.

Second, and relatedly, Plaintiff contends that Defendant "demonstrated deliberate indifference to Plaintiff's constitutional rights by failing to establish policies and procedures that adequately trained, monitored, supervised, or disciplined the employees of MCDAO regarding the constitutional duty to affirmatively gather and disclose exculpatory and impeachment evidence to the defense, despite the obviousness that such training, monitoring, or supervision was required in order to prevent constitutional violations, and their awareness of prior incidents in which employees of the MCDAO had failed to comply with the obligations of *Brady.*" *Id.* at 32. The "MCDAO, as an agency of [Defendant], [ ] has a policy, practice, and custom of failing or refusing to internally investigate, reprimand, sanction, or discipline prosecutors for misconduct." *Id.* at 22.

Defendant contends, *inter alia*, that Plaintiff has failed to plausibly allege that (i) Harrigan's misconduct in Plaintiff's case was caused by a custom or policy of Defendant, or that (ii) Defendant failed to train its employees in manner which constitutes deliberate indifference to Plaintiff's civil and constitutional rights. *See* ECF No. 4 at 4-12.

For the reasons below, the Court agrees with Defendant. Plaintiff has failed to plausibly allege (i) the existence of a custom or policy which caused the alleged constitutional violations in Plaintiff's case, and (ii) that Defendant failed to train, supervise, or discipline its employees in manner sufficient to give rise to municipal liability under *Monell*. [2]

***4** "A *Monell* claim—arising from the Supreme Court case of *Monell v. Department of Social Services*, 436 U.S. 658 (1978)—is a way to hold a municipality liable under Section 1983 for the conduct of its employees." *Pugh v. City of New York*, No. 01-CV-0129, 2002 WL 398804(ILG), at *2 (E.D.N.Y. Jan. 15, 2002). A municipality may be liable under § 1983 when, by implementation of "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that [municipality's] officers" or through practices that are so "permanent and well settled" as to constitute governmental "custom," it deprives the plaintiff of a constitutional right. *Monell*, 436 U.S. at 690. A municipality may also be liable "under the so-called 'failure to train' theory ... where the failure to train amounts to deliberate indifference to the rights of persons with whom the [agents of the municipality] come into contact." *Jenkins*, 478 F.3d at 94 (*quoting City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989); *Deats v. Monroe Cnty.*, No. 10-CV-6473-FPG, 2014 WL 6769756, at *6 (W.D.N.Y. Dec. 1, 2014)). "Where a district attorney acts as the manager of the district attorney's office, the district attorney acts as a county policymaker." *Walker v. City of New York*, 974 F.2d 293, 301 (2d Cir. 1992) (district attorney's office not immune from municipal liability under *Monell* for managerial functions, such as a "decision not to supervise or train ADAs on *Brady*" issues).

A plaintiff can plead a "policy" or "custom" by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Jones v. Westchester County*, 182 F. Supp. 3d 134, 158 (S.D.N.Y. 2016) (quotations omitted); *see Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x 10, 13 (2d Cir. 2015) (summary order); *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012). In addition, to prevail on a *Monell* claim, a plaintiff must also show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("Governments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

**A. Custom or Policy**

Plaintiff first alleges that Defendant has a *de facto* custom or policy of suppressing *Brady* material and permitting *Brady* violations. ECF No. 1 at 17, 23, 28, 32. Defendant argues that Plaintiff has not plausibly alleged that a policy of suppressing *Brady* material was sufficiently "widespread" within the MCDAO, such that Defendant may be liable under *Monell*. ECF No. 4 at 5. For the reasons below, the Court agrees with Defendant.

It is well settled that a policy or custom can be found in "an act performed pursuant to a custom that has not been formally approved by an appropriate decisionmaker ... [but] is so widespread as to have the force of law." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997); *see Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) ("persistent and widespread" practices of city officials may constitute a municipal custom). A practice is "widespread" when it is "common or prevalent throughout the [entity]." *Gleeson v. County of Nassau*, No. 15-CV-6487 (AMD) (RL), 2019 WL 4754326, at *16 (E.D.N.Y. Sept. 30, 2019).

To show a policy or custom through a "widespread practice," a plaintiff must attribute a subordinate's conduct to the actions or omissions of higher-ranking officials with policymaking authority. *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) (citations omitted). To do so, a plaintiff may show that (i) a "policymaker ordered or ratified the subordinate['s] actions, or (ii) "the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Id.* at 126. A plaintiff may also plead the existence of *de facto* customs or policies "by citing [ ] complaints in other cases that contain similar allegations." *Gaston v. Ruiz*, No. 17-CV-1252, 2018 WL 3336448, at *6 (E.D.N.Y. July 6, 2018). Such complaints should involve factually similar misconduct, be contemporaneous to the misconduct at issue in the plaintiff's case, and result in an adjudication of liability. *See, e.g., Isaac v. City of New York,* No. 16-CV-4729 (KAM), 2018 WL 5020173, at *17 (E.D.N.Y. Aug. 6, 2018) (finding that other court cases could not establish a *de facto* policy or custom because they involved dissimilar misconduct, were resolved by settlement, or the city prevailed); *Calderon v. City of New York*, 138 F. Supp. 3d 593, 613 (S.D.N.Y. 2015) ("None of the [16] lawsuits cited resulted in an adjudication or admission of liability and the number of suits does not suggest a pervasive illegal practice."); *Buari v. City of New York*, 530 F. Supp. 3d 356, 404 (S.D.N.Y. 2021).

***5** Here, Plaintiff has failed to plausibly allege that a policy or custom was created by a "persistent and widespread practice" of prosecutorial misconduct at the MCDAO. *See Buari*, 530 F. Supp. at 404. First, Plaintiff has presented no plausible allegations that the District Attorney "ordered or ratified" Harrigan's actions. *Amnesty America*, 361 F.3d at 113, 126. Second, Plaintiff has presented no plausible allegations that the District Attorney was "aware" of Harrigan's actions during Plaintiff's criminal robbery prosecution, nor that the District Attorney "consciously chose to ignore them[,]" at the time of their commission. *Id.* Accordingly, Plaintiff has failed to plausibly allege that the prosecutorial misconduct committed by Harrigan in Plaintiff's case may be attributable to any act or omission of the District Attorney.

Likewise, Plaintiff has failed to plausibly allege the existence of a "widespread practice" of prosecutorial misconduct by citing "complaints in other cases that contain similar allegations." *Gaston*, 2018 WL 3336448, at *6. In his complaint, Plaintiff has identified twenty-seven cases involving prosecutorial misconduct, which span over three decades, from 1980 until 2016. *See* ECF No. 1 at 24-27.[3] Only seven out of the twenty-seven cases Plaintiff has gathered involved *Brady* violations, and in one, the *Brady* violation did not result in a reversal of the conviction.

***6** Even after all reasonable inferences are drawn in Plaintiff's favor, such a low number of instances of misconduct, over the course of three decades, does not plausibly allege that a practice of permitting *Brady* violations was "so widespread as to have the force of law," *Bd. of Cnty. Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 404 (1997) (citations omitted), or "so manifest as to imply the constructive acquiescence of senior policy-making officials." *Sorlucco v. New York City Police Dept.*, 971 F.2d 864, 871 (2d Cir. 1992) (citations omitted); *see, e.g., Buari*, 530 F. Supp. 3d at 406 (plaintiff's twenty-three cited cases of misconduct occurring over a twenty-year period, was insufficient to establish that improper practice was so widespread as to have the force of law) (collecting cases).

In addition, because the cases provided span a period of three decades, the Court cannot conclude that the prosecutorial misconduct in those cases, let alone the seven involving *Brady* violations, was "contemporaneous to the misconduct at issue in [Plaintiff's] case." *Isaac*, 2018 WL 5020173, at *17. Likewise, a review of those cases shows that the violations

which occurred in them are not "factually similar" to Harrigan's alleged *Brady* violations, such that the Court may reasonably infer that a custom or policy of permitting *Brady* violations existed at the MCDAO. *Id.* at *17. A varied range of prosecutorial misconduct is present in each case, and the seven specific *Brady* violations that are enumerated are not sufficiently "factually similar" to Harrigan's misconduct with respect to the disclosure of either the radio call recordings or the "Find My iPhone" application in Plaintiff's case. *Id.*

In addition to the above-referenced cases, however, Plaintiff argues that "additional allegations" regarding District Attorney Sandra Doorley ("Doorley"), specifically, establish that the County had a *de facto* policy of suppressing *Brady* material at the time of his case. ECF No. 8 at 19-22. Plaintiff alleges that Doorley publicly "acknowledge[ed] the existence of MCDAO's unconstitutional policies, practices, and customs of failing to seek out and/or suppressing exculpatory and impeachment Brady evidence," in September 2021, seven years after Plaintiff's conviction. *Id.* (citing ECF No. 1 at 19-22). Doorley's comments in September 2021, which were made in regard to the MCDAO's consent to vacating the convictions of two individuals because of *Brady* violations arising out of perjury, are not sufficient to establish that a municipal policy or custom of permitting *Brady* violations existed at the MCDAO. ECF No. 8 at 20-21. These allegations, which are detailed further in Plaintiff's complaint, are not sufficient to plausibly allege that such a policy or custom was "so persistent and widespread as to have the force of law" at the time of Plaintiff's prosecution. *Friend v. Gasparino*, 61 F.4th 77, 93 (2d Cir. 2023). And, even if they were sufficient, Plaintiff has failed to plausibly allege "a direct causal link between [such] a municipal policy or custom and the alleged constitutional deprivation." *City of Canton*, 489 U.S. at 385. Accordingly, Plaintiff's *Monell* claim, to the extent it is premised on a "widespread practice" theory, is dismissed.

**B. Deliberate Indifference**

Plaintiff relatedly contends that Defendant demonstrated "deliberate indifference" to a risk of a constitutional deprivation by failing to train and supervise prosecutors with respect to their handling of *Brady* material, and failing to discipline prosecutors for prosecutorial misconduct. ECF No. 1 at 32-33. Defendant argues that Plaintiff has failed to plausibly allege that the MCDAO demonstrated deliberate indifference to Plaintiff's constitutional rights in these ways. ECF No. 4 at 4-12. For the reasons set forth below, Plaintiff's *Monell* claim, to the extent it is premised on a "deliberate indifference" theory, does not survive dismissal.

***7** Municipal liability can be based on a showing of "deliberate indifference" to a recurring situation likely to result in a constitutional violation. The municipality's need to act must be "so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." *Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992) (citing *Canton*, 489 U.S. at 390).

Three requirements must be met before a municipality's failure to train or supervise constitutes a deliberate indifference to the constitutional rights of citizens. *See Walker v. City of N.Y.*, 974 F.2d 293, 297 (2d Cir. 1992); *Vasconcelloes v. City of N.Y.*, 12-CV-8445, 2016 WL 403474, at *3 (S.D.N.Y. Jan. 28, 2016). First, Plaintiff must show that a municipal policymaker knows to a moral certainty that municipal employees will confront a given situation. *See Walker*, 974 F.2d at 297; *Vasconcelloes*, 2016 WL 403474, at *3. Second, Plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation. *See Walker*, 974 F.2d at 293; *Vasconcelloes*, 2016 WL 403474, at *3. Third, Plaintiff must show that the wrong choice by the municipal employee will frequently cause the deprivation of a citizen's constitutional rights. *See Walker*, 974 F.2d at 298; *Vasconcelloes*, 2016 WL 403474, at *3; *Treadwell v. Cnty. of Putnam*, No. 14-CV-10137, 2016 WL 1268279, at *3 (S.D.N.Y. Mar. 30, 2016). Two theories of recovery appear to be available to Plaintiff if these requirements are met: (i) a failure to supervise or discipline and (ii) a failure to train. They are similar, but distinct, theories. The Court addresses the three requirements under *Walker*, before addressing each theory, because both appear to be advanced by Plaintiff in his complaint. *See* ECF No. 1 at 32-33.

First, Plaintiff has alleged that the DA's Office "plainly knew, to a moral certainty, that ADAs would make probable cause assessments, offer testimonial evidence in court, confront false or misleading testimony, and acquire *Brady* material 'because these are basic facets of an ADA's job.' " *Buari*, 530 F. Supp. 3d at 406 (quoting *Bertuglia v. City of New York*, 839 F. Supp. 2d, 703 738 (S.D.N.Y. 2012) (citing *Walker*, 974 F.2d at 300)); *see Owens v. Cnty. of Monroe*, No. 21-CV-6445-FPG, 2021 WL 6113950, at *6 (W.D.N.Y. Dec. 27, 2021).

Second, Plaintiff has plausibly alleged that the "situation" in his case presented difficult choices "of the sort that training or supervision will make less difficult." *See Walker*, 974 F.2d at 293; *Vasconcelloes*, 2016 WL 403474, at *3. While the Court recognizes that certain types of prosecutorial misconduct are "so obvious to require no training[,]" such as suborning perjury or fabricating evidence, the duty to avoid *Brady* violations is not "so obvious or easy to [observe] as to require, as a matter of law, no training or supervision." *Walker*, 974 F. 2d at 300.

Third, Plaintiff has plausibly alleged that the "wrong choice by the municipal employee will frequently cause the deprivation of a citizen's constitutional rights." *Id.* at 298. A failure to disclose *Brady* material, as has been alleged, would frequently cause constitutional violations. *See Buari*, 530 F. Supp. at 406; *Walker*, 974 F.2d at 300 ("[W]ithholding *Brady* material will virtually always lead to a substantial violation of constitutional rights."); *Bertuglia*, 839 F. Supp. 2d at 739 ("[W]here an assistant district attorney commits misconduct ... or violates their obligations under *Brady*, those actions will frequently result in the violation of citizens' constitutional rights."); *Owens*, 2021 WL 6113950, at *6.

***8** With these three requirements adequately alleged, the Court turns to whether Plaintiff has plausibly alleged Defendant's "deliberate indifference" based on a (i) failure to supervise or discipline, or (ii) failure to train theory.

To establish *Monell* liability for a failure to supervise or discipline, a plaintiff must plead that (1) there was a pattern of allegations of or complaints about, or a pattern of actual, similar unconstitutional activity, and (2) the municipality consistently failed to investigate those allegations. *Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *21-22 (S.D.N.Y. Mar. 26, 2015). A need for greater supervision or discipline "may be demonstrated through proof of repeated complaints of civil rights violations" that are not followed by a "meaningful attempt ... to investigate or to forestall further incidents." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995); *Treadwell v. Cnty. of Putnam*, No. 14-CV-10137 (KMK), 2016 WL 1268279, at *4 (S.D.N.Y. Mar. 30, 2016).

Here, Plaintiff has failed to plausibly allege a "pattern of allegations of or complaints about, or a pattern of actual, similar unconstitutional activity." *Tieman*, 2015 WL 1379652, at *21-22. Because Plaintiff fails to plausibly allege such a pattern, the Court need not determine whether Defendant "consistently failed to investigate" one. *Id.* As explained in Section I.A. *supra*, the cases Plaintiff has gathered are not sufficient to plausibly allege that the MCDAO has experienced a "pattern" of constitutional violations, over a period of approximately thirty years, nor that the constitutional violations are sufficiently similar to that which is alleged to have occurred in Plaintiff's case. Plaintiff's "deliberate indifference" claim, premised on failure to supervise or discipline, is without merit.

To establish *Monell* liability for a failure to train, a municipality may be liable "when city policymakers are on actual or constructive notice that a particular omission in their training program causes [ ] employees to violate citizens' constitutional rights ... [but] the policymakers choose to retain that program." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citations omitted). A failure to train constitutes a policy or custom under § 1983 only where "in light of the duties assigned to [...] employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

A plaintiff must "identify a specific deficiency in [a defendant's] training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Alwan v. City of New York*, 311 F. Supp. 3d 570, 579 (E.D.N.Y. 2018) (quoting *Wray v. City of New York*, 490 F.3d 189, 196 (2d Cir. 2007)). The Second Circuit has suggested that a plaintiff "need only plead [a municipality's] failure to train caused the constitutional violation" because "[i]t is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage." *Amnesty America*, 361 F.3d at 130 n.10. Still, courts generally require that a plaintiff "provide more than a simple recitation of their theory of liability, even if that theory is based on a failure to train.' " *Tieman*, 2015 WL 1379652, at *22 (collecting cases); *see Collins*, 923 F. Supp. 2d at 478 (noting that under *Iqbal*, a plaintiff "must allege, not only a viable [failure to train] theory, but facts that render the theory plausible"). Accordingly, a plaintiff must "allege facts that support an inference that the municipality failed to train its [employees], that it did so with deliberate indifference, and that the failure to train caused his constitutional injuries." *Tieman*, 2015 WL 1379652, at *22 (collecting cases).

***9** Here, Plaintiff does not plausibly allege that a particular omission in Defendant's training "cause[d] [ ] employees to violate citizens' constitutional rights," nor that such an omission put Defendant on notice of an "obvious" need for more training, which was "so likely" to result in constitutional violations like those which are alleged to have occurred in Plaintiff's case. *Connick*, 563 U.S. at 61; *City of Canton*, 489 U.S. at 390. As stated, the cases Plaintiff has gathered, which span over three decades and involve a range of discrete instances of prosecutorial misconduct, are insufficient to indicate that an "obvious" omission in Defendant's training existed, let alone that such an omission "actually caused" a constitutional deprivation in Plaintiff's case. *City of Canton*, 489 U.S. at 390. While Plaintiff has alleged with some specificity a "deficiency" in Defendant's training, Plaintiff does not plausibly allege that this alleged deficiency "actually caused a constitutional deprivation" in his criminal robbery prosecution. *Alwan*, 311 F. Supp. 3d at 579.

Specifically, Plaintiff alleges that, since 1998, the MCDAO has failed to investigate instances of alleged prosecutorial misconduct. *See* ECF No. 1 at 23-29. In support of this assertion, Plaintiff alleges that the County stated, in response to a Freedom of Information request, that it does not possess "records of any discipline imposed on attorneys employed by [the] MCDAO from January 1, 1998 until 2021," nor records of discipline against attorneys which may have resulted from overturned convictions. *Id.* at 23.

Even accepting these allegations as true, and drawing all reasonable inferences in Plaintiff's favor, Defendant's alleged failure to maintain disciplinary records for instances of prosecutorial misconduct does not constitute a "deficiency" which is "closely related" to the ultimate injury in Plaintiff's case, such that it may have "actually caused the constitutional deprivation." *Alwan*, 311 F. Supp. 3d at 579. Absent a causal link, the Court is not convinced, as it must be, that Defendant's training was "so deficient as to reflect a policy of deliberate indifference to the civil rights of the citizenry." *Vann v. City of New York*, 72 F.3d 1040, 1050 (2d Cir. 1995) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985)).[4] Accordingly, to the extent Plaintiff's deliberate indifference claim is premised on a failure to train, this claim is dismissed.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is GRANTED.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 2804435

## Footnotes

1 Courts evaluating a motion to dismiss must accept facts alleged in the complaint as true and draw all reasonable inferences from those facts in favor of the non-moving party. As such, the facts below are drawn from Plaintiff's complaint and accepted as true. This background is a summary and does not necessarily include all allegations in the complaint.

2 For the purposes of this Decision and Order, the Court assumes, without deciding, that Plaintiff has plausibly alleged that the prosecutor's misconduct during his criminal robbery prosecution included a *Brady* violation. *See Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (underlying constitutional violation is a prerequisite to *Monell* liability).

3 *People v. Porter*, 136 A.D.3d 1344 (4th Dept 2016) (prosecutor elicited false and misleading testimony and committed summation misconduct which denied the defendant a fair trial); *People v. Wright*, 25 N.Y.3d 769 (2015) (summation misconduct); *People v. Jones*, 134 A.D.3d 1588 (4th Dept 2015) ("pervasive" and "egregious" summation misconduct); *People v. Gibson*, 134 A.D.3d 1512 (4th Dept 2015) (admonished for summation misconduct in this and other cases); *People v. Griffin*, 125 A.D.3d 1509, 1510 (4th Dept 2015) (summation misconduct and "[p]erhaps most egregiously in this one-witness case where credibility was

paramount, the prosecutor repeatedly and improperly vouched for the veracity of the complainant"); *People v. Jurs*, 51 Misc. 3d 653 (County Ct. Monroe Co. 2015) (summation misconduct); *People v. Carver*, 114 A.D.3d 1199 (4th Dept 2014) (belated disclosure of 911 call that identified another individual as the shooter, not the defendant, was a Brady violation); *People v. Collier*, 114 A.D.3d 1136 (4th Dept 2014) (prosecutor elicited prejudicial and misleading testimony and engaged in summation misconduct that denied the defendant a fair trial); *People v. Bernard*, 115 A.D.3d 1214 (4th Dept 2014) (MCDAO admonished for late Brady disclosure); *People v. Handy*, 20 N.Y.3d 663 (2013) (ADA's failure to preserve video of incident found to be a Brady violation); *People v. Gayden*, 111 A.D.3d 1388, 1389-90 (4th Dept. 2013) (failure to disclose the status of an essential prosecution witness as a paid informant constituted a *Brady* violation); *People v. Bradley*, 20 N.Y.3d 128 (2012) (presentation of prejudicial and misleading evidence denied defendant a fair trial); *People v. Fisher*, 18 N.Y.3d 964 (2012) (summation misconduct denied defendant a fair trial); *People v. Santiago*, 101 A.D.3d 1715 (4th Dept 2012) (admonished prosecutor for summation misconduct); *People v. Zacher*, 97 A.D.3d 1101 (4th Dept 2012) (holding that prosecutor's misconduct in characterizing the defendant's silence as evidence of his consciousness of guilt was harmless); *People v. Presha*, 83 A.D.3d 1406 (4th Dept 2011) (improper summation and prejudicial remarks by the prosecutor denied the defendant a fair trial); *People v. Stubbs*, 78 A.D.3d 1665 (4th Dept 2010) (the People's introduction of evidence of prior crimes to establish the defendant's identity was improper and denied defendant a fair trial); *People v. Bell*, 66 A.D.3d 1478 (4th Dept 2009) (error in allowing the prosecutor to vouch for witnesses' credibility was harmless); *People v. Davis*, 52 A.D.3d 1205 (4th Dept 2008) (late disclosure of key evidence denied the defendant a fair trial); *People v. Harris*, 35 A.D.3d 1197 (4th Dept 2006) (*Brady* violation denied the defendant a fair trial); *People v. Castro*, 784 N.Y.S.2d 466 (4th Dept 2004) (admonishing prosecutor for serious misconduct during summation); *People v. Valentin*, 1 A.D.3d 982, 982-83 (4th Dept 2003) (*Brady* violation denied the defendant a fair trial); *People v. Hammock*, 182 A.D.2d 1114 (4th Dept 1992) (deliberate prosecutorial misconduct in presenting false and misleading evidence, in flagrant disobedience of the trial court's prior ruling, denied the defendant a fair trial); *People v. Burke*, 566 N.Y.S.2d 169 (4th Dept 1991) (summation misconduct and the prosecutor's "pervasive pattern of misconduct" throughout the trial deprived defendant of fair trial); *People v. Grice*, 100 A.D.2d 419 (4th Dept 1984) (trial permeated by prosecutorial misconduct); *People v. Mott*, 94 A.D.2d 415 (4th Dept 1983) (deliberate and pervasive pattern of prosecutorial misconduct deprived the defendant of fair trial); *People v. Ausserau*, 77 A.D.2d 152, 154-55 (4th Dept 1980) (*Brady* violation).

4 For these reasons, the Court departs from the reasoning articulated in Section I.B. of *Owens v. Cnty. of Monroe*, No. 21-CV-6445-FPG, 2021 WL 6113950, at *6 (W.D.N.Y. Dec. 27, 2021).

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 808774
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Brett OTERI, Plaintiff,
v.
Leandra PALMATIER, Defendant.

9:23-CV-986 (AMN/ML)
|
Signed February 27, 2024

**Attorneys and Law Firms**

BRETT OTERI, Plaintiff, pro se, 18462, Schoharie County Correctional Facility, P.O. Box 159, 157 Steadman Way, Howes Cave, NY 12092.

GREGG TYLER JOHNSON, ESQ., JOHNSON & LAWS, LLC, 646 Plank Road, Suite 205, Clifton Park, NY 12065, Attorneys for Defendant Palmatier.

**DECISION AND ORDER**

ANNE M. NARDACCI, United States District Judge

## I. INTRODUCTION

***1** On August 14, 2023, pro se plaintiff Brett Oteri ("plaintiff") commenced this civil rights action pursuant to 42 U.S.C. § 1983 and alleged violations of his Fourteenth Amendment rights arising out of his confinement as a pre-trial detainee at Schoharie County Correctional Facility ("Schoharie County C.F."). Dkt. No. 1 ("Compl."). Plaintiff also filed a motion to proceed in forma pauperis ("IFP"). Dkt. No. 8.

In a Decision and Order filed on September 13, 2023 (the "September Order"), the Court granted plaintiff's IFP application and directed defendant Leandra Palmatier ("Palmatier") to respond to plaintiff's excessive force claims. Dkt. No. 10. Plaintiff's claims for monetary damages against defendant Schoharie County C.F. were dismissed with prejudice and his remaining Section 1983 claims were dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. *Id.*

On September 18, 2023, a summons was issued to Palmatier. Dkt. No. 12. Plaintiff submitted an amended complaint and a second amended complaint. Dkt. No. 13 ("Am. Compl.") and Dkt. No. 15 ("Sec. Am. Compl."). Because the second amended complaint supercedes and replaces the amended complaint, the Court will review the second amended complaint for sufficiency pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b). [1]

## II. LEGAL STANDARD

The legal standard governing the dismissal of a pleading for failure to state a claim pursuant to 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A(b) was discussed at length in the September Order. *See* Dkt. No. 10 at 2-4.

## III. SUMMARY OF SECOND AMENDED COMPLAINT

In the second amended complaint, plaintiff identifies the following individuals as new defendants: Correctional Worker Gerard ("Gerard"), Sergeant Brown ("Brown"), Sergeant Bartholomew ("Bartholomew"), Correctional Worker Mann ("Mann"), Correctional Worker Miller ("Miller"), Correctional Worker Mvona ("Mvona"), Sergeant Keller ("Keller"), Correctional Worker Madore ("Madore"), and Correctional Worker Mitchell ("Mitchell"). [2] *See* Sec. Am. Compl. at 4-5.

Between February 2023 and May 2023, Palmatier repeatedly woke plaintiff during the night by purposefully kicking and "loudly" slamming the cell gate. Sec. Am. Compl. at 8, 11. As a result, plaintiff suffered chest pains and anxiety. *Id.*

On June 11, 2023, at approximately 8:15 a.m., plaintiff was in his cell when Palmatier deliberately "sprayed" plaintiff while "laughing about it with others[.]" Am. Compl. at 7, 11. Palmatier issued a "false write-up" and placed plaintiff in segregated confinement until August 2023. *Id.* at 8, 10, 11. On the date that plaintiff was scheduled to be released, Bartholomew refused to allow him "out." *Id.* at 10.

***2** As a result of Palmatier's actions, other officials began a "campaign" of harassment and bullying. *See generally* Sec. Am. Compl. Generally, plaintiff alleges the following:

- Mann, Gerard, Madore, Miller, Keller, and Mnova issued false "write-ups."

- Gerard "started [...] locking [plaintiff] in for no good reason" while other prisoners maintained their privileges and were able to "walk around freely."
- Mann "chased [plaintiff] around the chairs" for "singing one of the songs [he] made."
- Miller, Mann, and Gerard "bothered" plaintiff about his cross and directed him to "put his cross" inside of his shirt. Plaintiff filed a grievance related to the issue and Keller stated, "it was ok for them to tell [him] that[.]"
- Brown constantly rolled her eyes, yelled at plaintiff, and unlawfully locked him in his cell.
- Brown and Bartholomew threatened to "tase" plaintiff while he was locked in his cell. Brown threatened plaintiff with bodily harm and "pulled and misfired" the taser causing "electric sparks."

Am. Compl. at 8-10, 15.

Construing the second amended complaint liberally, plaintiff asserts the following: (1) a Fourteenth Amendment excessive force claim; (2) Fourteenth Amendment harassment claims; (3) claims related to "false write-ups"; (4) Fourteenth Amendment due process claims related to segregated confinement; (5) Fourteenth Amendment equal protection claims; (6) Fourteenth Amendment deliberate medical indifference claims; and (7) First Amendment free exercise claims. *See generally* Am. Compl. Plaintiff seeks monetary damages. *See id.* at 13, 16.

## IV. DISCUSSION

### A. Fourteenth Amendment - Excessive Force

The Court set forth the law related to Fourteenth Amendment excessive force claims in the September Order, and will not restate it herein. *See* Dkt. No. 10 at 9-10.

Plaintiff's Fourteenth Amendment excessive force claim against Palmatier is repeated and realleged in the amended complaint. For the reasons set forth in the September Order, defendant is directed to respond to this claim.

### B. Fourteenth Amendment - Harassment

Plaintiff claims that Mann, Gerard, Madore, Miller, Keller, Mnova, Bartholomew, and Brown began a campaign of bullying and harassment against him. *See generally* Sec. Am. Compl. As a result, plaintiff suffered "extensive physical [and] mental health problems." *Id.* at 15.

"[A]llegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged." *Johnson v. Eggersdorf*, 8 Fed. App'x 140, 143 (2d Cir. 2001) (citation omitted). "Under certain circumstances, the intentional infliction of psychological pain may constitute a [constitutional] claim, so long as the pain is not *de minimis.*" *Shabazz v. Pico*, 994 F.Supp. 460, 475 (S.D.N.Y. 1998); *Cruz-Droz v. Marquis*, No. 3:17-CV-1291, 2018 WL 1368907, at *5 (D. Conn. Mar. 16, 2018) ("For harassment claims involving psychological injury, that injury must have been intentionally inflicted and be more than *de minimis.*") (citation omitted); *Cusamano v. Sobek*, 604 F.Supp.2d 416, 490 (N.D.N.Y. 2009).

Here the allegations in the second amended complaint do not support a Fourteenth Amendment claim against Mann, Gerard, Madore, Miller, Keller, Mnova, Bartholomew, or Brown. While plaintiff argues that he was subjected to a "campaign" of harassment, the complaint lacks specific information related to the behavior including the dates, times, frequency, and locations of the alleged harassment. Moreover, plaintiff's conclusory allegation of "extensive physical injury" and "mental health problems," without more, do not suggest that he suffered more than *de minimis* injury. *See Encarnacion v. Connors*, No. 9:21-CV-00986 (MAD/TWD), 2023 WL 6546247, at *13 (N.D.N.Y. Aug. 7, 2023), *report and recommendation adopted*, 2023 WL 6057393 (N.D.N.Y. Sept. 18, 2023).

***3** Accordingly, plaintiff's Eighth Amendment harassment claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and § 1915A(b) for failure to state a claim upon which relief may be granted

### C. False "Write-Ups"

It is well settled that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986), *cert. denied*, 485 U.S. 982 (1988)); *accord, Pittman v. Forte*, No. 9:01-CV-0100, 2002 WL 31309183, at *5 (N.D.N.Y. July 11, 2002) (Sharpe, M.J.); *see also Santana v. Olson*, No. 07-CV-0098, 2007 WL 2712992, at *2 (W.D.N.Y. Sept. 13, 2007) ("[T]he filing of a false behavior report by a correctional officer does not state a claim for relief."). The only way that false accusations contained in a

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

misbehavior report can rise to the level of a constitutional violation is when there has been more such as "retaliation against the prisoner for exercising a constitutional right." *Boddie*, 105 F.3d at 862.

The second amended complaint does include any facts or claims related to retaliation. Therefore, to the extent that plaintiff alleges that defendants violated his constitutional rights when they issued false reports, those claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and § 1915A(b).

**D. Fourteenth Amendment - Due Process Related to Segregated Confinement**

Construing the second amended complaint liberally, plaintiff claims that Palmatier violated his Fourteenth Amendment due process rights when she confined him to administrative segregation and that Bartholomew violated his Fourteenth Amendment rights when he refused to release plaintiff "on [his] date." *See* Sec. Am. Compl. at 10.

To successfully state a claim under Section 1983 for denial of due process, a plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004); *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir. 1996).

The Supreme Court has held that although states may still create liberty interests protected by due process, with respect to convicted prisoners "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995). The "atypicality" inquiry under *Sandin* is normally a question of law. *Colon*, 215 F.3d at 230-31; *Sealey*, 197 F.3d at 585. In making that determination the Court must consider the specific circumstances of the confinement, including both the duration and the conditions thereof. *Id.*

However, a pretrial detainee need not meet such a stringent standard because "[a] detainee's interest in freedom from unjustified infliction of pain and injury is more substantial ...." *Benjamin v. Fraser*, 264 F.3d 175, 188 (2d Cir. 2001); *see also Iqbal v. Hasty*, 490 F.3d 143, 146 (2d Cir. 2007), *rev'd on other grounds, Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ("Th[e Second Circuit] has said that *Sandin* does not apply to pretrial detainees and that, accordingly, pretrial detainees need not show that an imposed restraint imposes atypical and significant hardships to state deprivation of a liberty interest protected by procedural due process.").

***4** "Therefore, in the case of a pretrial detainee, the court must determine whether the condition imposed on the inmate was for a legitimate purpose or for the purpose of punishment." *Myers v. Bucca*, No. 6:15-CV-553 (DNH/ATB), 2015 WL 13401929, at *9 (N.D.N.Y. Dec. 7, 2015) (citations omitted), *report and recommendation adopted by* 2016 WL 165016 (N.D.N.Y. Jan. 14, 2016).

A pretrial detainee is entitled to the due process procedures outlined in *Wolff v. McDonnell*, 418 U.S. 539 (1974). "These procedures include a disciplinary hearing and written notice of the charges at least twenty-four hours in advance of that hearing; the opportunity to present witnesses and documentary evidence before an impartial hearing officer as long as doing so will not jeopardize prison safety and security; and a written statement including evidence relied on by the hearing officer in reaching his or her decisions and the reasons for the disciplinary action." *Myers*, 2015 WL 13401929, at *9 (citing *Wolff*, 418 U.S. at 564-66).

In order to state a viable cause of action for a violation of due process, plaintiff must first plead facts to establish that he was deprived of a liberty interest. In this regard, plaintiff alleges that he was confined "behind a fence" from June 2023 until August 2023. *See* Sec. Am. Compl. at 11. The pleading includes no allegations concerning the conditions of his segregated confinement. Without more, 60 days in segregated confinement does not implicate any of plaintiff's constitutionally protected liberty interests. *See, e.g., Logan v. Harvey*, 549 F.Supp.2d 204, 218 (N.D.N.Y. 2008) (dismissing the plaintiff's procedural due process claim where he was allegedly confined to SHU for 49 days and the complaint failed to allege any facts regarding the conditions imposed while in SHU); *Zamakshari v. Dvoskin*, 899 F.Supp. 1097, 1108 (S.D.N.Y. Sept. 8, 1995) (dismissing the plaintiff's procedural due process claim where he was confined to SHU for 60 days). Plaintiff has therefore failed to plead the existence of a valid liberty interest with respect to his confinement.

Even assuming plaintiff's confinement implicated a liberty interest, the second amended complaint is devoid of any allegations which plausibly suggest how his due process rights were violated. Consequently, he has failed to adequately plead a due process claim, regardless of where and how long he was confined.

Accordingly, Plaintiff's Fourteenth Amendment due process claims related to his segregated confinement are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

**E. Fourteenth Amendment - Equal Protection**

The Court set forth the law related to Fourteenth Amendment equal protection claims in the September Order, and will not restate it herein. *See* Dkt. No. 10 at 10-11.

In the September Order, the Court dismissed these claims holding:

> Here, the complaint fails to identify any individuals treated differently from plaintiff in a similar situation. As a result, plaintiff's equal protection is entirely conclusory and cannot survive sua sponte review. *See Iqbal*, 556 U.S. at 678 (concluding that a pleading that only "tenders naked assertions devoid of further factual enhancement" will not survive sua sponte review) (internal quotations and alterations omitted); *Twombly*, 550 U.S. at 555 ("[A] plaintiff's obligation ... requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."); *Thomas v. Pingotti*, No. 9:17-CV-0300 (GTS/DEP), 2017 WL 3913018, at *7 (N.D.N.Y. Sept. 6, 2017) ("Conclusory allegations of disparate treatment or a plaintiff's personal belief of discriminatory intent are patently insufficient to plead a valid claim under the Equal Protection clause.").

***5** Dkt. No. 10 at 11.

The Court has reviewed the second amended complaint and finds that plaintiff has failed to remedy the pleading deficiencies identified in the September Order. As a result, the Court finds that plaintiff has not alleged facts in the second amended complaint which plausibly suggest that he suffered a Fourteenth Amendment equal protection violation. As a result, and for the reasons set forth in the September Order, this claim is dismissed. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1).

**F. Fourteenth Amendment - Deliberate Medical Indifference**

To state a claim for deliberate indifference, a pretrial detainee must satisfy a two-pronged test. First, "the alleged deprivation of adequate medical care must be 'sufficiently serious.' " *Lloyd v. City of New York*, 246 F.Supp.3d 704, 717 (S.D.N.Y. 2017) (quoting *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 139 (2d Cir. 2013)). Second, the defendant must act with a "sufficiently culpable state of mind." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).

The objective prong requires "that the alleged deprivation of medical treatment is, in objective terms, 'sufficiently serious'—that is, the prisoner must prove that his medical need was 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (quoting *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998)).

As to the subjective prong, "a pretrial detainee alleging deliberate indifference to serious medical needs under the Fourteenth Amendment must establish ... that the defendant either: 'acted intentionally to impose the alleged condition' or 'recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee.' " *Logan v. City of Schenectady*, No. 18-CV-01179, 2019 WL 3803631, at *4 (N.D.N.Y. Aug. 13, 2019) (quoting *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017)).

Even assuming plaintiff suffered from an objectively serious medical condition, the second amended complaint does not plausibly suggest that any named defendant was personally involved in plaintiff's medical treatment or decisions related to plaintiff's medical care. The second amended complaint is devoid of any allegations, for example, that defendants had knowledge of plaintiff's medical care or that plaintiff requested medical attention from the defendants, or that the defendants denied such requests. While plaintiff claims he was denied medication and that his medical/mental health was "canceled," he does not attribute these actions to any named defendant. Moreover, even if he had, those statements, without more, does not suggest that any defendant acted intentionally with respect to his condition or recklessly failed to act with reasonable care to mitigate the risks that his condition posed. Indeed, plaintiff concedes that "the medical staff" administered an EKG test "multiple times." *See* Sec. Am. Compl. at 8.

Accordingly, plaintiff's deliberate medical indifference claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

**G. First Amendment - Free Exercise**

***6** The First Amendment to the United States Constitution guarantees the right to free exercise of religion. *See* U.S. Const. amend. I; *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). As is true with regard to the First Amendment generally, the free exercise clause applies to prison inmates, subject to appropriate limiting factors. *See Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (holding that "[p]risoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause") (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).

To state a claim under the Free Exercise Clause of the First Amendment, an inmate "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006) (articulating test that inmates "must show at the threshold that the disputed conduct ... burdens his sincerely held religious beliefs," prior to advancing to the *Turner* test and "legitimate penological interests that justify the impinging conduct"). "For a burden to be substantial, a plaintiff must demonstrate that the government's action pressures him to commit an act forbidden by his religion or prevents him from engaging in conduct or having a religious experience mandated by his faith." *Booker v. Maly*, No. 9:12-CV-246 (NAM/ATB), 2014 WL 1289579, at *22 (N.D.N.Y. Mar. 31, 2014), *aff'd*, 590 Fed. App'x 82 (2d Cir. 2015) (summary order); *Brandon v. Kinter*, 938 F.3d 21, 36 (2d Cir. 2019) (rejecting the argument that in deciding what constitutes a substantial burden, courts must "be made to decide the number of violations of a particular religious tenet that make a sin grievous").

In this case, plaintiff fails to identify his religion. Moreover, the Court has no basis to plausibly infer that plaintiff's inability to wear his cross outside of his shirt placed a substantial burden on plaintiff's sincerely held religious beliefs. Accordingly, plaintiff's First Amendment free exercise claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

**V. CONCLUSION**

**WHEREFORE**, it is hereby

**ORDERED** that the amended complaint (Dkt. No. 15) is accepted for filing; and it is further

**ORDERED** that the Clerk of the Court shall amend the docket report consistent with this Decision and Order; and it is further

**ORDERED** that plaintiff's Fourteenth Amendment excessive force claim against Palmatier survives review[3]; and it is further

**ORDERED** that the remaining claims are **DISMISSED** without leave to replead pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted; and it is further

**ORDERED** that Gerard, Brown, Bartholomew, Mann, Miller, Mvona, Keller, Madore, and Mitchell are **DISMISSED** as defendants herein; and it is further

**ORDERED** that the Clerk shall serve a copy of this Decision and Order on the parties in accordance with the Local Rules of Practice.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2024 WL 808774

**Footnotes**

1 An amended complaint "ordinarily supersedes the [earlier complaint] and renders it of no legal effect." *Arce v. Walker*, 139 F.3d 329, 332 n.4 (2d Cir. 1998) (quoting *International Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977)).

2 The Clerk of the Court is directed to add these individuals as defendants to the docket report for this action.

3 Palmatier has already submitted an answer to plaintiff's excessive force claims. *See* Dkt. No. 16.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Distinguished by Siracusa v. New Hyde Park-Garden City Union Free School District, E.D.N.Y., March 28, 2025

2017 WL 4350433
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Elizabeth PODLACH, Plaintiff,
v.
VILLAGE OF SOUTHAMPTON, Southampton Village Police Department, Police Officer Ashley E. Jones, Jane Doe 1, John Doe 1, and John Doe 2, in their individual and official capacities, Defendants.

14-CV-6954 (SJF)(SIL)
|
Signed 05/11/2017

**Attorneys and Law Firms**

Elizabeth Podlach, Hampton Bays, NY, pro se.

David H. Arntsen, Jeltje DeJong, Kelly E. Wright, Devitt Spellman Barrett, LLP, Smithtown, NY, for Defendants.

**REPORT AND RECOMMENDATION**

STEVEN I. LOCKE, United States Magistrate Judge

***1** Presently before the Court in this section 1983 civil rights litigation on referral from Honorable Sandra J. Feuerstein for Report and Recommendation is Defendants', the Village of Southampton, the Southampton Village Police Department, Police Officer Ashley E. Jones ("Officer Jones"), and three unnamed Police Officers, Jane Doe and John Does 1 and 2 (collectively "Defendants"), motion to dismiss *pro se* Plaintiff Elizabeth Podlach's ("Podlach" or "Plaintiff") First Amended Complaint ("Amended Complaint"). *See* Second Motion to Dismiss ("Def. Mot."), Docket Entry ("DE") [33]. The Amended Complaint restates with additional detail, and a substantial amount of commentary and legal argument, alleged civil rights violations and state-law causes of action relating to Plaintiff's arrest on August 31, 2013. *See* First Amended Complaint ("Amend. Compl."), DE [26]. These allegations were first pled in the original Complaint, which was dismissed with leave to amend. *See* 2/25/2016 Dismissal Order, DE [25]; *compare* Complaint ("Compl."), DE [1] *with* Amend. Compl. In response to the Amended Complaint, Defendants filed a motion to dismiss, which Podlach opposed. *See* Def. Mot.; Memorandum in Opposition ("Pl. Opp."), DE [34]. On September 16, 2016, Judge Feuerstein referred that motion to this Court for a report and recommendation as to whether it should be granted. *See* DE [18]. For the reasons set forth herein, the Court respectfully recommends that Defendants' motion be granted in its entirety and that the Amended Complaint be dismissed with prejudice.

**I. PROCEDURAL HISTORY**

Podlach filed the original Complaint on November 26, 2014. *See* DE [1]. In response, Defendants moved pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") to dismiss, and Judge Feuerstein referred that motion to this Court for report and recommendation. *See* DE [18]. Upon due consideration, this Court recommended dismissal of the original Complaint with leave to amend, and Judge Feuerstein adopted that conclusion. *See* Report and Recommendation, DE [20]; 2/25/2016 Dismissal Order.

Plaintiff subsequently filed her Amended Complaint on June 16, 2016. *See* Amend. Compl. The Amended Complaint, though over twice as long, contains the same eight causes of action as the original Complaint. Podlach alleges federal claims for excessive force, denial of medical care, conspiracy/retaliation for the exercise of her First Amendment rights, and denial of her Sixth Amendment right to counsel, as well as state-law claims for intentional infliction of emotional distress, negligence, respondeat superior, and negligent supervision, retention, and training. Compare *id.* at 24-41 *with* Compl. ¶¶ 54-75. In response to the Amended Complaint, Defendants filed the instant motion to dismiss. *See* Def. Mot.

**II. STATEMENT OF RELEVANT FACTS**

The following facts, set forth in the Amended Complaint, are presumed true for the purpose of Defendants' motion.

Podlach alleges that, at approximately 11:45 p.m. on August 30, 2013, she, a resident of Hampton Bays, was driving to pick up her boyfriend at the Southampton Long Island Railroad station. Amend. Compl. ¶¶ 13-15.[1] At 12:10 a.m., upon arriving in Southampton, unfamiliar with the area and dependent on printed directions, Plaintiff became disoriented and proceeded to drive through downtown Southampton in search of the train station, traveling up and down multiple streets attempting to read the street signs. *Id.* At approximately 12:15 a.m., "after driving around the village

several times," she saw a police officer, Officer Jones, ticketing another motorist. *Id.* ¶¶ 16-17. Podlach stopped her vehicle, exited, and approached the officer to ask directions while the officer was still involved with the stopped motorist. *See id.* According to Podlach, Officer Jones yelled at her, ordering her to get back into her car immediately. *Id.* ¶¶ 17, 19. Podlach complied and then drove away. *See id.* At 12:45 a.m., still lost in Southampton Village, Podlach stopped her car on Main Street to ask a group of men coming out of a bar for directions. *Id.* ¶¶ 21, 22. Just as one of those men finished giving Plaintiff directions to the train station, a police vehicle came speeding down the street and pulled up immediately adjacent to Plaintiff's car. *See id.* The driver, Officer Jones, yelled out the window, "Why didn't you wait for me?" and barked, "You just go straight," in reference to the station's location. *Id.* ¶¶ 23-24. In response, Podlach said the words, "Thank you," to Officer Jones and then audibly cursed at her. *Id.* ¶ 25.

***2** Still unable to find the station, Podlach continued driving slowly through Southampton, eventually down a dirt road, when she noticed a police car behind her. *Id.* ¶¶ 26-27. That vehicle eventually turned on its lights and flashers. *Id.* Podlach claims that at this point she was terrified, first, due to the location, a wooded and deserted area approximately ten minutes from town, and, second, due to an unrelated prior violent encounter that she had with law enforcement in a different state. *Id.* at ¶¶ 28-34. Officer Jones, who was the driver of the police vehicle, came to Podlach's car window and accused Plaintiff of swearing at her and asserted that such conduct was against the law. *Id.* ¶ 30. Officer Jones then directed Podlach to step out of her vehicle, but Podlach ignored this instruction and said to the officer that she was afraid to leave her car. *Id.* ¶¶ 32-34. She then turned the engine back on and slowly drove away. *Id.*

A few minutes later, Podlach stopped to call her boyfriend who was still waiting for her at the train station when a different police vehicle that was also driving at an extremely high rate of speed pulled in front of her blocking her car. *Id.* ¶¶ 34, 36. A male officer jumped out and, according to Plaintiff, immediately drew his service weapon and pointed it at her from about ten feet away while in a "shooting stance ... ready to shoot." *Id.* at ¶ 37. Plaintiff claims that she could see straight down the barrel of the gun and that the Officer's finger was on the trigger. *Id.* Another police vehicle arrived at the scene moments later while Podlach was still sitting in her car with her hands up. *Id.* ¶ 39. An older male officer got out of the same car as the younger officer and ordered Plaintiff to get out of her vehicle. *Id.* ¶ 40. As he was effecting the arrest, the older officer grabbed Podlach, turned her around, pulled her hands behind her back to handcuff her, and pushed her into the side of the car. *Id.* ¶¶ 41-42.

At about 1:00 a.m., Podlach arrived at the police station for processing. *Id.* ¶ 47. Plaintiff claims that she was at that time promised food, which she urgently needed due to her thyroid condition, about which she had already alerted the arresting officers. *Id.* Even though she told the officers at her arrest that she had not eaten for over twelve hours prior to being taken into custody, once lodged in her cell, the matron refused to give her any food, stating that Plaintiff must have done something wrong to end up in jail. *Id.* at 32-33, ¶¶ 47-49.

Podlach remained incarcerated through the night awaiting her arraignment and did not eat again until 10:00 a.m. that morning. *Id.* ¶ 49. Additionally, although Plaintiff requested to speak to her attorney while in custody for the "hearing," her requests were ignored, despite the fact she was questioned by various officers prior to her arraignment. *Id.* ¶ 50. Podlach also alleges in the Amended Complaint that the officer to whom she spoke informed her that she was not allowed to have a lawyer for her "hearing." *Id.* After her arraignment, the Southampton Court released Podlach on $1,500.00 of bail, and, ultimately, on July 28, 2014, Plaintiff pled guilty to disorderly conduct in satisfaction of all charges against her. *See id.* at 20, ¶ 52; Certificate of Disposition, DE [10-3].

### III. LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). But, a pleading "that offers only 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1965). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. at 1966).

***3** In reviewing a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the non-moving

party. *See LaFaro v. New York Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009). Where the complaint is filed by a *pro se* litigant, the Court must also be careful to "interpret the complaint liberally to raise the strongest claims that the allegations suggest." *Rosen v. N. Shore Tower Apartments, Inc.*, 11-CV-00752, 2011 WL 2550733, at *2 (E.D.N.Y. June 27, 2011) (citing *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000)). Notwithstanding, "threadbare recitals of the elements of a cause of action" that are supported by "conclusory" statements and mere speculation are inadequate and subject to dismissal. *See Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation and citation omitted).

## IV. DISCUSSION

Applying the standards outlined above, and for the reasons set forth herein, the Court respectfully recommends that Defendants' motion to dismiss the Amended Complaint be granted in its entirety.

### A. Causes of Action Arising Under 42 U.S.C. § 1983, generally

Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ....

42 U.S.C. § 1983. Although section 1983 itself does not create substantive rights, it does provide "a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). To prevail on a claim arising under 42 U.S.C. § 1983, a plaintiff must demonstrate: "(1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state[-]law." *Hawkins v. Nassau Cty. Corr. Facility*, 781 F.Supp.2d 107, 111 (E.D.N.Y. 2011) (citing 42 U.S.C. § 1983).

In the Amended Complaint, Plaintiff reasserts multiple causes of action under 42 U.S.C. § 1983 against Defendants for: (i) excessive force, (ii) denial of adequate medical care, (iii) conspiracy and retaliation for exercising her First Amendment rights; and (iv) denial of her right to counsel.

### B. Excessive Force

#### 1. Display of a Firearm

The Court first turns to Plaintiff's renewed excessive force claim regarding the display of a firearm by a member of law enforcement during her arrest. Here, just as it was originally pled, Podlach's first cause of action is premised primarily upon an unknown male officer drawing his weapon and pointing it at her during her arrest while she was inside of her car, approximately ten-feet away, and unarmed. *See* Amend. Compl. at 24-31. On this Court's recommendation, the District Court dismissed this same claim in the original Complaint as such actions by an officer effectuating an arrest, even when presumed true, do not constitute excessive force. *See Dunkelberger v. Dunkelberger*, 14–CV–3877, 2015 WL 5730605 at *15 (S.D.N.Y. Sept. 30, 2015); *Pittman v. City of New York*, 14-CV-4140, 2014 WL 7399308 (E.D.N.Y. Dec. 30, 2014); *Aderonmu v. Heavey*, 00 CIV. 9232, 2001 WL 77099 at *3 (S.D.N.Y. Jan. 26, 2001). This Court again recommends dismissal of the amended claim.

"The vast majority of cases within the Second Circuit hold that merely drawing weapons when effectuating an arrest does not constitute excessive force as a matter of law." *Dunkelberger*, 2015 WL 5730605, at *15 (citing *Cabral v. City of New York*, 12-CV-4659, 2014 WL 4636433, at *11 (S.D.N.Y. Sept. 17, 2014)) ("[The defendant's] approach with his gun drawn does not constitute excessive force as a matter of law."); *Mittelman v. Cty. of Rockland*, 07-CV-6382, 2013 WL 1248623, at *13 (S.D.N.Y. Mar. 26, 2013) ("Likewise insufficient is [the][p]laintiff's assertion that the officers pointed guns at him. A threat of force does not constitute excessive force."); *Aderonmu*, 2001 WL 77099, at *3 (dismissing excessive force claim based on an interrogation at gunpoint because the plaintiff "fail[ed] to allege that any physical force was used against him during his interrogation, or that any injuries resulted from [the] defendants' allegedly unconstitutional conduct").

***4** With respect to excessive force, Plaintiff's essential allegations have remained unchanged—immediately prior to

her being taken into custody, while she was still in her vehicle, a young male officer pointed his firearm at her and she was subsequently ordered her to exit her car. *See* Amend Compl. at 3-4, 28-30, ¶¶ 36-42. When compared to the original Complaint, the Amended Complaint contains some additional factual allegations related to this first cause of action, specifically, that the officer was in a "shooter's stance," that he appeared to be ready to shoot Podlach with his "finger ... on the trigger," and that the police force is "extremely young" and "inexperienced." *See* Amended Compl. at 49-50, ¶¶ 37-38. Podlach also asserts that police training and NYPD manuals classify this conduct as appropriate only when the officer intends to shoot to kill. *Id.* at 15. Nevertheless, these additional allegations do not allege that law enforcement used any actual physical force on Plaintiff as would save her claim from dismissal.

In support of her argument that the mere brandishing of a firearm by law enforcement can substantiate a claim of excessive force, Plaintiff directs the Court to *Robinson v. Solano*, 278 F.3d 1007 (9th Cir. 2002). *See* Pl. Opp. at 2-6. However, *Robinson* is factually distinguishable and contrary to precedent within the Second Circuit. *See Robinson*, 278 F.3d 1007. In *Robinson,* the plaintiff was unarmed and had not had any prior interactions with law enforcement preceding his arrest. *See id.* at 1010. Moreover, he was not in a vehicle and voluntarily approached the police after exiting his home to inquire about the incident that the officers were then investigating. *See id.* Further distinguishing *Robinson* from the instant matter, there, that plaintiff alleged that he was approximately six feet away from the police when they first drew their weapons, pointed them at his head, and ordered Robinson to put his hands up and that, after he complied with police directives, the officers repeated their command and brought their weapons closer, to within three feet of his head. *Id.* By contrast, here, when the police officer drew his weapon, he is alleged to have been approximately ten-feet away, and Podlach admits, that night prior to this encounter, she repeatedly refused to comply with police directives to stop and/or get out of her vehicle. *See* Amend. Compl. at ¶¶ 34-35, 37-41. Such differences alone render the use of and/or threat of force objectively more reasonable here than in *Robinson*. *Accord United States v. Santillian*, 13 CR. 138, 2013 WL 4017167, at *7 (S.D.N.Y. Aug. 7, 2013) (citing *Maryland v. Wilson*, 519 U.S. 408, 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) ("An officer making a traffic stop may order passengers to get out of the car pending completion of the stop.")); *United States v. Cummings*, 764 F.Supp.2d 480, 508 (E.D.N.Y. 2011) (holding that agents had the right to order the passenger co-defendant out of the car for safety reasons during a traffic stop even without any suspicion of wrongdoing on his part); *see also Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed. 2d 331 (1977) (holding that where police officers on routine patrol observed defendant driving an automobile with an expired license plate and lawfully stopped vehicle for purpose of issuing a traffic summons, order of one of officers that defendant get out of automobile was reasonable and thus permissible under Fourth Amendment). Additionally, Plaintiff's markedly different location, being in the driver's seat of an operable motor vehicle, puts her in possession of a potentially dangerous instrument as would justify an even greater display of force by law enforcement regardless of her motivation or mental state at the time. *Compare* ¶¶ 36-41 *with Costello v. Town of Warwick*, 273 Fed.Appx. 118 (2d Cir. 2008) (holding that police officer's decision to use *deadly* force against suspect was objectively reasonable when suspect was seated in the driver's seat, put vehicle into drive, stepped on the gas, and hit the police vehicle in front of it while suspect's car was surrounded by police officers).[2]

***5** The only other additional fact alleged in the Amended Complaint with respect to this excessive force claim concerns the assertion that due to the police officer drawing his weapon and pointing it at Plaintiff during her arrest, she lives in fear every day and has symptoms consistent with post-traumatic stress disorder and a deterioration of her health related to her thyroid condition. *See* Amend. Compl. at 20-21, 30, ¶ 53; Pl. Opp. ¶ 8. Though the Court notes that such an assertion may articulate an injury, because there is no actual excessive force alleged as a matter of law, these added details do not save Podlach's first cause of action. *See Espada v. Schneider,* 522 F.Supp.2d 544, 555 (S.D.N.Y. 2007) (noting that regardless of the level of injury pled the essential element of the cause of action is the factual assertion that the force that caused it was objectively unreasonable and excessive). Accordingly, the Court respectfully recommends that Defendants' motion to dismiss Plaintiff's first cause of action for excessive force be granted.

2. Seizure and Handcuffing

Next, the Court examines the allegations concerning Plaintiff's actual arrest. Preliminarily, the Court notes that "[n]ot every push or shove" constitutes a constitutional violation. *Robison v. Via*, 821 F.2d 913, 923 (2d Cir. 1987); *see Rodriguez v. Vill. of Ossining*, 918 F.Supp.2d 230, 238

(S.D.N.Y. 2013) (citing *Lemmo v. McKoy,* 08-CV-4264, 2011 WL 843974, at *5 (E.D.N.Y. Mar. 8, 2011)) (holding police officer did not use excessive force in grabbing arrestee's arm to try to remove her from a vehicle to arrest her after she failed to comply with order to step out of the vehicle). Instead, "[t]he Fourth Amendment prohibits the use of unreasonable and, therefore, excessive force by a police officer in the course of effecting an arrest." *Tracy v. Freshwater,* 623 F.3d 90, 96 (2d Cir. 2010). "A claim that excessive force was used in the course of a seizure is[, consequently,] subject to an objective test of reasonableness under the totality of the circumstances, which requires consideration of the specific facts in each case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of others and whether he is actively resisting arrest." *Sullivan v. Gagnier,* 225 F.3d 161, 165 (2d Cir. 2000); *see Roundtree v. City of New York*, 778 F.Supp. 614, 622 (E.D.N.Y. 1991) (holding that arrestee failed to state a claim where arrestee alleged that he was pushed by an officer into one of the cars and experienced emotional pain and suffering). Accordingly, to plead excessive force, a plaintiff must allege facts that facially establish that the use of force at issue is "objectively sufficiently serious or harmful enough to be actionable." *Sachs v. Cantwell,* 10-CV-1663, 2012 WL 3822220, at *14 (S.D.N.Y. Sept. 4, 2012) (citation and internal quotation marks omitted). "A *de minimis* use of force will rarely suffice to state a Constitutional claim," and consequently, even if an injury were to result from the force alleged to be excessive, when that injury is rightly also categorized as *de minimis* then the excessive force claim premised upon it should be dismissed. *Lemmo*, 2011 WL 843974, at *5 (citing *Graham,* 490 U.S. at 396, 109 S.Ct. 1865).

According to Plaintiff, when law enforcement took her into custody, the older male officer "grabbed" Podlach, "forcibly" turning her toward and "shov[ing] her into" her vehicle, "yanking" her arms down as he was attempting to handcuff her. *See* Amended Compl. ¶ 42. Even when assumed true and viewed collectively, these allegations simply do not rise to the level of excessive force in violation of Podlach's constitutional rights sufficient to sustain a section 1983 claim. Further, the only injuries that Podlach discusses in the Amended Complaint that could arguably rise above the *de minimis* threshold are her emotional distress and possible PTSD. *See* Amend. Compl. at 20-21, 30, ¶ 53; Pl. Opp. ¶¶ 3, 8-11. These injuries, however, are alleged to have resulted not from the actual use of physical force, but instead from the brandishing of a weapon that preceded it. *See id.* Moreover, Podlach acknowledges that prior to her arrest she refused to comply with law enforcement instructions to exit her vehicle and drove away from police directing her to stop. *See* Amend Compl. ¶¶ 34, 37-39, 40. Finally, Plaintiff alleges only emotional pain, "crying uncontrollably," as a result of the police officer's conduct while handcuffing her. *Id.* ¶ 42. The only specific physical injury Plaintiff mentions is that she had scars or scratches on her back, but according to her own pleadings these were the result, not of her arrest, but of her doing push-ups and sit-ups all night in her cell to calm herself down. *Id.* at 23.

***6** Despite her level of injury, Plaintiff still argues that the totality of the circumstances compels the Court to question the reasonableness of the police officers' conduct and thus deny Defendants' motion to dismiss. *See* Amend. Compl. at 18-23, 31, 45. However, in so do doing Podlach does not deny that she pled guilty to disorderly conduct, Section 240.20(7) of the New York State Penal Law. *See* Amend. Compl. at 30, 48; Certificate of Disposition, DE [10-3]; Pl. Opp. ¶ 2 ("The seminal material fact is that I pled guilty to a 'violation' ").[3] Though Plaintiff is correct in that she was not convicted of a crime, her plea to disorderly conduct nevertheless acknowledges that "[s]he was engaged in some unlawful activity for which the police could properly take [her] into custody." *Sealey v. Fishkin*, 96-CV-6303, 1998 WL 1021470, at *4 (E.D.N.Y. Dec. 2, 1998). When the Amended Complaint is read in conjunction with the Certificate of Disposition, the propriety of taking Plaintiff into custody and the limited physical force used to do so render her claim of excessive force related to her arrest inherently defective.[4]

Accordingly, because Podlach has failed to plausibly show that under any set of facts that she has pled she could be entitled to relief, the Court respectfully recommends that Defendants' motion to dismiss be granted and Plaintiff's excessive force cause of action be dismissed.

### C. Denial of Medical Care

Although Plaintiff's next cause of action is entitled a "Denial of Medical Care," the only denial articulated regards law enforcement's refusal to provide a meal during Podlach's initial overnight detention, which she maintains was medically necessary. *See* Amend. Compl. at 31-34 ("I explained clearly way [sic.] I needed food ... how my adrenal organ would be affected ... I also told him that this was what I required for not being moved to a hospital."). Even presuming all the facts and circumstances asserted regarding

Podlach's confinement, because such a limited deprivation does not rise to the level of a constitutional violation, the Court recommends that this cause of action be dismissed.

***7** Section 1983 claims premised upon inadequate conditions of confinement for pre-trial detainees are measured by "whether the conditions amount to 'punishment' without due process in violation of the Fourteenth Amendment." *Hendrix v. City of N.Y.*, 12 CV 5011, 2013 WL 6835168, at *8 (E.D.N.Y. Dec. 20, 2013) (quoting *Lareau v. Manson*, 651 F.2d 96, 102 (2d Cir. 1981)). Either a plaintiff must allege "express intent to punish" or that defendants' "deliberate indifference" caused conditions to deteriorate below a "minimal civilized measure of life's necessities" as would create "an excessive risk to the detainee's health or safety." *Benjamin v. Fraser,* 343 F.3d 35, 50 (2d Cir. 2003); *see also Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir. 2009) (noting that claims for deliberate indifference to the health or safety of a detainee are analyzed the same under the Eighth and Fourteenth Amendments); *Solomon v. Nassau Cnty.,* 759 F.Supp.2d 251, 257–58 (E.D.N.Y. 2011); *Martin v. Cnty. of Nassau,* 692 F.Supp.2d 282, 295 (E.D.N.Y. 2010).

Plaintiff attempts to put forth an allegation of express intent to punish in quoting the matron's response to her request for food in support of her cause of action for denial of medical care. *See* Amend. Compl. ¶ 49. Podlach alleges that when she pled with the matron for a meal, the matron responded, "You wouldn't be here if you hadn't done something wrong, you should have thought of that." *Id.* However, this statement, though arguably unsympathetic, does not establish that law enforcement's motivation in denying Plaintiff's request was to punish her in a manner sufficient to support a cause of action. *See Perez v. Ponte*, 236 F.Supp.3d 590, 600–01 (E.D.N.Y. 2017) (Report and Recommendation), *adopted by,* 16-CV-645, 2017 WL 1050109 (E.D.N.Y. Mar. 15, 2017) (declining to find that an express intent to punish motivated the housing of a pre-trial detainee in isolation despite supervisory guard's statement, "[I] heard you [were] giving my budd[ies] in [N]assau a hard time[.] [Y]ou act like an asshole you [are going to] get treated like one"). *See* Amend. Compl. ¶ 49. Accordingly, the Court finds that, even were the statement assumed to be true, it does not demonstrate the requisite express intent necessary to establish Plaintiff's claim.

Therefore, the Court next considers whether the duration of the alleged deprivation of food itself "rises to the level of a constitutional violation." *See Hendrix*, 2013 WL 6835168, at *8-9 (citing *Simmons v. Kelly,* 06 Civ. 6183, 2009 WL 857410, at *7 (S.D.N.Y. Mar. 31, 2009) (denying motion to dismiss where plaintiff alleged deprivation of food and water for thirty hours during pre-arraignment detention); *Hodge v. Ruperto,* 739 F.Supp. 873, 878 (S.D.N.Y. 1990) (holding a deprivation lasting two and a half days to be a constitutional violation); *Webster v. City of New York,* 333 F.Supp.2d 184, 200 (S.D.N.Y. 2004) (holding no constitutional violation when deprivation lasted from 1:30 am until day-time arraignment)). Here, Plaintiff alleges that she was held in custody without food from approximately 1:00 a.m. to approximately 10:00 a.m. that same day. *See* Amend. Compl. at 23, ¶ 49. Podlach claims in her Amended Complaint that she explained to law enforcement that she had a thyroid condition and had not eaten for the twelve hours prior to her arrest. *See id.* Although Plaintiff details the possible injuries inadequate nutrition can cause to someone with her thyroid condition, Hashimotos Thyroiditis, and contends that she has in her possession reports from treating physicians substantiating this risk, she fails to allege that any actual proximate serious injury occurred as a result of law enforcement's refusal to provide her with food during her overnight confinement. *See id.* at 31-33. Podlach does, however, allege a general decline in her health as a result of her arrest, which is broadly related to her thyroid condition and PTSD. *See id.* at 20, 23, 32 (explaining how in the morning due to the lack of food, the uncomfortable accommodations, and the harsh lighting she "felt very ill" and her "adrenal glands were messed up"). Nevertheless, such a generalized deterioration in health does not support a section 1983 deprivation of medical treatment claim sufficient to survive a Rule 12(b)(6) motion to dismiss. *See Mortimer Excell v. Fischer*, 9:08-CV-945, 2009 WL 3111711, at *4 (N.D.N.Y. Sept. 24, 2009) (holding plaintiff's claims that he suffered from heart and chest pains for a period of five days and that he was denied refills for medication used to treat stomach pain to be conclusory allegations); *Mena v. City of N.Y.*, 13-CV-2430, 2014 WL 4652570, at *6 (S.D.N.Y. Sept. 18, 2014) (dismissing as conclusory plaintiff's allegations regarding his mental health because they consisted of "his self-characterization that he was a mental health patient" and that he was "suffering from depression") (citing *Selah v. N.Y.S. DOCS Comm'r.*, 04–cv–3273, 2006 WL 2051402, at *5 (S.D.N.Y. July 25, 2006) ("[The plaintiff's] conclusory allegation that he suffers from some kind of mental illnesses ... is insufficient to rise to the level of a constitutional violation for failure to provide medical care.... [T]here is no allegation, as required, of pain, discomfort or risk to health, nor is there ... support for the claim of mental illness in the form of medical

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

evidence, such as a physician's diagnosis.") (citations and internal quotation marks omitted)).

***8** In recommending dismissal of Plaintiff's cause of action related to medical care and feeding, the Court notes that Plaintiff was fed at 10:00 a.m. prior to her arraignment hearing. *See* Amend. Compl. at 23. Though Podlach disagrees with the policy that delayed her feeding, the courts of this circuit have found that the government's purpose in not providing food to every detainee upon arrival at a police station is legitimate and non-punitive "particularly [for] those detainees who arrive at a police station in the early morning hours." *Webster v. City of N.Y.*, 333 F.Supp.2d 184, 200 (S.D.N.Y. 2004). Additionally, with respect to deprivations that are shorter in length and that are not accompanied by evidence of punitive intent, the failure to allege actual injury renders such allegations inherently insufficient. *Id.* Thus, Courts of the Second Circuit have consistently held that an overnight deprivation of food and water does not rise to the level of a constitutional violation as a matter of law. *Hendrix,* 2013 WL 6835168, at *8-9 (dismissing claim based upon detainee plaintiff being deprived of food from midnight until his arraignment the following afternoon); *see also Dzwonczyk v. Syracuse City Police Dep't,* 710 F.Supp.2d 248, 269 (N.D.N.Y. 2008) (dismissing claims based on deprivation lasting from the detainee's arrest at 5:35 p.m. until the following morning); *see Felmine v. City of New York*, 09-CV-3768, 2011 WL 4543268, at *22 (E.D.N.Y. Sept. 29, 2011) (granting summary judgment on claims based on deprivation for "several hours" after detainee was arrested around midnight). Accordingly, the Court respectfully recommends that Podlach's claims that her constitutional rights were violated by law enforcement's failure to provide food during her overnight detention be dismissed.

### D. Denial of Counsel Claim Under the Sixth And Fourteenth Amendments

The Court also respectfully recommends Plaintiff's next claim, that Defendants violated her right to counsel while she was in custody, be dismissed.

A detainee does not have an inherent right to counsel prior to the initiation of adversarial judicial proceedings. *Rothgery v. Gillespie Cty., Tex.*, 554 U.S. 191, 128 S.Ct. 2578, 171 L.Ed.2d 366 (2008) (holding that a criminal defendant's right to counsel is only triggered by way of formal charge, preliminary hearing, indictment, information, or arraignment). State law determines when adversarial judicial proceedings have commenced, and, under New York law, the filing of an accusatory instrument at an arraignment commences a criminal action. *Douglas v. People of the State of N.Y.,* 12 CV 3839, 2015 WL 9901710, at *8 (E.D.N.Y. Nov. 3, 2015) (Report and Recommendation*), adopted by*, 12 CV 3839, 2016 WL 270079 (E.D.N.Y. Jan. 21, 2016) (citing *Nimkoff v. Dollhausen,* 751 F.Supp.2d 455, 465 (E.D.N.Y. 2010); N.Y. Crim. Proc. Law. § 100.05). In the specific context of pre-arraignment detention, the Second Circuit has expressly held that the Sixth Amendment right does not attach to questioning, even questioning by the police. *Sullivan v. City of N.Y.*, 14-CV-1334, 2015 WL 5025296, at *6 (S.D.N.Y. Aug. 25, 2015) (citing *Wims v. New York City Police Dep't*, 10–CV–6128, 2011 WL 2946369, at *5 (S.D.N.Y. July 20, 2011) (dismissing Sixth Amendment Section 1983 claim where "plaintiff's complaint alleges only a lack of representation during his initial interrogation before arraignment")). Though the right to have an attorney present prior to and during questioning implicates an individual's right against self-incrimination under the Fifth Amendment and may result in suppression of evidence at trial, that right does not substantiate a cognizable section 1983 claim as a matter of law. *Nesbitt v. Cty. of Nassau*, 05 CV 5513, 2006 WL 3511377, at *2 (E.D.N.Y. Dec. 6, 2006) (citing *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998))

The Amended Complaint alleges that officers questioned Podlach at the start of her arrest processing regarding her driving history and the medications that she was taking for her thyroid condition. *See* Amend. Compl. ¶ 47. She was also "actively questioned by the superior officer about a toll [she] did not pay on the LIE and ... asked if she had difficulty with authority." Amend. Compl. ¶ 61. Plaintiff further claims that she felt forced to answer the questions posed to her because she was intimidated and isolated, with her boyfriend initially being denied access to the police station. *Id.* Accordingly, as all of Plaintiff's claims regarding lack of counsel occurred prior to her arraignment, the Court respectfully recommends that Defendants' Motion to Dismiss the Fourth Cause of Action for violations of the Sixth or Fourteenth Amendment be granted.

### E. First Amendment Retaliation and Conspiracy

***9** Next the Court examines Plaintiff's causes of action related to the First Amendment. The District Court adopted


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

this Court's recommendation that Podlach's First Amendment claims in her original Complaint be dismissed on three independent grounds: (1) her guilty plea conclusively established that her arrest was based upon probable cause, (2) she failed to allege that police-officer conduct had any chilling effect on her First Amendment rights, and (3) that the intracorporate conspiracy doctrine barred a conspiracy claim against the officers of the Southampton Police Department. *See* Report and Recommendation at 21-25; 2/25/2016 Dismissal Order. The Court renews its recommendation as the Amended Complaint fails to remedy these substantive defects in Plaintiff's pleadings.

1. Retaliation

To adequately plead a First Amendment retaliation claim under section 1983, "a plaintiff must allege that: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated by or substantially caused by plaintiff's exercise of that right; and (3) the defendant's actions effectively chilled the plaintiff's exercise of his rights." *Whitfield v. Imperatrice,* 477 Fed.Appx. 806, 808 (2d Cir. 2012) (citing *Connell v. Signoracci,* 153 F.3d 74, 79 (2d Cir. 1998)). A plaintiff "must show ... that his First Amendment rights were 'actually chilled.' " *Bartels v. Inc. Vill. of Lloyd Harbor,* 751 F.Supp.2d 387, 401 (E.D.N.Y. 2010) (quoting *Curley v. Vill. of Suffern,* 268 F.3d 65, 73 (2d Cir. 2001)). "Certain courts in the Second Circuit have held, however, that a plaintiff 'need not show a chilling effect' to prevail on a First Amendment retaliatory prosecution claim if he can 'demonstrate that the prosecution was not supported by probable cause.' " *Harris v. City of N.Y.*, 09-CV-3474, 2013 WL 4858333, at *6 (E.D.N.Y. Sept. 10, 2013) (quoting *Bradley v. City of New York,* 04 Civ. 8411, 2007 U.S. Dist. LEXIS 7811, at *21-22, 2007 WL 232945, at *8 (S.D.N.Y. Jan. 25, 2007)); *see also* Chi Chao *Yuan v. Rivera,* 48 F.Supp.2d 335, 351 n. 6 (S.D.N.Y. 1999) (stating that a plaintiff need only show actual chilling if alleging a restraint on future speech but not if probable cause for prosecution is in dispute).

Thus, the Court first turns to whether Plaintiff has alleged facts that if true are capable of calling into question the probable cause surrounding her arrest. A conviction, however, on any, even lesser included, charges conclusively establishes probable cause to arrest existed sufficient to defeat a section 1983 claim. *Corsini v. Brodsky*, 13CV2587, 2015 WL 3456781, at *8 (S.D.N.Y. May 27, 2015) (citing *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 120 (2d Cir. 1995); *Cameron v. Fogarty*, 806 F.2d 380, 388 (2d Cir. 1986)); *see Croft v. Greenhope Servs. for Women, Inc.*, 13 Civ. 2996, 2013 WL 6642677, at *5 (S.D.N.Y. Dec. 17, 2013) ("If following the arrest, the plaintiff was convicted of the charges against him, that conviction normally would be conclusive evidence of probable cause.") (internal quotation omitted); *supra* at n.4. As stated above, even though it is a violation and not a crime under New York law, a conviction for disorderly conduct, NYPL § 240.20, acknowledges "unlawful activity for which the police could properly take [a subject] into custody." *Sealey*, 1998 WL 1021470, at *4; *supra* at 14-15.

In the Amended Complaint, Plaintiff admits that she pled guilty to violating the disorderly conduct statute and, moreover, acknowledges that she was represented by counsel during that proceeding. *See* Amend. Compl. at 30 ("I was found to be not in violation of anything other than disturbing the peace ..."), 47-48. In an attempt to plead facts as would undermine the probable cause that such a conviction establishes, Podlach asserts immediately after her admission that "in the course of 2015 years after the case was over" she determined that it was "impossible to be founded [guilty] by either the DA or the officer who lied to me that using a curse word was against local law ... a crime." Amend. Compl. at 30. Later in the Amended Complaint, she further alleges that the DA told her attorney that he knew that the charges against her were "bullshit" and asserts that she pled guilty to avoid the expense of trial and under the false impression that disorderly conduct was a real offense. *Id.* at 47-48.

***10** In reviewing Podlach's claim, the Court notes preliminarily that, although Podlach did plead guilty to disorderly conduct, she did not plead guilty to swearing in public. According to the Certificate of Disposition, Plaintiff pled guilty to NYPL § 240.20(7) in satisfaction of ten other Vehicle and Traffic and Penal Law charges. *See* Certificate of Disposition. NYPL § 240.20(7) reads as follows:

> "A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof ... [h]e creates a hazardous or physically offensive condition by any act which serves no legitimate purpose."

*Id.* Nevertheless, Plaintiff is correct that disorderly conduct is a violation and not a crime. *Id.* However, her conclusory statements that this charge does not exist and that a conviction under this statute is constitutionally impermissible or impossible are patently false. *See, e.g., Sealey,* 1998 WL

1021470, at *4. Thus, Podlach has failed to plead a set of facts as would call into question the existence of the probable cause surrounding her arrest sufficient as to permit her First Amendment section 1983 claim to proceed.

Accordingly, as the Amended Complaint fails effectively to challenge the propriety of Podlach's arrest, the Court turns to whether the law enforcement conduct discussed above is alleged to have had an actual effect on her freedom of speech as protected under the First Amendment. As this Court explained in its prior Report and Recommendation, a Section 1983 claim premised upon intimidation and threats curtailing freedom of speech must set forth a particularized and specific chilling effect. *See Williams v. Town of Greenburgh*, 535 F.3d 71, 78 (2d Cir. 2008) (citing *Colombo v. O'Connell,* 310 F.3d 115, 117 (2d Cir. 2002)) ("[T]here is an injury requirement to state [a First Amendment 1983] claim."). The injury must be "actual" and "non-speculative." *Id.; Prince v. Cty. of Nassau*, 837 F.Supp.2d 71, 96 (E.D.N.Y. 2011) ("[A] plaintiff must show that his First Amendment rights were actually chilled.") (internal quotation marks omitted). Specific instances must be put forth where the allegedly injured party "desired to exercise her First Amendment rights but was chilled by" a defendant's alleged conduct. *See Mangano v. Cambariere*, 04 Civ. 4980, 2007 WL 2846418, at *2 (S.D.N.Y. Sept. 27, 2007) (noting, in context of summary judgment, that specific examples of when the plaintiff wanted to exercise her First Amendment Rights but chose not to are required). "[A]llegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Avgerinos v. Palmyra-Macedon Cent. Sch. Dist.*, 690 F.Supp.2d 115, 133 (W.D.N.Y. 2010) (quoting *Curley*, 268 F.3d at 73 (quoting *Laird v. Tatum*, 408 U.S. 1, 13-14, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972))) (internal quotation marks omitted). Subsequent acts by a plaintiff that seek redress of the underlying grievances weigh against finding that a plaintiff's First Amendment rights were objectively chilled. *MacPherson v. Town of Southampton*, 738 F.Supp.2d 353, 369 (E.D.N.Y. 2010) (citing *Rosendale v. Brusie*, 07-CV-8149CS, 2009 WL 778418, at *9 (S.D.N.Y. Mar. 25, 2009), *aff'd*, 374 Fed.Appx. 195 (2d Cir. 2010) (finding insufficient allegations of First Amendment retaliation when Complaint alleged that plaintiff continued to speak out against defendants' failure to enforce zoning regulations, brought a state court action, and commenced a federal action)).

***11** In the Amended Complaint, Plaintiff asserts only that her "speech was silence [*sic.*] so much so as to absolutely never ask a police officer for directions ever again, to address a police officer voluntarily ever again, to trust one, or risk my life to ask one a question." Amend. Compl. at 34. She goes on to state that she will never "express emotion toward an officer or in any place where an officer can even hear me." *Id.* Additionally, after alluding to her memory of her arrest, she concludes by commenting "to say this experience could leave anyone unaltered with regard to her speech is laughable and offensive." *Id.* Podlach's claimed injury of theoretically being prevented from speaking with police officers in the future is wholly speculative and conclusory, failing to allege a single instance of when she needed, wanted, or even had a subsequent opportunity to speak with a member of law enforcement and chose not to do so. *See* Amend. Compl. at 34. Plaintiff also fails to cite to any specific time that she wanted to curse at or even criticize a police officer and felt restrained as a result of the circumstances and conduct surrounding her arrest. *Id.* Further, in her concluding remarks, Plaintiff states that were the Courts to deny her relief, that she would not only appeal that decision but seek redress of her grievances against the police in the media undermining any claim that she feels inhibited about speaking out. *Id.* at 46. As Podlach's Amended Complaint has not put forth a set of facts that if proven true would substantiate that her rights under the First Amendment were actually chilled, she has failed to plead a cognizable First Amendment violation. Accordingly, the Court recommends that her claim be dismissed and Defendants' motion granted.

2. Conspiracy

As in the original Complaint, Plaintiff again asserts a conspiracy claim, alleging that Defendants' conduct "was the product of a conspiracy designed to punish plaintiff for exercising her First Amendment right to express herself orally." Amend. Compl. ¶ 59. Even assuming that Plaintiff stated a claim for First Amendment retaliation, she fails to state a cause of action for conspiracy.

*a. Intracorporate Conspiracy Doctrine*

First, Podlach's theory of liability must be dismissed under the intracorporate conspiracy doctrine, which holds that "the officers, agents, and employees of a single corporate entity, each acting within the scope of [his or] her employment, are legally incapable of conspiring together." *Little v. City of New York*, 487 F.Supp.2d 426, 441-42 (S.D.N.Y. 2007). The intracorporate conspiracy doctrine applies to the conduct of

both corporations and municipal entities. *Mendoza v. Cty. of Nassau*, 11-CV-2487, 2012 WL 4490539, at *8 (E.D.N.Y. Sept. 27, 2012). An exception to the intracorporate conspiracy doctrine exists where a plaintiff "adequately alleges that each defendant possessed an independent, personal conspiratorial purpose, wholly separate and apart from the entity." *Broich v. Vill. of Southampton*, 650 F.Supp.2d 234, 247 (E.D.N.Y. 2009) (internal quotation omitted).

Podlach alleges throughout her Amended Complaint that the officers of the Southampton Police Department worked together to arrest her on August 31, 2013, and that they were collectively and individually aware of why Officer Jones arrested her—namely disturbing the peace for cursing in public. *See* Amend. Compl. ¶¶ 46-48. However, such activity, even if proven true, falls squarely within scope of each individual officer's employment and cannot be said to be separate and apart from the Police Department itself—a municipal corporate entity. Additionally, Podlach failed to allege that any of the officers possessed any conspiratorial purpose other than arresting her for disturbing the peace to which she pled guilty. *See id.* Plaintiff claims that Officer Jones told her after her arrest, "You should have waited for me." Amend. Compl. ¶ 48. Presuming this statement occurred, the Court does not accept as reasonable Podlach's conclusion that it "made ... clear ... that she had followed [Podlach] because she was personally upset that [Plaintiff] had not waited for her when [she] first asked her for directions ... and then arrested [Podlach] after making up a law that didn't exist as an act of retaliation," as would express a personal conspiratorial purpose. *Id.* Accordingly, Defendants are legally incapable of conspiring together, and the claim of conspiracy should be dismissed.

*b. Section 1985(3)*

Second, as was also found in the prior Report and Recommendation, Plaintiff's claim is still improperly pled as arising under 42 U.S.C. § 1985(3). Under that statute, a plaintiff must allege: (1) a conspiracy, (2) for the purpose of depriving any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws, (3) an act in furtherance of the conspiracy, and (4) whereby a person is injured in his person or property or deprived of a right or privilege of a citizen. *Turkmen v. Hasty,* 789 F.3d 218, 262 (2d Cir. 2015). To prevail on a claim under 42 U.S.C. § 1985(3), "the conspiracy must also be motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999) (quoting *Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993)).

***12** Here, Plaintiff does not allege that Defendants acted with any racial, class-based, or otherwise discriminatory motivation, but rather, that Defendants sought to "punish [her] for exercising her First Amendment right to express herself orally." Amended Compl. ¶ 59. Accordingly, the Court again recommends that Defendants' motion to dismiss Plaintiff's claim for conspiracy arising under 42 U.S.C. § 1985(3) be granted.

**F. Supplemental Jurisdiction Over State-Law Claims**

Having recommended that each of Plaintiff's federal claims again be dismissed, the Court also renews its recommendation that the District Court decline to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims.

Supplemental jurisdiction over Plaintiff's state-law claims is governed by statute, which provides that, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy ..." 28 U.S.C. § 1367(a). However, a district court may decline to exercise supplemental jurisdiction over a claim where, as here, all claims over which it had original jurisdiction have been dismissed. 28 U.S.C. § 1367(c). When such circumstances arise prior to the commencement of trial, Second Circuit precedent consistently recognizes that, "the balance of factors to be considered," which include "judicial economy, convenience, fairness and comity," "will point toward declining to exercise jurisdiction over the remaining state-law claims." *Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 305 (2d Cir. 2003).

Defendants' filed their Rule 12(b)(6) motion to dismiss the Amended Complaint in lieu of an Answer and while a stay of discovery remained in effect. *See* DE [18], [33]. Thus, this litigation is still in its initial stages and no discovery has taken place. Accordingly, the Court respectfully recommends that the Defendants' motion to dismiss be granted and the District Court decline to exercise supplemental jurisdiction over Podlach's state-law causes of action. *See Quiroz v. U.S. Bank Nat'l Ass'n*, 10-CV-2485, 2011 WL 2471733, at *8

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

(E.D.N.Y. May 16, 2011) (Report and Recommendation), *adopted by*, 2011 WL 3471497 (E.D.N.Y. Aug. 5, 2011) (recommending that the district court decline to exercise supplemental jurisdiction over negligence claim once federal claims were dismissed between non-diverse parties). [5]

### G. Leave to Amend

***13** As the defects inherent in Plaintiff's original pleadings were not addressed in the Amended Complaint, the Court respectfully recommends that Podlach not be given *sua sponte* another opportunity to amend her complaint because such efforts would be futile. While leave to amend a complaint should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), it is "within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). However, the court must be mindful of the unique context of a *pro se* complaint and "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Aquino v. Prudential Life & Cas. Ins. Co.,* 419 F.Supp.2d 259, 278 (E.D.N.Y. 2005); *see also Thompson v. Carter,* 284 F.3d 411, 419 (2d Cir. 2002) ("The liberal pleading standards applicable to *pro se* civil rights complaints in this circuit require that the district court give [plaintiff] an opportunity to flesh out his somewhat skeletal complaints before dismissing them"). Nevertheless, "a district court may deny leave to amend when, as here, amendment would be futile because the problem with the claim 'is substantive ... [and] better pleading will not cure it.' " *Reynolds v. City of Mount Vernon*, 14-CV-1481, 2015 WL 1514894, at *5 (S.D.N.Y. Apr. 1, 2015) (quoting *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir. 2000)).

Despite the appropriate leniency afforded Plaintiff in light of her *pro-se* status, the Court finds that the deficiencies in Podlach's pleadings are substantive and persist despite clear guidance from this Court and the District Court. Instead of countenancing that guidance and properly amending her complaint, Plaintiff spends significant portions of the Amended Complaint providing extraneous background information, including newspaper articles with examples of her artwork, and generalized social commentary regarding police violence. *See, e.g.,* Amend. Compl. at 42-55. Additionally, in her opposition Plaintiff has not requested permission to file a second amended complaint, nor has Podlach "given any indication that [s]he is in possession of facts that would cure the problems identified in this opinion." *Clark v. Kitt*, 12-CV-8061, 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014). Accordingly, as the facts present in the pleadings "give[ ] no indication that a valid claim may be stated," the Court respectfully recommends that Plaintiff not be given further leave to amend. *See Flaherty v. All Hampton Limousine, Inc.*, 02-CV-4801, 2008 WL 2788171, at *8 (E.D.N.Y. July 16, 2008).

## V. CONCLUSION

Accordingly, based on the foregoing, the Court respectfully recommends that the District Court grant Defendants' motion to dismiss the Amended Complaint for failure to state a claim in its entirety and with prejudice.

## VI. OBJECTIONS

A copy of this Report and Recommendation is being served on Defendants by electronic filing on the date below. Defendants are directed to serve a copy of this Report and Recommendation on Plaintiff and promptly file proof of service by ECF. Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of receipt of this report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a); *Ferrer v. Woliver*, 05-3696, 2008 WL 4951035, at *2 (2d Cir. Nov. 20, 2008); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

### All Citations

Not Reported in Fed. Supp., 2017 WL 4350433

## Footnotes


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

1 The Amended Complaint contains both numbered and unnumbered paragraphs. Where available, the Court will use paragraph numbers in its citations; otherwise, the Court will cite to the relevant page number.

2 Plaintiff imbeds in the Amended Complaint a string cite to case law that she argues supports her claim that the mere display of a weapon by an officer can substantiate excessive force. *See* Amend. Compl. at 25. Upon review, the Court declines to follow these cases as they are from other Circuits and factually distinguishable from the present matter. *See* *Stamps v. Town of Framingham*, 813 F.3d 27, 35 (1st Cir. 2016) (denying summary judgment in case where officer kept his semi-automatic rifle pointed at the head of a compliant, prostate detainee while other officers searched a house and the gun accidentally discharged killing detainee; holding "[w]here an officer creates conditions that are highly likely to cause harm and unnecessarily so, and the risk so created actually, but accidentally, causes harm, the case is not removed from Fourth Amendment scrutiny."); *Binay v. Bettendorf*, 601 F.3d 640, 644 (6th Cir. 2010) (noting that officers continued to interrogate plaintiffs at gunpoint while they were handcuffed and compliant during execution of search warrant even after it was determined that no drugs were on the premises); *Curiel v. Cty. of Contra Costa*, 362 Fed.Appx. 824 (9th Cir. 2010) (finding that genuine issue of material fact existed as to whether deputies' use of force in entering house and seizing family members during murder investigation was excessive, when deputies' entered unannounced, with guns drawn and pointed at children, and they explicitly threatened deadly force with vulgar profanity); *Baird v. Renbarger*, 576 F.3d 340 (7th Cir. 2009) (finding police officer's use of submachine gun to detain plaintiffs at search site for an alleged altered vehicle identification number was objectively unreasonable where there was no indication of any threat, none of the plaintiffs resisted or attempted to flee, and scene consisted of peaceable individuals, including pacifist Amish, going about their business).

3 As Plaintiff repeatedly references the circumstances and implications of the resolution of the underlying criminal case in arguing against the motion to dismiss, the Court is permitted to and does take judicial notice of the Certificate of Disposition proffered by Defendants detailing Podlach's original charges and eventual plea. *See* *Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) (acknowledging that "[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint."); *see also* *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006) ("There are circumstances under which it is appropriate for a court to consider documents outside of the complaint on a motion to dismiss").

4 In her introductory remarks, Podlach explicitly states that she was wrongfully arrested and imprisoned and alludes to such a claim throughout her the Amended Complaint. *See, e.g.,* Amend. Compl. at 2, 28, 47-48. Podlach, however, never specifies a claim under state law or section 1983 regarding the lawfulness of her arrest itself. *See id.* Whether Plaintiff intended to assert such a claim, even when reading the *pro se* complaint liberally, the Court cannot find a viable cause of action for false or unlawful arrest as would survive a motion to dismiss. "[A] claim for false arrest turns only on whether probable cause existed to arrest a defendant, and [ ] it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly v. Couch,* 439 F.3d 149, 154 (2d Cir. 2006). On the question of probable cause, " 'a valid judgment of conviction, a defense to the tort [of false arrest], requires dismissal of a § 1983 action on motion for summary judgment.' " *Barnes v. Coughlin*, 14-CV-6364 2016 WL 3577603, at *4 (W.D.N.Y. June 27, 2016) (citing *Camarano v. City of New York*, 646 F.Supp. 246, 249 (S.D.N.Y. 1986)). As discussed, Plaintiff acknowledges that she pled guilty to disorderly conduct, one of the charges upon which she was arrested. *See supra* at 14-15. Accordingly, any nascent cause of action for unlawful or wrongful arrest would be dismissed were it explicitly pled.

5 The District Court previously declined to exercise supplemental jurisdiction over the state-law claims put forth by Plaintiff after determining that she had failed to state a federal claim. *See* DE [25]. Though the Court renews its recommendation that the District Court decline to exercise supplemental jurisdiction here

again, this Court also notes that Plaintiff has not put forth any additional factual allegations in the Amended Complaint with respect to those state-law claims that address the fatal deficiencies discussed in detail in the previous Report and Recommendation. *Compare* Report and Recommendation at 28-32 *with* Amend. Compl. at 35-41. The District Court acknowledged those legal conclusions but did not specifically adopt them as it declined to exercise supplemental jurisdiction over the underlying claims. *See* DE [25]. Accordingly, were the District Court not to adopt the present recommendations to dismiss the federal claims or, in its discretion, to determine that an exercise of supplemental jurisdiction over the state-law claims was now warranted, the Court incorporates by reference the argument and analysis contained in its prior Report and Recommendation and, in the alternative, independently again recommends dismissal of the state-law claims in their entirety. *See* Report and Recommendation at 28-32.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Distinguished by Siracusa v. New Hyde Park-Garden City Union Free School District, E.D.N.Y., March 28, 2025

2017 WL 4350433
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Elizabeth PODLACH, Plaintiff,
v.
VILLAGE OF SOUTHAMPTON, Southampton Village Police Department, Police Officer Ashley E. Jones, Jane Doe 1, John Doe 1, and John Doe 2, in their individual and official capacities, Defendants.

14-CV-6954 (SJF)(SIL)
|
Signed 05/11/2017

**Attorneys and Law Firms**

Elizabeth Podlach, Hampton Bays, NY, pro se.

David H. Arntsen, Jeltje DeJong, Kelly E. Wright, Devitt Spellman Barrett, LLP, Smithtown, NY, for Defendants.

**REPORT AND RECOMMENDATION**

STEVEN I. LOCKE, United States Magistrate Judge

***1** Presently before the Court in this section 1983 civil rights litigation on referral from Honorable Sandra J. Feuerstein for Report and Recommendation is Defendants', the Village of Southampton, the Southampton Village Police Department, Police Officer Ashley E. Jones ("Officer Jones"), and three unnamed Police Officers, Jane Doe and John Does 1 and 2 (collectively "Defendants"), motion to dismiss *pro se* Plaintiff Elizabeth Podlach's ("Podlach" or "Plaintiff") First Amended Complaint ("Amended Complaint"). *See* Second Motion to Dismiss ("Def. Mot."), Docket Entry ("DE") [33]. The Amended Complaint restates with additional detail, and a substantial amount of commentary and legal argument, alleged civil rights violations and state-law causes of action relating to Plaintiff's arrest on August 31, 2013. *See* First Amended Complaint ("Amend. Compl."), DE [26]. These allegations were first pled in the original Complaint, which was dismissed with leave to amend. *See* 2/25/2016 Dismissal Order, DE [25]; *compare* Complaint ("Compl."), DE [1] *with* Amend. Compl. In response to the Amended Complaint, Defendants filed a motion to dismiss, which Podlach opposed. *See* Def. Mot.; Memorandum in Opposition ("Pl. Opp."), DE [34]. On September 16, 2016, Judge Feuerstein referred that motion to this Court for a report and recommendation as to whether it should be granted. *See* DE [18]. For the reasons set forth herein, the Court respectfully recommends that Defendants' motion be granted in its entirety and that the Amended Complaint be dismissed with prejudice.

**I. PROCEDURAL HISTORY**

Podlach filed the original Complaint on November 26, 2014. *See* DE [1]. In response, Defendants moved pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") to dismiss, and Judge Feuerstein referred that motion to this Court for report and recommendation. *See* DE [18]. Upon due consideration, this Court recommended dismissal of the original Complaint with leave to amend, and Judge Feuerstein adopted that conclusion. *See* Report and Recommendation, DE [20]; 2/25/2016 Dismissal Order.

Plaintiff subsequently filed her Amended Complaint on June 16, 2016. *See* Amend. Compl. The Amended Complaint, though over twice as long, contains the same eight causes of action as the original Complaint. Podlach alleges federal claims for excessive force, denial of medical care, conspiracy/retaliation for the exercise of her First Amendment rights, and denial of her Sixth Amendment right to counsel, as well as state-law claims for intentional infliction of emotional distress, negligence, respondeat superior, and negligent supervision, retention, and training. Compare *id.* at 24-41 *with* Compl. ¶¶ 54-75. In response to the Amended Complaint, Defendants filed the instant motion to dismiss. *See* Def. Mot.

**II. STATEMENT OF RELEVANT FACTS**

The following facts, set forth in the Amended Complaint, are presumed true for the purpose of Defendants' motion.

Podlach alleges that, at approximately 11:45 p.m. on August 30, 2013, she, a resident of Hampton Bays, was driving to pick up her boyfriend at the Southampton Long Island Railroad station. Amend. Compl. ¶¶ 13-15. [1] At 12:10 a.m., upon arriving in Southampton, unfamiliar with the area and dependent on printed directions, Plaintiff became disoriented and proceeded to drive through downtown Southampton in search of the train station, traveling up and down multiple streets attempting to read the street signs. *Id.* At approximately 12:15 a.m., "after driving around the village

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

several times," she saw a police officer, Officer Jones, ticketing another motorist. *Id.* ¶¶ 16-17. Podlach stopped her vehicle, exited, and approached the officer to ask directions while the officer was still involved with the stopped motorist. *See id.* According to Podlach, Officer Jones yelled at her, ordering her to get back into her car immediately. *Id.* ¶¶ 17, 19. Podlach complied and then drove away. *See id.* At 12:45 a.m., still lost in Southampton Village, Podlach stopped her car on Main Street to ask a group of men coming out of a bar for directions. *Id.* ¶¶ 21, 22. Just as one of those men finished giving Plaintiff directions to the train station, a police vehicle came speeding down the street and pulled up immediately adjacent to Plaintiff's car. *See id.* The driver, Officer Jones, yelled out the window, "Why didn't you wait for me?" and barked, "You just go straight," in reference to the station's location. *Id.* ¶¶ 23-24. In response, Podlach said the words, "Thank you," to Officer Jones and then audibly cursed at her. *Id.* ¶ 25.

***2** Still unable to find the station, Podlach continued driving slowly through Southampton, eventually down a dirt road, when she noticed a police car behind her. *Id.* ¶¶ 26-27. That vehicle eventually turned on its lights and flashers. *Id.* Podlach claims that at this point she was terrified, first, due to the location, a wooded and deserted area approximately ten minutes from town, and, second, due to an unrelated prior violent encounter that she had with law enforcement in a different state. *Id.* at ¶¶ 28-34. Officer Jones, who was the driver of the police vehicle, came to Podlach's car window and accused Plaintiff of swearing at her and asserted that such conduct was against the law. *Id.* ¶ 30. Officer Jones then directed Podlach to step out of her vehicle, but Podlach ignored this instruction and said to the officer that she was afraid to leave her car. *Id.* ¶¶ 32-34. She then turned the engine back on and slowly drove away. *Id.*

A few minutes later, Podlach stopped to call her boyfriend who was still waiting for her at the train station when a different police vehicle that was also driving at an extremely high rate of speed pulled in front of her blocking her car. *Id.* ¶¶ 34, 36. A male officer jumped out and, according to Plaintiff, immediately drew his service weapon and pointed it at her from about ten feet away while in a "shooting stance ... ready to shoot." *Id.* at ¶ 37. Plaintiff claims that she could see straight down the barrel of the gun and that the Officer's finger was on the trigger. *Id.* Another police vehicle arrived at the scene moments later while Podlach was still sitting in her car with her hands up. *Id.* ¶ 39. An older male officer got out of the same car as the younger officer and ordered Plaintiff to get out of her vehicle. *Id.* ¶ 40. As he was effecting the arrest, the older officer grabbed Podlach, turned her around, pulled her hands behind her back to handcuff her, and pushed her into the side of the car. *Id.* ¶¶ 41-42.

At about 1:00 a.m., Podlach arrived at the police station for processing. *Id.* ¶ 47. Plaintiff claims that she was at that time promised food, which she urgently needed due to her thyroid condition, about which she had already alerted the arresting officers. *Id.* Even though she told the officers at her arrest that she had not eaten for over twelve hours prior to being taken into custody, once lodged in her cell, the matron refused to give her any food, stating that Plaintiff must have done something wrong to end up in jail. *Id.* at 32-33, ¶¶ 47-49.

Podlach remained incarcerated through the night awaiting her arraignment and did not eat again until 10:00 a.m. that morning. *Id.* ¶ 49. Additionally, although Plaintiff requested to speak to her attorney while in custody for the "hearing," her requests were ignored, despite the fact she was questioned by various officers prior to her arraignment. *Id.* ¶ 50. Podlach also alleges in the Amended Complaint that the officer to whom she spoke informed her that she was not allowed to have a lawyer for her "hearing." *Id.* After her arraignment, the Southampton Court released Podlach on $1,500.00 of bail, and, ultimately, on July 28, 2014, Plaintiff pled guilty to disorderly conduct in satisfaction of all charges against her. *See id.* at 20, ¶ 52; Certificate of Disposition, DE [10-3].

## III. LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). But, a pleading "that offers only 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1965). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. at 1966).

***3** In reviewing a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the non-moving

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

party. *See LaFaro v. New York Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009). Where the complaint is filed by a *pro se* litigant, the Court must also be careful to "interpret the complaint liberally to raise the strongest claims that the allegations suggest." *Rosen v. N. Shore Tower Apartments, Inc.*, 11-CV-00752, 2011 WL 2550733, at *2 (E.D.N.Y. June 27, 2011) (citing *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000)). Notwithstanding, "threadbare recitals of the elements of a cause of action" that are supported by "conclusory" statements and mere speculation are inadequate and subject to dismissal. *See Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation and citation omitted).

## IV. DISCUSSION

Applying the standards outlined above, and for the reasons set forth herein, the Court respectfully recommends that Defendants' motion to dismiss the Amended Complaint be granted in its entirety.

### A. Causes of Action Arising Under 42 U.S.C. § 1983, generally

Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ....

42 U.S.C. § 1983. Although section 1983 itself does not create substantive rights, it does provide "a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). To prevail on a claim arising under 42 U.S.C. § 1983, a plaintiff must demonstrate: "(1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state[-]law." *Hawkins v. Nassau Cty. Corr. Facility*, 781 F.Supp.2d 107, 111 (E.D.N.Y. 2011) (citing 42 U.S.C. § 1983).

In the Amended Complaint, Plaintiff reasserts multiple causes of action under 42 U.S.C. § 1983 against Defendants for: (i) excessive force, (ii) denial of adequate medical care, (iii) conspiracy and retaliation for exercising her First Amendment rights; and (iv) denial of her right to counsel.

### B. Excessive Force

#### 1. Display of a Firearm

The Court first turns to Plaintiff's renewed excessive force claim regarding the display of a firearm by a member of law enforcement during her arrest. Here, just as it was originally pled, Podlach's first cause of action is premised primarily upon an unknown male officer drawing his weapon and pointing it at her during her arrest while she was inside of her car, approximately ten-feet away, and unarmed. *See* Amend. Compl. at 24-31. On this Court's recommendation, the District Court dismissed this same claim in the original Complaint as such actions by an officer effectuating an arrest, even when presumed true, do not constitute excessive force. *See Dunkelberger v. Dunkelberger*, 14–CV–3877, 2015 WL 5730605 at *15 (S.D.N.Y. Sept. 30, 2015); *Pittman v. City of New York*, 14-CV-4140, 2014 WL 7399308 (E.D.N.Y. Dec. 30, 2014); *Aderonmu v. Heavey*, 00 CIV. 9232, 2001 WL 77099 at *3 (S.D.N.Y. Jan. 26, 2001). This Court again recommends dismissal of the amended claim.

"The vast majority of cases within the Second Circuit hold that merely drawing weapons when effectuating an arrest does not constitute excessive force as a matter of law." *Dunkelberger*, 2015 WL 5730605, at *15 (citing *Cabral v. City of New York*, 12-CV-4659, 2014 WL 4636433, at *11 (S.D.N.Y. Sept. 17, 2014)) ("[The defendant's] approach with his gun drawn does not constitute excessive force as a matter of law."); *Mittelman v. Cty. of Rockland*, 07-CV-6382, 2013 WL 1248623, at *13 (S.D.N.Y. Mar. 26, 2013) ("Likewise insufficient is [the][p]laintiff's assertion that the officers pointed guns at him. A threat of force does not constitute excessive force."); *Aderonmu*, 2001 WL 77099, at *3 (dismissing excessive force claim based on an interrogation at gunpoint because the plaintiff "fail[ed] to allege that any physical force was used against him during his interrogation, or that any injuries resulted from [the] defendants' allegedly unconstitutional conduct").

***4** With respect to excessive force, Plaintiff's essential allegations have remained unchanged—immediately prior to

her being taken into custody, while she was still in her vehicle, a young male officer pointed his firearm at her and she was subsequently ordered her to exit her car. *See* Amend Compl. at 3-4, 28-30, ¶¶ 36-42. When compared to the original Complaint, the Amended Complaint contains some additional factual allegations related to this first cause of action, specifically, that the officer was in a “shooter's stance,” that he appeared to be ready to shoot Podlach with his “finger ... on the trigger,” and that the police force is “extremely young” and “inexperienced.” *See* Amended Compl. at 49-50, ¶¶ 37-38. Podlach also asserts that police training and NYPD manuals classify this conduct as appropriate only when the officer intends to shoot to kill. *Id.* at 15. Nevertheless, these additional allegations do not allege that law enforcement used any actual physical force on Plaintiff as would save her claim from dismissal.

In support of her argument that the mere brandishing of a firearm by law enforcement can substantiate a claim of excessive force, Plaintiff directs the Court to *Robinson v. Solano*, 278 F.3d 1007 (9th Cir. 2002). *See* Pl. Opp. at 2-6. However, *Robinson* is factually distinguishable and contrary to precedent within the Second Circuit. *See* *Robinson*, 278 F.3d 1007. In *Robinson,* the plaintiff was unarmed and had not had any prior interactions with law enforcement preceding his arrest. *See* *id.* at 1010. Moreover, he was not in a vehicle and voluntarily approached the police after exiting his home to inquire about the incident that the officers were then investigating. *See* *id.* Further distinguishing *Robinson* from the instant matter, there, that plaintiff alleged that he was approximately six feet away from the police when they first drew their weapons, pointed them at his head, and ordered Robinson to put his hands up and that, after he complied with police directives, the officers repeated their command and brought their weapons closer, to within three feet of his head. *Id.* By contrast, here, when the police officer drew his weapon, he is alleged to have been approximately ten-feet away, and Podlach admits, that night prior to this encounter, she repeatedly refused to comply with police directives to stop and/or get out of her vehicle. *See* Amend. Compl. at ¶¶ 34-35, 37-41. Such differences alone render the use of and/or threat of force objectively more reasonable here than in *Robinson*. *Accord* *United States v. Santillian*, 13 CR. 138, 2013 WL 4017167, at *7 (S.D.N.Y. Aug. 7, 2013) (citing *Maryland v. Wilson*, 519 U.S. 408, 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) (“An officer making a traffic stop may order passengers to get out of the car pending completion of the stop.”)); *United States v. Cummings*, 764 F.Supp.2d 480, 508 (E.D.N.Y. 2011) (holding that agents had the right to order the passenger co-defendant out of the car for safety reasons during a traffic stop even without any suspicion of wrongdoing on his part); *see also* *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed. 2d 331 (1977) (holding that where police officers on routine patrol observed defendant driving an automobile with an expired license plate and lawfully stopped vehicle for purpose of issuing a traffic summons, order of one of officers that defendant get out of automobile was reasonable and thus permissible under Fourth Amendment). Additionally, Plaintiff's markedly different location, being in the driver's seat of an operable motor vehicle, puts her in possession of a potentially dangerous instrument as would justify an even greater display of force by law enforcement regardless of her motivation or mental state at the time. *Compare* ¶¶ 36-41 *with* *Costello v. Town of Warwick*, 273 Fed.Appx. 118 (2d Cir. 2008) (holding that police officer's decision to use *deadly* force against suspect was objectively reasonable when suspect was seated in the driver's seat, put vehicle into drive, stepped on the gas, and hit the police vehicle in front of it while suspect's car was surrounded by police officers). [2]

***5** The only other additional fact alleged in the Amended Complaint with respect to this excessive force claim concerns the assertion that due to the police officer drawing his weapon and pointing it at Plaintiff during her arrest, she lives in fear every day and has symptoms consistent with post-traumatic stress disorder and a deterioration of her health related to her thyroid condition. *See* Amend. Compl. at 20-21, 30, ¶ 53; Pl. Opp. ¶ 8. Though the Court notes that such an assertion may articulate an injury, because there is no actual excessive force alleged as a matter of law, these added details do not save Podlach's first cause of action. *See* *Espada v. Schneider,* 522 F.Supp.2d 544, 555 (S.D.N.Y. 2007) (noting that regardless of the level of injury pled the essential element of the cause of action is the factual assertion that the force that caused it was objectively unreasonable and excessive). Accordingly, the Court respectfully recommends that Defendants' motion to dismiss Plaintiff's first cause of action for excessive force be granted.

2. Seizure and Handcuffing

Next, the Court examines the allegations concerning Plaintiff's actual arrest. Preliminarily, the Court notes that “[n]ot every push or shove” constitutes a constitutional violation. *Robison v. Via*, 821 F.2d 913, 923 (2d Cir. 1987); *see* *Rodriguez v. Vill. of Ossining*, 918 F.Supp.2d 230, 238


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

(S.D.N.Y. 2013) (citing *Lemmo v. McKoy,* 08-CV-4264, 2011 WL 843974, at *5 (E.D.N.Y. Mar. 8, 2011)) (holding police officer did not use excessive force in grabbing arrestee's arm to try to remove her from a vehicle to arrest her after she failed to comply with order to step out of the vehicle). Instead, "[t]he Fourth Amendment prohibits the use of unreasonable and, therefore, excessive force by a police officer in the course of effecting an arrest." *Tracy v. Freshwater,* 623 F.3d 90, 96 (2d Cir. 2010). "A claim that excessive force was used in the course of a seizure is[, consequently,] subject to an objective test of reasonableness under the totality of the circumstances, which requires consideration of the specific facts in each case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of others and whether he is actively resisting arrest." *Sullivan v. Gagnier,* 225 F.3d 161, 165 (2d Cir. 2000); *see Roundtree v. City of New York*, 778 F.Supp. 614, 622 (E.D.N.Y. 1991) (holding that arrestee failed to state a claim where arrestee alleged that he was pushed by an officer into one of the cars and experienced emotional pain and suffering). Accordingly, to plead excessive force, a plaintiff must allege facts that facially establish that the use of force at issue is "objectively sufficiently serious or harmful enough to be actionable." *Sachs v. Cantwell,* 10-CV-1663, 2012 WL 3822220, at *14 (S.D.N.Y. Sept. 4, 2012) (citation and internal quotation marks omitted). "A *de minimis* use of force will rarely suffice to state a Constitutional claim," and consequently, even if an injury were to result from the force alleged to be excessive, when that injury is rightly also categorized as *de minimis* then the excessive force claim premised upon it should be dismissed. *Lemmo*, 2011 WL 843974, at *5 (citing *Graham,* 490 U.S. at 396, 109 S.Ct. 1865).

According to Plaintiff, when law enforcement took her into custody, the older male officer "grabbed" Podlach, "forcibly" turning her toward and "shov[ing] her into" her vehicle, "yanking" her arms down as he was attempting to handcuff her. *See* Amended Compl. ¶ 42. Even when assumed true and viewed collectively, these allegations simply do not rise to the level of excessive force in violation of Podlach's constitutional rights sufficient to sustain a section 1983 claim. Further, the only injuries that Podlach discusses in the Amended Complaint that could arguably rise above the *de minimis* threshold are her emotional distress and possible PTSD. *See* Amend. Compl. at 20-21, 30, ¶ 53; Pl. Opp. ¶¶ 3, 8-11. These injuries, however, are alleged to have resulted not from the actual use of physical force, but instead from the brandishing of a weapon that preceded it. *See id.* Moreover, Podlach acknowledges that prior to her arrest she refused to comply with law enforcement instructions to exit her vehicle and drove away from police directing her to stop. *See* Amend Compl. ¶¶ 34, 37-39, 40. Finally, Plaintiff alleges only emotional pain, "crying uncontrollably," as a result of the police officer's conduct while handcuffing her. *Id.* ¶ 42. The only specific physical injury Plaintiff mentions is that she had scars or scratches on her back, but according to her own pleadings these were the result, not of her arrest, but of her doing push-ups and sit-ups all night in her cell to calm herself down. *Id.* at 23.

***6** Despite her level of injury, Plaintiff still argues that the totality of the circumstances compels the Court to question the reasonableness of the police officers' conduct and thus deny Defendants' motion to dismiss. *See* Amend. Compl. at 18-23, 31, 45. However, in so doing Podlach does not deny that she pled guilty to disorderly conduct, Section 240.20(7) of the New York State Penal Law. *See* Amend. Compl. at 30, 48; Certificate of Disposition, DE [10-3]; Pl. Opp. ¶ 2 ("The seminal material fact is that I pled guilty to a 'violation' ").[3] Though Plaintiff is correct in that she was not convicted of a crime, her plea to disorderly conduct nevertheless acknowledges that "[s]he was engaged in some unlawful activity for which the police could properly take [her] into custody." *Sealey v. Fishkin*, 96-CV-6303, 1998 WL 1021470, at *4 (E.D.N.Y. Dec. 2, 1998). When the Amended Complaint is read in conjunction with the Certificate of Disposition, the propriety of taking Plaintiff into custody and the limited physical force used to do so render her claim of excessive force related to her arrest inherently defective.[4]

Accordingly, because Podlach has failed to plausibly show that under any set of facts that she has pled she could be entitled to relief, the Court respectfully recommends that Defendants' motion to dismiss be granted and Plaintiff's excessive force cause of action be dismissed.

### C. <u>Denial of Medical Care</u>

Although Plaintiff's next cause of action is entitled a "Denial of Medical Care," the only denial articulated regards law enforcement's refusal to provide a meal during Podlach's initial overnight detention, which she maintains was medically necessary. *See* Amend. Compl. at 31-34 ("I explained clearly way [sic.] I needed food ... how my adrenal organ would be affected ... I also told him that this was what I required for not being moved to a hospital."). Even presuming all the facts and circumstances asserted regarding

Podlach's confinement, because such a limited deprivation does not rise to the level of a constitutional violation, the Court recommends that this cause of action be dismissed.

***7** Section 1983 claims premised upon inadequate conditions of confinement for pre-trial detainees are measured by "whether the conditions amount to 'punishment' without due process in violation of the Fourteenth Amendment." *Hendrix v. City of N.Y.*, 12 CV 5011, 2013 WL 6835168, at *8 (E.D.N.Y. Dec. 20, 2013) (quoting *Lareau v. Manson*, 651 F.2d 96, 102 (2d Cir. 1981)). Either a plaintiff must allege "express intent to punish" or that defendants' "deliberate indifference" caused conditions to deteriorate below a "minimal civilized measure of life's necessities" as would create "an excessive risk to the detainee's health or safety." *Benjamin v. Fraser,* 343 F.3d 35, 50 (2d Cir. 2003); *see also Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir. 2009) (noting that claims for deliberate indifference to the health or safety of a detainee are analyzed the same under the Eighth and Fourteenth Amendments); *Solomon v. Nassau Cnty.,* 759 F.Supp.2d 251, 257–58 (E.D.N.Y. 2011); *Martin v. Cnty. of Nassau,* 692 F.Supp.2d 282, 295 (E.D.N.Y. 2010).

Plaintiff attempts to put forth an allegation of express intent to punish in quoting the matron's response to her request for food in support of her cause of action for denial of medical care. *See* Amend. Compl. ¶ 49. Podlach alleges that when she pled with the matron for a meal, the matron responded, "You wouldn't be here if you hadn't done something wrong, you should have thought of that." *Id.* However, this statement, though arguably unsympathetic, does not establish that law enforcement's motivation in denying Plaintiff's request was to punish her in a manner sufficient to support a cause of action. *See Perez v. Ponte*, 236 F.Supp.3d 590, 600–01 (E.D.N.Y. 2017) (Report and Recommendation), *adopted by,* 16-CV-645, 2017 WL 1050109 (E.D.N.Y. Mar. 15, 2017) (declining to find that an express intent to punish motivated the housing of a pre-trial detainee in isolation despite supervisory guard's statement, "[I] heard you [were] giving my budd[ies] in [N]assau a hard time[.] [Y]ou act like an asshole you [are going to] get treated like one"). *See* Amend. Compl. ¶ 49. Accordingly, the Court finds that, even were the statement assumed to be true, it does not demonstrate the requisite express intent necessary to establish Plaintiff's claim.

Therefore, the Court next considers whether the duration of the alleged deprivation of food itself "rises to the level of a constitutional violation." *See Hendrix*, 2013 WL 6835168, at *8-9 (citing *Simmons v. Kelly,* 06 Civ. 6183, 2009 WL 857410, at *7 (S.D.N.Y. Mar. 31, 2009) (denying motion to dismiss where plaintiff alleged deprivation of food and water for thirty hours during pre-arraignment detention); *Hodge v. Ruperto,* 739 F.Supp. 873, 878 (S.D.N.Y. 1990) (holding a deprivation lasting two and a half days to be a constitutional violation); *Webster v. City of New York,* 333 F.Supp.2d 184, 200 (S.D.N.Y. 2004) (holding no constitutional violation when deprivation lasted from 1:30 am until day-time arraignment)). Here, Plaintiff alleges that she was held in custody without food from approximately 1:00 a.m. to approximately 10:00 a.m. that same day. *See* Amend. Compl. at 23, ¶ 49. Podlach claims in her Amended Complaint that she explained to law enforcement that she had a thyroid condition and had not eaten for the twelve hours prior to her arrest. *See id.* Although Plaintiff details the possible injuries inadequate nutrition can cause to someone with her thyroid condition, Hashimotos Thyroiditis, and contends that she has in her possession reports from treating physicians substantiating this risk, she fails to allege that any actual proximate serious injury occurred as a result of law enforcement's refusal to provide her with food during her overnight confinement. *See id.* at 31-33. Podlach does, however, allege a general decline in her health as a result of her arrest, which is broadly related to her thyroid condition and PTSD. *See id.* at 20, 23, 32 (explaining how in the morning due to the lack of food, the uncomfortable accommodations, and the harsh lighting she "felt very ill" and her "adrenal glands were messed up"). Nevertheless, such a generalized deterioration in health does not support a section 1983 deprivation of medical treatment claim sufficient to survive a Rule 12(b)(6) motion to dismiss. *See Mortimer Excell v. Fischer*, 9:08-CV-945, 2009 WL 3111711, at *4 (N.D.N.Y. Sept. 24, 2009) (holding plaintiff's claims that he suffered from heart and chest pains for a period of five days and that he was denied refills for medication used to treat stomach pain to be conclusory allegations); *Mena v. City of N.Y.*, 13-CV-2430, 2014 WL 4652570, at *6 (S.D.N.Y. Sept. 18, 2014) (dismissing as conclusory plaintiff's allegations regarding his mental health because they consisted of "his self-characterization that he was a mental health patient" and that he was "suffering from depression") (citing *Selah v. N.Y.S. DOCS Comm'r.*, 04–cv–3273, 2006 WL 2051402, at *5 (S.D.N.Y. July 25, 2006) ("[The plaintiff's] conclusory allegation that he suffers from some kind of mental illnesses ... is insufficient to rise to the level of a constitutional violation for failure to provide medical care.... [T]here is no allegation, as required, of pain, discomfort or risk to health, nor is there ... support for the claim of mental illness in the form of medical

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

evidence, such as a physician's diagnosis.") (citations and internal quotation marks omitted)).

***8** In recommending dismissal of Plaintiff's cause of action related to medical care and feeding, the Court notes that Plaintiff was fed at 10:00 a.m. prior to her arraignment hearing. *See* Amend. Compl. at 23. Though Podlach disagrees with the policy that delayed her feeding, the courts of this circuit have found that the government's purpose in not providing food to every detainee upon arrival at a police station is legitimate and non-punitive "particularly [for] those detainees who arrive at a police station in the early morning hours." *Webster v. City of N.Y.*, 333 F.Supp.2d 184, 200 (S.D.N.Y. 2004). Additionally, with respect to deprivations that are shorter in length and that are not accompanied by evidence of punitive intent, the failure to allege actual injury renders such allegations inherently insufficient. *Id.* Thus, Courts of the Second Circuit have consistently held that an overnight deprivation of food and water does not rise to the level of a constitutional violation as a matter of law. *Hendrix,* 2013 WL 6835168, at *8-9 (dismissing claim based upon detainee plaintiff being deprived of food from midnight until his arraignment the following afternoon); *see also Dzwonczyk v. Syracuse City Police Dep't,* 710 F.Supp.2d 248, 269 (N.D.N.Y. 2008) (dismissing claims based on deprivation lasting from the detainee's arrest at 5:35 p.m. until the following morning); *see Felmine v. City of New York*, 09-CV-3768, 2011 WL 4543268, at *22 (E.D.N.Y. Sept. 29, 2011) (granting summary judgment on claims based on deprivation for "several hours" after detainee was arrested around midnight). Accordingly, the Court respectfully recommends that Podlach's claims that her constitutional rights were violated by law enforcement's failure to provide food during her overnight detention be dismissed.

### D. Denial of Counsel Claim Under the Sixth And Fourteenth Amendments

The Court also respectfully recommends Plaintiff's next claim, that Defendants violated her right to counsel while she was in custody, be dismissed.

A detainee does not have an inherent right to counsel prior to the initiation of adversarial judicial proceedings. *Rothgery v. Gillespie Cty., Tex.*, 554 U.S. 191, 128 S.Ct. 2578, 171 L.Ed.2d 366 (2008) (holding that a criminal defendant's right to counsel is only triggered by way of formal charge, preliminary hearing, indictment, information, or arraignment). State law determines when adversarial judicial proceedings have commenced, and, under New York law, the filing of an accusatory instrument at an arraignment commences a criminal action. *Douglas v. People of the State of N.Y.,* 12 CV 3839, 2015 WL 9901710, at *8 (E.D.N.Y. Nov. 3, 2015) (Report and Recommendation*), adopted by*, 12 CV 3839, 2016 WL 270079 (E.D.N.Y. Jan. 21, 2016) (citing *Nimkoff v. Dollhausen,* 751 F.Supp.2d 455, 465 (E.D.N.Y. 2010); N.Y. Crim. Proc. Law. § 100.05). In the specific context of pre-arraignment detention, the Second Circuit has expressly held that the Sixth Amendment right does not attach to questioning, even questioning by the police. *Sullivan v. City of N.Y.*, 14-CV-1334, 2015 WL 5025296, at *6 (S.D.N.Y. Aug. 25, 2015) (citing *Wims v. New York City Police Dep't*, 10–CV–6128, 2011 WL 2946369, at *5 (S.D.N.Y. July 20, 2011) (dismissing Sixth Amendment Section 1983 claim where "plaintiff's complaint alleges only a lack of representation during his initial interrogation before arraignment")). Though the right to have an attorney present prior to and during questioning implicates an individual's right against self-incrimination under the Fifth Amendment and may result in suppression of evidence at trial, that right does not substantiate a cognizable section 1983 claim as a matter of law. *Nesbitt v. Cty. of Nassau*, 05 CV 5513, 2006 WL 3511377, at *2 (E.D.N.Y. Dec. 6, 2006) (citing *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998))

The Amended Complaint alleges that officers questioned Podlach at the start of her arrest processing regarding her driving history and the medications that she was taking for her thyroid condition. *See* Amend. Compl. ¶ 47. She was also "actively questioned by the superior officer about a toll [she] did not pay on the LIE and ... asked if she had difficulty with authority." Amend. Compl. ¶ 61. Plaintiff further claims that she felt forced to answer the questions posed to her because she was intimidated and isolated, with her boyfriend initially being denied access to the police station. *Id.* Accordingly, as all of Plaintiff's claims regarding lack of counsel occurred prior to her arraignment, the Court respectfully recommends that Defendants' Motion to Dismiss the Fourth Cause of Action for violations of the Sixth or Fourteenth Amendment be granted.

### E. First Amendment Retaliation and Conspiracy

***9** Next the Court examines Plaintiff's causes of action related to the First Amendment. The District Court adopted

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

this Court's recommendation that Podlach's First Amendment claims in her original Complaint be dismissed on three independent grounds: (1) her guilty plea conclusively established that her arrest was based upon probable cause, (2) she failed to allege that police-officer conduct had any chilling effect on her First Amendment rights, and (3) that the intracorporate conspiracy doctrine barred a conspiracy claim against the officers of the Southampton Police Department. *See* Report and Recommendation at 21-25; 2/25/2016 Dismissal Order. The Court renews its recommendation as the Amended Complaint fails to remedy these substantive defects in Plaintiff's pleadings.

1. Retaliation

To adequately plead a First Amendment retaliation claim under section 1983, "a plaintiff must allege that: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated by or substantially caused by plaintiff's exercise of that right; and (3) the defendant's actions effectively chilled the plaintiff's exercise of his rights." *Whitfield v. Imperatrice,* 477 Fed.Appx. 806, 808 (2d Cir. 2012) (citing *Connell v. Signoracci,* 153 F.3d 74, 79 (2d Cir. 1998)). A plaintiff "must show ... that his First Amendment rights were 'actually chilled.' " *Bartels v. Inc. Vill. of Lloyd Harbor,* 751 F.Supp.2d 387, 401 (E.D.N.Y. 2010) (quoting *Curley v. Vill. of Suffern,* 268 F.3d 65, 73 (2d Cir. 2001)). "Certain courts in the Second Circuit have held, however, that a plaintiff 'need not show a chilling effect' to prevail on a First Amendment retaliatory prosecution claim if he can 'demonstrate that the prosecution was not supported by probable cause.' " *Harris v. City of N.Y.*, 09-CV-3474, 2013 WL 4858333, at *6 (E.D.N.Y. Sept. 10, 2013) (quoting *Bradley v. City of New York,* 04 Civ. 8411, 2007 U.S. Dist. LEXIS 7811, at *21-22, 2007 WL 232945, at *8 (S.D.N.Y. Jan. 25, 2007)); *see also* Chi Chao *Yuan v. Rivera,* 48 F.Supp.2d 335, 351 n. 6 (S.D.N.Y. 1999) (stating that a plaintiff need only show actual chilling if alleging a restraint on future speech but not if probable cause for prosecution is in dispute).

Thus, the Court first turns to whether Plaintiff has alleged facts that if true are capable of calling into question the probable cause surrounding her arrest. A conviction, however, on any, even lesser included, charges conclusively establishes probable cause to arrest existed sufficient to defeat a section 1983 claim. *Corsini v. Brodsky*, 13CV2587, 2015 WL 3456781, at *8 (S.D.N.Y. May 27, 2015) (citing *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 120 (2d Cir. 1995); *Cameron v. Fogarty*, 806 F.2d 380, 388 (2d Cir. 1986)); *see Croft v. Greenhope Servs. for Women, Inc.*, 13 Civ. 2996, 2013 WL 6642677, at *5 (S.D.N.Y. Dec. 17, 2013) ("If following the arrest, the plaintiff was convicted of the charges against him, that conviction normally would be conclusive evidence of probable cause.") (internal quotation omitted); *supra* at n.4. As stated above, even though it is a violation and not a crime under New York law, a conviction for disorderly conduct, NYPL § 240.20, acknowledges "unlawful activity for which the police could properly take [a subject] into custody." *Sealey*, 1998 WL 1021470, at *4; *supra* at 14-15.

In the Amended Complaint, Plaintiff admits that she pled guilty to violating the disorderly conduct statute and, moreover, acknowledges that she was represented by counsel during that proceeding. *See* Amend. Compl. at 30 ("I was found to be not in violation of anything other than disturbing the peace ..."), 47-48. In an attempt to plead facts as would undermine the probable cause that such a conviction establishes, Podlach asserts immediately after her admission that "in the course of 2015 years after the case was over" she determined that it was "impossible to be founded [guilty] by either the DA or the officer who lied to me that using a curse word was against local law ... a crime." Amend. Compl. at 30. Later in the Amended Complaint, she further alleges that the DA told her attorney that he knew that the charges against her were "bullshit" and asserts that she pled guilty to avoid the expense of trial and under the false impression that disorderly conduct was a real offense. *Id.* at 47-48.

***10** In reviewing Podlach's claim, the Court notes preliminarily that, although Podlach did plead guilty to disorderly conduct, she did not plead guilty to swearing in public. According to the Certificate of Disposition, Plaintiff pled guilty to NYPL § 240.20(7) in satisfaction of ten other Vehicle and Traffic and Penal Law charges. *See* Certificate of Disposition. NYPL § 240.20(7) reads as follows:

> "A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof ... [h]e creates a hazardous or physically offensive condition by any act which serves no legitimate purpose."

*Id.* Nevertheless, Plaintiff is correct that disorderly conduct is a violation and not a crime. *Id.* However, her conclusory statements that this charge does not exist and that a conviction under this statute is constitutionally impermissible or impossible are patently false. *See, e.g., Sealey,* 1998 WL

1021470, at *4. Thus, Podlach has failed to plead a set of facts as would call into question the existence of the probable cause surrounding her arrest sufficient as to permit her First Amendment section 1983 claim to proceed.

Accordingly, as the Amended Complaint fails effectively to challenge the propriety of Podlach's arrest, the Court turns to whether the law enforcement conduct discussed above is alleged to have had an actual effect on her freedom of speech as protected under the First Amendment. As this Court explained in its prior Report and Recommendation, a Section 1983 claim premised upon intimidation and threats curtailing freedom of speech must set forth a particularized and specific chilling effect. *See* *Williams v. Town of Greenburgh*, 535 F.3d 71, 78 (2d Cir. 2008) (citing *Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002)) ("[T]here is an injury requirement to state [a First Amendment 1983] claim."). The injury must be "actual" and "non-speculative." *Id.; Prince v. Cty. of Nassau*, 837 F.Supp.2d 71, 96 (E.D.N.Y. 2011) ("[A] plaintiff must show that his First Amendment rights were actually chilled.") (internal quotation marks omitted). Specific instances must be put forth where the allegedly injured party "desired to exercise her First Amendment rights but was chilled by" a defendant's alleged conduct. *See* *Mangano v. Cambariere*, 04 Civ. 4980, 2007 WL 2846418, at *2 (S.D.N.Y. Sept. 27, 2007) (noting, in context of summary judgment, that specific examples of when the plaintiff wanted to exercise her First Amendment Rights but chose not to are required). "[A]llegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Avgerinos v. Palmyra-Macedon Cent. Sch. Dist.*, 690 F.Supp.2d 115, 133 (W.D.N.Y. 2010) (quoting *Curley*, 268 F.3d at 73 (quoting *Laird v. Tatum*, 408 U.S. 1, 13-14, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972))) (internal quotation marks omitted). Subsequent acts by a plaintiff that seek redress of the underlying grievances weigh against finding that a plaintiff's First Amendment rights were objectively chilled. *MacPherson v. Town of Southampton*, 738 F.Supp.2d 353, 369 (E.D.N.Y. 2010) (citing *Rosendale v. Brusie*, 07-CV-8149CS, 2009 WL 778418, at *9 (S.D.N.Y. Mar. 25, 2009), *aff'd*, 374 Fed.Appx. 195 (2d Cir. 2010) (finding insufficient allegations of First Amendment retaliation when Complaint alleged that plaintiff continued to speak out against defendants' failure to enforce zoning regulations, brought a state court action, and commenced a federal action)).

***11** In the Amended Complaint, Plaintiff asserts only that her "speech was silence [*sic.*] so much so as to absolutely never ask a police officer for directions ever again, to address a police officer voluntarily ever again, to trust one, or risk my life to ask one a question." Amend. Compl. at 34. She goes on to state that she will never "express emotion toward an officer or in any place where an officer can even hear me." *Id.* Additionally, after alluding to her memory of her arrest, she concludes by commenting "to say this experience could leave anyone unaltered with regard to her speech is laughable and offensive." *Id.* Podlach's claimed injury of theoretically being prevented from speaking with police officers in the future is wholly speculative and conclusory, failing to allege a single instance of when she needed, wanted, or even had a subsequent opportunity to speak with a member of law enforcement and chose not to do so. *See* Amend. Compl. at 34. Plaintiff also fails to cite to any specific time that she wanted to curse at or even criticize a police officer and felt restrained as a result of the circumstances and conduct surrounding her arrest. *Id.* Further, in her concluding remarks, Plaintiff states that were the Courts to deny her relief, that she would not only appeal that decision but seek redress of her grievances against the police in the media undermining any claim that she feels inhibited about speaking out. *Id.* at 46. As Podlach's Amended Complaint has not put forth a set of facts that if proven true would substantiate that her rights under the First Amendment were actually chilled, she has failed to plead a cognizable First Amendment violation. Accordingly, the Court recommends that her claim be dismissed and Defendants' motion granted.

2. Conspiracy

As in the original Complaint, Plaintiff again asserts a conspiracy claim, alleging that Defendants' conduct "was the product of a conspiracy designed to punish plaintiff for exercising her First Amendment right to express herself orally." Amend. Compl. ¶ 59. Even assuming that Plaintiff stated a claim for First Amendment retaliation, she fails to state a cause of action for conspiracy.

*a. Intracorporate Conspiracy Doctrine*

First, Podlach's theory of liability must be dismissed under the intracorporate conspiracy doctrine, which holds that "the officers, agents, and employees of a single corporate entity, each acting within the scope of [his or] her employment, are legally incapable of conspiring together." *Little v. City of New York*, 487 F.Supp.2d 426, 441-42 (S.D.N.Y. 2007). The intracorporate conspiracy doctrine applies to the conduct of

both corporations and municipal entities. *Mendoza v. Cty. of Nassau*, 11-CV-2487, 2012 WL 4490539, at *8 (E.D.N.Y. Sept. 27, 2012). An exception to the intracorporate conspiracy doctrine exists where a plaintiff "adequately alleges that each defendant possessed an independent, personal conspiratorial purpose, wholly separate and apart from the entity." *Broich v. Vill. of Southampton*, 650 F.Supp.2d 234, 247 (E.D.N.Y. 2009) (internal quotation omitted).

Podlach alleges throughout her Amended Complaint that the officers of the Southampton Police Department worked together to arrest her on August 31, 2013, and that they were collectively and individually aware of why Officer Jones arrested her—namely disturbing the peace for cursing in public. *See* Amend. Compl. ¶¶ 46-48. However, such activity, even if proven true, falls squarely within scope of each individual officer's employment and cannot be said to be separate and apart from the Police Department itself—a municipal corporate entity. Additionally, Podlach failed to allege that any of the officers possessed any conspiratorial purpose other than arresting her for disturbing the peace to which she pled guilty. *See id.* Plaintiff claims that Officer Jones told her after her arrest, "You should have waited for me." Amend. Compl. ¶ 48. Presuming this statement occurred, the Court does not accept as reasonable Podlach's conclusion that it "made ... clear ... that she had followed [Podlach] because she was personally upset that [Plaintiff] had not waited for her when [she] first asked her for directions ... and then arrested [Podlach] after making up a law that didn't exist as an act of retaliation," as would express a personal conspiratorial purpose. *Id.* Accordingly, Defendants are legally incapable of conspiring together, and the claim of conspiracy should be dismissed.

*b. Section 1985(3)*

Second, as was also found in the prior Report and Recommendation, Plaintiff's claim is still improperly pled as arising under 42 U.S.C. § 1985(3). Under that statute, a plaintiff must allege: (1) a conspiracy, (2) for the purpose of depriving any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws, (3) an act in furtherance of the conspiracy, and (4) whereby a person is injured in his person or property or deprived of a right or privilege of a citizen. *Turkmen v. Hasty,* 789 F.3d 218, 262 (2d Cir. 2015). To prevail on a claim under 42 U.S.C. § 1985(3), "the conspiracy must also be motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999) (quoting *Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993)).

***12** Here, Plaintiff does not allege that Defendants acted with any racial, class-based, or otherwise discriminatory motivation, but rather, that Defendants sought to "punish [her] for exercising her First Amendment right to express herself orally." Amended Compl. ¶ 59. Accordingly, the Court again recommends that Defendants' motion to dismiss Plaintiff's claim for conspiracy arising under 42 U.S.C. § 1985(3) be granted.

**F. <u>Supplemental Jurisdiction Over State-Law Claims</u>**

Having recommended that each of Plaintiff's federal claims again be dismissed, the Court also renews its recommendation that the District Court decline to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims.

Supplemental jurisdiction over Plaintiff's state-law claims is governed by statute, which provides that, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy ..." 28 U.S.C. § 1367(a). However, a district court may decline to exercise supplemental jurisdiction over a claim where, as here, all claims over which it had original jurisdiction have been dismissed. 28 U.S.C. § 1367(c). When such circumstances arise prior to the commencement of trial, Second Circuit precedent consistently recognizes that, "the balance of factors to be considered," which include "judicial economy, convenience, fairness and comity," "will point toward declining to exercise jurisdiction over the remaining state-law claims." *Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 305 (2d Cir. 2003).

Defendants' filed their Rule 12(b)(6) motion to dismiss the Amended Complaint in lieu of an Answer and while a stay of discovery remained in effect. *See* DE [18], [33]. Thus, this litigation is still in its initial stages and no discovery has taken place. Accordingly, the Court respectfully recommends that the Defendants' motion to dismiss be granted and the District Court decline to exercise supplemental jurisdiction over Podlach's state-law causes of action. *See Quiroz v. U.S. Bank Nat'l Ass'n*, 10-CV-2485, 2011 WL 2471733, at *8

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

(E.D.N.Y. May 16, 2011) (Report and Recommendation), *adopted by*, 2011 WL 3471497 (E.D.N.Y. Aug. 5, 2011) (recommending that the district court decline to exercise supplemental jurisdiction over negligence claim once federal claims were dismissed between non-diverse parties). [5]

### G. Leave to Amend

***13** As the defects inherent in Plaintiff's original pleadings were not addressed in the Amended Complaint, the Court respectfully recommends that Podlach not be given *sua sponte* another opportunity to amend her complaint because such efforts would be futile. While leave to amend a complaint should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), it is "within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). However, the court must be mindful of the unique context of a *pro se* complaint and "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Aquino v. Prudential Life & Cas. Ins. Co.,* 419 F.Supp.2d 259, 278 (E.D.N.Y. 2005); *see also Thompson v. Carter,* 284 F.3d 411, 419 (2d Cir. 2002) ("The liberal pleading standards applicable to *pro se* civil rights complaints in this circuit require that the district court give [plaintiff] an opportunity to flesh out his somewhat skeletal complaints before dismissing them"). Nevertheless, "a district court may deny leave to amend when, as here, amendment would be futile because the problem with the claim 'is substantive ... [and] better pleading will not cure it.' " *Reynolds v. City of Mount Vernon*, 14-CV-1481, 2015 WL 1514894, at *5 (S.D.N.Y. Apr. 1, 2015) (quoting *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir. 2000)).

Despite the appropriate leniency afforded Plaintiff in light of her *pro-se* status, the Court finds that the deficiencies in Podlach's pleadings are substantive and persist despite clear guidance from this Court and the District Court. Instead of countenancing that guidance and properly amending her complaint, Plaintiff spends significant portions of the Amended Complaint providing extraneous background information, including newspaper articles with examples of her artwork, and generalized social commentary regarding police violence. *See, e.g.,* Amend. Compl. at 42-55. Additionally, in her opposition Plaintiff has not requested permission to file a second amended complaint, nor has Podlach "given any indication that [s]he is in possession of facts that would cure the problems identified in this opinion." *Clark v. Kitt*, 12-CV-8061, 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014). Accordingly, as the facts present in the pleadings "give[ ] no indication that a valid claim may be stated," the Court respectfully recommends that Plaintiff not be given further leave to amend. *See Flaherty v. All Hampton Limousine, Inc.*, 02-CV-4801, 2008 WL 2788171, at *8 (E.D.N.Y. July 16, 2008).

## V. CONCLUSION

Accordingly, based on the foregoing, the Court respectfully recommends that the District Court grant Defendants' motion to dismiss the Amended Complaint for failure to state a claim in its entirety and with prejudice.

## VI. OBJECTIONS

A copy of this Report and Recommendation is being served on Defendants by electronic filing on the date below. Defendants are directed to serve a copy of this Report and Recommendation on Plaintiff and promptly file proof of service by ECF. Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of receipt of this report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a); *Ferrer v. Woliver*, 05-3696, 2008 WL 4951035, at *2 (2d Cir. Nov. 20, 2008); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

### All Citations

Not Reported in Fed. Supp., 2017 WL 4350433

## Footnotes


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

1 The Amended Complaint contains both numbered and unnumbered paragraphs. Where available, the Court will use paragraph numbers in its citations; otherwise, the Court will cite to the relevant page number.

2 Plaintiff imbeds in the Amended Complaint a string cite to case law that she argues supports her claim that the mere display of a weapon by an officer can substantiate excessive force. *See* Amend. Compl. at 25. Upon review, the Court declines to follow these cases as they are from other Circuits and factually distinguishable from the present matter. *See* *Stamps v. Town of Framingham*, 813 F.3d 27, 35 (1st Cir. 2016) (denying summary judgment in case where officer kept his semi-automatic rifle pointed at the head of a compliant, prostate detainee while other officers searched a house and the gun accidentally discharged killing detainee; holding "[w]here an officer creates conditions that are highly likely to cause harm and unnecessarily so, and the risk so created actually, but accidentally, causes harm, the case is not removed from Fourth Amendment scrutiny."); *Binay v. Bettendorf*, 601 F.3d 640, 644 (6th Cir. 2010) (noting that officers continued to interrogate plaintiffs at gunpoint while they were handcuffed and compliant during execution of search warrant even after it was determined that no drugs were on the premises); *Curiel v. Cty. of Contra Costa*, 362 Fed.Appx. 824 (9th Cir. 2010) (finding that genuine issue of material fact existed as to whether deputies' use of force in entering house and seizing family members during murder investigation was excessive, when deputies' entered unannounced, with guns drawn and pointed at children, and they explicitly threatened deadly force with vulgar profanity); *Baird v. Renbarger*, 576 F.3d 340 (7th Cir. 2009) (finding police officer's use of submachine gun to detain plaintiffs at search site for an alleged altered vehicle identification number was objectively unreasonable where there was no indication of any threat, none of the plaintiffs resisted or attempted to flee, and scene consisted of peaceable individuals, including pacifist Amish, going about their business).

3 As Plaintiff repeatedly references the circumstances and implications of the resolution of the underlying criminal case in arguing against the motion to dismiss, the Court is permitted to and does take judicial notice of the Certificate of Disposition proffered by Defendants detailing Podlach's original charges and eventual plea. *See* *Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) (acknowledging that "[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint."); *see also* *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006) ("There are circumstances under which it is appropriate for a court to consider documents outside of the complaint on a motion to dismiss").

4 In her introductory remarks, Podlach explicitly states that she was wrongfully arrested and imprisoned and alludes to such a claim throughout her the Amended Complaint. *See, e.g.,* Amend. Compl. at 2, 28, 47-48. Podlach, however, never specifies a claim under state law or section 1983 regarding the lawfulness of her arrest itself. *See id.* Whether Plaintiff intended to assert such a claim, even when reading the *pro se* complaint liberally, the Court cannot find a viable cause of action for false or unlawful arrest as would survive a motion to dismiss. "[A] claim for false arrest turns only on whether probable cause existed to arrest a defendant, and [ ] it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly v. Couch,* 439 F.3d 149, 154 (2d Cir. 2006). On the question of probable cause, " 'a valid judgment of conviction, a defense to the tort [of false arrest], requires dismissal of a § 1983 action on motion for summary judgment.' " *Barnes v. Coughlin*, 14-CV-6364 2016 WL 3577603, at *4 (W.D.N.Y. June 27, 2016) (citing *Camarano v. City of New York*, 646 F.Supp. 246, 249 (S.D.N.Y. 1986)). As discussed, Plaintiff acknowledges that she pled guilty to disorderly conduct, one of the charges upon which she was arrested. *See supra* at 14-15. Accordingly, any nascent cause of action for unlawful or wrongful arrest would be dismissed were it explicitly pled.

5 The District Court previously declined to exercise supplemental jurisdiction over the state-law claims put forth by Plaintiff after determining that she had failed to state a federal claim. *See* DE [25]. Though the Court renews its recommendation that the District Court decline to exercise supplemental jurisdiction here

again, this Court also notes that Plaintiff has not put forth any additional factual allegations in the Amended Complaint with respect to those state-law claims that address the fatal deficiencies discussed in detail in the previous Report and Recommendation. *Compare* Report and Recommendation at 28-32 *with* Amend. Compl. at 35-41. The District Court acknowledged those legal conclusions but did not specifically adopt them as it declined to exercise supplemental jurisdiction over the underlying claims. *See* DE [25]. Accordingly, were the District Court not to adopt the present recommendations to dismiss the federal claims or, in its discretion, to determine that an exercise of supplemental jurisdiction over the state-law claims was now warranted, the Court incorporates by reference the argument and analysis contained in its prior Report and Recommendation and, in the alternative, independently again recommends dismissal of the state-law claims in their entirety. *See* Report and Recommendation at 28-32.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 2419142
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Posr A. POSR, Plaintiff,
v.
The CITY OF NEW YORK; Mayor Michael Bloomberg, in his individual and official capacity; the New York Police Department; New York Police Commissioner Raymond Kelly, in his individual and official capacity; New York Police Officer Peter Ueberacher, in his individual and official capacity; New York Police Officer Pedro Rivera, in his individual and official capacity; and Police Officer Christine Pimentel, in her individual and official capacity, Defendants.

No. 10 CIV 2551(RPP).
|
June 4, 2013.

**Attorneys and Law Firms**

Posr A. Posr, Howard Beach, NY, pro se.

Brian Jeremy Farrar, Assistant Corporation Counsel, New York City Law Department, New York, NY, for Defendants.

**OPINION & ORDER**

ROBERT P. PATTERSON, JR., District Judge.

***1** Pursuant to 42 U.S.C. § 1981, § 1983, and New York State law, *pro se* plaintiff Posr A. Posr brings this action against the City of New York (the "City"), New York City Mayor Michael Bloomberg, the New York City Police Department ("NYPD"), NYPD Commissioner Raymond Kelly, and NYPD Officers Peter Ueberacher, Pedro Rivera, and Christine Pimentel (collectively, Defendants). (*See* Am. Compl. at 1, April 2, 2012, ECF No. 42.) Defendants move for dismissal of several of Plaintiff's claims under Rule 12(c) of the Federal Rules of Civil Procedure and for summary judgment under Rule 56 on all of Plaintiff's remaining claims. (*See* Mot. to Dismiss Am. Compl., ECF No. 46; *see also* Mem. in Supp. of Mot. to Dismiss ("Dismiss Mem."), ECF No. 47 (incorporating arguments raised in Mem. in Supp. of Mot. for Summ. J. ("Summ. J. Mem."), ECF No. 27).) For the reasons stated below, the Court grants Defendants' motions, dismisses Plaintiff's claims, and enters summary judgment in favor of Defendants.

## I. FACTUAL BACKGROUND

### A. The Incident at West 123rd Street on March 9, 2009

Describing himself as "a male of Black African ancestry," (Am.Compl.1), Plaintiff alleges that, at approximately 11:03 a.m. on Monday, March 9, 2009, he emerged from the Pelham Fritz Recreation Facility in Marcus Garvey Park, walked one block north, turned onto 123rd Street, and started walking west, (*id.* ¶¶ 1–2); that he then stopped walking at 10 West 123rd Street, [1] where he put his gym bag down on "a 1.5 foot concrete cube," which he viewed as marking "the boundary between the public sidewalk ... and the courtyard of [a] private property;" and that he next unzipped his gym bag, retrieved his wallet from inside his bag, zipped the bag closed, lifted the bag, and proceeded west towards his residence at 136 West 123rd Street. (*Id.* ¶¶ 3, 5–7.)

In his response declaration, Officer Ueberacher stated that, on March 9, 2009, he was on 123rd Street, driving west in a marked patrol car, when he observed Plaintiff as follows:

> I observed Plaintiff Posr A. Posr standing in the courtyard of 6 West 123rd Street in Manhattan. The front door of that location was open and I observed Plaintiff placing unidentified objects into a red duffle bag. I had been advised by my command that there had been a recent spike in burglaries in that location. I was further advised that suspects committing these burglaries often strike during the midday hours and steal items that can easily be concealed in bags and knapsacks. (Ueberacher Decl. ¶ 2; *see also* Am. Compl. ¶¶ 9–12.) After observing Plaintiff pick up his bag and start walking, Officer Ueberacher pulled his car over and approached Plaintiff. (Ueberacher Decl. ¶ 3; Am. Compl. ¶¶ 12–15.)

Officer Ueberacher declared that, after he approached Plaintiff, the following interaction ensued:

> I asked Plaintiff whether he lived at 6 West 123rd Street and he informed me that he did not. I then asked Plaintiff why he was standing in front of that location and he refused to answer. I asked Plaintiff for his identification but he also refused. I explained to Plaintiff that I was asking these questions because there ha[d] been a high incidence of burglaries in that particular area.

***2** (Ueberacher Decl. ¶ 4.)

In his Amended Complaint, Plaintiff alleges that Officer Ueberacher observed him "put his bag down, bend over his bag, move his arms about his bag, pick up the bag, and proceed west," (Am.Compl.¶ 12); that Officer Ueberacher then approached and asked Plaintiff where he had come from, (*id.* ¶¶ 14–15); that Plaintiff did not respond to the question, and instead asked "why [Officer Ueberacher] wanted to know, or was there a problem, or some such question;" (*id.* ¶ 16); that Officer Ueberacher thereafter asked him for identification, (*id.* ¶ 20), but that, rather than turning over any identification, Plaintiff asked if a crime had been committed, (*id.* ¶ 21); that Officer Ueberacher responded to the question by stating Plaintiff had been observed putting a duffel bag down and putting something into the bag, (*id.* ¶ 22); that Plaintiff asked Officer Ueberacher if doing so was a crime, (*id.* ¶ 23); and that Officer Ueberacher replied, "it was not a crime," (*id.* ¶ 24), but that "there had been a lot of burglaries in the area," (*id.* ¶ 25).

Next, Plaintiff alleges that he inquired "if a burglary at 10 West 123rd Street had been reported," (*id.* ¶ 27); that Officer Ueberacher responded that "he was investigating a burglary." (*id.* ¶ 29); that Plaintiff queried if he "fit the description of a burglar," (*id.* ¶ 31); but that Officer

Ueberacher "did not say Plaintiff fit the description of a burglar," (*id.* ¶ 33); that he told Officer Ueberacher "if this were a white neighborhood, this wouldn't be happening," (*id.* ¶ 36); that Officer Ueberacher responded, "Do you want me to stop a white guy?" (*id.* ¶ 37); that Plaintiff replied yes, and pointed out a white person whom he thought Officer Ueberacher should stop, (*id.* ¶¶ 3 8, 40); and that Officer Ueberacher refused to stop this white person because the person was carrying a clipboard, (*id.* ¶ 41).

Plaintiff further alleges that, after Officer Ueberacher allegedly refused to stop the white passerby, Plaintiff asked to speak with Officer Ueberacher's supervisor, (*id.* ¶ 45; *see also* Ueberacher Decl. ¶ 5); that Officer Ueberacher placed a call on the radio for his sergeant, Yolanda Cuadrado, to respond, (*id.*); that while Officer Ueberacher was on the radio, Plaintiff called 911 on his cell phone, (Am.Compl.¶ 48); that, within minutes of Plaintiff's 911 call, four uniformed police officers arrived on the scene, (*id.* ¶ 49); that these officers stood around him in a threatening semi-circle, (*id.* ¶ 51); that Sergeant Cuadrado arrived shortly thereafter and spoke with Officer Ueberacher and then with Plaintiff, (Am. Compl. ¶¶ 53–57; Ueberacher Decl. ¶¶ 5–6); and that she then spoke with Plaintiff and told him that he "was free to go;" and that, as soon as she did so, he left the scene, (Am.Compl.¶ 57).

Plaintiff alleges, however, that prior to Sergeant Cuadrado telling him that he was free to go, he twice asked Officer Ueberacher if he could go, (*id.* ¶¶ 34, 43); that he also asked the four responding 911 officers if he could go (*id.* ¶ 50); and that, each time he asked, he was told that he was not free to go. (*id.* ¶¶ 35, 44, 51). Officer Ueberacher disputed this contention, stating:

> ***3** The entire interaction with Plaintiff lasted less than ten minutes. Plaintiff was not handcuffed during this encounter. No physical force was used on Plaintiff, no threats were made, and Plaintiff was free to leave at any time.

(Ueberacher Decl. ¶ 7.)

Following the March 9, 2009 incident on West 123rd Street, Officer Ueberacher completed a report for the NYPD Stop, Question & Frisk System (the "Stop & Frisk Report"). (*See* Letter from Defs. to the Court dated Nov. 16, 2012, Ex. B, ECF No. 62.) In the report, Officer Ueberacher wrote that he had stopped a person, whose name was listed as "Unknown," after observing that person for two minutes. (*Id.*) The report

indicated that the stop had lasted for seventeen minutes and included the following notes:

*Circumstances Leading to Stop*

— Suspects, Actions–Fits Description;

— Suspects, Actions–Other–At location putting unknown objects in duffle bag.

*Additional Factors*

— Report from Victim/Witness/Officer;

— Area has high incidence of reported offense;

— Evasive, false, or inconsistent responses to officers' questions;

-Other: Door to 6 West 123rd Street left open where subject 1st observed.

(*Id.*)

**B. Plaintiff's Freedom of Information Law Act Complaints**

i. *March 12, 2009 Request*

On March 12, 2009, three days after the incident with Officer Ueberacher, Plaintiff submitted a request pursuant to New York State's Freedom of Information Law Act (“FOIL”). seeking: (1) the audio tape and SPRINT Report of the 911 call that he had made from his cell phone on March 10, 2009; [2] (2) information on the number of areas in Harlem that the NYPD had designated as “high burglary” between March 10, 2008 and March 10, 2009; and (3) information on the NYPD's guidelines for designating an area as “high burglary.” (*See* Letter from Defs. to Court dated Feb. 23, 2012, Ex. B (“Pl.'s 2009 FOIL File”) at 2–5, ECF No. 39; *see also* Am. Compl. ¶¶ 68–70, 76–77.) Plaintiff alleges that he submitted this FOIL request to Officer Rivera, and that after he did so, Officer Rivera “refused to time-stamp or otherwise render a receipt” acknowledging the submission of Plaintiff's request. (Am.Compl.¶¶ 68–72.)

On April 13, 2009, Sergeant James Russo sent Plaintiff a letter acknowledging the receipt of Plaintiff's March 12, 2009 FOIL request. (*Id.* at 10.) In the letter, Sergeant Russo informed Plaintiff that, “[d]ue to the large volume of pending FOIL requests, which are processed in the order in which they are received, and due to the fact that NYPD records are kept in many offices located in five counties,” a determination on Plaintiff's request would not be reached until July 17, 2009.(*Id.*) A few weeks later, on April 29, 2009, Sergeant Russo assigned Plaintiff's FOIL request to Officer Pimentel. (*Id.* at 6–7.) Thereafter, the Tape and Records Unit of the NYPD Communications Division searched for the record of a 911 call made from Plaintiff's cell phone on March 10, 2009–the date that Plaintiff's FOIL request had specified-but the search returned “negative results.” (*Id.* at 2–5, 7–8.) On August 11, 2009, Sergeant Russo sent Plaintiff a letter stating that the NYPD FOIL Unit had been “unable to locate records responsive to [his] request based on the information provided.” (*Id.* at 9.) The letter advised that, if Plaintiff desired, he could appeal the decision in writing within thirty days. (*Id.*) However, Plaintiff does not claim, nor does his FOIL file indicate, that he appealed this decision.

ii. *April 13, 2012 Request*

***4** On April 13, 2012, Plaintiff filed an additional FOIL request seeking verification that he had “signed in” to the Pelham Fritz Recreation Facility in Marcus Garvey Park on March 9, 2009. (*See* Nov. 16, 2012 Letter Ex. A (“Pl.'s 2012 FOIL File”).) In response, on June 12, 2012, a New York City Parks & Recreation Records Access Officer mailed Plaintiff a copy of his “Membership Usage Report.” [3] (*Id.* at 2, 4–11.) The Membership Usage Report showed that Plaintiff had signed in to the Pelham Fritz Recreation Facility on March 9, 2009 at 9:59 a.m. (*Id.* at 5.) The report did not reflect the time when Plaintiff left the facility. (Cf.id.)

**II. PROCEDURAL HISTORY**

**A. The Complaint**

On March 4, 2010, Plaintiff filed his original Complaint against the City of New York, Mayor Bloomberg, the NYPD, Commissioner Kelly, and Officer Ueberacher. [4] (*See* Orig. Compl. at 1, ECF No. 2.) Pursuant to 42 U.S.C. § 1983, the Complaint alleged that Officer Ueberacher had violated Plaintiff's right to be free from unreasonable seizure under the Fourth Amendment, his right to equal protection under the Fourteenth Amendment, and his right to be free from an assault on his dignity under the Ninth Amendment. (*id.* ¶¶ 52.1–57.) The Complaint further alleged that Officer Ueberacher had violated 42 U.S.C. § 1981, (*id.* ¶ 53), as well as numerous New York State laws, (*id.* ¶¶ 44–52). In addition, the Complaint alleged that the NYPD and the City of New York, with support from Mayor

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Bloomberg and Commissioner Kelly, had violated Plaintiff's Fourteenth and Ninth Amendment rights by "adopting, condoning, and executing a policy of seizing Blacks walking in Harlem without probable cause to believe such Blacks ha[d committed] or [we]re about to commit a crime." (*id.* ¶¶ 50–51.)

On July 22, 2011, Defendants filed a Rule 56 motion arguing that they were entitled to summary judgment because:

> (1) Plaintiff fail[ed] to state a cognizable § 1983 claim; (2) Defendant Officer Ueberacher [wa]s entitled to qualified immunity; (3) Plaintiff fail[ed] to state a claim for racial discrimination; (4) Defendants Raymond Kelly and Michael Bloomberg had no personal involvement in the incident alleged in the Complaint; (5) Plaintiff fail[ed] to state a *Monell* claim; [and] (6) the New York City Police Department [wa]s not a suable entity.

(Summ. J. Mem. at 3). Defendants also requested that the Court decline to exercise its jurisdiction over any of Plaintiff's state law claims. (*Id.*)

**B. Plaintiff's First Motion to Compel**

In response to Defendants' Rule 56 motion, Plaintiff submitted a motion to compel production of records that he considered material to his opposition to summary judgment. (Mot. to Compel, ECF No. 30.) Following briefing and letters from both parties, (see ECF Nos. 31–35), the Court issued an Order granting Plaintiff's motion to compel in its entirety, (First Compel Order at 12). The Order directed Defendants to provide Plaintiff with:

> ***5** (1) The entire SPRINT report and [the audio-taped] 911 call (or [to] provide sufficient evidence that an appropriate search ... [was] made and that th[e records] do not exist; and
>
> (2) Evidentiary support for [Officer] Ueberacher's assertion that prior to March 9, 2009, he had been advised by his command "that there had been a recent spike of burglaries" in the vicinity of West 123rd Street between Marcus Garvey Park West and Malcolm X Boulevard, and that the burglaries often occurred "during the midday hours, and involved items that c[ould] easily be concealed in bags and knapsacks."

(*Id.* (citing Ueberacher Decl. ¶ 2) (alterations in original omitted).)

In accordance with the Court's Order, Defendants provided Plaintiff with: (1) a copy of his March 12, 2009 FOIL file showing that the his 911 call records had been searched for on August 11, 2009; (2) a copy of the NYPD's audio retention policy stating that the NYPD records all 911 calls and digitally stores them on a voice recording system for 180 days, at which point a computer program automatically deletes them; and (3) proof that the audio file of Plaintiff's 911 call no longer existed because the call had been recorded more than 180 days prior to the Court's Order. (*See* Feb. 23, 2012 Letter.) Additionally, Defendants provided Plaintiff with an affidavit from Sergeant Cuadrado. (*See id.* Ex. C ("Cuadrado Aff." dated Jan. 25, 2012).) In the Affidavit, Sergeant Cuadrado stated that, as the Patrol Sergeant for the NYPD's 28th Precinct from December 2008 until November 2010, she "was responsible for informing the officers under [her] command of crimes that had occurred within the confines of the precinct, and the locations of the crimes." (*id.* ¶ 3.) She explained that "[t]he purpose of informing them of such, was so that when the officers went on patrol, they would pay special attention to the areas where crimes had been occurring." (*Id.*) Sergeant Cuadrado also stated:

> From approximately March 1, 2009 to March 9, 2009, I informed the patrol officers at the start of their tours, including Police Officer Ueberacher, that there was a spike in residential burglaries within the confines of the 28th Precinct, which includes the vicinity of Marcus Garvey Park West and Malcolm X Boulevard in Manhattan. The officers, including Police Officer Ueberacher, were informed that many of these burglaries were occurring during the daytime hours, and involved stolen items that could easily be concealed in a backpack or duffle bag.

(*id.* ¶ 4.)

**C. The Amended Complaint**

On January 27, 2012, Plaintiff sought leave to amend his original Complaint so that he could add claims related to his March 12, 2009 FOIL request. (Not. of Mot. to Am. Compl. at 1, 3–4, ECF No. 37.) The Court granted Plaintiff leave to amend on March 13, 2012. (Order, Mar. 13, 2012, ECF No. 40.) On April 2, 2012, Plaintiff filed his Amended Complaint, alleging that the City of New York had violated Plaintiff's Fifth Amendment due process rights by maintaining a policy of not time-stamping any FOIL requests, (*id.* ¶ 109), and that Officer Rivera had violated Plaintiff's Fifth Amendment due process rights by refusing to time-stamp his particular FOIL request, (*id.* ¶¶ 111–14). In addition, the Amended Complaint alleged that Officer Pimentel had violated Plaintiff's Fifth Amendment rights by withholding the burglary data and the 911 call records requested by Plaintiff.[5] (*id.* ¶¶ 109.)

***6** On April 16, 2012, Defendants filed an Answer to Plaintiff's Amended Complaint. The Answer included a footnote, arguing that Defendants' July 22, 2011 summary judgment motion remained pending, and that Plaintiff's claims should all be dismissed for the reasons set forth in their summary judgment motion and in letters that they had sent to the Court on February 23, 2012 and March 9, 2012. (Answer at 1 n. 3.) In an Order dated April 20, 2012, the Court directed Defendants to "serve and file a separate submission stating these grounds explicitly so [that] Plaintiff [could] ha[ve] notice of Defendants' grounds." (Order, Apr. 20, 2012, ECF No. 44.) Thereafter, on May 5, 2012, Defendants filed a Rule 12(c) motion to dismiss the FOILrelated claims that Plaintiff had included in his Amended Complaint. (Dismiss Mem. at 2.) As to Plaintiff's other claims arising from the March 9, 2009 incident with Officer Ueberacher, Defendants "respectfully refer[ed]" Plaintiff and the Court to the summary judgment motion that they had filed on July 22, 2011, and to the February 23, 2012 letter and March 9, 2012 letter attached to their motion to dismiss. (*Id.; see also* Dismiss Mem. Exs. C & E.)

**D. Plaintiff's Request for a Second Order to Compel**

After Defendants filed their motion to dismiss, Plaintiff submitted multiple letters to the Court requesting additional discovery and seeking an extension of time in which to respond to "Defendants' summary judgment motion." (*See* Letter from Plaintiff to Court dated May 17, 2012, ECF No. 52; *see also* Order ("Second Compel Order"), Nov. 5, 2012, ECF No. 59 (summarizing letters filed by Plaintiff on May 17, July 2, and Aug. 22, 2012, as well as Defendants' Aug. 10, 2012 response letter).) In one of his letters, Plaintiff reported that Defendants had failed to provide him with (1) a copy of Officer Ueberacher's Stop & Frisk Report; (2) the burglary data that he had requested in his March 12, 2009 FOIL request and upon which Sergeant Cuadrado had relied in her Affidavit; and (3) the park attendance records that he had asked for in his April 13, 2012 FOIL request. (*See* Letter from Plaintiff to Court dated July 2, 2012, ECF No. 55.) Thus, on November 5, 2012, the Court issued an order directing Defendants to produce these records to Plaintiff. (Second Compel Order at 3–4.)

Accordingly, on November 16, 2012, Defendants submitted a copy of Officer Ueberacher's Stop & Frisk Report and a copy of Plaintiff's park attendance "Membership Usage" records. (*See* Nov. 16, 2012 Letter Exs. A & B; *see also* supra n. 4.) In the letter transmitting these materials, Defendants stated that they were "unaware of any 'data' ... relied on by Sergeant Cuadrado," but that they were "continuing to look into this matter." (*Id.* at 1.) Defendants closed their letter by requesting that their "July 2011 motion for summary judgment and [their] May 2012 motion to dismiss be granted." (*Id.* at 2.) The Court then directed Defendants to "advise [it] and Plaintiff of the result of their investigation [into the burglary data] by December 7, 2012." (*See id.* at 3 (endorsement by Court).) Thus, on December 7, 2012, Defendants submitted a letter stating that they remained unaware of any specific data relied on by Sergeant Cuadrado because "the information she [had] conveyed to the police officers under her command ... was generated by word-of-mouth, and communicated verbally among supervisors." (Letter from Defs. dated Dec. 7, 2012, ECF No. 64.) The Court issued an Order directing Plaintiff to file any further papers by February 4, 2013. (Order, Jan. 24, 2012, ECF No. 65.) Plaintiff did not submit any additional papers to the Court, and the issues are now deemed to be fully briefed.

**III. APPLICABLE LAW—42 U.S.C. § 1983**

**A. Individual Liability**

***7** Section 1983 provides a remedy to persons who, under color of state law, have been deprived of "any rights, privileges, or immunities secured by the Constitution." 42 U.S.C.

§ 1983. The Supreme Court has explained that "[t]he purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole,* 504 U.S. 158, 161, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992). Thus, in order to be held liable under § 1983, a state actor must be, or have been, personally involved in the violation alleged. *See Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ("Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution."). When a state actor is sued under § 1983 for being personally involved in a constitutional violation, he may be granted qualified immunity from suit. *See Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (explaining rationale behind offering government officials qualified immunity). To determine if a state actor is entitled to such immunity, a court must decide (1) "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right;" and (2) "whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Pearson v. Callahan,* 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (internal references omitted). A court may approach this two-pronged analysis in whatever order that it deems appropriate. *Id.* at 236.

### B. Municipal Liability

Conversely, a plaintiff seeking to sue a municipality under § 1983 must show that an identified municipal "policy," "custom," or "practice" was the "moving force" behind the harm alleged. *See Monell v. New York Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). It is not enough for a plaintiff to allege that a municipality's employee acted unconstitutionally in a single instance, or that a municipality's employees are guilty of some wrongdoing. *See id.* at 691 ("A municipality cannot be held liable under § 1983 on a respondeat superior theory."). Rather, a plaintiff must prove (1) that a written discriminatory policy exists; or (2) that "the discriminatory practices of city officials are ... so permanent and well settled as to constitute a custom or usage with the force of law;" or that (3) "the actions of subordinate officers are sufficiently widespread to constitute the constructive acquiescence of senior policymakers." *Sorlucco v. New York City Police Dep't,* 971 F.2d 864, 870–71 (2d Cir.1992) (internal quotation marks omitted).

## IV. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. Legal Standard [6]

Under Rule 56 of the Federal Rules of Civil Procedure, "[s]ummary judgment is proper if, viewing all facts of record in a light most favorable to the non-moving party, no genuine issue of material fact remains for adjudication." *Samuels v. Mockry,* 77 F.3d 34, 35 (2d Cir.1996); *see also Fincher v. Depository Trust & Clearing Corp.,* 604 F.3d 712, 720 (2d Cir.2010) (explaining that "[a]n issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" and that "[a] fact is material if it might affect the outcome of the suit under governing law"). A party moving for summary judgment bears the burden of proving that no genuine issue of material fact exists, or that the evidence supporting the non-moving party's case is so slight that no rational jury could find in the non-moving party's favor. *See Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1223 (2d Cir.1994). The party opposing summary judgment must then come forward with facts sufficient to show that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In so doing, the opposing party must show more than "[t]he mere existence of a scintilla of evidence in support of [its] position." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. Plaintiff's Fourth Amendment Claim

***8** Plaintiff's Fourth Amendment claim alleges that Officer Ueberacher stopped Plaintiff "without reasonable or probable cause to believe a crime had been, was being, or was about to be committed and without reasonable or probable cause to believe that Plaintiff had committed, was committing, or was about to commit a crime." (Am.Compl.¶ 104.) The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. Const., amend. IV. The Supreme Court has made clear that a "seizure" occurs when a police officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *United States v. Terry,* 392 U.S. 1, at 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "The test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547,

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

113 L.Ed.2d 690 (1991) (citing *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). Said another way, Fourth Amendment scrutiny is triggered when a reasonable person would have believed that he was not free to leave and go about his business. *See INS v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984).

Where an individual does not consent to a police encounter and a police officer has reasonable articuable suspicion that "criminal activity may be afoot," the Fourth Amendment permits that officer to briefly detain and question a person for investigative purposes. *See* Terry, 392 U.S. at 30. For such an investigative stop, reasonable suspicion demands that an officer be "able to articulate something more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Reasonable suspicion may, however, be based on "a series of acts, each perhaps innocent in itself, but which taken together warrants further investigations." Terry, 392 U.S. at 22.

i. *The encounter between Officer Ueberacher and Plaintiff constituted an investigative stop under the Fourth Amendment.*

As the party opposing summary judgment, Plaintiff is entitled to have the evidence construed in the light most favorable to him and to have all inferences drawn in his favor. *See Thomas,* 165 F.3d at 142. Thus, for the purpose of deciding Defendants' summary judgment motion, the Court assumes that, as Plaintiff asserts, Officer Ueberacher told Plaintiff that he was not free to leave the scene of his encounter with Officer Ueberacher. (*See* Am. Compl. ¶¶ 34–35, 43–44.) The Court also assumes that, when the four unnamed responding 911 officers arrived at the scene, they stood around Plaintiff in a threatening semi-circle and at least one of these officers told Plaintiff that he was not free to leave. (*id.* ¶¶ 50–52.) Under these circumstances, a reasonable person would not have felt free to disregard the police and to go about his business. *See Hodari D.,* 499 U.S. at 628.

***9** In addition, the Court notes that Plaintiff reported not feeling free to leave the scene and that he did not actually leave the scene until Sergeant Cuadrado told him that he could go. (Am.Compl.¶¶ 53–57.) The Court further notes that Officer Ueberacher completed a report for the NYPD's Stop, Question & Frisk System after his encounter with Plaintiff, a fact which suggests that Officer Ueberacher also viewed the encounter to be non-consensual. (*See* Nov. 16, 2012 Letter Ex. B.) Thus, considering these factors together, it is clear that Plaintiff did not consent to the encounter with Officer Ueberacher. Fourth Amendment scrutiny is therefore required as to whether Officer Ueberacher had reasonable articuable suspicion to perform an investigative stop on Plaintiff. See *Mendenhall,* 446 U.S. at 553–54 (concluding that "foundation ... for invoking constitutional safeguards" exists "only when" an individual shows that his freedom of movement has been restrained by "means of physical force or a show of authority"); *see also* Terry, 392 U.S. at 30.

ii. *Officer Ueberacher had reasonable articuable suspicion to perform an investigative stop on Plaintiff.*

Both Plaintiff and Officer Ueberacher agree that Officer Ueberacher approached Plaintiff only *after* observing him "put his bag down, bend over his bag, move his arms about his bag, pick up the bag, and proceed west." (Am. Comp. ¶ 12; *see also* Ueberacher Decl. ¶ 2.) Officer Ueberacher stated that he was suspicious of Plaintiff's activities at that time because the front door of a building at 6 or 10 West 123rd Street was ajar-an observation which Plaintiff has not contradicted. (*See* Ueberacher Decl. ¶ 2.) Officer Ueberacher also stated that he was particularly suspicious of Plaintiff's activities because he had previously been told by his commanding officer of "a recent spike in burglaries" in the location around where Plaintiff was observed and that the "suspects committing these burglaries often str[uck] during the midday hours and st[ole] items that c[ould be] easily be concealed in bags and knapsacks." (*Id.*) To this end, at or around the time of the incident, Officer Ueberacher recorded in his Stop & Frisk Report that he had observed Plaintiff in an area with a "high incidence of reported offense." (Nov. 16, 2012 Letter Ex. B.) Moreover, the affidavit submitted by Sergeant Cuadrado confirms that, prior to March 9, 2009, she was also aware of, and did in fact inform, Officer Ueberacher about the burglary pattern in the area. (Cuadrado Aff. ¶ 4.)

Although Plaintiff's presence in the "high-crime area" where he was observed, is not, by itself, sufficient to justify the investigative stop at issue here, the fact that Officer Ueberacher had been told about a recent spike in midday burglaries-taken together with the undisputed facts that a front door near to Plaintiff was open and that near to this open door, Plaintiff was observed bending over his duffle bag and moving his arms about his bag-establish that Officer Ueberacher had reasonable suspicion to briefly stop and question Plaintiff. [7] (*See* Am. Compl. ¶¶ 7, 11; Ueberacher Decl. ¶ 2); *see also Illinois v. Wardlow,* 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) ("[O]fficers are not required to ignore the relevant characteristics of a location

in determining whether the circumstances are sufficiently suspicious to warrant further investigation."); *Floyd v. City of New York,* 813 F.Supp.2d 417, 442–43 (S.D.N.Y.2011) (concluding that officers had reasonable suspicion to stop and frisk two men whom they observed attempting to unlock front door of a house with a number of different keys in a location that had a midday burglary pattern).

***10** Moreover, the scope and duration of the investigative stop that Officer Ueberacher performed on Plaintiff was reasonable in light of Officer Ueberacher's articuable suspicion. *See United States v. Tehrani,* 49 F.3d 54, 58 (2d Cir.1995) ("If an investigative detention is properly premised upon articuable suspicion, the next inquiry is whether its scope and duration are reasonable."). The encounter between Plaintiff and Officer Ueberacher lasted less than twenty minutes, including the time that Plaintiff waited for the arrival of Sergeant Cuadrado, whose presence he had requested, and the officers who were responding to his 911 call. *See Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."). Moreover, the questions that Officer Ueberacher asked Plaintiff were appropriately tailored to his articuable suspicion about Plaintiff's actions. *See* Terry, 392 U.S. at 20 (explaining that an investigative stop must be "reasonably related in scope to the circumstances which justified the intervention in the first place"). Finally, the investigative stop performed on Plaintiff was limited to Officer Ueberacher's questions alone, as Plaintiff was not frisked, searched, or handcuffed during the encounter. *Cf. Royer,* 460 U.S. at 500 (requiring that whatever investigative methods are employed be "the least intrusive means reasonably available to verify or dispel [an] officer's suspicion in a short period of time").

Thus, for the reasons just discussed and in light of the totality of the circumstances presented, the Court concludes that Officer Ueberacher had reasonable articuable suspicion to approach, briefly detain, and question Plaintiff. *See United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (A court "must look at the totality of the circumstances of each case to see whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing."). Moreover, because neither the duration nor the scope of Officer Ueberacher's investigative stop was unreasonable, summary judgment is granted to Defendants on Plaintiff's Fourth Amendment claim against Officer Ueberacher. [8]

**C. Plaintiff's Fourteenth Amendment Claims**

Summary judgment is likewise granted to Defendants on Plaintiff's Fourteenth Amendment claims. (*See* Am. Compl. ¶¶ 65, 102, 106.) The Fourteenth Amendment prohibits a state from depriving any person of life, liberty, or property without due process of law and it also prohibits a state from denying any person equal protection of the law. U.S. Const., amend. XIV. Here, Plaintiff claims that the encounter with Officer Ueberacher on March 9, 2009 led to the violation of his Fourteenth Amendment rights by Officer Ueberacher, the City of New York, Mayor Bloomberg, and Commissioner Kelly. (*id .* ¶ 106.) In addition, Plaintiff claims that the NYPD, Mayor Bloomberg, and Commissioner Kelly violated his Fourteenth Amendment rights by "adopting, condoning, orchestrating, and executing a policy of seizing Blacks in Harlem and throughout the City of New York without probable or reasonable cause to believe such Blacks have committed, are committing, or are about to commit a crime." [9] (*id.* ¶¶ 65, 102.)

***11** As has just been shown, however, Officer Ueberacher had reasonable articuable suspicion to perform the brief investigative stop at issue here. By contrast, Plaintiff has not shown that Officer Ueberacher had reasonable suspicion to stop, but then declined to stop, the white passerby. Accordingly, Plaintiff has failed to show that Officer Ueberacher violated his

Fourteenth Amendment equal protection rights by impermissibly stopping him on the basis of his race, or on any other improper ground. *See Floyd,* 813 F.Supp.2d at 444 (dismissing equal protection claim against defendant officers where court found that officers had reasonable suspicion to perform investigative stop). Similarly, because Officer Ueberacher's investigative stop was lawful, Plaintiff has not shown that the City of New York or the NYPD [10] maintained an unlawful, racially-motivated municipal policy, custom, or practice that caused the deprivation of his Fourteenth Amendment rights. *See Vippolis v. Vill. of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985) (requiring that, if § 1983 municipal liability is to attach, a "causal connection" between a municipality's policy and the deprivation of a plaintiff's constitutional rights must be established), *cert denied,* 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 685 (1987).

Nor has Plaintiff shown that Mayor Bloomberg or Commissioner Kelly adopted a racially-motivated municipal policy or were otherwise personally involved in Plaintiff's

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

encounter with Officer Ueberacher. *See Iqbal,* 556 U.S. at 676 (requiring a plaintiff to "plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). Plaintiff's Amended Complaint, for example, does not allege that either Mayor Bloomberg or Commissioner Kelly was physically present at or near the West 123rd Street location where Plaintiff's encounter with Officer Ueberacher took place; and it also fails to include any allegations that either defendant directly participated in the investigative stop that Officer Ueberacher performed on Plaintiff. *See Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987) (affirming dismissal of claims against defendants where complaint failed to include allegations of personal involvement in the underlying constitutional violations).

Finally, the Court notes that the injunctive relief requested by Plaintiff on his Fourteenth Amendment claims is mooted by New York State law. Specifically, Plaintiff requests that the Court order the City of New York, Mayor Bloomberg, and Commissioner Kelly to "purge and effect a complete erasure of the information in [a] 'profiling database' " that Plaintiff alleges the City maintains. (Am.Compl. § 103.) But Article 140.50 of New York Criminal Procedure Law already forbids a police officer from recording in a computerized or electronic database the name, address, or social security number of a person, such as Plaintiff, who has been stopped, questioned, or frisked by a police officer, but is then released without further legal action. *See* N.Y.Crim. P. Law § 140.50(4) (McKinney). Indeed, Plaintiff's own name was not even recorded by Officer Ueberacher in the Stop & Frisk Report. (*See* Nov. 16, 2012 Letter, Ex. B.)

**D. Plaintiff's Ninth Amendment Claim**

***12** Defendants are also granted summary judgment on Plaintiff's Ninth Amendment claim, alleging that Officer Ueberacher, Mayor Bloomberg, and Commissioner Kelly, by "racially profiling and targeting Plaintiff for seizure and search, used state power to assault Plaintiff's value, esteem, worth, and nature as a human being, which assault amounted to an assault on Plaintiff's dignity." (Am.Compl.¶ 107.) Also unsuccessful is Plaintiff's separate claim against the City of New York, Mayor Bloomberg, Commissioner Kelly, and Officer Pimentel for a "declaratory judgment that the Ninth Amendment protects the individual right to dignity and that racial group profiling necessarily assaults an individual's dignity as a human being." (*id.* ¶ 108.)

The Ninth Amendment states that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. Const., amend. IX. Plaintiff's claims under this amendment fail because the Ninth Amendment is "not an independent source of individual rights." *Jenkins v. C.I.R.,* 483 F.3d 90, 92 (2d Cir.2007). Rather, the amendment "provides a 'rule of construction,' " which "dictates that 'the full scope of the specific guarantees in the Constitution is not limited by the text, but embraces their purpose.' " *Id.* (quoting *United States v. Bifield,* 702 F.2d 342, 349 (2d Cir.1983)). Accordingly, the Ninth Amendment "cannot serve as the basis for a § 1983 claim," and Plaintiff's claims under this Amendment must be dismissed. *See Brown v. City of New York,* No. 11 CIV 1068, 2013 WL 491926, at *4 (S.D.N.Y. Feb. 8, 2013) (dismissing § 1983 claim premised on violation of Ninth Amendment); *see also Subgidio v. Graiani,* No. 05 CIV 4065, 2006 WL 648229, at *7 (S.D.N.Y. Mar. 16, 2006) (holding that a Plaintiff's Ninth Amendment claim failed "because that amendment cannot be enforced by means of an action under § 1983").

**E. Plaintiff's Claim Pursuant to 42 U.S.C. § 1981**

In addition to the § 1983 claims just discussed, Defendants have also moved for summary judgment on Plaintiff's § 1981 claim against Officer Ueberacher. (Summ. J. Mem. at 12–13.) Specifically, Plaintiff alleges that Officer Ueberacher, by offering and then "refus[ing] to seize a white person as he had seized Plaintiff," denied Plaintiff "the same right to be secure in his person, papers, and effects from unreasonable seizures as is enjoyed [by] white citizens." (Am.Compl.¶ 105.)

Section 1981 provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens....

§ 1981(a). "The statute has long been viewed as prohibiting certain forms of discrimination based on race, and its reference to rights enjoyed by white citizens establishes

the racial character of the rights being protected." *Albert v. Carovano,* 851 F.2d 561, 571 (2d Cir.1988) (internal citations and quotation marks omitted). Thus, to establish a claim under § 1981, a plaintiff must allege facts showing that: (1) the plaintiff is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute. *See Mian v. Donaldson, Lufkin, Jenrette Sec. Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993).

***13** Here, given that Officer Ueberacher had reasonable articuable suspicion to perform a brief investigative stop on Plaintiff, Plaintiff has failed to show that Officer Ueberacher "had an intent to discriminate against him on the basis of race." *See id.* Furthermore, the fact that Officer Ueberacher did not stop the white passerby as Plaintiff requested, (*see* Am. Compl. ¶¶ 36–41), does not give rise to the inference that Officer Ueberacher stopped Plaintiff on the basis of his race. The circumstances in which this passerby was allegedly observed were not reasonably comparable to those surrounding the investigative stop of Plaintiff. Indeed, the white passerby was not observed standing in front of an open door, nor was there reason to believer he was placing any potentially stolen items in a bag. In fact, he was reported to be carrying only a clipboard, (*id.* ¶ 41), thus making it unlikely that he was concealing stolen items. Hence, Defendants are granted summary judgment on Plaintiff's Section 1981 claim.

## V. DEFENDANTS' RULE 12(c) MOTION TO DISMISS

### A. Legal Standard

Rule 12(c) provides that, "[a]fter the pleadings are closed-but early enough not to delay trial-a party may move for judgment on the pleadings." Fed.R.Civ.P. 12(c); *see also Patel v. Searles,* 305 F.3d 130, 135 (2d Cir.2002). In considering a Rule 12(c) motion, a court applies "the same standard as that applicable to a motion under Rule 12(b)(6), accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party." *Burnette v. Carothers,* 192 F.3d 52, 56 (2d Cir.1999). Thus, a pleading will survive a Rule 12(c) motion only if it is supported by allegations that put forth underlying facts sufficient to state a claim to relief that is "plausible on its face." *Twombly,* 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct." *Iqbal,* 556 U.S. at 678. In considering a motion to dismiss, a court must disregard claims that amount only to "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *id.,* and must confine its consideration to the pleadings and any matters that are subject to judicial notice, *see* Fed.R.Civ.P. 12(d).

### B. Plaintiff's FOIL–Related Due Process Claims

Plaintiff claims that the City of New York violated his Fifth Amendment procedural due process rights by maintaining a policy of not time-stamping any FOIL requests, (*id.* ¶ 109), and that Officer Rivera violated his Fifth Amendment due process rights by refusing to time-stamp his particular FOIL request, (*id.* ¶¶ 111–14). Plaintiff contends that Officer Rivera's refusal to time-stamp his FOIL submission was "for the purpose of thwarting Plaintiff's ability to obtain burglary information in relation to an instance of racial profiling." (*Id.*) In addition, Plaintiff alleges that Officer Pimentel violated his due process rights by withholding the burglary data and the 911 call records that he had requested in his FOIL request on March 12, 2009. (*id.* ¶¶ 115–16, 80–86.)

***14** This Court is without jurisdiction to consider Plaintiff's FOIL-related claims and thus Defendants' request to dismiss these claims will be granted. Under New York state law, if an agency or government official fails to comply with the provisions of FOIL, the person submitting the FOIL request must pursue an administrative appeal or seek remedies in state court pursuant to N.Y. C.P.L.R. Article 78. *See* N.Y. Pub. Off. Law § 89; *see also Schuloff v. Fields,* 950 F.Supp. 66, 67–68 (E.D.N.Y.1997) ("The appropriate vehicle for challenging denials of access guaranteed by [FOIL] is a state court proceeding pursuant to N.Y. C.P.L.R. Article 78 upon exhaustion of administrative remedies."); *Sonds v. Cuomo,* No. 9:11 CIV 895, 2012 WL 952540, at *3 (N.D.N.Y. Feb.3, 2012) ("Plaintiff's state FOIL request cannot be the basis of a federal action."); *Zimmelman v. Teachers' Ret. Sys. of City of New York,* No. 08 CIV 6958, 2010 WL 1172769, at* 14 (S.D.N.Y. Mar. 8, 2010) (ruling that where a plaintiff has not exhausted his remedies under an administrative appeal process, a federal court has no jurisdiction to consider an alleged failure to comply with city policies).

In addition, assuming *arguendo* that Plaintiff could bring his FOIL-related claims in this Court and that Plaintiff could also show that either the City maintained a policy of refusing to time-stamp FOIL requests or that Officer Rivera refused to time-stamp Plaintiff's particular FOIL submission, Plaintiff's FOIL-related claims would still fail. Plaintiff, in order to make out a due process claim for property deprivation, must show that he had a federal protectable property interest. *See*

*Matthews v. Eldridge,* 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). But, as several courts within this Circuit have found, "a plaintiff has no property interest in obtaining FOIL documents." [11] *Blount v. Brown,* No. 10 CIV 01548, 2010 WL 1945858, at *2 (E.D.N.Y. May 11, 2010); *see also* *Billups v. Millet,* No. 91 CIV 6326, 1996 WL 99399, at *4 (S.D.N.Y. Mar.6, 1996) ("FOIL documents are an expectation .... [and New York state law] does not require that documents be produced as of right, but only after request and investigation."); *Webb v. Ashburn,* No. 96 CIV 0325, 1997 WL 118355, at *5–6 (S.D.N.Y. Mar. 17, 1997) (same). Likewise, Plaintiff's allegations about Officer Pimentel would also fail on the merits. Plaintiff, who acknowledges that he specified the wrong 911 call date in his FOIL request, offers no support for his conclusory allegation that Officer Pimentel failed to inform him about having located the SPRINT report and audio-taped recording of his 911 call because she "was aware of, condoned, and supported the City of New York's Stop–and–Frisk–Black–people policy." (*id.* ¶¶ 83, 85–87.)

### VI. STATE LAW CLAIMS

The Court, having dismissed or entered summary judgment on all of the federal claims alleged in Plaintiff's Amended Complaint, now dismisses all of the pendent state law claims, (*see* Am. Compl. ¶¶ 94–97), alleged therein pursuant to 28 U.S.C. § 1367(c)(3). *See* *Pitchell v. Callan,* 13 F.3d 545, 547 (affirming district court' dismissal of pendent state law claims on basis that "[i]t is axiomatic that when all federal claims are eliminated prior to trial, a court should decline to exercise jurisdiction over any remaining pendent state claims"); *see also* *Carnegie–Melon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federallaw claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.).

### VII. CONCLUSION

***15** For the reasons stated above, Defendants' motion for snmmary judgment and motion to dismiss are granted. Plaintiff's Amended Complaint is hereby dismissed with prejudice.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 2419142

## Footnotes

1 Plaintiff and Defendants both agree that Plaintiff was on West 123rd Street in the vicinity of Marcus Garvey Park West and Malcolm X Boulevard at approximately 11:00 a.m. on March 9, 2009. (*See* Am. Compl. at 1; Answer to Am. Compl. ("Answer") ¶ 8, ECF No. 43.) Plaintiff asserts, however, that he stopped walking in front of 10 West 123rd Street, (Am.Compl.¶ 3), whereas Officer Ueberacher stated that he observed Plaintiff standing at 6 West 123rd Street, (Decl. of Brian J. Farrar in Supp. of Mot. for Summ. J. ("Farrar Summ. J. Decl.") Ex. C ("Ueberacher Decl.") ¶ 2, July 22, 2011, ECF No. 28). Neither Plaintiff nor Defendants discuss the discrepancy between these addresses, and so the Court finds that the difference is immaterial to resolving the issues presented here. In addition, 10 West 123rd Street and 6 West 123rd Street are both located between Marcus Garvey Park West and Malcolm X Boulevard, which is also called Lenox Avenue. In their letters and briefings, parties refer to both of these street names, but for simplicity, the Court adopts Malcolm X Boulevard as its reference.

2 Plaintiff entered the wrong date in his FOIL request as the 911 call that Plaintiff made during his encounter with Officer Ueberacher occurred on *March 9, 2009,* not on *March 10, 2009.* (*See* Am. Compl. ¶ 77.)

3 On November 16, 2012, Defendants submitted a letter to the Court, copied to Plaintiff, stating that the "NYC Parks Department ... attempted to provide Plaintiff with copies of his attendance records, pursuant to Plaintiff's

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

April 13, 2012 FOIL request, [but] the mailing was returned to sender when Plaintiff failed to update his current address." (Nov. 16, 2012 Letter at 1.)

4 Plaintiff's original Complaint named additional defendants, but because these parties are not relevant to the disposition of Defendants' motions, they will not be discussed herein. The Court will also not recount the full procedural history of this case as it has already been set forth in previous orders. (*See, e.g.,* Order Granting Plaintiff's First Mot. to Compel (the "First Compel Order"), Jan. 4, 2012, ECF No. 36.)

5 When filed, Plaintiff's Amended Complaint named Officer Rivera and "NYPD X" as the defendants involved in the processing of his March 12, 2009 FOIL request. (Am. Compl. at 1.) Plaintiff later requested that "NYPD X" be identified as Officer Christine Pimentel. (Pl.'s Letter to the Court, July 2, 2012, ECF No. 55.) Defendants opposed this request "because the three year statute of limitations for [Plaintiff's] claim pursuant to § 1983 against Pimentel had lapsed." (Defs.' Letter to Court at 1, Aug. 10, 2012, ECF No. 56.) By Order dated November 5, 2012, this Court granted Plaintiff's request to substitute Officer Pimentel with "NYPD X" without prejudice to Defendants' Motion to Dismiss on statute of limitation grounds. (Order at 4, Nov. 5, 2012, ECF No. 59.)

6 The Court is mindful that Plaintiff is proceeding *pro se* in this civil rights action. Plaintiff's submissions will therefore be held to "less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); *see also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) ( "[T]he pleadings of a pro se plaintiff must be read liberally and should be interpreted to raise the strongest arguments that they suggest.") (internal quotation marks omitted). The Court's liberal construction of Plaintiff's submissions does not, however, relieve Plaintiff of his burden to show that his pleadings contain factual allegations sufficient to raise a "right to relief above the speculative level." *See Bridgewater v. Taylor,* 698 F.Supp.2d 351, 357 (S.D.N.Y.2010) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Nor does a party's *pro se* status relieve him from the usual summary judgment requirements. *See Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995).

7 In arriving at this conclusion, the Court does not reach the question of whether Plaintiff was standing in the courtyard of a building at 6 or 10 West 123rd Street or on the public sidewalk in front of a building at 6 or 10 West 123rd Street.

8 Because Officer Ueberacher did not violate Plaintiff's Fourth Amendment rights, there is no need to consider if Officer Ueberacher is entitled to qualified immunity.

9 Plaintiff raises this claim without identifying a specific cause of action, but the Court construes Plaintiff's claim to be made under the Fourteenth Amendment's equal protection clause. *See Graham,* 89 F.3d at 79 (emphasizing that a *pro se* plaintiff's pleadings must be read liberally and interpreted to raise strongest arguments that they suggest).

10 In addition to failing on the merits, all of Plaintiff's claims against the NYPD must be dismissed because, pursuant to New York City's Charter, the NYPD is not a suable entity. *See* N.Y. City Charter § 396. Section 396 of the Charter specifically states that "[a]ll actions and proceedings for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law." *Id.; see also Williams v. New York City Police Dep't,* 930 F.Supp. 49, 54 (S.D.N.Y.1996) ("As an agency of the City of New York, the Police Department is not a suable entity."); *East Coast Novelty Co., Inc. v. City of New York,* 781 F.Supp. 999, 1010 (S.D.N.Y.1992) (dismissing claims against NYPD because district court found that New York City Charter precluded such action against the agency).

11 Additionally, even though submissions beyond the pleadings may not be considered in deciding Defendants' motion to dismiss, the Court notes in passing that Plaintiff has also not shown any causal connection

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

between the deprivation of his constitutional rights and the City's alleged time-stamping policy or the refusal of Officer Rivera to time-stamp his FOIL request. On April 13, 2009, the NYPD FOIL Unit sent Plaintiff a letter acknowledging the submission of his March 12, 2009 FOIL request, and on August 11, 2009, the NYPD FOIL Unit sent Plaintiff a letter stating that their search had returned negative results. (*See* Feb. 23, 2012 Letter Ex. B.) These facts show that the City responded appropriately to Plaintiff's FOIL request.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2026 WL 2130622
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Stacey PYNN, Plaintiff,
v.
Matthew PYNN et al., Defendants.

24-CV-508-LJV
|
Signed July 24, 2026

**Attorneys and Law Firms**

Stacey Pynn, Lockport, NY, Pro Se.

DECISION & ORDER

LAWRENCE J. VILARDO, UNITED STATES DISTRICT JUDGE

***1** In 2024, the pro se plaintiff, Stacey Pynn, filed a complaint asserting claims under 42 U.S.C. § 1983, as well as under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and other federal and state laws. Docket Item 1. She moved to proceed in forma pauperis ("IFP"), Docket Item 2, and this Court granted that motion, Docket Item 9. She also moved for a preliminary injunction and a temporary restraining order ("TRO"), Docket Item 4; for electronic filing privileges, Docket Item 5; for service by the United States Marshals Service, Docket Item 6; and for this Court to rule on her pending motions, Docket Item 8. This Court denied those motions. Docket Item 9. Pynn then sought reconsideration of the order denying her motion for a preliminary injunction and TRO, Docket Item 10, which the Court also denied, Docket Item 14.

On October 24, 2025, Pynn filed a sealed motion to amend the complaint and included a proposed amended complaint. [1] Docket Items 24-25. A few months later, she again moved for a preliminary injunction. Docket Items 29-31.

The Court now screens the complaint under 28 U.S.C. § 1915(e)(2) and decides Pynn's motions to amend and for a preliminary injunction. For the reasons that follow, Pynn's claim for "violation of due process right to care and custody of children" may proceed against Niagara County and John Spero in his individual capacity. But her claims against Andrew Isenberg, Dean Puleo, the New York State Unified Court System, the New York State Office of Court Administration, all judges, the Niagara County Clerk's Office, the Niagara County Department of Social Services, and Niagara County Child Protective Services are dismissed under 28 U.S.C. § 1915(e)(2)(B). Pynn's remaining claims against the other defendants will be dismissed under that same section unless she files an amended complaint that corrects the deficiencies noted below. The Court denies Pynn's motion to amend the complaint, Docket Item 24, to add the defendants identified in her proposed amended complaint, Docket Item 25. The Court also denies her motion for a preliminary injunction, Docket Item 29, along with her requests for declaratory and other injunctive relief, Docket Item 1 at 97-99.

## DISCUSSION

Section 1915(e)(2) "provide[s] an efficient means by which a court can screen for and dismiss legally insufficient claims." *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (citing *Shakur v. Selsky*, 391 F.3d 106, 112 (2d Cir. 2004)). The court shall dismiss a complaint in a civil action "at any time if the court determines that...the action...(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." *See* 28 U.S.C. § 1915(e)(2).

***2** Generally, the court will afford a pro se plaintiff an opportunity to amend or to be heard prior to dismissal "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim." *Abbas*, 480 F.3d at 639 (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)); *see also* *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ("A pro se complaint is to be read liberally. Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." (italics omitted) (quoting *Gomez*, 171 F.3d at 795)). But leave to amend pleadings may be denied when any amendment would be "futile." *Cuoco*, 222 F.3d at 112.

### I. SCREENING THE COMPLAINT

In evaluating the complaint, the court accepts all factual allegations as true and draws all inferences in the plaintiff's favor. *See* *Larkin v. Savage*, 318 F.3d 138, 139 (2d Cir. 2003)


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

(per curiam); *King v. Simpson*, 189 F.3d 284, 287 (2d Cir. 1999). Although "a court is obliged to construe [pro se] pleadings liberally, particularly when they allege civil rights violations," *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004), even a pro se complaint "must plead 'enough facts to state a claim to relief that is plausible on its face,' " *Shibeshi v. City of New York*, 475 F. App'x 807, 808 (2d Cir. 2012) (summary order) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim will have 'facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In other words, although a pro se complaint need not provide every last detail in support of a claim, it must allege some facts that support the claim. *See id.* (concluding that district court properly dismissed pro se complaint under section 1915(e)(2) because complaint did not meet pleading standard in *Twombly* and *Iqbal*). And even pro se pleadings must meet the requirements of Rule 8 of the Federal Rules of Civil Procedure, *see Wynder v. McMahon*, 360 F.3d 73, 79 n.11 (2d Cir. 2004), and "give the defendant fair notice of what the...claim is and the grounds upon which it rests," *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (alteration in original) (quoting *Twombly*, 550 U.S. at 555).

Pynn has sued more than 30 defendants—including her ex-husband, Matthew Pynn; the New York State Unified Court System and Office of Court Administration; a number of New York State judges and justices; and Niagara County and a number of its departments and employees—for violating her rights under the New York State and United States Constitutions, RICO, and several criminal statutes. Docket Item 1. A liberal reading of the complaint tells the following story. [2]

In 2002, Pynn married Matthew Pynn, [3] an attorney employed by Niagara County in various capacities for more than two decades. *Id.* ¶¶ 69-71. The couple had four children together. *Id.* ¶ 71. In 2013, Stacey Pynn "filed for divorce" in New York State Supreme Court, Niagara County. *Id.*

***3** "Due to the nature of his job as a Niagara County [p]ublic [d]efender," Matthew Pynn became "well acquainted with judges, court officials and court staffers" as well as "with local police and other investigative officers, especially child welfare investigators" in Niagara County. *Id.* ¶ 70. Through those contacts, he was able to "use[ ]...the [c]ourt system" to cover up his own criminal activities. *Id.* ¶¶ 34-37, 70. Indeed, the "courts and child welfare agencies located in and around Niagara County...conspired to criminally cover up the severe child abuse and maltreatment committed by" Matthew Pynn. *Id.* ¶ 72.

Since 2013, a number of New York State Supreme Court Justices named as defendants have been assigned to the Pynns' divorce case: Justice Catherine Nugent Panepinto, Justice Richard Kloch, Justice Sara Sheldon, Justice Daniel J. Furlong, and Justice Frank Sedita III. *See id.* ¶¶ 122-125, 129-132, 148-200. Pynn says that each of those jurists was biased against her and part of a conspiracy to cover up Matthew Pynn's misconduct. *See id.* More specifically, the justices issued orders favoring Matthew Pynn, then recused themselves after Stacey Pynn brought to light each justice's conflict of interest. *See id.*

The only exception is Justice Sedita, and not in a good way. "[D]espite his obvious bias," Justice Sedita has "refuse[d] to disqualify himself" from the case, even after Pynn filed several motions for his recusal. *Id.* ¶ 189; *see also id.* ¶¶ 190-200 (detailing Justice Sedita's various unfair rulings and refusal to recuse himself). Most notably, on December 3, 2021, Justice Sedita issued an order "preclud[ing Pynn] from filing any applications in the court without prior approval or an attorney." *Id.* ¶ 193.

Pynn has appealed at least some of the orders issued in the matrimonial proceedings—including Justice Sedita's order barring her from filing unapproved applications pro se—to the New York State Supreme Court, Appellate Division, Fourth Department. *See id.* ¶¶ 169, 193, 195; *see also id.* at 101-120 [4] (state court docket attached as an exhibit showing notices of appeal filed by Pynn). The Fourth Department ruled in Pynn's favor on her appeal of an order issued by Justice Furlong and against her on her appeal of the filing injunction. *See id.* ¶¶ 169, 193, 195. But according to Pynn, at least one justice created "false 'orders' with an incorrect case index" to ensure those orders "cannot be appealed." *See id.* ¶¶ 178, 264(c).

Pynn also filed motions to change venue, but those motions were "consistently denied" by another defendant, Judge Kevin M. Carter, formerly the administrative judge for New York State's Eighth Judicial District. *Id.* ¶ 123. Judge Carter also ignored Pynn's emails about missing evidence in the state court record. *Id.* ¶¶ 215-20.

Along the same lines, when Pynn complained to two defendants—Judge Norman St. George, the first deputy chief

administrative judge of the New York Court System, and Judge Lawrence Marks, the former chief administrative judge of the New York Court System—about the actions of the other jurists involved in her legal proceedings, Judge St. George and Judge Marks failed to "effective[ly] interven[e]." *Id.* ¶¶ 47-48, 266(h). Moreover, the New York State Unified Court System and its "administrative arm," the New York State Office of Court Administration—both defendants here—have "refused to right the[se] wrong[s]," thus "obstruct[ing] justice." *Id.* ¶¶ 42-43, 255, 262.

Due to the bias of the New York State Supreme Court, Niagara County, Pynn has filed several actions in other courts "[i]n an[ ] attempt to obtain a fair forum." *See, e.g.*, *id.* ¶ 211. In July 2016, for example, Pynn filed a case in this Court against several of the same defendants named here, including Matthew Pynn, Niagara County, Niagara County Child Protective Services ("Niagara County CPS"), Niagara County CPS Supervisor Bianca Gatto, and the Niagara County Department of Social Services ("Niagara County DSS"). *Id.* ¶ 226; *see Pynn v. Pynn*, Case No. 16-cv-548, Docket Item 1 (W.D.N.Y. July 5, 2016). Pynn alleged that the defendants in that case were "conspir[ing]" with various others, including a New York State Supreme Court justice, to "protect" Matthew Pynn and "deprive [Stacey Pynn] of custody of and access to her four minor children." *Pynn*, Case No. 16-cv-548, Docket Item 6 ¶ 2 (W.D.N.Y. Aug. 9, 2016) (amended complaint). This Court dismissed that case for lack of subject matter jurisdiction. *Id.*, Docket Item 108 (W.D.N.Y. Feb. 7, 2019).

***4** Several years later, in September 2022, Pynn applied in Niagara County Family Court for a "[t]emporary [o]rder of [p]rotection for her[self] and her children" against Matthew Pynn. Docket Item 1 ¶ 201. After "[a]ll [Niagara County] Family Court [j]udges ...recused" themselves due to their "familiarity" with Matthew Pynn, defendant Judge Keith D. Kibler, a family court judge from Wyoming County, was assigned to the matter. *Id.* ¶¶ 202-03. Judge Kibler denied Pynn's application without affording her adequate due process and subsequently "refused to [recuse] himself" from the case "despite his obvious obligations to do so." *Id.* ¶ 207.

Pynn then sought an "[e]mergency [t]emporary [o]rder of [p]rotection for her[self] and her children against...Matthew Pynn" in Erie County Family Court. *Id.* ¶ 211. That case was "dismissed...and remanded" to a court in Niagara County despite that court's "conflict[s ]of[ ]interest." *Id.* In January 2023, Pynn "commenced her own civilian criminal complaint[ against] Matthew Pynn" in Lockport City Court. *Id.* ¶ 224. But Judge Carter and two of his "assistants"—defendants Andrew Isenberg and Dean Puleo— "shielded the complaint from proceeding" as part of what Pynn calls the conspiracy to aid in and "cover[ ]up" Matthew Pynn's "child endangerment." *Id.* ¶¶ 50-51, 224-25.

Others involved in Pynn's legal proceedings or the underlying custody dispute also have been biased or corrupt. For instance, the Niagara County Clerk's Office, Niagara County Clerk Joseph Jastrzemski, and Clerk's Office employee Lisa Kessler— all named as defendants here—did not ensure that the record in Pynn's divorce proceedings was entirely correct and complete. *See id.* ¶¶ 46, 57-58, 120-21, 177. In addition, defendants Niagara County CPS and DSS, and several of those entities' employees and representatives, failed to properly investigate Matthew Pynn and charge him with child abuse. [5] *Id.* ¶¶ 56, 59-63, 226-245.

Likewise, defendant David Nathanson, a "purported forensic psychologist" appointed by Justice Kloch in the state court proceedings, "conspired to conceal the...sexual abuse" committed by Matthew Pynn by writing an incorrect and biased report. *See id.* ¶¶ 65, 139-145. Defendant Charles P. Ben, an attorney, similarly accepted an appointment to represent the Pynn children despite his prior working relationship with Matthew Pynn. *See id.* ¶¶ 165, 207, 269(d). Finally, three officers with the New York State Police—defendants Ronald Wilson, John Spero, and Stanley Edwards III—failed to "properly investigate" Matthew Pynn's sexual abuse. *Id.* ¶¶ 145-47. In fact, Spero made "willful false statements that he did an investigation and [that] there was no indication that [Matthew] Pynn ever acted in a manner that would be considered harmful to the welfare of his child." *Id.* ¶ 146 (internal quotation marks omitted).

Pynn says that the dozens of defendants conspired to "conduct[ ] a criminal enterprise involving the exploitation and abuse of minors"—including her four children— and to "cover up[ ]" that "criminal activity." *Id.* ¶¶ 17-20. She also says that the defendants, individually and together, violated her constitutional rights to due process, equal protection of law, and access to the courts. *See id.* at 74-79, 81-85. She seeks compensatory and punitive damages, *id.* at 97, along with various forms of injunctive and declaratory relief, *id.* at 97-99. [6]

## II. IMMUNITY

**A. Eleventh Amendment Immunity**

***5** Pynn claims that the New York State Unified Court System, the New York State Office of Court Administration, and the Niagara County Clerk's Office violated her First, Fifth, Ninth, and Fourteenth Amendment rights; failed to "prevent fraud, abuse, and conflict[s] of interest" in violation of 42 U.S.C. § 602(6); "violate[d] New York State's contract with the [f]ederal [g]overnment to receive Title IV Federal Funding under the Child Abuse Prevention and Treatment Act"; violated the False Claims Act; engaged in "criminal activity [under] the [RICO] Act"; and committed other crimes. *See* Docket Item 1 ¶¶ 73, 124, 195, 223, 257-64. The New York State Unified Court System, the Office of Court Administration, and the Niagara County Clerk's Office are arms of New York State. *See* N.Y. Const. art. VI, § 1(a); *Gollomp v. Spitzer*, 568 F.3d 355, 367-68 (2d Cir. 2009) (holding that the New York State Unified Court System is an "arm of the [s]tate" (quoting *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006))); *McKeown v. N.Y. State Comm'n on Jud. Conduct*, 377 F. App'x 121, 122-23 (2d Cir 2010) (summary order) (holding that the New York State Office of Court Administration is an "arm[ ] of the [s]tate"); *Gamble v. Off. of the Cnty. Clerk in Bronx Cnty.*, 2025 WL 41999, at *2 (S.D.N.Y. Jan. 2, 2025) (holding that county clerk's office is an "arm of the state.")

"The Eleventh Amendment bars damage[ ] actions in federal court against a state[,] and against state officials acting in their official capacities, unless the state waives sovereign immunity or Congress abrogates it." *Chris H. v. New York*, 740 F. App'x 740, 741 (2d Cir. 2018) (summary order). "New York has not waived its immunity for damages claims brought under [section] 1983, nor has Congress abrogated it." *Thomas v. Martin-Gibbons*, 857 F. App'x 36, 37 (2d Cir. 2021) (summary order) (first citing *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 38-40 (2d Cir. 1977); and then citing *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990)). So the Eleventh Amendment bars official capacity suits under section 1983 and RICO for money damages against New York State. *See id.; see also Kentucky v. Graham*, 473 U.S. 159, 169 (1985) ("[A]bsent waiver by the [s]tate or valid congressional override, the Eleventh Amendment bars a damages action against a [s]tate in federal court...This bar remains in effect when [s]tate officials are sued for damages in their official capacity." (citations omitted)); *Moore v. City of New York*, 2011 WL 795103, at *7 n.3 (E.D.N.Y. Feb. 28, 2011) ("Congress did not abrogate Eleventh Amendment protection when it passed the RICO statute...and New York State has not waived its sovereign immunity either from RICO claims." (citation omitted)). And as arms of the state, the New York State Unified Court System, the Office of Court Administration, and the Niagara County Clerk's Office are protected by that immunity. *See Arce v. Turnbull*, 2019 WL 4451477, at *4 (W.D.N.Y. Sept. 17, 2019) (because "[t]he New York State Unified Court System...is 'unquestionably an arm of the [s]tate, [New York courts are] entitled to Eleventh Amendment sovereign immunity' " (quoting *Gollomp*, 568 F.3d at 368)); *McKeown*, 377 F. App'x at 122-23 (holding that lawsuits against the New York State Office of Court Administration are barred the Eleventh Amendment); *Gamble*, 2025 WL 41999, at *2 ("[C]laims against the Bronx County Clerk's Office are barred by the Eleventh Amendment because the office is an arm of the state.").

Pynn's claims for damages against the state entities are therefore barred. But Pynn does not simply seek damages in connection with the Niagara County proceedings; she also asks for declaratory relief. *See* Docket Item 1 at 97. More specifically, she asks "that this Court...declar[e]" that her rights to equal protection, due process, and access to the courts were violated "since inception of" her state court proceedings. *Id.* That relief is precluded by Eleventh Amendment immunity as well.

***6** Although the Eleventh Amendment "does not prevent federal courts from granting prospective injunctive relief to prevent a continuing violation of federal law," *Ward v. Thomas*, 207 F.3d 114, 119 (2d Cir. 2000) (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985)), " '[a] declaratory judgment is not available when the result would be a partial end run around' the Eleventh Amendment's bar on retrospective awards of monetary relief," *id.* at 120 (quoting *Green*, 474 U.S. at 73). "The line between prospective and retrospective relief is drawn because '[r]emedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law,' whereas 'compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment.' " *Id.* at 119 (citing *Green*, 474 U.S. at 68). So while a court may enjoin future action by state officials and grant declaratory relief consistent with such an injunction, the Eleventh Amendment "does not permit judgments against state officers declaring that they violated federal law *in the past*." *Gibson v. Cuomo*, 2022 WL 22870127, at *3 (W.D.N.Y. Mar. 25, 2022) (quoting *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993)). Pynn's request for a declaration that her constitutional rights were

"corruptly violated" in connection with her various court proceedings, Docket Item 1 at 97-99, is therefore barred.

The same is true of Pynn's request that this Court declare "the New York CPS Program Manual" unconstitutional. *See id.* at 98. At first glance, that request might be construed as seeking an injunction against the manual's requirement that the relevant social services department refer a case "back to the district in which the subject resides" following a "finding of child abuse/maltreatment," *id.* ¶ 238—that is, as seeking prospective injunctive relief. But Pynn refers to that policy only in the context of *her own cases* having been referred back to Niagara County. *See id.* ¶¶ 211, 238-39. That is to say, Pynn's issue is with how the manual affected her case, not its prospective effect. And those past incidents, "in conjunction with [Pynn's] conclusory language requesting injunctive relief," are "insufficient" to escape to escape the Eleventh Amendment's bar. *See Kelsey v. Kessel*, 2024 WL 1020522, at *4 (S.D.N.Y. Mar. 8, 2024) (Eleventh Amendment barred claim seeking "nullification" of order of protection and "invalidation" of state law on which it was based where plaintiff complained only of past harm suffered due to order of protection).

In sum, because the New York Unified Court System, the Office of Court Administration, and the Niagara County Clerk's Office are protected by sovereign immunity, Pynn cannot recover damages against them. Likewise, sovereign immunity bars her requests for declaratory relief as well. And because better pleading would not cure those defects, Pynn's claims against the New York State Unified Court System, the New York State Office of Court Administration, and the Niagara County Clerk's Office, along with her parallel requests for declaratory relief, are dismissed without leave to amend.

**B. Judicial and Quasi-judicial Immunity**

Pynn names nine New York State justices and judges—Justice Nugent Panepinto, Justice Furlong, Justice Sedita, Justice Kloch, Justice Sheldon, Judge Carter, Judge Marks, Judge St. George, and Judge Kibler (collectively, the "judicial defendants")—who in various ways were involved in her divorce proceedings against Matthew Pynn. She alleges that these jurists acted corruptly and conspired to violate her First, Fifth, Ninth, and Fourteenth Amendment rights; "abused process[ ]" in violation of New York law by failing to recuse themselves and by issuing unfavorable orders; endorsed criminal acts in "violat[ion of] New York [S]tate's Title IV Federal Funding income requirements"; engaged in "criminal activity [under] the [RICO] Act"; and violated several other federal and New York criminal laws. [7] Docket Item 1 ¶¶ 75, 122-25, 262-66, 269-70.

***7** "It is well settled that judges generally have absolute immunity from suits for money damages for their judicial actions." *Bliven v. Hunt*, 579 F.3d 204, 209 (2d Cir. 2009); *see also Kellogg v. Nichols*, 703 F. Supp. 3d 367, 372 (N.D.N.Y. 2023) ("The doctrine of judicial immunity shields judges from suit to the extent they are sued in their individual capacities."). This is to ensure "that a judicial officer, in exercising the authority vested in [that judge], shall be free to act upon [the judge's] own convictions, without apprehension of personal consequences." *Bradley v. Fisher*, 80 U.S. 335, 347 (1871). Judicial immunity therefore does not give way even to "allegations of bad faith or malice." *Mireles v. Waco*, 502 U.S. 9, 11 (1991).

Judicial "immunity is overcome in only two sets of circumstances." *Id.* "First, a judge is not immune from liability for nonjudicial actions, i.e., actions not taken in the judge's judicial capacity." *Id.* (citations and italics omitted). "Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Id.* at 12 (citations omitted).

Pynn's claims concern the justices' and judges' alleged conduct and decisions while presiding over her divorce proceedings. She says that they "maintained cases and failed their lawful obligations to disclose their conflicts with...Matthew Pynn and recuse," thereby denying her right to access the courts and to "a fair and impartial forum." Docket Item 1 ¶ 118. But such allegations fall squarely in the protection afforded by judicial immunity. [8]

***8** "The Supreme Court has generally concluded that acts arising out of, or related to, individual cases before the judge are considered judicial in nature." *Bliven*, 579 F.3d at 210. Further, courts have held that judges' decisions on motions—even motions to recuse—are indisputably judicial in nature. *See Buhannic v. Friedman*, 2019 WL 481732, at *5 (S.D.N.Y. Feb. 7, 2019) (ruling on motions is a "quintessential judicial act[ ]"); *Moskovits v. Bank of Am. N.A.*, 2021 WL 230193, at *4 (S.D.N.Y. Jan. 20, 2021) ("[A] judge's decision to recuse or not to recuse himself is itself a judicial act protected by immunity." (citing *Bobrowsky v. Yonkers Courthouse*, 777 F. Supp. 2d 692, 714 (S.D.N.Y. 2011))). Pynn complains about what the judges did or did not do when they presided over her

case—precisely the acts and decisions for which judges are immune from suit.

Pynn's allegations that the judges "conspired" with Matthew Pynn and other county employees, Docket Item 1 ¶¶ 103, 118-19, does not change this analysis. More specifically, she asserts that the judges collectively "conspired to commit and cover[ ] up" child abuse by issuing orders against her "[d]espite the plethora of evidence that [her] children were sexually abused, strangulated [sic], and harshly neglected." *Id.* ¶ 103, 119. But right or wrong, the judges' orders and decisions are clearly "judicial" actions protected by absolute judicial immunity. *Bobrowsky*, 777 F. Supp. 2d at 715 (holding that judge's "rulings[, even though] adverse to plaintiff, [we]re the very essence of 'judicial functions' and [could ]not, therefore, be the basis for liability" (citation omitted)). And even "[m]ore fundamentally, since absolute immunity spares [judges] any scrutiny of [their] motives, an allegation that an act was done pursuant to a conspiracy has no greater effect than an allegation that it was done in bad faith or with malice, neither of which defeats a claim of absolute immunity." *See* *Dorman v. Higgins*, 821 F.2d 133, 139 (2d Cir. 1987).

Pynn's claims against the justices and judges therefore are subject to dismissal because of judicial immunity.[9] And because "better pleading w[ould] not cure" that defect, those claims are dismissed without leave to amend. *Cuoco*, 222 F.3d at 112.

For the same reasons, Pynn's claims against defendants Isenberg and Puleo are dismissed. Pynn alleges that Isenberg and Puleo, Judge Carter's "assistants", "shielded [Pynn's criminal] complaint" against Matthew Pynn "from proceeding" to a criminal action, "thereby conspiring...to commit and cover[ ]up strangulation and other forms of child endangerment." Docket Item 1 ¶¶ 50-51, 225. But "judges and their supporting staff are afforded absolute immunity" for judicial tasks. *Dekom v. Fannie Mae*, 846 F. App'x 14, 19 (2d Cir. 2021) (summary order) (quoting *Rodriguez v. Weprin*, 116 F.3d 62, 66-67 (2d Cir. 1997)). Therefore, for the same reasons that the judges and justices are entitled to immunity for issuing unfavorable orders and for the alleged conspiracy, Isenberg and Puleo are entitled to immunity as well. *See* *Rodriguez*, 116 F.3d. at 66-67. And because "better pleading w[ould] not cure" this defect, the claims against Isenberg and Puleo are dismissed without leave to amend. *Cuoco*, 222 F.3d at 112.

## III. NIAGARA COUNTY AGENCIES

Pynn names Niagara County and two of its agencies —Niagara County DSS and Niagara County CPS—as defendants. *See generally* Docket Item 1. But those agencies cannot be sued because only a county itself—not an administrative arm of the county—is a viable defendant. *See* *S.W. v. Warren*, 528 F. Supp. 2d 282, 302 (S.D.N.Y. 2007) ("Under New York law, departments which are merely administrative arms of a municipality have no separate legal identity apart from the municipality and therefore cannot sue or be sued."); *Bell v. Cayuga Cnty. Dep't of Soc. Servs.*, 2018 WL 2100602, at *2 (W.D.N.Y. May 7, 2018) (dismissing claims against Cayuga County Department of Social Services because it is an "administrative arm" of the county). Therefore, Pynn's claims against Niagara County DSS and Niagara County CPS are dismissed, and because "better pleading w[ould] not cure" the defect, they are dismissed without leave to amend. *Cuoco*, 222 F.3d at 112.[10]

## IV. SUBSTANTIVE CLAIMS

### A. Section 1983

***9** "To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997) (citing *Eagleston v. Guido*, 41 F.3d 865, 875-76 (2d Cir. 1994)). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

A municipality cannot be held liable under section 1983 unless the challenged action was undertaken pursuant to a municipal policy or custom. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978). To state a claim under *Monell*, a plaintiff must plead three elements: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)).

When asserting claims against individual defendants,[11] "[a] prerequisite to a claim for damages under [s]ection 1983...is a defendant's 'personal involvement' in the alleged

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

constitutional violation." *Carwell v. City of New York*, 2023 WL 419182, at *5 (S.D.N.Y. Jan. 26, 2023) (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001)). To show such involvement, "the plaintiff must directly plead and prove that 'each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution.' " *Tangreti v. Bachmann*, 983 F.3d 609, 612 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676). "A defendant in a [section] 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (alteration and internal quotation marks omitted).

**1. Access to the Courts**

***10** "It is well established that all persons enjoy a constitutional right of access to the courts, although the source of this right has been variously located in the First Amendment right to petition for redress[;] the Privileges and Immunities Clause of Article IV, section 2[;] and the Due Process Clauses of the Fifth and Fourteenth Amendments." *Monsky v. Moraghan*, 127 F.3d 243, 246 (2d Cir. 1997) (citations omitted). Pynn raises two causes of action concerning the alleged denial of her right to access the courts. The first, for "case-fixing" in violation of the "Fifth and Fourteenth Amendment right[ ] of due process and equal protection," states that the defendants "conspired to obstruct justice" and engaged in " 'case-fixing'...to influence and impede adjudication" of her state court cases. Docket Item 1 ¶ 262. Along the same lines, the complaint's third cause of action is labeled "conspiracy...to deprive plaintiff of her [First] Amendment public right of access to the courts" and alleges that the defendants "intended to obstruct her right of access to the courts in a manner to influence [or] impede adjudication" and "corrupted the official court record" to further this objective. *Id.* ¶ 264. Because both causes of action allege denial of fair access to the courts and arise from the same conduct, the Court will consider them together.

"To state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury [as a result of being denied access to the courts]." *Oliver v. City of New York*, 2022 WL 633873, at *2 (S.D.N.Y. Mar. 4, 2022) (citation and emphasis omitted). As such, "the underlying cause of action ...is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002).

Pynn submits a long list of conclusory allegations about how the defendants collectively denied her access to the courts. For example, she says that "some...impersonated positions as public officers," while "others presided on cases despite financial and political conflicts of interest." Docket Item 1 ¶ 262. She says that the defendants "repeatedly and persistently violated state and criminal laws and massively obstructed documents from official court[ or] government records." *Id.* She says that the defendants "persistently promulgated deliberate[,] malicious[,] manufactured[, or] known to be manufactured false narratives and created false probable cause"; attempted to silence her when Justice Furlong told her "[s]hut your mouth!"; and "[f]inancially battered and...exploited [her] for millions of dollars." *Id.* And she says that the defendants engaged in witness tampering, suppressed evidence, filed "false" court orders, and "corrupted the official court record." *Id.* ¶¶ 262, 264.

But Pynn does not plead any facts supporting her conclusory assertions. Indeed, most of her allegations do not even say which defendant did what. For example, Pynn does not say who engaged in witness tampering and who created "false probable cause," nor does she say anything about how anyone did either of those things. Likewise, Pynn does not say who "[f]inancially battered and...exploited" her or how they did that. Without more, the Court cannot discern which defendants denied Pynn access to the courts.

Pynn's claims that the defendants denied her access to courts therefore are subject to dismissal. In light of Pynn's pro se status, however, *see Cuoco*, 222 F.3d at 112, she may amend her complaint to add facts alleging that specific defendants denied her access to the courts and how they did that. In other words, any amended complaint must name each individual defendant who denied Pynn access to the courts and explain how. And with respect to any claim against Niagara County, Pynn also must detail the municipal custom, policy, or practice that she believes denied her access to the courts.

**2. Defamation**

Pynn says that the defendants also "conspired" to "defame" her in violation of section 1983. Docket Item 1 ¶ 263. She claims that the defendants "shared among themselves...that [Pynn] is a 'contemptuous[,]' 'meritless[,]' 'frivolous' litigator while they knew she was not" and "falsely label[led]" her as "contumacious" and a "false alleger." *Id.* She adds that as a result of these statements, "people at work...talk[ed]

about her" and assumed "she must have done something wrong." *Id.*

***11** As an initial matter, "[i]t is well established that pure opinions, no matter how offensive, cannot be the subject of an action for defamation." *Coleman v. Grand*, 158 F.4th 132, 139 (2d Cir. 2025) (internal quotation marks omitted). The statements made about Pynn seem to be opinions and therefore "cannot be the subject" of a defamation claim, *see id.,* let alone a violation of her civil rights actionable under section 1983. Pynn also does not say who made the allegedly defamatory statements about her, and her defamation claim fails for that reason as well.

What is more, defamation alone is neither a violation of civil rights laws nor sufficient to give rise to a constitutional claim. Indeed, "reputation alone, apart from some more tangible interests such as employment, is [n]either 'liberty' [n]or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *Paul v. Davis*, 424 U.S. 693, 701 (1976). Therefore, a plaintiff must allege something in addition to reputational stigma to state a cognizable defamation claim under section 1983. *Easton v. Sundram*, 947 F.2d 1011, 1016 (2d Cir. 1991), *cert. denied*, 504 U.S. 911 (1992), *abrogated on other grounds*, *Washington v. County of Rockland*, 373 F.3d 310 (2d Cir. 2004). More specifically, "[t]o establish the so-called 'stigma plus,' a plaintiff must allege two elements: (1) 'the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false,' plus (2) 'a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights.' " *Balentine v. Tremblay*, 554 F. App'x 58, 60 (2d Cir. 2014) (summary order) (quoting *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004)).

Pynn's section 1983 defamation claim is subject to dismissal because even if the defendants' statements amounted to defamation, she has failed to allege the "plus" necessary to turn her defamation claim into a claim under section 1983. *See* *Easton*, 947 F.2d at 1016. In other words, Pynn has alleged in conclusory terms only that the statements about her were false and that people at work thought less of her as a result, but more is required for a claim under section 1983. *Balantine*, 554 F. App'x at 61 (finding plaintiff's "alleged reputational damage resulting in the loss of private employment, humiliation, and embarrassment are inadequate to satisfy the 'plus' requirement"). And Pynn's state law defamation claim neither alleges false factual statements as opposed to opinions, nor alleges who made any defamatory statement. Her claims for defamation and under section 1983 based on defamation therefore are subject to dismissal. Again in light of her pro se status, however, she may amend her complaint to state a viable defamation claim that corrects the deficiencies described above.

### 3. Due Process Right to Care and Custody of Children

Pynn alleges that the defendants also violated her "liberty interest in the care, custody, and management of her children, the right to intimate association, and a substantial measure of sanctuary from unjustified interference from the State." Docket Item 1 ¶ 265.

It is well settled in the Second Circuit "that a parent's interest in the custody of a child is a constitutionally protected liberty interest subject to due process protection." *Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 103 (2d Cir. 1999) (quoting *Cecere v. City of New York*, 967 F.2d 826, 829 (2d Cir.1992) (alteration omitted)). Parents' rights in this context are both substantive and procedural. *See* *Hagans v. Nassau Cnty. Dep't of Soc. Servs.*, 2020 WL 1550577, at *5 (E.D.N.Y. Mar. 31, 2020); *see also* *Albright v. Oliver*, 510 U.S. 266, 272 (1994) (the Due Process Clause "confers both substantive and procedural rights").

***12** Essentially, "a procedural due process claim challenges the procedure by which a removal is effected, [while] a substantive due process claim challenges the 'fact of [the] removal' itself." *Southerland v. City of New York*, 680 F.3d 127, 142 (2d Cir. 2012) (alteration in original) (quoting *Bruker v. City of New York*, 92 F. Supp. 2d 257, 266-67 (S.D.N.Y. 2000)). "As a general rule...before parents may be deprived of the care, custody or management of their children without their consent, due process—ordinarily a court proceeding resulting in an order permitting removal—must be accorded to them." *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999).

Substantive due process protects parents' right "to remain together [with their children] without the coercive interference of the awesome power of the state.' " *Southerland*, 680 F.3d at 142 (quoting *Tenenbaum*, 193 F.3d at 600). But as sweeping as such language might sound, it is far from absolute. *See* *Wilkinson*, 182 F.3d at 104 ("Although parents enjoy a constitutionally protected interest in their family integrity, this interest is counterbalanced by the 'compelling governmental interest in the protection of minor children, particularly in circumstances where the protection

Case 1:26-cv-00703-ECC-ML Document 6 Filed 09/22/26 Page 271 of 391

is considered necessary as against the parents themselves.' " (quoting *Manzano v. S.D. Dep't of Soc. Servs.*, 60 F.3d 505, 510 (8th Cir.1995))). Indeed, to constitute a substantive due process violation, "[t]he interference with the" parents' custody of the child "must be 'so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection.' " *Southerland*, 680 F.3d at 152 (quoting *Anthony v. City of New York*, 339 F.3d 129, 142-43 (2d Cir. 2003)).

Stated another way, to state a viable substantive due process claim, "[i]t is not enough that the government act be incorrect or ill-advised; it must be conscience-shocking." *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 275 (2d Cir. 2011) (citation and internal quotation marks omitted). Indeed, "[o]nly the most egregious official conduct can be said to be arbitrary in th[is] constitutional sense and therefore unconstitutional." *Id.* (citation and internal quotation marks omitted).

Furthermore, "a claim under the Due Process Clause for infringement of the right to familial associations requires the allegation that state action was specifically intended to interfere with the family relationship." *Gorman v. Rensselaer County*, 910 F.3d 40, 48 (2d Cir. 2018). "Common negligence is categorically insufficient to shock the conscience, so [a] parent[ ] must raise an inference that [the defendants] acted maliciously before [an allegation] can even begin to support a violation of substantive due process." *Cox*, 654 F.3d at 276. Courts impose liability only for " 'obvious extremes,' such as manufacturing evidence or ignoring exculpatory information." *E.D. ex rel. V.D. v. Tuffarelli*, 692 F. Supp. 2d 347, 359 (S.D.N.Y. 2010) (quoting *Wilkinson*, 182 F.3d at 104).

Pynn does not allege any specific process that she was denied before her children were removed from her custody. On the contrary, it appears that her children were removed from her custody pursuant to divorce and custody proceedings. *See* Docket Item 1 ¶¶ 110, 119; *see generally* Docket Item 1 at 101-120 (state court docket attached as an exhibit showing court orders regarding custody). So Pynn therefore raises only a substantive due process claim: She says that the defendants "willfully ignor[ed] child abuse," "fail[ed] to investigate reports of severe child abuse," "delay[ed] for seven years a multiphasic forensic evaluation for the children's reports of sexual abuse and strangulation," and corrupted the divorce and custody proceedings. *Id.* ¶ 265.

***13** Although Pynn generally alleges that all defendants violated her right to substantive due process, she does not include any specific factual allegations that might plausibly implicate most of the defendants for their role in violating her rights. *See id.* In fact, most of her allegations are conclusory, claiming that all defendants together "corruptly conspired to deprive [or] harshly restrict...Pynn of her Fourteenth Amendment Right of Intimate Association with her children." *Id.* That allegation is not detailed enough to plausibly implicate any single defendant. There are, however, three exceptions: David Nathanson, John Spero, and Niagara County.

*a. Nathanson*

Pynn makes several allegations concerning the role that forensic psychologist David Nathanson played in violating her rights. *Id.* ¶ 65. New York State Supreme Court Justice Kloch appointed Nathanson to draft a "forensic custodial evaluation," Pynn says, presumably about Matthew Pynn's fitness to have custody of the children. *Id.* ¶ 139. Pynn alleges that "Nathanson conspired to conceal...child sexual abuse" by contacting "Niagara [County] CPS and the New York State Police [and] 'requesting' [that] they do not talk to [Pynn's] children about their sexual abuse allegations." *Id.* ¶¶ 140-41. She says that he also intentionally failed to include "pertinent" mental health information about Matthew Pynn in his report. *Id.* ¶¶ 142-43.

Alleging interference with an investigation, suppression of evidence from a court ordered report, and concealment of child abuse certainly are analogous to the "obvious extremes" that courts have found may implicate liability for substantive due process violations. *See Tuffarelli*, 692 F. Supp. 2d at 359. And Pynn contends that Nathanson did this with the intent to interfere with her familial relationships and to cover up Matthew Pynn's abuse. Docket Item 1 ¶¶ 142-43. Therefore, the facts are sufficient to state a plausible substantive due process claim.

But Pynn fails to allege that Nathanson acted under color of state law. As discussed above, to state a viable section 1983 claim, a plaintiff must plead both the violation of a constitutional right and that the violation "was attributable to a person acting under color of state law." *Whalen*, 126 F.3d at 405. The "definition of acting under color of state law requires that the defendant in a [section] 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of

state law.' " *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).

The Second Circuit has "identified three 'main tests' to determine" whether an entity or individual, such as Nathanson, has engaged in state action:

> (1) whe[ther] the entity acts pursuant to the coercive power of the state or is controlled by the state ('the compulsion test'); (2) whe[ther] the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies ('the joint action test' or 'close nexus test'); and
>
> (3) whe[ther] the entity has been delegated a public function by the state ('the public function test').

*See Barrows v. Becerra*, 24 F.4th 116, 135 (2d Cir. 2022) (alterations omitted) (quoting *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012)). "The fundamental question under each test is whether the private entity's challenged actions are 'fairly attributable' to the state." *Fabrikant*, 691 F.3d at 207 (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)). And "merely conclusory allegation[s] that a private entity acted in concert with a state actor do[ ] not suffice to state a [section] 1983 claim against the private entity." *Alicea v. Yang*, 2023 WL 5994211, at *2 (2d Cir. Sep. 15, 2023) (summary order) (citation omitted). Nor do allegations of "communications between a private and state actor...without facts supporting a concerted effort or plan between the parties." *Morpurgo v. Inc. Vill. of Sag Harbor*, 697 F. Supp. 2d 309, 338 (E.D.N.Y. 2010), *aff'd*, 417 F. App'x 96 (2d Cir. 2011) (summary order) (alterations and citation omitted).

***14** Pynn alleges that Nathanson is a "purported forensic psychologist" who was appointed by Justice Kloch to complete a "forensic custodial evaluation" on Matthew Pynn. Docket Item 1 ¶¶ 65, 139. But there is no indication that Nathan was employed by the state or was otherwise a state actor. And other than her conclusory allegations that all defendants "conspired" in this case, Pynn does not allege that Nathanson made a "concerted effort or plan" with the state to interfere in the investigation or to suppress evidence relevant to the report. So the fact that Nathanson was appointed by the court and submitted a report is not enough to make him a state actor. *See Walker v. O'Connor*, 2022 WL 2341420, at *3 (N.D.N.Y. Jun. 29, 2022) (collecting cases) (the "allegation that [the psychologist] was ordered by the court to issue a forensic evaluation does not give rise to the reasonable inference that she was acting under color of state law").

In sum, Pynn has pleaded facts that create a plausible substantive due process violation, but she has not sufficiently pleaded that Nathanson acted under color of state law. Because of her pro se status, however, Pynn may file an amended complaint detailing the manner in which Nathanson acted under color of state law.

*b. Spero*

Pynn alleges that New York State Police Officer Spero "created an unsworn letter on police letterhead...containing knowing and willful false statements that he did an investigation and [that] there was no indication 'that [Matthew] Pynn ever acted in a manner that would be considered harmful to the welfare of his child.' " Docket Item 1 ¶ 146. Similar to the allegations against Nathanson, these allegations involve accusations of "manufacturing evidence," which can implicate a substantive due process violation of the right to familial association. *See Tuffarelli*, 692 F. Supp. 2d at 359. Therefore, Pynn has pleaded facts sufficient to state a plausible due process claim against Spero in his individual capacity.

*c. Niagara County*

To plead a viable section 1983 claim against a municipality, "a plaintiff must allege the existence of a formal policy which is officially endorsed by the municipality, or a practice so persistent and widespread that it constitutes a custom or usage of which supervisory authorities must have been aware, or that a municipal custom, policy, or usage can be inferred from evidence of deliberate indifference of supervisory officials to such abuses." *Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x 10, 13 (2d Cir. 2015) (summary order). "Absent an express municipal policy, [a] plaintiff may prove a municipal custom, policy[,] or practice in several ways." *Ramos v. County of Suffolk*, 2009 WL 10708571, at *2 (E.D.N.Y. Sep. 8, 2009). One way is to demonstrate a policymaker's "acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity." *Jeffes v. Barnes*, 208 F.3d 49, 61 (2d Cir. 2000) (citation omitted). "In limited circumstances, a municipality may also be held liable for its failure to train," supervise, discipline, or screen its employees. *See Hernandez v. United States*, 939 F.3d 191, 206 (2d Cir. 2019) (citation and internal quotation marks omitted); *Tirado v. City of New York*, 2021 WL 11646299, at *9 (S.D.N.Y. Jan. 25, 2021).

But "[w]here plaintiffs seek to hold a municipality liable under" those theories, "they must also show that the municipal policymaker acted with deliberate indifference." *Pipitone v. City of New York*, 57 F. Supp. 3d 173, 191 (E.D.N.Y. 2014) (citing *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989)); *see Tirado*, 2021 WL 11646299, at *9 (explaining that "[m]unicipal liability can also be established through a municipal policymaker's failure to appropriately train, supervise, discipline, or screen municipal employees where such a failure amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact" (citation and internal quotation marks omitted)). "Deliberate indifference is a stringent standard of fault," so a plaintiff must plausibly allege that the municipality "fail[ed] to act when it ha[d] 'actual or constructive notice.' " *Hernandez*, 939 F.3d at 207 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). Stated differently, a plaintiff must allege "that the municipal action was taken with deliberate indifference as to its known or obvious consequences. A[n allegation] of simple or even heightened negligence will not suffice." *Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018) (alterations and citation omitted).

***15** Pynn alleges that Niagara County engaged in "reprehensible hiring practices," including the intentional "hiring of multiple disgraced criminal public officials." Docket Item 1 ¶¶ 73-74. She specifically points to the hiring of Matthew Pynn, who she says had a known history of child sexual abuse, and Nicholas D'Angelo—a former attorney for Niagara County DSS and CPS—who she says was a "known sex offender" when he was hired. *Id.* ¶¶ 60, 74, 95, 253. Liberally reading these allegations, the Court construes them as claiming that Niagara County failed to screen its employees, resulting in the violation of Pynn's substantive due process rights.

To establish a failure-to-screen claim, "a plaintiff must plead facts to support an inference that the municipality's hiring of the individual reflected 'deliberate indifference to the risk that a violation of a particular constitutional or statutory right [would] follow the decision.' " *Tirado*, 2021 WL 11646299, at *12 (alteration in original) (quoting *Lehal v. Cent. Falls Det. Facility Corp.*, 2016 WL 7377238, at *8 (S.D.N.Y. Nov. 21, 2016)). The plaintiff must do "more than cursorily state a theory of liability based on the [municipality's] failure to screen." *Id.*

The complaint here passes muster, at least at this stage. Pynn alleges that Niagara County's practice of hiring employees who are known "child sexual perpetrator[s]" constitutes deliberate indifference to the risk that those employees may "conspire[ ] to commit and cover up...child sexual abuse," "den[y] a fair forum for court and [c]hild [p]rotection investigations," and "willfully ignore[ ] evidence" and reports of child abuse. Docket Item 1 ¶ 253. And those are the exact actions that Pynn now says have resulted in her injury. *Id.*; *see also id.* ¶¶ 258, 260. At this stage, Pynn's allegations present a sufficiently plausible claim for failure to screen.

*d. Conclusion*

Pynn's fourth cause of action for violation of due process related to the care and custody of her children therefore may proceed against Niagara County and Spero in his individual capacity. Her similar claims against the remaining defendants are subject to dismissal. But in light of Pynn's pro se status, *Cuoco*, 222 F.3d at 112, she may amend her complaint to detail the specific role that any of the other defendants played in the violation of her right to the care and custody of her children and the manner in which Nathanson acted under color of state law.

**B. 18 U.S.C. § 1591**

Pynn's sixth cause of action alleges that the defendants engaged in a "conspiracy to sex traffic minors in violation of 18 U.S.C. § 1591." Docket Item 1 at 89. Section 1591 was enacted through the Trafficking Victims Protection Act ("TVPA"), *Cornish v. Tripp*, 2026 WL 194596, at *1, 3 (D. Conn. Jan. 26, 2026), and establishes criminal penalties for "knowingly...recruit[ing], entic[ing],...or solicit[ing]" someone to engage in a commercial sex act and using "force, threats of force, fraud, [or] coercion" to accomplish that purpose, 18 U.S.C. § 1591(a). It also "imposes criminal liability upon whoever knowingly...'recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person,' " *Kitler v. Church of Jesus Christ of Latter-Day Saints*, 2025 WL 2209870, at *9 (N.D.N.Y. Aug. 4, 2025) (quoting 18 U.S.C. § 1591(a)(1)), or " 'benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act [described in section 1591(a)(1)],' with knowledge, or a reckless disregard for the fact, 'that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act,' " *see id.* (quoting 18 U.S.C. § 1591(a)(2)). In other words, section 1591 "bars"

either "sex trafficking of children or by force, fraud, or coercion."*Cornish*, 2026 WL 194596, at *3.

***16** Although section 1591 does not include a civil remedy, a subsequent section of the statute—18 U.S.C. § 1595—"provides for a private right of action in favor of any victim of a violation" of section 1591. *See Moore v. Rubin*, 724 F. Supp. 3d 93, 99 (E.D.N.Y. 2024); *see also Ardolf v. Weber*, 332 F.R.D. 467, 473 (S.D.N.Y. 2019). More specifically, section 1595 states that an "individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially...from participation in a venture which [it] knew or should have known has engaged in an act in violation of this chapter)." 18 U.S.C. § 1595(a). This Court therefore generously construes Pynn's claim as a request for relief under section 1595 based on an underlying violation of section 1591.

Pynn has not raised a viable claim, however, for at least two reasons. First, section 1595 permits only victims to bring a civil action, and Pynn does not allege that she is a victim of sex trafficking. [12] *See* 18 U.S.C. § 1595 ("[A] victim of a violation of this chapter may bring a civil action[.]"); *see also Cornish*, 2026 WL 194596, at *3 (section 1595 "does not permit individuals who are not the victim...to bring a claim on behalf of a victim"). Second, even if that were not the case, a claim made under section 1595's civil remedy provision "must allege that the defendant[s] 'knowingly benefit[ted], financially or by receiving anything of value,' from participating in a trafficking venture." *Smith v. Ebanks*, 2024 WL 1242082, at *3 (E.D.N.Y. Mar. 22, 2024) (quoting 18 U.S.C. § 1595(a)). And Pynn does not allege that the defendants financially benefitted from commercial sex trafficking; instead, she alleges only that they "had to have known" about Matthew Pynn's abuse and "conspired to criminally commit and cover up" such abuse. [13] Docket Item 1 ¶¶ 267-69.

Because Pynn has not raised a viable claim under 18 U.S.C. § 1595, and because better pleading cannot cure that deficiency, Pynn's sixth cause of action is dismissed without leave to amend.

### C. RICO

"To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of [s]ection 1962." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (quoting *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001)). To show a violation of section 1962, a plaintiff must "allege the existence of seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983) (quoting 18 U.S.C. § 1962(a)-(c)). "And to state a RICO conspiracy" claim under section 1962(d), "a plaintiff must allege 'the existence of an agreement to violate RICO's substantive provisions.' " *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018) (quoting *United States v. Sessa*, 125 F.3d 68, 71 (2d Cir. 1997)).

***17** "A plaintiff's burden is high when pleading RICO allegations." *Mackin v. Auberger*, 59 F. Supp. 3d 528, 541 (W.D.N.Y. 2014). "[G]iven RICO's damaging effects on the reputations of individuals alleged to be engaged in RICO enterprises and conspiracies," courts "look with particular scrutiny at [civil RICO] claims." *Id.* (citations and internal quotation marks omitted); *see also Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) ("Because the 'mere assertion of a RICO claim has an almost inevitable stigmatizing effect on those named as defendants, courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.' " (alterations omitted) (quoting *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir.1990))); *Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.*, 2013 WL 3943267, at *5 (S.D.N.Y. July 31, 2013) (observing that "frivolous RICO allegations are often manifested in the form of 'garden variety fraud or breach of contract cases that some [p]laintiff has attempted to transform into a vehicle for treble damages by resort to what has been referred to as the litigation equivalent of a thermonuclear device' " (alterations and some internal quotation marks omitted) (quoting *Goldfine v. Sichenzia*, 118 F. Supp. 2d 392, 394 (S.D.N.Y. 2000))).

Pynn has failed to state a plausible RICO claim for at least three reasons. First, she has not sufficiently pleaded the existence of an "enterprise." Second, she has not pleaded any effect on "foreign or interstate commerce." Third, she has not sufficiently pleaded a conspiracy.

#### 1. Existence of an Enterprise

"A RICO enterprise 'includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.' " *DeFalco*, 244 F.3d at 306 (quoting 18 U.S.C. § 1961(4)). "A racketeering enterprise is proven through 'evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.' " *Id.* at 307 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). "Thus, evidence of an ongoing organization, the associates of which function as a continuing unit, suffices to prove an enterprise." *Id.* (citing *Turkette*, 452 U.S. at 583)).

"[A] governmental unit can be a RICO enterprise." *Id.* at 307-08 (citing *United States v. Angelilli*, 660 F.2d 23, 30-35 (2d Cir. 1981)). But "[i]t is well established...that, under [section] 1962(c), the alleged RICO 'person' and RICO 'enterprise' must be distinct." *Id.* (citation omitted). As the Supreme Court has explained, "[t]he 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages," and "[t]he existence of an enterprise at all times remains a separate element" of a RICO claim. *Turkette*, 452 U.S. at 583. "Accordingly, 'in assessing whether an alleged enterprise has an ascertainable structure distinct from that inherent in a pattern of racketeering, it is appropriate to consider whether the enterprise would still exist were the predicate acts removed from the equation.' " *Mackin*, 59 F. Supp. 3d at 544 (quoting *Wood v. Inc. Vill. of Patchogue*, 311 F. Supp. 2d 344, 357 (E.D.N.Y. 2004) (alteration omitted)).

Pynn alleges the existence of a single enterprise, and she says that all defendants "are in some way [ ]related to or are members of" that enterprise. Docket Item 7 at 156. But the alleged enterprise is not "distinct" from the alleged RICO activities and therefore is not an enterprise at all. *Turkette*, 452 U.S. at 583. In fact, Pynn explicitly says that the sole purpose of the enterprise is for Matthew Pynn and his co-defendants to conspire to commit "illegal abduction, through court ordered removal of custody from safe custodial parents, through false, manufactured, premises, and other means...and [to] actually remove[ ] and 'kidnap[ ]' minor children for the purposes of engaging...in abusive sex acts[,]...molestation[,] and abuse." *See* Docket Item 7 at 142. In other words, the enterprise exists for the defendants to "conspire[,]...actually commit[,] and cover[ ] up the hiring of multiple disgraced criminal public officials" and for "Matthew Pynn's child sexual abuse, strangulation and other...forms of child abuse." *Id.* at 157. So the enterprise is no different than the alleged illegal acts.

***18** Therefore, the alleged enterprise "would [not] still exist were the predicate acts removed from the equation." *Mackin*, 59 F. Supp. 3d at 544 (quoting *Wood*, 311 F. Supp. 2d at 357); *see Newkirk v. Village of Steger*, 2004 WL 2191589, at *16 (N.D. Ill. Sept. 24, 2004) (explaining that plaintiffs failed to allege existence of an enterprise where "asserted 'purpose' [wa]s nothing more than a laundry list of the alleged predicate acts...[and p]laintiffs offer[ed] nothing to show that [d]efendants ever functioned as an ongoing RICO organization or had any goals separate from the alleged predicate acts"). And for that reason, Pynn has failed to plead the existence of a RICO enterprise. [14]

**2. Affecting Foreign or Interstate Commerce**

To state a RICO claim, the complaint must "allege[ ] that the enterprise engaged in, or that its activities affected, interstate or foreign commerce." *Edmondson v. Raniere*, 751 F. Supp. 3d 136, 160 (E.D.N.Y. 2024). That burden is not high: " '[C]onduct having even a de minimis effect on interstate commerce suffices' to satisfy this element." *Id.* (alteration in original) (italics omitted) (quoting *United States v. Mejia*, 545 F.3d 179, 203 (2d Cir. 2008)); *see also United States v. Barton*, 647 F.2d 224, 233 (2d Cir. 1981) ("[T]o establish a violation of [section] 1962, the courts have ruled that the impact need not be great. So long as the activities of the enterprise affect interstate commerce, the jurisdictional element is satisfied."). At the same time, this requirement is not meaningless, and a plaintiff must plead some facts showing an impact on interstate or foreign commerce to state a RICO claim. *See Edmondson*, 751 F. Supp. 3d at 181 n.29 ("Although the burden to plead this element is minimal, the complaint still must offer sufficient facts to meet that burden." (citation and internal quotation marks omitted)).

Pynn says that the enterprise impacted interstate commerce by "defrauding" the "United States of Title IV funding through false pretenses, and the trafficking of child sex abuse victims" and by "suppl[ying] an unlimited number of child victims to pedophiles throughout the state for profits." Docket Item 7 at 166. She also alleges that the defendants have "defraud[ed] the United States of [ ]millions of dollars each year." *Id.* But those are nothing more than conclusions about the impact on interstate commerce, not facts that might support those conclusions. And that is not enough to state a viable RICO claim. *See Lally v. Leff*, 2018 WL 4445152, at *5 (E.D.N.Y. Sep. 18, 2018) (holding that because "[t]he allegations on which plaintiff

relie[d]...contain[ed] only vague and conclusory assertions regarding...interstate commerce," they were "insufficient to meet even the low pleading threshold"); *Rubinov v. Suyunova*, 2025 WL 461353, at *2 (E.D.N.Y. Feb. 11, 2025) (holding that "plaintiff's conclusory allegation that defendants' actions affected interstate commerce because defendants either supported or transmitted, 'via interstate commerce[,]...' threats and intimidation towards plaintiff [wa]s not sufficient to establish the 'affect interstate commerce' prong of a RICO claim").

**3. RICO Conspiracy**

***19** "[T]he core of a RICO civil conspiracy is an agreement to commit predicate acts." *Edmondson*, 751 F. Supp. 3d at 176 (quoting *Hecht v. Com. Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990)). To show this, the plaintiff must plead that "each defendant 'knew about and agreed to facilitate' the pattern of racketeering activity." *Id.* (quoting *Baisch v. Gallina*, 346 F.3d 366, 377 (2d Cir. 2003)). Pynn alleges that the defendants "all conspired and actually committed and covered up the hiring of multiple disgraced criminal public officials," including Matthew Pynn. Docket Item 7 at 157. But once again, Pynn's assertions are conclusory and devoid of any facts showing an "agreement" between and among the defendants to engage in a "pattern of racketeering activity." *See Edmondson*, 751 F. Supp. 3d at 176.

**4. Conclusion**

For all those reasons, Pynn has failed to plead a viable RICO claim. Indeed, Pynn's "allegations as to these claims are conclusory, without factual support, and suggest that [she] is merely dissatisfied with" actions by certain government officials, including the courts, and the outcomes of the proceedings in which she was involved. *See Masri v. Liebowitz*, 2024 WL 1639904, at *8 (S.D.N.Y. Apr. 15, 2024), *appeal dismissed sub nom., Masri v. Afriyie*, 2025 WL 1603359 (2d Cir. Feb. 24, 2025); *see also Mackin*, 59 F. Supp. 3d at 546 (dismissing RICO claim where plaintiff "simply attempt[s] to craft a claim under RICO based upon purely personal disputes." (quoting *Daskal v. Tyrnauer*, 37 Misc.3d 1214(A), at *38, 2012 WL 5276925 (Sup. Ct. Kings Cnty. 2012))). That is not sufficient, particularly in light of the high pleading standards that apply to RICO claims. *See Mackin*, 59 F. Supp. 3d at 541.

Nevertheless, in light of Pynn's pro se status, she may amend her complaint to allege facts establishing a RICO claim. In any amended complaint, Pynn must specifically allege facts establishing 1) an enterprise that is distinct from the alleged conspiracy and its goals, 2) activities affecting interstate commerce, and 3) an agreement between and among the defendants to accomplish the unlawful purpose.

**V. MOTION TO AMEND**

Pynn's motion to amend seeks to add five new defendants to the action: George Maziarz, a former New York state senator to whom Matthew Pynn has donated money; Beverly Maziarz, George Maziarz's wife and a friend of Matthew Pynn; Michele Bergeven, an attorney who represented Matthew Pynn; Patrick Balkin, an attorney for the Niagara County DSS and Matthew Pynn; and Catherine Wojtaszek, the former Niagara County District Attorney. Docket Item 25 ¶ 12.

Federal Rule of Civil Procedure 15(a)(2) provides that a "court should freely give leave [to amend] when justice so requires." This "permissive standard...is consistent with [the Second Circuit's] strong preference for resolving disputes on the merits." *Loreley Fin. (Jersey) No. 3. Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (citation and internal quotation marks omitted). The decision "to grant or deny leave to amend" is nevertheless committed to "the sound discretion of the district court." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). "A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *Id.* "[T]he standard for denying leave to amend based on futility is the same as the standard for granting a motion to dismiss." *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015).

Pynn's proposed amended complaint alleges that the new defendants collectively engaged in mail fraud, wire fraud, obstruction of justice, extortion, and money laundering; violated the False Claims Act; violated her civil rights as alleged in the original complaint; and were involved in the conspiracy described in the original complaint. Docket Item 25 ¶¶ 34-47, 51-56. But she does not plead any facts showing what any of the new defendants did to injure her. On the contrary, she pleads conclusions, not facts.

***20** For example, Pynn says that George Maziarz, a former state senator, is a "primary influence in judicial assignments" and uses his "influence to determine case outcomes, contracts, and retaliatory legal actions." *Id.* ¶ 12. George's wife, Beverly Maziarz, also "influence[s] judicial assignments and case

outcomes." *Id.* ¶ 33. And together, the couple uses campaign funds to "protect...individuals convicted of sexual offenses." *Id.* But those are conclusions, not facts. And at least as pleaded, they have nothing to do with Pynn's case.

Along the same lines, Pynn says that Wojtaszek "shielded...Matthew Pynn from prosecution and is related to Defendant [Justice] Kloch." *Id.* ¶ 12. Similarly, Pynn alleges that Bergevin and Balkin, both attorneys for Matthew Pynn, submitted false information to the court and "prosecuted duplicative and retaliatory matters." *Id.* ¶¶ 12, 25, 29. But none of those allegations show how any proposed new defendant engaged in fraud or any other nefarious activity or how anything they did affected Pynn's rights. Pynn's motion to amend therefore is denied as futile.

If Pynn seeks to add any new defendant in any subsequent amended complaint, she must plead facts, not conclusions, about what each defendant did or did not do that resulted in an injury to her. And as explained above, any amended complaint must include all allegations against each of the defendants so that the amended complaint stands alone as the only complaint that the defendants must answer. *See supra* note 1; *Int'l Controls Corp.*, 556 F.2d at 668.

**VI. MOTION FOR PRELIMINARY INJUNCTION**

For the second time, Pynn has moved for a preliminary injunction. Docket Item 29. "A plaintiff seeking a preliminary injunction must establish that [s]he is likely to succeed on the merits, that [s]he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in h[er] favor, and that an injunction is in the public interest." *Do No Harm v. Pfizer Inc.*, 646 F. Supp. 3d 490, 499 (S.D.N.Y. 2022) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008)). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24.

Pynn's first motion for a preliminary injunction "enforcing [her] First Amendment right of unrestricted access to New York State...courts" sought to enjoin Niagara County and Niagara County CPS "from maintaining [court] cases involving [Pynn] and her immediate family." Docket Item 4 at 1-2, 30. She asked the Court to order that all such proceedings be transferred to another state court or to federal court. *Id.* at 2. The Court denied Pynn's motion, and her subsequent motion for reconsideration, explaining that under *Younger v. Harris*, 401 U.S. 37 (1971), and domestic relations abstention, and under the *Rooker-Feldman* doctrine, federal courts generally do not have any power to intervene in or overturn state court decisions—especially in cases that involve matrimonial issues such as child custody. Docket Item 9 (denying motion for preliminary injunction); Docket Item 14 (denying motion for reconsideration).

Pynn's second motion for a preliminary injunction seeks a variety of related relief. For example, she asks this Court to (1) enjoin the defendants from "[d]eleting, backdating, altering, or withholding any docket entries, NYSCEF filings, paper submissions, recusal forms, transfer orders, or administrative correspondence" in seven different state court matters in which Pynn is a party; (2) enjoin the defendants from refusing to file submissions based on Justice Sedita's filing restriction against her; (3) enjoin the defendants from "[i]mposing any sanction, fee or other penalty" against her for seeking court records; (4) direct the "[c]ourt [a]dministration [d]efendants" to provide Pynn with "copies of the NYSCEF dockets and all 'processed' entries" in each of her seven cases; (5) direct the "[c]ourt [a]dministration [d]efendants" to "[p]reserve in unaltered form all recusal logs, transfer requests, administrative orders, and correspondence relating to judicial assignments, disqualifications, and venue determinations" in Pynn's cases, and to make those records available to her; (6) enjoin the defendants from "[t]aking any adverse action" against Pynn in response to her filing this action; (7) enjoin US Bank Trust National Association [15] and Niagara County from "[t]aking any further steps to enforce the foreclosure judgment" on her home; and (8) direct itself to expedite screening Pynn's complaint. Docket Item 29 at 1-3.

***21** Except for the final request, which is denied as moot in light of this screening order, the requested relief relates to the administration of ongoing civil actions in, and orders issued by, state courts. And as this Court already explained when it denied Pynn's first motion for a preliminary injunction, the Court cannot "intervene in 'civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions.' " Docket Item 9 at 15 (quoting *Falco*, 805 F.3d at 427).

In *Younger*, the Supreme Court endorsed "a strong federal policy against federal[ ]court interference with pending state judicial proceedings absent extraordinary circumstances." *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982). Pynn's latest motion for injunctive relief refers to seven state court proceedings without saying what those proceedings involve or whether they still are pending, so this Court does not address whether the injunction she requests is technically barred under *Younger*. But "a

[c]ourt may abstain" from granting injunctive relief "under the principles of comity and federalism," even if all the requirements of *Younger* are not met, "when...'the equitable relief sought would inappropriately require the federal court to supervise institutions central to the state's sovereignty.' " *Kunz v. N.Y. State Comm'n on Jud. Conduct*, 356 F. Supp. 2d 188, 194 (N.D.N.Y. Feb. 15, 2005) (quoting *Miller v. Silbermann*, 951 F. Supp. 485, 491-92 (S.D.N.Y. 1997)).

That is precisely the kind of relief that Pynn seeks here: a sprawling injunction that would require this Court to engage in "an ongoing federal audit" of Pynn's interactions with state and local officials, courts, and other entities. *See O'Shea v. Littleton,* 414 U.S. 488, 500 (1974). What is more, the injunctive relief Pynn seeks against the defendants is both unwise and unworkable.

So this Court does not have the power to do what Pynn asks it to do. And even if it did have that power, it would not intervene in matters being handled by the state courts. [16] The Court therefore denies Pynn's motion for a preliminary injunction.

## CONCLUSION

For the reasons stated above, Pynn's claim for violation of the right to care and custody of her children may proceed against Niagara County and Spero in his individual capacity. But her claims against the judicial defendants, Isenberg, Puleo, the New York State Unified Court System, the New York State Office of Court Administration, the Niagara County Clerk's Office, Niagara County DSS, and Niagara County CPS are dismissed under 28 U.S.C. § 1915(e)(2)(B). And her other claims against the remaining defendants will be dismissed under that same section unless, within 45 days of the date of this order, she files an amended complaint that corrects the deficiencies noted above and otherwise complies with Rules 8 and 10 of the Federal Rules of Civil Procedure.

***22** Pynn's requests for declaratory and injunctive relief, Docket Item 1 at 97-99; her motion to amend, Docket Item 24; and her motion for a preliminary injunction, Docket Item 29, are DENIED.

Pynn is reminded that an amended complaint is intended to **completely replace** the prior complaint in the action and thus "renders [any prior complaint] of no legal effect." *Int'l Controls Corp.*, 556 F.2d at 668; *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). Therefore, any amended complaint **must include all allegations against each of the defendants** so that the amended complaint stands alone as the only complaint that the defendants must answer in this action.

## ORDER

In light of the above, IT IS HEREBY

ORDERED that Pynn's claim for violation of the right to care and custody of her children against Niagara County and Spero in his individual capacity may proceed to service; and it is further

ORDERED that Pynn's claims against Norman St. George, Lawrence Marks, Kevin Carter, Keith D. Kibler, Daniel J. Furlong, Richard Kloch, Frank Sedita, Sara Sheldon, Catherine Nugent Panepinto, Andrew Isenberg, Dean Puleo, the New York State Unified Court System, the New York State Office of Court Administration, the Niagara County Clerk's Office, the Niagara County Department of Social Services, and Niagara County Child Protective Servies are dismissed, and the Clerk of the Court shall terminate those parties as defendants in this action; and it is further

ORDERED that Pynn may amend her complaint within 45 days of the date of this order; and it is further

ORDERED that the Clerk of the Court shall send to Pynn with this order a copy of the original complaint, a blank section 1983 complaint form, and the instructions for preparing an amended complaint; and it is further

ORDERED that if Pynn does not file an amended complaint correcting the deficiencies noted above within 45 days of the date of this order, her claims against all defendants other than Niagara County and Spero will be dismissed; and it is further

ORDERED that if Pynn does not file an amended complaint within 45 days of the date of this order, the Clerk of the Court shall cause the United States Marshals Service to serve copies of the summons, the complaint, and this decision and order upon Niagara County and Spero, without her payment therefor, unpaid fees to be recoverable if this action terminates by monetary award in Pynn's favor; [17] and it is further

ORDERED that Pynn must effect service within 90 days of the date the summons is issued. It is Pynn's responsibility to inquire of the Marshals at 716-348-5300 as to whether service has been made and, if necessary, to request an extension of time for service. *See Meilleur v. Strong*, 682 F.3d 56, 63 (2d Cir. 2012). If, within 90 days of issuance of the summons, Pynn has not made service or requested an extension of time in which to do so, the Court may dismiss this action for failure to prosecute under Rules 4(m) and 41(b) of the Federal Rules of Civil Procedure; and it is further

***23** ORDERED that Pynn shall notify the Court in writing if her address changes. The Court may dismiss the action if Pynn fails to do so.

SO ORDERED.

**All Citations**

Slip Copy, 2026 WL 2130622

## Footnotes

1 An amended complaint is intended to **completely replace** the prior complaint and thus “renders [any prior complaint] of no legal effect.” *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977). Pynn's proposed amended complaint, however, does not attempt to replace the original and instead pleads facts only against five new defendants and seeks to “incorporate[ ]” the original complaint. *See* Docket Item 25 ¶ 12. In light of Pynn's pro se status, the Court will screen the original complaint, Docket Item 1, and then address the motion to amend, Docket Items 24-25.

2 The following facts are taken from the complaint, Docket Item 1, including the state court records that Pynn attached to it. *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (a complaint is “deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint.” (citation and internal quotation marks omitted)).

3 Stacey Pynn is referred to as “Pynn,” or occasionally, for clarity's sake, as “Stacey Pynn.” Matthew Pynn is referred to throughout this decision by his full name.

4 Page numbers in docket citations refer to ECF pagination.

5 More specifically, Pynn names the following individuals as defendants who failed to adequately investigate and charge Matthew Pynn: CPS supervisor Bianca Gatto; former DSS and CPS attorney Nicholas D'Angelo; DSS attorney David Haylett, Jr.; CPS caseworker Rhonda Platt; Niagara County Attorney Claude Joerg; DSS Commissioner Meghan Lutz; and “Jane Doe,” a CPS supervisor. *See* Docket Item 1 ¶¶ 56, 58-63, 226-245; *id.* at 1, 63.

6 More specifically, she asks this Court to transfer any matters involving “Pynn and her immediate family” to a different forum outside Niagara County; “declar[e] that the actions of all the [d]efendants...corruptly violated [Pynn]'s” rights; “rule” that the judicial defendants' “orders...are void and unenforceable”; “remov[e] all state court orders that preclude” her “right of public access to the courts”; “order [d]efendants to cease and desist from obstructing official government records”; “enter” the New York State Unified Court System “into a federal receivership”; deny any immunity to any defendants “without their required oath on file”; and declare “that the New York CPS Program Manual” is unconstitutional. Docket Item 1 at 97-99.

7 Pynn also alleges that several jurists “failed or neglected to take and file their ...public officer's oath” required under New York State Public Officer's Law § 10, and that many of the orders issued against her therefore are “void.” *See* Docket Item 1 ¶¶ 78-81, 84, 91, 99. Pynn's allegations that the jurists failed to take or “file”

their oaths are conclusory. But even if they were well pleaded, and even accepting these allegations as true, "[i]t is well settled...that the failure of [an] officer to take the prescribed oath of office will not prevent him from discharging his duties." *Matter of Delehanty*, 202 Misc. 33, 36, 115 N.Y.S.2d 602, 606 (Sup. Ct. N.Y. Cnty. 1952), *aff'd*, 280 A.D. 542, 115 N.Y.S.2d 614 (1st Dep't 1952) (citing *Sylvia Lake Co. v. Northern Ore Co.*, 242 N.Y. 144, 147 (1926) ("[S]o far as the public and third persons are concerned, the official acts of a de facto judge are just as valid as those of a de jure judge.")).

8 Pynn does not allege that Judges St. George and Marks—the first deputy chief administrative judge of the New York Court System and the former chief administrative judge of the New York Court System, respectively—presided over her divorce proceedings; instead she alleges that they failed to "effective[ly] interven[e]" when she complained to them about the actions taken by the other judges. *Id.* ¶¶ 47-48, 266(h).

It is certainly true that judicial immunity does not extend to non-judicial acts. *See Bliven*, 579 F.3d at 209. For that reason, the Supreme Court has concluded that a judge was not entitled to judicial immunity in connection with terminating the employment of a probation office employee. *See Forrester v. White*, 484 U.S. 219, 228-30 (1988). When terminating an employee, a judge acts as an administrator, not as a judge. *See id.* at 229.

But Pynn does not take issue with administrative actions taken by Judges St. George and Marks. Rather, she alleges, they failed to sufficiently investigate her complaints against the other judges and properly respond. *See* Docket Item ¶¶ 47-48, 266(h). And those actions—"responding to disciplinary complaints and assigning proceeding among judges"— are ultimately judicial in nature. *See Jackson v. Stanford*, 2019 WL 13166075, at *2 (S.D.N.Y. Jan. 7, 2019) (dismissing claims against Judge Marks on basis of judicial immunity where plaintiff alleged "that Marks failed to investigate [plaintiff]'s complaint against [New York State Supreme Court judge] and refused to transfer [plaintiff's] proceeding to another" judge). Pynn's claims against Judges St. George and Marks therefore fare no better than her claims against the other judges named in the complaint. And the same is true to the extent her claims against Judge Carter, formerly the administrative judge for New York State's Eighth Judicial District, involve his refusal to move the venue for her proceedings or investigate the complaints raised in her emails.

9 As noted below, to the extent Pynn intended to sue the nine judicial defendants, along with Isenberg and Puleo, in their official capacities, any such claims are barred by the Eleventh Amendment.

10 Although a Court may "redirect" a claim brought against an administrative arm of a municipality against the municipality itself, *see Nowlin v. 2 Jane Doe Female Rochester New York Police Officers*, 2012 WL 1415704, at *2 (W.D.N.Y. Mar. 23, 2012) (redirecting claims against Monroe County Jail "as against defendant Monroe County"), Pynn already has named Niagara County itself as a defendant, Docket Item 1 at 1, so such action is not necessary.

11 With regard to the numerous individual defendants who are employed by governmental entities, Pynn does not specify whether she is suing those defendants for damages in their official or individual capacities. To the extent that she intends to sue them in their official capacities, a section 1983 claim against an individual in his or her official capacity "is in effect a claim against the governmental entity itself." *Lore v. City of Syracuse*, 670 F.3d 127, 164 (2d Cir. 2012) (citing *Monell*, 436 U.S. at 691 n.55). It is thus "well settled that 'a suit against a municipal officer in his or her official capacity is functionally equivalent to a suit against the entity of which the officer is an agent.' " *Rech v. Siragusa*, 2023 WL 2559409, at *7 (W.D.N.Y. Mar. 3, 2023) (quoting *Baines v. Masiello*, 288 F. Supp. 2d 376, 384 (W.D.N.Y. 2003)); *see also Beckwith v. Erie Cnty. Water Auth.*, 413 F. Supp. 2d 214, 224-25 (W.D.N.Y. 2005) ("A claim against a government official in his official capacity is merely another way of asserting a claim against the governmental entity that employes the official." (citing *Monell*, 436 U.S. at 690 n. 55)). Therefore, to the extent Pynn intended to sue the Niagara County employees she

names as defendants—D'Angelo, Lutz, Gatto, and Platt—for damages in their official capacities, any such claims would be redundant of her claims against Niagara County.

Any potential official capacity claims against the various individual defendants employed by New York State would fare no better. As noted above, the Eleventh Amendment bars official capacity suits for money damages against New York State and state officials acting in their official capacities. Therefore, any official capacity claims against the state employees Pynn names—the nine judges and justices, three state police officers, and two court employees—also would be barred. *See* *Daniel v. Safir*, 135 F. Supp. 2d 367, 372 (E.D.N.Y. 2001) (Eleventh Amendment barred official capacity claims against law clerks employed by New York state court judges);*Johnston v. Bauer*, 2023 WL 9534631, at *2 (N.D.N.Y. Oct. 12, 2023), *report and recommendation adopted*, 2024 WL 456786 (N.D.N.Y. Feb. 6, 2024) ("[J]udges within the New York State Unified Court System are entitled to Eleventh Amendment immunity to the extent they are sued in their official capacity."); *Keir v. Donaldson*, 2025 WL 3442904, at *11-12 (N.D.N.Y. Dec. 1, 2025) (dismissing official capacity claims against New York State Police officer because of "Eleventh Amendment immunity").

12 Moreover, because Pynn is proceeding pro se, she cannot assert that claim on behalf of her children. *See* *Tindall v. Poultney High Sch. Dist.*, 414 F.3d 281, 284 (2d Cir. 2005) ("It is...a well-established general rule in this Circuit that a parent not admitted to the bar cannot bring an action pro se in federal court on behalf of his or her child." (italics omitted)).

13 Pynn alleges that the defendants had a "financial motive to conceal the child abuse," Docket Item 1 ¶ 245, but she does not say that they financially benefitted from any alleged sex trafficking.

14 Pynn points to other unrelated instances of wrongdoing by some defendants to support the existence of an enterprise—for example, past allegations of harassment against Puleo and Jastrzemski, Docket Item 7 at 160, 162, and Isenberg's prior arrest. *id.* at 160. She also asserts a history of "nepotism" in Niagara County. *Id.* at 163-64. But Pynn does not explain how these allegations are tied to the supposed enterprise or how such facts indicate the existence of an "ongoing organization" between the defendants. *See* *DeFalco*, 244 F.3d at 307.

15 Despite Pynn's claim that US Bank is a defendant in this matter, *see* Docket Item 29 at 3, it is not mentioned in either her original complaint or her proposed amended complaint. Moreover, it is unclear how the foreclosure proceeding has any bearing on the facts of this case.

16 The injunctive relief Pynn requests in her complaint, Docket Item 1 at 97-99, asks for the same type of relief requested in her second motion for a preliminary injunction: for this Court to essentially oversee Pynn's interactions with local courts and officials. *See, e.g.*, *id.* at 98 (requesting that this Court order the defendants "to cease and desist from obstructing official government records, including but not limited to documents from court and corresponding docket sheets"). Those requests are denied for the same reasons just discussed in connection with the motion for a preliminary injunction.

17 If Pynn files an amended complaint as provided in this decision and order, service will be deferred until the Court has screened the amended complaint.

LAWRENCE J. VILARDO

UNITED STATES DISTRICT JUDGE

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 835406
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ivan RAMOS, Plaintiff,
v.
Gregory J. CULICK, Chief of Amsterdam Police Department, Sergeant Carl J. Rust, Amsterdam Police Department, Defendants.

6:16-CV-01312 (FJS/TWD)
|
Signed 02/09/2017

**Attorneys and Law Firms**

IVAN RAMOS, 12-B-2475, Green Haven Correctional Facility, P.O. Box 4000, Stormville, NY 12582, Plaintiff, pro se.

## ORDER AND REPORT-RECOMMENDATION

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

### I. INTRODUCTION

***1** Pro se Plaintiff Ivan Ramos' initial complaint (Dkt. No. 1) in this civil rights action against Defendant Carl J. Rust ("Rust"), brought under 42 U.S.C. § 1983, was dismissed for failure to state a claim on initial review pursuant to 28 U.S.C. §§ 1915(e). (Dkt. No. 12.) The dismissal was without prejudice, and the Hon. Frederick J. Scullin, Senior District Judge, has referred Plaintiff's amended complaint (Dkt. No. 11) to the Court for initial review. Plaintiff has added Gregory J. Culick ("Culick") as a Defendant in his amended complaint. *Id.*

### II. INITIAL SCREENING

Having found that Plaintiff meets the financial criteria for commencing this case *in forma pauperis*, and because Plaintiff seeks relief from an officer or employee of a governmental entity, the Court must consider the sufficiency of the allegations set forth in the Complaint in light of 28 U.S.C. §§ 1915(e) and 1915A. Section 1915(e) directs that when a plaintiff proceeds *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).[1]

Similarly, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief can be granted; or ... seeks monetary relief against a person who is immune from such relief." 28 U.S.C. § 1915A.

In reviewing a *pro se* complaint, the Court has the duty to show liberality towards *pro se* litigants, *see Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990), and should exercise "extreme caution ... in ordering *sua sponte* dismissal of a *pro se* complaint *before* the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted). Therefore, a court should not dismiss a complaint if the Plaintiff has stated "enough facts to state a claim that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the Court should construe the factual allegations in the light most favorable to Plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the possibility of misconduct, the complaint has alleged but it has not "show[n] that the pleader is entitled to relief." *Id.* at 679 (quoting Federal Rule of Civil Procedure 8(a)(2)). While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, ... it demands more than an unadorned, the-defendant-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Thus, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Id.* (internal quotations marks and alterations omitted). Allegations that "are so vague as to fail to give the defendants adequate notice of the claims

against them" are subject to dismissal. *Sheehy v. Brown*, 335 Fed.Appx. 102, 104 (2d Cir. 2009).

***2** Where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Id.* (citation omitted).

## III. PLAINTIFF'S AMENDED COMPLAINT

Plaintiff is presently imprisoned after being convicted by a jury of a double homicide. (Dkt. No. 11 at ¶ 4.[2]) Defendant Rust is a Sergeant in the Amsterdam Police Department in Amsterdam, New York. *Id.* at ¶ 3. On March 2, 2012, at approximately 5:50am, Rust arrived at the crime scene of the double homicide at 359 Locust Avenue, and upon entering the apartment saw one male victim and one female victim in close proximity. *Id.* at 5.[3] Rust took four photographs on his department phone and backed out of the crime scene. *Id.*

Plaintiff, who was sentenced to life in prison without parole, has denied committing the crimes, and since his conviction has begun his own investigation and allegedly learned from a reliable source that the actual perpetrator of the double homicide had left his orange and blue parka at the crime scene and had been unsuccessful in retrieving it. *Id.* at ¶¶ 7-9. The Plaintiff has identified the alleged perpetrator and the alleged source of the information in his amended complaint. *Id.* at ¶ 10.

Plaintiff contends he needs the four pictures in order to demonstrate that someone other than he committed the double homicide. *Id.* at ¶ 16. According to Plaintiff, if he had the pictures, he could show them to his source to ascertain if the orange and blue parka belonged to the person Plaintiff believes to have been the actual perpetrator of the crimes. *Id.* at ¶ 17. Plaintiff alleges that the discovery will lead to DNA testing, and that without the four photos, his access to the courts will be curbed. *Id.* at ¶ at 18.

On April 12, 2016, Plaintiff submitted a Freedom of Information Law ("FOIL") request under N.Y. Pub. Off. Law §§ 87-89, requesting:

1.) A complete list of all Departmental Equipment/Gear issued to Sgt. Carl Rust, Badge # 207, for the dates of 2/28/2012–3/3/2012.

2.) The listing of the documents required which should include all of the Departmental Equipments/Gear's "Item I.D. number, Item Description, Issue date, e.t.c., which would correspond to each item issued to Sgt. Carl J. Rust, Badge # 207, during the requested dates above.

(Dkt. No. 11 at 9.) On April 13, 2016, Defendant Culick denied the request on the grounds that it would require the creation of a document, something not required under FOIL. *Id.* at 10. On July 20, 2016, Plaintiff wrote to Culick in response to his April 13, 2016, denial letter. (Dkt. 11 at 7.) Plaintiff enclosed a copy of Rust's March 2, 2012, statement disclosing that he had taken the four pictures at the crime scene, *id.* at 5, and described it as indicating "in no uncertain terms of the photographs requested under the FOIL back in April 12th, along with the time and date the photographs were taken." *Id.* at 7. Although Culick could likely have inferred from Plaintiff's July 20, 2016, follow up letter that Plaintiff wanted copies of the photographs, no specific request for the photographs was made in the April 12, 2016, FOIL request. *Id.* at 7, 9.

***3** Plaintiff followed up on his July 20, 2016, letter to Culick with an August 19, 2016, letter enclosing another copy of Rust's statement and again mentioning the four photographs. *Id.* at 6. On September 1, 2016, Culick again responded that Plaintiff's request would require creation of a document, and the request was denied because no such document existed. *Id.* at 11. Presumably, the document referenced by Culick was the list initially requested by Plaintiff.

Plaintiff has alleged that the refusal to give him the four pictures constitutes a violation of his rights under the First and Fourth Amendments to the Constitution. *Id.* at ¶ 19. He seeks relief directing Defendants to produce the cell phone used by Rust in taking the photographs and the photographs. *Id.*

## IV. ANALYSIS

### A. Defendant Rust

Personal involvement of an official sued in his official capacity is not necessary where a plaintiff is seeking only injunctive or declaratory relief under § 1983. *See Davidson v. Scully*, 148 F.Supp. 2d 249, 254 (S.D.N.Y. 2001). "Actions involving claims for prospective declaratory or injunctive

relief are permissible provided the official against whom the action is brought has a direct connection to, or responsibility for, the alleged illegal action." *Marshall v. Switzer*, 900 F.Supp. 604, 615 (N.D.N.Y. 1995); *see also* *Schallop v. New York State Dept. of Law*, 20 F.Supp. 2d 384, 391 (N.D.N.Y. 1998) (claim for injunctive relief proper "where the state official has the authority required to perform the act.")

The only allegations in Plaintiff's amended complaint regarding Rust are that he is employed as a Sergeant by the Amsterdam Police Department, was the first to arrive on the scene of the double homicide, and took four pictures with his department issued cell phone. (Dkt. No. 11 at ¶¶ 3-4.) The amended complaint is devoid of factual allegations plausibly showing involvement on the part of Defendant Rust in Plaintiff's lack of success in obtaining the four photographs, or that Rust, as a Sergeant in the Amsterdam Police Department, has the authority in his official capacity to release the photographs to Plaintiff. [4] (*See generally* Dkt. No. 11.) Plaintiff's April 12, 2016, FOIL request was sent to the "Records Access Officer" and the request was handled by Police Chief Culick with no mention of Rust. *Id.* at 6-11.

In light of the absence of any allegations in Plaintiff's amended complaint plausibly showing that Rust had any direct connection to, or responsibility for, Plaintiff's attempt to obtain copies of the four photographs, the Court recommends that the action be dismissed as against Rust. *See* *Marshall*, 900 F.Supp. at 615. Plaintiff has failed to allege any facts showing that Rust was in any way involved in the denial of Plaintiff's FOIL request, despite having had two opportunities to do so. There is nothing in Plaintiff's amended complaint suggesting that if given a third opportunity, Plaintiff would be able to state a claim for relief against Rust. *See* *Cuoco*, 222 F.3d at 112. Therefore, the Court recommends that dismissal of the action against Rust be dismissed with prejudice.

**B. Defendant Culick**

1. Plaintiff's Fourteenth Amendment Right to Due Process

Plaintiff has alleged that denial of the photographs violated his rights under the First and Fourth Amendments. (Dkt. No. 11 at ¶ 19.) The Fourth Amendment to the Constitution protects people from unreasonable searches and seizures, U.S. Const. amend. IV, and has no relevance to Plaintiff's claim. Surmising that Plaintiff may have intended to allege a claim for denial of due process under the Fourteenth Amendment, rather than a Fourth Amendment claim, the Court has treated it as such.

***4** In *District Attorneys Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68-69 (2009), the Supreme Court found that a valid conviction constitutionally deprives a criminal defendant of his liberty. Thus, a post-conviction "right to due process is not parallel to a trial right, and rather must be analyzed in light of the fact that [the convicted party] has already been found guilty at a fair trial, and has only a limited interest in postconviction relief." *Id.* at 69. States are given more flexibility in deciding the procedures needed in the context of post-conviction relief. *Id.* " '[W]hen a State chooses to offer help to those seeking relief from convictions,' due process does not dictat[e] the exact form such assistance must assume.' " *Id.* (quoting *Pennsylvania v. Finley*, 481 U.S. 551, 559 (1987)). Although there is no requirement to exhaust state-law remedies, *see* *Patsy v. Board of Regents of Fla.*, 457 U.S. 496, 500-01 (1982), a plaintiff bears the burden of showing the inadequacy of the state law procedures available to him in seeking state post-conviction relief. *Osborne*, 557 U.S. at 71. "Federal courts may upset a State's postconviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights provided." *Id.* at 69.

In New York State, FOIL "provides the only state-created right to documentary evidence for a New York prisoner." [5] *McLean v. Brown*, 08-CV-5200 (JG), 2010 WL 2609341, at * 7 (E.D.N.Y. June 25, 2010); [6] *see also* *Mallet v. Johnson*, No. 09 Civ. 8430 (JGK), 2011 WL 2652570, at * 4 (S.D.N.Y. July 7, 2011) (FOIL provides a mechanism by which an inmate may obtain evidence related to a prior conviction); N.Y. Pub. Off Law § 89. A violation of New York FOIL does not give rise to a claim under § 1983. *Sonds v. Cuomo*, No. 9:11-CV-0895 (NAM/ATB), 2012 WL 952540, at * 3 (N.D.N.Y. Feb. 3, 2012) ("Plaintiff's state FOIL request cannot be the basis of a federal action."). "The appropriate vehicle for challenging denials of access guaranteed by the New York Freedom of Information Law is a state court proceeding pursuant to N.Y.C.P.L.R. Article 78 upon exhaustion of administrative remedies." *Schuloff v. Fields*, 950 F.Supp. 66, 67-68 (E.D.N.Y. 1997); *Posr v. City of N.Y.*, No. 10-CV-2551 (RPP), 2013 WL 2419142, at * 14 (S.D.N.Y. June 4, 2013) ("Under New York state law, if an agency or governmental official fails to comply with the provisions of FOIL, the person submitting the FOIL request must pursue an administrative appeal or seek remedies in state court pursuant to N.Y.C.P.L.R. Article 78." (citing N.Y. Pub. Off. Law § 89)).

"The sufficiency of Article 78 proceedings to satisfy due process requirements is well established." *Mallett*, 2011 WL 2652570, at * 4; *see also Hellenic Am. Neighborhood Action Comm.*, 101 F.3d 877, 880-81 (2d Cir. 1996) ("An Article 78 proceeding is adequate for due process purposes even though the petitioner may not be able to recover the same relief that he could in a § 1983 suit"); *Davis v. Guarino*, 52 Fed.Appx. 568, 569 (2d Cir. 2002) (denial of plaintiff's FOIL request did not violate due process because "an Article 78 proceeding is a perfectly adequate post-deprivation remedy"); *Blount v. Brown*, No. 10-CV-01548 (ARR), 2010 WL 1945858, at * 2 (E.D.N.Y. May 11, 2010) ("[W]ith respect to the question of constitutional due process and FOIL requests, adequate process is clearly available through an Article 78 proceeding to remedy an improper denial of disclosure.") (citation and internal quotation marks omitted); *Papay v. Haselhuhn*, No. 07 Civ. 3858 (LAP) (JG), 2010 WL 4140430, at * 9-10 (S.D.N.Y. Oct. 21, 2010) (availability of Article 78 proceeding defeats claim that denial of FOIL request violates due process).

In sum, the New York FOIL procedures are sufficient to protect any property interest Plaintiff may have in the receipt of FOIL documents. Accordingly, the Court finds that Plaintiff has failed to state a claim under the Fourteenth Amendment for violation of his right to due process with regard to his FOIL request for the four crime scene photographs. Therefore, the Court recommends that Plaintiff's Fourteenth Amendment due process claim with regard to his FOIL application be dismissed without prejudice, but without leave to replead in this action in light of its futility. *Cuoco*, 222 F.3d at 99.

2. Plaintiff's First Amendment Claim for Denial of Access to the Courts

***5** Plaintiff has also alleged a First Amendment claim for denial of access to the courts. The Supreme Court has long held that inmates are guaranteed a right of access to the courts under the First Amendment to the Constitution. *See Lewis v. Casey*, 518 U.S. 343, 350 (1996); *Bounds v. Smith*, 430 U.S. 817, 828 (1977). To state a claim for violation of the constitutional right of access to court, a plaintiff must allege facts plausibly suggesting: "(1) a 'nonfrivolous, arguable underlying claim' that has been frustrated by the defendants' actions, and (2) a continued inability to obtain the relief sought by the underlying claim." *Arar v. Ashcroft*, 585 F.3d 559, 592 (2d Cir. 2009) (quoting *Christopher v. Harbury*, 536 U.S. 403, 415-16 (2002)); *see also Whitfield v. Inperatrice*, No. 08 CV 3395 (CBA)(LB), 2010 WL 6032636 at *5 (E.D.N.Y. Sept. 17, 2010) (plaintiff's complaint "must identify a separate, 'ancillary' legal claim that has been thwarted or prejudiced by the alleged denial, and that is 'non-frivolous' and arguable in nature."), *adopted as modified on other grounds*, 2011 WL 864703 (March 9, 2011), *aff'd* 477 Fed.Appx. 806 (2d Cir. 2012). A plaintiff must set forth sufficient facts in the complaint to suggest that success on the underlying claim is founded on more than mere "hope." *Christopher*, 536 U.S. at 415. In addition, a plaintiff must point to deliberate and malicious acts by the defendant that frustrated his efforts to commence or prosecute that claim. *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (citing *Lewis*, 518 U.S. at 353.)

In order to state a claim for denial of access, Plaintiff is required to "allege actual injury separate and apart from the claim that he was refused access to court records." *Whitfield*, 2010 WL 6032636, at * 6 (citing *Christopher*, 536 U.S. at 414-15, "[T]he very point of recognizing any access claims is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong ... our cases rest on the recognition that the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered an injury by being shut out of court.")

Plaintiff does not allege in his amended complaint that the denial of his FOIL request prejudiced or interfered with an existing judicial proceeding, such as a post-conviction motion to vacate judgment pursuant N.Y. Criminal Procedure Law § 440.10(g). [7] Moreover, Plaintiff has failed to set forth facts in his amended complaint suggesting that if he were to challenge his conviction relying on the four photographs, his success would be based on more than mere "hope." *Christopher*, 536 U.S. at 415. Plaintiff's amended complaint gives no indication that he has a reasonable basis, or any basis, for believing that the four photographs show the orange and blue parka he alleges belonged to the person whom he believes to be the actual killer. (Dkt. No. 11 at ¶ 17.) Even if they did, the amended complaint is devoid of factual allegations suggesting that the parka still exists, or could be located, or that it would provide any DNA evidence that would help establish Plaintiff's innocence or indeed be connected to the double homicide in any manner. *Id.* at ¶ 19. In short, the allegations in Plaintiff's amended complaint do not even provide an adequate basis for hope. In addition, Plaintiff has alleged no facts plausibly showing that Culick acted deliberately and maliciously in frustrating Plaintiff's efforts to

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

commence or prosecute an underlying claim as is required for an access to the courts claim. *Davis,* 320 F.3d at 351.

Based upon the foregoing, the Court finds that Plaintiff's amended complaint fails to state a First Amendment access to courts claim against Culick. Therefore, the Court recommends that Plaintiff's access to the courts claim be dismissed, but that the dismissal be without prejudice, and Plaintiff be granted one more opportunity to submit an amended complaint setting forth a claim for denial of access to court.

***6 ACCORDINGLY**, it is hereby

**RECOMMENDED**, that Plaintiff's amended complaint (Dkt. No. 11) be **DISMISSED WITH PREJUDICE** as against Defendant Rust upon initial review for failure to state a claim; and it is further

**RECOMMENDED** that the Plaintiff's amended complaint be **DISMISSED** as against Defendant Culick, and that the dismissal be **WITHOUT PREJUDICE, BUT WITHOUT LEAVE TO AMEND IN THIS ACTION** as to his Fourteenth Amendment due process claim, and **WITHOUT PREJUDICE AND WITH LEAVE TO AMEND** as to his First Amendment access to courts claim.

**ORDERED**, that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

***7** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[8] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 835406

## Footnotes

1 To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or fact." *Neitzke v. Williams*, 490 U.S. 319, 327 (1989).

2 Paragraph references are used where the referenced document contains consecutively numbered paragraphs.

3 Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

4 Plaintiff has not alleged whether he is suing Rust in his official or individual capacity, or both. Since Plaintiff is seeking solely injunctive relief, the Court has assumed that Rust is being sued in his official capacity. (See Dkt. No. 11.)

5 Photographs are included in the definition of "records" covered by FOIL. N.Y. Pub. Off. Law § 86(4).

6 Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

7 As noted above, Plaintiff's April 12, 2016, FOIL request does not, by its terms, include a request for the four photographs Plaintiff is seeking in this action, despite what appears to have been Plaintiff's intent in making the request. (Dkt. No. 11 at 6.)

8 If you are proceeding *pro se* and are served with this report and recommendation/order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and recommendation/order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 823580
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ivan RAMOS, Plaintiff,
v.
Gregory J. CULICK, Chief of Amsterdam Police Department, and Sergeant Carl J. Rust, Amsterdam Police Department, Defendants.

6:16-CV-1312(FJS/TWD)
|
Signed 03/02/2017

**Attorneys and Law Firms**

IVAN RAMOS, 12-B-2475, Green Haven Correctional Facility, P. O. Box 4000, Stormville, New York 12582, Plaintiff pro se.

**ORDER**

Frederick J. Scullin, Jr., Senior United States District Judge

***1** Currently before the Court is Magistrate Judge Dancks' February 9, 2017 Order and Report-Recommendation, in which she recommended that this Court dismiss Plaintiff's Amended Complaint with prejudice as against Defendant Rust for failure to state a claim. *See* Dkt. No. 13 at 12. She also recommended that this Court dismiss the Amended Complaint against Defendant Culick without prejudice, but without leave to amend, as to his Fourteenth Amendment due process claim and without prejudice and with leave to amend as to his First Amendment access-to-courts claim. *See* Id. The parties did not file any objections to these recommendations.

When a party does not object to a magistrate judge's report-recommendation, the court reviews that report-recommendation for clear error or manifest injustice. *See* *Linares v. Mahunik*, No. 9:05-CV-625, 2009 WL 3165660, *10 (N.D.N.Y. July 16, 2009) (citation and footnote omitted). After conducting this review, "the Court may 'accept, reject, or modify in whole or in part, the ... recommendations made by the magistrate judge.' " *Id.* (quoting 28 U.S.C. § 636(b)(1)(C)).

The Court has reviewed Magistrate Judge Dancks' February 9, 2017 Order and Report-Recommendation for clear error and manifest injustice; and, finding none, the Court hereby

**ORDERS** that Magistrate Judge Dancks' February 9, 2017 Order and Report-Recommendation is **ACCEPTED in its entirety** for the reasons stated therein; and the Court further

**ORDERS** that Plaintiff's Amended Complaint, *see* Dkt. No. 11, is **DISMISSED with prejudice** as against Defendant Rust; and the Court further

**ORDERS** that Plaintiff's Amended Complaint against Defendant Culick is **DISMISSED without prejudice, but without leave to amend** as to his Fourteenth Amendment due process claim; and the Court further

**ORDERS** that Plaintiff's Amended Complaint against Defendant Culick is **DISMISSED without prejudice and with leave to amend** as to his First Amendment access-to-courts claim; and the Court further

**ORDERS** that, if Plaintiff wishes to proceed with his First Amendment access-to-courts claim, he must file a signed amended complaint that cures the pleading defects that Magistrate Judge Dancks identified in her February 9, 2017 Order and Report-Recommendation; and the Court further

**ORDERS** that, upon Plaintiff's full compliance with this Order, the Clerk of the Court shall return the file to this Court for further review; and the Court further

**ORDERS** that, if Plaintiff fails to comply fully with the terms of this Order **within thirty (30) days** from its filing date, the Clerk of the Court shall enter Judgment indicating that this action is **DISMISSED with prejudice**, without further order of this Court, pursuant to 28 U.S.C. § 1915A(b), for failure to state a claim upon which relief may be granted; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on Plaintiff in accordance with the Local Rules.

**IT IS SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 823580

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 2663369
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Christopher E. ROBINSON, Plaintiff,
v.
Michael WRIGHT, New York State Parole Officer; Matthew Mullen, New York State Parole Officer; and Tonia Zimmerman, New York State Parole Officer, Defendants.

5:21-CV-1098 (TJM/ML)
|
Signed July 11, 2022

**Attorneys and Law Firms**

CHRISTOPHER E. ROBINSON, Plaintiff, Pro Se, Cayuga Correctional Facility, Post Office Box 1186, Moravia, New York 13118.

**ORDER and REPORT-RECOMMENDATION**

MIROSLAV LOVRIC, United States Magistrate Judge

***1** The Clerk has sent this *pro se* amended complaint filed by Christopher E. Robinson ("Plaintiff") to the Court for review. (Dkt. No. 11.) For the reasons discussed below, I recommend that Plaintiff's Amended Complaint (Dkt. No. 11) be accepted in part for filing and dismissed in part without leave to amend.

## I. BACKGROUND

Construed as liberally [1] as possible, Plaintiff's Amended Complaint alleges that defendants Michael Wright, Matthew Mullen, and Tonia Zimmerman (collectively "Defendants"), who are all New York State parole officers, violated his civil rights by submitting perjured testimony against him. (*See generally* Dkt. No. 11 [Am. Compl.].) More specifically, Plaintiff alleges that on April 29, 2021, during a parole revocation hearing: (1) Defendant Wright testified that (a) Plaintiff was not allowed to possess a smartphone throughout his parole, and (b) his reasoning for requesting a search of Plaintiff's residence was because of law enforcement contact related to a domestic violence incident involving Plaintiff; (2) Defendant Mullen testified that he personally searched Plaintiff's bedroom and found a smartphone under a mattress; and (3) Defendant Zimmerman (a) omitted, while under oath, where she found alleged contraband while searching Plaintiff's residence, and (b) omitted, while under oath, Officer Delaney when listing the individuals present while searching Plaintiff's residence. (*Id.*)

Plaintiff alleges that based on Defendants' perjured statements, the parole violations against him were sustained and he has been reincarcerated. (*Id.*) Based on these factual allegations, Plaintiff asserts the following five causes of action: (1) a claim that Plaintiff's right to a fair trial was violated by Defendants pursuant to the Due Process Clause in the Fourteenth Amendment and 42 U.S.C. § 1983; (2) a claim that Plaintiff's right to a fair trial was violated by Defendants pursuant to the Fifth Amendment and 42 U.S.C. § 1983; (3) a claim that Defendant Wright violated Plaintiff's rights in making an arbitrary and capricious decision pursuant to the Fourteenth and Fifth Amendments; (4) a claim of malicious prosecution against Defendants pursuant to the Fifth, Eighth, and Fourteenth Amendments; and (5) a claim of false imprisonment against Defendants pursuant to the Fifth, Eighth, and Fourteenth Amendment. (*Id.*) As relief, Plaintiff seeks $3,000,000.00 in damages against Defendants. (*Id.*)

## II. LEGAL STANDARD GOVERNING INITIAL REVIEW OF A COMPLAINT

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2).

***2** In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

"In reviewing a complaint ... the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

"[E]xtreme caution should be exercised in ordering sua sponte dismissal of a ... complaint before the adverse party has been served and [the] parties ... have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983). The Court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a plaintiff's complaint to proceed. *See, e.g., Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may *sua sponte* dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint." *Aguilar v. United States*, 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at *2 (D. Conn. Nov. 8, 1999) (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998)); *see also Neitzke v. Williams*, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis."); *Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory for purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint.").

## III. ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Having reviewed Plaintiff's Amended Complaint with this principle in mind, I recommend that his claims be accepted in part for filing and dismissed in part without leave to amend.

### A. Section 1983 Claims Against Defendants in Official Capacities

To the extent that Plaintiff's claims are asserted against Defendants in their official capacities, I recommend that they be dismissed for failure to state a claim upon which relief may be granted. Plaintiff seeks only monetary damages, and Defendants—in their official capacities—are immune from suit pursuant to the Eleventh Amendment. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985) ("The Court has held that, absent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court. This bar remains in effect when State officials are sued for damages in their official capacity." (internal citations omitted)); *Quern v. Jordan*, 440 U.S. 332, 341 (1979) ("[W]e simply are unwilling to believe, on the basis of such slender 'evidence,' that Congress intended by the general language of § 1983 to override the traditional sovereign immunity of the States."); *Minotti v. Lensink*, 798 F.2d 607, 609 (2d Cir. 1986) ("Using its authority under section 5 of the fourteenth amendment, Congress may abrogate the eleventh amendment in the absence of a waiver by the states, but the civil rights statute 42 U.S.C. § 1983 does not override the eleventh amendment." (internal citations omitted)).

***3** Plaintiff alleges that Defendants are New York State Parole Officers. (Dkt. No. 11 at 2-3.) "Because the New York State [Division of Parole ("DOP")] is an arm of the state, [and] Plaintiff [asserts] claims against.... DOP employees[,] ... the Eleventh Amendment bars any claims for damages against ... [D]efendants in their official capacities." *Kirkland v. New York State Div. of Parole*, 20-CV-8606, 2021 WL 706709, at *3 (S.D.N.Y. Feb. 18, 2021) (citing *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009)).

As a result, I recommend that Plaintiff's claims against Defendants in their official capacities be dismissed because they are immune from suit.

### B. Section 1983 Claims Against Defendants in Individual Capacities

To the extent that Plaintiff asserts claims pursuant to 42 U.S.C. § 1983 against Defendants in their individual capacities, I recommend that his claims pursuant to the Fifth and Eighth Amendments and alleging malicious prosecution and false arrest be dismissed but that Defendants be directed to respond to his claim pursuant to the Fourteenth Amendment.

#### 1. Fifth Amendment

The Fifth Amendment Due Process Clause applies only to the federal government, and not to state or municipal governments. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without due process of law."); *Poe v. Ullman*, 367 U.S. 497, 540 (1961) (explaining that prohibitions "against the deprivation of life, liberty or property without due process of law" set forth in Fourteenth Amendment are applicable to state government and same prohibitions in Fifth Amendment are applicable to "the Federal Government"); *Ambrose v. City of New York*, 623 F. Supp. 2d 454, 466-67 (S.D.N.Y. 2009) (holding that any due process claim "against the City is properly brought under the Fourteenth Amendment, not the Fifth Amendment"); *Mitchell v. Home*, 377 F. Supp. 2d 361, 372-73 (S.D.N.Y. 2005) ("The Fifth Amendment's Due Process Clause protects citizens against only federal government actors, not State officials. Any due process rights plaintiff enjoys as against state government officials ... arise solely from the Fourteenth Amendment due process clause." (internal citations omitted)).

Plaintiff has not alleged that any federal official violated his Fifth Amendment due process rights. Instead, all of his allegations are against state officials. Thus, Plaintiff's due process claims may only be brought under the Fourteenth Amendment, not the Fifth Amendment. *See Dusenbery*, 534 U.S. at 167 (explaining that Fifth Amendment does not apply to State officials); *Ambrose*, 623 F. Supp. 2d at 466-67 (stating that Fifth Amendment does not apply to city officials).

As a result, I recommend that Plaintiff's Fifth Amendment claim against Defendants is dismissed for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915A(b)(1).

**2. Eighth Amendment**

The Eighth Amendment "protects prisoners from cruel and unusual punishment by prison officials," *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015), whereas the Fifth and Fourteenth Amendments "prohibit the government from depriving any person of life, liberty, or property, without due process of law." *Smalls v. Collins*, 10 F.4th 117, 133 (2d Cir. 2021) (internal quotation marks, citations and alterations omitted). Generally, *pro se* plaintiffs bring Eighth Amendment claims to challenge "excessive force," "denial of adequate medical care," "unconstitutional conditions of confinement unrelated to medical care," and the "failure to protect." *Randle v. Alexander*, 960 F. Supp. 2d 457, 470 (S.D.N.Y. 2013). Though Plaintiff cites the Eighth Amendment, he does not raise issues that are customarily resolved by Eighth Amendment claims; instead, he appears to challenge the lack of "due process of law." (Dkt. No. 11.) Accordingly, Plaintiff's Eighth Amendment claims "relating to [parole revocation] proceedings ... are more properly analyzed as due process violations." *Barclay v. New York*, 477 F. Supp. 2d 546, 555 (N.D.N.Y. 2007) (Hurd, J.).

**3. Malicious Prosecution/False Imprisonment**

***4** A plaintiff alleging malicious prosecution and false arrest must demonstrate termination of the proceedings in his favor. *See Henry v. City of New York*, 17-CV-3450, 2021 WL 1648029, at *4 (S.D.N.Y. Apr. 27, 2021) (citing *Shabazz v. Kailer*, 201 F. Supp. 3d 386, 391 (S.D.N.Y. 2016)) (dismissing the plaintiff's malicious prosecution claim because he did not "secure a favorable termination of the criminal action."); *Aragon v. New York*, 14-CV-9797, 2017 WL 2703562, at *5 (S.D.N.Y. June 22, 2017) (quoting *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994)) ("Thus, to recover damages for a false imprisonment claim under Section 1983, a prisoner must demonstrate that his conviction 'has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.' ").

Here, Plaintiff alleges that his "parole violations were sustained and [he has] been reincarcerated." (Dkt. No. 11 at 4.) Thus, Plaintiff has not obtained a favorable termination of the underlying proceeding to state a malicious prosecution or false imprisonment claim.

As a result, I recommend that Plaintiff's claims alleging malicious prosecution and false arrest be dismissed for failure to state a claim upon which relief may be granted.

**4. Fourteenth Amendment**

A final parole revocation proceeding is an administrative proceeding held solely to enable parole authorities to determine whether the parolee violated the terms of parole.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

*People ex rel. Maiello v. New York State Bd. of Parole,* 65 N.Y.2d 145, 147 (N.Y. 1985). Although a parolee facing revocation of release is not entitled to the "full panoply of rights" due to a defendant in a criminal prosecution, the Supreme Court has held that the revocation of parole implicates a liberty interest protected by the Due Process Clause of the Fourteenth Amendment. *Morrisey v. Brewer,* 408 U.S. 471, 482 (1972). Upholding the *Morrisey* decision, a year later the Supreme Court further defined the process required during a preliminary parole revocation hearing. *Gagnon v. Scarpelli,* 411 U.S. 778, 786 (1973). "At the ... hearing, a probationer or parolee is entitled to notice of the alleged violations of probation or parole, an opportunity to appear and to present evidence in his own behalf, a conditional right to confront adverse witnesses, an independent decisionmaker, and a written report of the hearing." *Gagnon,* 411 U.S. at 786 (citing *Morrisey,* 408 U.S. at 487). Furthermore, at the final hearing, individuals are given a more detailed hearing with the minimum requirements including:

> (a) written notice of the claimed violations of (probation or) parole; (b) disclosure to the (probationer or) parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking (probation or) parole.

*Id.* (citing *Morrisey,* 408 U.S. at 489).

Here, Plaintiff alleges that his constitutional rights were violated during his parole revocation hearing based on false statements made by Defendants. Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's Fourteenth Amendment claims against Defendants in their individual capacities.

## IV. OPPORTUNITY TO AMEND

***5** Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.). [2]

In this instance, I conclude that any further amendments to Plaintiff's Amended Complaint would be futile. As a result, I recommend that Plaintiff's Amended Complaint be dismissed without leave to amend to the extent that it alleges claims pursuant to 42 U.S.C. § 1983 against Defendants in their (1) official capacities, and (2) individual capacities alleging violations of the Fifth and Eighth Amendments, for malicious prosecution, and for false imprisonment. *See Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 168 (2d Cir. 2003) (quoting *Dluhos v. Floating & Abandoned Vessel, Known as "New York,"* 162 F.3d 63, 69 (2d Cir. 1998)) (finding that the "District Court did not abuse its discretion in denying [the plaintiff] leave to amend the complaint because there was a 'repeated failure to cure deficiencies by amendments previously allowed.' "); *Salinger v. Projectavision, Inc.*, 972 F. Supp. 222, 236 (S.D.N.Y. 1997) ("Three bites at the apple is enough.").

**ACCORDINGLY**, it is respectfully

**RECOMMENDED** that Plaintiff's Amended Complaint (Dkt. No. 11) be **ACCEPTED FOR FILING** with respect to Plaintiff's Fourteenth Amendment due process claim against Defendants in their individual capacities; and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITHOUT LEAVE TO REPLEAD** Plaintiff's claims (1) against Defendants in their official capacities, and (2) against Defendants in their individual capacities pursuant to the Fifth Amendment, Eighth Amendment, for malicious prosecution, and for false imprisonment, for failure to state a claim upon which relief may be granted and because it seeks monetary relief against Defendants who are immune from such relief pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this report and recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[3]

***6 NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[4] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

**All Citations**

Not Reported in Fed. Supp., 2022 WL 2663369

## Footnotes

1 The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

2 *See also* *Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend “unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim”—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

3 The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

4 If you are proceeding *pro se* and served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 4356214
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Christopher E. ROBINSON, Plaintiff,
v.
Michael WRIGHT, New York State Parole Officer, Matthew Mullen, New York State Parole Officer, and Tonia Zimmerman, New York State Parole Officer, Defendants.

5:21-CV-1098 (TJM/ML)
|
Signed September 19, 2022

**Attorneys and Law Firms**

Christopher E. Robinson, Moravia, NY, Pro Se.

**DECISION & ORDER**

Thomas J. McAvoy, Senior United States District Judge

***1** The Court referred this *pro se* Complaint to Magistrate Judge Miroslav Lovric for a Report-Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff alleges that Defendants, New York State Parole Officers, violated his rights when they brought parole violations against him. On May 12, 2022, the Court accepted and adopted a Report-Recommendation from Judge Lovric that recommended that the Court dismiss Plaintiff's Complaint with leave to replead. See dkt. # 12. The Court also accepted for filing an Amended Complaint that Plaintiff filed in response to Judge Lovric's Report-Recommendation. Id. The Court referred that Amended Complaint to Judge Lovric for an initial review. Id.

Judge Lovric's Report-Recommendation, dkt. # 13, issued July 11, 2022, recommends that the Court permit Plaintiff's Fourteenth Amendment due process claim against the Defendants in their individual capacities to go forward. Judge Lovric concluded that Plaintiff could conceivably make out a claim that the Defendants had violated his due process rights by testifying falsely at his parole revocation hearing. As far as the other claims Plaintiff raised, Judge Lovric concluded that better pleading would not cure their deficiencies and recommended that those claims be dismissed without opportunity to replead.

Plaintiff did not object to the Report-Recommendation. The time for such objections has passed. After examining the record, this Court has determined that the Report-Recommendation is not subject to attack for plain error or manifest injustice and the Court will accept and adopt the Report-Recommendation for the reasons stated therein.

Plaintiff wrote to inform the Court that he had no objections to the Report-Recommendation. See dkt. # 16. Instead, he asked permission for leave to file a summary judgment motion because he could "show, beyond a reasonable doubt, that his claim is meritorious." Id. The Court will deny this motion. It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). As this law makes clear, a motion for summary judgment argues that no evidence exists to support a particular claim. Defendants have not yet answered the Complaint, and no evidence has yet been collected. A motion for summary judgment would not be appropriate at this time. The Court will deny the motion. A schedule for discovery and motion deadlines will be set after Defendants have answered or otherwise responded to the Amended Complaint.

Accordingly,

The Report-Recommendation of Magistrate Judge Lovric, dkt. # 13, is hereby **ACCEPTED** and **ADOPTED**. Plaintiff's Amended Complaint is hereby accepted for filing with respect to Plaintiff's due process claim against the Defendants in their individual capacities. Plaintiff's Amended Complaint is hereby DISMISSED WITHOUT LEAVE TO REPLEAD with respect to:

***2** 1. Plaintiff's claims against Defendants in their official capacities;

2. Plaintiff's claims against Defendants in their individual capacities pursuant to the Fifth Amendment, Eighth Amendment, and any claims for malicious prosecution and false imprisonment.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 4356214

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Distinguished by Evans v. Solomon, E.D.N.Y., August 11, 2010

2007 WL 1300983
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Heather STOKES, Plaintiff,
v.
CITY OF NEW YORK, Detective Buskey, Shield # 238, Kwayera Archer-Cunningham, Defendants.

No. 05-CV-0007 (JFB)(MDG).
|
May 3, 2007.

**Attorneys and Law Firms**

Michael Colihan, Brooklyn, NY, for plaintiff.

Brooke Birnbaum, Esq., of Counsel, Corporation Counsel of the City of New York, New York, NY, for defendants.

MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge.

***1** Plaintiff Heather Stokes ("Stokes") brings this action, alleging claims for violations of her civil rights under 42 U.S.C. § 1983, as well as pendent state claims, arising from her arrest on March 4, 2004, at her residence in Brooklyn, New York, for Criminal Impersonation in the Second Degree and Forgery in the Third Degree. Stokes contends that defendant Detective Mark Buskey ("Buskey") entered her residence without a warrant, arrested her without probable cause, and utilized excessive force during the arrest. As a result, Stokes asserts claims for unreasonable search and seizure, false arrest, excessive force, and false imprisonment in connection with her arrest and subsequent detention.

Defendants City of New York and Buskey (collectively, "the defendants") move for summary judgment on all claims pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons stated below, defendants' motion for summary judgment is (1) denied as to the unreasonable search and seizure claim because a disputed issue of material fact exists as to whether Buskey had consent to enter the residence; (2) granted as to the false arrest and false imprisonment claims based upon the existence of probable cause as a matter of law; (3) granted as to the excessive force claim because no force was used during the arrest other than a routine handcuffing and pat-down and, thus, there is no cognizable constitutional injury; (4) granted as to the municipal liability claim; and (5) granted as to the pendent state claims.

I. BACKGROUND

A. The Facts

The facts described below are taken from the parties' depositions, declarations, affidavits, exhibits and respective Local Rule 56.1 statements of facts. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York,* 422 F.3d 47, 50 (2d Cir.2001).

Buskey was employed as a Detective for the New York City Police Department during the time period of the incident alleged in the complaint. (Defs.' 56.1 Stmt. ¶ 1.) (hereinafter "Defs.' 56.1")[1] Sister Kwayera Archer-Cunningham ("Archer-Cunningham") is the founder and director of the Ifetayo Cultural Arts Facility ("Ifetayo"), a non-profit organization. (*Id.* ¶ 2.) Stokes was employed by Ifetayo from approximately October 2003 through February 5, 2004, when she was terminated. (*Id.* ¶ 3; Ex. D, at ¶¶ 4-5.)

On February 13, 2004, Archer-Cunningham called the 70th Precinct of the NYPD to report that a check in the amount of approximately $431 (hereinafter, "the Check") from Ifetayo had been cashed by Stokes without an authorized signature. (Ex. D, at ¶ 4.) According to Archer-Cunningham, she was the only person authorized to sign checks on behalf of Ifetayo on the account on which the Check was drawn, and she did not sign the Check that was cashed by Stokes. (*Id.* ¶¶ 5-6.)

On or about February 15, 2004, Buskey was assigned to handle the complaint made by Archer-Cunningham. (Defs.' 56.1 ¶ 7.) On February 17, 2004, Buskey called Archer-Cunningham and left her a message. (*Id.* ¶ 8.) On February 20, 2004, Archer-Cunningham spoke with Buskey about the Check, and told him that Stokes had cashed the Check issued by Ifetayo and that Archer-Cunningham did not sign the front of the check as the payor, even though the check

purportedly contained her signature. (Ex. D., at ¶¶ 7-8.) Archer-Cunningham also provided Buskey with a copy of the Check. (Defs.' 56.1 ¶ 11.) Upon receiving a copy of the Check, Buskey brought it to the location where the Check had been cashed. (*Id.* ¶ 12.) The check-cashing establishment provided Buskey with a copy of the photo identification card used by the person who had cashed the check. (*Id.* ¶ 13.) The name on the photo identification card was Heather Stokes, which matched the name provided by Archer-Cunningham. (*Id.* ¶ 14; Ex. C, at 44-45.) According to Buskey, he then contacted the New York City Police Department Legal Bureau and the District Attorney's Office, informed them of the information he had obtained, and was told he had probable cause to arrest Stokes. (Ex. C, at 59, 64-65; Ex. J.)

***2** In mid-February 2004, Buskey called Stokes, told her that there was an open complaint against her, and asked her to come to the precinct. (Defs.' 56.1 ¶¶ 17-18.) Stokes told Buskey that she was not going to take care of any business over the phone and hung up. (Defs.' 56.1 ¶ 19.)

According to Stokes, on March 4, 2004, she was in her home in Brooklyn, New York, when Buskey entered the residence without a warrant to arrest her. (Compl.¶¶ 12-13.) Stokes testified that the following events took place once Buskey was in the residence: Buskey called for back-up during the arrest and, as a result, over one dozen police officers arrived at Stokes' home. (Ex. 1, at 150.) According to plaintiff, Buskey's partner was shocked when he called for back-up and asked Buskey what he was doing. (*Id.,* at 49-50.) Stokes did not resist arrest, was placed in handcuffs, and was physically searched by Buskey. (Defs.' 56.1 ¶ 22; Ex. 1, at 149, 152-53.) Stokes is not claiming any physical injuries as a result of the arrest, but rather is claiming that the arrest resulted in emotional trauma. (Ex. 1, at 183.)

B. Procedural History

On January 3, 2005, Stokes filed the instant action against the City of New York, Buskey, and Archer-Cunningham. [2] This case was reassigned to the undersigned on February 10, 2006. On January 5, 2007, defendants moved for summary judgment on all claims. Oral argument was held on February 16, 2007.

II. STANDARD OF REVIEW

The standards for summary judgment are well-settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir.2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir.2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts ... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson,* "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (internal citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir .1984) (internal quotations omitted). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir.1996) (internal quotations omitted).

III. DISCUSSION

***3** Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan,* 443 U.S. 137, 145 n. 3 (1979). Section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

42 U.S.C. § 1983. For claims under section 1983, a plaintiff must prove "that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999) (citation omitted).

Defendants move for summary judgment on all claims. Specifically, defendants assert the following bases for their motion: (1) Buskey had probable cause to arrest Stokes and, in any event, is entitled to qualified immunity; (2) Stokes did not provide any evidence with which to prove excessive force; (3) Stokes cannot identify any unlawful policies or practices of the City that could have led to her arrest; and (4) Stokes cannot prove any cognizable state claims. The Court will examine each of Stokes' claims in turn-the unreasonable search and seizure claim, the false arrest/false imprisonment claim, the excessive force claim, the *Monell* claim, and the pendent state law claims.

A. Unreasonable Search and Seizure

Stokes asserts a claim for unreasonable search and seizure under the Fourth Amendment based upon Buskey's entry into Stokes' residence without a warrant for her arrest. As set forth below, there is a disputed issue of material fact regarding whether consent was given to enter the residence that cannot be resolved on summary judgment.

The Fourth Amendment protects individuals in their homes "against unreasonable searches and seizures." U.S. Const. amend. IV. "A warrantless search is '*per se* unreasonable ... subject only to a few specifically established and well-delineated exceptions.' " *United States v. Elliot,* 50 F.3d 180, 185 (2d Cir.1995) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973)). "To the Fourth Amendment rule ordinarily prohibiting the warrantless entry of a person's house as unreasonable *per se,* one jealously and carefully drawn exception recognizes the validity of searches with the voluntary consent of an individual possessing authority." *Georgia v. Randolph,* 126 S.Ct. 1515, 1520 (2006) (quotations and citations omitted); *accord United States v. Matlock,* 415 U.S. 164 (1974); *Koch v. Town of Brattleboro, Vt.,* 287 F.3d 162, 167 (2d Cir.2002) ("A search conducted pursuant to consent by an authorized third party does not require probable cause or a warrant.") (citing *Matlock,* 415 U.S. at 171 n. 7). Depending on the circumstances, "[t]hat person might be the householder against whom evidence is sought, or a fellow occupant who shares common authority over property, when the suspect is absent." *Randolph,* 126 S.Ct. at 1520 (citing *Schneckloth,* 412 U.S. at 222 and *Matlock,* 415 U.S. at 170). More specifically, "[t]he law in this circuit is well settled that a third party's consent will validate a search of places or items in which another maintains a privacy interest if two conditions are satisfied: the third party had (1) 'access to the area searched,' and (2) either '(a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access [to the area].' " *United States v. Snype,* 441 F.3d 119, 136 (2d Cir.2006) (quoting *Ehrlich v. Town of Glastonbury,* 348 F.3d 48, 53 (2d Cir.2003)).

***4** Although the defendants move for summary judgment on all claims, the defendants provide no explanation as to how this claim can be resolved by way of summary judgment. In fact, defendants acknowledge that "[t]o the extent that the Court construes plaintiff's complaint as alleging a claim for an arrest in plaintiff's home without a warrant, defendants concede there is likely an issue of fact." (Defs.' Mem. at 7 n. 1.) As a threshold matter, because the complaint asserts, among other things, that defendants violated Stokes' right "to be from unreasonable search & seizure [and] from warrantless search & seizure," the Court construes the complaint as raising such a claim.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Moreover, with respect to the unreasonable search and seizure claim, the Court finds that there is clearly an issue of fact that precludes summary judgment. In particular, although it is undisputed the Buskey entered the residence without a warrant, defendants contend that Stokes' husband was present at the residence at the time of arrest and gave Buskey permission to enter the home. (*Id.*) However, in his deposition, Stokes' husband testified that he did not observe the officers enter his house and did not give consent for them to enter. (Ex. L, at 27.) Moreover, Stokes testified that she did not give Buskey permission to enter. (Ex. C, at 76.) Therefore, there is a disputed issue of material fact on the core issue with respect to this claim-namely, whether Buskey had consent to enter the residence to execute the arrest.[3] Accordingly, summary judgment on this claim is denied.[4]

B. False Arrest and False Imprisonment

Defendants assert that Stokes' claims for false arrest and false imprisonment must be dismissed as a matter of law because probable cause existed for Stokes' arrest and that, in any event, Buskey is immune from suit based upon qualified immunity. As set forth below, the Court agrees.

1. Probable Cause

In New York, the claim colloquially known as "false arrest" is a variant of the tort of false imprisonment, and that tort is used to analyze an alleged Fourth Amendment violation in the section 1983 context. *See Singer v. Fulton Cty. Sheriff,* 63 F.3d 110, 118 (2d Cir.1995). To prevail, a plaintiff must prove four elements: "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not contest the confinement, and (4) the confinement was not otherwise privileged." *Broughton v. New York,* 37 N.Y.2d 451, 456 (N.Y.1975) (internal citations omitted). Only the last element is in dispute in the instant case-defendant argues that the arrest was privileged as a matter of law because it was supported by probable cause. The Second Circuit has established that "[t]he existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest.' " *Weyant,* 101 F.3d at 852 (quoting *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994)); *see also Fulton v. Robinson,* 289 F.3d 188, 195 (2d. Cir.2002) ("A § 1983 claim of false arrest based on the Fourth Amendment right to be free from unreasonable seizures may not be maintained if there was probable cause for the arrest."). "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* Furthermore, "[t]he validity of an arrest does not depend on an ultimate finding of guilt or innocence." *Peterson v. County of Nassau,* 995 F.Supp. 305, 313 (E.D.N.Y.1998) (citing *Pierson v. Ray,* 386 U.S. 547, 555 (1967), *overruled on other grounds by Harlow v. Fitzgerald,* 457 U.S. 800 (1982)). "Rather, the court looks only to the information the arresting officer had at the time of the arrest." *Id.* (citing *Anderson v. Creighton,* 483 U.S. 635, 641 (1987)). Finally, under the collective knowledge doctrine, defendant Buskey is permitted to rely on knowledge obtained by any other officers during the investigation. *See Savino v. City of New York,* 331 F .3d 63, 74 (2d Cir.2003) ("The collective knowledge doctrine provides that, for the purpose of determining whether an arresting officer had probable cause to arrest, 'where law enforcement authorities are cooperating in an investigation, ... the knowledge of one is presumed shared by all.' ") (quoting *Illinois v. Andreas,* 463 U.S. 765, 772 n. 5 (1983)).

***5** Defendants argue that probable cause to arrest existed based on the fact that Archer-Cunningham had called the police complaining that the Check had been illegally cashed. "An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity." *Singer,* 63 F.3d at 119; *see also McKinney v. George,* 726 F.2d 1183, 1187 (7th Cir.1984) ("If policemen arrest a person on the basis of a private citizen's complaint that if true would justify the arrest, and they reasonably believe it is true, they cannot be held liable for a violation of the Constitution merely because it later turns out that the complaint was unfounded."). Although Stokes argues that Archer-Cunningham never "filed" a written criminal complaint but rather simply called the police to report the problem concerning the Check, the application of this rule is not limited to the formal filing of a written complaint. Instead, the Second Circuit and other courts have found probable cause to exist where, in the absence of circumstances raising doubts as to the victim's veracity, the police received information directly from a purported victim of a crime without a formal written complaint. For example, in *Curley v. Village of Suffern,* 268 F.3d 65, 69-70 (2d Cir.2001), the Second Circuit found that an arrest of a bar owner for

assault was supported by probable cause where police officers based the arrest on information received at the scene. In reaching that decision, the Second Circuit reiterated that "[w]hen information is received from a putative victim or an eyewitness, probable cause exists, unless the circumstances raise doubt as to the person's veracity." *Curley,* 268 F.3d at 70; *see also Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir.2000) ("We have previously held that police officers, when making a probable cause determination, are entitled to rely on the victims' allegations that a crime has been committed.") (citing *Singer,* 63 F.3d at 119); *Miloslavsky v. AES Eng'g Soc'y Inc.,* 808 F.Supp. 351, 355 (S.D.N.Y.1992) ( "[A] law enforcement official has probable cause to arrest if he received information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth"). Moreover, "the veracity of complainants who are victims of the very crimes they report to police is assumed." *Miloslavsky,* 808 F.Supp. at 355; *accord Lee v. Sandberg,* 136 F.3d 94, 103 n. 5 (2d Cir.1997) (quoting *Miloslavsky* with approval); *see also* 2 Wayne LaFave, *Search and Seizure,* § 3.4(a), at 205 (noting that the Supreme Court has "proceeded as if veracity may be assumed when information comes from the victim of ... criminal activity").

In the instant case, it is uncontroverted that: (1) on February 20, 2004, putative victim Archer-Cunningham, as the founder and director of Ifetayo, reported to Buskey that one of the organization's checks had been cashed under the name Heather Stokes, a former employee, and that she (Archer-Cunningham) did not sign the check as payor, although the Check purported to contain her signature; (2) after that conversation, Archer-Cunningham provided Buskey with a copy of both the front and back of the Check; and (3) Buskey took the Check to the check-cashing establishment where it had been cashed and obtained a photo-identification card of the person who had cashed the check, which matched the name provided by Archer-Cunningham-namely, plaintiff Heather Stokes.

***6** Under New York law, "[a] person is guilty of Forgery in the Third Degree when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument." N.Y. Penal Law § 170.05. The Penal Law of the State of New York defines the term "falsely makes" as follows: "A person 'falsely makes' a written instrument when he makes or draws a complete written instrument in its entirety, or an incomplete written instrument, which purports to be an authentic creation of its ostensible maker or drawer but which is not such either because the ostensible maker or drawer is fictitious or because, if real, he did not authorize the making or drawing thereof." N.Y. Penal Law § 170.00. The Penal law defines the term "falsely completes" as follows: "A person 'falsely completes' a written instrument when, by adding, inserting or changing matter, he transforms an incomplete written instrument into a complete one, without authority of anyone entitled to grant it, so that such complete instrument appears or purports to be in all respects an authentic creation of or fully authorized by its ostensible maker or drawer." *Id.*

Therefore, based upon the uncontroverted evidence in the record, the Court concludes that Buskey had probable cause to believe that Stokes was guilty of Forgery in the Third Degree. Specifically, the information from the putative victim, Archer-Cunningham-that her authorized signature had been forged on an organization check issued to Stokes, a former employee, as the payee and cashed by Stokes-provided probable cause to charge Stokes with forgery because there was absolutely no reason for him to doubt Archer-Cunningham's veracity. [5] *See, e.g., Bell v. Murray,* 340 F.Supp.2d 323, 330 (W.D.N.Y.2004) (rejecting argument that police had insufficient basis to arrest individual where person to whom check was written was interviewed by police and stated check had been stolen from her); *People v. Swystun,* 509 N.Y.S.2d 220, 220 (N.Y.App.Div.1986) (finding that "information conveyed to the police officer concerning attempts by defendant to cash a stolen check at a local department store was sufficiently trustworthy to establish probable cause for officer to arrest defendant"); *see also Ex Parte Bryant,* 167 U.S. 104, 107-08 (1897) ("If it were true that three checks were missing from the check books of Morrison & Marshall to which the [appellant] had access, and no corresponding memoranda were made on the stubs; that the three checks were presented to the Commercial Bank; and that the appellant had no authority to sign checks for Morrison & Marshall,-the inference is at least a reasonable one that these checks were forged by the appellant."). Furthermore, probable cause was also buttressed by the additional investigation by Buskey in obtaining a copy of the Check from the victim and verifying from the check-cashing establishment that Stokes had cashed the Check. [6]

The three arguments made by Stokes in an attempt to avoid summary judgment on this claim are unavailing because, as discussed below, they fail to undermine or address the uncontroverted evidence outlined above indicating that Buskey had probable cause to arrest Stokes. First, Stokes argues that Buskey should have done additional investigation


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

before making the arrest. For example, Stokes criticizes Buskey for failing to: (1) interview Archer-Cunningham in person, rather than over the telephone; (2) have Archer-Cunningham sign a criminal court complaint or affidavit; or (3) submit the Check to experts for handwriting analysis. However, it is well-settled that there is no independent claim for a police officer's purported failure to investigate; rather, such allegations are considered, to the extent they are relevant, within the framework of claims for false arrest, false imprisonment, or malicious prosecution. *See Blake v. Race,* No. 01-CV-6954 (JFB), 2007 WL 952063, at *19 n. 18 (E.D.N.Y. Mar. 29, 2007); *Campbell v. Giuliani,* No. 99-CV-2603 (JG), 2000 U.S. Dist. LEXIS 1617, at *12 (E.D.N.Y. Feb. 16, 2000). Moreover, "[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore or eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y. City Transit Auth.,* 124 F.3d 123, 128 (2d Cir.1997); *see also Curley,* 268 F.3d at 70 ("Although a better procedure may have been for the officers to investigate plaintiff's version of events more completely, the arresting officer does not have to prove plaintiff's version wrong before arresting him."); *Cornett v. Brown,* 04-CV-0754 (DGT) (LB), 2006 U.S. Dist. LEXIS 22415, at *23 (E.D.N.Y. Mar. 30, 2006) ("[W]hile an arresting officer may not disregard information known to him in making an arrest, he is not required 'to investigate exculpatory defenses offered by the person being arrested or to assess the credibility of unverified claims of justification before making an arrest.' ") (quoting *Jocks v. Tavernier,* 316 F.3d 128, 135-36 (2d Cir.2003)); *Williams v. City of New York,* 02-CV-3693 (CBM), 2003 U.S. Dist. LEXIS 19078, at *12 (S.D.N.Y. Oct. 23, 2003) (noting that, once probable cause to arrest exists, police officers have no obligation to conduct additional investigation "to address every possible discrepancy or alternative prior to" the arrest even if "further investigation" would have "yielded results in plaintiffs' favor"); *Dukes v. City of New York,* 879 F.Supp. 335, 343 (S.D.N.Y.1995) ("Police officers need not conduct an investigation which exculpates an arrestee.") (citing *Baker v. McCollan,* 443 U.S. 137, 147 (1979)). As the Second Circuit has explained,

> ***7** [P]robable cause does not require an officer to be certain that subsequent prosecution of the arrestee will be successful. It is therefore of no consequence that a more thorough or more probing investigation might have cast doubt upon the situation.

*Krause,* 887 F.2d at 370. Thus, in the instant case, once Buskey learned from Archer-Cunningham that someone had allegedly forged her signature on the Check, that former employee Stokes had cashed the Check, and that Stokes had access to the Check, he had probable cause to arrest Stokes and did not have an independent duty to conduct additional investigation where there was no reason to doubt the victim's veracity. [7]

Second, the Court finds unpersuasive Stokes' effort to create an issue of fact by pointing to purported discrepancies between Archer-Cunningham's deposition testimony and Detective Buskey's testimony regarding what information she provided to Buskey in reporting the forgery. The Court recognizes that, in analyzing this motion for summary judgment, the Court must view the evidence in the light most favorable to Stokes, the non-moving party. Therefore, the above-referenced uncontroverted evidence is based upon the most favorable version of the evidence for the plaintiff contained in the testimony of Archer-Cunningham, rather than any additional details in Buskey's testimony which Stokes argues should not be credited. [8] In other words, the Court has relied solely on Archer-Cunningham's undisputed testimony to determine what information she provided to the police. Specifically, Archer-Cunningham testified that she told the police the following: (1) she called the 70th Precinct in mid-February 2004 to tell them that the Check had been signed without her authorized signature and that Stokes had cashed it (Ex. 2, at 87-88); (2) Archer-Cunningham is the only person authorized to sign checks issued by Ifetayo (Ex. 2, at 51); (3) that the Check at issue was made out to Heather Stokes as payee (Ex. 2, at 50); and (4) that she wanted the matter "documented and investigated" (Ex. 2, at 49-50). In addition, Archer-Cunningham testified that she provided Buskey with a copy of the Check (Ex. 2, at 52.) This deposition testimony is also completely consistent with her recent affidavit (submitted with defendants' summary judgment motion) which provides:

> On February 13, 2004, I called the 70th Precinct of the New York City Police Department to report that a check in the amount of approximately Four Hundred and Thirty-One Dollars ($431.00) (herein referred to as "the check") from Ifetayo had been cashed by Heather Stokes without an

authorized signature. I was the only person to sign checks on behalf of Ifetayo on the account on which the check was drawn. I did not sign the check from Ifetayo that was cashed by Heather Stokes. On February 20, 2004, I spoke with Detective Mark Buskey from the New York City Police Department about the check that was cashed by a former employee of Ifetayo, Heather Stokes. I told Detective Mark Buskey that Heather Stokes cashed the check issued by Ifetayo and that I did not sign the front of the check as payor. After Heather Stokes' arrest, I told the District Attorney's Office that I did not want to pursue the prosecution of Heather Stokes.

***8** (Ex. D., at ¶¶ 4-9.) In short, as discussed above, based upon Archer-Cunningham's uncontroverted testimony regarding information provided to the police (completely apart from any disputed details of Buskey's conversation with Archer-Cunningham, as recounted by Buskey), there was probable cause to arrest Stokes.

Third, the Court finds Stokes' arguments regarding Buskey's alleged lack of credibility and purported improper motives for the arrest to be similarly unavailing because such issues have no bearing on the probable cause analysis in this case. An officer's personal, subjective opinion as to whether there is probable cause to arrest is irrelevant; rather, probable cause is analyzed objectively. *See Maryland v. Pringle,* 540 U.S. 366, 371(2003); *see also Whren v. United States,* 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *Mistretta v. Prokesch,* 5 F.Supp.2d 128, 135 (E.D.N.Y.1998) ("Even less savory ulterior motives are irrelevant as long as the facts available to the arresting officer satisfy the probable cause standard."). Moreover, "[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore or eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti,* 124 F.3d at 128; *see also Curley,* 268 F .3d at 70 ("Although a better procedure may have been for the officers to investigate plaintiff's version of events more completely, the arresting officer does not have to prove plaintiff's version wrong before arresting him."); *Cornett,* 2006 U.S. Dist. LEXIS 22415, at *23 ("[W]hile an arresting officer may not disregard information known to him in making an arrest, he is not required 'to investigate exculpatory defenses offered by the person being arrested or to assess the credibility of unverified claims of justification before making an arrest.' ") (quoting *Jocks,* 316 F.3d at 135-36). Moreover, as noted above, even if the Court uses only the victim's testimony (rather than Buskey's) regarding the information supplied to the police, there was probable cause for the arrest.

Finally, even though Archer-Cunningham told the District Attorney's Office following the arrest that she did not want to pursue the prosecution of Stokes and the Office declined to prosecute, that subsequent decision is not a basis for undermining the probable cause determination at the time of arrest. *See Krause,* 887 F.2d at 370 ("Even if [the plaintiff] had actually gone to trial and been acquitted, that result would have no bearing on the determination of whether probable cause existed to arrest him .").

In sum, the objective, uncontroverted facts establish probable cause for plaintiff's arrest. Accordingly, Stokes' false arrest/false imprisonment claim cannot survive summary judgment.

### 2. Qualified Immunity

In the alternative, even assuming *arguendo* that probable cause to arrest Stokes on the forgery charge was lacking, the Court finds that Buskey is entitled to summary judgment based upon the doctrine of qualified immunity.

***9** The doctrine of qualified immunity shields government officials from civil liability if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818. As the Second Circuit has noted, "[t]his doctrine is said to be justified in part by the risk that the 'fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.' " *McClellan v. Smith,* 439 F.3d 137, 147 (2d Cir.2006) (quoting *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999) (quotation omitted)). Thus, qualified immunity is not merely a defense, but rather is also "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v.. Forsyth,* 472 U.S. 511, 526 (1985). Accordingly, the availability of qualified immunity should be decided by a court "at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 U.S. 224, 227 (1991).

When analyzing qualified immunity in the context of a suit for damages based on an arrest allegedly without probable cause, a police officer is immune from such suit " 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.' " *Posr v. Court Officer Shield No. 207,* 180 F.3d 409, 416 (2d Cir.1999) (quoting *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991)). The Second Circuit has defined this standard,

which is often referred to as "arguable probable cause," as follows:

> Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well established law. It is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials-like other officials who act in ways they reasonably believe to be lawful-should not be held personally liable.

*Cerrone v. Brown,* 246 F.3d 194, 203 (2d Cir.2001) (quotations and citations omitted). Moreover, under that standard, "an 'arresting officer is entitled to qualified immunity as a matter of law if the *undisputed facts* and all permissible inferences favorable to the plaintiff show ... that officers of reasonable competence could disagree on whether the probable cause test was met .' " *McCllellan,* 439 F.3d at 147-48 (quoting *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987)).

In the instant case, given the information provided to the police by Archer-Cunningham-including that she did not authorize her signature on the Check and that the Check was cashed by Stokes, a former employee of Ifetayo who had access to the Check-the Court concludes that, at a minimum, reasonable officers could disagree on whether probable cause existed to arrest Stokes on the forgery charge. Therefore, because, at a minimum, arguable probable cause existed for the arrest, Buskey is entitled to summary judgment based upon the doctrine of qualified immunity, even if probable cause was lacking.

D. Excessive Force

***10** Stokes has alleged excessive force was used by Buskey during the arrest. Specifically, Stokes argues that the force used-namely, being frisked and handcuffed-was excessive because Buskey entered the residence without a warrant and without consent. As set forth below, the routine frisking and handcuffing of a defendant during an arrest cannot be the basis of a Fourth Amendment excessive force claim and, thus, such a claim cannot survive summary judgment under the facts of this case.

A police officer's use of force is excessive in violation of the Fourth Amendment, "if it is objectively unreasonable 'in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation.' " *Maxwell v. City of New York,* 380 F.3d 106, 108 (2d Cir.2004) (quoting *Graham v. Connor,* 490 U.S. 386, 397 (1989)). More specifically, "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham,* 490 U.S. at 396 (citations and internal quotations omitted).

Physical force is often necessary when effectuating arrests or executing search warrants and, thus, "not every push or shove" is unconstitutionally excessive, "even if it may later seem unnecessary in the peace of a judge's chambers." *Maxwell,* 380 F.3d at 108 (citation and internal quotation marks omitted). The analysis involves an inquiry into the totality of the circumstances, "including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of others and whether he is actively resisting arrest." *Sullivan v. Gagnier,* 225 F.3d 161, 165 (2d Cir.2000) (citations omitted). "Officers may not ... gratuitously inflict pain in a manner that is not a reasonable response to the circumstances." *Diaz v. City of New York,* No. 00-CV-2944 (JMA), 2006 U.S. Dist. LEXIS 93923, at *18 (E.D.N.Y. Dec. 29, 2006) (citing *Amnesty Am.,* 361 F.3d at 124). However, "the reasonableness inquiry does not allow [the court] to substitute [its] own viewpoint; [the court] must judge the officer's actions 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' " *Papineau v. Parmley,* 465 F.3d 46, 61 (2d Cir.2006) (quoting *Graham,* 490 U.S. at 396).

Here, Stokes' claim of excessive force is, in essence, based on the argument that the entry into the apartment to execute the arrest was illegal and, therefore, any force during the arrest is *per se* excessive. However, in *Jones v. Parmley,* 465 F.3d 46, 62 (2d Cir.2006), the Second Circuit clarified a prior decision in *Atkins v. New York City,* 143 F.3d 100 (2d Cir.1998), and

reiterated that the existence of an unlawful seizure does not necessarily mean that any use of force during such seizure is *per se* excessive and unlawful. More specifically, in *Jones,* the Court rejected the argument that force used during an arrest without probable cause is *per se* excessive and, instead, emphasized that the same reasonableness standard articulated in *Graham* applies to those situations as well:

> ***11** There was ... no need for this Court in *Atkins* to reach the question of whether any force used in an arrest lacking probable cause is *per se* excessive. Such a construction would read the highly fact-specific situation in which *Atkins* arose too broadly because it would appear to suggest that any force employed by a police officer would be unlawful so long as probable cause did not exist, even if the detainee had threatened the officer with significant harm. We are further mindful that the Supreme Court held in *Graham* that "*all* claims that law enforcement officers have used excessive force ... should be analyzed under the ... 'reasonableness' standard" of the Fourth Amendment, thereby establishing a general requirement. 490 U.S. at 395 (emphasis in original). The *Atkins* court clearly did not intend to create or substitute a new standard for arrests lacking probable cause, and the reasonableness test established in *Graham* remains the applicable test for determining when excessive force has been used, including those cases where officers allegedly lack probable cause to arrest.

*Id.* at 62. Although the issue in this case is not a lack of probable cause to arrest (as discussed *supra* ) but rather a dispute about whether the initial entry into the residence to effectuate the arrest was lawful, the Jones holding applies with equal force. In other words, this Court rejects Stokes' position that, if the entry into the residence was illegal, then any force subsequent to that entry was illegal and excessive. Instead, as with every case, Stokes must prove that the force used during the arrest was excessive under the *Graham* standard.

After analyzing Stokes' excessive force claim under the *Graham* standard, the Court concludes that it cannot survive summary judgment. As set forth below, the only force to which Stokes points is a routine frisk and handcuffing at the time of arrest. Such force at the time of arrest, absent something more, cannot constitute a cognizable excessive force claim.

"Frequently, a reasonable arrest involves handcuffing the suspect, and to be effective handcuffs must be tight enough to prevent the arrestee's hands from slipping out." *Esmont v. City of New York,* 371 F.Supp.2d 202, 214 (E.D.N.Y.2005) (citing *Cavazos v. Voorhies,* 00-CV-7929 (RAG), 2002 WL 31017492, at *3 (N.D.Ill. Sept. 9, 2002)). "While it is not *per se* reasonable under the *Graham* standard to apply handcuffs during an arrest ... 'there is still no clear authority on whether and under what circumstances, if any, a person has a constitutional right not to be handcuffed in the course of an arrest.' " *Scott v. County of Nassau,* No. 94-CV-4291 (NGG), 1998 U.S. Dist. LEXIS 19680, at * 14 (E.D.N.Y. Dec. 11, 1998) (quoting *Soares v. State of Connecticut,* 8 F.3d 917, 921-22 (2d Cir.1993)). To determine whether handcuffing of an arrestee is reasonable, the handcuffing must be viewed "in light of the minimal amount of force necessary to maintain custody of [the arrestee]." *Esmont,* 371 F.Supp.2d at 215. "[I]n evaluating the reasonableness of handcuffing, a Court is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the arrestee's pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists." *Id.* (citing *Burchett v. Kiefer,* 310 F.3d 937, 944-45 (6th Cir.2002)) (additional citation omitted).

***12** In this instance, Stokes makes no claim that the handcuffs were too tight, that she made any complaints of discomfort to defendants, or that she suffered any physical injury as a result of the handcuffing. Under such circumstances, this Court concludes, as a matter of law, that the handcuffing of Stokes cannot constitute excessive force. In *Esmont,* the court noted that there were no cases "permitting a plaintiff to establish an excessive force claim based on tight handcuffing in the absence of a request to loosen them." *Esmont,* 371 F.Supp.2d at 215 (collecting cases); *Scott,* 1998 U.S. Dist. LEXIS 19680, at *14 ("Without additional allegations of excessive force or blatant disregard for pre-existing injuries, complaints, or requests for medical treatment, the use of handcuffs has been found to be

reasonable.") (collecting cases); *Gilles v. Davis,* 427 F.3d 197, 207-08 (3d Cir.2005) (holding that where plaintiff did not complain about pain caused by handcuffs or demonstrate any signs of discomfort and did not seek medical attention, "the facts alleged constitute insufficient evidence as a matter of law for excessive force by handcuffing").

Similarly, with respect to the pat-down search made incident to Stokes' arrest, Stokes sets forth no evidence suggesting that the search was conducted in a non-routine manner. At her deposition, Stokes testified that Buskey patted her down on her clothing. (Stokes Dep. at 152-53.) It is axiomatic that a lawful arrest "establishes the authority to search" and such a search is "reasonable" under the Fourth Amendment. *United States v. Robinson,* 414 U.S. 218, 235 (1973). Moreover, the police are not required to have probable cause to believe that an arrestee in fact had weapons, contraband or evidence on their persons. *See United States v. Chadwick,* 433 U.S. 1, 14 (1977), *overruled on other grounds by California v. Acevedo,* 500 U.S. 565, 575-79 (1991). Given the record in this case, the pat-down incident to arrest conducted by Buskey was reasonable as a matter of law under the Fourth Amendment and cannot be the basis for an excessive force claim. [9]

In sum, Stokes has alleged no force, or provided any evidence of force, beyond routine handcuffing and a pat-down incident to the arrest which are both proper under the Fourth Amendment and, thus, cannot provide a legal basis for an excessive force claim. [10] Accordingly, summary judgment on the excessive force claim is granted.

F. Municipal Liability

Defendants argue that summary judgment should be granted in their favor because plaintiff lacks evidence that the alleged unconstitutional conduct of defendant Buskey was the product of an official policy or custom.

The Supreme Court expressly rejected liability pursuant to a theory of *respondeat superior* for purposes of section 1983 in *Monell. See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978) ("[A] municipality cannot be held liable *solely* because it employs a tortfeasor-or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."). Thus, "[a] municipality will not be held liable under Section 1983 unless the plaintiff can demonstrate that the allegedly unconstitutional action of an individual law enforcement official was taken pursuant to a policy or custom 'officially adopted and promulgated by that [municipality's] officers.' " *Abreu v. City of New York,* No. 04-CV-1721 (JFB), 2006 U.S. Dist. LEXIS 6505, at *11 (E.D.N.Y. Feb. 22, 2006) (quoting *Monell,* 436 U.S. at 690). "[M]unicipal liability under § 1983 attaches where-and only where-a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers. *City of Canton v. Harris,* 489 U.S. 378, 389 (1989) (quoting *Pembaur v. Cincinnati,* 475 U.S. 469, 483-84 (1986)). An individual's misconduct will not result in *respondeat superior* liability for his supervisors absent specific allegations that he acted pursuant to an official policy or custom. *Ricciuti v. N.Y. City Transit Auth,* 941 F.2d 119, 123 (2d Cir.1991). However, "[a] court may draw the inference of the existence of a policy or custom 'when a plaintiff presents evidence that a municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.' " *Caidor v. M & T Bank Corp.,* No. 05-CV-0297 (FJS/GJD), 2006 U.S. Dist. LEXIS 22980, at *35-36 (N.D.N.Y. Mar. 27, 2006) (quoting *Grifin-Nolan v. Providence Wash. Ins. Co.,* No. 04-CV-1453 (FJS/GJB), 2005 U.S. Dist. LEXIS 12902, *10 (N.D.N.Y. Jun. 20, 2005) (quotation omitted)). However, " 'the mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference.' " *Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir.1995) (internal citation and quotation omitted).

***13** The Court finds that the municipal liability claim should be dismissed because plaintiff has failed to adduce any evidence, beyond mere speculation and conjecture, that the alleged unconstitutional conduct committed by Buskey was connected to any municipal policy, custom or practice. *See, e.g., Prowisor v. Bon-Ton, Inc.,* 426 F.Supp.2d 165, 174 (S.D.N.Y.2006) ("The doctrine of *respondeat superior* is insufficient to support a claim against a municipal employer, as are conclusory assertions of a custom or policy in the absence of factual allegations or inferences.") (citing *Zahra,* 48 F.3d at 678); *see also Young v. County of Fulton,* 999 F.Supp. 282, 285-86 (N.D.N.Y.1998) (granting summary judgment on municipal liability claim under section 1983 because plaintiffs relied solely on conjecture and hyperbole to indicate a custom or practice on the part of the defendants); *Roberts by Roberts v. City of New York,* 753 F.Supp. 480, 485 (S.D.N.Y.1990) (same).

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

G. State Law Claims

Defendants also move for summary judgment on Stokes' pendent state law claims for false arrest, assault and battery, and negligent hiring/retention. As set forth below, the Court concludes that these claims cannot survive summary judgment.

With respect to the false arrest claim, it is well-settled that the analysis of a false arrest/false imprisonment claim under New York law is "substantially the same" as that under the Fourth Amendment. *See Weyant,* 101 F.3d at 852. Thus, "the existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest ... whether that action is brought under state law or under § 1983." *Id.* (citations and quotations omitted). As discussed *supra,* the Section 1983 false arrest/false imprisonment claim must fail because probable cause to arrest existed and, thus, the false arrest/false imprisonment claims under state law fails for the same reason.

Similarly, the Court's analysis of the excessive force claim under Section 1983 likewise precludes recovery under state law for assault and battery. *Kramer v. City of New York,* No. 04-CV-0106 (HB), 2004 WL 2429811, at *11 (S.D.N.Y. Nov. 1, 2004) ("In the context of state officers performing their lawful duties, New York State law regarding assault and battery parallels the federal laws regarding excessive force.").[11] Specifically, under New York law, reasonable force used during a lawful arrest is privileged. *See, e.g., Arnold v. State,* 486 N.Y.S.2d 94, 95-96 (N.Y.App.Div .1985). Thus, the routine handcuffing and pat-down of an individual during a lawful arrest, without any evidence to suggest that such acts were performed in an unreasonable manner (such as an unreasonable tightening of the handcuffs causing injury), cannot provide a basis for a jury to find in plaintiff's favor on an assault and battery claim. *See, e.g., Kramer,* 2004 WL 2429811, at *11 (dismissing assault and battery claims based on handcuffing during lawful arrest); *Palmer v. Town of Eastchester,* No. 96-CV-4860 (BSJ), 1997 WL 811536, at *4 (S.D.N.Y. Apr. 9, 1997) (handcuffing and pat-down during lawful arrest was privileged and defeated state law claims for assault and battery). Accordingly, defendants are entitled to summary judgment on Stokes' assault and battery claim.

***14** Finally, with respect to the negligent hiring and/or retention claims, the Court notes as a threshold matter that, because Stokes' opposition papers did not address defendants' motion for summary judgment on this claim, the claim is deemed abandoned and summary judgment could be granted on that basis alone. *See Bellegar de Dussuau v. Blockbuster, Inc.,* No. 03-CV-6614 (WHP), 2006 WL 465374, at *7 (S.D.N.Y. Feb. 28, 2006) (finding claim abandoned by virtue of plaintiff's failure to address it in opposition to defendant's summary judgment motion on the claim); *see also DeVito v. Barrant,* No. 03-CV-1927 (DLI), 2005 WL 2033722, at *10 (E.D.N.Y. Aug. 23, 2005) (same); *Taylor v. City of New York,* 269 F.Supp.2d 68, 75 (E.D.N.Y.2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."); *Arias v. NASDAQ/AMEX Mkt. Group,* No. 00-CV-9827 (MBM), 2003 WL 354978, at *13 (S.D.N.Y. Feb. 18, 2003) (dismissing claims as "abandoned" where plaintiff's summary judgment opposition "neither refute[d] nor even mention[ed]" defendant's argument for summary judgment on two of his claims); *see also* Local Civ. Rule 7.1 ("[A]ll oppositions thereto shall be supported by a memorandum of law, setting forth the points and authorities relied upon ... in opposition to the motion.... Willful failure to comply with this rule may be deemed sufficient cause for the ... granting of a motion by default."). In any event, as set forth below, the Court has examined the merits of this claim and concluded that it must be dismissed as a matter of law.

It is well settled under New York law that "[a] claim for negligent hiring or supervision can only proceed against an employer for an employee acting outside the scope of her employment." *Colodney v. Continuum Health Partners, Inc.,* No. 03-CV-7276 (DLC), 2004 U.S. Dist. LEXIS 6606 (S.D.N.Y. Apr. 15, 2004). Thus, "[w]here an employee is acting within the scope of his or her employment, the employer is liable under the theory of *respondeat superior* and no claim may proceed against the employer for negligent hiring or retention." *Rossetti v. Bd. of Educ.,* 716 N .Y.S.2d 460, 462 (N.Y.App.Div.2000); *see also Murns v. City of New York,* No. 00-CV-9590 (DLC), 2001 WL 515201, at *5 (S.D.N.Y. May 15, 2001). In the instant case, it is undisputed that Buskey was acting within the scope of his employment. Accordingly, summary judgment on this claim is warranted.

IV. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is (1) denied as to the unreasonable search and seizure claim; (2) granted as to the false arrest and false

imprisonment claims; (3) granted as to the excessive force claim; (4) granted as to the municipal liability claim; and (5) granted as to the pendent state claims.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 1300983

## Footnotes

1 References to Defs.' 56.1 Statement are undisputed unless otherwise indicated.

2 According to the docket, Archer-Cunningham has never been served in this lawsuit. Accordingly, because Stokes has not served Archer-Cunningham or shown good cause for her failure to do so, Stokes' claims against Archer-Cunningham are dismissed without prejudice pursuant to Rule 4(m) of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 4(m); *see, e.g., Rosenbaum v. Johar,* No. 05-CV-24748 (RNC), 2007 U.S. Dist. LEXIS 24748, at *9 (D.Conn. Mar. 25, 2007); *Lykes Lines Ltd. LLC v. Bringer Corp.,* No. 04-CV-4460 (RMB), 2007 U.S. Dist LEXIS 19785, at *11-* 12 (S.D.N.Y. Mar. 12, 2007); *Astarita v. Urgo Butts & Co.,* No 96 Civ. 6991(PKL), 1997 U.S. Dist. LEXIS 8112, 1997 WL 317028, at *5 (S.D.N.Y. Jun. 10, 1997).

3 It does not appear that Buskey is moving for summary judgment on this claim on the grounds of qualified immunity. In any event, to the extent he is, the Court concludes that qualified immunity at this stage would be unwarranted because of the disputed issue of fact on consent. In other words, if Stokes' contention is correct and Buskey entered the residence without a warrant and without consent, his actions would not be protected by qualified immunity under the facts of this case.

4 In their Reply Brief, defendants argue that, even if the entry was illegal, plaintiff is only entitled to nominal damages of $1. The Court will not address this issue at the summary judgment stage, but rather will allow parties to brief legal issues regarding damages in connection with the trial on the above-referenced claim.

5 The Court recognizes that “the mere attempted negotiation or utterance of a forged instrument cannot, of itself, establish a presumption that defendant had knowledge the instrument was forged.” *People v. Miller,* 537 N.Y.S.2d 318, 320 (N.Y.App.Div.1989) (finding insufficient proof of knowing possession of forged instrument where, among other things, there was no proof as to how defendant could have acquired check and it was stipulated that the forged signature was not in the defendant's handwriting). However, “[g]uilty knowledge of forgery may be shown circumstantially by conduct and events.” *People v. Johnson,* 483 N.E.2d 120, 124 (N.Y.1985); *see also Krause v. Bennett,* 887 F.2d 362, 371 (2d Cir.1989) (“While in this case the element of knowledge was essential in finding [the plaintiff] had committed the crime charged, [the officer] was entitled to rely on the implications of the information known to him in assessing whether [the plaintiff] possessed this knowledge.”). As noted above, the circumstantial evidence that, among other things, Stokes (1) had access to the checks by virtue of her employment at Ifetayo, and (2) cashed the check containing the forged signature, were sufficient, at a minimum, to establish probable cause for her arrest.

6 Although Stokes also argues that there was no probable cause to support her arrest for the charge of Criminal Impersonation in the Second Degree, the Court need not address that issue on a false arrest claim because probable cause existed as to the forgery charge, and, thus, the arrest is justified even if there were other charges for which no probable cause existed. Thus, whether or not there was also probable cause for the criminal impersonation charge is irrelevant for purposes of the false arrest claim. As the Second Circuit has observed, “a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and that it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

charge actually invoked by the arresting officer at the time of arrest." *Jaegly v. Couch,* 439 F.3d 149, 154 (2d Cir.2006) (citing *Devenpeck v. Alford,* 543 U.S. 146, 153 (2004) (holding that the probable cause inquiry is based upon whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause)).

7 In any event, as noted above, Buskey did conduct additional investigation by obtaining a copy of the Check from the victim and confirming with the check-cashing establishment that Stokes had, in fact, cashed the check. Although such investigation was not required, it provided corroboration of the victim's account.

8 The Court notes that the purported discrepancies raised by Stokes between the accounts of Buskey and Archer-Cunningham are not material to the Court's analysis of the probable cause issue. For example, Stokes argues that Buskey incorrectly stated in his deposition that Archer-Cunningham told him that Stokes signed Archer-Cunningham's name to the check at issue. However, even if she did not specifically identify who had forged her name to Buskey, Archer-Cunningham has stated in sworn testimony that she told the police that her signature was forged on the Check and Stokes, her former employee, had cashed the Check without authorization. Stokes has pointed to no evidence to contradict that testimony and, based upon that information and the strong inference that could be drawn therefrom, there was probable cause to believe that Stokes had forged the check.

9 Although Stokes notes in her Counter 56.1 Statement that the search was done by an officer of the opposite sex, she does not argue that the search was *per se* improper because she is female and Buskey is male, nor does she attempt to make any specific argument regarding the manner of the pat-down search to support an excessive force claim. In any event, courts have repeatedly found that the fact that a pat-down search incident to arrest is conducted by an officer of the opposite sex of the arrestee does not, absent some additional evidence of improper conduct during the search, convert a lawful search incident to arrest into an unlawful one. *See, e.g., Caldwell v. Rubbo,* No. 92-7177, 1993 U.S.App. LEXIS 20412, at *3 (4th Cir.1993) ("Caldwell had no constitutional right to have the pat-down search performed by someone of her own gender."); *Walton v. City of Southfield,* 995 F.2d 1331, 1339 (6th Cir.1993) (summary judgment granted to male officer who conducted search of female suspect), *overruled on other grounds by Saucier v. Katz,* 533 U.S. 194 (2001); *Ziegler v. Doe,* No. 01-CV-10377 (DML), 2003 WL 21369254, at *3 (E.D.Mich. Jun. 11, 2003) ("[T]he plaintiff alleges a generalized right to a non-invasive pat-down search by an officer of the same sex, a rule that would not only be impractical, but also has no support in the jurisprudence."); *Wyatt v. Slagle,* 240 F.Supp.2d 931, 939-940 (S.D.Iowa 2002) (holding that opposite-sex pat-down searches conducted incident to arrest were reasonable under the Fourth Amendment and granting summary judgment for defendant officer in Section 1983 action); *Greiner v. City of Champlin,* 816 F.Supp. 528, 543 (D.Minn.1993) ("Plaintiffs do not specifically argue that the method in which [the police officer] conducted the search gave rise to the constitutional violation, but instead implies [sic] that the fact that a male officer rather than a female officer conducted the search means a *per se* constitutional violation occurred. The Court disagrees."), *aff'd in part, remanded in part on other grounds,* 27 F.3d 1346 (8th Cir.1994). This holding has also been applied to misdemeanor arrests. *See, e.g., Martin v. Swift,* 781 F.Supp. 1250, 1253 (E.D.Mich.1992) (holding that there is "no question that [the pat-down search of a female arrestee on a misdemeanor by a male officer] *would* pass constitutional muster" and noting "[t]o find otherwise would require every police car to carry two officers, one male and one female, so that misdemeanants would be searched by officers of the same sex") (emphasis in original). Here, no evidence has been proffered regarding anything improper about Buskey's conduct during the pat-down search.

10 At oral argument, counsel for plaintiff acknowledged that no physical excessive force was used against plaintiff and, instead, argued that plaintiff was subjected to excessive force in the sense of mental and emotional distress: "I don't think there's physical excessive force, your Honor. I think there's excessive force in the sense of mental and emotional distress." (Oral Argument Tr. at 14.) However, to the extent plaintiff

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

claims that she suffered mental or emotional distress from the alleged unlawful entry of the police officers into her home to arrest her, that issue would be considered under the unreasonable search and seizure claim discussed *supra* and does not provide a separate avenue for recovery under an excessive force claim where no physical excessive force is alleged. *See, e.g., Davis v. United States,* 03-CV-1800 (NRB), 2004 WL 324880, at *28 n. 6 (S.D.N.Y. Feb. 19, 2004) ("Emotional pain and suffering cannot form the basis of an excessive force claim .") (collecting cases).

11 The Court recognizes that New York State law may differ in a situation where there has been an unlawful arrest because, unlike the rule described by the Second Circuit in *Jones,* 465 F.3d 46, and discussed *supra* as to Stokes' excessive force claim, some New York courts have suggested that, under New York law, any touching during an unlawful arrest is a battery. *See, e.g., Johnson v. Suffolk Cty. Police Dep't,* 665 N.Y.S.2d 440 (N.Y.App.Div.1997) ("As the arrest of the plaintiff by the defendant police officer ... was unlawful, [the officer] committed a battery when he touched the plaintiff during that arrest ."); *Budgar v. State of New York,* 414 N.Y.S.2d 463, 466 (N.Y.Ct.Cl.1979) ("[S]ince the arrest was unlawful, a technical assault and battery occurred when the claimant was handcuffed and forcibly placed in the State police car."). However, that potential theory of recovery under state law cannot arise here because, as discussed *supra,* the Court has concluded that there was probable cause for plaintiff's arrest and, thus, the arrest was lawful.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 6318280
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

George TARANTO, et al., Plaintiffs,
v.
PUTNAM COUNTY, et al., Defendants.

No. 21-CV-2455 (KMK)
|
Signed September 28, 2023

**Attorneys and Law Firms**

Thomas Martin Gambino, Esq., Law Office of Thomas M. Gambino & Associates PC, Poughkeepsie, NY, Counsel for Plaintiffs.

James A. Randazzo, Esq., Portale Randazzo LLP, White Plains, NY, Counsel for Defendants.

Drew William Sumner, Esq., Sumner Law LLP, White Plains, NY, Counsel for Defendants.

OPINION & ORDER

KENNETH M. KARAS, District Judge:

***1** Plaintiffs George Taranto ("Taranto"), Karen Taranto, and Christopher P. Taranto and Kerrianne Taranto-Garabo as Executors for the Estate of Taranto (altogether, "Plaintiffs") bring this Action, pursuant to 42 U.S.C. § 1983, against Putnam County ("County"), the Putnam County Sheriff's Office, Sheriff Robert L. Langley, Jr. ("Langley"), Deputy Sheriff Ronald C. Yeager ("Yeager"), Investigator Daniel Hunsberger ("Hunsberger"), Deputy Sheriff Ryan Diskin ("Diskin"), Deputy Sheriff Vincent Dalo ("Dalo"), Sergeant William Quick ("Quick"), and Officers John Does 1–10 (collectively, "Defendants"), in their individual and official capacities, alleging several constitutional violations and state claims. (*See generally* Second Am. Compl. (Dkt. No. 31).) Before the Court is Defendants' Motion to Dismiss (the "Motion") the claims in the Second Amended Complaint ("SAC") except for the Fourth Amendment excessive force claim, failure to intervene claims against the on-scene officers, state law claims for assault, battery, and wrongful death, and Karen Taranto's claims for loss of consortium, (*see* Notice of Defs.' Mot. To Dismiss (Dkt. No. 32)).[1] For the following reasons, Defendants' Motion To Dismiss is granted in part and denied in part.

I. Background

A. Allegations and Materials Appropriately Considered

As a threshold matter, the Court must determine whether it may consider the (1) Notice of 50-h Hearing attached to Defendants' Motion, (*see* Dkt. No. 34) or the (2) Langley Video Interview, New York Attorney General Complaint, Putnam County Daily Voice News Article, 50-h Adjournment Letters, and Letter from Dr. Frank Kessler attached to Plaintiffs' Opposition (*see* Dkt No. 38) at this stage of the litigation.[2]

1. Applicable Law

Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the pleadings themselves," because "[t]o go beyond the allegations in the [c]omplaint would convert the Rule 12(b)(6) motion to dismiss into one for summary judgment pursuant to [Rule] 56." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002) (citation omitted). However, "the Court's consideration of documents attached to, or incorporated by reference in the [c]omplaint, and matters of which judicial notice may be taken, would not convert the motion to dismiss into one for summary judgment." *Id.* (citations omitted); *see also Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (explaining that "when ruling on Rule 12(b)(6) motions to dismiss," courts may "consider the complaint in its entirety ..., documents incorporated into the complaint by reference, and matters of which a court may take judicial notice" (quotation marks omitted)); *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) ("In deciding a Rule 12(b)(6) motion, the court may consider 'only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken.' " (alteration omitted) (quoting *Samuels v. Air Transp. Loc. 504*, 992 F.2d 12, 15 (2d Cir. 1993))). Under the Federal Rules of Evidence, a court may take judicial notice of a fact outside of the pleadings provided that the fact "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

2. Application

***2** "Generally, a court may incorporate documents referenced where (1) [the] plaintiff relies on the materials in framing the complaint, (2) the complaint clearly and substantially references the documents, and (3) the document's authenticity or accuracy is undisputed." *Stewart v. Riviana Foods Inc.*, No. 16-CV-6157, 2017 WL 4045952, at *6 (S.D.N.Y. Sept. 11, 2017) (emphasis omitted) (collecting cases); *see also* *Dunkelberger v. Dunkelberger*, No. 14-CV-3877, 2015 WL 5730605, at *5 (S.D.N.Y. Sept. 30, 2015) ("To be incorporated by reference, the complaint must make a clear, definite, and substantial reference to the documents, and to be integral to a complaint, the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint." (alterations omitted) (quoting *Bill Diodato Photography LLC v. Avon Prods., Inc.*, No. 12-CV-847, 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012))).

Even if not incorporated by reference, a document on which the complaint "solely relies and which is integral to the complaint," *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (citation, emphasis, and quotation marks omitted), or a document on which "the complaint relies heavily on upon its terms and effect," *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quotation marks omitted), may also be considered by the Court on a motion to dismiss. Documents are "integral" where the plaintiff had to rely on their content "in order to explain what the actual unlawful course of conduct was on which the [d]efendants embarked." *Thomas*, 232 F. Supp. 2d at 276; *see also* *Gantt v. Ferrara*, No. 15-CV-7661, 2017 WL 1192889, at *14 (S.D.N.Y. Mar. 29, 2017) (holding documents were integral to the complaint where the plaintiff "relied heavily upon [them] in framing the [c]omplaint" (alterations in original) (citation omitted)). Additionally, "no serious question as to [the documents'] authenticity can exist," *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991), and it must be "clear on the record that no dispute exists regarding the authenticity or accuracy of the document," *DiFolco*, 622 F.3d at 111 (citation and quotation marks omitted).

Plaintiffs' Second Amended Complaint states that "Defendants have not held a hearing on this claim pursuant to General Municipal Law 50-h." (SAC ¶ 21.) That is Plaintiffs' sole reference to the 50-h Hearing. (*See generally id.*) No Party has attempted to explain how the Notice of 50-h Hearing, 50-h Adjournment Letters, and Letter from Dr. Frank Kessler regarding Taranto's ability to testify were clearly referenced in or integral to the Second Amended Complaint. Indeed, the Second Amended Complaint makes no reference to these documents and Plaintiffs have not relied on these documents in framing the Second Amended Complaint. Accordingly, these documents are not considered by the Court at this stage. For the same reason, the New York Attorney General Complaint against the Putnam County Sheriff's Department, the Putnam County Daily Voice News Article regarding the DiPippo settlement, and the Langley Video Interview, which are not mentioned anywhere in the Second Amended Complaint, cannot be considered.

B. Factual Background

The following facts are drawn from the SAC and materials attached thereto and are assumed to be true for the purpose of deciding the instant Motion.

1. Parties

The Putnam County Sheriff's Office was and remains an agency of Putnam County. (SAC ¶ 5.) Langley, Yeager, Hunsberger, Diskin, Dalo, Quick, and Officers John Does 1-10 were employed "by Putnam County, by and through the Putnam County Sheriff's Office and/or Fire Department personnel and/or Emergency Medical Technicians" and "were acting within the scope of their employment." (*Id.* ¶¶ 6–7.) Langley "at all relevant times herein was and still is employed by Putnam County and/or Putnam County Sheriff's Office as Sheriff of Putnam County" and "supervised the actions of all subordinate officers of the Putnam County Sheriff's Office complained of herein." (*Id.* ¶¶ 10, 13.) "John Doe 1 was a Fire Department supervisor present at the time [ ] Taranto encountered the remaining Defendants" and "John Doe 2-3 are Emergency Medical Technicians present at the time [ ] Taranto encountered the remaining Defendants." (*Id.* ¶¶ 14–15.)

***3** "Taranto was born on December 25, 1943 and died on August 25, 2021. His estate was duly formed on November 4, 2021 in Connecticut where he resided with his wife at the time of his death. Christopher P. Taranto and Kerrianne Taranto-Garabo, the decedent's children, were appointed by the Connecticut Probate Court as co-executors for the Estate of [ ] Taranto and have been substituted herein in his place and stead." (*Id.* ¶ 17.)

2. Factual Allegations Giving Rise to the Current Action

On July 8, 2019 at approximately 2:00 AM while lawfully at his residence located at 202 Apple Tree Lane, Brewster, New York, Taranto heard noise outside his residence and saw flashlights by his window. (*Id.* ¶¶ 24–25.) Taranto exited his home and stood on his driveway with his lawfully possessed firearm at his side pointing downward towards the ground. (*Id.* ¶¶ 26–27.) Taranto heard multiple Defendants screaming at him to drop his firearm and raise his hands. (*Id.* ¶ 28.) Taranto complied with the orders and placed his firearm on the pavement and raised his hands. (*Id.* ¶ 29.) Taranto further complied with Defendants' orders to walk towards them. (*Id.* ¶ 30.)

Dalo then approached Taranto from behind and "violently threw him to the ground, banging his head on the ground, repeatedly striking him and smashing his face upon the pavement." (*Id.* ¶ 31.) "Thereafter, all Defendants continued to use force upon a prone and helpless [ ] Taranto as he lie face-down on the pavement experiencing difficulty breathing and chest pains." (*Id.* ¶ 32.) "Defendants, [ ] Yeager, [ ] Diskin, [ ] Dalo, [ ] Quick and/or John Does 1–10 proceeded to throw him to the ground, beat him about the face, head[,] and body with at least closed fists, grind his head and face on the ground and severely brutalize him." (*Id.* ¶ 40.)

During Taranto's arrest, Defendants believed Taranto to be emotionally disturbed and believed he was "verbally non-compliant." (*Id.* ¶¶ 33, 37.) Taranto was a 75-year-old, "frail man suffering from early dementia," and had recently had open heart surgery at the time of the incident. (*Id.* ¶¶ 33, 39.) Plaintiffs allege Defendants were aware of these facts at the time of the incident. (*Id.* ¶ 39.) Plaintiffs further allege that "[d]espite believing [ ] Taranto to be an emotionally disturbed person, Defendants failed to utilize a process or procedure to [e]nsure his safety." (*Id.* ¶ 34.) Plaintiffs additionally allege that "[d]uring the course of [ ] Taranto's arrest, the Defendants did not believe [ ] Taranto to have used deadly physical force against them." (*Id.* ¶ 35.) Defendants "eventually placed handcuffs" on Taranto while under the supervision of Quick. (*Id.* ¶ 41.) "As the supervisor in charge, [ ] Quick was responsible for the overall actions of the subordinate officers on scene, including the treatment of [ ] Taranto and the force used upon him." (*Id.* ¶ 42.)

"Taranto was detained in handcuffs in the rear seat of a police vehicle while pleading for help from law enforcement personnel on scene due to the excruciating pain caused by handcuffs placed on him that were fastened too tight." (*Id.* ¶ 44.) Taranto was removed from the scene while informing Defendants he was "experiencing chest pains and sustained physical injuries to his face, head, and body." (*Id.* ¶ 45.) "Defendants refused to permit [ ] Taranto to receive proper medical attention at the scene or to be removed from the scene via ambulance." (*Id.* ¶ 46.) "Any first aid provided at the scene by Fire Department personnel or Emergency Medical Technicians present at the scene was insufficient and inadequate to address [ ] Taranto's medical distress." (*Id.* ¶ 48.) Plaintiffs also allege that "[a]ny Fire Department personnel or Emergency Medical Technicians present on scene conspired with the remaining Defendants to conceal and/or cover up Defendants' excessive use of force utilized upon [ ] Taranto and the injuries caused to him." (*Id.* ¶ 49.) Taranto was eventually moved to Putnam County Hospital while in Defendants' custody unbeknownst to his family. (*Id.* ¶ 50.)

***4** Defendants entered Taranto's home without his or Karen Taranto's consent. (*Id.* ¶ 51.) Once inside the home, Defendants demanded Karen Taranto show them Taranto's pistol permit and stated "they almost killed her husband and would only tell her that he had been arrested." (*Id.* ¶¶ 52–53.) Defendants did not advise her that her husband was going to a hospital or that he was injured. (*Id.* ¶ 54.) Defendants left Taranto at the hospital after placing a criminal court summons in his pocket charging him with Menacing in the Second Degree "unattended and without notifying his family who several hours later received a phone call from a nurse at the hospital." (*Id.* ¶¶ 55–56.) Plaintiffs attach an appearance ticket for Taranto with the charge of Menacing in the Second Degree to the Second Amended Complaint. (SAC Ex. 4.) A nurse from Putnam Hospital called Karen Taranto to inform her that her husband was placed on life support after suffering cardiac and respiratory failure and pulmonary edema. (SAC ¶ 57.) Because Taranto was unable to breathe on his own, he was placed on a respirator—he remained unconscious for several days and was in critical condition. (*Id.* ¶¶ 58–59.) Taranto was removed to Danbury Hospital via ambulance given the critical nature of his injuries. (*Id.* ¶ 60.) After recovering consciousness and regaining the ability to breathe on his own, Taranto was released from the hospital. (*Id.* ¶ 61.)

On September 1, 2019, Taranto woke up and realized he was unable to walk. (*Id.* ¶ 62.) Taranto was taken to Danbury

Hospital where a scan revealed that he had "brain bleeds as a direct result of the brutal attack." (*Id.* ¶ 63.) The following day, Taranto underwent surgery to relieve the bleeding and pressure on his brain. (*Id.* ¶ 64.) Taranto lost control of his bladder as a result of the surgery and had permanent reduced motor skills and cognitive ability. (*Id.* ¶¶ 66–67.) Taranto remained in the hospital for another seven days and then began physical rehabilitation treatment. (*Id.* ¶ 65.)

Plaintiffs allege that the "Defendants herein have covered-up Defendants' collective misconduct and violent tendencies of the Defendants, including but not limited to Defendant Quick." (*Id.* ¶ 72.) "After knowing that the original information disseminated concerning [ ] Taranto was false, Defendants engaged in a course of conduct to continue its malicious prosecution of [ ] Taranto after falsely arresting him and criminally charging him in an attempt to justify and cover-up their prior false statements and misconduct" and "Defendants thereafter tampered with potential witnesses seeking to obtain false testimony from them and coerce[d] them to falsely testify against [ ] Taranto in criminal court." (*Id.* ¶¶ 76–77.) "Defendants have fabricated evidence against [ ] Taranto in an effort to conceal their wrongful actions." (*Id.* ¶ 87.)

Plaintiffs additionally allege that "Defendants failed to disclose criminal discovery in a timely fashion and/or at all" and that "Defendants maintain a pattern, policy and/or practice whereby criminal discovery is not provided in a timely fashion and/or at all." (*Id.* ¶¶ 82–83.) Defendants provided the Putnam County District Attorney's Office documents which have been provided to Taranto's criminal defense attorney which "came after various filings as part of this present litigation apparently in response to those filings." (*Id.* ¶¶ 88–89.) "Criminal Discovery was initially provided to defense counsel by the Putnam County District Attorney's Office on September 10, 2020, with Supplemental Disclosure being provided on November 16, 2020, April 6, 2021 and May 27, 2021"—the "May 27, 2021 Supplemental Discovery was made seven days after Plaintiffs' counsel filed his response to Defendants' pre-motion letter." (*Id.* ¶¶ 90–91.) "Other than document number 28, the disclosure presented as part of the May 27, 2021 Supplemental Discovery existed before the initial discovery response was made on September 10, 2020 but were not provided at that time." (*Id.* ¶ 92.) "One such document ... purports to be an internal investigation allegedly performed by Defendants pursuant to the arrest of George Taranto," which "is alleged to have started on July 8, 2019 and ended one-year later on July 9, 2020 resulting in Defendant Langley condoning the actions of the Defendants herein." (*Id.* ¶¶ 93–94.) "This document, along with other documents provided by Defendants as part of [ ] Taranto's criminal prosecution, have been fabricated by the Defendants in an effort to conceal their wrong-doing." (*Id.* ¶ 95.) "[T]his report was not disclosed as part of the original criminal disclosure on September 10, 2020 or either Supplement disclosure on November 16, 2020 or April 6, 2021." (*Id.* ¶ 96.) Plaintiffs attach a list of materials disclosed to defense counsel on different dates, beginning in September 2020 and ending in May 2021. (SAC Ex. 9.)

***5** Plaintiffs point to "misconduct committed by the Defendants in the matter of *DiPippo v. County of Putnam, et al.* where Defendants, among other things, also failed to disclose criminal discovery." (SAC ¶ 84.) "In the matter of *DiPippo v. County of Putnam*, Defendant Quick was also one of the defendants who failed to disclose and apparently hid criminal discovery." (*Id.* ¶ 85.) [3]

The complaint arrest report attached to Plaintiffs' Second Amended Complaint July 8, 2019, reported by Yeager and reviewed by Quick, states:

> ON 07/08/2019 AT APPROXIMATELY 0310 HOURS, MEMBERS WERE INVESTIGATING A STOLEN VEHICLE INCIDENT AT 201 APPLE TREE LN IN THE TOWN OF SOUTHEAST. WHILE STANDING IN THE PARKING LOT OUTSIDE OF SAID RESIDENCE, AN OLD WHITE MALE, GEORGE C TARANTO DOB ... 1943, EXITED HIS RESIDENCE AT 202 APPLE TREE LANE AND WALKED UP TO INVESTIGATOR HUNSBERGER. INV HUNSBERGER TURNED TO ASK THE MAN TO GO BACK INTO HIS RESIDENCE WHEN MEMBER OBSERVED INV HUNSBERGER RUN TO COVER AND HEARD INV HUNSBERGER YELL "HES GOT A GUN".
>
> DEPUTY DALO, DEPUTY DISKIN, SERGEANT QUICK AND MYSELF ALL DREW OUR SERVICE WEAPONS AND ORDERED MR. TARANTO NUMEROUS TIMES TO PUT DOWN HIS WEAPON AND PUT HIS HANDS IN THE AIR. MR. TARANTO DID NOT INITALLY COMPLY WITH ORDERS AND TOOK COVER BEHIND A VEHICLE. ALL MEMBERS CLEARLY STATED MULTIPLE TIMES THAT WE WERE POLICE FROM THE SHERIFF'S OFFICE. AFTER MULTIPLE ORDERS TO PUT DOWN HIS WEAPON, MR. TARANTO COMPLIED, PUT HIS WEAPON DOWN ON THE PAVEMENT,

AND LISTENED TO ORDERS TO WALK TOWARD DEPUTIES. AT THIS TIME DEPUTY DALO WAS ABLE TO SNEAK UP BEHIND MR. TARANTO AND BRING HIM TO THE GROUND. ALL MEMBERS THEN ASSISTED TRYING TO GET MR. TARANTO IN HANDCUFFS. MR. TARANTO WAS ORDERED NUMEROUS TIME TO PUT HIS HANDS BEHIND HIS BACK BUT CONTINUED TO KEEP THEM LOCKED UNDER HIS BODY. MEMBERS WERE ABLE TO FREE MR. TARANTO'S ARMS AND GET THEM BEHIND HIS BACK SO THAT HE COULD BE PLACED IN HANDCUFFS.

EMS WAS CALLED TO THE SCENE TO EVALUATE MR. TARANTO FOR ANY INJURIES. HE WAS TRANSPORTED BY AMBULANCE TO PUTNAM HOSPITAL CENTER FOR FURTHER EVALUATION. MEMBER FOLLOWED THE AMBULANCE TO PHC AND ISSUED MR. TARANTO AN APPEARANCE TICKET FOR THE TOWN OF SOUTHEAST COURT FOR THE CHARGE OF MENACING IN THE 2ND DEGREE (PL 120.14(1)) FOR 08/01/2019 AT 1800 HOURS AT WHICH TIME HE WILL BE ARRAIGNED. MEMBER ALSO CHARGED MR. TARANTO WITH CRIMINAL POSSESSION OF A WEAPON IN THE 4TH DEGREE (VTL 265.01(2)), RESISTING ARREST (PL 205.30) AND OBSTRUCTING GOVERNMENTAL ADMINISTRATION IN THE 2ND DEGREE (PL 195.05).

THE COLT MUSTANG .380 PISTOL WITH A FULL MAGAZINE OF AMMUNITION

(SAC Ex. 3.) Additionally attached to the Second Amended Complaint is a use of force form prepared by Quick indicating that Taranto was emotionally disturbed, that he resisted through “Verbal Non Compliance,” “Verbal Threats/ Gestures” and “Physically Uncooperative (Resisting),” that “verbal command,” “physical direction,” “impact weapon,” and “hands” were used to control Taranto, and that “suspect was tackled then physically restrained” and sustained “laceration to head/shoulder pain.” (SAC Ex. 5.)

Plaintiffs additionally attach a Putnam County Sheriff's Department Personnel Investigation conducted by Kevin McManus which lists personnel involved as Quick, Diskin, Dalo, Yeager, Hunsberger, and Investigator Ryan McMahon and states that:

***6** On 07/08/2019, the afore mentioned Sheriff's Office members were investigating a stolen vehicle complaint on Apple Tree Lane within Reed Farm, located in the T/O Southeast. During the investigation, the defendant exited his residence of 202 Apple Tree Lane holding a unholstered handgun. The defendant was ordered to drop his weapon multiple times over the course of 3 minutes. Upon the defendant finally placing his weapon on the ground, he was taken to the ground by Deputy Dalo and assisted by other members. The defendant continued to struggle while members attempted to handcuff him. As a result of being taken to the ground, the defendant sustained a small cut or rash to his head.

(SAC Ex. 8.) The Recommendation of Investigating Officer stated that:

All Sheriff's Office members on scene acted within the scope of their duties in assisting with effecting a lawful arrest of the defendant. Furthermore, all Sheriff's Office members acted within the scope of the New York State Penal Law as it pertains to Article 35 as well as within the rules and regulations of the Putnam County Sheriff's Department in effecting said arrest using the minimum force necessary. Since Sgt, Quick was directly involved in the incident, member believes any investigation should be conducted by his direct supervisor. Sheriff's Office Rules and Regulations Article 8.lA, in effect at the time of this incident states Any injury to a prisoner whether the injury occurred while the subject was being taken into custody or while the person was in custody of the Putnam

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

> County Sheriff's Department shall be the subject of an internal investigation, Member observed video and spoke with Sgt, Quick and several of the Deputies involved after the incident and investigation determined that the there was no improper conduct on the part of any Sheriff's Office member on scene. Member used my discretion in determining there was no need for a detailed written report.

(*Id.*) The report is signed by Langley, among others, stating "no action needed, acceptable force used on combative subject was armed with a firearm which was still within reach." (*Id.*) Plaintiffs, citing to this document, allege Langley " 'rubber stamped' an approval of the treatment of [ ] Taranto while in police custody." (SAC ¶ 86.) "Defendant Langley's deliberate indifference to 'rubber stamp' his deputies['] misconduct during an election year is nothing more than an attempt to protect his position rather than addressing the misconduct of his deputies." (*Id.* ¶ 106.)

Finally, Plaintiffs attach Taranto's Information signed by Yeager for Menacing in the Second Degree, Criminal Possession of a Weapon in the Fourth Degree, Resisting Arrest, Obstructing Governmental Administration in the Second Degree, based upon the following facts, respectively:

> The said defendant, at or about 03:10 hours on the aforesaid date, while in front of 202 Apple Tree Ln in the Town of Southeast, County of Putnam, New York, did intentionally place or attempt to place members of the Putnam County Sheriff's Office in reasonable fear of physical injury, serious physical injury or death. Specifically, your defendant placed Investigator Hunsberger, Deputy Diskin, Deputy Dalo, Deputy Yeager and Sergeant Quick in reasonable fear of physical injury, serious physical injury or death by displaying a Colt Mustang .380 pistol.
>
> The said defendant, at or about 03:10 hours on the aforesaid date, at 202 Apple Tree Ln, in the Town of southeast, County of Putnam, New York, was in possession of a Colt Mustang .380 pistol with intent to use the same unlawfully against another.
>
> The said defendant, at or about 03:10 hours on the aforesaid date, while at 202 Apple Tree Ln in the Town of Southeast, County of Putnam, New York, did intentionally prevent or attempt to prevent members of the Putnam County Sheriff's Office from effecting an authorized arrest of himself, in that the defendant did physically struggle with members to avoid being handcuffed.
>
> ***7** The said defendant, at or about 03:10 hours on the aforesaid date, at 202 Apple Tree Ln, in the Town of Southeast, County of Putnam, New York, did intentionally prevent or attempt to prevent members of the Putnam County Sheriff's Office from performing an official function by means of intimidation, physical force or interference, or by means of an independently unlawful act in that he menaced police officers with a firearm which interfered with an official police investigation.

(SAC Ex. 10.)

C. Procedural History

Plaintiffs filed their original Complaint on March 19, 2021, (Dkt. No. 1), their Amended Complaint on July 12, 2021, (Dkt. No. 14), and their Second Amended Complaint on January 10, 2022, (Dkt. No. 31). Defendants filed their Motions to Dismiss and accompanying Memorandum of Law on January 21, 2022. (*See* Not. of Mot. (Dkt. No. 32); Mem. of Law in Supp. of Mot. ("Defs.' Mem.") (Dkt. No. 33).) Plaintiffs filed their Opposition on February 18, 2022. (*See* Mem. of Law for Reply to Mot. to Dismiss ("Pls.' Mem.") (Dkt. No. 37).) Plaintiffs additionally filed a motion to amend that same day. (Dkt. No. 39).) Defendants filed their Reply (*see* Reply to Mot. ("Defs.' Reply Mem.") (Dkt. No. 40)), and their Opposition to Plaintiffs' motion to amend on March 4, 2022, (Dkt. No. 41). Plaintiffs filed their Reply to Defendants' Opposition to Plaintiffs' motion to amend on March 9, 2022. (Dkt. No. 42.)

## II. Discussion

A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a Rule 12(b)(6) motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft*

v. *Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79. ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

***8** "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegation contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw all reasonable inferences in the plaintiff's favor," *Div. 1181*, 9 F.4th at 95 (citation omitted). Additionally, "when ruling on a Rule 12(b)(6) motion to dismiss," district courts are directed to confine their consideration to "the complaint in its entirety, ... documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (quotation marks omitted); *see also Dashnau v. Unilever Mfg. (US), Inc.*, 529 F. Supp. 3d 235, 240 (S.D.N.Y. 2021) (same).

B. Analysis

1. False Arrest

A § 1983 claim for false arrest "rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). A § 1983 false arrest claim "is substantially the same as a claim of false arrest under New York law." *Id.* New York law requires a plaintiff to show "that (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement[,] and (4) the confinement was not otherwise privileged." *Toussaint v. Cnty. of Westchester*, No. 21-CV-03817, 2022 WL 2834108, at *5 (S.D.N.Y. July 20, 2022). "[T]he existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest ... under § 1983." *Dillon v. Rosen*, No. 22-CV-7035, 2022 WL 4538397, at *3 (S.D.N.Y. Sept. 28, 2022) (quoting *Jenkins v. City of N.Y.*, 478 F.3d 76, 84 (2d Cir. 2007)); *see also Figueroa v. Mazza*, 825 F.3d 89, 99 (2d Cir. 2016) ("The existence of probable cause to arrest ... will defeat a claim of false arrest under the Fourth Amendment."). "[A] claim for false arrest will not lie so long as the arresting officer had probable cause to arrest the plaintiff for some crime." *Jaegly v. Couch*, 439 F.3d 149, 150 (2d Cir. 2006).

Generally speaking, officers have probable cause to arrest when they have "reasonably trustworthy information as to facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (internal quotation marks and alterations omitted). As the Second Circuit recently observed:

> To determine the existence of probable cause, a court considers the totality of the circumstances, based on 'a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest.' The court considers those facts available to the officer at the time of the arrest and immediately before it. The significance of each of these factors may be enhanced or diminished by surrounding circumstances.

*Guan v. City of New York*, 37 F.4th 797, 804 (2d Cir. 2022) (quotation marks and citations omitted).

Moreover, "[t]he doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The qualified immunity defense, thus, is a broad shield that protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Kass v. City of N.Y.*, 864 F.3d 200, 206 (2d Cir. 2017) (quoting *Zalaski v. City*

*of Hartford*, 723 F.3d 382, 389 (2d Cir. 2013)). "[I]n the qualified immunity context, an officer invoking the probable cause defense need only establish that he or she acted with arguable probable cause[.]" *Schlaepfer v. City of N.Y.*, No. 20-CV-3339, 2022 WL 4484571, at *9 (S.D.N.Y. Sept. 27, 2022) (quotation marks omitted); *Kass*, 864 F.3d at 206 ("An officer is entitled to qualified immunity from a federal false arrest and imprisonment claim if he had arguable probable cause to arrest the plaintiff for any offense, regardless of the offense with which the plaintiff was actually charged."). "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Falls v. (Police Officer) Detective Michael Pitt*, No. 16-CV-8863, 2021 WL 1164185, at *12 (S.D.N.Y. Mar. 26, 2021) (quoting *Walczyk v. Rio*, 496 F.3d 139, 163 (2d Cir. 2007)); *see also Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010) (same).

***9** Defendants argue there existed probable cause to arrest Taranto for, among other offenses, criminal possession of a weapon in the fourth degree. (Defs.' Mem. 4–9.) "A person is guilty of criminal possession of a weapon in the fourth degree when ... [h]e or she possesses any dagger, dangerous knife, dirk, machete, razor, stiletto, imitation pistol, undetectable knife[,] or any other dangerous or deadly instrument or weapon with intent to use the same unlawfully against another[.]" N.Y. Penal Law § 265.01(2). "Crucially, for the charge of criminal possession of a weapon in the fourth degree, 'the element of intent to use a dangerous instrument unlawfully can be presumed from a finding that defendant possessed a dangerous instrument.' " *Curanaj v. Cordone*, No. 10-CV-5689, 2012 WL 4221042, at *11 (S.D.N.Y. Sept. 19, 2012) (quoting *People v. Campbell*, 450 N.Y.S.2d 210, 211 (App. Div. 1982)). Plaintiffs clearly alleged that Taranto was in possession of a firearm, (SAC ¶¶ 26–27), accordingly, at the least, Defendants had arguable probable cause to arrest Taranto. *See Curanaj*, 2012 WL 4221042, at *11 (holding that the "[d]efendants had arguable probable cause on the charge of Criminal Possession of a Weapon in the Fourth Degree" when the plaintiff clearly "possessed a dangerous instrument"—an ax—because "[f]rom that fact, the intent element is satisfied"); N.Y. Penal Law § 265.15 ("The possession by any person of any dagger, dirk, stiletto, dangerous knife or any other weapon, instrument, appliance or substance designed, made or adapted for use primarily as a weapon, is presumptive evidence of intent to use the same unlawfully against another."); *cf. Egan v. New York City*, No. 16-CV-1479, 2018 WL 4926445, at *9 (S.D.N.Y. Oct. 10, 2018) (holding that because the "criminal purpose of a laser pointer is not immediately apparent" possession of a laser pointer would not be "enough to provide probable cause in this case: there must be probable cause to believe that Plaintiff possessed the laser with the intent to use it unlawfully"); *Levy v. City of New York*, 935 F. Supp. 2d 575, 586 (E.D.N.Y. 2013) (noting in false arrest case for N.Y. Penal Law § 265.01(2) that "[b]ecause a kitchen knife is an inherently utilitarian utensil, the key inquiry is the manner in which the kitchen knife is used"). Thus, the Court grants the Motion to Dismiss the false arrest claim.

2. Denial of Fair Trial

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). To state a fair trial right claim, a plaintiff must plausibly plead the following elements: "an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016) (citing *Ricciuti*, 124 F.3d at 130).

Probable cause is not a defense to a denial of fair trial claim. *See Heard v. City of New York*, 319 F. Supp. 3d 687, 697 (S.D.N.Y. 2018); *Overby v. Fabian*, No. 17-CV-3377, 2018 WL 3364392, at *11 (S.D.N.Y. July 10, 2018). "Because probable cause is no defense to a denial of the right to a fair trial claim, fair trial claims cover kinds of police misconduct not addressed by false arrest or malicious prosecution claims." *Garnett*, 838 F.3d at 278; *see also Brandon v. City of New York*, 705 F. Supp. 2d 261, 276 (S.D.N.Y. 2010) (noting that the Second Circuit has permitted "claims for both malicious prosecution and a denial of [a plaintiff's] fair right to trial based on the same alleged fabrication of evidence").

Plaintiffs make many conclusory allegations regarding fabrication of evidence. For instance, Plaintiffs allege "[a]fter knowing that the original information disseminated concerning [ ] Taranto was false, Defendants engaged in a course of conduct to continue its malicious prosecution

of [ ] Taranto after falsely arresting him and criminally charging him in an attempt to justify and cover-up their prior false statements and misconduct," that "Defendants thereafter tampered with potential witnesses seeking to obtain false testimony from them and coerce them to falsely testify against [ ] Taranto in criminal court," that "Defendants have fabricated evidence against [ ] Taranto in an effort to conceal their wrongful actions," that "[a]fter knowing that the original allegations concerning [ ] Taranto were false, Defendants engaged in a course of conduct to fabricate their claims concerning [ ] Taranto," and that Defendants "[f]abricat[ed] and contrive[ed] criminal charges lodged against Plaintiff." (SAC ¶¶ 76–77, 87, 99, 123.) Plaintiffs' Opposition similarly states "[a]s discussed herein, Plaintiffs have demonstrated, before discovery has proceeded, the extent and nature of the fabrication of evidence by the Defendants pursuant to the arrest and prosecution of [ ] Taranto," which "includes the criminal discovery turned over by the Defendants to the prosecutor after pleadings were docketed pursuant to this litigation despite the documents provided during criminal discovery having been previously available based upon the dates of creation." (Pls.' Mem 15.) However, the Opposition, like the Second Amended Complaint does not specifically point to particular instances of fabrication of evidence. [4]

***10** Conclusory statements that officers fabricated evidence do not suffice to state a claim for the denial of a fair trial. *See* *Longo v. Ortiz*, No. 15-CV-7716, 2016 WL 5376212, at *6 (S.D.N.Y. Sept. 26, 2016) (holding that the plaintiff failed to state denial of fair trial claim where he alleged "he was denied the right to a fair trial ... when the defendants fabricated evidence, gave false testimony, and made false extrajudicial statements ... to be used against [the plaintiff] at trial as well as to a Supreme Court judge in an effort to secure a search warrant, indictment and conviction" (internal quotation marks omitted)); *see also* *Harasz v. Katz*, 239 F. Supp. 3d 461, 493 (D. Conn. 2017) (holding that the plaintiff failed to state a denial of fair trial claim where he merely alleged that officers "did in fact participate in fabrication of evidence, ignored the truth when presented[,] and chose what to bring as the truth ... [and] did not want the truth to interfere with their witch hunt."). "Instead[,] plaintiffs must identify the actual fabrication," which Plaintiffs fail to do. *Hutchins v. Solomon*, No. 16-CV-10029, 2018 WL 4757970, *16 (S.D.N.Y. Sept. 29, 2018); *see also* *Thompson v. City of New York*, No. 18-CV-04105, 2020 WL 2097622, at *4 (S.D.N.Y. May 1, 2020) ("The [c]omplaint does not identify what evidence was fabricated; and the [c]omplaint fails to identify what, if any, fabricated evidence the defendants offered or to whom it was offered and what effect the purported false evidence would have had on the jury."); *Cunningham v. City of New York*, No. 17-CV-5124, 2018 WL 4168964, at *5 (S.D.N.Y. Aug. 30, 2018) (dismissing fair trial claim where the complaint failed to assert that arresting report contained a fabrication); *Waddlington v. City of New York*, 971 F. Supp. 2d 286, 297 (E.D.N.Y. 2013) (dismissing fair trial claim, and noting that the "[p]laintiff at no point alleges with specificity what false information [defendant police officers] created or forwarded to the D.A.'s Office"); *cf.* *Long v. New York City*, No. 14-CV-9908, 2016 WL 4203545, at *3 (S.D.N.Y. Aug. 8, 2016) ("[The p]laintiff claims specific sentences in specific documents were intentionally falsified by Officer Vazquez.").

Plaintiffs additionally allege that an investigation that ended on July 9, 2020 "along with other documents provided by Defendants as part of [ ] Taranto's criminal prosecution, have been fabricated by the Defendants in an effort to conceal their wrong-doing." (SAC ¶ 94–95.) Again, Plaintiffs have not identified any specific fabrication. Furthermore, Plaintiffs have not alleged a causal connection between any fabrication contained within the investigation, which concluded a year after Taranto was arrested, and any deprivation. "The manufacture of false evidence, in and of itself ... does not impair anyone's liberty, and therefore does not impair anyone's constitutional right ... the deprivation of liberty of which [a plaintiff] complains [must] be shown to be the result of [the defendant's] fabrication of evidence." *Zahrey v. Coffey*, 221 F.3d 342, 348–49 (2d Cir. 2000) (internal quotation marks omitted) (noting that plaintiff had alleged the "eight months he was confined, from his bail revocation (after his arrest) to his acquittal" was the result of "the manufacture of false evidence"). Without such an allegation, Plaintiffs claim cannot stand. *Cf.* *Ricciuti*, 124 F.3d at 126–27, 130 (holding qualified immunity is unavailable where plaintiffs alleged that a fabricated confession caused prosecutors to add another charge); *Harris v. City of New York*, No. 15-CV-8456, 2017 WL 6501912, at *8 (S.D.N.Y. Dec. 15, 2017) ("[F]abricated evidence may cause a further deprivation if it adversely informs a prosecutor's charging and bail determinations."); *Long v. New York City*, No. 14-CV-9908, 2016 WL 4203545, at *5 (S.D.N.Y. Aug. 8, 2016) ("[F]abrication of evidence leading to pre-trial detention can satisfy the causation element for a fair trial claim.").

3. Deliberate Indifference to Medical Needs

Because Taranto was a pre-trial detainee at the time he was allegedly denied adequate medical care, Plaintiffs' claim falls under "the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight[h] Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). A pre-trial detainee's rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *Id.* (quotation marks omitted).

To establish a claim for deliberate indifference to medical needs under the Due Process Clause of the Fourteenth Amendment, a pre-trial detainee must establish two elements: (1) that the "deprivation of medical care ... [was] 'sufficiently serious,' " and (2) that the defendant "acted or failed to act with 'a sufficiently culpable state of mind.' " *Smith v. Outlaw*, No. 15-CV-9961, 2017 WL 4417699, at *2 (S.D.N.Y. Sept. 30, 2017) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006)). The first element is objective and requires allegations that suggest that the detainee was subject to "conditions posing a substantial risk of serious harm." *Blandon v. Capra*, No. 17-CV-65, 2017 WL 5624276, at *7 (S.D.N.Y. Nov. 20, 2017) (quotation marks omitted) (quoting *Hayes v. N.Y.C. Dep't of Corrs.*, 84 F.3d 614, 620 (2d Cir. 1996)). The second element, which is applied somewhat "differently to claims under the Eighth Amendment [than] the Fourteenth Amendment," also imposes an objective standard, whereas the Eighth Amendment imposes a "subjective standard." *Howard v. Brown*, No. 15-CV-9930, 2018 WL 3611986, at *4 (S.D.N.Y. July 26, 2018) (citation omitted). That is, the law enforcement or prison official need only "recklessly fail[ ] to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35.

***11** Plaintiffs contend in their Opposition that "Taranto was detained at the scene for such an extended period of time" which "begs further inquiry of ... why he was not immediately transported to a hospital." (Pls.' Mem. 18.) Plaintiffs allege that before he was transported for treatment, Taranto was detained in the rear seat of a police vehicle, however the Second Amended Complaint does not allege the length of the detention. (SAC ¶ 44.) Plaintiffs additionally allege that "Taranto was eventually removed from the scene while he informed the Defendants that he was experiencing chest pains and sustained physical injuries to his face, head, and body" and transported to a hospital to received care. (*Id.* ¶¶ 45, 50.)

"When the basis for a ... claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the [detainee's] *underlying medical condition* alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious, to support a[ ] ... claim." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (citation and quotation marks omitted); *see also James v. Brown*, No. 14-CV-1767, 2016 WL 3945688, at *4 (S.D.N.Y. July 19, 2016) (noting that where an inmate alleges "an unreasonable delay or interruption in treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." (alteration and citation omitted)). "[A] short interruption of care, even if the underlying medical condition is serious, does not constitute a serious medical need where the 'alleged lapses in treatment are minor.' " *Ferguson v. Cai*, No. 11-CV-6181, 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012) (quoting *Smith*, 316 F.3d at 186). "Where temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in this Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness." *Id.* (collecting cases). Where a plaintiff cannot show actual injury, he may nonetheless satisfy the objective prong by demonstrating that the delay of medical treatment exposed him to "an unreasonable risk of future harm." *Smith*, 316 F.3d at 188. However, "the inmate must show that the risk of future harm is 'so grave that it violates contemporary standards of decency.' " *Braxton v. Nichols*, No. 08-CV-8568, 2010 WL 1010001, at *3 (S.D.N.Y. Mar. 18, 2010) (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)).

"Although in many cases, calling for medical assistance within an hour or so of the injury may have sufficed in meeting an official's duties, *see Pateman v. City of White Plains*, No. 17-CV-6156, 2020 WL 1497054, at *21 (S.D.N.Y. Mar. 25, 2020) (collecting cases), the Second Circuit has also noted that 'it's the particular risk of harm faced by a [detainee] due to the challenged deprivation of care' that is relevant to deliberate indifference claims, *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003) (citation omitted)." *Maldonado v. Town of Greenburgh,* 460 F. Supp. 3d 382, 396 (S.D.N.Y. 2020). Therefore, "delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for the delay." *Id.* (quoting *Smith*, 316 F.3d at 186). For instance, in

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

*Maldonado*, this Court held that a pretrial detainee's estate plausibly alleged deliberate indifference to medical needs when the pretrial detainee was tasered, was not responding to NARCAN, and even though the defendant was told the pretrial detainee needed to be rushed to medical treatment immediately, there was a 20-minute delay in transporting the pretrial detainee to the emergency room. *Id.* at 389, 397. The pretrial detainee was pronounced dead at the hospital. *Id.* at 390. Here, Plaintiffs have not alleged how much time transpired between the incident and Taranto's arrival at the hospital—it is possible Taranto was transported to the hospital almost immediately after the alleged incident. *See Cooper v. City of New York*, No. 14-CV-3698, 2016 WL 4491719, at *1, 8 (E.D.N.Y. Aug. 25, 2016) (holding plaintiff who was attacked by police, became unconscious, and fell into a coma had not alleged deliberate indifference to medical needs when the "incident took place at 1:15pm, and it was reported at 1:32pm" and plaintiff was then admitted to the emergency room approximately 20 minutes later). Indeed, Plaintiffs allege that Taranto was removed from the scene "while" informing Defendants he was "experiencing chest pains and sustained physical injuries to his face, head, and body"—indicating there was no delay between Taranto's complaints and his transport to the hospital. (SAC ¶ 45.) Additionally, Plaintiffs have not alleged any fact indicating that any delay worsened Taranto's medical condition. Without any sense of the time that transpired between Taranto's injury and the subsequent transport to the hospital or any allegations as to whether any delay worsened or posed any specific risk to Taranto's medical condition, Plaintiffs have not plausibly alleged any delay constitutes deliberate indifference to medical needs. *See Smith*, 316 F.3d at 186 ("[It is] the particular risk of harm faced by a [detainee] due to the challenged deprivation of care, rather than the severity of the [detainee's] underlying medical condition, considered in the abstract, that is relevant.").

***12** Plaintiffs additionally allege that "Defendants refused to permit [ ] Taranto to receive proper medical attention at the scene or to be removed from the scene via ambulance," and that "[a]ny first aid provided at the scene by any Fire Department personnel or Emergency Medical Technician present at the scene was insufficient and inadequate to address [ ] Taranto's medical distress." (*Id.* ¶¶ 46, 48.) "While Plaintiff[s] allege[ ] that 'all defendants' failed to provide adequate medical treatment, that allegation is insufficient because it is conclusory." *Sterling v. Akinyombo,* No. 20-CV-10804, 2022 WL 2657223, at *5 (S.D.N.Y. July 8, 2022) (citation omitted). Plaintiffs have not alleged which Defendants were involved in any deprivations of care or what medical attention was or was not provided at the scene. Such conclusory allegations cannot withstand Defendants' Motion to Dismiss. *See Price v. Koenigsmann*, No. 19-CV-4068, 2022 WL 125818, at *5 (S.D.N.Y. Jan. 13, 2022) (holding that factual allegations plaintiff makes that reference "Defendants" and their deliberate indifference to his medical needs "are vague and conclusory" and therefore cannot support a plausible deliberate indifference claim).

4. 1985(3) Conspiracy

To state a claim for conspiracy in violation of § 1985(3), a plaintiff must allege (1) a conspiracy, (2) with the intent or purpose to deprive a person of equal protection of the law, (3) an act in furtherance of the conspiracy, (4) which results in an injury to a person, or a person's property, or the deprivation of a federal constitutional right. *Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015). "In order to maintain an action under [§] 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that [the] defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (citation and internal quotation marks omitted). "In addition, a plaintiff must allege that she is a member of a protected class and that the conspirators acted with class-based discriminatory motivation." *Arroyo-Horne v. City of New York*, No. 16-CV-3857, 2019 WL 3428577, at *5 (E.D.N.Y. July 30, 2019), *aff'd*, 831 F. App'x 536 (2d Cir. 2020).

Defendants argue that Plaintiffs failed to plead any specifics about the alleged conspiracy and failed to plead a factual basis supporting a meeting of the minds. (Defs.' Reply Mem. 4.) Plaintiffs argue that they have sufficiently pled a cause of action of conspiracy noting that the identities of the John Doe Defendants are unknown but that they were present on the scene at the time of Taranto's arrest and failed to intervene when Taranto was assaulted, failed to provide proper medical attention, and "covered-up the wrongdoing of the known Defendants." (Pls.' Mem. 15.) Plaintiffs also allege that "[i]n furtherance of the conspiracy, Defendants fabricated evidence against [Taranto], failed to provide evidence in a timely manner despite it being available during [ ] Taranto's criminal prosecution and engaged in acts to cover up the excessive use of force upon [ ] Taranto by the Defendants herein." (SAC ¶ 153.) However, Plaintiffs have not included any facts which support a plausible allegation that Defendants conspired together, let alone conspired to deprive Taranto's of

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

equal protection of the laws. Accordingly, the claim cannot stand. *See Ziglar v. Abbasi*, 582 U.S. 120, 154 (2017) ("To state a claim under § 1985(3), a plaintiff must first show that the defendants conspired—that is, reached an agreement —with one another."); *see also Arroyo-Horne*, 2019 WL 3428577, at *5 (dismissing 1985 conspiracy claim when the complaint "does not provide any allegations or include any facts from which the Court could conclude that any individual(s) conspired to deprive Plaintiff of equal protection of the laws or equal privileges and immunities under the laws."); *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 308 (S.D.N.Y. 2013) (dismissing the plaintiff's section 1985(3) claim because the complaint did not "set forth any specific facts that indicate any sort of meeting of the minds ... let alone an agreement to violate [the plaintiffs' rights]" (emphasis omitted)); *Friends of Falun Gong v. Pacific Cultural Enter., Inc.*, 288 F. Supp. 2d 273, 279 (E.D.N.Y. 2003) (finding that the plaintiff failed to adequately plead a section 1985(3) claim because "the complaint [did] not include any facts that could support an inference of a conspiracy" and because the plaintiff "cite[d] no facts from which a meeting of the minds could be inferred").

***13** However, even if Plaintiffs have plausibly alleged concerted action by Defendants, the claim still fails. Defendants additionally argue that Plaintiffs' § 1985(3) should fail as "Plaintiffs failed to plead membership in a protected class under § 1985(3)." (Defs.' Reply Mem. 4.) The Court agrees. To establish a violation of § 1985(3), a plaintiff must establish, among other elements, that the conspiracy was motivated by "some racial or perhaps otherwise class-based, invidious discriminatory animus." *McDaniel v. City of New York*, 585 F. Supp. 3d 503, 522 (S.D.N.Y. 2022), *report and recommendation adopted*, No. 19-CV-11265, 2022 WL 874769 (S.D.N.Y. Mar. 24, 2022) (quotation marks omitted). Plaintiffs have not attempted to do so. (*See generally* SAC.) Accordingly, the section 1985(3) conspiracy claim fails on this ground as well. *McDaniel*, 585 F. Supp. 3d at 522 (dismissing claims pursuant to § 1985 when the complaint "provides no factual assertions that would establish the requisite discriminatory animus"); *see also Joyner v. Alston & Bird LLP*, No. 21-CV-8549, 2022 WL 6244417, at *10 (S.D.N.Y. May 13, 2022), *report and recommendation adopted*, No. 21-CV-8549, 2022 WL 4115954 (S.D.N.Y. Sept. 9, 2022) (dismissing claim § 1985(3) in part because plaintiff had not alleged "discriminatory animus aimed at depriving her of a federal constitutional right").

5. 1983 "Cover-Up" Claim

"In a section 1983 claim alleging a cover-up by government agents, the constitutional right at issue is the First Amendment right of access to courts: the theory is that the cover-up has made it impossible for the plaintiff to litigate an underlying claim, because material evidence was destroyed, for instance, or because the statute of limitations expired before the plaintiff discovered the cover-up." *Tavares v. New York City Health & Hosps. Corp.*, No. 13-CV-3148, 2015 WL 158863, at *7 (S.D.N.Y. Jan. 13, 2015) (citing *Christopher v. Harbury*, 536 U.S. 403, 413–14 & n. 11 (2002) (describing these claims as "backward-looking access claims")). "The Second Circuit has emphasized, however, that '[t]he viability of [such] claims is far from clear,' pointing out that the *Harbury* decision was careful not to endorse their validity." *Id.* (citing *Sousa v. Marquez*, 702 F.3d 124, 128 (2d Cir. 2012)).

Nevertheless, even assuming backward-looking access claims are actionable, Plaintiffs' fail. "[S]uch claims are available only if a judicial remedy was 'completely foreclosed' by the alleged cover-up." *Sousa*, 702 F.3d at 128 (quoting *Broudy v. Mather*, 460 F.3d 106, 120 (D.C. Cir. 2006)). Plaintiffs' claims are clearly not foreclosed as they are bringing them in this very Action and have not argued that any claims have been foreclosed—accordingly the claim is dismissed. *See Tavares*, 2015 WL 158863, at *7–8 (dismissing "cover-up" claim when plaintiff "has not alleged that the DOCCS [d]efendants' actions prevented him from litigating his underlying Eighth Amendment and state-law medical malpractice claims against the City [d]efendants —indeed, he is bringing those very claims in this action.").

6. Individual Liability

Defendants argue that Plaintiffs "impermissibly plead all causes of action against all named Defendants instead of bringing each cause of action against only the involved [D]efendants." (Defs.' Mem. 14.) Specifically, Defendants argue that Plaintiffs' "Fourth Amendment false arrest and excessive force claims" and failure to intervene claims against Langley "who was not present at the scene on July 8, 2019" must fail for lack of personal involvement. (*Id.*)

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Sterling*,

2022 WL 2657223, at *4 (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). "[A] plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quotation marks omitted); *see also Leneau v. Ponte*, No. 16-CV-776, 2018 WL 566456, at *15 (S.D.N.Y. Jan. 25, 2018) (dismissing allegations against a defendant for lack of personal involvement because the "[p]laintiff's general allegation that all defendants were involved in the alleged constitutional violations does not rescue the claims against" a particular defendant). Accordingly, "a plaintiff may not rely on a special test for supervisory liability" instead, "[t]he violation must be established against the supervisory official directly." *Tangreti*, 983 F.3d 616–18.

***14** The Court agrees that Plaintiffs have not alleged Langley's personal involvement in Plaintiffs' remaining constitutional claim, namely their excessive force claim. While Plaintiffs have pled that Langley "failed to intercede to terminate the aforementioned assault upon [ ] Taranto" they have not alleged he was present during the incident at issue or how he somehow permitted the use of force to occur. (SAC ¶ 71.) And while they allege Langley "was personally aware of the events complained of herein as they were occurring" they have not alleged any fact indicating this was the case. (*Id.* ¶ 73.) Such conclusory allegations do not sufficiently allege personal involvement. *See Falls v. Pitt*, No. 16-CV-8863, 2018 WL 3768036, at *6 (S.D.N.Y. Aug. 8, 2018) (finding personal involvement not established where the plaintiff failed to allege the defendants were "present" for the alleged violation or "participated directly" in or "somehow permitted" the alleged violation); *Lara-Grimaldi v. Cnty. of Putnam*, No. 17-CV-622, 2018 WL 1626348, at *11 (S.D.N.Y. Mar. 29, 2018) (holding personal involvement not established where the "[c]omplaint contain[ed] no allegations whatsoever that [the defendant] was involved in, aware of, or somehow permitted" the violation).

Plaintiffs additionally state in their Opposition that dismissal of Langley is inappropriate at this stage because he "established policy, was responsible for the training and discipline of officers and the overall operation of the Defendant police department." (Pls.' Mem. 19.) "While personal involvement of a supervisor may be established by showing that he created a policy or custom under which the violation occurred, conclusory allegations that a defendant was involved in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal involvement." *Koehl v. Bernstein*, No. 10-CV-3808, 2011 WL 2436817, at *19 (S.D.N.Y. June 17, 2011), *report and recommendation adopted by*, No. 10-CV-3808, 2011 WL 4390007 (S.D.N.Y. Sept. 21, 2011) (citation omitted). Plaintiffs appear to only allege a single instance of excessive force in their Second Amended Complaint, namely the incident at issue. (*See generally* SAC.) "Allegations involving only a single incident are generally insufficient to demonstrate the existence of an official policy or custom for purposes of establishing personal involvement under § 1983." *Parris v. N.Y. State Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 364 (S.D.N.Y. 2013). Accordingly, this single alleged use of force is insufficient to plausibly allege personal involvement on the basis of a policy. *See Tubbs v. Venettozzi*, No. 19-CV-126, 2019 WL 2610942, at *8 (N.D.N.Y. June 26, 2019) (holding that allegations that Superintendent was made aware of complaints about due process violations and allowed a custom of due process violations in disciplinary hearings failed when plaintiff only alleged two such incidents); *Lindsey v. Butler*, 43 F. Supp. 3d 317, 331 (S.D.N.Y. 2014), *on reconsideration in part*, No. 11-CV-9102, 2014 WL 5757448 (S.D.N.Y. Nov. 5, 2014) (holding that plaintiff's claims that Commissioner Kelly "created or adopted" an unconstitutional policy were insufficient to plausibly allege personal involvement "[w]ithout more than the allegations related to the single incident in the station house"). Additionally, insofar as Plaintiffs seek to hold Langley liable on the basis of his supervisory position, the Second Circuit has made clear that in the wake of *Iqbal*, plaintiffs cannot rely on supervisory liability to establish personal involvement. *Tangreti*, 983 F.3d at 620 (holding it was insufficient to show that defendant "was negligent, or even grossly negligent, in her supervision of the correctional officers or in failing to act on the information she had" for the purposes of personal involvement); *see also Bridgewater v. Taylor*, 832 F. Supp. 2d 337, 348 (S.D.N.Y. 2011) (holding personal involvement not established where the plaintiff made conclusory claims that a supervisory official failed to provide proper training and supervision or created a policy).

### 7. Putnam County Sheriff's Office

***15** Defendants argue that "claims against the Putnam County Sheriff's Office must be dismissed because the police department is a non-suable entity." (Defs.' Mem. 23.) The Court agrees. Under law of the State of New York, "a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence." *Hoisington*

v. County of Sullivan, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999). "[T]he Sheriff's Department [does not] exist separate and apart from the County and, as a result, [ ] can[not] be sued." *Sagaria v. Orange Cnty. Jail,* No. 20-CV-2287, 2021 WL 4392422, at *3 (S.D.N.Y. Sept. 24, 2021); *see also* *Gleeson v. County of Nassau*, No. 15-CV-6487, 2019 WL 4754326, at *14 (E.D.N.Y. Sept. 30, 2019) (holding Nassau County Sheriff's Department and Nassau County Correction Center were not proper parties because they are administrative arms of Nassau County); *Polite v. Town of Clarkstown,* 60 F. Supp. 2d 214, 216 (S.D.N.Y. 1999) ("Therefore, municipal departments in this State—such as the Clarkstown Police Department—are not amenable to suit, and no claims can lie directly against them.") Indeed, "Plaintiffs concede the Putnam County Sheriff's Office is not a suable entity." (Pls.' Mem. 26.)

8. *Monell* Claim

"To state a claim under [§ 1983], the plaintiff must show that a defendant, acting under color of state law, deprived him of a federal constitutional or statutory right." *Sykes v. Bank of Am.*, 723 F.3d 399, 405–06 (2d Cir. 2013). However, "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008); *see also* *Williams v. Lohard*, No. 20-CV-10571, 2022 WL 269164, at *3 (S.D.N.Y. Jan. 28, 2022) ("[The] [p]laintiff's claim against the [c]ity fails for lack of facts supporting the existence of a municipal policy or practice." (citing cases)); *Palmer v. City of New York*, 564 F. Supp. 3d 221, 240 (E.D.N.Y. 2021) (dismissing claim against city where the plaintiffs failed to "sufficiently allege[ ] that they suffered constitutional violations as a result of an official policy or custom" (quotation marks omitted)); *Salvatierra v. Connolly*, No. 09-CV-3722, 2010 WL 5480756, at *10 (S.D.N.Y. Sept. 1, 2010) (dismissing a claim against agencies where the plaintiff did not allege that any policy or custom caused the deprivation of his rights), *report and recommendation adopted*, 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011).

This multi-factor test, and particularly the fifth element, reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *see also* *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (holding that a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior." (italics omitted)); *Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong"); *Newton v. City of N.Y.*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also* *City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

***16** "In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.' " *Davis v. City of N.Y.*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003). Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton*, 566 F. Supp. 2d at 271; *see also* *City of Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Bird v. Cnty. of Westchester*, No. 20-CV-10076, at *12 (S.D.N.Y. June 23, 2022) ("[The] [p]laintiff fails to allege the existence of any other similar incident, which dooms [the p]laintiff's claim because a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality." (quotation marks omitted)); *Santana v. City of N.Y.,* No. 15-CV-6715, 2018 WL 1633563, at *10 (S.D.N.Y. Mar. 29, 2018) ("[A] 'single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy.' ") (quoting *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir.

1998)); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").

A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Atadzhanov v. City of New York,* No. 21-CV-5098, 2022 WL 4331304, at *11 (S.D.N.Y. Sept. 19, 2022) (citations omitted); *see also* *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226–27 (2d Cir. 2004) (describing methods of establishing *Monell* liability). Moreover, as noted, a plaintiff must also establish a causal link between the municipality's policy, custom, or practice and the alleged constitutional injury. *See* *Tuttle*, 471 U.S. at 824 n.8 ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a constitutional violation. There must at least be an affirmative link between[, for example,] the training inadequacies alleged, and the particular constitutional violation at issue." (emphasis omitted)); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiffs' injury, *Monell* prohibits a finding of liability against the [c]ity."); *Hincapie v. City of New York*, 434 F. Supp. 3d 61, 77 (S.D.N.Y. 2020) (holding that the plaintiff "fails to state a *Monell* claim" because the plaintiff "has not pled facts demonstrating a direct link between his injuries and the alleged municipal policy"); *Johnson v. City of New York*, No. 06-CV-9426, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (noting that after demonstrating the existence of a municipal policy or custom, "a plaintiff must establish a causal connection—an affirmative link—between the policy and the deprivation of his constitutional rights" (quotation marks omitted)).

Plaintiffs assert that the County is liable to Plaintiffs for the alleged constitutional deprivations based upon its maintenance of "a policy, practice or custom, officially or unofficially, of unconstitutional practices, including the use of force, the cover-up of police misconduct, the failure to maintain an independent police review board, the fabrication of evidence, the intimidation of witnesses, the failure to disclose discovery during criminal prosecution and the condoning of police misconduct." (SAC ¶ 161.) Plaintiffs further allege that the County "by and through its policy makers, maintained a policy, practice or custom, officially or unofficially, of failing to adequately supervise, discipline and/or train its officers, including with respect to the use of force, tactics with respect to emotionally disturbed persons and the use of weapons during police encounters." (*Id.* ¶ 162.)

***17** Plaintiffs do not allege that the County maintains a formal policy officially endorsed by the municipality. (*See generally id.*)[5] Accordingly, the Court need only analyze whether Plaintiffs have plausibly alleged that there existed a sufficiently widespread practice to constitute a custom, whether policymakers failed to provide adequate training or supervision so grossly that it rises to gross indifference, or whether actions by final policymakers constituted official policy. *See* *Atadzhanov*, 2022 WL 4331304, at *11 (listing the four modes of proving a policy, custom, or practice under *Monell*).

<u>a. Widespread Practice</u>

To demonstrate a de facto policy or custom through a widespread practice, a plaintiff must "show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Buari v. City of N.Y.*, 530 F. Supp. 3d 356, 398 (S.D.N.Y. 2021) (quoting *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004)). A practice can constitute a custom under *Monell* when the practice is "persistent and widespread," or "permanent and

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

well settled as to constitute a 'custom or usage' with the force of law" and to "imply the constructive knowledge of policymaking officials." *In re N.Y.C. Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 400 (S.D.N.Y. 2021) (quoting *Sorlucco v. N.Y.C. Police Dep't,* 971 F.2d 864, 870–71 (2d Cir. 1992)); *see also Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 532 (S.D.N.Y. 2012) (noting that to demonstrate a practice is sufficiently widespread and crystalized to constitute a custom under *Monell*, "a plaintiff must prove that the custom at issue is permanent and well-settled" (citing *Praprotnik*, 485 U.S. at 127)).

***18** Plaintiffs allege that "Defendants maintain a pattern, policy and/or practice whereby criminal discovery is not provided in a timely fashion and/or at all" and cite to *DiPippo v. County of Putnam,* No. 17-CV-7948, 2019 WL 1004152 (S.D.N.Y. Feb. 28, 2019). (SAC ¶¶ 83–84.) In *DiPippo*, plaintiff Anthony DiPippo alleged in part that he was denied a fair trial and wrongfully convicted based upon fabricated evidence during his criminal trials in 1994 and 2012. 2019 WL 1004152, at *8. The court held that plaintiff had

> pleaded ample specific facts indicating that Defendants used extremely similar coercive investigative techniques on at least six witnesses within the [ ] investigation [at issue]. These techniques included: procuring testimony that implicated DiPippo in exchange for leniency, threatening witnesses with prosecutions against them if they did not provide inculpatory testimony, harassing and assaulting witnesses over extended periods of time, isolating witnesses and interrogating them for hours, forcing or attempting to force witnesses to sign false affidavits or other pre-written statements, administering sham polygraph examinations, failing to keep records of meetings with witnesses, using force on witnesses, and denying witnesses the opportunity to consult with counsel.

*Id.* at *9. Based on these allegations, and the fact that "DiPippo was wrongfully convicted twice and tried three times by a jury" and the plaintiff "alleged facts that indicated that the [Putnam County Sheriff's Department] officers used similar unconstitutional methods in every trial" the court held that, that the plaintiff had sufficiently pled a *Monell* claim under a widespread practice theory. *Id.* at *11.

Defendants argue that Plaintiffs' sole reliance on this case dooms their *Monell* claim as the case resolved by settlement without determination or admission of liability. (Defs.' Mem. 18–19.) Indeed, courts in this District have held that "citations to lawsuits, even if they did involve comparable conduct, do not alone establish a custom or practice that is widespread and persistent, *particularly if the lawsuits did not result in an adjudication of liability.*" *Bethune v. Westchester County*, No. 18-CV-3500, 2020 WL 1032508, at *5 (S.D.N.Y. Mar. 2, 2020) (emphasis added) (granting a motion to dismiss where the plaintiff premised *Monell* liability on, inter alia, citations to several filed lawsuits); *see also Barnett v. Westchester County*, No. 18-CV-2483, 2020 WL 1032445, at *5 (S.D.N.Y. Feb. 28, 2020) (same); *Vincent v. Winski*, No. 14-CV-7744, 2018 WL 1441370, at *17 (S.D.N.Y. Mar. 22, 2018) (granting the defendants' motion to dismiss *Monell* claims where "the only facts that [the] [p]laintiff identifie[d] in support of any pattern of mishandling situations because of a failure to train ... consist[ed] of other litigations resulting in settlements"); *Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *17 (S.D.N.Y. Mar. 26, 2015) (concluding that "lawsuits cited by [the] [p]laintiff in the [proposed amended complaint], even when combined with [other] allegations ..., are insufficient to plausibly support an inference of a widespread custom" to establish *Monell* municipal liability). *DiPippo* was settled without an admission of liability. *See* Stipulation of Discontinuance with Prejudice, *DiPippo*, 2019 WL 1004152, Dkt. No. 98. Accordingly, Plaintiffs cannot allege a widespread practice on the basis of *DiPippo* alone. *See McDonald v. City of Troy*, 542 F. Supp. 3d 161, 175–76 (N.D.N.Y. 2021) (holding that while "Plaintiffs' eight settled [excessive force] lawsuits over eight years is not the best record for a small city like Troy to sport .... [B]ecause plaintiff has not pointed to a single related case that actually resulted in a finding of liability on the City's part, that showing falls woefully short of establishing *Monell* liability"); *An v. City of New York,* 230 F. Supp. 3d 224, 229–30 (S.D.N.Y. 2017) (granting a motion to dismiss where a complaint sought to establish *Monell* liability based on "cites [to] six lawsuits filed between 2012 and 2016 and one newspaper report" but failed to plausibly allege a custom

because "the Complaint fail[ed] to allege that any of the six lawsuits, which were filed over a course of four years, resulted in a finding that the NYPD officers violated the plaintiffs' First Amendment rights"). [6]

b. Failure to Train

***19** *Monell* liability can also exist " 'where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions.' " *Fraser*, 2021 WL 1338795, at *10 (quoting *Reynolds*, 506 F.3d at 192). One category of municipal acquiescence involves a failure to train public officials. However, a failure to train constitutes a policy or custom that is actionable under § 1983 only where "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390. The Second Circuit has held that a finding of deliberate indifference requires: (1) "that a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "that the wrong choice by the ... employee will frequently cause the deprivation of a citizen's constitutional rights." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (alteration in original) (quoting *Walker v. City of N.Y.*, 974 F.2d 293, 297–98 (2d Cir. 1992)). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61.

To set forth a failure to train claim, "a plaintiff must plausibly allege a specific deficiency in the municipality's training." *Tieman*, 2015 WL 1379652, at *22. Here, Plaintiffs' claim fails first and foremost because they have not alleged a specific training deficiency. Indeed, Plaintiffs' Second Amended Complaint does not "contain sufficient factual matter" to state a training deficiency "that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Instead, Plaintiffs only broadly allege "Defendant Putnam County and/or Putnam County Sheriff's Office breached their duty to the public and the Plaintiff specifically by deploying Deputies without first properly screening the hiring of and training of them," that the County failed to "train its officers, including with respect to the use of force, tactics with respect to responding to emotionally disturbed persons and the use of weapons during police encounters," and that "Langley has failed to train and/or retrain his deputies, including the Defendants herein, in the proper and lawful use of force," "the proper treatment of prisoners requiring medical attention," "proper response and/or treatment of emotionally disturbed persons," and the "requirement to timely transmit criminal discovery as part of a criminal prosecution." (SAC ¶¶ 108–111, 162, 201.) Simply put, the sum total of Plaintiffs' failure-to-train claim is based on a threadbare description of the County's training, and is the type of conclusory claim that courts routinely dismiss. *See, e.g.*, *Clarke v. Antonini*, No. 21-CV-1877, 2022 WL 4387357, at *12 (S.D.N.Y. Sept. 22, 2022) (dismissing *Monell* claim where plaintiff failed to "allege a specific deficiency in either the [c]ity or the [c]ounty's training for his failure-to-train theory"); *Lehal v. Cent. Falls Det. Facility Corp.*, No. 13-CV-3923, 2016 WL 7377238, at *11 (S.D.N.Y. Nov. 21, 2016) (dismissing failure to train claim when a "[p]laintiff's new allegations regarding a supposed lack of training are too general and speculative to support a *Monell* claim"); *Triano*, 895 F. Supp. 2d at 539–40 (dismissing *Monell* claim where the plaintiff "merely alleged that the [t]own failed to train its employees, without providing any supporting factual detail about alleged deficiencies in the training program"); *Walker v. City of New York*, No. 14-CV-808, 2015 WL 4254026, at *11 (S.D.N.Y. July 14, 2015) (dismissing failure to train claim where the plaintiff "neither cites to procedural manuals and training guides, nor highlights the pertinent aspects of police training in order to prove the claim").

Furthermore, in addition to identifying a specific training deficiency, a plaintiff must "establish that that deficiency caused the constitutional deprivation." *Benn v. City of New York*, No. 18-CV-722, 2021 WL 3193022, at *6 (S.D.N.Y. July 28, 2021) (citation omitted). Plaintiffs, however, only make conclusory assertions that Langley, "as Sheriff of Putnam County and/or subordinates under his command, fail to properly train and/or supervise its officers resulting in the unlawful actions complained of herein." (SAC ¶ 115.) Plaintiffs' conclusory assertions do not suffice to plausibly allege that a deficiency in training caused Taranto's injury. *See* *King v. City of Beacon Police Dep't*, No. 20-CV-5815, 2021 WL 1550073, at *3 (S.D.N.Y. Apr. 20, 2021) (dismissing *Monell* claims when a plaintiff's allegations that his injuries "resulted from a municipal policy or custom" were

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

"wholly conclusory"); *Acosta v. City of New York*, No. 11-CV-856, 2012 WL 1506954, at *11 (S.D.N.Y. Apr. 26, 2012) (dismissing *Monell* claim where the plaintiff merely alleged that the city "failed to train its police officers," because the plaintiff "failed to set forth factual allegations that would support a plausible inference that the [c]ity's 'policies' or 'customs' caused ... [the] alleged violations of [the] plaintiff's rights").

***20** In sum, Plaintiffs have not pled a plausible *Monell* claim under a failure to train theory.

c. Failure to Discipline or Supervise

"In *City of Canton*, the Supreme Court established the 'deliberate indifference' standard in the context of a claim for failure to train, but 'the stringent causation and culpability requirements set out in that case have been applied to a broad range of supervisory liability claims,' including claims for failure to supervise and failure to discipline." *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 306 (S.D.N.Y. 2015) (quoting *Reynolds*, 506 F.3d at 192).

"To establish *Monell* liability premised on a failure to supervise, a plaintiff must plead that (1) there was a pattern of allegations of or complaints about, or a pattern of actual, similar unconstitutional activity, and (2) the municipality consistently failed to investigate those allegations." *Lopes v. Westchester Cnty.*, No. 18-CV-8205, 2020 WL 1445729, at *5 (S.D.N.Y. Mar. 25, 2020). Alternatively, "a plaintiff may plead (1) that there was a pattern of actual similar constitutional violations and (2) the municipality consistently failed to discipline those involved." *Tieman*, 2015 WL 1379652 at *21 (emphasis omitted). To establish deliberate indifference for a failure to supervise and/or discipline claim, the plaintiff must show that "the need for more or better supervision to protect against constitutional violations was obvious," which may be established "through proof of repeated complaints of civil rights violations ... if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Buari,* 530 F. Supp. 3d at 400.

"[A]n allegation of numerous claims of [the underlying constitutional wrong] by itself is insufficient to raise an inference of deliberate indifference due to failure to supervise." *Tieman*, 2015 WL 1379652, at *21. Rather, a plaintiff must allege that "meaningful attempts to investigate repeated claims ... are absent." *Id.* (quoting *Hart v. City of Binghamton*, No. 10-CV-1064, 2012 WL 1565085, at *5 (N.D.N.Y. May 2, 2012)). In other words, "[f]or deliberate indifference to be shown, the response must amount to a persistent failure to investigate the complaints or discipline those whose conduct prompted the complaints." *Hart*, 2012 WL 1565085, at *5. Plaintiffs do not make any such allegation, instead Plaintiffs allege that Langley, "as Sheriff of Putnam County and/or subordinates under his command, fail to ... supervise its officers resulting in the unlawful actions complained of herein," failed "to discipline subordinates upon findings of misconduct," and that the "attack against [ ] Taranto could have been prevented had Putnam County and/or Sheriff Langley acted properly by removing Deputies who have demonstrated violent tendencies, failed to act within the boundaries of law, properly train its officers, properly supervise its officers and/or to discipline officer misconduct." (SAC ¶¶ 75, 115.) While the *DiPippo* case points to misconduct that occurred in the Putnam County Sheriff's Office, Plaintiffs make no specific factual allegations regarding any failures to investigate complaints or discipline officers involved in that matter by the Putnam County Sheriff's Office's in the Second Amended Complaint. (*See generally* SAC.) The only relevant allegations in the Second Amended Complaint are that "Plaintiffs are presently aware of similar misconduct committed by the Defendants in the matter of *DiPippo v. County of Putnam, et al.* where Defendants, among other things, also failed to disclose criminal discovery," and that "[i]n the matter of *DiPippo v. County of Putnam*, Defendant Quick was also one of the defendants who failed to disclose and apparently hid criminal discovery." (*Id.* ¶¶ 84–85.) However, Plaintiffs have made no allegations regarding any prior lack of investigation into or disciplining of Quick, or any other officer for that matter, in the Second Amended Complaint, which dooms their claim. *See* *Esperanza v. City of New York,* 325 F. Supp. 3d 288, 309 (E.D.N.Y. 2018) ("Plaintiffs do not allege any specific facts regarding whether the [c]ity investigated or disciplined Lluka in response to the complaints of excessive force."); *Walker*, 2015 WL 4254026, at *11 (noting that "[e]ven if [the] [p]laintiff had shown an obvious need for more or better supervision by listing the numerous lawsuits and complaints, he has not stated any facts to show that the [c]ity has acted with deliberate indifference" where "he does not specifically claim that the [c]ity *failed to investigate* the list of lawsuits"). Cases finding failures to supervise or discipline have required more. *See, e.g.*, *Buari*, 530 F. Supp. 3d at 407–08 (ruling that the plaintiff sufficiently alleged failure to supervise when "in approximately 72 cases where courts had found prosecutorial

misconduct occurred [ ]including the use of and failure to correct false or misleading testimony and *Brady* violations[ ], officials could only identify one prosecutor from between 1975 and 1996 who had been disciplined in any respect"); *Marlin v. City of New York*, No. 15-CV-2235, 2016 WL 4939371, at *20–21 (S.D.N.Y. Sept. 7, 2016) (denying motion to dismiss on failure to discipline claim where officers were not disciplined in over thirty-five percent of substantiated complaints, which "plausibly suggest[ed] that the City did nothing"). [7]

d. Final Policymaker

***21** "Actions by an individual with final decision-making authority in a municipality constitute official policy for purposes of a § 1983 claim." *Anthony v. City of New York*, 339 F.3d 129, 139 (2d Cir. 2003). "[E]ven a single action by a decisionmaker who possesses final authority to establish municipal policy with respect to the action ordered is sufficient to implicate the municipality in the constitutional deprivation for the purposes of § 1983." *Amnesty*, 361 F.3d at 126 (internal quotation marks and citation omitted). When a non-decisionmaker committed the constitutional violation "a plaintiff must allege facts suggesting that an officer with final policymaking authority ordered, ratified, or 'was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions.' " *Hu v. City of New York*, 927 F.3d 81, 105 (2d Cir. 2019) (quoting *Amnesty Am.*, 361 F.3d at 126).

"An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions." *Anthony*, 339 F.3d at 139. When alleging policymakers caused the violation, "the critical inquiry is not whether an official generally has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit." *Guity v. Uniondale Union Free School Dist.*, No. 18-CV-04369, 2019 WL 3402280, at *7 (E.D.N.Y. July 26, 2019) (alteration omitted). "Whether an official has final policymaking authority is a legal question, determined on the basis of state law." *Roe*, 542 F.3d at 37.

Plaintiffs do allege in the Second Amended Complaint that "Defendant Langley is the final decision/policy maker of the Putnam County Sheriff's Department and in is familiar with, creates and implements his Department's practices and policies." (SAC ¶ 107.) However, Plaintiffs do not point to any support for this proposition, which they must do to sufficiently allege Langley was a final policymaker with respect to the particular conduct challenged in this lawsuit. *See* *Coppola v. Town of Plattekill*, No. 17-CV-1032, 2018 WL 1441306, at *10 (N.D.N.Y. Mar. 22, 2018) ("[M]inimal, conclusory statements fall far short of satisfying Plaintiff's burden to allege facts creating a plausible inference that either of these defendants were final policymakers. Plaintiff does not direct the Court to New York State law, municipal charters, or any other source that could support her claim."); *W.A. v. Hendrick Hudson Cent. Sch. Dist.*, No. 14-CV-8093, 2016 WL 1274587, at *12–13 (S.D.N.Y. Mar. 31, 2016) (dismissing a *Monell* claim where the plaintiffs "allege[d] that 'Coughlin, as an administrator for the District, possesses policy making authority,' " but "cite[d] no state or county law that actually vests Coughlin with final policymaking authority over the maintenance and protection of student records"); *Canner v. City of Long Beach*, No. 12-CV-2611, 2015 WL 4926014, at *6 (E.D.N.Y. Aug. 18, 2015) (noting a prior order where the court dismissed the plaintiffs' *Monell* claim where the "plaintiffs did not reference any state law supporting their claim that [an official] was a final policymaker"); *see also* *Jeffes v. Barnes,* 208 F.3d 49, 57–58 (2d Cir. 2000) ("Where a plaintiff relies not on a formally declared or ratified policy, but rather on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law."); *Long v. Cnty. of Orleans*, 540 F. Supp. 3d 344, 352–53 (W.D.N.Y. 2021), *appeal dismissed* (Sept. 1, 2021) (holding at summary judgment that the "[p]laintiff's vague assertion of final policymaking authority by Sheriff Bower is simply insufficient to satisfy his burden" when the plaintiff "neither produced nor pointed to any evidence or legal authority supporting the conclusion that Sheriff Bower had final policymaking authority regarding the force to be used in effectuating an arrest or when probable cause for an arrest has been established" (quotation marks omitted)). Accordingly, the *Monell* claim cannot stand. [8]

9. State Claims

***22** Defendants move to dismiss all of Plaintiffs' state claims "except for state law claims for assault, battery and wrongful death, and Ms. Taranto's corollary claims for loss of consortium." (Defs.' Mem. 2.) [9]

a. Defamation

To state a claim for defamation under New York law, a plaintiff must allege "(1) a false statement about the plaintiff; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on part of the publisher; (4) that either constitutes defamation per se or caused special damages." *Alvarado v. Mount Pleasant Cottage Sch. Dist.*, 404 F. Supp. 3d 763, 790 (S.D.N.Y. 2019) (quotation marks omitted). Under New York law, "spoken defamatory words are slander; written defamatory words are libel." *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001); *see also* Celle v. Filipino Reporter Enters. Inc., 209 F.3d 163, 176 (2d Cir. 2000) ("Libel is a method of defamation expressed in writing or print.").

***23** A plaintiff must plead the defamatory statements with some particularity. N.Y. C.P.L.R. 3016(a) ("In an action for libel or slander, the particular words complained of shall be set forth in the complaint, but their application to the plaintiff may be stated generally."). Under Federal Rule of Civil Procedure 8's liberal pleading standards, this requires a plaintiff to "identify the allegedly defamatory statements, the person who made the statements, the time when the statements were made, and the third parties to whom the statements were published." *Neal v. Asta Funding, Inc.,* 13-CV-2176, 2014 WL 3887760, at *3 (S.D.N.Y. June 17, 2014).

Plaintiffs argue they have sufficiently pled a cause of action for defamation because the "filing of false criminal allegations sufficiently demonstrates libel/slander per se." (Pls.' Mem. 26.) More specifically, Plaintiffs allege that "Defendants, individually and/or collectively, have defamed [Taranto] by libel per se and/or slander per se, libel and/or slander, based upon the false arrest of Plaintiff and release of false information concerning said arrest, the sum and substance of which defamatory statements was that [Taranto] engaged in acts constituting the crime of Menacing in the Second Degree and other alleged criminal acts despite knowing them to be false." (SAC ¶ 206.)

However, "[o]fficers may not be held liable for any allegedly defamatory statements in their criminal complaints, because 'individuals participating in a public function such as judicial proceedings are afforded protection from liability by an absolute immunity.' " *Grant v. City of Syracuse*, No. 15-CV-445, 2017 WL 5564605, at *11 (N.D.N.Y. Nov. 17, 2017); *Lockett v. City of Middletown*, No. 19-CV-08255, 2021 WL 1092357, at *6 (S.D.N.Y. Mar. 22, 2021) (same). Accordingly, "[a] person filing a formal complaint charging another with a crime is ... entitled to absolute immunity from a civil suit for defamation." *Grant*, 2017 WL 5564605, at *11 (citation omitted); *see also Frederique v. Cnty. of Nassau*, 168 F. Supp. 3d 455, 488 (E.D.N.Y. 2016) ("[T]o the extent that Plaintiffs argue that the Felony Complaints and District Court Informations contained defamatory statements, the [Nassau County Police Department] officers who made those statements are protected from liability by an absolute immunity."); *Goncalves v. Reynolds*, 198 F. Supp. 2d 278, 282 (W.D.N.Y. 2001) (holding that absolute immunity shielded the defendant from liability for defamation where the "defendant's actions with respect to plaintiff's arrest and the bringing of the assault charge were clearly prosecutorial in nature, and were directly related to the decision to prosecute plaintiff"). Accordingly, Plaintiffs' defamation claim cannot stand.

b. Negligence

The elements of a negligence claim under New York law are: "(i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach." *Lombard v. Booz–Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002) (citing *Merino v. New York City Transit Auth.*, 639 N.Y.S.2d 784 (App. Div. 1996)).

Plaintiffs argue they "have sufficiently pled negligence as an alternate theory of liability," because Defendants "owned [sic] a duty of care to [ ] Taranto who was deprived of his liberties while in Defendants['] custody, care and control." (Pls.' Mem. 25.) "Under New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution." *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994); *see also Toure v. Air France*, No. 21-CV-1645, 2022 WL 4079592, at *3 (E.D.N.Y. Sept. 6, 2022) ("[A] plaintiff seeking damages for an injury resulting from a wrongful arrest and detention may not recover under broad general principles of negligence ... but must proceed by way of the traditional remedies of false arrest and imprisonment.") (citation omitted); *Durr v. Slator*, 558 F. Supp. 3d 1, 40 (N.D.N.Y. 2021) ("When a plaintiff brings excessive force and assault claims which are premised upon a defendant's allegedly intentional conduct, a negligence claim with respect to the same conduct will not lie." (citation and

quotation marks omitted)); *Dollard v. City of New York*, 408 F. Supp. 3d 231, 238–39 (E.D.N.Y. 2019) ("New York does not, as a matter of public policy, recognize a claim for negligence arising out of an arrest or prosecution.... To the extent that a claim for negligence and/or NIED is based upon injury incident to an arrest, a plaintiff must resort to the traditional tort remedies of false arrest, false imprisonment, and malicious prosecution."); *Sullivan v. City of New York*, No. 17-CV-3779, 2018 WL 3368706, at *18 (S.D.N.Y. July 10, 2018) ("New York courts have long held that, where a plaintiff brings false-arrest and false-imprisonment claims, she cannot also recover under broad principles of negligence."). Accordingly, Plaintiffs cannot maintain a negligence claim insofar as that claim overlaps with excessive force, false arrest, false imprisonment, and malicious prosecution causes of action.

***24** "However, a plaintiff may proceed with negligence claims brought against law enforcement officials if such claims are not duplicative of false arrest, false imprisonment, or malicious prosecution." *Lalonde v. City of Ogdensburg*, ––– F. Supp. 3d ––––, 2023 WL 2537626, at *29 (N.D.N.Y. Mar. 16, 2023). Accordingly, courts have allowed negligence actions pertaining to deprivations of adequate medical care to proceed. *See Durr*, 558 F. Supp. 3d at 40–41 (holding that plaintiff plausibly alleged both a deliberate indifference to medical claim needs claim and a negligence claim related to the failure to provide medical care upon his arrest).

"[I]t is well-established in New York that when the State assumes physical custody of inmates or detainees, who cannot protect and defend themselves in the same way as those at liberty can, the State owes a duty of care to safeguard those individuals from harm." *Maldonado*, 460 F. Supp. 3d at 400–01 (quotation and citation omitted). Accordingly, courts have found that when a plaintiff is injured during an arrest and the arresting officers fail to provide medical care upon arrest, a plaintiff may proceed with a negligence claim. *See Durr*, 558 F. Supp. 3d at 41 (holding negligence claim survived when the "complaint plausibly alleges that Plaintiff was seriously injured during the course of his arrest and that the City Defendants, knowing that Plaintiff was in severe pain, declined to take him to the Upstate Emergency Department for treatment, despite being instructed to do so by healthcare personnel").

Plaintiffs allege that "Defendants refused to permit [ ] Taranto to receive proper medical attention at the scene or to be removed from the scene via ambulance," and that "[a]ny first aid provided at the scene by any Fire Department personnel or Emergency Medical Technician present at the scene was insufficient and inadequate to address [ ] Taranto's medical distress." (SAC ¶¶ 46, 48.) Federal Rule of Civil Procedure 8 "requires, at a minimum, that a complaint give each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." *Patrico v. Voya Fin., Inc.*, No. 16-CV-7070, 2017 WL 2684065, at *5 (S.D.N.Y. June 20, 2017) (quotation marks omitted). A complaint fails this standard when it "lump[s] all the defendants together in each claim and provid[es] no factual basis to distinguish their conduct." *Id.* Plaintiffs have brought the claims against multiple Defendants, namely Putnam County Sheriff's Office employees, not all of whom were present at the scene, and possibly Fire Department personnel, and Emergency Medical Technicians. (*See generally* SAC.) It is unclear from Plaintiffs' pleadings which Defendants prevented Taranto from receiving proper medical attention or what medical attention Taranto was prevented from receiving, as Plaintiffs have simply pled that "Defendants" were responsible for such actions and have not provided a "plausible factual basis to distinguish the conduct of each of the defendants." *Bardwil Indus. Inc. v. Kennedy,* No. 19-CV-8211, 2020 WL 2748248, at *3 (S.D.N.Y. May 27, 2020). On that basis, the negligence claim must fail. *See Nesbeth v. N.Y.C. Mgmt. LLC*, 17-CV-8650, 2019 WL 110953 (S.D.N.Y. Jan. 4, 2019) ("[I]t is well-established in this Circuit that plaintiffs cannot simply lump defendants together for pleading purposes" under Rule 8 (quotation marks omitted)); *Medina v. Bauer*, No. 02-CV-8837, 2004 WL 136636, at *6 (S.D.N.Y. Jan. 27, 2004) ("By lumping all the defendants together and failing to distinguish their conduct, plaintiff's amended complaint fails to satisfy the requirements of Rule 8. Specifically, the allegations fail to give adequate notice to these defendants as to what they did wrong.").

c. Negligent Hiring, Supervision, and Training

***25** Defendants argue that Plaintiffs' negligent-hiring, retention, training, and supervision claims are not actionable under New York law because all Defendants were acting within the scope of their employment. (Defs.' Mem. 21.) Indeed, Plaintiffs allege that, at all relevant times, Defendants "were acting within the scope of their employment and in furtherance of the purposes and business of Putnam County and/or the Putnam County Sheriff's Office, and/or Fire Department personnel and/or Emergency Medical Technicians." (SAC ¶ 7.) "New York law provides that an

employer can be liable for the torts of an employee who acts within the scope of his or her employment under the theory of respondeat superior, but no claim may proceed against the employer for negligent hiring, retention, supervision or training." *Hurt v. City of New York*, No. 15-CV-7612, 2018 WL 4007639, at *4 (S.D.N.Y. Aug. 22, 2018) (quotation marks omitted). An "exception to [this] general principle exists where the plaintiff is seeking punitive damages from the employer based on alleged gross negligence in the hiring or retention of the employee." *Nesheiwat v. City of Poughkeepsie*, No. 11-CV-7072, 2013 WL 620267, at *2 (S.D.N.Y. Feb. 13, 2013).

"It is [ ] well settled that 'the State and its political subdivisions [such as counties] are not subject to punitive damages ... [as] the goals of punishment and deterrence are not served when punitive damages are imposed against the State, for in such circumstances, it ultimately is the innocent taxpayer who is punished.' " *Martinez v. Cnty. of Suffolk*, 999 F. Supp. 2d 424, 433 (E.D.N.Y. 2014) (citing *Hubbard v. Town of Sand Lake*, 667 N.Y.S.2d 496, 498 (App. Div. 1998)); *see also Ogunkoya v. Cnty. of Monroe*, No. 15-CV-6119, 2020 WL 3791850, at *8 (E.D.N.Y. July 7, 2020) (noting that municipalities are not subject to punitive damages). "Thus, the negligent hiring claim ... is dismissed." *Martinez,* 999 F. Supp. 2d at 433.

d. Prima Facie Tort

To survive a motion to dismiss on a claim of prima facie tort, a plaintiff must allege: (1) the defendant's intentional infliction of harm; (2) special damages resulting from the defendant's actions; (3) a lack of "excuse or justification"; and (4) that the defendant's act or acts would otherwise be lawful. *NE Brands LLC v. Seattle Pac. Indus., Inc.*, No. 19-CV-7420, 2020 WL 4287989, at *2 (S.D.N.Y. July 27, 2020) (quoting *U.S. for Use and Benefit of Evergreen Pipeline Constr. Co., Inc. v. Merritt Meridian Constr. Corp.*, 95 F.3d 153, 161 (2d Cir. 1996)). "Special damages" refers to an injury made up of a "specific and measurable loss." *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 143 (1985). Defendants argue that Plaintiffs have failed to allege any specific damages and their claim therefore fails. (Defs.' Mem. 22.) Plaintiffs have failed to respond to this argument. (*See generally* Pls.' Mem.)

Federal courts have the discretion to deem a claim abandoned when a defendant moves to dismiss that claim and the plaintiff fails to address in their opposition papers the defendant's arguments for dismissing such a claim. *See, e.g.*, *Lipton v. Cnty. of Orange*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed."); *Anti–Monopoly, Inc. v. Hasbro, Inc.*, 958 F. Supp. 895, 907 n.11 (S.D.N.Y. 1997) ("[T]he failure to provide argument on a point at issue constitutes abandonment of the issue ... which provides an independent basis for dismissal." (citations omitted)), *aff'd*, 130 F.3d 1101 (2d Cir. 1997); *see also Robinson v. Fischer*, No. 09-CV-8882, 2010 WL 5376204, at *10 (S.D.N.Y. Dec. 29, 2010) (report and recommendation) (collecting cases). Because Plaintiffs have failed to address Defendants' argument for dismissing the prima facie tort claim, that claim is abandoned. *See Laface v. E. Suffolk BOCES*, No. 18-CV-1314, 2019 WL 1959489, at *8 (E.D.N.Y. May 2, 2019) ("In the Second Circuit, a plaintiff's failure to respond to contentions raised in a motion to dismiss constitute[s] an abandonment of those claims." (alteration and quotation marks omitted) (collecting cases)); *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08-CV-442, 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014) ("At the motion to dismiss stage ... a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim.").

III. Conclusion

***26** For the foregoing reasons, Defendants' Motion is granted in part and denied in part. Defendants' request that all of Plaintiffs' state causes of action be dismissed as a result of Plaintiffs' failure to comply with New York's General Municipal Law is denied. The remainder of Defendants' Motion is granted. Because this is the first adjudication of Plaintiffs' claims on the merits, Plaintiffs' claims are dismissed without prejudice. If Plaintiffs wish to file a third amended complaint alleging additional facts and otherwise addressing the deficiencies identified above, Plaintiffs must do so within 30 days of the date of this Opinion & Order. There will be no extensions. Plaintiffs are further advised that the third amended complaint will completely replace, not supplement, the instant Second Amended Complaint. The third amended complaint must therefore contain all of the claims, defendants, and factual allegations that Plaintiffs wish the Court to consider. If Plaintiffs fail to timely file a third amended complaint, the claims may be dismissed with prejudice.

The Court will hold a status conference on October 3, 2023, at 12:15 P.M.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 6318280

## Footnotes

1 Plaintiffs have withdrawn their malicious prosecution and Eighth Amendment claims. (Mem. of Law for Reply to Mot. to Dismiss. 14, 16.)

2 The Arrest Report, Use of Force Form, Appearance Ticket, Criminal Court Information, Criminal Court Discovery, Photograph Hospital, Photograph Surgery, and Personnel Investigation, attached to Plaintiffs' Opposition, are also attached to the Second Amended Complaint.

3 Defendants note that the defendant in *DiPippo v. County of Putnam* was actually Quick's father. (Defs.' Mem. 18.)

4 Plaintiffs in their Opposition also point to "the statements of [ ] Langley, which purport to have one of his subordinates change the Use of Force Form with respect to the use of an impact weapon upon [ ] Taranto." (Pls.' Mem 15.) Plaintiffs do not make any such allegations in the Second Amended Complaint.

5 Plaintiffs posit that the municipal liability lies because of "the failure to maintain an independent police review board." (SAC ¶ 161.) However, an alleged absence of a formal policy is not a policy: "the absence of a policy is not a policy and is not actionable under *Monell*." *Zachary v. City of Newburgh*, No. 13-CV-5737, 2014 WL 1508705, at *5 (S.D.N.Y. Apr. 1, 2014) (citing *Monell*, 436 U.S. at 690–91); *see also Quinones v. New York City*, No. 19-CV-5400, 2020 WL 5665142, at *19 (S.D.N.Y. Aug. 17, 2020) ("[B]ut, under *Monell*, a municipality's failure to put a formal policy in place to prevent unlawful conduct is not the same thing as an actionable policy."), *report and recommendation adopted*, No. 19-CV-5400, 2020 WL 6901340 (S.D.N.Y. Nov. 23, 2020). "Nonetheless, the Supreme Court has left a narrow opening for § 1983 claims like the one [the Court] address[es] here seeking liability based not on affirmative conduct but on a government official's failure to act." *Reynolds v. Giuliani*, 506 F.3d 183, 191–92 (2d Cir. 2007) (citing *City of Canton*, 489 U.S. at 394–95 (O'Connor, J., concurring in part and dissenting in part) ("Where ... a claim of municipal liability is predicated upon a failure to act, the requisite degree of fault must be shown by proof of background events and circumstances which establish that the 'policy of inaction' is the functional equivalent of a decision by the city itself to violate the Constitution.")). When a municipality "does not have an adequate policy ...*Monell* liability exists 'where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Fraser v. City of N.Y.*, No. 20-CV-4926, 2021 WL 1338795, at *10 (S.D.N.Y. Apr. 9, 2021) (quoting *Reynolds*, 506 F.3d at 192). "Such a pattern, if sufficiently persistent or widespread as to acquire the force of law, may constitute a policy or custom within the meaning of *Monell*." *Id.*

6 Plaintiffs have not argued that they have plausibly alleged municipal liability on the basis of a widespread practice of excessive force. (Pls.' Mem. 22–24.) Indeed, Plaintiffs have not pointed to any other instances of excessive use of force beyond the incident described at hand. (*See generally* SAC.) This alone is fatal to Plaintiffs' *Monell* claim. *See Aragon v. New York*, No. 14-CV-9797, 2017 WL 2703562, at *6 (S.D.N.Y. June 22, 2017) (dismissing claims where "[the] [p]laintiff seems to allege the existence of a practice adopted by the [County] solely based on [the] [p]laintiff's alleged experience"); *Gordon v. City of New York*, No. 10-CV-5148,

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

2012 WL 1068023, at *4 (E.D.N.Y. Mar. 29, 2012) (dismissing *Monell* claim where the plaintiff's "allegation [was] unsupported by anything other than the facts of what occurred in his particular case").

7 In *DiPippo*, the court noted that Plaintiff alleged that "Stephens and other supervisors purportedly knew about Castaldo and Quick's misconduct, personally participated in it, and failed to document or disclose it. Stephens and other supervisors also allegedly failed to prevent Castaldo and Quick from engaging in misconduct, participated in it, encouraged it, and affirmatively misrepresented to prosecutors that no misconduct had occurred ... Stephens updated Thoubboron about all major investigatory developments. Hence, Thoubboron was either aware of the misconduct committed by Defendants Stephens, Castaldo, and Quick or willfully blind to it." 2019 WL 1004152, at *6. However, Plaintiffs have made no specific allegations in the Second Amended Complaint about any alleged failure to supervise or discipline.

Plaintiffs additionally allege that "[a]t all times mentioned herein and prior to the incidents described herein, Putnam County, by and through its policy makers, maintained a policy, practice or custom, officially or unofficially, of failing to adequately supervise, discipline and/or train its officers, including with respect to the use of force, tactics with respect to responding to emotionally disturbed persons and the use of weapons during police encounters." (SAC ¶ 162.) Plaintiffs have not alleged any prior failures to supervise or discipline officers for use of force, tactics with respect to responding to emotionally disturbed persons and the use of weapons during police encounters.

8 Furthermore, Plaintiffs do not specifically argue in their Opposition that *Monell* liability is predicated upon an act of a final policymaker or point to a specific to act in their briefing. (Pls.' Mem. 22–24.)

9 Defendants aver that Plaintiffs' state law claims are precluded due to their failure to comply with General Municipal Law § 50-h. (Defs.' Mem 20–21.) Section 50-h states:

> [w]herever a notice of claim is filed against a city, county, town, village, fire district, ambulance district or school district the city, county, town, village, fire district, ambulance district or school district shall have the right to demand an examination of the claimant relative to the occurrence and extent of the injuries or damages for which claim is made, which examination shall be upon oral questions unless the parties otherwise stipulate .... The action ... may not be commenced until compliance with the demand for examination if the claimant fails to appear at the hearing or requests an adjournment or postponement beyond the ninety day period.

N.Y. Gen. Mun. Law § 50-h(1);(5). In federal court, "a 'plaintiff's failure to attend a 50-h [h]earing—*no matter the reason*—is a complete bar to his state law claims[.]' " *Bird v. Cnty. of Westchester*, No. 20-CV-10076, 2022 WL 2263794, at *12–13 (S.D.N.Y. June 23, 2022) (citation omitted); *see also* *Misek-Falkoff v. Metro. Transit Auth. (MTA)*, 843 N.Y.S.2d 155, 156 (App. Div. 2007) ("A party who has failed to comply with General Municipal Law § 50-h is generally precluded from commencing an action against a municipality[.]"); *Baumblatt v. Battalia*, 520 N.Y.S.2d 571, 574 (App. Div. 1987) (dismissing a complaint against a town because "the plaintiff failed to appear for examination on his original notice of claim as requested by the town's attorney pursuant to General Municipal Law § 50-h and this failure bars the commencement of an action against the town"). Plaintiffs' Second Amended Complaint only states that "Defendants have not held a hearing on this claim pursuant to General Municipal Law 50-h." (SAC ¶ 21.) This Court cannot determine at this stage whether this was due to Taranto's failure to attend the hearing.

Defendants also moved to dismiss Plaintiffs' intentional infliction of emotional distress claims against the County. (Defs.' Mem 21.) Plaintiffs "concede that a cause of action for intentional infliction of emotional distress against Putnam County cannot be maintained." (Pls.' Mem. 25.)

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Distinguished by Sparks v. Holland, N.D.N.Y., September 30, 2025

2016 WL 5793714
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Matthew THORNTON, Plaintiff,
v.
COUNTY OF ALBANY; Christian Clark, Superintendent, Albany County Correctional Facility; Arthur Brothers, Corrections Officer, Albany County Correctional Facility; Brian Eckles, Corrections Officer, Albany County Correctional Facility; Jeffrey Hunt, Corrections Officer, Albany County Correctional Facility; and Patrick Galarneau, Corrections Officer, Albany County Correctional Facility, Defendants.

9:14-CV-679 (DNH/CFH)
|
Signed 10/04/2016

**Attorneys and Law Firms**

OFFICE OF JESSICA M. GORMAN, 74 Chapel Street, 2nd Floor, OF COUNSEL: JESSICA M. GORMAN, ESQ., Albany, New York 12207, Attorney for Plaintiff.

ALBANY COUNTY ATTORNEY'S OFFICE, 112 State Street, Suite 1010, OF COUNSEL: PATRICK J. COLLINS, ESQ., KEVIN M. CANNIZZARO, ESQ., Albany, New York 12207, Attorneys for Defendants.

## MEMORANDUM-DECISION and ORDER

DAVID N. HURD, United States District Judge

### I. INTRODUCTION

***1** This civil action arises out of the assault of plaintiff Matthew Thornton ("Thornton" or "plaintiff") on two occasions during his detainment at Albany County Correctional Facility ("ACCF") in Albany, New York.

Thornton asserts claims pursuant to 42 U.S.C. § 1983 and state law alleging excessive force, failure to intervene, municipal liability, assault and battery, negligence, and negligent hiring and supervision against the County Of Albany ("the County"), ACCF Superintendent Christian Clark ("Supt. Clark"), and Corrections Officers Arthur Brothers ("CO Brothers"), Brian Eckles ("CO Eckles"), Jeffrey Hunt ("CO Hunt"), and Patrick Galarneau ("CO Galarneau") (collectively "defendants").

Following the completion of discovery, defendants moved pursuant to Federal Rule of Civil Procedure ("Rule") 56 for summary judgment on plaintiff's federal claims.[1] Plaintiff opposed and defendants replied. The motion was fully briefed and oral argument was heard on September 21, 2016 in Utica, New York. Decision was reserved.

### II. BACKGROUND

On March 8, 2013, while incarcerated at ACCF, Thornton was assaulted by two inmates on the 1 West Tier. See Defs.' Statement of Material Facts, ¶ 15 ("Rule 7.1 Stat.").[2] During the assault, lasting a few minutes, plaintiff was repeatedly punched and kicked in the face and body, which continued after he fell to the floor. Compl. ¶¶ 18, 19, 22. His scalp was sliced with a weapon believed to be a razor blade. Id. ¶ 21. He sustained serious injuries including a scalp laceration, broken teeth, and fractured jaw. Id. ¶ 22.

***2** CO Brothers was assigned to the 1 West Tier at that time, and upon seeing the altercation, made several orders for the inmates to stop fighting. Rule 7.1 Stat. ¶ 17. After several orders to stop fighting, Thornton and the other inmates complied and were then locked in their cells. Id. ¶ 18. Each inmate then requested to go to the medical unit. Id. ¶ 19.[3] Immediately following the altercation, plaintiff was moved to the 3 West Tier. Gorman Decl., Ex. 2 (1 West Tier Log). He was thereafter treated at the medical unit for a laceration on his scalp, fractured tooth, missing tooth, and mandibular fracture. Rule 7.1 Stat. ¶ 20. He was later transferred to Albany Medical Center where staples were placed in his scalp and he underwent surgery for placement of a metal plate in his jaw. Id. ¶ 21. He was eventually given a disciplinary ticket and served 14 days in keep-lock. Compl. ¶ 31. He thereafter received further medical care at ACCF on numerous occasions, but grew unhappy with the treatment. Rule 7.1 Stat. ¶¶ 22, 23.

Thornton received a grievance form from Corrections Officer Michael Benedetto on April 11, 2013. Id. ¶ 25. According to plaintiff, ACCF medical staff failed to timely remove the staples from his scalp, allowing his skin to grow over the staples causing him pain. Compl. ¶ 32. After filing several sick slips, id. ¶ 33, he was taken to the medical unit at

approximately 10:00 p.m. on April 11, 2013, Rule 7.1 Stat. ¶ 25. CO Hunt and CO Galarneau stood watch in the doorway as nurses sifted through plaintiff's scalp looking for the staples. Rule 7.1 Stat. ¶¶ 26, 28. As the nurses continued to look f or the staples, plaintiff yelled in pain. Id. ¶ 27. CO Hunt believed plaintiff was non-compliant with the nursing staff and ordered him to comply. Id. ¶ 30. CO Hunt then advised the nursing staff to leave the room and he entered the room, where he and plaintiff were alone for approximately 25 seconds while CO Galarneau stood outside observing. Id. ¶¶ 31, 32.

Defendants admit that CO Hunt used force against Thornton and the security alarm was sounded. Id. ¶ 33. [4] They contend the force used was appropriate to subdue plaintiff. Id. Plaintiff was then handcuffed and taken to the Special Housing Unit. Id. ¶ 34. The incident was investigated; witness statements, incident reports, use of force reports, and plaintiff's statement were recorded. Id. ¶ 35. [5]

***3** Thornton submitted a handwritten letter which he referred to as a grievance on April 14, 2013 regarding the April 11, 2013 incident. Id. ¶ 36. T his letter was provided directly to Chief Correction Officer Brian Mooney ("Chief Mooney") who spoke with plaintiff regarding his letter. Id. ¶ 36. Plaintiff never filed a formal grievance utilizing the prison grievance procedure regarding the April 11, 2013 incident. Id. ¶ 37.

On April 14, 2013, Thornton filed a formal grievance regarding the medical and dental care he received at ACCF. Id. ¶ 40. On May 7, 2013, plaintiff filed an additional grievance regarding his medical and dental care. Id. ¶ 41. He admits that he did not file a formal grievance regarding the March 8, 2013 incident nor the April 11, 2013 incident. Id. ¶ 42.

## III. LEGAL STANDARD

The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A f act is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248; see also Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

When summary judgment is sought, the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim. Id. at 250 n.4. The failure to meet this burden warrants denial of the motion. Id. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Id. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. Jeffreys, 426 F.3d at 553. Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); see also Anderson, 477 U.S. at 250 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

## IV. DISCUSSION

Thornton asserts the following causes of action: (1) excessive force against CO Hunt and CO Galarneau based on the April 11, 2013 assault; (2) failure to intervene against CO Brothers and CO Eckles based on the March 8, 2013 assault and CO Galarneau based on the April 11, 2013 assault; (3) a claim of municipal liability [6] against the County and Supt. Clark for failure to train and unconstitutional customs, policies, and practices; (4) state law assault and battery against CO Hunt, CO Galarneau, and the County based on the April 11, 2013 assault; (5) state law negligence against CO Brothers, CO Eckles, and the County for failing to help during the March 8, 2013 assault; and (6) state law negligent hiring and supervision against the County and Supt. Clark. He requests compensatory and punitive damages. Plaintiff also asserted claims against John Does 1-6, unidentified corrections officers, but never named them in discovery.

### A. Failure to Exhaust Administrative Remedies

***4** Defendants contend Thornton's federal claims must be dismissed because he failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"). Plaintiff responds that defendants waived any failure to exhaust defense because they failed to plead it in

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

their answer. He alternatively argues that even if defendants did not waive the defense and may assert it now, they have not carried their burden to show on summary judgment that he failed to exhaust, because he exhausted through both the informal process at ACCF and by submitting a handwritten letter complaint. Defendants contend they did in fact preserve defense by pleading as an eleventh affirmative defense, that "[p]laintiff's claims are barred by his failure to satisfy conditions precedent to suit." Answer, ¶ 111.

The PLRA requires an inmate to exhaust "such administrative remedies as are available" before bringing suit to complain of prison conditions or actions taken by prison officials, such as the use of excessive force. 42 U.S.C. § 1997e(a); see Ross v. Blake, ___ U.S. ____, 136 S. Ct. 1850, 1854–55 (2016). One of the purposes of the PLRA is to give corrections officials an opportunity to resolve inmate complaints before the inmate files suit. Jones v. Bock, 549 U.S. 199, 219 (2007). T he PLRA requires "proper exhaustion," which means "using all steps that the [prison grievance system] holds out, and doing so properly (so that the [prison grievance system] addresses the issues on the merits)." Woodford v. Ngo, 548 U.S. 81, 90 (2006) (citation omitted).

In Hemphill v. New York, the United States Court of Appeals for the Second Circuit set forth a three-part inquiry to guide analysis of whether a plaintiff has satisfied the PLRA. 380 F.3d 680, 686–91 (2d Cir. 2004). As the Second Circuit recently reiterated:

> The first part involves an assessment whether administrative remedies were in fact available to the plaintiff; the second part instructs courts to consider whether defendants forfeited the affirmative defense of exhaustion by failing to preserve it or should be estopped from raising it because their own actions inhibited the plaintiff's ability to exhaust administrative remedies; and the third part directs courts to determine whether special circumstances existed that justified a plaintiff's failure to exhaust remedies that were available and not subject to estoppel. See Amador v. Andrews, 655 F.3d 89, 102 (2d Cir. 2011) (summarizing Hemphill inquiry).

Williams v. Corr. Officer Priatno, 829 F.3d 118 (2d Cir. 2016). [7]

Failure to exhaust administrative remedies is an affirmative defense under the PLRA. Jones, 549 U.S. at 216. A party responding to a pleading "must affirmatively state any avoidance or affirmative defense," Fed. R. Civ. P. 8(c)(1), and generally, "[f]ailure to plead an affirmative defense in the answer results in the waiver of that defense and its exclusion from the case." Satchell v. Dilworth, 745 F.2d 781, 784 (2d Cir. 1984) (internal quotation marks omitted). Nonetheless, "a district court may entertain unpleaded affirmative defenses at the summary judgment stage in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings." Rose v. AmSouth Bank of Fla., 391 F.3d 63, 65 (2d Cir. 2004) (internal quotation marks, ellipsis and alteration omitted).

***5** Defendants failed to assert exhaustion of administrative remedies as an affirmative defense in their answer, filed on September 8, 2014. They failed to include this affirmative defense despite asserting twenty-eight other affirmative defenses. Id. ¶¶ 101–128. Defendants' eleventh affirmative defense alleges "Plaintiff's claims are barred by his failure to satisfy conditions precedent to suit." Id. ¶ 111. A review of the County's answers in four other cases with apparent PLRA requirements, brought to the undersigned's attention by plaintiff, suggests the County routinely raises failure to comply with the PLRA or failure to exhaust administrative remedies as individual affirmative defenses, often in addition to the affirmative defense of failure to comply with, or satisfy conditions precedent. See Hinds v. Cnty of Albany, No. 9:15-cv-1325, ¶ 82 ("Plaintiff has failed to comply with the Prisoner Litigation Reform Act."), ¶ 91 ("Plaintiff's claims are barred by her failure to satisfy conditions precedent to suit."); Chriss v. Cnty of Albany, No. 1:08-cv-678, ¶ 74 ("Plaintiff has failed to exhaust his administrative remedies pursuant to 42 U.S.C. § 1997e."); Carpenter v. Apple, No. 9:15-cv-1269, ¶ 146 ("Plaintiff has failed to exhaust administrative remedies."), ¶ 147 ("Plaintiff has failed to meet conditions precedent to suit."), ¶ 148 ("Plaintiff's claims are barred, in whole or in part, because Plaintiff has failed to comply with the Prisoner Litigation Reform Act."); Smith v. Roberson, No. 9:15-cv-930, ¶ 66 ("Plaintiff's claims are barred, in whole

or in part, because Plaintiff has failed to comply with the Prisoner Litigation Reform Act."), ¶ 75 ("Plaintiff's claims are barred by her failure to satisfy conditions precedent to suit."). While certainly not conclusive, these cases suggest that the County intends the defenses of failure to exhaust administrative remedies and failure to comply with conditions precedent as two separate affirmative defenses.

Defendants urge their eleventh affirmative defense is sufficient to preserve failure to exhaust for two reasons: (1) the scope of "conditions precedent to suit" includes failure to exhaust administrative remedies, and (2) their asserted language satisfies the pleading requirements of Rules 8(c) and 9(c). However the defendants have pointed to no controlling caselaw providing that "failure to comply with conditions precedent" or "failure to satisfy conditions precedent to suit" is sufficient to preserve a failure to exhaust administrative remedies defense under the PLRA.

Rule 8, General Rules of Pleading, provides that "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense. Rule 8(c). District courts in this Circuit have struggled with the applicability of heightened pleading requirements to affirmative defenses, see e.g., Tardif v City of New York, 302 F.R.D. 31, 32–33 (S.D.N.Y. 2014), and the Second Circuit has not ruled on the applicability of the Twombly/Iqbal[8] standard to affirmative defenses. Without deciding whether defendants need be held to this higher standard, it is prudent to at least require defendants to include enough language to provide plaintiff with "fair notice" of defenses, in line with the prevailing pleading standard in the Second Circuit as noted by defendants. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002). Defendants have not pointed to any controlling caselaw providing that they cannot or should not be required to explicitly plead "failure to exhaust," "failure to exhaust administrative remedies," "failure to comply with the PLRA," or similar language in order to preserve such a defense under the PLRA, and there is no reason why they cannot be required to do so. Accordingly, defendants' eleventh affirmative defense is insufficient to preserve the affirmative defense of failure to exhaust administrative remedies under the PLRA and the defendants are precluded from raising it now.

While it is true that a court may entertain unpleaded affirmative defenses at the summary judgment stage, plaintiff would be unduly prejudiced were defendants permitted to argue failure to exhaust, eighteen months after this lawsuit was commenced. As plaintiff explains, had this affirmative defense been asserted in defendants' answer, plaintiff would have conducted discovery and depositions on this issue, to explore, for example, the practices and customs at ACCF regarding informal and formal grievances, the number and content of grievances recorded in the year at issue and subsequent years, reports or evidence regarding issues with failures to provide inmates with formal grievance forms and with documenting informal grievances, and information about personnel at ACCF responsible for handling grievances and his grievances specifically. Defendants have proffered no excuse for their delay in raising this affirmative defense and have thus waived it. Accordingly, there is no need to address whether defendants' eleventh affirmative defense is pleaded with sufficient particularity and in compliance with Rule 9(c).

***6** Even if defendants preserved the failure to exhaust defense and could assert it now, their motion would still be denied because they have not carried their burden to show plaintiff failed to exhaust his administrative remedies as a matter of law. "[G]iven that non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to exhaust his available administrative remedies." Smith v. Kelly, 985 F. Supp. 2d 275, 285 (N.D.N.Y. 2013) (Suddaby, J.). "The procedure for exhaustion is not defined by the PLRA, but rather by the rules of the facility or jurisdiction in which the inmate-plaintiff is incarcerated. Espinal v. Goord, 558 F.3d 119, 134 (2d Cir. 2009).

The ACCF's grievance procedures are provided to inmates in the ACCF Inmate Rules and Regulations Information Book. Collins Decl., Ex. I. The ACCF grievance process includes both informal and formal steps, and inmates are required to exhaust the informal process before using the formal process. Id. 24. The process first requires the inmate to attempt to resolve the issue with the officer assigned to their housing unit. Id. ¶ 1. The second step provides: "If for some reason you and the officer are unable to reach an acceptable resolution through the informal process, you may request, and will receive, a grievance form to fill out from the unit supervisor. Once you receive a formal step, you will have 5 days to submit your grievance." Id. ¶ 2. Step 3 states "You must file a grievance within five days of the date of the alleged act or occurrence giving rise to the grievance." Id. ¶ 3. The remaining steps detail how the grievance will be investigated, how and when a decision will be rendered, and the appellate review process.

The inmate handbook is unclear. It requires the inmate to first exhaust the informal process, and if an acceptable resolution is not reached, to then file a grievance within five days of receiving a "formal step" (i.e. receiving a grievance form). Yet, the procedure requires the inmate to "file a grievance" within five days of the act giving rise to it. There are no time frames limiting when the inmate must begin the informal process, how long he or she should let the informal process continue on to attempt to resolve the issue before requesting a formal process, how long he or she should wait to receive a grievance form from a supervisor, or what he or she should do if a grievance form is never received.

According to the ACCF grievance procedures, exhaustion is satisfied if a resolution is reached informally, and Thornton has put forth evidence that he exhausted his available administrative remedies with respect to both the March 8 and April 11 assaults because he reached informal resolutions of his issues and defendants have not shown otherwise. His claim regarding the March 8, 2013 assault is that CO Brothers and CO Eckles failed to protect him from and during the assault by other inmates. After the incident, he was transferred to a different unit away from the inmates who assaulted him. Therefore, the danger that CO Brothers and CO Eckles failed to protect plaintiff from was removed and his issue resolved. He would have had no need to initiate the formal grievance process because an acceptable resolution was reached.

With respect to the April 11, 2013 assault, defendants acknowledge that Thornton informally resolved his issue. Plaintiff's April 14, 2013 handwritten letter complaint was provided to Chief Mooney, who went on to talk directly with him. As defendants note: "Apparently satisfied with Chief Mooney's statement, plaintiff never filed a formal grievance ...." Defs' Mem. of Law, 3. Thornton testified that he spoke to Chief Mooney about being assaulted and Chief Mooney said he would look into it. Collins Decl., Ex. C, p.147–49. Plaintiff also alleges that his disciplinary sentence after the April 11, 2013 incident was later reduced by Chief Mooney from solitary to long term keep-lock.

***7** Defendants' own policy requires inmates to utilize the informal process first, and only proceed to the formal process if an acceptable resolution is not reached. Defendants have not carried their burden to show that Thornton has failed to exhaust his available administrative remedies. Instead, there is evidence that he resolved his issues informally.

### B. Monell Claim

Thornton alleges that the County failed to institute and implement appropriate policies at the ACCF on a variety of subjects including the right to be free from excessive force and free from assault by other inmates. Compl. ¶ 81. Alternatively he argues that the County has policies addressing these topics but through gross negligence demonstrated deliberate indifference to inmates by failing or refusing to enforce these policies. Id. ¶ 82. Defendants argue the Monell claim must be dismissed because plaintiff fails to allege a policy, practice, usage, or custom that was put in place by policymakers and caused a deprivation of his constitutional rights.

Municipal liability under § 1983 requires a plaintiff to show that the "municipality violated a federally protected right through (1) municipal policy, (2) municipal custom or practice, or (3) the decision of a municipal policymaker with final policymaking authority." Zherka v. DiFiore, 412 Fed.Appx. 345, 348 (2d Cir. 2011) (summary order). In order to hold the County liable under § 1983, plaintiff must put forth sufficient evidence to show that individual defendants' unconstitutional actions were taken pursuant to an official municipal policy, custom, or practice. Monell, 436 U.S. at 690–91; see also Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995).

The plaintiff's complaint simply recites the text of § 1983. With respect to the failure to implement policies, Thornton has not put forth any evidence to show that a policymaker such as Supt. Clark was deliberately indifferent to the need to train corrections officers on the use of excessive force or on inmate on inmate assault protocol, and that the lack of such training caused a deprivation of his constitutional rights. There is no evidence in the record that ACCF routinely violated inmates' rights by using excessive force or inappropriately handled inmate on inmate violence. Further, there is a use of force policy in place and plaintiff has not shown that it allows or causes routine or excessive use of force. Similarly, there are guidelines in place on inmate classification and plaintiff does not argue that these result in inmate on inmate violence. Therefore Thornton has not put forth evidence to show that the County nor Supt. Clark were deliberately indifferent by failing or refusing to enforce the ACCF's existing policies.

As there is absolutely no admissible evidence in the record on which the County or Supt. Clark could be held liable on a theory of municipal liability, plaintiff's Monell claim will be dismissed.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**V. CONCLUSION**

Defendants' motion for summary judgment will be granted in part and denied in part. Thornton's Monell claim against Albany County will be dismissed. His excessive force and failure to intervene claims will remain, along with his three state law causes of action for negligence, assault and battery, and negligent supervision and hiring, for which defendants did not move for dismissal on.

Therefore, it is

***8** ORDERED that

1. Defendants' motion for summary judgment is GRANTED in part and DENIED in part;

2. Defendants' motion to dismiss plaintiff's § 1983 claim for failure to intervene against CO Brothers, CO Eckles, and CO Galarneau and f or excessive force against CO Hunt and CO Galarneau is DENIED; and

3. Plaintiff's § 1983 claim for municipal liability is DISMISSED.

IT IS SO ORDERED.

Dated: October 4, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5793714

## Footnotes

1 Defendants' motion seeks summary judgment of the complaint in its entirety, however they have made no arguments in support of dismissal of plaintiff's state law claims.

2 Facts cited from defendants' Statement of Material Facts have been admitted by plaintiff in corresponding paragraphs of his response to same. Plaintiff admits the majority of facts set forth by defendants, however for those he denies, he fails to cite to admissible evidence in the record as required by the Local Rules and instead cites to his complaint. See L.R. 7.1(a)(3) ("Each denial shall set forth a specific citation to the record where the factual issue arises. The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."). His unverified complaint contains mere allegations which are insufficient to oppose summary judgment, and thus those facts denied but not supported by admissible evidence are deemed admitted. Further, plaintiff did not set forth additional facts which he contends are in dispute, though permitted to do so and represented by able counsel. Id. ("The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs, followed by a specific citation to the record where the fact is established.").

Many facts from plaintiff's complaint, while not supported with admissible evidence at this juncture, will be included here for background purposes only.

3 Plaintiff contends that CO Brothers and CO Eckles were 20–40 feet away at the time of the incident, and although he was bleeding from his mouth, face, head, and screaming for help, neither intervened or attempted to help. Compl. ¶¶ 20, 23. He alleges that when the assault ended, he again yelled to the officers for help. Id. ¶ 24. He asserts they looked directly at him, did nothing to assist him, and instead rang the bell for inmates to lock in to their cells for lunch. Id.

4 Again, though not relevant for purposes of this motion, according to the complaint, CO Hunt punched Thornton above his right eye, knocking him back onto the exam table. Compl. ¶ 41. He then grabbed plaintiff's hair and punched him in the face and upper body. Id. Thornton fell off the exam table onto the floor and attempted to

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

crawl out of the room while CO Hunt continued to punch him. Id. ¶¶ 41, 43. CO Galarneau then yelled for someone to sound the alarm and entered the exam room himself, punching Thornton's legs and buttocks as CO Hunt sat on his back and pinned him down. Id. ¶¶ 42, 43. Several corrections officers including a sergeant responded to the exam room. Id. ¶ 44. Plaintiff was then handcuffed; CO Hunt continued to punch him in the back until the sergeant ordered him to stop. Id. ¶ 45. As a result of the April 11 assault, plaintiff suffered serious injuries including re-injury of his jaw, nerve damage, cuts, swelling, and bruising in his face. Id. ¶ 59.

5 According to the complaint, Thornton was charged with assaulting an officer, refusing to obey a direct order, obstructing/interfering with staff, making a threat, fighting, and failing to obey inmate rules. Compl. ¶ 50. He was found guilty of all charges on April 18, 2013 and sentenced to six months in solitary confinement. Id. ¶ 51. After submitting a grievance about his disciplinary hearing and charges and requesting a time cut, Chief Mooney modified plaintiff's sentence from solitary confinement to long term keep-lock. Id. ¶¶ 57, 58.

6 Pursuant to Monell v. Dep't of Social Servs. of the City of New York, 436 U.S. 658 (1978).

7 The United States Supreme Court in Ross v. Blake recently clarified certain circumstances in which a plaintiff's obligation to exhaust administrative remedies may be excused if remedies were unavailable. The Hemphill inquiry at issue here though, “whether defendants forfeited the affirmative defense of exhaustion by failing to preserve it,” remains unchanged following Ross. Williams, 829 F.3d 118.

8 Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007); Ashcroft v. Iqbal, 556 U.S. 662 (2009).

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Distinguished by Rivera v. Westchester County, S.D.N.Y., September 23, 2020

2015 WL 1379652
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Steven TIEMAN, Plaintiff,
v.
CITY OF NEWBURGH, Po Joseph Palermo, Po John Maguire, Po Eric Eltz, Po Patrick Kelly, Po Anthony Guidice, Po Christopher Lahar, Town of Newburgh, Sgt William Ransom, Unknown Police Officers 1–5, Defendants.

No. 13–CV–4178 (KMK).
|
Signed March 26, 2015.

**Attorneys and Law Firms**

David A. Zelman, Esq., The Law Office of David A. Zelman, Brooklyn, NY, for Plaintiff.

Roberta D. Asher, Esq., Asher & Associates, New York, NY, for Plaintiff.

David Lewis Posner, Esq., McCabe & Mack LLP, Poughkeepsie, NY, for Defendant City of Newburgh.

Carl Steven Sandel, Esq., Drew William Sumner, Esq., Morris Duffy Alonso & Faley, New York, NY, for Defendants Town of Newburgh and SGT William Ransom.

*OPINION & ORDER*

KENNETH M. KARAS, District Judge.

***1** Plaintiff Steven Tieman brought suit against Defendants City of Newburgh (the "City"); City of Newburgh Police Officers Joseph Palermo, John Maguire, Eric Eltz, Patrick Kelly, Anthony Giudice, Christopher Lahar, and Unknown Police Officers 1–5; the Town of Newburgh (the "Town"); Town of Newburgh Sergeant William Ransom; and State Trooper Moises Nales. The City of Newburgh moves to dismiss all claims against the City and against Defendants Palermo, Maguire, Eltz, Kelly, Guidice, and Lahar (collectively, the "City Police Officer Defendants"), and for the Court to reject Plaintiff's request to file his Proposed Amended Complaint ("PAC"). The Town of Newburgh moves to dismiss all claims against the Town and against Defendant Ransom, and for the Court to reject Plaintiff's PAC. For the following reasons, the Town's Motion To Dismiss is granted and the City's Motion To Dismiss is denied in part and granted in part.

## I. *Background*

### *A. Factual Background*

The following factual summary is derived from Plaintiff's PAC, which the Court takes as true for the purpose of these Motions To Dismiss. [1] These claims arise out of an incident that occurred on June 17, 2010, at approximately 5:45 p.m. (Pl.'s Mem. of Law in Opp'n ("Pl.'s Mem.") Ex. A(PAC), at ¶ 10 (Dkt. No. 46).) Plaintiff alleges that he "was lawfully driving on a public street in Newburgh, New York, when he was approached by a police officer, upon information and belief, [Defendant Eltz], who was wearing plain clothes." (*Id.*) [2] Without warning and "for no apparent reason," Defendant Eltz "began to yell" at Plaintiff, and "told him to get out of the car." (*Id.* ¶ 11.) Plaintiff further alleges that he "was frightened and thought he was being robbed, so he drove away." (*Id.*) Defendant Eltz and other police officers, including Defendants Maguire, Kelly, Guidice, Lahar, and Palermo, gave chase to Plaintiff. (*Id.* ¶ 12.) "At some point thereafter, and prior to Plaintiff stopping his vehicle," Defendants Ransom and Nales joined the chase. (*Id.*) "After a brief car chase, [P]laintiff pulled over to the side of the road, put his pickup truck in park, turned off the engine, and raised his hands to surrender." (*Id.* ¶ 13.) Plaintiff alleges that, when he stopped his vehicle, Defendant Nales was located near Plaintiff's vehicle. (*Id.*)

Next, Plaintiff alleges that "one of the defendant police officers, on information and belief [Defendant Maguire], opened the truck door and ordered his police dog to attack [P]laintiff." (*Id.* ¶ 14.) Plaintiff "was thereupon attacked by the police dog, and punched numerous times by [Defendant Maguire]." (*Id.*) Plaintiff alleges that he was "not resisting the police officers in any way," but he nonetheless was dragged from his truck and thrown to the ground by Defendant Maguire and other officers, and was "beaten severely by the defendant officers, who at this point were laughing and telling the dog what a good job he had done." (*Id.* ¶ 15.) Plaintiff alleges that at that point "[t]here were at least fifteen or twenty

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

police officers surrounding" him. (*Id.*) Plaintiff alleges that though he was "handcuffed and secured by the police officers, the police dog was again ordered to attack" him, which attack was "completely unjustified, and resulted in numerous further physical injuries." (*Id.* ¶ 16.)

***2** Plaintiff alleges that the injuries he suffered as a result of this assault "included deep dog bites and lacerations to his left side and left leg; bruising to his jaw, head, back, and arms; lacerations to his right elbow; and a broken left ring finger (caused by a dog bite)." (*Id.* ¶ 17.) Plaintiff alleges that he was arrested, taken to the Newburgh City police station, then taken for medical treatment at St. Luke's Hospital, and then to Orange County Jail, where he received further medical treatment. (*Id.* ¶ 18.) Plaintiff alleges that his wounds became infected while in jail, and that he suffered severe and permanent injuries, including "scarring and weakness in his limbs," "severe physical pain," and "serious and permanent psychological and emotional injuries, including depression, flashbacks, nightmares, unreasonable fear of dogs and police officers, and inability to concentrate." (*Id.* ¶¶ 19–21.)

According to Plaintiff, the City "has a policy or practice of using excessive force when effectuating arrests, and fails to train and/or discipline its employees to prevent violations of arrestee's [sic] constitutional rights." (*Id.* ¶ 22.) Additionally, Plaintiff claims that the City "has an extensive history of lawsuits and other complaints alleging the use of excessive force by its employees." (*Id.* ¶ 23.) In particular, according to Plaintiff, "[p]ublic court records reveal at least nine suits filed in the five years before the incident [that is the basis for this Action] which allege that police officers employed by [the City] used excessive force during the course of an arrest," "[a]t least five" of which incidents "involved allegations of unnecessary and excessive dog bites." (*Id.*) Plaintiff has listed and described the following lawsuits:

> In *Burley. et al. v. City of Newburgh, et al.,* 07–CV–3336, the plaintiffs alleged that on May 11, 2005, police officers employed by [the City] falsely arrested one plaintiff and sprayed him with pepper spray, threw him to the ground, and kicked him in the face causing him to lose consciousness. The other plaintiff alleged that police officers employed by [the City] falsely arrested him, hit him in the face, and kicked him in the ribs.
>
> In *Bryant v. City of Newburgh, et al.,* 06–CV–4200, the plaintiff alleged that he was falsely arrested with excessive force by police officers employed by [the City] on both May 17, 2005 and June 22, 2006.
>
> In *Garcia. et al. v. City of Newburgh, et al.,* 08–CV–1198, [the] plaintiff alleged that on March 30, 2007, he was falsely arrested with excessive force by police officers employed by [the City], including [Defendant Kelly].
>
> In *Cooper. et al. v. City of Newburgh, et al.,* 09–CV–2234, four plaintiffs alleged that on March 31, 2007, July 8, 2007, August 8, 2007, and August 9, 2007, respectively, [City] police officers arrested one of the plaintiffs with excessive force. The complaint alleged that during the course of each arrest, officers directed police dogs to "bite and hold" causing serious injuries to each plaintiff.
>
> ***3** In *Follini v. City of Newburgh, et al.,* 08–CV–6347, [the] plaintiff alleged that on July 22, 2007, police officers employed by [the City], including [Defendant Palermo], falsely arrested [the] plaintiff with excessive force, including pushing [the] plaintiff to the ground, repeatedly administering a taser while [the] plaintiff was on the ground, and administering pepper spray directly to [the] plaintiff's face.
>
> In *Allen v. City of Newburgh[,] et al.,* 08–CV–6771, the plaintiff alleged that on August 12, 2007, officers employed by [the City] arrested him with excessive force, causing injuries including loss of consciousness, shoulder dislocation, facial bruising, and muscle spasms.
>
> In *Baynes v. City of Newburgh, et al.,* 08–CV–6442, [the] plaintiff alleged that on August 25, 2007, police officers employed by [the City], including [Defendant Palermo] and [Defendant Kelly], physically assaulted, maced, and tased[ ] both [the] plaintiff and additional arrestees who were not resisting arrest.
>
> In *Fahey, et al. v. Lt. Peter Leach, et al.,* 08–CV–8280, [the] plaintiffs alleged that on September 30, 2007, multiple [City] police officers assaulted [the] plaintiffs at a gas station and at the police precinct.
>
> In *Whitfield v. City of Newburgh, et al.,* 08–CV–8516, the deceased plaintiff, through his estate, alleged that on July 8, 2008, officers employed by [the City] administered a taser to [the] plaintiff and ordered a police dog to attack [the] plaintiff multiple times, causing his death.

(*Id.* ¶¶ 24–32 (italics omitted).) Plaintiff further alleges that the City "routinely reached settlement agreements" with the Plaintiffs in these cases. (*Id.* ¶ 33.) In particular, Plaintiff claims that *"Garcia* settled in 2008, *Bryant, Cooper* and

*Bavnes* settled in 2010, *Fahey* and *Allen* settled in 2011, and *Follini* settled in 2012." (*Id* .) Plaintiff further asserts that while the "amount of each settlement agreement [is] not publically available, upon information and belief, most, if not all, of the above-mentioned cases settled for amounts well in excess of nuisance value." (*Id.* ¶ 34.) Additionally, Plaintiff alleges, upon information and belief, that "the officers that were the subject of these lawsuits were not disciplined by [the City] for their actions." (*Id.*)

Plaintiff alleges two other bases for the City's "notice of allegations of excessive force." (*Id.* ¶ 35.) Specifically, Plaintiff alleges that the City "was also on notice of allegations of excessive force by its officers through public forums, including on February 11, 2008," on which date "the Newburgh City Council held a public comment session, at which numerous residents testified regarding the excessive and unnecessary use of police dogs during arrests, as well as additional perceived problems within the Police Department, including the lack of a civilian review board." (*Id.*) Additionally, Plaintiff alleges that "[o]n August 1, 2013, Matrix Consulting Group published their Final Report entitled 'An Assessment of the Culture, Community Relations, Use of Force, Training, Disciplinary Practices of the Police Department–City of Newburgh, New York,' " (the "Matrix Report"). (*Id.* ¶ 36.) According to Plaintiff, the Matrix Report stated generally that "discipline guidelines and decisions are unstructured," noted that "assigning a specific investigator and requiring a formal report" was not "previously required," and stated that "only 43% of sworn officers who responded to the polling in the report agreed that they received appropriate training to do their job well." (*Id.*)

***4** Finally, Plaintiff makes a number of general allegations regarding the City and Town. First, Plaintiff alleges that the "City of Newburgh and Town of Newburgh have been aware for years (from lawsuits, notices of claim and complaints filed with the municipalities themselves and their police departments) that many of their police officers are insufficiently trained with respect to the laws and regulations regarding use of force during an arrest." (*Id.* ¶ 40.) Plaintiff further alleges that the "municipalities are ... aware that such improper training has often resulted in a deprivation of civil rights," and that despite having such notice, "the municipalities have failed to take corrective action," which "caused the officers in the present case to violate plaintiff's civil rights." (*Id.*) Additionally, Plaintiff alleges that the City and Town "have been on notice that the defendant police officers lack the objectivity, temperament, maturity, and discretion to be members of their respective police departments," and despite such notice, "the municipalities have retained the individual defendants as police officers." (*Id.* ¶ 41.) Plaintiff also alleges that "upon information and belief, in 2010, Defendants had a policy or routine practice of using excessive force when effectuating arrests," and that upon information and belief, "it was the policy and/or custom of defendant City of Newburgh to inadequately train, supervise, discipline, and/or terminate their officers, staff, agents and employees, thereby failing to adequately discourage further constitutional violations on the part of their officers, staff, agents and employees." (*Id.* at ¶¶ 42–43.) Furthermore, Plaintiff alleges that "as a result of the above described policies and customs, the officers, staff, agents and employees of defendant [City], believed that their actions would not be properly monitored by supervisory officers and that misconduct would not be investigated or sanctioned, but would be tolerated." (*Id.* at ¶ 44.) Plaintiff concludes that "the above described policies and customs demonstrate a deliberate indifference on the part of the policymakers of [the City] to the constitutional rights of arrestees and were the cause of the violations of Plaintiff's rights alleged herein." (*Id.* ¶ 45.)

*B. Procedural Background*

Plaintiff filed suit against the City, the City Police Officer Defendants, the Town, Defendant Ransom, and Defendant Nales on June 14, 2013. (*See* Dkt. No. 2.)[3] On January 9, 2014, the Court held a pre-motion conference with all Parties. (*See* Dkt. (minute Entry for Jan. 9, 2014).) Following that conference, Plaintiff submitted a letter explaining the basis for filing an amended complaint, and attaching his PAC. (*See* Dkt. No. 20.)[4] Plaintiff never formally moved to file his PAC, which contains all of the factual allegations in his Complaint, as well as additional allegations.

***5** On May 23, 2014, the City moved to dismiss the claims against the City and the City Police Officer Defendants, and to oppose the filing of Plaintiff's PAC as to the claims against the City and the City Police Officer Defendants. (*See* Dkt. No. 25.) Similarly, the Town moved to dismiss the claims against the Town and Defendant Ransom, and to oppose the filing of Plaintiff's PAC as to the claims against the Town and Defendant Ransom. (*See* Dkt. No. 29.)

*II. Discussion*

*A. 12(b)(5) Motion To Dismiss*

The City of Newburgh moves to dismiss the claims against the City Police Officer Defendants for failure to serve, pursuant to Federal Rule of Civil Procedure 12(b)(5).

*1. Standard of Review*

"[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)." *Sinochem Int'l. Co. v. Malaysia Int'l Shipping Corp.,* 549 U.S. 422, 430–31, 127 S.Ct. 1184, 167 L.Ed.2d 15 (2007). Valid service is a prerequisite for a federal court to assert personal jurisdiction over a claim. *See Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.,* 484 U.S. 97, 104, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987). "When a defendant moves to dismiss under Rule 12(b)(5), the plaintiff bears the burden of proving adequate service." *Dickerson v. Napolitano,* 604 F.3d 732, 752 (2d Cir.2010) (brackets and internal quotation marks omitted).

In deciding a Rule 12(b)(5) motion, the Court "must look to matters outside the complaint to determine what steps, if any, the plaintiff took to effect service." *C3 Media & Mktg. Grp., L.L.C. v. Firstgate Internet, Inc.,* 419 F.Supp.2d 419, 427 (S.D.N.Y.2005) (internal quotation marks omitted); *see also PH Int'l Trading Corp. v. Nordstrom, Inc.,* No. 07–CV–10680, 2009 WL 859084, at *3 (S.D.N.Y. Mar. 31, 2009) ("A court may, on a Rule 12(b)(5) motion to dismiss, consider affidavits and documents submitted by the parties without converting the motion into one for summary judgment under Rule 56." (brackets and internal quotation marks omitted)). For a plaintiff to satisfy his burden of proving adequate service, *see Mende v. Milestone Tech., Inc.,* 269 F.Supp.2d 246, 251 (S.D.N.Y.2003), "[c]onclusory statements that a defendant was properly served are insufficient to overcome a defendant's sworn affidavit that he was never served," *Howard v. Klynveld Peat Marwick Goerdeler,* 977 F.Supp. 654, 658 (S.D.N.Y.1997), *aff'd,* 173 F.3d 844 (2d Cir.1999). Similarly, defective service is not cured or overcome "on the mere assertion that a defendant had actual notice." *Weston Funding, L.L.C. v. Consorcio G Grupo Dina, S.A. de C.V.,* 451 F.Supp.2d 585, 589 (S.D.N.Y.2006) (internal quotation marks omitted).

*2. Analysis*

The Parties agree that service was attempted as follows. "[A] summons addressed to each defendant was delivered to the City Clerk's office, 83 Broadway, Newburgh, N.Y. 12550" in August 2013. (Pl.'s Mem. 9.) Plaintiff asserts that this service was proper because 83 Broadway "is the usual and typical place to serve Newburgh officers," the process server Michael Root of Majestic Process Service, Inc. went to the police department at 55 Broadway, Newburgh, N.Y. 12550, and was told by a sergeant "that the place to serve Newburgh officers was 83 Broadway," and "Mr. Root asked Ms. [Autumn] Resto, a paralegal at Newburgh City Hall, if she could accept service on behalf of the officer[s]," "she checked with a supervisor, read the documents, and agreed to accept service on behalf of the officers." (*Id.* at 9–10; *see also id.* Ex. C (Decl. of Michael Root) ("Root Decl.") ¶¶ 1, 3–7.)

***6** In support of its Motion To Dismiss, the City submitted an affidavit from Michelle Kelson, Corporation Counsel for the City of Newburgh. (*See* Aff. of Michelle Kelson (April 24, 2014) ("April 24 Kelson Aff.") ¶ 1 (Dkt. No. 27).) Ms. Kelson avers that she was notified that the City Clerk's office had received "several summons[es] and one copy of the verified complaint" for this case, and that there was "one summons for the City and one for each individual police officer." (*Id.* ¶ 2.) Ms. Kelson appended the documentation that that City Clerk's office received-seven summonses and one copy of the verified complaint. (*Id.* at Ex. A.) The City also submitted an affidavit from Ms. Resto, who averred:

> My instructions from the Corporation Counsel are to take whatever legal papers are given to me. I do not offer an opinion as to whether giving me these papers is proper service. I have no authority to accept service on behalf of an individual employee of the City of Newburgh. I have never been appointed an agent to accept service on behalf of any Newburgh employee.

(Aff. of Autumn Resto ("Resto Aff.") ¶ 3 (Dkt. No. 49).) In Reply, the City submitted a second affidavit from Ms. Kelson, who averred:

> Employees in my office, including Ms. Resto, have standing instructions to take legal papers delivered to this office. No one here, including myself, is authorized to accept service on behalf of any employee of the City of Newburgh. Pursuant to CPLR § 311(A) (3), the

> Corporation Counsel's office is a designated agent for receipt of process for the City but not its employees.
>
> No employee of the Corporation Counsel's office has been designated as an agent to receive[ ] process pursuant to CPLR § 318.
>
> The Corporation Counsel's office is on the second floor of City Hall located at 83 Broadway, Newburgh, New York. It is a separate building from the police station which is located a few hundred yards away at 55 Broadway. No police officers report to City Hall at the beginning or end of their shifts or receive their work assignments here. All police officers' place of business is the police department. The individual defendants in this case are not stationed at City Hall and, as to the performance of their job duties, City Hall is just another location within the City to which they are occasionally dispatched for official police business.

(Aff. of Michelle Kelson (June 17, 2014) ("June 17 Kelson Aff.") ¶¶ 2–4 (Dkt. No. 48).)

Under Federal Rule 4(e), Plaintiff could serve the City Police Officer Defendants pursuant to state law, *see* Fed.R.Civ.P. 4(e)(1), or by delivering a copy of the summons and of the Complaint to each individual personally, leaving a copy of each at each individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there, or by delivering a copy of each to an agent authorized by appointment or law to receive service of process, *See* Fed.R.Civ.P. 4(e)(2). The City argues, and Plaintiff does not contest, that service was not properly effected pursuant to Rule 4(e)(2). The summons and complaint were not delivered to each person individually, nor were they delivered to each individual's dwelling or usual place of abode. Finally, service was not effected by delivering a copy of the summons and complaint to an agent authorized by appointment or law to receive service of process; the evidence shows that Ms. Resto was not an agent authorized to receive service for the City Police Officer Defendants, nor does Plaintiff even dispute that fact. (Resto Aff. ¶ 3.)

***7** Thus, the question is whether the City Police Officer Defendants were properly served under state law, as is permissible under Federal Rule of Civil Procedure 4(e)(1). Section 308 of the New York C.P.L.R. ("CPLR") governs personal service upon natural persons, and provides that service may be effected

> 1. by delivering the summons within the state to the person to be served; or
>
> 2. by delivering the summons within the state to a person of suitable age and discretion at the actual place of business, dwelling place or usual place of abode of the person to be served and by either mailing the summons to the person to be served at his or her last known residence or by mailing the summons by first class mail to the person to be served at his or her actual place of business in an envelope bearing the legend "personal and confidential" and not indicating on the outside thereof, by return address or otherwise, that the communication is from an attorney or concerns an action against the person to be served, ... or
>
> 3. by delivering the summons within the state to the agent for service of the person to be served as designated under rule 318[.]

N.Y. C.P.L.R. § 308. Again, service was not effected by personal delivery to the City Police Officer Defendants or by delivery at their dwelling places or usual places of abode, nor is there any evidence that Ms. Resto was an agent for service designated under CPLR § 318. Thus, the question is whether the City Police Officer Defendants were served by delivery of the summonses to a person of suitable age and discretion at their actual place of business and by mailing the summonses to the individuals at their last known residences or actual places of business. [5]

Here, Plaintiff has failed to establish that the City Police Officer Defendants were served at their "actual place of business" pursuant to CPLR § 308(2). "A person's 'actual place of business' must be where the person is physically present with regularity, and that person must be shown to regularly transact business at that location." *Selmani v. City of New York,* 100 A.D.3d 861, 954 N.Y.S.2d 580, 581–82 (App.Div.2012); *see also Sajimi v. City of New York,* No. 07–CV–3252, 2011 WL 135004, at *3 (E.D.N.Y. Jan. 13, 2011) ("The term 'actual place of business' has been defined as a place where the defendant is regularly physically present or regularly transacts business."); *Varela v. Flintlock Const., Inc.,* 148 F.Supp.2d 297, 301 (S.D.N.Y.2001) ("Actual place of business is statutorily defined as any location that the defendant, through regular solicitation or advertisement, has held out as its place of business. For a location to be a person's actual place of business for service pursuant to CPLR § 308(2), that person must be shown to regularly transact business at that location." (citation and internal quotation

marks omitted)). Plaintiff makes no such showing. Indeed, the only evidence submitted on this issue is from Ms. Kelson, who averred, "No police officers report to City Hall at the beginning or end of their shifts or receive their work assignments here. All police officers' place of business is the police department. The individual defendants in this case are not stationed at City Hall and, as to the performance of their job duties, City Hall is just another location within the City to which they are occasionally dispatched for official police business." (June 17 Kelson Aff. ¶ 4.) Plaintiff has failed to meet his burden of proving that service was effected at Defendants' place of business. *See GMA Accessories, Inc. v. Solnicki,* No. 07–CV–3219, 2010 WL 3749213, at *4 (S.D.N.Y. Sept. 24, 2010) (noting that the plaintiff has the burden of showing service was made at the defendant's place of business and holding that the plaintiff failed to meet this burden when it failed to submit any evidence). [6] Accordingly, service was improper under New York law. *See Davis v. City of New York,* No. 07–CV–1395, 2008 WL 2511734, at *3 (S.D.N.Y. June 19, 2008) (holding that an attempt to effect service on individual police officers at the office of the city's corporation counsel was invalid because the "police precinct to which they report and where they conduct their business is their actual place of business" and the plaintiff "made no effort to serve the officers personally or at their actual residences"); *Moultry v. City of Poughkeepsie,* 154 F.Supp.2d 809, 812 (S.D.N.Y.2001) (holding that service was improper under New York law where the plaintiff tried to serve police officer defendants at the city chamberlain's office, and the defendants worked at police department headquarters, reported to work at headquarters at the beginning and end of each shift, and "[u]nless they [were] testifying in [c]ity [c]ourt, the officers ha[d] no official police business in [c]ity [h]all, and they [did] not work for or with the [c]ity [c]hamberlain"). Furthermore, even if Mr. Root went to the Police Department at 55 Broadway, was told by a sergeant to go to the City Attorney at 83 Broadway, and was told by Ms. Resto that she could accept service on behalf of the officers, as Mr. Root declared, service was still improper. (*See* Root Decl. ¶¶ 3–7.) *See Moultry,* 154 F.Supp.2d at 811–12 (holding that service on individual police officers at the city chamberlain's office was improper even though a clerk for the chamberlain accepted service on behalf of the individual police officers and "told the process server that he had come to the right place, and that she was empowered to accept personal service for the individual police officers"). [7]

***8** Additionally, when effecting service under state law, a plaintiff must, at the very least, serve a summons and notice. Specifically, "[i]f the complaint is not served with the summons, the summons shall contain or have attached thereto a notice stating the nature of the action and the relief sought, and ... the sum of money for which judgment may be taken in case of default." N.Y. C.P.L.R. § 305(b). Here, Plaintiff served a summons for the City and summonses for each of the six individual City Police Officer Defendants, but only one copy of the Complaint. (*See* April 24 Kelson Aff. Ex. A.) None of the summonses contained any notice of the claims. (*Id.*) Thus, at least five of the summonses served on the City Police Officer Defendants did not have attached or contain either a copy of the Complaint or notice of the claims, and therefore were invalid under New York law.

Next, Plaintiff argues that, if the Court found service to be improper, it "should be cognizant of the fact that, at the time of the filing of this case, Plaintiff was pro se" and therefore should be granted special leniency regarding procedural matters. (Pl.'s Mem. 11.) However, Plaintiff was pro se for only a very short portion of this case. Plaintiff filed his Complaint pro se on June 14, 2013. (Dkt. No. 2.) On August 21, 2013, Roberta D. Asher [8] entered a notice of appearance on behalf of Plaintiff. (Dkt. No. 4.) [9] Thus, when service was attempted on August 29, 2013, Plaintiff was represented by counsel. (Pl.'s Mem. Ex. D.) Therefore, the Court sees no reason to extend special solicitude to Plaintiff regarding his inadequate service on the basis of his temporarily pro se status. *Cf. Marchand v. Simonson,* 16 F.Supp.3d 97, 106–07 (D.Conn.2014) (noting that the court would "take[ ] into consideration [the] plaintiff's pro se status at the time he filed his amended complaint," but that because the plaintiff was represented at the time he filed opposition to a motion, the court "need not apply the liberal pro se construction in considering [the] plaintiff's opposition" (italics omitted)); *Neely v. RMS Residential Mortg. Solution, L.L.C.,* No. 12–CV–1523, 2013 WL 752636, at *12 (E.D.N.Y. Feb. 26, 2013) ("Although the [c]ourt liberally construed [the][p]laintiff's pro se [o]riginal [c]omplaint, since [the] [p]laintiff is now represented by counsel, the [c]ourt has no obligation to construe the [p]roposed [a]mended [c]omplaint liberally[.]" (brackets, italics, and internal quotation marks omitted)); *Eaves v. Strayhorn,* No. 09–CV–394, 2010 WL 2521449, at *9 (S.D.Ohio June 15, 2010) ("[The] [p]laintiff cannot use the initial pro se filing to obscure the fact that he, with counsel, allowed the statute of limitations to run before re-filing his complaint." (italics omitted)); *Khan v. Abercrombie & Fitch, Inc.,* No. 01–CV–6163, 2003 WL 22149527, at *10 (S.D.N.Y. Sept. 17, 2003) (refusing to allow a plaintiff to amend her

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

complaint at a late stage of litigation despite her argument she should be afforded deference based on her pro se status, where she was pro se when the case was filed but "has been represented by counsel since the earliest stages of [the] action").

***9** Prior to 1993, "the former Rule 4(j) ... provided that if service was not made within 120 days, and the serving party cannot show good cause why such service was not made within that period, the action shall be dismissed as to that defendant without prejudice ." *Zapata v. City of New York,* 502 F.3d 192, 195 (2d Cir.2007) (internal quotation marks omitted). Following the 1993 amendments, the relevant rule, now codified in Rule 4(m), states, "If a defendant is not served within 120 days after the complaint is filed, the court ... must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period." Fed.R.Civ.P. 4(m). Thus, the amendment provided "district courts [with] discretion to grant extensions even in the absence of good cause." *Zapata,* 502 F.3d at 196; *see also Henderson v. United States,* 517 U.S. 654, 662, 116 S.Ct. 1638, 134 L.Ed.2d 880 (1996) ("[I]n 1993 amendments to the Rules, courts have been accorded discretion to enlarge the 120–day period even if there is no good cause shown." (internal quotation marks omitted)).

Here, Plaintiff has not shown good cause—or indeed even tried to argue that good cause existed, instead merely arguing that service was proper and that Plaintiff should get solicitude as he previously was pro se. (Pl.'s Mem. 9–11.) "Good cause is deemed to exist in exceptional circumstances where the plaintiff's failure to serve process in a timely manner was the result of circumstances beyond its control." *Ligon v. City of New York,* No. 12–CV–2274, 2013 WL 3502127, at *1 (S.D.N.Y. July 12, 2013) (internal quotation marks omitted). "[A]ttorney inadvertence or negligence does not establish good cause," nor does "ignorance of the law." *Novak v. Nat'l Broad. Co. Inc.,* 131 F.R.D. 44, 45–46 (S.D.N.Y.1990). "Additionally, a mistaken belief that service was proper does not establish good cause." *Bernstein v. Vill. of Piermont,* No. 11–CV–3677, 2012 WL 6625231, at *3 (S.D.N.Y. Dec. 20, 2012) (internal quotation marks omitted). The Court sees no basis for making a finding that there was good cause for Plaintiff's failure to timely serve the City Police Officer Defendants.

Thus, the only remaining question is whether, in the absence of good cause, the Court should exercise its discretion to grant an extension. Importantly, if the Court were to dismiss the claims against the City Police Officer Defendants, Plaintiff would not be able to bring the claims again because they would be time-barred. Because Section 1983 "does not provide a specific statute of limitations," "courts apply the statute of limitations for personal injury actions under state law." *Hogan v. Fischer,* 738 F.3d 509, 517 (2d Cir.2013). "Section 1983 actions filed in New York are therefore subject to a three-year statute of limitations." *Id.* The events giving rise to this suit occurred on June 17, 2010. (Compl. ¶ 10 (Dkt. No. 2); PAC ¶ 10.) Thus, the statute of limitations expired on June 17, 2013, three days after this suit was filed. (*See* Dkt. No. 2.) "Where, as here, good cause is lacking, but the dismissal without prejudice in combination with the statute of limitations would result in a dismissal *with* prejudice," there must be "sufficient indications on the record that the district court weighed the impact that a dismissal or extension would have on the parties." *Zapata,* 502 F.3d at 197 (footnote omitted).

***10** When courts are deciding whether to exercise their discretion to extend the service deadline in the absence of good cause, they are to consider the following factors: "(1) whether the applicable statute of limitations would bar the refiled action; (2) whether the defendant had actual notice of the claims asserted in the complaint; (3) whether the defendant had attempted to conceal the defect in service; and (4) whether the defendant would be prejudiced by the granting of plaintiff's request for relief from the provision." *E. Refractories Co. v. Forty Eight Insulations, Inc.,* 187 F.R.D. 503, 506 (S.D.N.Y.1999). Regarding the first factor, as explained above, the applicable statute of limitations would bar the refiled action, so Plaintiff would be prejudiced if the Court declined to grant an extension. Though this factor weighs in favor of an extension, it "does not guarantee an extension for every case that may be time-barred if refiled." *Bunim v. City of New York,* No. 05–CV–1562 et al., 2006 WL 2056386, at *3 (S.D.N.Y. July 21, 2006) (internal quotation marks omitted). Therefore, the Court must consider the other factors. There are no indications that the City Police Officer Defendants have actual notice of the claims asserted or that they attempted to conceal the defect in service. However, there are also no allegations that these Defendants would be prejudiced if the Court granted an extension. *See Alvarado v. Am. Freightways, Inc.,* No. 04–CV–9536, 2005 WL 1467893, at *6 (S.D.N.Y. June 21, 2005) (holding that allowing service after the statute of limitations has expired does not, by itself,

constitute prejudice). Here, because Plaintiff "would be time-barred from refilling and the defendants allege no prejudice if Rule 4(m) relief is granted, the balance of equities tips in favor of [Plaintiff]." *Id.; see also Gore v. RBA Grp., Inc.,* No. 03–CV–9442, 2009 WL 884565, at *7 (S.D.N.Y. Mar. 27, 2009) ("Since the statute of limitations would bar the plaintiff from re-filing his suit against [the defendant] and nothing in the record indicates that an extension of the time for service will prejudice the defendant, the balance of equities tips in favor of the plaintiff."). "Granting ... [P]laintiff[ ] a discretionary extension also furthers the principle that litigation should generally be resolved on the merits." *Alvarado,* 2005 WL 1467893, at *6. Therefore, the Court will grant Plaintiff 21 days from the date of this Opinion to properly serve the City Police Officer Defendants, or else face dismissal of his claims against these Defendants. However, no further extensions will be given, in the absence of good cause.

*B. 12(b)(6) Motion To Dismiss and Opposition to PAC*

Next, the City and Town move under Rule 12(b)(6) to dismiss the Complaint for failure to state a claim under *Monell v. Dep't of Soc. Servs. of City of N.Y.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and the Town moves to dismiss the claims against the Town Police Officer Ransom. Additionally, the Defendants move that the Court deny Plaintiff's request to file his PAC.

*1. Standard of Review*

***11** Federal Rule of Civil Procedure 15 supplies the legal standard applicable to a motion to amend a complaint. Rule 15(a)(2) provides that leave to amend a complaint shall be "freely" given when "justice so requires." Fed.R.Civ.P. 15(a)(2). However, " '[i]t is within the sound discretion of the district court to grant or deny leave to amend.' " *Barbata v. Latamie,* No. 11–CV–7381, 2012 WL 1986981, at *2 (S.D.N.Y. June 4, 2012) (quoting *Green v. Mattingly,* 585 F.3d 97, 104 (2d Cir.2009)). "A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 200 (2d Cir.2007) (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). However, "[o]utright refusal to grant the leave without any justifying reason for the denial is an abuse of discretion." *Jin v. Metro. Life Ins. Co.,* 310 F.3d 84, 101 (2d Cir.2002). "When the plaintiff has submitted a proposed amended complaint, the district judge may review that pleading for adequacy and need not allow its filing if it does not state a claim upon which relief can be granted." *Ricciuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991); *see also Alaska Laborers Emp'rs Ret. Fund v. Scholastic Corp.,* No. 07–CV–7402, 2011 WL 3427208, at *2 (S.D.N.Y. Aug.3, 2011) ("[A] court should not grant a plaintiff the right to amend [a complaint] when such amendment ... could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." (citations and internal quotation marks omitted)). The adequacy of the proposed amended complaint is judged by the same standard as that applied to a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See id.; see also Gen. Elec. Capital Fin., Inc. v. Bank Leumi Trust Co. of N.Y.,* No. 95–CV–9224, 1999 WL 33029, at *5 (S.D.N.Y. Jan.21, 1999).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (second alteration in original) (citations omitted). Instead, the Supreme Court has emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.,* and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563. Plaintiffs must allege "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. But if a plaintiff has "not nudged [his] claims across the line from conceivable to plausible, the [ ] complaint must be dismissed." *Id.; see also Iqbal,* 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (alteration in original) (citation omitted) (quoting Fed.R.Civ.P. 8(a)(2))).

***12** "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus,* 551 U.S.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

89, 93–94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); *see also Rothstein v. UBS AG,* 708 F.3d 82, 94 (2d Cir.2013) ("In addressing the sufficiency of a complaint we accept as true all factual allegations and draw from them all reasonable inferences ."); *Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.,* 737 F.3d 166, 176 (2d Cir.2013) ("In reviewing a dismissal pursuant to Rule 12(b)(6), we ... accept all factual allegations in the complaint as true ...." (alterations and internal quotation marks omitted)). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court ... draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res ., Inc.,* 992 F.Supp.2d 302, 304 n. 1 (S.D.N.Y.2014) (citing *Koch v. Christie's Int'l PLC,* 699 F.3d 141, 145 (2d Cir.2012)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678. Therefore, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679.

Moreover, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir.1999) (internal quotation marks omitted); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (noting that the court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit" (citation omitted)).

*2. Analysis*

*a. Section 1983 Claims Against the City and Town*

Plaintiff brings claims under 42 U.S.C. § 1983 against the City and Town. "To state a claim under [§ 1983], the plaintiff must show that a defendant, acting under color of state law, deprived him of a federal constitutional or statutory right." *Sykes v. Bank of Am.,* 723 F.3d 399, 405–06 (2d Cir.2013). "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell,* 436 U.S. at 691. Thus, "to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury,* 542 F.3d 31, 36 (2d Cir.2008); *cf. Salvatierra v. Connolly,* No. 09–CV–3722, 2010 WL 5480756, at *10 (S.D.N.Y. Sept. 1, 2010) (dismissing a claim against agencies where the plaintiff did not allege that any policy or custom caused the deprivation of his rights), *adopted by* 2011 WL 9398 (S.D.N.Y. Apr.16, 2010); *Arnold v. Westchester County,* No. 09–CV–3727, 2010 WL 3397375, at *9 (S.D.N.Y. Apr.16, 2010) (dismissing a claim against the county because the complaint "[did] not allege the existence of an unconstitutional custom or policy"), adopted sub nom. *Arnold v. Westchester Cnty. Dep't of Corr.,* 2010 WL 3397372 (S.D.N.Y. Aug.15, 2010). The fifth element reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *see also Newton v. City of New York,* 566 F.Supp.2d 256, 270 (S.D.N.Y.2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). In other words, a municipality may not be liable under Section 1983 "by application of the doctrine of respondeat superior." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 478, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (italics omitted); *see also Vassallo v. Lando,* 591 F.Supp.2d 172, 201 (E.D.N.Y.2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong"). Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *see also City of St. Louis v. Praprotnik,* 485 U.S. 112, 122, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights."). "In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.' " *Davis v. City of New York,* 228 F.Supp.2d 327, 336 (S.D.N.Y.2002), *aff'd,* 75 F. App'x 827 (2d Cir.2003). Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton,* 566 F.Supp.2d at 271; *see also City of Okla. v. Tuttle,* 471 U.S. 808, 823–24,

105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Brogdon v. City of New Rochelle,* 200 F.Supp.2d 411, 427 (S.D.N.Y.2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").

***13** A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following: "(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Brandon v. City of New York,* 705 F.Supp.2d 261, 276–77 (S.D.N.Y.2010) (citations omitted); *see also Roe,* 542 F.3d at 36 (describing the second category for establishing *Monell* liability); *Patterson v. County of Oneida,* 375 F.3d 206, 226–27 (2d Cir.2004) (describing methods of establishing *Monell* liability). Moreover, a plaintiff also must establish a causal link between the municipality's policy, custom, or practice and the alleged constitutional injury. *See Tuttle,* 471 U.S. at 824 n. 8 ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell's* requirement that the particular policy be the 'moving force' behind a *constitutional* violation. There must at least be an affirmative link between[, for example,] the training inadequacies alleged, and the particular constitutional violation at issue." (emphasis in original)); *Roe,* 542 F.3d at 37 (holding that "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury." (quoting *Brown,* 520 U.S. at 404)); *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiffs' injury, *Monell* prohibits a finding of liability against the [c]ity."); *Johnson v. City of New York,* No. 06–CV–9426, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (noting that after demonstrating the existence of a municipal policy or custom, "a plaintiff must establish a causal connection-an affirmative link-between the policy and the deprivation of his constitutional rights" (internal quotation marks omitted)).

At this stage, of course, Plaintiff need not prove these elements, but still must plead them sufficiently to make out a plausible claim for relief. Although there is no heightened pleading requirement for complaints alleging municipal liability under § 1983, *see Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), a complaint does not "suffice if it tenders naked assertion [s] devoid of further factual enhancement," *Iqbal,* 556 U.S. at 678 (alteration in original) (internal quotation marks omitted). Thus, to survive a motion to dismiss, Plaintiff cannot, through conclusory allegations, merely assert the existence of a municipal policy or custom, but "must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." *Santos v. New York City,* 847 F.Supp.2d 573, 576 (S.D.N.Y.2012) (citing *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993)). Put another way, mere allegations of a municipal custom, a practice of tolerating official misconduct, or inadequate training and/or supervision are insufficient to demonstrate the existence of such a custom unless supported by factual details.

***14** Of the four categories among which a *Monell* plaintiff must establish, Plaintiff's allegations do not include the first two. Plaintiff does not allege that there was a formal policy calling for the use of excessive force, nor does he allege any actions by government officials who were responsible for any offending policies. Rather, Plaintiff's allegations implicate the third and fourth categories-a consistent practice of use of excessive force, that supervisors were aware of and tolerated the use of excessive force, a failure to train officers in the use of force, and/or a failure to supervise officers with regard to their use of force when arresting suspects.

Plaintiff makes a number of general allegations against both the City and Town in his PAC. Plaintiff alleges that the event in question "was not an isolated incident," and, in fact, that the City and Town "have been aware for years (from lawsuits, notices of claim and complaints filed with the municipalities themselves and their police departments) that many of their police officers are insufficiently trained with respect to the laws and regulations regarding use of force during an arrest." (PAC ¶ 40.) Plaintiff further alleges that the municipalities are "aware that such improper training has often resulted in a deprivation of civil rights," and that "[d]espite such notice, the municipalities have

failed to take corrective action." (*Id.*) Additionally, Plaintiff alleges that the City and Town "are also liable because they have been on notice that the defendant police officers lack the objectivity, temperament, maturity, and discretion to be members of their respective police departments," and retaining the police officers amounts to "gross negligence and deliberate indifference." (*Id.* ¶ 41.) Plaintiff further alleges that "upon information and belief, in 2010, Defendants had a policy or routine practice of using excessive force when effectuating arrests." (*Id.* ¶ 42.)

Plaintiff's PAC also contains allegations specifically against the City, apart from the allegations generally against the City and Town. First, Plaintiff alleges that the City "has a policy or practice of using excessive force when effectuating arrests, and fails to train and/or discipline its employees to prevent violations of arrestee's [sic] constitutional rights." (*Id.* ¶ 22.) Plaintiff also alleges that "upon information and belief, it was the policy and/or custom of [D]efendant City of Newburgh to inadequately train, supervise, discipline, and/or terminate their officers, staff, agents and employees, thereby failing to adequately discourage further constitutional violations on the part of their officers, staff, agents and employees." (*Id.* ¶ 43.) Plaintiff alleges that "as a result of the above described policies and customs, the officers, staff, agents and employees of [the City] believed that their actions would not be properly monitored by supervisory officers and that misconduct would not be investigated or sanctioned, but would be tolerated," and that these customs and policies "demonstrate a deliberate indifference on the part of the policymakers of Defendant City of Newburgh to the constitutional rights of the arrestees and were the cause of the violations of Plaintiff's rights alleged herein." (*Id.* ¶¶ 44–45.) By themselves, these general allegations are "conclusory, and therefore must be disregarded." *Simms v. City of New York,* No. 10–CV–3420, 2011 WL 4543051, at *3 (E.D.N.Y. Sept.28, 2011) (dismissing conclusory allegations that did not provide any facts that would allow the court to infer what city policies or practices led to the alleged deficiency) (citing *Iqbal,* 556 U.S. at 678–79), *aff'd,* 480 F. App'x. 627 (2d Cir.2012); *see also Triano v. Town of Harrison,* 895 F.Supp.2d 526, 535–37 (S.D.N.Y.2012) (holding that "mere allegations of a municipal custom or practice of tolerating official misconduct are insufficient to demonstrate the existence of such a custom unless supported by factual details" and collecting cases); *Duncan v. City of New York,* No. 11–CV–3826, 2012 WL 1672929, at *3 (E.D.N.Y. May 14, 2012) (holding that "boilerplate statements" claiming that New York City had a custom of making and tolerating false arrests and of using excessive force "[were] insufficient to state a claim of municipal liability under *Monell* "); *Moore v. City of New York,* No. 08–CV–8879, 2010 WL 742981, at *6 (S.D.N.Y. Mar.2, 2010) ("Allegations that a defendant acted pursuant to a policy or custom without any facts suggesting the policy's existence, are plainly insufficient." (internal quotation marks omitted)); *Bradley v. City of New York,* No. 08–CV–1106, 2009 WL 1703237, at *3 (E.D.N.Y. June 18, 2009) ("The [c]omplaint's conclusory, boilerplate language-that the [c]ity 'fail[ed] to adequately train, discipline, and supervise' employees and 'fail[e]d to promulgate and put into effect appropriate rules and regulations applicable to the duties and behavior' of its employees-is insufficient to raise an inference of the existence of a custom or policy, let alone that such a policy caused [the][p]laintiffs to be arrested without probable cause." (citation omitted)).

***15** The only remaining allegation against the Town is that it "was a municipal corporation," and "was the employer and supervisor" of Defendant Ransom. (PAC ¶ 8.) Therefore, Plaintiff alleges, the Town "was responsible for [Defendant Ransom's] training, supervision and conduct," as well as "for enforcing the regulations of the Town of Newburgh Police Department and for ensuring that Town of Newburgh police personnel obey the laws of the State of New York and of the United States." (*Id.*) This allegation would only support a claim for vicarious liability, and does not state a claim for municipal liability under *Monell. See City of Canton,* 489 U.S. at 385 ("Respondeat superior or vicarious liability will not attach under § 1983." (italics omitted)); *Hughes v. Salerno,* No. 11–CV–9094, 2012 WL 6097775, at *4 (S.D.N.Y. Dec.5, 2012) ("*Monell* does not provide a cause of action for vicarious liability."). Therefore, Plaintiff's claim for municipal liability against the Town is dismissed and the Court denies Plaintiff's request to file his PAC with regard to this claim . [10]

Plaintiff does offer more specific allegations in support of his two theories of *Monell* liability against the City. For example, Plaintiff alleges that the City "has an extensive history of lawsuits and other complaints alleging the use of excessive force by its employees." (PAC ¶ 23.) As noted, Plaintiff specifically identifies nine lawsuits he represents were filed in the five years before the incident in question, at least five of which "involved allegations of unnecessary and excessive dog bites." (*Id.; see also id.* ¶¶ 24–32.) Plaintiff alleges that the "City of Newburgh routinely reached settlement agreements with the plaintiffs in the above-mentioned cases," and further alleges that "upon information and belief, most, if

not all, of the above-mentioned cases settled for amounts well in excess of nuisance value." (*Id* . ¶¶ 33–34.) Plaintiff also alleges "[u]pon information and believe," that "the officers that were the subject of these lawsuits were not disciplined by [the City] for their actions." (*Id.* ¶ 34.)

Additionally, Plaintiff alleges that the City of Newburgh "was also on notice of allegations of excessive force by its officers through public forums, including on February 11, 2008," when "the Newburgh City Council held a public comment session, at which numerous residents testified regarding the excessive and unnecessary use of police dogs during arrests, as well as additional perceived problems within the Police Department, including the lack of a civilian review board." (*Id.* ¶ 35.)

Finally, Plaintiff alleges that Matrix Consulting Group published its final report, titled "An Assessment of the Culture, Community Relations, Use of Force, Training, Disciplinary Practices of the Police Department–City of Newburgh, New York," on August 1, 2013. (*Id.* ¶ 36.) According to Plaintiff,

> ***16** Among the many findings and recommendations in the report is that discipline guidelines and decisions are unstructured-the report therefore recommended, *inter alia,* that the Chief should direct improvements to the Internal Affairs process, including assigning a specific investigator and requiring a formal report, which was not previously required. In addition, only 43% of sworn officers who responded to the polling in the report agreed that they received appropriate training to do their job well. This report's findings support the proposition that [the City's] training and discipline procedures are inadequate to prevent violations of arrestees['] constitutional rights.

(*Id.*)

These allegations fail to plausibly state that there is a City practice of using excessive force during arrests, generally, or using police dogs so consistent and widespread as to constitute a custom or usage. Under the third category of *Monell* claims, "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law," *Brown,* 520 U.S. at 404, which is to say, that it is a "longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity," *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *see also* *Kern v. City of Rochester,* 93 F.3d 38, 44 (2d Cir.1996) (noting that a municipality's custom "need not be memorialized in a specific rule or regulation"); *Jeffes v. Barnes,* 208 F.3d 49, 61 (2d Cir.2000) (discussing *Jett* ). Therefore, a plaintiff may establish municipal liability by demonstrating that a municipality "indirectly caused the misconduct of a subordinate municipal employee by acquiescing in a longstanding practice or custom which may fairly be said to represent official policy." *Miller v. County of Nassau,* 467 F.Supp.2d 308, 314 (E.D.N.Y.2006). To prevail on this theory of municipal liability, however, a plaintiff must prove that the custom at issue is permanent and well-settled. *See* *Praprotnik,* 485 U.S. at 127 (noting that the Supreme Court "has long recognized that a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage with the force of law' " (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (internal quotation marks omitted))); *Davis* 228 F.Supp.2d at 346 (explaining that "[w]idespread means that [the unconstitutional acts in question] are common or prevalent throughout the [government body]; well-settled means that the [unconstitutional acts in question] have achieved permanent, or close to permanent, status."). As the Supreme Court emphasized in *Monell,* Congress enacted § 1983 to impose liability on municipalities "because of the persistent and widespread discriminatory practices of state officials," and out of recognition that such practices could become "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Monell,* 436 U.S. at 691 (citation and internal quotation marks omitted).

***17** The lawsuits cited by Plaintiff in the PAC, even when combined with the allegations regarding the public forum comments and the Matrix Report, are insufficient to plausibly support an inference of a widespread custom. To begin, even if the civil complaints involved comparable conduct to that

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

alleged here, "none result[ed] in an adjudication of liability." Walker v. City of New York, No. 12–CV–5902, 2014 WL 1259618, at *3 (S.D.N.Y. Mar.18, 2014); *see also* Collins v. City of New York, 923 F.Supp.2d 462, 479 (E.D.N.Y.2013) (holding that a "litany of other police-misconduct cases" discussed in the plaintiff's complaint "[were] insufficient to make a plausible case for *Monell* liability," because they either were different from the misconduct alleged in the complaint, post-dated the alleged misconduct in the case at hand, or "involve[d] something less (settlements without admissions of liability and unproven allegations) than evidence of misconduct"); *accord* Strauss v. City of Chicago, 760 F.2d 765, 768–69 (7th Cir.1985) (holding, even pre-*Twombly* and *Iqbal,* that allegations of complaints about similar conduct were insufficient to state a claim for a widespread custom under *Monell* because "the number of complaints filed, without more, indicates nothing," as "[p]eople may file a complaint for many reasons, or for no reason at all," and "[t]hat they filed complaints does not indicate that the policies that [the plaintiff] alleges exist do in fact exist"); Rikas v. Babusch, No. 13–CV–2069, 2014 WL 960788, at *3 (N.D.Ill. Mar.12, 2014) ("[T]he fact that prior lawsuits were filed against [one of the defendants accused of excessive force] does not support [the plaintiff's] *Monell* claim nor does it evidence a widespread municipal practice."); Xian Ming Wu v. City of New Bedford, No. 12–CV–11648, 2013 WL 4858473, at *2 (D.Mass. Sept.11, 2013) (holding that a complaint's reference to two other similar complaints is insufficient to survive a motion to dismiss). And though numerous cases, discussed below, look to unsubstantiated allegations in lawsuits and complaints by residents to establish municipal liability, these cases do so through the framework of deliberate indifference failure-to-train and failure-to-supervise cases and their reasoning is therefore not persuasive here. *See e .g.,* Walker, 2014 WL 1259618, at *3 (holding that failure-to-train cases, such as Fiacco v. City of Rensselaer, 783 F.2d 319 (2d Cir.1986), are inapposite to *Monell* claims alleging a widespread custom). Simply put, the fact that there were allegations of thirteen instances of excessive force during arrests over four years (none of which involved findings or admissions of culpability) during which hundreds, if not thousands, of arrests were made does not plausibly demonstrate that the use of excessive force during arrest was so frequent and pervasive to constitute a custom. Walker, 2014 WL 1259618, at *1–3 (holding that the allegation that ten similar complaints were filed against New York City in the ten preceding years was insufficient to state a claim because the "paltry number of complaints (none resulting in an adjudication of liability), spread over a period so long in a city so large, hardly suggests the frequency or pervasiveness of the purported custom that is required to state a *Monell* claim"). (*See also* Aff. of David L. Posner ("Posner Aff.") Ex. D (Matrix Report), at 59 (Dkt. No. 26) (noting that the City made "a total of 2,478 arrests in 2012").) [11]

***18** Additionally, in Plaintiff's Memorandum in Opposition, he argues that the City has a police force of 75, and that Plaintiff alleges that there were at least 15 to 20 police officers surrounding him, meaning that "Plaintiff's allegations, taken as true, would mean that at least one-fifth of the entire City of Newburgh Police Department was present for the assault of Plaintiff, and both tolerated the abuse of plaintiff's constitutional rights and did not fear retribution." (Pl.'s Mem. 8.) However, the size of the City's police force is not a fact alleged in the Complaint or PAC, and the Court cannot consider additional factual allegations contained in Plaintiff's papers. *See* Paul v. Bailey, No. 09–CV–5784, 2013 WL 2896990, at *5 (S.D.N.Y. June 13, 2013) ("[A]s a general rule, ... courts should not consider factual allegations made for the first time in opposition papers."); Friedman v. MiraMed Revenue Grp., L.L.C., No. 12–CV–5328, 2012 WL 5992163, at *3 (S.D.N.Y. Nov. 19, 2012) ("[T]he [c]ourt declines to consider the additional facts set forth in [the] plaintiff's opposition papers that are not in his complaint."). [12] In any event, the allegation that 15 to 20 officers were present during Plaintiff's arrest does nothing to establish that the alleged excessive force happened as part of a well-established practice or custom. Instead, this allegation only supports, at best, a single instance where numerous officers allegedly used excessive force. This is not an akin to establishing a custom of use of excessive force. *See* Tuttle, 471 U.S. at 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell* [.]"); Triano, 895 F.Supp.2d at 532 ("Normally, a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality." (alteration and internal quotation marks omitted)). For the above reasons, Plaintiff fails to state a *Monell* claim for relief against the City of Newburgh on the theory that the City of Newburgh has a custom of using excessive force during arrests so widespread to have the force of law.

The Court next considers whether Plaintiff has adequately pleaded a claim for relief against the City under a deliberate indifference theory, the fourth category of *Monell* claims. "*Monell's* policy or custom requirement is satisfied where

a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani,* 506 F.3d 183, 192 (2d Cir.2007) (citing *Jett,* 491 U.S. at 737); *see also City of Canton,* 489 U.S. at 394–95 (O'Connor, J., concurring in part and dissenting in part) ("Where ... a claim of municipal liability is predicated upon a failure to act, the requisite degree of fault must be shown by proof of a background of events and circumstances which establish that the 'policy of inaction' is the functional equivalent of a decision by the city itself to violate the Constitution."); *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 129 (2d Cir.2004) (citing *City of Canton* for the proposition that a "municipality can be liable for failing to train its employees where it acts with deliberate indifference in disregarding the risk that its employees will unconstitutionally apply its policies without more training"); *Johnson,* 2011 WL 666161, at *3 (explaining that a plaintiff may demonstrate the existence of a custom or policy by alleging "a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees"). However, such a failure to act, train, or supervise can constitute a municipal custom "only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." *Reynolds,* 506 F.3d at 192 (citing *City of Canton,* 489 U.S. at 390); *see also Marte v. N.Y.C. Police Dep ' t,* No. 10–CV–3706, 2010 WL 4176696, at *2 (S.D.N.Y. Oct. 12, 2010) (noting that a municipality's failure to train its employees can support § 1983 liability only where " 'the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.' " (quoting *City of Canton,* 489 U.S. at 388)).

***19** In *City of Canton,* the Supreme Court established the "deliberate indifference" standard in the context of a claim for failure to train, but "the stringent causation and culpability requirements set out in that case have been applied to a broad range of supervisory liability claims," including claims for failure to supervise and failure to discipline. *Reynolds,* 506 F.3d at 192 (citing *Amnesty Am.,* 361 F.3d at 127 (failure to supervise); *Berry v. City of Detroit,* 25 F.3d 1342, 1354 (6th Cir.1994) (failure to discipline)); *see also Connick v. Thompson,* ––– U.S. ––––, ––––, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011) (noting that "deliberate indifference" is a "stringent standard" requiring "proof that a municipal actor disregarded a known or obvious consequence of his action" (internal quotation marks omitted)).[13] In this context, the Supreme Court has held that "where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence may 'be properly thought of as a city 'policy or custom' that is actionable under § 1983.' " *Amnesty Am.,* 361 F.3d at 126 (quoting *City of Canton,* 489 U.S. at 388); *see also Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir.1995) (holding that a plaintiff "may establish the pertinent custom or policy by showing that the municipality, alerted to the [unconstitutional action by its employees], exhibited deliberate indifference"); *Sorlucco v. N.Y.C. Police Dep't,* 971 F.2d 864, 871 (2d Cir.1992) (stating that municipal liability lies where the subordinate's misconduct is "so manifest as to imply the constructive acquiescence of senior policy-making officials").

Plaintiff has attempted to allege two types of deliberate indifference claims: failure to train and failure to supervise/discipline. Indeed, "[a] § 1983 plaintiff injured by a police officer may establish the pertinent custom or policy by showing that the municipality, alerted to the possible use of excessive force by its police officers, exhibited deliberate indifference." *Vann,* 72 F.3d at 1049. To establish deliberate indifference for a failure to supervise and/or discipline claim, the plaintiff must "show that the need for more or better supervision to protect against constitutional violations was obvious," which may be established "by showing that there were repeated complaints of civil rights violations," and "deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Shepherd v. Powers,* No. 11–CV–6860, 2012 WL 4477241, at *9 (S.D.N.Y. Sept.27, 2012) (internal quotation marks omitted). The Second Circuit has set out three requirements that must be met before a municipality may be liable under either theory: first, that a policymaker knows " 'to a moral certainty' " that his or her employees will confront a given situation; second, " 'that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation;' " and third, " 'that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.' " *Jenkins v. City of New York,* 478 F.3d 76, 94 (2d Cir.2007) (quoting *Walker v. City of New York,* 974 F.2d 293, 297–98 (2d Cir.1992)).

***20** Applying these principles to this case, the Court concludes that Plaintiff has sufficiently alleged that the need for more or better supervision was obvious. There is no bright line rule for how many complaints of civil rights violations is sufficient to show the need for more supervision, nor is there a bright line rule for how recent those complaints must be. The City asserts that the complaints relied on by Plaintiff regarding excessive force incidents that occurred between 2005 and 2008 are too sparse and too remote to support an inference of obviousness. (Def.'s Mem. of Law in Supp. of Dismissal ("City's Mem.") 10 (Dkt. No. 28); Newburgh's Reply Br. in Supp. of 12(b)(5) and 12(b)(6) Dismissal ("City's Reply") 5–6 (Dkt. No. 47).) However, the City provides no authority to support the notion that a plaintiff must cite a certain number of complaints in a certain time period to make out a *Monell* claim. Indeed, the case law supports Plaintiff's position here. For example, in *McCants v. City of Newburgh,* No. 14–CV–556, 2014 WL 6645987 (S.D.N.Y. Nov.21, 2014), *clarified on denial of reconsideration,* 2014 WL 7398910 (S.D.N.Y. Dec.9, 2014), the court denied a motion to dismiss a *Monell* claim on deliberate indifference grounds. In that case, the court found it sufficient that the plaintiff's pleadings referred to other lawsuits demonstrating that the municipality "was on notice to the possible use of excessive force by its police officers on seventeen different occasions." *Id.* at *4. There, the seventeen excessive force claims were made "in the seven-year time period prior to" the incident resulting in the suit. *Id.* In *Farrow v. City of Syracuse,* No. 12–CV–1401, 2014 WL 1311903, (N.D.N.Y. Mar. 31, 2014), the Northern District of New York noted in dicta that were the court deciding a motion to dismiss, the fact that "at least 15 excessive force complaints ha[d] been filed against the [c]ity in the past 5 years" would be sufficient state a plausible failure to train case. *Id.* at *8 n. 7; *see also Shepherd,* 2012 WL 4477241, at *10 (holding, on a motion to dismiss where the complaint relied on a Department of Justice ("DOJ") report finding evidence of unconstitutional activity in 2008 to support a claim that such a custom existed in 2010, that the court "[was] obligated to draw all reasonable inferences in [the] [p]laintiff's favor and thus [took] as true for purposes of th[e] motion practice the assertion that the deficiencies found by the DOJ existed at the time of the alleged assault against [the][p]laintiff"). The Court does not see any material difference between the seventeen excessive force claims in seven years in *McCants,* the fifteen excessive force claims in five years in *Farrow,* [14] and the thirteen claims alleged in nine lawsuits in five years here. [15] While there may be questions about the quantum of proof Plaintiff has regarding these other complaints at summary judgment, Plaintiff's allegations allow the Court to plausibly infer that the City was on notice that the police officers were using excessive force in making arrests. *See Osterhoudt v. City of New York,* No. 10–CV–3173, 2012 WL 4481927, at *1 (E.D.N.Y. Sept. 27, 2012) ("Mere allegations have little, if any, probative force and by themselves would hardly prevent summary judgment. But in the context of Rule 12, where plausibility is in issue, it is hard to ignore these cases, which suggest that the conduct complained of is not limited to the four corners of [the plaintiff's] complaint.").

***21** However, an allegation of numerous claims of excessive force by itself is insufficient to raise an inference of deliberate indifference due to failure to supervise. Instead, a plaintiff must allege that "meaningful attempts to investigate repeated claims of excessive force are absent." *Hart v. City of Binghamton,* No. 10–CV–1064, 2012 WL 1565085, at *5 (N.D.N.Y. May 2, 2012) (internal quotation marks omitted). Put another way, "[f]or deliberate indifference to be shown, the response must amount to a persistent failure to investigate the complaints or discipline those whose conduct prompted the complaints." *Id.* (internal quotation marks omitted); *see also Lawrence v. City of Rochester,* No. 09–CV–6078, 2015 WL 510048, at *7 (W.D.N.Y. Feb.6, 2015) ("Deliberate indifference may be inferred from the failure to train or supervise based on proof of repeated complaints of civil rights violations that are followed by no meaningful attempt on the part of the municipality to investigate or to forestall." (internal quotation marks omitted)); *Aretakis v. Durivage,* No. 07–CV–1273, 2009 WL 249781, at *29 (N.D.N.Y. Feb. 3, 2009) (same). Here, Plaintiff does not offer any allegations plausibly establishing that the City failed to investigate the listed complaints of excessive force. The *only* allegation Plaintiff makes regarding the City's response to the other lawsuits and the complaints made in the public forum is that "[u]pon information and belief, the officers that were the subject of these lawsuits were not disciplined by [the City] for their actions." (PAC ¶ 34.) This is insufficient.

There are two ways to plausibly plead deliberate indifference with respect to failure to supervise/discipline. First, a plaintiff may plead (1) that there was a pattern of allegations of or complaints about similar unconstitutional activity and (2) that the municipality *consistently failed to investigate* those allegations. Second, a plaintiff may plead (1) that there was a pattern of actual similar constitutional violations and (2) the municipality *consistently failed to discipline* those involved. However, what Plaintiff alleges here is (1) that

there was a pattern of allegations of or complaints about similar unconstitutional activity and (2) that those allegedly involved were not disciplined. This does not plausibly plead a claim for deliberate indifference. There is no basis for the Court to conclude that Plaintiff plausibly alleged that the past conduct was *actually* unconstitutional, and therefore it would not be deliberately indifferent of the City to fail to punish police officers for conduct that was not improper or that they did not commit. Indeed, to plausibly allege a deliberate indifference failure to discipline claim under the second strategy, Plaintiff must allege a consistent pattern of a failure to discipline unconstitutional action. *See Posr v. City of New York,* 835 F.Supp. 120, 125 (S.D.N.Y.1993) (holding, in granting a motion to dismiss a failure to discipline case, that while "[i]t is true that a consistent failure to discipline can give rise to a finding that a municipality has a policy of not disciplining," "[n]o court ... has ever held that a municipality is required to discipline every officer upon a finding of wrongdoing"), *aff'd,* 22 F.3d 1091 (2d Cir.1994); *see also Hart,* 2012 WL 1565085, at *4 (holding, in the context of a summary judgment motion, that "while [the][p]laintiff [had] cited to numerous cases concerning citizen complaints of the use of excessive force," he "[had] not provided evidence tending to indicate that any [of] the [ ] complaints were of substance," thus the "failure to find any of the officers engaged in excessive force alleged in the complaints does not mean *a fortiori,* that the [c]ity was deliberately indifferent to the well being of its citizens"); *cf. Bertuglia v. City of New York,* 839 F.Supp.2d 703, 738 (S.D.N.Y.2012) (denying a motion to dismiss a deliberate indifference claim where "[t]he plaintiffs have pleaded that the [c]ity has a longstanding, de facto policy of never disciplining prosecutors who commit specified types of prosecutorial misconduct and not otherwise training them to avoid misconduct"). Finally, Plaintiff's allegation that the Matrix Report concluded that the City's "discipline guidelines and decisions are unstructured" and recommended that certain changes be made is insufficient to plausibly plead that there was a consistent failure to investigate allegations of misconduct or punish incidents of unconstitutionally excessive force to meet the stringent standard of deliberate indifference. In particular, Plaintiff alleges no causal link between the allegedly "unstructured" discipline guidelines and the unconstitutional practice of not investigating allegations of use of excessive force. For the above reasons, the Court holds that Plaintiff has not plausibly alleged a failure to supervise/discipline case against the City.

***22** The Court now turns to the additional requirements for a failure to train claim. To allege a failure to train claim, a plaintiff must plausibly allege a specific deficiency in the municipality's training. In *Amnesty America,* the Second Circuit suggested that to state a claim for a municipality's failure to train its employees, a plaintiff "need only plead that the city's failure to train caused the constitutional violation," because "[i]t is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage." 361 F.3d at 130 n. 10. However, since *Twombly* and *Iqbal,* "courts in this district have generally required that plaintiffs provide more than a simple recitation of their theory of liability, even if that theory is based on a failure to train." *Simms,* 2011 WL 4543051, at *2 n. 3 (collecting cases), *aff'd sub nom. Simms v. City of New York,* 480 F. App'x 627 (2d Cir.2012); *see also Simms,* 480 F. App'x at 631 n. 4 ("While it may be true that § 1983 plaintiffs cannot be expected to know the details of a municipality's training programs prior to discovery, this does not relieve them of their obligation under *Iqbal* to plead a facially plausible claim." (citation omitted)); *Santos,* 847 F.Supp.2d at 577 ("Because the existence of a municipal policy or practice, such as a failure to train or supervise, cannot be grounded solely on the conclusory assertions of the plaintiff, [the plaintiff's] claims against the [c]ity are dismissed with prejudice." (citation omitted)). To state a claim for municipal liability based on failure to train, Plaintiff therefore must allege facts that support an inference that the municipality failed to train its police officers, that it did so with deliberate indifference, and that the failure to train caused his constitutional injuries. *See Acosta v. City of New York,* No. 11–CV–856, 2012 WL 1506954, at *11 (S.D.N.Y. Apr. 26, 2012) (dismissing *Monell* claim where plaintiff merely alleged that the city "failed to train its police officers as to display a deliberate indifference," because plaintiff "failed to set forth factual allegations that would support a plausible inference that the [c]ity's 'policies' or 'customs' caused ... [the] alleged violations of [the] plaintiff's rights"); *Simms,* 2011 WL 4543051, at *2 (dismissing failure to train claim where there was "not enough factual material in the [c]omplaint for the court to reasonably infer that the police misconduct [the plaintiff] allege [d] was the result of anything other than the individual acts of the arresting officers"); *Johnson,* 2011 WL 666161, at *4 (holding that a complaint that "contain[ed] only an unsupported conclusory allegation that the [c]ity failed to train the individual [d]efendants" could not withstand a motion to dismiss because the plaintiff did not plead any facts that "plausibly allege[d] a specific deficiency in the training or supervision program" (internal quotation marks omitted)); *Araujo v. City of New York,* No. 08–CV–3715, 2010 WL 1049583, at *9 (E.D.N.Y. Mar. 19, 2010) (dismissing failure

to train claim where the plaintiff alleged "no facts to indicate any deliberate choice by municipal policymakers to engage in unconstitutional conduct").

***23** Other than Plaintiff's boilerplate assertions discussed above, the sole fact Plaintiff pleaded with respect to the City's failure to train its officers is that, "only 43% of sworn officers who responded to the polling in the [Matrix Report] agreed that they received appropriate training to do their job well." (PAC ¶ 36.) This factual allegation is just not enough to nudge Plaintiff's claim from possible to plausible. The polling data is not specific as to training regarding the use of excessive force. Nor has Plaintiff pleaded any facts suggesting that an alleged training deficiency *caused* his constitutional injury, for example by identifying "procedural manuals or training guides" or by "highlight[ing] relevant particular aspects of police training or supervision." *Marte,* 2010 WL 4176696, at *3. The allegation that, three years after the incident in question took place, only 43% of officers who responded to polling stated that they received appropriate training to do their job well does not allow the Court to plausibly conclude that, at the time of the incident, the City's training as to the use of force during arrest was insufficient and that that insufficiency led to Plaintiff's injuries. *See Hunter v. City of New York,* 35 F.Supp.3d 310, 325–26 (E.D.N.Y.2014) (dismissing a *Monell* failure to train claim because the pleadings did not plausibly state a claim that there was "a specific deficiency in the city's training program and that the deficiency is closely related to [the plaintiff's] ultimate injury, such that it actually caused [the plaintiff's] constitutional deprivation" (internal quotation marks omitted)); *Triano,* 895 F.Supp.2d at 539 (dismissing a *Monell* failure to train claim where the plaintiff "merely alleged that the [t]own fail[ed] to train its employees, without providing any supporting factual detail about alleged deficiencies in the training program, or regarding other instances of police misconduct which could be attributed to a failure to train"); *Khanukayev v. City of New York,* No. 09–CV–6175, 2012 WL 3538729, at *4 (S.D.N.Y. Aug.13, 2012) (dismissing a failure to train claim where "the complaint [does not] ... allege ... the manner in which there was a failure to train"); *Doe v. City of New York,* No. 09–CV–9895, 2012 WL 2900483, at *2 (S.D.N.Y. July 2, 2012) ("The [a]mended [c]omplaint contains no facts elaborating on (or even theorizing as to) the defective nature of the NYPD training program, let alone an allegation as to how a defect in training or supervision caused her harm."); *Simms,* 2011 WL 4543051, at *3 ("While this assertion does specify what type of training the officers lacked, it does not provide any facts that would allow the court to infer what city policies, practices, or customs contributed to or caused the deficiency."); *Johnson,* 2011 WL 666161, at *4 (dismissing a failure to train claim where plaintiff did not plead "any facts that plausibly allege[d] a specific deficiency in the training or supervision program that accounts for deprivation of [his] constitutional rights" and "[did] not identify procedural manuals or training guides, nor [did he] highlight relevant particular aspects of police training or supervision" (internal quotation marks omitted)); *Brown v. City of New York,* No. 09–CV–2337, 2010 WL 4077925, at *2 (S.D.N.Y. Oct.13, 2010) (dismissing a failure to train claim where the plaintiff "[did] not allege any ... specific deficiencies in the officers' training, nor [did] he allege any facts from which the court could infer that such ... deficiencies existed"); *Williams v. City of New York,* 690 F.Supp.2d 338, 345–46 (S.D.N.Y.2010) (dismissing a plaintiff's failure to train claim where the plaintiff's complaint "once mention[ed] the [c]ity's inadequate training program," but did "not set forth a single factual allegation relating to the program"). For the foregoing reasons, Plaintiff fails to state a claim against the City under *Monell.* However, the Court will give Plaintiff one last chance to plead a *Monell* claim against the City.

*b. Claims against Defendant Ransom*

***24** Plaintiff's PAC contains the following allegation against Defendant Ransom. The City Police Officers "gave chase to [P]laintiff in a number of police vehicles," and "[a]t some point soon thereafter, and prior to Plaintiff stopping his vehicle," Defendant Ransom joined the chase. (PAC ¶ 12.) That is the only allegation specifically referring to Defendant Ransom. However, the Complaint and PAC also contain a number of allegations against "the defendant police officers," a term defined in the Complaint as the City Police Officer Defendants and unknown police officers 1–5, (Compl.¶ 4), and not defined in the PAC. Plaintiff alleges that, after he pulled over, Defendant Maguire "opened the truck door and ordered his police dog to attack [P]laintiff," and Plaintiff was attacked by the police dog and punched by Defendant Maguire. (PAC ¶ 14.) Plaintiff further alleges that although he was "not resisting the police officers in any way," he was "dragged from the truck and thrown to the ground by [Defendant Maguire] and additional officers," and was "thereupon beaten severely by the defendant officers, who at this point were laughing and telling the dog what a good job he had done." (*Id.* ¶ 15.) Then, after Plaintiff was handcuffed and secured, "the police dog was again ordered to attack" Plaintiff. (*Id.* ¶ 16.) Additionally, Plaintiff alleges that "the defendant police officers are liable for failing to intervene ...

because (1) the officers had a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officers' position would have known that the plaintiff's constitutional rights were being violated, and (3) the officers did not take reasonable steps to intervene." (*Id.* ¶ 39.)

In response to the Town's Motion To Dismiss, Plaintiff argues that Defendant Random "does not deny being present at the scene," and cites to Defendant Ransom's testimony at Plaintiff's criminal trial to establish his presence at the scene. (Pl.'s Mem. 11–13.) Plaintiff then argues that this is sufficient at the pleading stage because Plaintiff has sufficiently alleged that Defendant Ransom was present and Plaintiff need not plead the "specific involvement of each and every officer while he was being assaulted and bitten by a police dog [.]" (*Id.* at 12.) However, there is simply no basis for the Court to consider the testimony given at trial in the manner that Plaintiff would like. This testimony, attached as Exhibit B to Plaintiff's Memorandum in Opposition, is not attached to the PAC, nor is it integral to the PAC or incorporated by reference into the PAC. *See Rosenblum v. Thomson Reuters (Markets) L.L.C.,* 984 F.Supp.2d 141, 146 (S.D.N.Y.2013) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, ... documents incorporated by reference in the complaint [, and] a document, not incorporated by reference, where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." (footnotes and internal quotation marks omitted)). "To be incorporated by reference, the complaint must make a clear, definite and substantial reference to the documents[.]" *Bill Diodato Photography L.L.C. v. Avon Products, Inc.,* No. 12–CV–847, 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012) (internal quotation marks omitted). "[T]o be integral to a complaint, the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint." *Id.* (internal quotation marks omitted). Here, Plaintiff clearly has notice of the document, since he is the one who submitted it to the Court. *See Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria,* 265 F.R.D. 106, 124 (S.D.N.Y.2010) ("[T]here is no dispute that, pursuant to the first prong of the integrality test, plaintiffs had 'actual notice' of the extraneous information since they enclosed the extrinsic documents with their opposition brief."). The Complaint and PAC make no reference whatsoever to Defendant Ransom's testimony at Plaintiff's criminal trial, and thus do not incorporate this document by reference. Moreover, there is no evidence that Plaintiff relied on this trial testimony in framing the Complaint or PAC. And, the fact that it was Plaintiff, himself, who submitted this document as an attachment to his opposition memorandum, counsels against the Court considering it. *Id.* at 122–23 (noting that "[c]ourts in [the Second] Circuit have made clear that a plaintiff may not shore up a deficient complaint through extrinsic documents submitted in opposition to a defendant's motion to dismiss" and collecting cases).

***25** Finally, the Court "may also consider matters of which judicial notice may be taken, even if the corresponding documents are not attached to or incorporated by reference in the complaint." *Munno v. Town of Orangetown,* 391 F.Supp.2d 263, 268 (S.D.N.Y.2005). However, even if this trial testimony is appropriate for judicial notice, the Court would consider it "only to establish [its] existence and legal effect, or to determine what statements [it] contained not for the truth of the matters asserted." *Liang v. City of New York,* No. 10–CV–3089, 2013 WL 5366394, at *5 (E.D.N.Y. Sept. 24, 2013) (alterations and internal quotation marks omitted) (quoting *Twine v. Four Unknown N.Y. Police Officers,* No. 10–CV–6622, 2012 WL 6184014, at *7 (S.D.N.Y. Dec. 12, 2012)); *see also Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) ("If the court takes judicial notice, it does so in order to determine *what* statements [the document] contained —but *again not for the truth of the matters asserted.*" (internal quotation marks omitted)).

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (internal quotation marks omitted). There are two ways a plaintiff can establish personal involvement of a police officer in the use of excessive force. "A police officer is personally involved in the use of excessive force if the officer either: (1) directly participates in an assault; or (2) is present during the assault, and fails to intercede on behalf of the victim even though he had a reasonable opportunity to do so." *Vesterhalt v. City of New York,* 667 F.Supp.2d 292, 297 (S.D.N.Y.2009). Additionally, to be liable the officer must "observe[ ] or ha[ve] reason to know that an individual's constitutional right has been violated[.]" *Brooks v. County of Nassau,* ––– F.Supp.3d ––––, 2014 WL 5093277, at *5 (E.D.N.Y. Oct.9, 2014) (internal quotation marks omitted).

Plaintiff does not allege that Defendant Ransom directly participated in the assault, therefore the question is whether

he sufficiently alleges that Defendant Ransom was present and failed to intercede, even though he had a reasonable opportunity to do so. First, Plaintiff's allegation that all "the defendant police officers are liable for failing to intervene ... because (1) the officers had a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officers' position would have known that the plaintiff's constitutional rights were being violated, and (3) the officers did not take reasonable steps to intervene" is a conclusory allegation that does nothing more than provide a formulaic recitation of the elements of a cause of action, and is therefore not entitled to the presumption of truth. (PAC ¶ 39.) *See Iqbal,* 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.... In keeping with [this] principle[ ] a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."); *Twombly,* 550 U.S. at 555 ("[A] formulaic recitation of the elements of a cause of action will not do."). To state a claim against each individually named defendant, Plaintiff must include allegations as to that defendant. *See Ochre L.L.C. v. Rockwell Architecture Planning & Design, P.C.,* No. 12–CV–2837, 2012 WL 6082387, at *6 (S.D.N.Y. Dec. 3, 2012) ("Where a complaint names multiple defendants, that complaint must provide a plausible factual basis to distinguish the conduct of each of the defendants."), *aff'd,* 530 F. App'x 19 (2d Cir.2013); *Appalachian Enters., Inc. v. ePayment Solutions, Ltd.,* No. 01–CV–11502, 2004 WL 2813121, at *7 (S.D.N.Y. Dec.8, 2004) ("A plaintiff fails to satisfy Rule 8, where the complaint lumps all the defendants together and fails to distinguish their conduct because such allegations fail to give adequate notice to the defendants as to what they did wrong." (alterations and internal quotation marks omitted)).

***26** In a claim for excessive force or for failure to intervene with respect to excessive force, courts in the Second Circuit have allowed plaintiffs to use a flexible approach, recognizing the difficulty that plaintiffs may have in pleading who did what. For example, "[a] plaintiff need not establish who, among a group of officers, directly participated in the attack and who failed to intervene." *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003), *aff'd sub nom. Jeffreys v. City of New York,* 426 F.3d 549 (2d Cir.2005). However, this does not eliminate Plaintiff's burden to allege facts supporting a plausible inference of personal involvement by Defendant Ransom. For example, it is sufficient to allege "who was present during the assaults, and that these defendants *either* directly participated in the excessive force *or* failed to intervene." *Snoussi v. Bivona,* No. 05–CV–3133, 2010 WL 3924255, at *3 (E.D.N.Y. Feb. 17, 2010) (emphasis added), *adopted by* 2010 WL 3924683 (E.D.N.Y. Sept.29, 2010). But, a plaintiff fails to state a claim for which relief can be granted if he does not make any factual allegations that any officer "was present" or "had an opportunity to intercede." *K.D. ex rel. Duncan v. White Plains Sch. Dist.,* 921 F.Supp.2d 197, 207 (S.D.N.Y.2013) (discussing failure to intervene in the context of an alleged due process violation). In assessing the sufficiency of Plaintiff's claims, the Court is also mindful that the activities he describes—being handcuffed, thrown on the ground, beaten, and attacked by a dog—"are likely to have prevented [P]laintiff from identifying which of the defendant officers specifically engaged in the bad acts." *Snoussi,* 2010 WL 3924255, at *3 (brackets and internal quotation marks omitted).

Here, though, Plaintiff fails to meet this liberal standard with respect to his allegations against Defendant Ransom. Plaintiff merely pleads that Defendant Ransom joined the police chase. (PAC ¶ 12.) Plaintiff does not sufficiently plead personal involvement, because he does not even plead that Defendant Ransom was present at the scene of the alleged unconstitutional conduct, and therefore also does not sufficiently plead that a reasonable person in Defendant Ransom's position would know that Plaintiff's rights were being violated and that Defendant Ransom had a reasonable opportunity to intervene but failed to do so. Plaintiff argues that Defendant Ransom was at the scene, relying not on allegations in the Complaint or PAC but rather on a document outside the pleadings that the Court is not permitted to consider, and based on an inference he suggests that "[a]t no point does Ransom claim that he left the scene, so he was presumably also present when Plaintiff was thrown to the ground and beaten, and attacked by the police dog a second time while in handcuffs." (Pl.'s Mem. 12.) However, Plaintiff never alleged that Defendant Ransom was at the scene. But, in light of Plaintiff's citation to Defendant Ransom's trial testimony, the Court will give Plaintiff one more opportunity to amend his Complaint to include any additional allegations against Defendant Ransom.

*III. Conclusion*

***27** For the above reasons, the Town's Motion To Dismiss is granted; the claims against the Town are dismissed with prejudice, and the claims against Defendant Ransom are dismissed without prejudice. The City's Motion To Dismiss

is granted in part and denied in part. In particular, the claims against the City are dismissed without prejudice, but Plaintiff may file his PAC against the City Police Officer Defendants. Plaintiff shall properly serve the City Police Officer Defendants within 21 days of the date of this Opinion, or else face dismissal of the claims against those Defendants. Additionally, Plaintiff is given 21 days to file an amended complaint to supplement his allegations against Defendant Ransom and the City. The Clerk of the Court is respectfully requested to terminate the pending Motions. (*See* Dkt. Nos. 25, 29.)

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1379652

## Footnotes

1 As explained below, Plaintiff's PAC will be accepted unless it would be subject to dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). Because the PAC contains all of the factual allegations contained in Plaintiff's original Complaint, as well as additional allegations, the Court will merely address the sufficiency of the factual allegations in the PAC. If any portion of the PAC would be subject to dismissal, the corresponding portion of the Complaint necessarily will also be dismissed under Rule 12(b) (6).

2 Plaintiff asserts that he was lawfully driving that evening, but he was "convicted of driving while impaired by alcohol in violation of Vehicle and Traffic Law § 1192(1), criminal possession of a controlled substance in the seventh degree, resisting arrest, unlawful fleeing a police officer in a motor vehicle in the third degree (two counts) and reckless driving in conjunction with this incident." (Mem. of Law in Supp. of the Town of Newburgh and Sergeant William Ransom's Mot. To Dismiss ("Town's Mem.") 2 n. 1 (Dkt. No. 30); *see also* Newburgh's Reply Br. in Supp. of 12(b) (5) and 12(b)(6) Dismissal ("City's Reply") 1–2 (Dkt. No. 47).) Whether Plaintiff was driving lawfully is not relevant to the instant Motions, so the Court declines to assess whether, and to what extent, it should consider these seemingly undeniable facts put forth by Defendants. However, counsel for Plaintiff may someday be called upon to explain the good faith basis for this allegation.

3 In June 2014, the Court so ordered a stipulation between Plaintiff and Defendant Nales to dismissal of the claims against that Defendant. (*See* Dkt. No. 35.)

4 Plaintiff's PAC also is filed as an attachment to Plaintiff's Memorandum of Law in Opposition, (*see* Dkt. No. 46 Ex. A), and as an attachment to an affidavit submitted by the City in connection with its Memorandum of Law, (*see* Dkt. No. 26 Ex. A).

5 The Court notes that Plaintiff only asserts that service was proper pursuant to N.Y. C.P.L.R. § 308(2). (*See* Pl.'s Mem. 9–11 .)

6 Mr. Root's declaration that 83 Broadway is the usual and typical place to serve all Newburgh officers and employees, (Root Decl. ¶ 3), is the type of "conclusory statement[ ]" that is insufficient to carry the burden that service was adequate. *Doe v. Alsaud,* 12 F.Supp.3d 684, 687–88 (S.D.N.Y.2014) (internal quotation marks omitted).

7 Under New York law, when serving a *corporation,* a process server may rely on the representations of employees of the corporation with respect to who may accept service on the corporation's behalf. *See Melkaz Int'l Inc. v. Flavor Innovation Inc.,* 167 F.R.D. 634, 642 n. 6 (E.D.N.Y.1996). Here, however, Mr. Root was serving individuals and, indeed, not even serving them at their place of business.

8 The Clerk of the Court is respectfully requested to change the name of the attorney appearing for Plaintiff from Stacy Nicole Baden to Roberta D. Asher, as indicated on the notice of appearance. (*See* Dkt. No. 4.)

9 Plaintiff's second counsel, David A. Zelman, entered a notice of appearance on Plaintiff's behalf on December 19, 2013. (Dkt. No. 18.)

10 In its Memorandum of Law in Support of its Motion To Dismiss, the Town argued that the Complaint and PAC "are devoid of factual allegations supporting the inference that the alleged policies actually exist." (Town's Mem. 6.) Though Plaintiff responded to the City's arguments regarding his *Monell* claims, he did not respond to the Town's arguments regarding municipal liability. (*See generally* Pl.'s Mem.) The Town argues in reply that "Plaintiff's failure to raise any argument in opposition to the Town's motion constitutes an abandonment of the claim, and as such, the claims against the Town must be dismissed." (Town of Newburgh and Sergeant William Ransom's Reply Br. in Further Supp. of their Mot. To Dismiss ("Town's Reply") 3 (Dkt. No. 50) (citing *Hanig v. Yorktown Cent. Sch. Dist.,* 384 F.Supp.2d 710, 724 (S.D.N.Y.2005)).) Though the Court dismisses Plaintiff's *Monell* claims against the Town on the merits, it alternatively holds that Plaintiff has abandoned this claim, as Plaintiff offered no response to the Town's arguments in support of its Motion To Dismiss the *Monell* claim. *See* *Baity v. Kralik,* ––– F.Supp.3d ––––, 2014 WL 5010513, at *16 (S.D.N.Y. Sept.30, 2014) (holding that the court "could find [the][p]laintiff to have abandoned any claim that *Monell* liability applies" when the plaintiff's memorandum in opposition made no mention of the defendant's arguments on that issue, and collecting cases); *Chamberlain v. City of White Plains,* 986 F.Supp.2d 363, 392 (S.D.N.Y.2013) (holding, in the context of a § 1983 *Monell* claim, that "[a] court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed").

11 The City puts forward several documents not attached to Plaintiff's Complaint or PAC, specifically, a redacted settlement stipulation from one of the cases Plaintiff refers to in the PAC, releases signed by some plaintiffs in the cases referred to by Plaintiff in the PAC, and an excerpt of the Matrix Report. (*See* Aff. of David L. Posner ("Posner Aff.") Ex. B–D (Dkt. No. 26).) The Court considers the Matrix Report because it is incorporated by reference into the PAC, as Plaintiff specifically cites to the Report and its findings. *See* *Wilson v. Med. Unit Officials at George R. Vierno Ctr. Jail at 09–09 Hazen St.,* No. 10–CV–1438, 2011 WL 6780934, at *2 (E.D.N.Y. Dec. 27, 2011) ("Because they are explicitly cited in [the] plaintiff's complaint, the court shall deem the ultrasound reports incorporated by reference and shall consider them in assessing [the] defendants' motion to dismiss."); *Harrison v. Metro. Life Ins. Co.,* 417 F.Supp.2d 424, 431 (S.D.N.Y.2006) (considering a document outside the complaint where the plaintiff "cites to" the document in her complaint and specifically quoted from one part of it). Furthermore, Plaintiff does not dispute the veracity of the Report provided by the City.

The other documents provided by Defendants, however, are not material to the Court's determination of the City's Motion, so the Court need not assess whether they are properly considered.

12 "[W]here a pro se plaintiff has submitted other papers to the [c]ourt, such as legal memoranda, the [c]ourt may consider statements in such papers to supplement or clarify the plaintiff's pleaded allegations." *Sommersett v. City of New York,* No. 09–CV–5916, 2011 WL 2565301, at *3 (June 28, S.D.N.Y.2011) (italics and internal quotation marks omitted). Here, however, Plaintiff was not pro se when he submitted the PAC, so the Court does not have an obligation read the PAC with the special solicitude due to pro se plaintiffs. *See* *Neely,* 2013 WL 752636, at *12 ("Although the [c]ourt liberally construed [the][p]laintiff's pro se [o]riginal [c]omplaint, since [the][p]laintiff is now represented by counsel, the [c]ourt has no obligation to construe the [p]roposed [a]mended [c]omplaint liberally[.]" (brackets, italics, and internal quotation marks omitted)).

13 The Supreme Court has emphasized that a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick,* 131 S.Ct. at 1359; *see also* *Tuttle,* 471 U.S. at

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Tieman v. City of Newburgh, Not Reported in F.Supp.3d (2015)

822–23 ("[A] 'policy' of 'inadequate training' " is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell."* ).

14 Indeed, the fifteen cases referred to in *Farrow* were *filed* against the city in the preceding five years, so the underlying claims likely occurred even outside that timeframe.

15 Unlike in cases such as *Perez v. N.Y.C. Dep't of Corr.,* No. 10–CV–2697, 2012 WL 3704744 (E.D.N.Y. Aug.27, 2012), there is no doubt here that the City knew about the complaints. *Id.* at *3 (reasoning that "[w]hile a court may consider complaints made against a municipality and its response to them to determine whether the municipality acted with deliberate indifference," the plaintiff's claims must be dismissed because the "plaintiff does not allege who, if anyone, at [the department of corrections] and/or the [c]ity knew about the alleged incidents, or how and through whom these entities may have responded to the alleged incidents").

Additionally, the Court concludes that it can consider all of the other lawsuits cited by Plaintiff, not just the ones involving police dogs, as Plaintiff alleges a custom involving a broad array of unconstitutionally excessive force during arrest, resulting not only in him being attacked by a police dog, but also being punched and beaten severely during his arrest. (*See* PAC ¶¶ 14–16.)

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1146942
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Leon G. TSINBERG, Plaintiff,
v.
CITY OF NEW YORK, Defendant.

20 Civ. 749 (PAE)
|
Signed 03/25/2021

**Attorneys and Law Firms**

Leon G. Tsinberg, Bronx, NY, Pro Se.

Pamela Ann Koplik, Mark W. Muschenheim, NYC Law Department, Office of the Corporation Counsel, New York, NY, for Defendant.

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

***1** Plaintiff Leon G. Tsinberg, a "non-admitted attorney" proceeding *pro se*, sues the City of New York (the "City") under 42 U.S.C. § 1983, alleging constitutional violations arising from the ticketing and towing of his 2009 Nissan Altima (the "Vehicle").

In 2018, while Tsinberg was temporarily living out of state, the Vehicle accumulated several parking tickets, mostly for displaying an expired registration. After Tsinberg failed to respond to those tickets, the City entered default judgments on them. Tsinberg later moved to reopen those judgments, but did not succeed. Then, in January 2019, the City immobilized and towed the Vehicle, which remains in storage accruing storage fees. Tsinberg alleges that these events violated, *inter alia*, his due process rights under the Fourteenth Amendment, his right to be free from excessive fines under the Eighth Amendment, his right to be free from unreasonable seizures under the Fourth Amendment, and his right against double jeopardy under the Fifth Amendment. The City has moved to dismiss all Tsinberg's claims.

Before the Court is the report and recommendation of the Honorable Sarah L. Cave, United States Magistrate Judge, recommending that the City's motion to dismiss be granted. *See* Dkt. 46 ("Report"). For the following reasons, the Court adopts that recommendation in full.

## I. Background

### A. Factual Background [1]

The Court adopts the Report's comprehensive account of the facts and procedural history, to which no party objects. The following summary captures the limited facts necessary for an assessment of the issues presented.

In New York City, the Parking Violations Bureau ("PVB") [2] issues and adjudicates summonses for violations of parking and traffic laws. *See* N.Y. Veh. & Traf. Law ("VTL") § 237(1)–(2), (9); N.Y.C. Admin. Code § 19-201 *et seq.* A person accused of a parking violation is first given a summons, *i.e.*, a parking ticket, containing information about the charged offense and how to contest or pay it. *See* VTL § 238(1); N.Y.C. Admin. Code § 19-204(a). State and City law require that, if the operator of the vehicle is not present at the time of service, notice of the violation must be affixed to the vehicle "in a conspicuous place." VTL § 238(2); N.Y.C. Admin. Code § 19-204(b). In that case, such notice "shall have the same force and effect and shall be subject to the same penalties for disregard thereof as" personal service on the violator. VTL § 238(2); N.Y.C. Admin. Code § 19-204(b).

***2** Once a parking summons issues, the recipient may plead guilty and pay the fine, or plead not guilty and receive a hearing date before an administrative law judge ("ALJ"). N.Y.C. Admin. Code §§ 19-202, 19-204, 19-206. A person may so plead by mail, by phone, in person at one of the Department of Finance's "Business Centers," or online, either through the City's website or a "Pay or Dispute" application. *See Schaer v. City of New York*, No. 09 Civ. 7441 (CM), 2011 WL 1239836, at *7 (S.D.N.Y. Mar. 25, 2011); Report at 3–4. If a party fails to plead or appear, the City may obtain a default judgment sustaining the charge in the summons, fixing the fine, and assessing fees and penalties. *See* N.Y.C. Rules & Regs. tit. 19 §§ 39-05, 39-07, 39-10(d). Once a default judgment is entered, a party may reopen it "only upon written application showing excusable neglect and a substantial defense to the charge." *Id.* § 39-10(i). After a party is found guilty of a parking violation, she may appeal to the PVB Appeals Board. *See* VTL § 242; N.Y.C. Rules & Regs. tit. 19 § 39-12(a), (b)(2). Finally, a party may challenge an adverse decision by the Appeals Board in New York State Supreme Court, by petitioning under Article 78 of the N.Y.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

C.P.L.R. ("CPLR"). *See* VTL § 243; N.Y.C. Admin. Code § 19-209.

If the owner of a vehicle owes more than $350 in judgments, the City may tow and impound her vehicle to satisfy those outstanding judgments. *See* N.Y.C. Admin. Code § 19-212; N.Y.C. Rules & Regs. tit. 34 § 4-08(a)(9). In that case, the owner may be held liable for towing and storage fees associated with the impoundment. *See* CPLR § 8013(c);[3] N.Y.C. Rules & Regs. tit. 34 § 4-08(a)(9)(iii)–(vii) (authorizing, among other things, $185 removal fee and $20-per-day storage fee).

Tsinberg spent most of 2018 temporarily living and working in Pennsylvania, where he ran a business out of the Philadelphia International Airport. FAC ¶ 1. During that time, he left the Vehicle parked in the Riverdale neighborhood of the Bronx, where it amassed 11 tickets, five of which are relevant here. *Id.* ¶¶ 1–2; Dkt. 22-3; Dkt. 26 ("Koplik Decl."), Ex. A.[4] The first of those five tickets was for displaying an expired inspection sticker; the other four were for displaying an expired registration sticker. *See* Dkt. 22-3; Koplik Decl., Exs. D–H. Each was issued on a different day between April and October 2018. After Tsinberg failed to respond to them, the City entered a default judgment on each about three months after issuance. *See* Koplik Decl., Exs. D–H; Report at 6–7. Each ticket was originally $65, or $325 total, but, after penalties associated with Tsinberg's failure to plead to or contest the tickets accrued, the total amount owed on the five tickets rose to over $600. FAC ¶ 34; Report at 6–7.

In January 2019, Tsinberg discovered the tickets and the default judgments against him. FAC ¶ 3. He then sought to vacate three of the default judgments by filing disputes through the City's "Pay or Dispute" application and submitting an image of his current, unexpired registration. *See* FAC ¶ 11; Koplik Decl., Exs. D–F. Each application was denied by an ALJ because his application did not show a legally sufficient reason for his failure to respond to the summons, and his proof of current registration did not refute that his car had displayed an expired registration when each summons was issued. *See* Koplik Decl., Exs. D–F.

On January 29, 2019, the City placed an immobilizing "boot" on the Vehicle. FAC ¶ 14. The City affixed a notice to the Vehicle, which provided a telephone number and five physical addresses at which Tsinberg could pay the outstanding judgments. Dkt. 22-4 ("Booting Notice"). The City also affixed an execution to the Vehicle, which stated that the state of New York, or one of its subdivisions, was the judgment creditor, "and/or the debt enforced is for child support, spousal support, maintenance or alimony." FAC ¶ 7; Dkt. 22-2 ("Execution"). The same day, Tsinberg filed an order to show cause ("OTSC") in New York State Supreme Court, seeking to commence an Article 78 proceeding and to obtain a temporary restraining order ("TRO") to prevent the towing of his Vehicle. FAC ¶¶ 5, 8; Dkt. 22-9. He tried to serve the City with the OTSC at two the addresses provided on the Booting Notice, but neither office would accept service. FAC ¶ 10.

***3** On January 30, 2019, the City towed the Vehicle. *Id.* ¶ 12. On February 15, 2019, the City placed an "indefinite sales hold" on the Vehicle—meaning that the Vehicle would not be auctioned to satisfy Tsinberg's unpaid judgments—given the pending Article 78 petition. *See id.* ¶¶ 22, 36; Koplik Decl., Ex. R. The Vehicle remains in City storage and has accrued thousands of dollars in storage fees. Reply at 7 n.5 (as of July 28, 2020, total outstanding judgments were $10,397.72). On June 25, 2019, the New York State Supreme Court dismissed Tsinberg's Article 78 petition because he had failed to serve or file any complaint or petition in the matter and to exhaust administrative appeals. Koplik Decl., Ex. Q.

**B. Procedural History**

On January 28, 2020, Tsinberg filed a Complaint. Dkt. 2. On May 7, 2020, the City moved to dismiss. Dkts. 15–17. On June 18, 2020, Tsinberg filed the FAC. On August 3, 2020, the City moved to dismiss the FAC, Dkt. 25, and filed a memorandum of law in support, City Mem., and the declaration of Pamela A. Koplik, Esq., *see* Koplik Decl. On August 4, 2020, the Court referred that motion to Judge Cave for a report and recommendation. Dkt. 29. On August 18, 2020, Tsinberg opposed the City's motion. Dkt. 31 ("Pl. Opp'n"). On September 8, 2020, the City replied. *See* Reply.

While the motion to dismiss was pending, Tsinberg sought "preliminary discovery" from the City; the City moved to stay discovery pending a ruling on its motion to dismiss. *See* Dkt. 43 at 1. On November 19, 2020, Judge Cave granted the City's motion to stay, with an exception for the exchange of five narrow categories of information, largely relating to the circumstances surrounding the seizure and storage of the Vehicle. *Id.* at 2–3.

On January 22, 2021, Judge Cave issued the Report, which recommends the dismissal of the FAC with prejudice and without leave to amend. *See* Report at 1, 35. On February

15, 2021, Tsinberg filed objections to the Report. Dkt. 51 ("Objections"). On March 15, 2021, the City responded. Dkt. 54 ("Response").

**II. Legal Standard**

**A. Report and Recommendation**

In reviewing a Report and Recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When specific objections are made, "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3); *United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997). To accept those portions of the report to which no timely objection has been made, "a district court need only satisfy itself that there is no clear error on the face of the record." *King v. Greiner*, No. 02 Civ. 5810 (DLC), 2009 WL 2001439, at *4 (S.D.N.Y. July 8, 2009) (citing *Wilds v UPS*, 262 F. Supp. 2d 163, 169 (S.D.N.Y. 2003)); *see also Edwards v. Fischer*, 414 F. Supp. 2d 342, 346–47 (S.D.N.Y. 2006).

To the extent that the objecting party makes only conclusory or general objections, or simply reiterates the original arguments, the Court will review the report and recommendation strictly for clear error. *See Dickerson v. Conway*, No. 08 Civ. 8024 (PAE), 2013 WL 3199094, at *1 (S.D.N.Y. June 25, 2013); *Kozlowski v. Hulihan*, Nos. 09 Civ. 7583, 10 Civ. 0812 (RJH), 2012 WL 383667, at *3 (S.D.N.Y. Feb. 7, 2012).

**B. Motion to Dismiss Pursuant to Rule 12(b)(6)**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Although the court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet "is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

***4** Where, as here, the plaintiff is *pro se*, his complaint must be construed "liberally, reading it with special solicitude and interpreting it to raise the strongest claims that it suggests." *J.S. v. T'Kach*, 714 F.3d 99, 103 (2d Cir. 2013) (quoting *Harris v. City of New York*, 607 F.3d 18, 24 (2d Cir. 2010)). This mandate "applies with particular force when a plaintiff's civil rights are at issue." *Maisonet v. Metro. Hosp. & Health Hosp. Corp.*, 640 F. Supp. 2d 345, 348 (S.D.N.Y. 2009). Consistent with that approach, factual allegations made in a *pro se* plaintiff's opposition papers, or the attachments thereto, may be considered "as supplementing the Complaint, at least to the extent they are consistent with the allegations in the Complaint." *George*, 2012 WL 2512964, at *6 n.7.

However, *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law." *Maisonet*, 640 F. Supp. 2d at 348 (citation omitted). Thus, even a *pro se* plaintiff "must state a plausible claim for relief." *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013). The Court need not accept allegations that are "contradicted by other matters asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint." *Fisk v. Letterman*, 401 F. Supp. 2d 362, 368 (S.D.N.Y. 2005).

**III. Discussion**

The Report recommends dismissal of Tsinberg's entire case for failure to state a claim. In many respects, Tsinberg's objections do not engage with any specific aspects of the thoughtful and well-reasoned Report, but reprise, through 35 "claims" spanning nearly 50 pages, general assertions about the sufficiency of the FAC's allegations and principles of constitutional law. Thus, as to much of the Report, review for clear error would be appropriate. *See Dickerson*, 2013 WL 3199094, at *1. Nevertheless, for the avoidance of doubt, in the interest of thoroughness, and given Tsinberg's *pro se* status, the Court will review the entire Report *de novo.*

The Court addresses Tsinberg's claims in the following order: (1) Fourteenth Amendment Due Process Clause claims; (2) Fifth Amendment Double Jeopardy Clause claim; (3) Eighth Amendment Excessive Fines Clause claim; (4) Fourth Amendment claim; (5) municipal liability claim; (6) Fair Debt Collection Practices Act claim; and (6) state-law claims. Finally, the Court addresses Tsinberg's request for leave to amend the FAC.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

### A. Due Process Clause

#### 1. Procedural Due Process

Tsinberg claims that the City's ticketing and towing of his car violated his rights to procedural due process because he received insufficient notice of the tickets, because the dispute mechanism provided by the "Pay or Dispute" application was inadequate, and because his Article 78 proceeding failed to provide adequate post-deprivation remedies. *See* FAC ¶¶ 48–61; Pl. Opp'n ¶¶ 1–11, 18–20.

The Court agrees with the Report that Tsinberg has failed to allege a violation of his rights to procedural due process. Before depriving a person of a liberty or property interest, the state, consistent with due process of law, must use procedures that balance the interests involved in the deprivation. "The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.' " *Mathews v. Eldridge*, 424 U.S. 319, 348–49 (1976) (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 171–72 (1951) (Frankfurter, J., concurring)). The interests to be balanced are: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.

***5** "Courts in this Circuit have found that, as a general matter, the PVB/Article 78 review process for challenging parking summonses meets the requirements of procedural due process." *Nestle Waters N. Am., Inc. v. City of New York*, No. 15 Civ. 5189 (ALC), 2016 WL 3080722, at *8 (S.D.N.Y. May 25, 2016) (collecting cases), *aff'd*, 689 F. App'x 87 (2d Cir. 2017) (summary order); *see Schaer*, 2011 WL 1239836, at *9 ("The City's administrative parking violations system has been held to be constitutional.") (collecting cases); *Rackley v. City of New York*, 186 F. Supp. 2d 466, 480 (S.D.N.Y. 2002) (The City "provide[s] parking violators ... with more than sufficient process to satisfy the Constitution."). To plausibly allege a procedural due process violation, therefore, Tsinberg must allege some departure from that constitutionally "more than sufficient" process.

Tsinberg has failed to do so. First, he alleges that the City's service of parking summonses by affixing them to his car and mailing them to him was insufficient. That is because he alleges that he failed to receive *actual* notice of the tickets and, because he lived in Philadelphia at the time, the City should have either called or emailed him to give him such notice before the judgments against him were entered. *See* FAC ¶¶ 48–49; Objections at 17, 20–21. But the method of service the City employed here is prescribed by the statutes above, and courts have repeatedly held it to be constitutional. *See* VTL § 238(2); *e.g.*, *Nestle Waters*, 2016 WL 3080722, at *8. Nor was the City obliged to anticipate that Tsinberg might have been out of state for several months, and to depart from its statutorily prescribed method of service to accommodate that absence. Further, as the Report notes, Tsinberg did receive actual notice of the default judgments against him, as evidenced by his challenges thereto, and had both the chance to contest them before the City towed and impounded his Vehicle several weeks later, and to pay them while his Vehicle continued to accumulate storage costs. *See* Report at 19.

Second, Tsinberg alleges that the procedures through which he tried to vacate the default judgments against him were deficient because the "Pay or Dispute" application is flawed in unspecified ways. *See* FAC ¶¶ 48–51; Pl. Opp'n ¶ 10. To the extent that Tsinberg alleges that the City obtained judgments against him through "adjudication via app," that is wrong. As the Report notes, the default judgments were entered in the usual course, and Tsinberg merely tried to vacate them through the "Pay or Dispute" application. *See* Report at 18–19. As to the latter process, Tsinberg was never required to use that method of contesting the judgments—he remained free at all times to file his disputes by mail or in person. *See* City Reply at 3 n.1. His decision to do so, absent any allegation that other such options were unavailable, cannot support a plausible claim for any deprivation of procedural due process.

Third, Tsinberg alleges that, while Article 78 proceedings may, in some cases, provide adequate post-deprivation protections against arbitrary government action, here that was not so because the New York Supreme Court's dismissal of his Article 78 proceeding for failure to serve, failure to file a petition, and failure to exhaust administrative remedies was "merely on a Temporary Restraining Order," and not a "valid, final judgment on the merits." FAC ¶ 55. He also argues that, because the Booting Notice did not provide him with the proper address for service of an Article 78 petition on the City, he was denied procedural due process.

Pl. Opp'n ¶¶ 7–9; Objections at 6–7, 9–11, 15–17. As to the first point, Tsinberg's decision to seek a TRO rather than commence an Article 78 proceeding, as well as his failure to serve or file any attending petition or exhaust administrative remedies, resulted from his own decisions, not any procedural impediments erected by the City. *See* Koplik Decl., Ex. Q. Those decisions do not affect the availability of Article 78 proceedings as a sound, post-deprivation guard against erroneous deprivations. "The fact that [a plaintiff] failed properly to pursue the state court action, and that it is now too late to do so, does not affect [the] due process analysis. Where a state law remedy gives a party a meaningful opportunity to challenge the state's action, he is not deprived of due process simply because he failed to avail himself of the opportunity." *Nestle Waters*, 2016 WL 3080722, at *10 (quoting *Rivera-Powell v. N.Y.C. Bd. of Elections*, 740 F.3d 458, 467 n.9 (2d Cir. 2006)); *see* *Schaer*, 2011 WL 1239836, at *9 ("[T]he Second Circuit has 'held on numerous occasions that an Article 78 proceeding is a perfectly adequate postdeprivation remedy[.]' " (quoting *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 985 F.2d 90, 93 (2d Cir. 1996))). [5] As to the second, Tsinberg does not provide any authority for the notion that the City deprived him of due process by failing to provide, on the Booting Notice, the proper address for service of a TRO, rather than the proper address at which to pay his tickets.

***6** The Court thus agrees with the Report that the FAC fails to plausibly allege any procedural due process violation. [6]

### 2. Substantive Due Process

Although the FAC did not do so expressly, the Report also construed it to assert a substantive due process claim, but found such claim to be deficient. The Court agrees with that assessment. To violate Tsinberg's substantive due process rights, the City's actions "must have occurred under circumstances warranting the labels 'arbitrary' and 'outrageous.' " *Schaer*, 2011 WL 1239836, at *6 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998)). "Only conduct that 'shocks the conscience' qualif[ies] as even potentially violative of plaintiffs' substantive due process rights." *Id.* (quoting *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999)). Upon *de novo* review, the Court agrees with, and adopts in full, the Report's conclusion that the City's ticketing and towing of Tsinberg's car—all under established and oft-approved state and local law—does not approach this threshold. *See* Report at 23–24. [7] Tsinberg's claim for violation of his substantive due process rights is also dismissed.

### B. Double Jeopardy

Tsinberg next claims that the issuance of several tickets for the same alleged failure to display an unexpired registration sticker subjected him to double jeopardy, in violation of the Fifth Amendment. *See* FAC ¶ 45. The Report recommends dismissing this claim because the Double Jeopardy Clause applies only to criminal proceedings, and Tsinberg has failed to adequately allege that the parking sanctions imposed on him were "so punitive in form and effect as to render them criminal despite [the legislature's] intent to the contrary." Report at 25–26 (quoting *Doe v. Pataki*, 120 F.3d 1263, 1274 (2d Cir. 1997)).

***7** Again, the Court agrees with that assessment. The Double Jeopardy Clause protects an individual's right not to be "subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V, cl. 2. The Supreme Court has held that the "Clause protects only against the imposition of multiple *criminal* punishments for the same offense," and does not apply to civil penalties. *Hudson v. United States*, 522 U.S. 93, 99 (1997). To decide whether a sanction is criminal or criminal, courts apply a two-part test. First, courts consider whether the legislative intent behind the law was punitive: If the intent was " 'not to punish, but to accomplish some other legitimate governmental purpose,' then it has been considered 'nonpenal.' " *Doe*, 120 F.3d at 1273. Second, even where a law was not *designed* to be punitive, courts then must determine whether it is "so punitive either in purpose or effect" that the sanction at issue is "transform[ed] into a criminal penalty." *United States v. Ward*, 448 U.S. 242, 248–49 (1980). The Supreme Court "has not spelled out the precise nature of the second-stage inquiry," *Doe*, 120 F.3d at 1275, but has identified several non-exclusive and non-dispositive factors that may guide it, *see* *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963) (identifying, *inter alia*, whether the sanction imposes an affirmative disability or restraint, has historically been considered punishment, and depends on a finding of scienter). At this second stage of the inquiry, the burden is on the party challenging a law to "show by 'the clearest proof' that the sanctions imposed 'are *so punitive in form and effect* as to render them criminal despite [the legislature's] intent to the contrary.' " *Doe*, 120 F.3d at 1274 (quoting *United States v. Ursery*, 518 U.S. 267, 290 (1996)).

Here, Tsinberg addresses only the second inquiry, arguing that the collective amount of fines and fees, including storage fees, imposed on him provide "the clearest proof" that the parking sanctions at issue are in fact criminal. *See* Objections at 32–35. The Court disagrees. As the Report cogently explains, the City's parking procedures, including seeking recoupment of storage costs occasioned by the impoundment of delinquent vehicles, serve legitimate, important non-punitive interests. *See* Report at 24, 26 (collecting cases). And Tsinberg does not explain how the accumulation of fines and storage costs, resulting from his own failure to pay the original penalties, can convert otherwise civil sanctions into criminal ones. Indeed, as the Report notes, such a result would be surprising given the substantial New York state authority holding that parking and traffic sanctions are civil, not criminal. *See Dubin v. County of Nassau*, 277 F. Supp. 3d 366, 400 (E.D.N.Y. 2017) (noting that "such a claim would not be plausible given the weight of New York legal authority holding that penalties for traffic infractions are civil and not criminal" and collecting cases). The imposition of parking tickets, and resulting penalties for non-payment, thus is not a criminal punishment to which the Double Jeopardy Clause applies. The Court adopts the Report's recommendation and dismisses Tsinberg's double jeopardy claim.

**C. Excessive Fines**

Next, Tsinberg alleges that the magnitude of the civil penalties that have accrued on the parking tickets at issue are impermissible under the Eighth Amendment's prohibition on excessive fines. In support, he argues that, while the $65 fines originally imposed may not be excessive, the accumulation of "fines on fines," including tow, boot, and storage fees, is unconstitutional, and tantamount to "criminal usury." *See* FAC ¶¶ 32–44, 69; Pl. Opp'n ¶¶ 21–27; Objections at 36–40. The Report recommends dismissal of this claim because, even if the Excessive Fines Clause applies here, the fines are not disproportionately excessive. *See* Report at 26–30. The Court agrees with the Report's assessment.

The Second Circuit has established a "two-step inquiry for determining whether a financial penalty is excessive under the Eighth Amendment." *United States v. Viloski*, 814 F.3d 104, 108 (2d Cir. 2016). First, a court must "determine whether the Excessive Fines Clause applies at all," *i.e.*, whether the forfeiture at issue "may be characterized, at least in part, as 'punitive.' " *Id.* at 109. Second, a court must "determine whether the challenged forfeiture is unconstitutionally excessive." *Id.* A fine is constitutionally excessive "if it is grossly disproportional to the gravity of a defendant's offense." *Id.* (quoting *United States v. Bajakajian*, 524 U.S. 321, 334 (1998)).

***8** Here, the parties and the Report focus only on the second question, assuming that the Excessive Fines Clause applies in the first instance. The Court therefore assumes without deciding that the Clause applies to the routine application of the City's parking and traffic laws in cases like Tsinberg's. [8] As to the second factor, the Second Circuit has set forth a four-factor test governing the inquiry:

> (1) the essence of the crime of the defendant and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of the harm caused by the defendant's conduct.

*Viloski*, 814 F.3d at 109 (quoting *United States v. George*, 779 F.3d 113, 122 (2d Cir. 2015)). Courts may also consider, along with those four factors, "whether the forfeiture would deprive the defendant of his livelihood." *Id.* at 111. In undertaking this analysis, the Supreme Court has admonished that "judgments about the appropriate punishment for an offense belong in the first instance to the legislature." *Bajakajian*, 524 U.S. at 336; *see id.* (courts "should grant substantial deference" to the legislature (citation omitted)).

The Court agrees that Tsinberg has failed to plausibly allege that the fines at issue are "grossly disproportional" to Tsinberg's offenses. Tsinberg does not argue that the $65 parking fines were excessive. *See, e.g.*, FAC ¶ 36; Pl. Opp'n ¶ 11. [9] Instead, he contends that the fines he accrued for failing to address the five $65 tickets, and the resulting fees associated with booting, towing, and storing his Vehicle collectively became disproportionate. *See, e.g.*, Objections at 38–40. Whereas Tsinberg was ticketed $65 per original ticket, or $325 total, those penalties increased to about $640, or another $63 per ticket, after he failed to respond to or pay those tickets. *See* FAC ¶ 34; Koplik Decl., Exs. D–H; Dkt. 22-3. As to the first factor, Tsinberg's offense is the accumulation and failure to resolve several duly issued parking tickets, for which, as several ALJs held, he did not

provide any legitimate excuse. *See* Koplik Decl., Exs. D–F. Beyond the five tickets directly at issue here—which Tsinberg still has not paid—he also accrued at least six others in a similar period, for a variety of offenses. *See* Dkt. 22-3. Thus, while negligent or reckless parking violations themselves may not entail a great degree of moral culpability, *see George*, 779 F.3d at 123, Tsinberg's sustained refusal to lawfully address them, well after he undisputedly received notice of them, weighs in the City's favor. As a result, Tsinberg is squarely a member of the "class of persons for whom" such enhanced penalties were principally designed. *Viloski*, 814 F.3d at 109. Without the prospect of escalating fines, violators like Tsinberg would have little reason ever to pay their tickets to the City. The third factor, as to whether the maximum fine was imposed, does not fit well into the parking-ticket context, where there appears to be little discretion over the degree of any given penalty. *Cf. Viloski*, 814 F.3d at 109 (discussing imposition of sentence and fine within the context of the criminal Sentencing Guidelines and statutory maximum penalties). Thus, the Court gives it little weight in the analysis. Last, although when Tsinberg's experience is viewed in isolation, his non-payment of five $65 tickets may not have meaningfully harmed the City of New York, the City must process an "overwhelming volume of alleged parking violations." *C.A.U.T.I.O.N., Ltd. v. City of New York*, 898 F. Supp. 1065, 1067 (S.D.N.Y. 1995). Without the ability to enforce timely compliance by scofflaws who might otherwise be disinclined to pay up, it would likely suffer substantial financial harms. The City also has a separate, if less tangible, interest in promoting compliance with its laws, which is undermined even by small-scale disregard like that here.

***9** Considering the above factors, Tsinberg has not plausibly alleged anything close to a gross disproportion between his offense and the penalties, totaling $315, for his failure to address his many parking tickets. That conclusion accords with the assessment of various other courts to have considered the issue. *See, e.g.*, *Shibeshi v. City of New York*, No. 11 Civ. 4449 (LAP), 2011 WL 13176091, at *2 (S.D.N.Y. Sept. 21, 2011) ("[Plaintiff's] fines totaling $515.16 for four tickets, plus additional fees, are not disproportional."), *aff'd*, 475 F. App'x 807 (2d Cir. 2012) (summary order); *Wemhoff v. City of Baltimore*, 591 F. Supp. 2d 804, 808–09 (D. Md. 2008); *Popescu v. City of San Diego*, No. 06 Civ. 1577 (LAB), 2008 WL 220281, at *4 (S.D. Cal. Jan. 25, 2008) (penalty's increase from $47 to $104 upon nonpayment not excessive). [10]

The same is true of Tsinberg's claim that the City's booting, towing, and impounding of his car, and that the resulting accrual of fees, were excessive. Courts have approved the towing and auctioning of vehicles to satisfy municipal judgments, as state law specifically authorizes. *See, e.g.*, *Berger v. Phila. Parking Auth.*, 413 F. Supp. 3d 412, 420 (E.D. Pa. 2019) (denying Eighth Amendment Excessive Fines claim under *Timbs* for towing and impoundment of vehicle for failure to pay parking tickets); *see also Rackley*, 186 F. Supp. 2d at 469–85 (same under Fourth Amendment and Due Process Clause). Although the value of the car was, at the time of its towing, substantially greater than the amount Tsinberg owed, he remained free at all times to recover the Vehicle by paying the City what he owes it. And even if the City auctions his car to satisfy the judgments at issue, Tsinberg would then have a right to receive any sale proceeds above the outstanding judgments and fees at the time of sale. *See* CPLR § 5234(a). Finally, as to the booting, towing, and storage fees associated with the Vehicle—including the mandatory $20 daily storage fee that has been amassing since January 2019 as a result of Tsinberg's refusal to pay his debts to the City, *see* N.Y.C. Rules & Regs. tit. 34 § 4-08(a)(9)(vii)—Tsinberg fails to explain, except in conclusory terms, why those essentially compensatory fees are unconstitutional. *See, e.g.*, *Potter v. City of Lacey*, No. 20 Civ. 05925 (RJB), 2021 WL 915138, at *1 (W.D. Wash. Mar. 10, 2021) (impoundment fees not excessive because "they can reflect the costs associated with towing and storage"); *see* Objections at 38–40. Accordingly, the Court adopts in full the Report's recommendation that Tsinberg's Eighth Amendment claim, too, be dismissed for failure to state a claim.

### D. Fourth Amendment

Tsinberg also asserts a Fourth Amendment claim related to the towing of the Vehicle, arguing that such towing constituted an unreasonable seizure. *See* FAC ¶¶ 62–67. Specifically, he claims that the City booted and towed his Vehicle "through an automated system ... without an independent review of the underlying facts and circumstances ... by a judge." *Id.* ¶ 65. He also asserts that the inclusion of language regarding child support, spousal support, or alimony on the Execution makes the seizure even more unreasonable. *See id.*; Execution. The Report recommends dismissal of this claim, which the Court adopts.

***10** The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV. By virtue of its incorporation through the Fourteenth Amendment's Due Process Clause, the Fourth Amendment is binding on states

and, relevant here, municipalities such as New York City. *See City of Ontario v. Quon*, 560 U.S. 746, 750 (2010). It "applies in the civil context as well" as the criminal. *See, e.g.*, *Soldal v. Cook County*, 506 U.S. 56, 57 (1992) (collecting cases).

A seizure of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *United States v. Iverson*, 897 F.3d 450, 458 (2d Cir. 2018) (quoting *United States v. Jacobson*, 466 U.S. 109, 113 (1984)). The reasonableness of a seizure is the "ultimate standard under the Fourth Amendment." *Soldal*, 506 U.S. at 61 (citation omitted). The permissibility of any governmental seizure is thus "judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Delaware v. Prouse*, 440 U.S. 648, 654 (1979).

Tsinberg has failed to plausibly allege that any seizure of his Vehicle was unreasonable. It is undisputed that the City seized Tsinberg's Vehicle based on valid judgments entered against him pursuant to state and local law, and that the seizure was authorized by statute given those outstanding judgments. *See* N.Y.C. Admin. Code § 19-212 (allowing towing of vehicle for which outstanding judgments exceed $350); *see also* VTL § 237(5) (empowering PVB to "enter judgments and enforce them, without court proceedings, in the same manner as the enforcement of money judgments in civil actions in any court of competent jurisdiction or any other place provided for the entry of civil judgment within the state of New York"); FAC ¶ 34 (alleging that $640.59 in fines "caused NYC Admin. Code § 19-212 to trigger this seizure of the property"). Courts have held that the towing and impoundment of vehicles in similar circumstances is reasonable under the Fourth Amendment. *See, e.g.*, *Shibeshi*, 2011 WL 13176091, at *2 ("The City's warrantless seizure of a person's vehicle from a public street due to that person's failure to pay parking ticket fines has been held not to violate the Fourth Amendment in that it is a reasonable seizure, does not implicate core privacy concerns requiring a warrant and, of itself, demonstrates probable cause."); *Yu Juan Sheng v. City of New York*, No. 05 Civ. 1118 (RRM) (VVP), 2009 WL 6871132, at *8 (E.D.N.Y. June 26, 2009) (approving towing and impoundment resulting from default judgments on parking tickets), *report and recommendation adopted*, 2010 WL 3744428 (E.D.N.Y. Sept. 20, 2010); *Rackley*, 186 F. Supp. 2d at 478–79 (same even where City officials erroneously calculated amounts owed to City on multiple dates). Tsinberg does not offer any countervailing authority, or explain why the underlying tickets arising from the same expired registration makes the ultimate seizure, which undisputedly complied with N.Y.C. Admin. Code § 19-212, unreasonable. *See* FAC ¶ 65. [11] The Court therefore also adopts the Report's recommendation on this point and dismisses Tsinberg's Fourth Amendment claim.

### E. *Monell* Liability

***11** Having dismissed each of Tsinberg's § 1983 claims, the Court holds, with the Report, that dismissal of Tsinberg's claim for municipal liability against the City is required as well. A plaintiff cannot establish municipal liability under § 1983 based on a theory of *respondeat superior*. Instead, to hold a municipality liable for its employees' unconstitutional actions, a plaintiff must establish a municipal policy or custom that directly caused the plaintiff to be subjected to a constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007); *see City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (the "first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation"). Because *Monell* liability merely extends liability for an underlying constitutional violation to a municipality, without a predicate violation, the Court need not address whether the municipality itself can be liable for such violation. *See, e.g.*, *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct."); *see also Salem v. City of New York*, 811 F. App'x 678, 683 (2d Cir. 2020) (summary order) (dismissal of *Monell* claim appropriate where plaintiff had "not plausibly pled any underlying constitutional violation that survives a motion to dismiss"). Here, with the Court's having held that Tsinberg failed to state a claim for any underlying constitutional violation under § 1983, there is no basis to extend any such liability to the City based on an alleged custom, policy, or widespread usage of the City. Tsinberg's *Monell* claim is therefore dismissed.

### F. Fair Debt Collection Practices Act

Tsinberg next asserts that the City's actions violated the Fair Debt Collection Practice Act ("FDCPA"), 15 U.S.C. § 1962 *et seq.* He alleges that the Execution's reference to child support or alimony, as a potential ground for seizure of the Vehicle, was false and harassing under that statute. *See* FAC ¶¶ 62–63; Pl. Opp'n ¶¶ 28–29; Objections at 40. As the Report

correctly concluded, that claim fails for at least two reasons. First, the FDCPA does not apply to actions taken by municipal employees, and Tsinberg alleges only that the City of New York, through its employees, affixed the Execution notice to his Vehicle. *See* 15 U.S.C. § 1962a(6)(C) (excluding from definition of "debt collector" any "officer or employee of ... any state"), (8) (defining "state" to include "any political subdivision" thereof). Second, the FDCPA "does not extend to creditors seeking to collect on debts owed to themselves." *Muniz v. Bank of Am., N.A.*, No. 11 Civ. 8296 (PAE), 2012 WL 2878120, at *3 (S.D.N.Y. July 13, 2012) (collecting cases). Here, the City's Execution was issued and posted in connection with its attempts to collect debts Tsinberg owed to the City, not to any other person. The Court thus adopts the Report in full in dismissing Tsinberg's claim for a violation of the FDCPA.

**G. State-Law Claims**

Finally, Tsinberg brings claims under state law for conversion, trespass to chattels, and defamation. FAC ¶¶ 68–71. The Report recommends that the Court decline to exercise supplemental jurisdiction over these claims given the Court's dismissal of Tsinberg's federal causes of action. The Court agrees. "District courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine —judicial economy, convenience, fairness, and comity— will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (citation omitted); *Spiegel v. Schulmann*, 604 F.3d 72, 83 (2d Cir. 2010) ("[T]he district court may also decide whether to exercise supplemental jurisdiction over this claim; it may determine that this area of law would benefit from further development in the state courts and therefore dismiss the claim without prejudice to refiling in state court."); *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."). Having dismissed all federal claims over which the Court had original jurisdiction before meaningful discovery has taken place, and far before trial, the Court dismisses Tsinberg's state-law claims, too, without prejudice to his pursuit of those claims in state court.

**H. Leave to Replead**

***12** Last, the Report recommends that Tsinberg not be granted leave to file another amended complaint, and that his claims instead be dismissed with prejudice given the substantive deficiencies in his allegations and his earlier opportunity to amend his complaint after the City moved to dismiss it. Report at 34–35. Tsinberg, in his Objections (but not in his opposition), sought leave to file another amended complaint, after further discovery, to remedy any deficiencies in the FAC. *See* Objections at 48. He does not, however, identify any specific facts that, if pled, could salvage any of his claims. *See id.*

*Pro se* complaints should generally be given leave to amend when there is "any indication that a valid claim might be stated." *Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir. 2002) (citation omitted); *see Grullon v. City of New Haven*, 720 F.3d 133, 140 (2d Cir. 2013). But a district court has discretion to deny leave if a revised claim still "could not withstand a motion to dismiss." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002). If the problems with a *pro se* plaintiff's claim are "substantive," rather than the result of an "inadequately or inartfully pleaded" complaint, an opportunity to replead would be "futile" and "should be denied." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). Thus, "[i]n the absence of any identification of how a further amendment would improve upon the Complaint, leave to amend must be denied as futile." *In re WorldCom, Inc. Sec. Litig.*, 303 F. Supp. 2d 385, 391 (S.D.N.Y. 2004); *see also, e.g.*, *Cuoco*, 222 F.3d at 112 (courts should generally grant a *pro se* plaintiff "leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated"); *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 F. App'x 617, 622 (2d Cir. 2009) (summary order) ("Granting leave to amend is futile if it appears that plaintiff cannot address the deficiencies identified by the court and allege facts sufficient to support the claim.").

The Court agrees with the recommendation in the Report and will dismiss Tsinberg's claims without leave to amend, and with prejudice. Tsinberg already had one opportunity to amend his complaint, and did so after reviewing the City's arguments, in its first motion to dismiss, explaining why his pleading failed to state a claim. *See, e.g.*, *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 506 (2d Cir. 2014) (upholding dismissal of amended complaint with prejudice where, "following Defendant's first motion to dismiss for failure to state a claim," plaintiff had already amended its

complaint once and failed to "resolve its pleading deficiencies in its First Amended Complaint"); *Green v. Niles*, No. 11 Civ. 1349 (PAE), 2012 WL 987473, at *7 (S.D.N.Y. Mar. 23, 2012). Further, the Court agrees with the Report's assessment that the FAC's substantive deficiencies are such that a third attempt to state a viable claim would be futile. *See, e.g.*, *Binn v. Bernstein*, No. 19 Civ. 6122 (GHW) (SLC), 2020 WL 4550312, at *34 (S.D.N. Y July 13, 2020) (collecting cases denying plaintiffs a "third bite at the apple"), *aff'd*, 2020 WL 4547167 (2d Cir. Aug. 6, 2020).

## CONCLUSION

For the foregoing reasons, the Court adopts the Report in full, grants the City's motion to dismiss, and dismisses Tsinberg's claims without leave to amend. Tsinberg's federal claims are dismissed with prejudice, but his state-law claims are dismissed without prejudice to his ability to pursue them in state court.

***13** The Clerk of Court is respectfully directed to close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 1146942

## Footnotes

1 The Court mainly draws its account of the facts from the Amended Complaint and the documents attached to and discussed in it. Dkt. 22 ("FAC"); *see* *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). Given Tsinberg's *pro se* status, the Court also considers the allegations raised in Tsinberg's opposition to the motion to dismiss to the extent consistent with those in the FAC. *See, e.g.*, *George v. Pathways to Hous., Inc.*, No. 10 Civ. 9505 (ER), 2012 WL 2512964, at *6 n.7 (S.D.N.Y. June 29, 2012). To resolve the motion to dismiss under Rule 12(b)(6), the Court presumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiffs. *See* *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

2 What was once called the PVB is now called the "Adjudications Division." *See* Dkt. 27 ("City Mem.") at 2. The Court, however, follows the parties and the Report in generally referring to the agency using its old name, the PVB.

3 In its opening brief, the City misidentified the statute authorizing the imposition of towing and storage fees as VTL § 1224. *See* Dkt. 33 ("Reply") at 7 n.5. It clarified in its reply brief that VTL § 1224 only applies to abandoned vehicles, and that CPLR § 8013(c) is the authorizing statute for the imposition of removal and storage fees in this case. *Id.*

4 Only the first five were subject to final judgments in January 2019, when Tsinberg's car was towed, although several would later become so, leading to $750 more in outstanding judgments. *See* Dkt. 22-3; Report at 7–8.

5 The Report construed Tsinberg's allegations about the adequacy of the Article 78 proceedings as a challenge to the result of that action, and so assessed this issue under the *Rooker-Feldman* doctrine. *See* Report at 19–20. But in the Court's view, Tsinberg's challenge to the procedural adequacy of the Article 78 proceeding, liberally construed, does not necessarily require review of the merits of that action. *See* *Hoblock v. Albany Cnty. Bd. Of Elections*, 422 F.3d 77, 85 (2d Cir. 2005) (*Rooker-Feldman* bars federal court review of merits of state-court judgments). Thus, while the Court agrees with the Report's ultimate conclusion, it departs from the

Report insofar as it based its recommendation on the application of *Rooker-Feldman.* To the extent Tsinberg does seek review of the merits of the state-court decision at issue, the Court fully agrees with the thoughtful assessment of this issue in the Report.

6 In his Objections, Tsinberg argues, for the first time, that *Krimstock v. Kelly*, 306 F.3d 40 (2d Cir. 2002) requires a different result. But parties may not raise new legal arguments for the first time in their objections to a report and recommendation. *See, e.g.*, *Gonzalez v. Garvin*, No. 99 Civ. 11062 (SAS), 2002 WL 655164, at *2 (S.D.N.Y. Apr. 22, 2002) (dismissing objection "because it offers a new legal argument that was not presented in his original petition, nor in the accompanying Memorandum of Law"); *see also Abu-Nassar v. Elders Futures, Inc.*, No. 88 Civ. 7906 (PKL), 1994 WL 445638, at *4 n.2 (S.D.N.Y. Aug. 17, 1994) (rejecting arguments advanced for first time in objections to report because permitting such claims would "undermine the authority of the Magistrate Judge by allowing litigants the option of waiting until a Report is issued to advance additional arguments"). The Court thus rejects this objection. In any event, as the City notes, *Krimstock* appears inapposite. *See* Response at 3 & n.1.

7 In his Objections, Tsinberg expands on his claim of a substantive due process violation, suggesting that the state has no legitimate interest in enforcing registration requirements and that he was singled out for disfavored treatment when the City placed his car on an "indefinite sales hold" as a result of his Article 78 petition, leading to significant storage fees. Objections at 17–19, 25–32. Again, these new theories are not cognizable in the Court's review of a report and recommendation. *See, e.g.*, *Gonzalez*, 2002 WL 655164, at *2. Even if they were, they do not come close to showing a substantive due process violation. In fact, it appears that it was Tsinberg, not the City, who requested that the Vehicle be placed on a sales hold, which request led to the accumulating storage fees. FAC ¶ 54; *see also* Koplik Decl., Ex. R (sales hold listing "requester" as "Leon G. Tsinberg").

8 *See Farina v. Metro. Transp. Auth.*, 409 F. Supp. 3d 173, 198–99 (S.D.N.Y. 2019) ("fees and penalties" that "are multiples" of an unpaid tolls were plausibly alleged to be partially punitive); *Dubin*, 277 F. Supp. 3d at 400–02 (Excessive Fines Clause applied to "Drivers' Responsibility Fee" that imposed a mandatory $45 payment on ticketed motorists who received a final disposition other than "not guilty," and recognizing that "administrative and other civil penalties satisfy the [first factor], even if they bear no direct relationship to a criminal prosecution"); *see also Pimental v. City of Los Angeles*, 974 F.3d 917, 922 (9th Cir. 2020) (Excessive Fines Clause applies to "municipal fines," and specifically parking tickets and late penalties, under *Timbs v. Indiana*, 139 S. Ct. 682 (2019), which held that the Clause applies to the states). *But see id.* at 925–29 (Bennett, J., concurring) (disagreeing that Eighth Amendment Excessive Fines Clause "should routinely apply to parking meter violations," noting that the "potential for federal court litigation is endless" and risks "trivializ[ing] the Eighth Amendment, the Fourteenth Amendment, and the Civil Rights Acts"). Given the Supreme Court's recent holding that the Fourteenth Amendment incorporates the Excessive Fines Clause against state and municipal governments, *see Timbs*, 139 S. Ct. 682, courts in the coming years may be called on more often to assess its applicability to cases like this one, and the extent to which these protections police the bounds of municipal fines, fees, and other penalties. Without fuller presentation by the parties, the Court here has no occasion to opine on this threshold question.

9 Tsinberg, for the first time in his Objections, argues that the $65 exceeds a statutory cap of $50 for parking violations set by N.Y. Admin. Code § 19-203(b). *See* Objections at 37. As the City notes, the $65 amount results from a mandatory state surcharge required by VTL § 1809-a, which provides that "[t]he provisions of any other general or special law notwithstanding," any city with more than 100,000 persons, must levy "a mandatory surcharge in addition to any other sentence, fine or penalty otherwise permitted or required, in the amount of fifteen dollars." Response at 7. That provision states that such $15 surcharge "shall not be deemed a monetary penalty for the purposes of ... section 19-203 of the administrative code of the city of New York"—the provision that Tsinberg relies on for this point.

10 Although Tsinberg relies heavily on the Supreme Court's holding in *Timbs* in arguing to the contrary, that case merely held that the Excessive Fines Clause applies to the states. *See* 139 S. Ct. at 691 ("[R]egardless of whether application of the Excessive Fines Clause to civil *in rem* forfeitures is itself fundamental or deeply rooted, our conclusion that the Clause is incorporated remains unchanged"). It did not purport to alter the above analysis.

11 Tsinberg is also vague as to how the reference to child support or alimony on the Execution plays into the Fourth Amendment analysis. To the extent he argues that the language on the Execution falsely accuses him of owing child support or alimony, that characterization is wrong. A photograph of the Execution is attached to the FAC. It identifies outstanding child support or alimony as *among* the authorized bases for such an execution, but it does not state that each was the bases for executing on Tsinberg's car. It states: "The judgment creditor is the state of New York, or any of its agencies or municipal corporations *and/or* the debt enforced is for child support, spousal support, maintenance or alimony." Execution (emphasis added). The execution's recitation thus is consistent with the FAC's allegation that Tsinberg does not owe child support, alimony, or spousal support. FAC ¶ 7; *see* Report at 29 (noting that Execution merely recites legally available bases). Even construing the FAC liberally, it is not plausibly alleged that Tsinberg's vehicle was towed based on a misperception that he owed child support, spousal support, or alimony, as opposed to the substantial debts that Tsinberg admits he actually owed to the City for parking infractions.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4290631
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Virginia TUFARO, Plaintiff,
v.
The CITY OF NEW YORK, The New York City Police Department, Riverbay Co–Op City Riverbay Corporation, P.O. Catala (shield 03989), P.O. Melvin Gonzalez (shield 4237), P.O. Jacinto Cruz (shield 2132), John and Jane Does 1–10, Defendants.

No. 12–CV–7505 (AJN).
|
Signed Aug. 28, 2014.

*MEMORANDUM AND ORDER*

ALISON J. NATHAN, District Judge.

***1** Before the Court are the Defendants' motions to dismiss. The City of New York, Detective Rodell Glover, and Detective Tyrone Tillman collectively are referred to herein as the "City Defendants," while Riverbay Co–Op City, Riverbay Corporation, P.O. Catala (shield 03989), P.O. Melvin Gonzalez (shield 4237), and P.O. Jacinto Cruz (shield 2132) collectively are referred to herein as the "Riverbay Defendants." Although the City and Riverbay Defendants raise slightly different arguments in their separate moving papers, both raise the same dispositive issue that the Court will address here-whether Plaintiff's allegations state a claim under 42 U.S.C. § 1983. The Court concludes that they do not and accordingly grants the motions to dismiss.

## I. BACKGROUND

The factual allegations stated below are taken from Plaintiff's Second Amended Complaint ("SAC"), Dkt. No. 30, and are presumed true and construed in Plaintiff's favor for the purposes of deciding the City and Riverbay Defendants' motions to dismiss. *See, e.g., Krassner v. 2nd Ave. Delicatessen, Inc.,* 496 F.3d 229, 237 (2d Cir.2007).

On or about October 22, 2009, individual Defendant officers, possibly including Tillman, Glover, Catala, Gonzalez, and Cruz, [1] arrested an individual named Sharon Sutton in or near a housing development known as Co–Op City that is owned and operated by Riverbay Corporation. An agreement between Riverbay Corporation and the City of New York allegedly gives the Co–Op City Department of Public Safety and its officers the authority to make arrests and process prisoners arrested on the grounds of Co–Op City as if they were New York City police officers. Sutton was charged with driving under the influence and a hit-and-run offense. After taking her into custody, the officers determined that she was unruly, combative, violent, and otherwise acting in a bizarre manner, which led them to believe the she was in need of medical treatment. Thus, the officers transported Sutton to the Jacoby Medical Center.

At the Jacoby Medical Center, the officers kept Sutton's feet shackled to prevent her from fleeing, but left her hands and arms unsecured and apparently left Sutton unguarded while on a hospital gurney awaiting examination. Plaintiff, Virginia Tufaro, was a supervising nurse employed at Jacoby Medical Center. At some point, Plaintiff asked the officers whether there was any cause for concern as to the safety of her staff, and she was told that Sutton was securely in the custody of the officers as a prisoner and would not be a threat to Plaintiff, her staff, or anyone else in Jacoby Medical Center. Plaintiff then inquired about what Sutton had done and why the officers believed Sutton needed medical attention. The officers replied that Sutton had been charged with driving while intoxicated, hit and run, and assault and had acted bizarrely; Plaintiff apparently then suggested that patients such as Sutton were usually secured and closely guarded by accompanying officers. The officers replied that Plaintiff should not worry because they had the situation under control, telling Plaintiff "You don't have to worry," Sutton would not bother anyone, and that the officers would be standing close by and would protect Plaintiff and those around her.

***2** Based on these representations, Plaintiff continued to treat and examine Sutton. At some later point, while Plaintiff was attempting to administer an IV solution into Sutton's arm, Sutton used her free hands and arms to attack and assault Plaintiff. Sutton grabbed Plaintiff's left arm, dug her fingernails deeply into Plaintiff's arm, thereby puncturing Plaintiff's skin, and pulled and yanked Plaintiff's arm. The Officers were apparently not immediately available to protect Plaintiff and only secured Sutton's arms after the attack.

## II. DISCUSSION

### A. Legal Standard

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

On a motion to dismiss a complaint for failure to state a claim upon which relief can be granted, a district court is to accept as true all facts alleged in the complaint and is to draw all reasonable inferences in favor of the plaintiff. *See, e.g., Krassner,* 496 F.3d at 237. Factual allegations are therefore afforded a presumption of truth, but a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain,* 478 U.S. 265, 286 (1986)). "To survive a motion to dismiss, the plaintiff's pleading must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570).

**B. Substantive Due Process Claims**

Plaintiff's only federal law claims arise under 28 U.S.C. § 1983 for alleged violations of her constitutional rights, specifically her substantive due process rights under the Fourteenth Amendment to the United States Constitution. Plaintiff does not allege that she directly suffered any harm at the hands of government actors, be they New York City Police Department Officers or Co–Op City Officers operating under color of law; rather, she alleges the she was attacked by a private actor, Sutton, whom the officers failed to properly restrain. Because the Court concludes that the Plaintiff has failed to state a constitutional violation under the Fourteenth Amendment against any officer, it need not decide whether the Co–Op City Officers were state actors and will instead assume that they were for the purposes of deciding this motion.

In *DeShaney v. Winnebago County Department of Social Services,* the Supreme Court held that the Due Process Clause of the Fourteenth Amendment "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." 489 U.S. 189, 196 (1989). Drawing on the reasoning of *DeShaney,* the Second Circuit has recognized two narrow exceptions to this rule. *Matican v. City of New York,* 524 F.3d 151, 155 (2d Cir.2008). The first exception covers acts of private violence where the state had a "special relationship" with the victim. *Id.* (citing *Ying Jing Gan v. City of New York,* 996 F.2d 522, 533 (2d Cir.1993)). The second exception covers situations in which the state or its agents " 'in some way had assisted in creating or increasing the danger to the victim.' " *Id.* (quoting *Dwares v. City of New York,* 985 F.2d 94, 98–99 (2d Cir.1993)). But even if Plaintiff is able to satisfy one of these exceptions, she "must [also] show that the officers' behavior was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " *Id.* (quoting *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 848 n. 8 (1998) ((*"Lewis"* )).

***3** The special relationship exception requires some form of involuntary custody of the Plaintiff. *Id.* (citing *Lombardi v. Whitman,* 485 F.3d 73, 79 n. 3 (2d Cir.2007); *Suffolk Parents of Handicapped Adult v. Wingate,* 101 F.3d 818, 824 (2d Cir.1996); *Doe v. N.Y. City Dep't of Soc. Servs.,* 649 F.2d 134, 141 (2d Cir.1981)). Because Plaintiff was not in involuntary custody at the time of her attack, she fails to satisfy this exception to *DeShaney.*

The state-created danger exception requires some form of affirmative, rather than passive, conduct on the part of a government actor that "communicates, explicitly or implicitly, official sanction of private violence." *Okin v. Vill. Of Corwall–on–Hudson Police Dep't,* 577 F.3d 415, 429 (2d Cir.2009) (citing *Pena v. DePrisco,* 432 F.3d 98, 111 (2d Cir.2005); *Hemphill v. Schott,* 141 F.3d 412, 419 (2d Cir.1998); *Dwares v.. City of New York,* 985 F.2d 94, 99 (2d Cir.1993)). Thus, for example, a state-created danger has been found to exist where officers callously signaled to an alleged domestic abuser that he could act with impunity when they casually discussed sports with him and spoke derisively about the alleged victim following her calls for assistance, *Okin,* 577 F.3d at 427–430; officers told skinheads that they would not intervene to stop the skinheads from assaulting flag-burning protesters unless things got too rowdy, *Dwares,* 985 F.2d at 99; officers returned a gun to the victim of a robbery and allowed the victim to join in the pursuit of the alleged robber leading to the victim shooting the robber, *Hemphill,* 141 F.3d at 419; officers encouraged another officer to drink to excess and drive in that condition with impunity, which led to the deaths of three people, *Pena,* 432 F.3d at 111; or officers designed a sting operation in such a way that the private assailant would learn about plaintiff's involvement and identity, *Matican,* 524 F.3d at 158 & n. 7.

But under the Supreme Court's holding in *DeShaney,* " 'allegations that the defendant officers stood by and did nothing are insufficient to state a constitutional violation.' " *Matican,* 524 F.3d at 157 (quoting *Pena,* 432 F.3d at 110)). Furthermore, "[i]t is not enough to allege that a government actor failed to protect an individual from a known danger of bodily harm or failed to warn the individual of that danger." *Lombardi,* 485 F.3d at 79 (citing *Collins v. City of Harker Heights,* 503 U.S. 115, 125–29 (1992)). And

"[t]his is so notwithstanding [a plaintiff's] assertion that the officers promised to protect him." *Matican,* 524 F.3d at 158 (citing *DeShaney,* 489 U.S. at 200 ("The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him ....")).

Plaintiff alleges only that Defendants failed to restrain Sutton's arms in addition to Sutton's feet while being treated by Plaintiff. Plaintiff does not allege that the officers in any way encouraged Sutton to attack Plaintiff or indicated that Sutton could do so with impunity. It may be the case that the officers owed Plaintiff a duty of care under state tort law; indeed, Plaintiff alleges several claims based on such a theory. "But the claim here is based on the Due Process Clause of the Fourteenth Amendment, which, as [the Supreme Court has] said many times, does not transform every tort committed by a state actor into a constitutional violation." *DeShaney,* 489 U.S. at 201 (citations omitted). As the Supreme Court made clear in *DeShaney,* "[a] State may, through its courts and legislatures, impose such affirmative duties of care and protection upon its agents as it wishes. But not 'all common-law duties owed by government actors were ... constitutionalized by the Fourteenth Amendment.' " *Id.* (quoting *Daniels v. Williams,* 474 U.S. 327, 335 (1986)).

***4** Plaintiff offers no countervailing authority to the principles identified here. Instead, Plaintiff only points to *Dwares* as standing for the proposition that a "due process claim was stated where police officers knew of, and failed to intercede to stop a particular violent attack." Opp. at 18 (Dkt. No. 57). In an effort to align her circumstances with those in *Dwares,* Plaintiff highlights the fact that the Defendants took custody of Sutton, used force including pepper spray to subdue her, and were aware of her violent tendency, but did not relay this information to Plaintiff and did not properly secure Sutton. Opp. at 19. From this, Plaintiff concludes that "Sutton was a state created danger that was intentionally put in the vicinity of plaintiff." Opp. at 19. But in *Dwares,* the plaintiff's complaint "alleged that the officers conspired with the 'skinheads' to permit the latter to beat up flag burners with relative impunity, assuring the 'skinheads' that unless they got totally out of control they would not be impeded or arrested." 985 F.2d at 99. By encouraging the skinheads in such a manner, the officers' actions crossed the line from passive to active conduct. *Matican,* 524 F.3d at 157. Construing the facts as favorably as possible for Plaintiff, she merely asserts that the defendant officers stood by and did nothing despite assuring her that they would protect her from a known danger; such passive conduct is insufficient to state a claim under Section 1983. *See Matican,* 524 F.3d at 157–58 (citing *DeShaney;* 489 U.S. at 200; *Pena,* 432 F.3d at 110; *Lombardi,* 485 F.3d at 79).

Assuming, for the sake of argument, that Plaintiff were able to satisfy the state-created danger exception to *DeShaney,* she must also allege that the officers' behavior was so egregious that it shocked the conscience. *Matican,* 524 F.3d at 155. "This requirement screens out all but the most significant constitutional violations, 'lest the Constitution be demoted to ... a font of tort law.' " *Id.* (quoting *Lewis,* 523 U.S. at 848 n. 8). It may appear difficult to define precisely the type of behavior that would shock the conscience, but "the Supreme Court noted one set of parameters: negligently inflicted harm is categorically beneath the threshold of constitutional due process, whereas the intentional infliction of injury is the conduct most likely to rise to the conscience-shocking level." *Matican,* 524 F.3d at 158 (internal citations and quotation marks omitted). Although there is obviously some gray area between these two poles, the conduct alleged by Plaintiff clearly falls in the former category. By the very terms of her Complaint, Plaintiff alleges only that Defendants failed to properly confine or restrain Sutton, not that they intentionally or recklessly caused Plaintiffs injuries. Indeed, all but one of her state-law claims are based in negligence—negligent screening, hiring, and retention; negligence; and negligent infliction of emotional distress. SAC ¶¶ 71–78.

***5** Therefore, because the Plaintiff has failed to allege a state-created danger or conduct that shocks the conscience, she has failed to state a claim for a constitutional violation of her substantive due process rights under Section 1983.

### C. Supplemental Jurisdiction and Remaining Claims

Having dismissed all claims over which this Court has original jurisdiction, the Court exercises its discretion to decline to exercise supplemental jurisdiction over Plaintiff's remaining claims. 28 U.S.C. § 1367(c)(3); *Matican,* 524 F.3d at 154–55 ("Furthermore, if Matican has no valid claim under § 1983 against any defendant, it is within the district court's discretion to decline to exercise supplemental jurisdiction over the pendent state-law claims." (citing *Kolari v. New York–Presbyterian Hosp.,* 455 F.3d 118, 122 (2d Cir.2006)).

## III. CONCLUSION

For the reasons stated herein, both the Riverside and City Defendants' motions are GRANTED and all claims against

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

the Defendants are dismissed. The Clerk of Court is directed to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4290631

## Footnotes

1 Glover and Tillman are apparently officers with the New York City Police Department while Officers Catala, Gonzalez, and Cruz are apparently officers with the Co–Op City Department of Public Safety. Plaintiff's Second Amended Complaint does not distinguish between the individual Defendants and so the Court refers to them collectively as the "officers." For the purposes of this Memorandum and Order, it is not necessary to know the precise identity of the officers or their affiliation.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 6685476
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kylie Ann TURCZYN, Deceased, by and through Barbara McGREGOR, as Administratrix of the Estate of Kylie Ann Turczyn, Plaintiff,
v.
CITY OF UTICA et al., Defendants.

No. 6:13–cv–1357 (GLS/ATB).
|
Signed Nov. 26, 2014.

**Attorneys and Law Firms**

Office of Frank Policelli, Frank Policelli, Esq., of Counsel, Utica, NY, for the Plaintiff.

City of Utica—Corporation Counsel, Mark C. Curley, Esq., Merima Smajic, Esq., Zachary C. Oren, Esq., of Counsel, Utica, NY, for the Defendants.

***MEMORANDUM–DECISION AND ORDER***

GARY L. SHARPE, Chief Judge.

## I. *Introduction*

***1** Plaintiff Kylie Ann Turczyn, deceased, by and through Barbara McGregor, as administratrix of the estate of Kylie Ann Turczyn, commenced this action against defendants City of Utica, City of Utica Police Dept., and Elizabeth Shanley alleging substantive due process claims pursuant to 42 U.S.C. § 1983 and separate state law causes of action. (Am.Compl., Dkt. No. 12.) Pending is defendants' motion to dismiss for failure to state a claim. (Dkt. No. 19.) For the reasons that follow, the motion is granted in part and denied in part.

## II. *Background*

### A. *Facts* [1]

Shanley, an Oneida County domestic violence investigator, was at all relevant times assigned by the Police Department to accomplish the goals of reducing "occurrence[s] of domestic violence by increasing reporting and by identifying and tracking repeat victims and/or offenders," and "increas[ing] victims' access to supportive services by encouraging [them] to report their abuse, thereby increasing arrest rates for domestic offenders." (Am.Compl.¶ 10.) On June 22, 2012, Thomas Anderson, Turczyn's former boyfriend and the father of her daughter, broke into Turczyn's home armed with a 9 mm rifle. (*Id.* ¶ 11) Anderson repeatedly shot Turczyn, taking her life in view of their four-year-old daughter, G.T. (*Id.*) Anderson then dispatched himself. (*Id.*)

In the twelve months preceding this horrific event, Turczyn made between five and ten complaints to Utica police officers, "including informing them of a specific threat by Anderson to kill her." (*Id.* ¶ 12.) Turczyn specifically told Shanley "that Anderson was armed and had threatened to kill her." (*Id.* ¶ 12(d).) Despite their knowledge of domestic violence between Turczyn and Anderson, neither Shanley, New York State Police, nor Utica Police took any steps to arrest Anderson, investigate Turczyn's complaints, or follow-up with Anderson "as is the policy and protocol of the domestic violence unit." (*Id.* ¶ 14.)

On June 18, 2012, Shanley told Turczyn to seek an order of protection, which she attempted to do, but was told by an unknown person at the Oneida County Family Court to return the following day because the court was " 'too busy.' " (*Id.* ¶¶ 15–16.) The following day, Turczyn left a voice message for Shanley, explaining that she was unable to obtain an order of protection and that Anderson had a gun and planned to kill her that week. (*Id.* ¶¶ 16–18.) Despite her knowledge, "Shanley took no action." (*Id.* ¶ 17.) Shanley also mistakenly believed that Turczyn's issues with Anderson were outside of the purview of Utica Police and should, instead, be dealt with by New York State Police; however, "she did not inform any other police agency or take any action herself." (*Id.* ¶¶ 18, 19, 20.)

### B. *Procedural History*

Turczyn commenced this action by filing a complaint on October 31, 2013. (Dkt. No. 1.) Defendants thereafter moved to dismiss, (Dkt. No. 10.) In response, Turczyn filed an amended complaint as of right, which is now the operative pleading. (*See generally* Am. Compl.) In her amended complaint, Turczyn alleges the following causes of action: (1) a denial of substantive due process rights under the Fifth and Fourteenth Amendments due to deliberate indifference; (2) a *Monell* [2] claim against the City; (3) negligence; (4)

a "derivative action" on behalf of G.T.; and (5) negligent infliction of emotional distress. (*Id.* ¶¶ 37–74.) Defendants now move to dismiss the amended pleading pursuant to Rules 8(a)(2) and 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 19.)

### III. *Standard of Review*

***2** The standard of review under Fed.R.Civ.P. 12(b)(6) is well settled and will not be repeated here. For a full discussion of the standard, the court refers the parties to its prior decision in *Ellis v. Cohen & Slamowitz, LLP,* 701 F.Supp.2d 215, 218 (N.D.N.Y.2010).

### IV. *Discussion*

**A. *Preliminary Matters***

At the outset, it is noted that some of Turczyn's claims are deemed abandoned by her failure to oppose their dismissal. *See Barmore v. Aidala,* 419 F.Supp.2d 193, 201–02 (N.D.N.Y.2005) ("The failure to oppose a motion to dismiss a claim is deemed abandonment of the claim, and, in the Northern District of New York, is deemed consent to granting that portion of the motion." (internal citations omitted)); *Hanig v. Yorktown Cent. Sch. Dist.,* 384 F.Supp.2d 710, 723 (S.D.N.Y.2005) ("[B]ecause [the] plaintiff did not address [the] defendant's motion to dismiss with regard to [a particular] claim, it [wa]s deemed abandoned and ... dismissed."). In particular, Turczyn squarely opposed dismissal of her substantive due process claim as against Shanley, (Dkt. No. 20 at 8–12), and scarcely, but sufficiently to save the claim from dismissal for abandonment, offered reasons why her substantive due process claim as against the City should survive defendants' motion, (*id.* at 5–7). Aside from the substantive due process claim, Turczyn failed to offer any opposition to defendants' motion, which also sought dismissal of her pendant causes of action. (Dkt. No. 19, Attach. 6 at 31–40 & n. 15.) Accordingly, Turczyn's pendant state law claims, (Am.Compl.¶¶ 59–74), are dismissed.

Additionally, it is clear that the Police Department must be dismissed as urged by defendants, (Dkt. No. 19, Attach. 6 at 2 n. 2), because "a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence." *Varela v. City of Troy,* No. 1:10–cv–1390, 2014 WL 2176148, at *6 (N.D.N.Y. May 22, 2014) (internal quotation marks omitted). As such, all claims as against the Police Department are dismissed.

The court also notes that both parties have submitted certain evidence that is outside of the pleadings (Dkt. No. 19, Attachs. 3, 4; Dkt. No. 20, Attachs. 1, 2.) Beginning with defendants, they submitted a January 2, 2013 stipulation of discontinuance, which, on its face, purports to memorialize McGregor's agreement to withdraw the notice of claim filed on behalf of Turczyn and to discontinue with prejudice, (Dkt. No. 19, Attach.3), and a December 28, 2012 letter, which appears to memorialize a conversation regarding the discontinuation of legal action and execution of a stipulation, (Dkt. No. 19, Attach.4). Relying on a single out-of-Circuit decision, *see Raines v. Haverford Coll.,* 849 F.Supp. 1009, 1010 (E.D.Pa.1994), which does not appear directly to support their position nor does it give this court confidence that the kinds of documents at issue here were contemplated by that decision, defendants assert that the documents may be considered on their motion to dismiss as "part of the record of this case." (Dkt. No. 19, Attach. 6 at 25 n. 11.) Turczyn argues that defendants' reliance on the stipulation is inappropriate at this juncture, yet she offers the affidavit of McGregor, submitted to dispute the validity of the stipulation, (Dkt. No. 20, Attach.1), without any explanation as to why the court should or may consider it. (Dkt. No. 20 at 12–13.)

***3** The court has excluded from its consideration of this motion to dismiss the exhibits offered by defendants as well as the McGregor affidavit. *See* Fed.R.Civ.P. 12(d). The existence of some document or documents that may extinguish a plaintiff's claims, such as a release or stipulation of discontinuance, is an affirmative defense, *see Beede v. Stiefel Labs., Inc.,* No. 1:13–cv–120, 2014 WL 896725, at *3 (N.D.N.Y. Mar.6, 2014), and " '[a]n affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6) ... if the defense appears on the face of the complaint,' " *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.,* 620 F.3d 137, 145 (2d Cir.2010) (quoting *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74 (2d Cir.1998)).

Here, the stipulation defense is not apparent from the face of the amended complaint. Moreover, the court refuses to consider the documents in question as part of the record of this case, a proposition for which no in-Circuit authority has been offered nor has any been discovered by this court. As such, the documents offered by defendants, (Dkt. No. 19, Attachs.3, 4), are not properly before the court, and their argument that Turczyn's claims must be dismissed because of

those documents is rejected. McGregor's affidavit, (Dkt. No. 20, Attach.1), which was also improvidently submitted for consideration, is likewise excluded. The court now turns to the merits of defendants' arguments regarding the substantive due process and *Monell* claims.

**B. *Rule 8***

First, defendants argue that Turczyn's § 1983 due process claim is subject to dismissal under the Rule 8 plausibility analysis—specifically because of Turczyn's failure to allege facts supportive of a sufficient nexus between Shanley's omissions and Turczyn's death. (Dkt. No. 19, Attach. 6 at 23–24.) The court disagrees. The amended complaint plausibly alleges a causal connection between the conduct of defendants—their alleged conscience-shocking failure to protect Turczyn, (Am.Compl.¶ 49)—and her injuries, *i.e.,* the allegations plausibly suggest that defendants' acts were a substantial factor in bringing about Turczyn's injuries. *See Gierlinger v. Gleason,* 160 F.3d 858, 872 (2d Cir.1998) ("[I]n all § 1983 cases[ ] the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury."). Accordingly, this argument is rejected.

**C. *Rule 12(b)(6)***

Defendants argue that Turczyn has failed to state a substantive due process claim as against Shanley or the City. (Dkt. No. 19, Attach. 6 at 220, 26–31.) Defendants contend that Turczyn alleges only passive conduct on the part of Shanley that does not give rise to a substantive due process violation. (*Id.* at 10–12.) More generally, defendants assert that Turczyn has failed to plead facts to show "implicit prior assurances through repeated sustained inaction," and that, even if she did, the state action alleged does not rise to the level of conscience-shocking behavior. (*Id.* at 15–20.) Alternatively, defendants argue that Shanley is entitled to qualified immunity. (*Id.* at 20–23.) With respect to the City, defendants contend that Turczyn has failed to allege facts that support a claim of municipal liability. (*Id.* at 26–31.) For reasons explained below, defendants' motion is denied with respect to Turczyn's substantive due process claim against Shanley, but granted with respect to her *Monell* claim against the City.

***4** Only one relevant exception to the general rule that no substantive due process claim lies for a state's failure to protect an individual from private violence, *see DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), potentially applies in this case. That exception imposes liability for failure to protect where state actors in some way affirmatively assist "in creating or increasing the danger to the victim." *Okin v. Vill. of Cornwall–On–Hudson Police Dep't,* 577 F.3d 415, 428 (2d Cir.2009) (internal quotation marks and citation omitted); *see Pena v. DePrisco,* 432 F.3d 98, 110 (2d Cir.2005). "[R]epeated, sustained inaction by government officials, in the face of potential acts of violence, might constitute 'prior assurances,' rising to the level of an affirmative condoning of private violence, even if there is no explicit approval or encouragement." *Okin,* 577 F.3d at 428 (quoting *Dwares v. City of N.Y.,* 985 F.2d 94, 99 (2d Cir.1993)). Moreover, when "state officials communicate to a private person that he ... will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others, those officials can be held liable under section 1983 for injury caused by the misconduct" "even though none of the defendants [is] alleged to have communicated the approval explicitly." *Id.* at 428–29 (quoting *Pena,* 432 F.3d at 111)). In a nutshell, "[t]he affirmative conduct of a government official may give rise to an actionable due process violation if it communicates, explicitly or implicitly, official sanction of private violence." *Id.* at 429.

A successful substantive due process claim also requires that the plaintiff show "that the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " *Id.* at 431 (quoting *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 847 n. 8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). A hierarchy of intent provides guidance on the likelihood that a particular harm rises to the necessary level. Intentionally inflicted harms are most likely to meet the standard, while reckless and negligent inflictions of harm are each less likely, in graduated downward steps, to show conscience-shocking state action. *Id.* As for recklessly inflicted injuries, " '[d]eliberate indifference that shocks in one environment may not be so patently egregious in another.' " *Id.* (quoting *Lewis,* 523 U.S. at 850). Accordingly, the inquiry is highly fact specific.

Unlike *Town of Castle Rock v. Gonzales,* 545 U.S. 748, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005), or *Neal v. Lee County,* Civil Action No. 1:08CV262, 2010 WL 582437 (N.D.Miss. Feb.12, 2010)—cases in which police had limited interaction with either the victim or killer prior to the victim's demise, and upon which defendants rely for dismissal of the claim against Shanley, (Dkt. No. 19, Attach. 6 at 3–5, 7–8)—the allegations here go substantially farther. Turczyn alleges several occasions [3] when Shanley knew of

Anderson's threatening acts and did nothing, which arguably communicated to him prior assurances that there would be no penalty to pay for his conduct. (Am.Compl.¶¶ 12–13.) "This is so even though none of the defendants are alleged to have communicated the approval explicitly." *Pena,* 432 F.3d at 111. *Okin* has specifically recognized the liability that may arise under these circumstances. *See* 577 F.3d at 428–29 (explaining that liability under § 1983 attaches when "state officials communicate to a private person that he ... will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others" (quoting *Pena,* 432 F.3d at 111)).

***5** The amended complaint also pleads facts that demonstrate, at this juncture, egregious behavior that shocks the contemporary conscience. As in *Okin,* the allegations here tend to show that Shanley, who was tasked with accomplishing certain goals related to curbing domestic violence, was deliberately indifferent as to whether or not Anderson would make good on his multiple threats against Turczyn's life over a twelve-month-period. (Am.Compl.¶ ¶ 10, 12.) These allegations sufficiently support that Shanley's affirmative conduct was the product of deliberate indifference that shocks the conscience, and would provide a reasonable jury with a valid basis to so find. *See Conradt v. NBC Universal, Inc.,* 536 F.Supp.2d 380, 394–95 (S.D.N.Y.2008).

Finally, Shanley is not entitled to qualified immunity at this juncture. Her argument on this issue is two-fold. First, Shanley asserts that no constitutional violation occurred, and, second, she claims that, even if a constitutional violation occurred, the right was not clearly established. (Dkt. No. 19, Attach. 6 at 20–23.) The first prong of the argument is easily swept aside by reference to the preceding paragraphs that explain that the amended complaint alleges a cognizable substantive due process violation. As for whether or not the right was clearly established, which is a prerequisite to qualified immunity, *see Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), this question has been resolved by the Second Circuit. On the issue, the court has explained that it is "clearly established," under the state-created danger theory, "that police officers are prohibited from affirmatively contributing to the vulnerability of a known victim by engaging in conduct, whether explicit or implicit, that encourages *intentional* violence against the victim, and as that is the substantive due process violation alleged here, qualified immunity does not apply." *Okin,* 577 F.3d at 434. Accordingly, Shanley is not entitled to qualified immunity at this time.

As for the City, defendants assert that Turczyn has failed to plead a *Monell* claim because the amended complaint merely alleges legal conclusions. (Dkt. No. 19, Attach. 6 at 26–31.) With respect to Turczyn's allegation that the City failed to properly train or supervise its employees, defendants contend that the amended complaint is too conclusory, but that, even if adequately pleaded, Turczyn's municipal liability claim must nonetheless fail because she has not alleged deliberate indifference. (*Id.* at 29–31.)

It is well settled that "the inadequacy of police training may serve as the basis for § 1983 liability ... where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Oh. v. Harris,* 489 U.S. 378, 380, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The deliberate indifference standard is "stringent" and requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson,* ––– U.S. ––––, ––––, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011) (internal quotation marks and citation omitted). A showing of deliberate indifference requires that: (1) "a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "the wrong choice by the ... employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of N.Y.,* 974 F.2d 293, 297–98 (2d Cir.1992) (quoting *City of Canton,* 489 U.S. at 390 n. 10).

***6** Here, because Turczyn has failed to adequately plead that the City's failure to train and supervise amounted to deliberate indifference, she has failed to state a claim of municipal liability. The amended complaint uses the label "deliberate indifference" in reference to Turczyn's municipal liability claim and generically references the City's failure to properly train and supervise, but it fails to allege facts that support either conclusory notion. (Am.Compl.¶¶ 45, 52.) Turczyn's pleading failure mandates dismissal of her *Monell* claim against the City. *See Gauthier v. Kirkpatrick,* Civil Action No. 2:13–cv–187, 2013 WL 6407716, at *10 (D.Vt. Dec.9, 2013) (dismissing failure to train *Monell* claim because the plaintiff failed to plead facts that supported the deliberate difference elements); *Santos v. New York City,* 847 F.Supp.2d 573, 577 (S.D.N.Y.2012); *see also Worrell v. City of N.Y.,* No. 12–CV–6151, 2014 WL 1224257, at *13 (E.D.N.Y. Mar. 24, 2014).

### V. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion to dismiss (Dkt. No. 19) is **GRANTED IN PART** and **DENIED IN PART** as follows:

**GRANTED** with respect to all claims alleged as against the City of Utica Police Dept. and the Clerk is directed to terminate the City of Utica Police Dept. from this action; and

**GRANTED** with respect to Turczyn's *Monell* claim against the City (Am.Compl.¶ ¶ 51–58), which is hereby **DISMISSED WITHOUT PREJUDICE,** and the Clerk is directed to terminate the City of Utica from this action; and

**GRANTED** with respect to all of Turczyn's pendant state law claims, (Am.Compl.¶ ¶ 59–74), which are hereby **DISMISSED;** and **DENIED** in all other respects; and it is further

**ORDERED** that the sole remaining defendant, Shanley, shall file an appropriate responsive pleading within the time allotted by the rules; and it is further

**ORDERED** that the parties shall contact Magistrate Judge Andrew T. Baxter in order to schedule further proceedings; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 6685476

## Footnotes

1 The facts are presented in the light most favorable to plaintiff.

2 *See Monell v. Dep't of Soc. Servs. of N.Y.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

3 In fact, Turczyn claims that she lodged five to ten complaints—of which Shanley was aware—with the Utica Police within the twelve months preceding the murder. (Am.Compl.¶¶ 12, 13.) So many occurrences may amount to "repeated [and] sustained inaction ... in the face of potential acts of violence." *Okin,* 577 F.3d at 428.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 981850
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jeramie WHITE, Plaintiff,
v.
SYRACUSE POLICE DEPARTMENT, et al., Defendants.

Civil Action No. 5:18-CV-1471 (GTS/DEP)
|
Signed 01/07/2019

**Attorneys and Law Firms**

FOR PLAINTIFF: Jeramie White, Pro se, 18-B-0311, Cayuga Correctional Facility, P.O. Box 1186, Moravia, NY 13118.

ORDER, REPORT, AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

***1** This is a civil rights action brought by *pro se* plaintiff Jeramie White, a New York State prison inmate, pursuant to 42 U.S.C. § 1983, against the Syracuse Police Department ("SPD") and five of its officers. In his complaint, plaintiff alleges that defendants violated his constitutional rights during the course of his arrest on February 13, 2017. Plaintiff's complaint and accompanying application for leave to proceed *in forma pauperis* ("IFP") have been referred to me for review. Based upon my consideration of those materials, I will (1) grant plaintiff's amended IFP application, (2) recommend dismissal of his claim against the SPD with leave to replead, and (3) recommend that his complaint otherwise be accepted for filing.

I. BACKGROUND

Plaintiff commenced this action on or about December 20, 2018. Dkt. No. 1. According to plaintiff, he and two friends were on their way to play indoor basketball when their vehicle was pulled over for a traffic infraction. *Id.* at 4; Dkt. No. 1-1 at 4. Plaintiff alleges that after the stop, defendant William Kittle forcibly removed White from the vehicle and that Kittle, in addition to defendants Abraham Mamoun and Shawn Hauck, proceeded to use excessive force against him during the course of his arrest. Dkt. No. 1 at 4-5, 6-7; *see also* Dkt. No. 1-1 at 4, 8. Plaintiff further alleges that defendants Altimonda and Fiorini were present and had an obligation to intervene and prevent the unlawful use of force, but failed to do so. *Id.* at 5, 7.

Plaintiff was ultimately arrested and charged with resisting arrest, in violation of N.Y. Penal Law § 205.30, and second-degree obstruction of governmental administration, in violation of N.Y. Penal Law § 195.05. Dkt. No. 1-1 at 4. As relief, plaintiff seeks compensatory and punitive damages in the amount of $1,000,000. Dkt. No. 1 at 8.

A. Plaintiff's Amended IFP Application [1]

When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $400, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized, however, to permit a litigant to proceed IFP if it determines that he is unable to pay the required filing fee. 28 U.S.C. § 1915(a)(1). [2] Because I conclude that plaintiff meets the requirements for IFP status, his amended application for leave to proceed without prepayment of fees is granted. [3]

B. Sufficiency of Plaintiff's Complaint

1. Governing Legal Standard

***2** Because I have found that plaintiff meets the financial criteria for commencing this case IFP, I must next consider the sufficiency of the claims set forth in his complaint in light of 28 U.S.C. § 1915(e). Section 1915(e) directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). Similarly, 28 U.S.C. § 1915A(b) directs a court to review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity," and to "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also* *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) ("We have found both sections [1915 and 1915A] applicable to prisoner proceedings *in forma pauperis*.").

In deciding whether a complaint states a colorable claim, a court must extend a certain measure of deference in favor of *pro se* litigants, *Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to address the sufficiency of plaintiff's allegations, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983). The court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a *pro se* plaintiff's complaint to proceed. *See, e.g.*, *Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may *sua sponte* dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint.' " *Aguilar v. United States*, Nos. 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at *2 (D. Conn. Nov. 8, 1999) (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) ); *see also* *Neitzke v. Williams*, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis."); *Pino v. Ryan*, 49 F.3d. 51, 53 (2d Cir. 1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory, for the purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint.").

When reviewing a complaint under section 1915(e), the court is guided by the Federal Rules of Civil Procedure. Specifically, Rule 8 provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, J.) (quotation marks and italics omitted).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the court should construe the factual allegations of a complaint in a light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2) ).

2. Analysis of Plaintiff's Claims

***3** Although a municipality is subject to suit pursuant to section 1983, *see* *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978), a municipal police department does not have the capacity to be sued as an entity separate from the municipality in which it is located. *See* *Krug v. Cnty. of Rensselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008) (citing *Orraca v. City of N.Y.*, 879 F. Supp. 148 (S.D.N.Y. 1995) ); *Turczyn ex rel. McGregor v. City of Utica*, No. 13-CV-1357, 2014 WL 6685476, at *2 (N.D.N.Y. Nov. 26, 2014) (Sharpe, J.); *see also* *Hoisington v. Cnty. of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999) ("Under New York law, a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence. Therefore, municipal departments like the Department of Social Services are not amenable to suit and no claims lie directly against the Department."). Although I would ordinarily recommend that, for the sake of judicial efficiency, the court substitute the City of Syracuse in place of the SPD, plaintiff's complaint contains no factual allegations that would support a *Monell* claim against the City of Syracuse. Accordingly, I recommend dismissal of plaintiff's claims asserted against the SPD.

With respect to his remaining claims, although plaintiff makes passing reference to his rights arising under the Eighth and Fourth Amendments, *see* Dkt. No. 1 at 6, it is clear from the factual allegations that he is asserting claims for excessive force and the failure to intervene arising under the Fourth Amendment. *See generally* Dkt. No. 1; *see also* *Edrei v. Maguire*, 892 F.3d 525, 533 (2d Cir. 2018) ("Arrestees may invoke the Fourth Amendment's prohibition against 'unreasonable' seizures."). In light of the court's obligation to liberally construe a *pro se* litigant's pleadings, I find that plaintiff's complaint should be accepted for filing and the

individual officer defendants should be required to respond in accordance with the local rules of practice for this court and the Federal Rules of Civil Procedure. [4]

C. Whether to Permit Amendment

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires."); *see also Mathon v. Marine Midland Bank, N.A.*, 875 F. Supp. 986, 1003 (E.D.N.Y. 1995) (permitting leave to replead where court could "not determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy"). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, No. 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).

In this case, while I recommend dismissal of plaintiff's claim against the SPD, plaintiff could potentially amend his complaint to assert a cognizable cause of action against a defendant, such as the City of Syracuse, which is amenable to suit. Accordingly, I recommend that plaintiff be granted leave to amend his complaint. If plaintiff chooses to file an amended complaint, he must clearly and concisely set forth the facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, plaintiff is informed that any such amended complaint will replace the existing complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (internal quotation marks omitted) ).

II. SUMMARY, ORDER, AND RECOMMENDATION

***4** Having reviewed plaintiff's amended application for leave to proceed in this action IFP, I conclude that he has met the applicable requirements for leave to proceed without prepayment of fees, and will therefore grant his application. Turning to the merits of his complaint, to the extent that it names five police officers and alleges a violation of 42 U.S.C. § 1983, I conclude that those claims are not subject to dismissal at this procedural juncture. I recommend a finding, however, that plaintiff's claim against the SPD is legally deficient and subject to dismissal, but that plaintiff should be afforded an opportunity to amend with respect to that claim. Accordingly, it is hereby

ORDERED that plaintiff's amended application for leave to proceed in this action without prepayment of fees (Dkt. No. 6) is GRANTED; and it is further

ORDERED that plaintiff's original application for leave to proceed in this action without prepayment of fees (Dkt. No. 2) is DENIED as moot; and it is further

RECOMMENDED that plaintiff's complaint (Dkt. No. 1) be accepted for filing with respect to plaintiff's Fourth Amendment cause of action against defendants Mamoun, Kittle, Hauck, Altimonda, and Fiorini; and it is further

RECOMMENDED that plaintiff's remaining cause of action against the Syracuse Police Department be otherwise DISMISSED with leave to replead within thirty days of the issuance of an order adopting this recommendation; and it is further

RECOMMENDED that, in the event plaintiff does not choose to file an amended complaint and the above recommendations are adopted, the case should move forward with respect to plaintiff's Fourth Amendment cause of action against defendants Mamoun, Kittle, Hauck, Altimonda, and Fiorini.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. [5] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

**All Citations**

Not Reported in Fed. Supp., 2019 WL 981850

## Footnotes

1 Plaintiff filed both an original and amended motion to proceed in this action IFP. Dkt. Nos. 2, 6. While the two motions contain slightly different information concerning plaintiff's financial status, only the amended motion contains the required certification from an official at the correctional facility in which plaintiff is confined. *Compare* Dkt. No. 3 *with* Dkt. No. 7. Accordingly, plaintiff's original IFP application is denied as incomplete.

2 The total cost for filing a civil action in this court is $400.00, consisting of the civil filing fee of $350.00, *see* 28 U.S.C. § 1914(a), and an administrative fee of $50.00. Although an inmate granted IFP status is not required to pay the $50.00 administrative fee, he is required to pay, over time, the full amount of the $350.00 filing fee regardless of the outcome of the action. *See* 28 U.S.C. § 1915(b)(3).

3 Plaintiff is reminded that, although his IFP application has been granted, he will still be required to pay fees that he incurs in this action, including copying and/or witness fees.

4 The court expresses no opinion concerning whether plaintiff's claims can survive a properly filed motion to dismiss or motion for summary judgment, or whether he may prevail at trial.

5 If you are proceeding *pro se* and are served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 974824
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jeramie WHITE, Plaintiff,
v.
SYRACUSE POLICE DEPARTMENT; Abraham Mamoun, Syracuse Police Dept.; William Kittle, Syracuse Police Dept.; Shawn Hauck, Syracuse Police Dept.; Altimonda, Syracuse Police Dept.; and Fiorini, Syracuse Police Dept., Defendants.

5:18-CV-1471 (GTS/DEP)
|
Signed 02/28/2019

**Attorneys and Law Firms**

JERAMIE WHITE, 18-B-0311, Plaintiff, Pro Se, Cayuga Correctional Facility, P.O. Box 1186, Moravia, New York 13118.

**DECISION and ORDER**

Hon. Glenn T. Suddaby, Chief U.S. District Judge

***1** Currently before the Court, in this *pro se* civil rights action filed by Jeramie White ("Plaintiff") against the Syracuse Police Department and five of its employees ("Defendants"), is United States Magistrate Judge David E. Peebles' Report-Recommendation recommending that (1) Plaintiff's Complaint be accepted for filing by the Court with respect to Plaintiff's Fourth Amendment cause of action against Defendants Mamoun, Kittle, Hauck, Altimonda and Fiorini, and (2) Plaintiff's remaining cause of action against the Syracuse Police Department be dismissed with leave to replead within thirty days of the issuance of an Order adopting the Report-Recommendation. (Dkt. No. 9.) Plaintiff did not submit an objection to the Report-Recommendation, and the deadline by which to do so has expired. (*See generally* Docket Sheet.) [1]

Based upon a review of this matter, the Court can find no clear error in the Report-Recommendation: [2] Magistrate Judge Peebles employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court accepts and adopts the Report-Recommendation for the reasons stated therein; Plaintiff's Complaint is accepted for filing with respect to his Fourth Amendment cause of action against Defendants Mamoun, Kittle, Hauck, Altimonda and Fiorini; and Plaintiff's remaining cause of action against the Syracuse Police Department is dismissed with leave to replead within thirty days of the issuance of this Decision and Order.

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Peebles' Report-Recommendation (Dkt. No. 9) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Plaintiff's Complaint is accepted for filing with respect to Plaintiff's Fourth Amendment cause of action against Defendants Mamoun, Kittle, Hauck, Altimonda and Fiorini; and it is further

***2 ORDERED** that Plaintiff's remaining cause of action against the Syracuse Police Department is **DISMISSED with leave to replead within THIRTY (30) DAYS** of the issuance of this Decision and Order.

**ORDERED** that, in the event Plaintiff files an Amended Complaint within the above-referenced thirty-day period, it shall be referred to Magistrate Judge Peebles for review; and it is further

**ORDERED** that, in the event Plaintiff does not file an Amended Complaint within the above-referenced thirty-day period, this action shall move forward with respect to his Fourth Amendment cause of action against Defendants Mamoun, Kittle, Hauck, Altimonda and Fiorini, and the Clerk of the Court is directed to issue summonses and USM-285 forms at that time for service by the U.S. Marshal Service.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 974824

## Footnotes

1 The Court notes that, on January 11, 2019, Plaintiff filed a letter from the City of Syracuse Citizen Review Board dated December 31, 2018, outlining its findings with respect to this matter. (Dkt. No. 10.) In its letter, the Citizen Review Board upheld Plaintiff's claim for excessive force against "Det. One," recommended a written reprimand against that individual, and absolved "Det. Two," "Sgt. One," and "Lt. One" from wrongdoing regarding the use of excessive force. (*Id.*) The Court does not liberally construe this letter as any sort of Objection to the Report-Recommendation.

2 When no objection is made to a report-recommendation, the Court subjects that report-recommendation to only a clear error review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*; *see also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks omitted).

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.